IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| WARREN HILL, LLC, | : CIVIL ACTION |
| --- | --- |
| Plaintiff, | : 2:18-01228-HB |
| v. | : |
| SFR EQUITIES, LLC, | : |
| Defendant. | : |

**DEFENDANT SFR EQUITIES, LLC'S
STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT**

1. Gene Harris is one of three managers of the AHG Group ("AHG") and companies it owns. AHG is a company based in Winter Park, Florida. AHG, among other things, invests in real estate and other businesses. Declaration of Gene Harris, at ¶ 1 (hereinafter "Harris Dec.").

2. Over the years, AHG created numerous other companies that own and manage AHG's investments. Harris Dec. at ¶ 2.

3. One such company is SFR Equities, LLC ("SFR"). Harris is one of three Managers and the lead Manager of SFR. As the lead Manager, he is responsible for SFR's day-to-day operations. Harris Dec. at ¶ 3.

4. Prior to 2016, SFR made a loan to CHGO Real Estate Consulting Group, LLC owned by Brian Hynes or his family members that, in turn, owned an equity interest in Vendor Assistance Program, LLC ("VAP"). VAP is a specialty finance company that earns fees for managing trusts that purchase millions of dollars of receivables owed by the state of Illinois to its vendors. As a result, Harris generally became aware of VAP's business and knew some of its principals prior to 2016. SFR converted its debt to equity in CHGO effective January 1, 2016.

SFR also made a loan to a VAP affiliate, Healthcare Finance, LLC in 2015. Harris Dec. at ¶ 4; Declaration of Brian Hynes, at ¶ 1.

5. In 2015, Harris learned that Warren Hill, LLC, ("Warren Hill") also an investor in and lender to VAP, wished to sell its approximate 1/3 interest in VAP to a new investor. Harris Dec. at ¶ 5.

6. Negotiations between SFR and Warren Hill started in 2015 and dragged on for months. Harris negotiated with Jim Delaney representing Warren Hill and, at times, its attorney Louis Ballezzi, Esquire. The negotiations finally resulted in a written Membership Interest Purchase Agreement ("MIPA") between the parties that was signed on or about February 17, 2016, but took effect on January 1, 2016. Harris Dec. at ¶ 6.

7. Under the MIPA, Warren Hill sold its 33.246% of the membership interests of VAP (collectively the **"Interests"**)" to SFR effective January 1, 2016. Harris Dec., at Exhibit "A"; "MIPA", at 1.

8. As part of the consideration for purchase of the membership interests in VAP from Warren Hill, SFR agreed to pay an earn out, based on the revenue earned by VAP in 2016, 2017 and 2018, as follows:

> (d) Further, for each of the three years following the Closing Date, Purchaser shall, within 90 days of the end of such year, pay Seller an amount equal to 50% of VAP's Net Income (as defined below) allocable to the Interest for such year. **"Net Income"** is defined to mean (i) the sum of (A) any and all fees earned by VAP in its capacity as a manager or an administrator of (1) the Vendor Assistance Trust and/or (2) any other trust or account maintained in the course of VAP's business, (B) any and all interest income, (C) any and all fees earned from providing services to affiliates or third parties, and (D) any and all other revenues received by VAP other than the Reserve Amounts (as defined below), less (ii) the sum of (A) $50,000 per month for each month in which VAP's average outstanding receivables are greater than or equal to $50,000,000, (B) $25,000 per month for each month in which

> VAP's average outstanding receivables are less than $50,000,000, (C) interest paid by VAP on debt for which VAP is the debtor and any member of VAP is the lender solely to the extent that (1) such debt was outstanding as of the Closing Date, (2) the original principal of such debt, in the aggregate, does not exceed $4,000,000, and (3) the interest rate to which such debt is subject does not exceed 12% per annum, and (D) any consulting fees paid to any member of VAP or any third party in exchange for introducing any new business opportunity to VAP, provided that such new business opportunities exclude any business involving any vendor, payee, program or party which VAP had previously investigated, transacted with or paid any consultant with respect to. Items (A) through (D) of clause (i) of the preceding sentence are herein defined as **"Revenue"**, and items (A) through (D) of clause (ii) of the preceding sentence are herein defined as **"Expenses"**. For purposes of this Agreement, all Revenues are recognized when they are received by VAP, and all Expenses are recognized when they are paid by VAP. For purposes of clarity, Schedule 1.2(d) illustrates examples of the calculation payment of VAP's Net Income allocable to the Interest.

Harris Dec. Exhibit "A" ("MIPA"), at 2-3.

9. The MIPA contains an integration clause:

> **6.1 COMPLETE AGREEMENT.** This Agreement, including the exhibits hereto, represents the entire agreement of the parties with respect to the subject matter hereof. All prior negotiations between the parties are merged into this Agreement and there are no understandings or agreements other than those incorporated herein.

Harris Dec. Ex. "A" ("MIPA"), at 9.

10. The MIPA is governed by Illinois law:

> **6.4 GOVERNING LAW.** This Agreement shall be governed by and construed in accordance with the internal law of the State of Illinois without regard to its principles of conflicts of law.

Harris Dec. Ex. "A" ("MIPA"), at 9.

11. The MIPA contains a schedule, Schedule 1.2(d) that, "for purposes of clarity . . . illustrates an example of the calculation and payment of VAP's Net Income allocable to the "Interests". MIPA, at 3 and 13.

21816142v.2

12. Schedule 1.2(d) was prepared by Jim Delaney on behalf of Warren Hill and is set forth on a spreadsheet he prepared. Harris Dec., at ¶ 11.

13. Schedule 1.2(d), MIPA, at 18, states: "Income when received"; "Expenses when paid" and is calculated on a cash, not an accrual basis. Harris Dec. at ¶ 12 and Exh. "A" ("MIPA"), at 15.

14. When the parties, in early 2017, calculated the earn out for calendar year 2016 (the first year for which an earn out was due under the MIPA) the earn out was calculated based on cash income paid to VAP in calendar year 2016, not on an accrual basis. Harris Dec., at ¶ 13, 16.

15. In early 2017, SFR received a spreadsheet (attached to Harris Dec. at Exhibit B) from Jim Delaney acting on behalf of Warren Hill calculating the 2016 earn out on a cash basis. The spreadsheet is in a form similar to the spreadsheet Delaney also prepared that is attached as Schedule 1.2(d) to the MIPA. Harris Dec., at ¶ 10-14 and Exhibit "B" attached thereto. Compare, MIPA at 13 to Harris Dec., Ex. "B".

16. SFR paid the 2016 earn out to Warren Hill in the amount of $675,924 in two installments on March 17 and March 29, 2017 on a cash basis based on revenues received and expenses paid during 2016. Warren Hill accepted the earn out payments and never questioned the cash basis of the payments until after this litigation began. Harris Dec., at ¶ 13.

17. Brian Hynes is the founder of Vendor Assistance Program, LLC ("VAP"). He founded VAP in 2010 and has been continuously involved in its management since that time. He is also the manager of CHGO Real Estate Finance, LLC ("CHGO"). CHGO is a member of VAP. Hynes Dec., at ¶ 1.

18. Hynes is active in Illinois politics and is an attorney admitted to practice law in Illinois. He is also a business man residing in Puerto Rico. He was deposed in this case on October 17, 2018. Hynes Dec., at ¶ 2.

19. Hynes is one of VAP's six managers. Hynes has been a manager of VAP since he founded it in 2010. VAP's Operating Agreement stating that VAP's business shall be conducted by a majority vote of its Board of Managers at Article III, Sec. 3.1 is attached to the Hynes Dec. at Exh. "C." No single member of VAP controls VAP. SFR is a member of VAP and was entitled to appoint one Manager of VAP, Gene Harris. Hynes Dec., at ¶ 3.

20. In late 2016, VAP's Board of Managers, including Hynes, learned that the Federal Government issued new lender risk retention regulations, 12 CFR sec. 244.1, et. seq., that would affect VAP's business. As a result of the passage of those regulations, VAP would have to retain a 5% interest in all future securitization transactions in which VAP was the certificate holder. In 2016 and 2017 VAP was the certificate holder for numerous trusts financing millions of dollars of receivables owed to vendors by the State of Illinois. Hynes Dec., at ¶ 4.

21. After consulting with legal counsel, VAP's members decided to create a new affiliate, Bluestone Capital Markets, LLC ("BCM") as a vehicle to comply with the new risk retention regulations. Hynes Dec., at ¶ 5.

22. On or about March 15, 2017 SFR on behalf of certain of the members of VAP, filed Articles of Organization for BCM with the Florida Secretary of State. A true and correct copy of the electronic Articles of Organization for BCM attached to the Hynes Declaration as fully as though set forth at length as Exhibit "D". Hynes Dec., at ¶ 6.

23. The members of BCM entered into an Operating Agreement for BCM dated March 15, 2017 attached to the Hynes Declaration as though set forth at length as Exhibit "E". Hynes Dec., at ¶ 7.

24. VAP entered into a series of risk retention agreements with Barclay's Bank for trusts that VAP manages and for which VAP held trust certificates. The trust certificates entitle the certificate holders to residual income from each trust. The risk retention agreements (one of which is attached to the Hynes Dec. as Exhibit "F") entered into by VAP after the new regulations took effect, identify BCM as an affiliate that is the sole owner of the trust certificate issued pursuant to each trust agreement, and confirm that BCM is owned by the same persons, in the same proportionate interest therein, as the owners of VAP. As a result of entering into the risk retention agreements, VAP complied with the new federal risk retention regulations. Hynes Dec., at ¶ 8.

25. VAP transferred all its trust certificates to BCM, and all new trust certificates were created in the name of BCM. Hynes Dec., at ¶ 9.

26. On or about March 13, 2017, Hynes filed a certificate of formation of a limited liability company with the government of Puerto Rico creating a new limited liability company called Blue Stone Finance, LLC, ("BSF") 1315 Ashford Avenue PH1 San Juan, PR 00907 for the "purpose of transacting any and all lawful business for which limited liability companies may be organized under the General Corporations Law for the Commonwealth of Puerto Rico." A true and correct copy of the Certificate of Formation of Blue Stone Finance LLC is attached to the Hynes Declaration as Exhibit "G". Hynes Dec., at ¶ 10.

27.     The members of BSF entered into an Operating Agreement for BSF on or about September 5, 2017 and it is attached to the Hynes Declaration as Exhibit "H". Hynes Dec., at ¶ 11.

28.     On or about September 8, 2017 the Boards of BCM and BSF each signed unanimous written consent resolutions ratifying the Articles of Organization that were filed earlier in the year in March, 2017 and ratifying and approving the Operating Agreements for both companies. True and correct copies of the written Consent Resolutions are attached to the Hynes Declaration as fully as though set forth at length as Exhibits "I" and "J". Hynes Dec., at ¶ 12.

29.     In September and October, 2017 the Boards of VAP and BCM entered into a series of Consent Resolutions attached hereto as Exhibits "K, L, M, N, O and P" respectively transferring all the trust certificates in which VAP maintained a residual interest to BCM. These transactions were approved by VAP's lender, Bridgeview Bank, which held a security interest in the Certificates as collateral for a loan to VAP. As a result of these transactions, BCM, holds the trust certificates which will produce residual income for BCM in the future. As a result of these transactions, VAP no longer holds any interest in the trust certificates and was no longer entitled to any revenue derived from them. Hynes Dec., at ¶ 13.

30.     In the written "Consents of Managers" attached hereto as Exhibits "K", "M" and "O" the Managers of VAP stated, among other things:

> "**WHEREAS,** the Members of VAP have created Bluestone Capital Markets, LLC, a Florida limited liability company ("**Bluestone**"), and the Managers of VAP and Bluestone wish to reorganize the business and assets of VAP and Bluestone to result in (a) VAP retaining responsibility for the Trust in exchange for the Fees, and (b) Bluestone holding the Trust Certificate and all interests therein (collectively the "**Reorganization**");

21816142v.2

> **WHEREAS,** the Managers deem that the Reorganization is in
> VAP's best interests because it will permit the respective rights
> and responsibilities of VAP and Bluestone with respect to the Trust
> to be more appropriately aligned and will result in more clarity in
> the marketplace and certain economic and administrative
> advantages and effectiveness."

The Managers of BCM executed resolutions attached to the Hynes Decl. as Exhs "L", "N" and "P" containing similar language.

31.     On or about January 28, 2018 each of the VAP, BSF and BCM Boards approved a series of services agreements to document services BSF already was performing for BCM and VAP in connection with the Trusts managed by VAP beginning on or about November 1, 2017. Attached to the Hynes Declaration as Exhibits "Q", "R" and "S" are three written consent resolutions of the Boards of Managers of VAP, BSF and BCM adopting and ratifying drafts of the services agreements. Hynes Dec., at ¶ 14.

32.     Despite Hurricane Maria, BSF found office space in Puerto Rico, hired and moved several former VAP employees, and one former AHG employee, to Puerto Rico, and conducted business under the services agreements to benefit VAP, including the large volume of business that occurred in November and December 2017. At that time, the State of Illinois paid VAP millions of dollars in invoices which generated management fees for BSF. With the payment from the State of Illinois, VAP repaid the trusts managed by VAP that previously purchased the receivables that had been repaid. The trusts, in turn, repaid the lenders that had financed the purchase of the receivables. In addition, BCM earned fees for holding the trust certificates in place of VAP. Hynes Dec., at ¶ 15.

33.     BSF and BCM each are limited liability companies in good standing and filed tax returns in 2018 reporting income earned in 2017 by each limited liability company.

34. SFR paid the 2017 earn out in the amount of $633,549 on or about March 7, 2018 based on VAP's 2017 cash revenue and cash expenses and not the cash revenue or cash expenses of BCM or BSF. <u>Harris Dec.</u>, at 14.

 

                                                **WHITE AND WILLIAMS LLP**

By: _____
Michael N. Onufrak
Thomas M. Pinney
1650 Market Street, Suite 1800
Philadelphia, PA 19103
(215) 864-7174
Attorney for Defendant
SFR Equities, LLC

Dated: November 20, 2018