## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| WARREN HILL, LLC | : | CIVIL ACTION |
|---|---|---|
| Plaintiff, | : | 2:18-cv-01228 |
| v. | : | |
| SFR EQUITIES, LLC | : | |
| Defendant. | : | |

## DECLARATION OF BRIAN F. HYNES

I, Brian F. Hynes, pursuant to 28 U.S.C. §1746, under penalty of perjury, hereby declare as follows:

1.     I am the founder of Vendor Assistance Program, LLC ("VAP"). I founded the company in 2010 and have been continuously involved in its management since that time. VAP is a specialty finance company that earns its income by managing trusts that purchase millions of dollars of receivables owed by the State of Illinois to its vendors. I am also the manager of CHGO Real Estate Finance, LLC ("CHGO"). CHGO is a member of VAP.

2.     I am an attorney admitted to practice law in Illinois. I am also a business man residing in Puerto Rico. I was deposed in this case on October 17, 2018.

3.     VAP is managed by a board of six managers. I am one of the managers. I have been a manager since I founded it in 2010. VAP's Operating Agreement, stating that VAP's business shall be conducted by a majority vote of its managers at Article III, Sec. 3.1, is attached hereto as Exh. "C". No single member or manager of VAP controls VAP. SFR Equities, LLC ("SFR") is a member of VAP and is entitled to appoint one Manager of VAP, Gene Harris.

## CREATION OF BCM BY VAP'S MEMBERS TO COMPLY
## WITH FEDERAL RISK RETENTION REGULATIONS

4.      In late 2016, I and other VAP managers learned that the Federal Government

issued new lender risk retention regulations, 12 CFR Sec. 244.1, et. seq., that would affect

VAP's business.  As a result of the passage of these regulations, VAP would have to retain a 5%

interest in all future securitization transactions where VAP was the certificate holder.  In 2016

and 2017 VAP was the certificate holder for numerous trusts financing millions of dollars of

receivables owed to vendors by the State of Illinois.

5.      After consulting with legal counsel, VAP's members decided to create an

affiliate, Bluestone Capital Markets, LLC ("BCM") as the vehicle to comply with the new

federal risk retention regulations.

6.      On or about March 15, 2017, SFR, on behalf of certain of the members of VAP,

filed Articles of Organization for BCM, with the Florida Secretary of State for Bluestone Capital

Markets, LLC, attached hereto as Exh. "D".

7.      The members of BCM entered into an Operating Agreement, attached hereto as

Exh. "E", for BCM, on or about March 15, 2017.

8.      VAP entered into a series of risk retention agreements with Barclay's Bank for

trusts that VAP manages and for which VAP held trust certificates.  The trust certificates entitle

the holder of the certificate to residual income from each trust.  The risk retention agreements

entered into by VAP (an example of which is attached hereto as Exh. "F") identify BCM as an

affiliate of VAP that is the sole owner of the trust certificate issued pursuant to each trust

agreement and confirm that BCM is owned by the same persons, in the same proportionate

interest therein, as owners of VAP.  Exh. "F", at 4.  As a result of entering into the risk retention

agreements, VAP complied with the new federal risk retention regulations.

-2-

9.      VAP transferred all its trust certificates to BCM, and all new trust certificates were created in the name of BCM after its creation.

## CREATION OF BSF BY VAP'S MEMBERS TO TAKE ADVANTAGE OF PUERTO RICO TAX LAW

10.     On or about March 13, 2017, I filed a certificate of formation of a limited liability company, attached hereto as Exh. "G", with the government of Puerto Rico creating a new limited liability company called Blue Stone Finance, LLC ("BSF"), at 1315 Ashford Avenue PH1 San Juan, PR 00907, for the "purpose of transacting any and all lawful business for which limited liability companies may be organized under the General Corporations Law for the Commonwealth of Puerto Rico."

11.     The members of BSF entered into an Operating Agreement, attached hereto as Exh. "H", for BSF on or about September 5, 2017.

12.     On or about September 8, 2017 the Board of Managers of BCM and BSF signed the unanimous written consent resolutions, attached hereto as Exhs. "I" and "J", ratifying the Articles of Organization that were filed earlier in the year in March 2017 and ratifying and approving the Operating Agreements for both new companies.

13.     In September and October, 2017 the Boards of VAP and BCM entered into a series of Consent Resolutions attached hereto as Exhibits "K, L, M, N, O and P" respectively transferring all the trust certificates in which VAP maintained a residual interest to BCM. These transactions were approved by VAP's lender, Bridgeview Bank, which held a security interest in the Certificates as collateral for a loan to VAP. As a result of these transactions, BCM holds trust certificates which will produce residual income for BCM in the future in exchange for its retaining the 5% risk retention required by the new regulations. As a result of these transactions,

-3-

VAP no longer holds any interest in the trust certificates and is no longer entitled to any revenue derived from them.

14.     In the written "Consents of Managers" attached hereto as Exhibits "K", "M" and "O" the Managers of VAP stated, among other things:

> "**WHEREAS,** the Members of VAP have created Bluestone Capital Markets, LLC, a Florida limited liability company ("**Bluestone**"), and the Managers of VAP and Bluestone wish to reorganize the business and assets of VAP and Bluestone to result in (a) VAP retaining responsibility for the Trust in exchange for the Fees, and (b) Bluestone holding the Trust Certificate and all interests therein (collectively the "**Reorganization**");
>
> **WHEREAS,** the Managers deem that the Reorganization is in VAP's best interests because it will permit the respective rights and responsibilities of VAP and Bluestone with respect to the Trust to be more appropriately aligned and will result in more clarity in the marketplace and certain economic and administrative advantages and effectiveness."

The Managers of BCM executed resolutions attached hereto as Exhs "L", "N" and "P" containing similar language.

15.     On or about January 28, 2018, each of the Boards of Managers of VAP, BSF and BCM approved a series of services agreements under which BSF was compensated for performing services for the trusts managed by VAP.  Likewise, under the services agreements, BCM was compensated by the Trusts managed by VAP for holding the trust certificates.  True and correct copies of the written consent resolutions of the Boards of Managers of VAP, BSF and BCM adopting and ratifying the services agreements are attached hereto as Exhibits "Q", "R", and "S".

16.     Despite Hurricane Maria, BSF found office space in Puerto Rico, hired and moved several former VAP employees, and one former AHG employee, to Puerto Rico, and conducted business under the services agreements to benefit VAP, including the large volume of

21805926v.1

business that occurred in November and December 2017. At that time, the State of Illinois repaid VAP for millions of dollars in invoices that it had purchased which generated management fees for BSF. With the payment from the State of Illinois, VAP repaid the trusts managed by VAP that previously purchased the receivables that had been repaid. The trusts, in turn, repaid the lenders that had financed the purchases. In addition, BCM earned fees for holding the trust certificates in place of VAP.

17.    BSF and BCM each are limited liability companies in good standing and filed tax returns in 2017 reporting income earned in 2017 by each limited liability company.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed this 20th day of November     .

BRIAN F. HAYNES

# EXHIBIT "C"

EXECUTION VERSION

**Second Amended and Restated
Operating Agreement**

of

**Vendor Assistance Program, LLC,
an Illinois Limited Liability Company**

**Effective as of September 21, 2012**

2087462v6

CONFIDENTIAL

SFR 23246

## SECOND AMENDED AND RESTATED OPERATING AGREEMENT

THIS Second Amended and Restated Operating Agreement (this "Operating Agreement") is made and entered into as of September 21, 2012 (the "Effective Date"), by and among those Persons (as hereinafter defined) who executed a counterpart of this Operating Agreement as a Member (referred to herein individually as a "Member" and collectively as the "Members").

### BACKGROUND

WHEREAS, Vendor Assistance Program, LLC (the "Company") was organized as a limited liability company under the laws of the State of Illinois on or about September 23, 2010;

WHEREAS, the Company and certain of its Members previously entered into that certain Operating Agreement dated on or about September 23, 2010 (the "Initial Agreement");

WHEREAS, the Company and certain of its Members previously entered into that certain First Amended and Restated Operating Agreement dated on or about March 19, 2012 (the "Amended and Restated Agreement") which amended and restated the Initial Agreement;

WHEREAS, the Company and the requisite Members have executed consents approving (i) the amendment and restatement of the Amended and Restated Agreement as set forth in this Operating Agreement, (ii) the purchase of all of VAP Emerald Investors LLC's Membership Interests by NAI Ark Funding LLC ("NAI"), (iii) the assignment of a nine percent (9%) Membership Interest owned by NAI to Warren Hill LLC ("Warren Hill"), (iv) the assignment of a twenty-six percent (26%) Membership Interest owned by Brian F. Hynes to CHGO Real Estate Consulting Group, LLC, (v) the assignment of a two and one-half percent (2.5%) Membership Interest owned by Brian F. Hynes to NAI, (vi) the repurchase by the Company of a ten percent (10%) from NAI, (vii) the assignment of a two and one-half percent (2.5%) Membership Interest owned by Brian F. Hynes to Warren Hill, (viii) the issuance of a one percent (1%) Membership Interest by the Company to Drew Delaney, (ix) the issuance of a five percent (5%) Membership Interest by the Company to JRB CA, LLC ("JRB") which is an Affiliate of J. Richard Blewitt ("Blewitt"), (x) the issuance of a five percent (5%) Membership Interest by the Company to North Fork Capital, LLC ("North Fork") which is an Affiliate of James Neumann ("Neumann"), and (xi) the assignment one percent (1%) Membership Interest owned by David Reape ("Reape") to NAI, which is an Affiliate of Reape;

WHEREAS, the parties hereto wish to amend and restate the Amended and Restated Agreement, as hereafter amended and restated, in its entirety, as of the Effective Date;

WHEREAS, VAP Emerald Investors LLC's entire membership interest in the Company has been purchased by NAI, and accordingly, VAP Emerald Investors LLC is no longer be a Member of the Company;

WHEREAS, Kevin F. Flynn and John P. McMahon have resigned from any and all positions formerly held by such individuals with the Company;

WHEREAS, the Company and BN Capital LLC have entered into that certain Consulting Agreement dated as of July 24, 2012 (the "Consulting Agreement"); and

2

CONFIDENTIAL

SFR 23247

WHEREAS, the Members hereby enter into this Operating Agreement to provide for the governance of the Company and the conduct of its business and to specify their relative rights and obligations.

NOW, THEREFORE, the Members agree as follows:

## ARTICLE I.

## DEFINITIONS

1.1    Definitions.  The following terms used in this Operating Agreement shall have the following meanings:

(a)    "Act" shall mean the Illinois Limited Liability Company Act at 805 ILCS 180/1-5, et seq., as amended.

(b)    "Affiliate" shall mean with respect to any specified Person, (i) any Person that directly or indirectly controls, is controlled by, or is under common control with such specified Person, or (ii) if such specified Person is an individual, any person that is an Immediate Family Relation of such specified Person, or if such specified Person is an entity controlled by an individual, an Immediate Family Relation of such individual controlling such specified Person. A Person shall be deemed to be "controlled by" any other Person if such Person possesses, directly or indirectly, power to vote ten percent (10%) or more of the securities (on a fully diluted basis) having ordinary voting power for the election of directors or managers or power to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

(c)    "Affiliate Agreement" shall have the meaning set forth in Section 3.3.

(d)    "Affiliate Member" shall mean, with respect to any Manager appointed pursuant to Section 3.2, the Member who appointed such Manager or in which such Manager holds a direct or beneficial interest or is an Affiliate thereof.

(e)    "Articles of Organization" shall mean the Articles of Organization of the Company, as filed with the Secretary of State of Illinois, on September 23, 2010, as amended from time to time.

(f)    "Capital Account" as of any given date shall mean the Capital Contribution to the Company by a Member as adjusted up to such date pursuant to Article 7.

(g)    "Capital Contribution" shall mean any contribution to the capital of the Company in cash or property by a Member whenever made.

(h)    "Capital Markets Committee" shall have the meaning as set forth in Section 3.4(a).

(i)    "Cause" shall mean, with respect to a Manager or a member of a specified committee, as applicable, (i) such Person's conviction or guilty plea as to a felony involving moral

3

CONFIDENTIAL

SFR 23248

turpitude or (ii) such Person's fraud, embezzlement or theft against the Company or any Affiliate of the Company.

      (j)     "Code" shall mean the Internal Revenue Code of 1986 or corresponding provisions of subsequent superseding federal revenue laws, as amended.

      (k)     "Company" is defined in the preamble to this Operating Agreement.

      (l)     "Compensation Committee" shall have the meaning set forth in Section 3.4(b).

      (m)     "Confidential Information" shall have the meaning as set forth in Section 11.1.

      (n)     "Covered Person" shall mean as of any time of determination: (i) any then-current or former Member or Manager; (ii) any Affiliate of a then-current or former Member or Manager; (iii) any then-current or former officer, director, manager, stockholder, partner, member, employee, advisor, representative or agent of any current or former Member or any of their respective Affiliates; or (iv) except as otherwise determined by the Board of Managers, any then-current or former officer, employee, advisor, representative or agent of the Company.

      (o)     "Deficit Capital Account" shall mean with respect to any Interest Holder, the deficit balance, if any, in such Interest Holder's Capital Account as of the end of the taxable year, after giving effect to the following adjustments:

      1)     credit to such Capital Account any amount which such Interest Holder is treated as obligated to restore under Section 1.704-1(b)(2)(ii)(c) of the Treasury Regulations, as well as any addition thereto pursuant to the next to last sentence of Sections 1.704-2(g)(1) and (i)(5) of the Treasury Regulations, after taking into account thereunder any changes during such year in partnership minimum gain (as determined in accordance with Section 1.704-2(d) of the Treasury Regulations) and in the minimum gain attributable to any partner for nonrecourse debt (as determined under Section 1.704-2(i)(3) of the Treasury Regulations); and

      2)     debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4),(5) and (6) of the Treasury Regulations.

This definition of Deficit Capital Account is intended to comply with the provisions of Treasury Regulation Sections 1.704-1(b)(2)(ii)(d) and 1.704-2, and will be interpreted consistently with those provisions.

      (p)     "Distributable Cash" shall mean all cash, revenues and funds received by the Company from Company operations, less the sum of the following to the extent paid or set aside by the Company: (i) all principal and interest payments on indebtedness of the Company and all other sums paid to lenders; (ii) all cash expenditures incurred in the normal operation of the Company's business; (iii) such Reserves as the Managers deem reasonably necessary for the proper operation of the Company's business.

      (q)     "Economic Interest" shall mean an Interest Holder's share of one or more of the Company's Net Profits, Net Losses and distributions of the Company's assets pursuant to this

4

**CONFIDENTIAL**

SFR 23249

Operating Agreement and the Act, but shall not include any right to participate in the management or affairs of the Company, including, the right to vote on, consent to or otherwise participate in any decision of the Members or Managers.

(r)      "Employee Interests" means Interests which are issuable or issued to employees, directors or consultants of the Company pursuant to a Membership Interest option agreement or Membership Interest purchase, warrant or other equity incentive plan or arrangement approved by the Board of Managers.

(s)      "Entity" shall mean any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative, association, foreign trust or foreign business organization.

(t)      "Fiscal Year" shall have the meaning set forth in Section 7.10.

(u)      "Gifting Member" shall mean any Member / Interest Holder who Transfers for no consideration (by operation of law or otherwise, except with respect to bankruptcy) all or any part of its Membership Interest or Economic Interest outstanding.

(v)      "Immediate Family Relation" shall mean (i) with respect to any individual, his ancestors, spouse, issue, spouses of issue, any trustee or trustees, including successor and additional trustees, principally for the benefit of any one or more of such individuals, and any entity or entities all of the beneficial owners of which are such trusts and/or such individuals, but (ii) with respect to a legal representative, the Immediate Family Relation of the individual for whom such legal representative was appointed and (iii) with respect to a trustee, the Immediate Family Relation of the individuals who are the principal beneficiaries of the trust.

(w)      "Indemnifiable Losses" shall have the meaning set forth in Section 11.2(c).

(x)      "Initial Capital Contribution" shall mean the initial contribution to the capital of the Company by a Member as set forth on the Exhibit A hereto.

(y)      "Interest" shall mean an Economic Interest or a Membership Interest.

(z)      "Interest Holder" shall mean either a Member holding an Economic Interest or the Transferee of a Member's Economic Interest.

(aa)      "Majority Interest" shall mean one or more Membership Interests of Members which in the aggregate exceed fifty percent (50%) of all Membership Interests.

(bb)      "Manager" or "Managers" shall mean one or more Person(s) named as such pursuant to Article 3.   References to the Manager in the singular or the plural, or as him, her, it, itself, or other like references shall also, where the context so requires, be deemed to include the singular or the plural and the masculine or feminine reference, as the case may be.

(cc)      "Member" shall mean each of the parties who executes a counterpart of this Operating Agreement as a Member and each of the parties who may hereafter become Members in

**CONFIDENTIAL**

SFR 23250

accordance with the terms and conditions herein. To the extent a Manager has purchased a Membership Interest in the Company, he will have all the rights of a Member with respect to such Membership Interest, and the term "Member" as used herein shall include a Manager to the extent he has purchased such Membership Interest in the Company. If a Person is a Member immediately prior to the purchase or other acquisition by such Person of an Economic Interest, such Person shall have all the rights of a Member with respect to such purchased or otherwise acquired Membership Interest or Economic Interest, as the case may be.

(dd)   "Membership Interest" shall mean, as set forth in Exhibit A, a Member's entire interest in the Company, including such Member's Economic Interest and ownership interest in the Company, and the right to participate in the management of the business and affairs of the Company, including the right to vote on, consent to, or otherwise participate in any decision or action of or by the Members granted pursuant to this Operating Agreement and the Act.

(ee)   "Membership Interest Certificates" shall have the meaning set forth in Section 5.12.

(ff)   "Net Profits" and "Net Losses" shall mean the income, gain, loss, deductions and credits of the Company in the aggregate or separately stated, as appropriate, determined in accordance with generally accepted accounting principles applied on a consistent basis at the close of each fiscal year on the Company's tax return filed for federal income tax purposes.

(gg)   "New Issuance Closing Date" shall have the meaning as set forth in Section 8.5(a).

(hh)   "New Issuance Notice" shall have the meaning as set forth in Section 8.5(a).

(ii)   "New Securities" shall have the meaning as set forth in Section 8.5(a).

(jj)   "Operating Agreement" shall mean this Operating Agreement as originally executed and as amended from time to time.

(kk)   "Option Interest" shall have the meaning set forth in Section 8.2(e).

(ll)   "Outstanding Member Loans" shall have the meaning set forth in Section 3.3.

(mm)   "Percentage Interest" as to (i) a Member means a fraction (expressed as a percentage rounded to the third decimal point), the numerator of which is the Membership Interest owned by such Member at the time of determination and the denominator of which is the Membership Interests owned by all Members at the time of determination and (ii) an Interest Holder means a fraction (expressed as a percentage rounded to the third decimal point), the numerator of which is the Economic Interest owned by such Interest Holder at the time of determination and the denominator of which is the Interests owned by all Interest Holders at the time of determination.

(nn)   "Persons" shall mean any individual or Entity, and the heirs, executors, administrators, legal representatives, successors, and assigns of such "Person" where the context so permits.

6

**CONFIDENTIAL**

SFR 23251

(oo)   "Preemptive Right Holder" shall have the meaning as set forth in Section 8.5(a).

(pp)   "Primary Option" shall have the meaning set forth in Section 8.2(b).

(qq)   "Primary Option Member" shall have the meaning set forth in Section 8.2(c).

(rr)   "Proportionate Percentage" shall have the meaning as set forth in Section 8.5(a).

(ss)   "Purchaser" shall have the meaning set forth in Section 8.4(a).

(tt)   "Reserves" shall mean funds set aside or amounts allocated to reserves which shall be maintained in amounts deemed sufficient by the Mangers for working capital and to pay taxes, insurance, debt service or other costs or expenses incident to the ownership or operation of the Company's business.

(uu)   "Secondary Option" shall have the meaning set forth in Section 8.2(c).

(vv)   "Sellers" shall have the meaning set forth in Section 8.4(a).

(ww)   "Selling Member" shall mean any Member / Interest Holder which sells, assigns, pledges, hypothecates or otherwise Transfers for consideration all or any portion of its Membership Interest or Economic Interest.

(xx)   "Subject Purchasers" shall have the meaning as set forth in Section 8.5(a).

(yy)   "Super-Majority Interest" shall mean one or more Membership Interests of Members which in the aggregate exceed sixty-seven percent (67%) of all Membership Interests.

(zz)   "Tag-Along Amount" shall have the meaning set forth in Section 8.4(a).

(aaa)   "Tag-Along Members" shall have the meaning set forth in Section 8.4(a).

(bbb)   "Tag-Along Notice" shall have the meaning set forth in Section 8.4(b).

(ccc)   "Tag-Along Right" shall have the meaning set forth in Section 8.4(a).

(ddd)   "Tax Distribution" shall have the meaning as set forth in Section 7.5(b).

(eee)   "Transfer" shall mean, as to any Interest, to sell, transfer, assign, gift, pledge, grant a security interest in, encumber or otherwise dispose of, such interest.

(fff)   "Transferring Member" shall mean a Selling Member or a Gifting Member.

(ggg)   "Treasury Regulations" shall include proposed, temporary and final regulations promulgated under the Code.

7

CONFIDENTIAL

SFR 23252

(hhh)   "Withdrawal Event" shall occur upon the death, resignation, bankruptcy or dissolution of a Member, or the occurrence of any other event which terminates the continued membership of a Member in the Company.

## ARTICLE II.

## FORMATION OF COMPANY

2.1     **Formation.** The Company was formed as a limited liability company under the Act by a filing of the Articles of Organization with the Illinois Secretary of State. The Managers shall cause, to the extent appropriate under the circumstances, the execution and filing of such documents with the Secretary of State of any other state in which the Company may be carrying on business as may be required to qualify the Company as a foreign limited liability company in that state.

2.2     **Name.** The name of the Company is Vendor Assistance Program, LLC.

2.3     **Principal Place of business.** The principal place of business of the Company shall be in Chicago, Illinois. The Company may locate its places of business and registered office at any other place or places as the Managers may deem advisable.

2.4     **Registered Office and Registered Agent.** The Company's registered office shall be at the office of its registered agent at 211 Fulton Street, Suite 600, Peoria, IL 61602, and the name of its registered agent is Theodore L. Eissfeldt. The registered office and registered agent may be changed by filing the address of the new registered office and/or the name of the new registered agent with the Illinois Secretary of State pursuant to the Act.

2.5     **Business Purpose.** The business purpose of the Company shall be the transaction of any or all lawful business for which limited liability companies may be organized under the Act.

2.6     **Term.** The term of existence of the Company shall commence on the effective date of filing of Articles of Organization with the Illinois Secretary of State, and shall continue until termination of the Company in accordance with the provisions of this Operating Agreement, or sooner as provided by law.

## ARTICLE III.

## RIGHTS AND DUTIES OF MANAGERS

3.1     **Management.** Subject to Article 6, the business and affairs of the Company shall be managed by its Managers and the Managers shall direct, manage and control the business of the Company in accordance with the terms and conditions of this Operating Agreement. Except for situations in which the approval of the Members or a specified committee of the Board of Managers is expressly required by this Operating Agreement or by non-waivable provisions of the Act, the Managers shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to

8

**CONFIDENTIAL**

SFR 23253

perform any and all other acts or activities customary or incident to the management of the Company's business subject to the terms and conditions of this Operating Agreement. Except as otherwise set forth in this Operating Agreement, all decisions concerning the management of the Company's business shall be made by a vote of a majority of the Managers constituting a quorum and shall be the actions of the Company.

    3.2    **Number, Tenure and Qualifications.**  The Company shall initially have eight (8) Managers who are set forth in Exhibit A. The number of Managers of the Company shall be fixed from time to time by the affirmative vote of Members holding a Majority Interest in the Company. In no instance shall there be less than one Manager. Subject to the below, the affirmative vote of Members holding a Majority Interest shall elect each Manager, who shall hold office until his successor shall have been elected and shall have qualified. Managers need not be Members of the Company. Notwithstanding the above, it is agreed that so long as each of Patti Solis Doyle, Dustin Mauldin, Neumann, Blewitt, Reape, Drew Delaney, a natural person to be designated by Howard & Howard Attorneys PLLC within fourteen (14) days following the Effective Date (the "H&H Designee"), and a natural person to be designated by CHGO Real Estate Consulting Group, LLC within fourteen (14) days following the Effective Date (the "CHGO Designee") shall have an Affiliate Member, each shall at all times be a Manager of the Company (or shall have the right (either himself or herself, or through his or her Affiliate Member, as applicable) to appoint a designee to serve as Manager of the Company), until such Manager's earlier death, resignation or removal for Cause. In the event of the death, resignation or disability of any of the foregoing Managers, his or her Affiliate Member, or the Member by whom such Manager was designated, shall have the right to appoint a successor designee to the Board of Managers. The size of the Board of Managers shall at all times be no less than the number of designees to which the parties hereto are entitled as set forth in this Section 3.2. For the avoidance of doubt, and notwithstanding anything in this Operating Agreement to the contrary, no Manager appointed pursuant to this Section 3.2 shall be subject to removal from the Board of Managers, other than as a result of his or her death, disability or removal for Cause. Blewitt and Neumann will serve as chairman of the Board of Managers on a rotating basis so long as the Consulting Agreement is in effect. The position of chairman of the Board of Managers will preside at meetings of the Board of Managers unless (i) otherwise agreed among the Chairman then serving and a majority of the other Managers with respect to any meetings of the Board of Managers or (ii) the Chairman fails to appear at a meeting of the Board of Managers after having received proper notice of such meeting in accordance with Section 3.15; provided, that any Manager may raise any issue for discussion or action at any meeting of the Board of Managers.

    3.3    **Certain Powers of Managers.**  Without limiting the generality of Section 3.1 and subject to last paragraph of this Section 3.3 and Section 3.4, the Managers shall have responsibility to the Company, and power and authority, on behalf of the Company:

    (a)    To acquire property from any Person as the Managers may determine, whether or not such Person is directly or indirectly affiliated or connected with any Manager or Member;

    (b)    To borrow money for the Company from banks, other lending institutions, the Managers, Members, or affiliates of the Managers or Members on such terms as the Managers deem appropriate, and in connection therewith, to hypothecate, encumber and grant security interests in the assets of the Company to secure repayment of the borrowed sums. No debt shall be contracted or

**CONFIDENTIAL**

SFR 23254

liability incurred by or on behalf of the Company except by the Managers, or to the extent permitted under the Act, by agents or employees of the Company expressly authorized to contract such debt or incur such liability by the Managers;

    (c)    To purchase liability and other insurance to protect the Company's property and business;

    (d)    To hold and own real and personal properties in the name of the Company;

    (e)    To invest Company funds in time deposits, short-term governmental obligations, commercial paper or other investments;

    (f)    Upon the affirmative vote of the Members holding at least a sixty seven (67%) of the Membership Interests, to sell or otherwise dispose of all or substantially all of the assets of the Company as part of a single transaction or plan as long as such disposition is not in violation of or a cause of a default under any other agreement to which the Company may be bound;

    (g)    To execute on behalf of the Company all instruments and documents, including, without limitation, checks; drafts; notes and other negotiable instruments; mortgages or deeds of trust; security agreements; financing statements; documents providing for the acquisition, mortgage or disposition of the Company's property; assignments, bills of sale; leases; and any other instruments or documents necessary to the business of the Company;

    (h)    To engage, employ, and terminate accountants, legal counsel, managing agents or other experts to perform services for the Company; provided, that Howard & Howard Attorney PLLC is an approved legal counsel for the Company;

    (i)    To enter into any and all other agreements on behalf of the Company, in such forms as the Managers may approve;

    (j)    To elect the officers of the Company as set forth in Article 6;

    (k)    To prepare annual budgets and business plans for the Company;

    (l)    To do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business; and

    (m)    To cause the actions set forth in clauses (a) through (l) above.

Notwithstanding the foregoing, the Company will first provide (10) days advance written notice to each of JRB and North Fork in accordance with Section 12.1 herein prior to the execution of any agreement or completion of any transaction (each an "Affiliate Agreement") with any Member, Manager, or any Affiliate of any Member or Manager (each, an "Affiliated Person") (other than an employment agreement that is an Affiliate Agreement, which shall be handled under the terms and conditions contained within Section 3.4(b) herein); provided, that the following agreements are acknowledged and approved as acceptable by each of JRB and North Fork: (w) that certain Consulting Agreement by and between the Company and Brian F. Hynes dated as of August 30,

10

**CONFIDENTIAL**

SFR 23255

2012, (x) that certain Loan Agreement dated as of December 31, 2011, by and between Warren Hill and the Company, as amended by that certain First Amendment to Loan Agreement dated March 19, 2012 by and between Warren Hill and the Company and the "Loan Documents" (as defined therein), (y) (A) that certain Loan and Security Agreement by and between NAI and the Company dated July 25, 2012, and (B) that certain Promissory Note dated July 25, 2012 executed by the Company in favor of NAI in original face amount of $400,000, and (C) the other "Loan Documents" (as defined therein), and (z) (A) that certain Loan Agreement by and between NAI and the Company dated July 25, 2012, (B) that certain Revolving Note dated July 25, 2012 executed by the Company in favor of NAI in original face amount of $1,000,000 and (C) the other "Loan Documents" (as defined therein) (clauses (x) through (z) collectively, the "Outstanding Member Loans"); provided, further, there shall be excluded from the provisions of this Section 3.3, any agreement or agreements with an Affiliated Person(s) which contain terms that are no less favorable to the Company than those which might be obtained from a third party which is not an Affiliated Person and which do not have an aggregate annual value in excess of $10,000. If each of JRB and North Fork fails to take action within the ten (10) day period described in the foregoing sentence, the Company will provide a second written notice to each of JRB and North Fork in accordance with Section 12.1 herein. At any time during either of such aforementioned two ten (10) day periods, either of JRB or North Fork may prohibit the Company from entering into such agreement or transaction if it so elects to do so by providing written notice to the Company in accordance with Section 12.1 herein. If each of JRB and North Fork fails to take action prior to the expiration of such aforementioned second ten (10) day period, each of JRB and North Fork shall have waived its right to object to such agreement or transaction.

3.4     Special Committees.

(a)     Capital Markets Committee. Subject to the terms and conditions contained within this Section 3.4(a), the Board of Managers shall form a two-Manager committee which shall be delegated the authority to make all decisions on matters directly related to transactions pursuant to which the Company incurs indebtedness including through securitization transactions and all actions directly related thereto (the "Capital Markets Committee"); provided, that (i) any decisions regarding the issuance of equity (including the issuance of any interests in the Company that are exercisable for, convertible into, exchangeable for, or issuable as, equity interests of the Company) which will have a dilutive effect on the equity ownership interest of any Member or (ii) any contract or agreement with Neumann or Blewitt (or any Affiliate of either individual) entered into after the date of this Operating Agreement pursuant to which either Neumann or Blewitt (or any Affiliate of either individual) receives payments from the Company or shares any proceeds with or otherwise to be received by the Company, will in each case be subject to the approval of the Board of Managers (it being understood that the Capital Markets Committee shall retain the authority with respect to any transaction related to the incurrence of debt related to such contract or agreement).

1)     For the avoidance of doubt, for any proposed transaction contemplating both an issuance of equity (including the issuance of any interests in the Company that are exercisable for, convertible into, exchangeable for, or issuable as, equity interests of the Company) and an issuance or incurrence of debt by the Company, (i) the Capital Markets Committee shall have the authority to make decisions on all matters relating to such debt, but not such equity issuance and (ii) the Board of Managers shall have the authority to reject any debt transaction if the issuance of any equity (including the issuance of any securities in the Company that are exercisable

11

CONFIDENTIAL

SFR 23256

for, convertible into, exchangeable for, or issuable as, equity securities of the Company) is a condition to the incurrence of such debt transaction.

2)    The members of the Capital Markets Committee shall be Blewitt and Neumann and they shall be the sole members of the Capital Markets Committee. The Capital Markets Committee shall continue until the earliest to occur of the following: (i) the Consulting Agreement is terminated for Cause as defined thereunder; (ii) the Consulting Agreement is terminated without Cause as defined thereunder; (iii) the term of the Consulting Agreement expires as provided thereunder; or (iv) both Blewitt and Neumann are no longer able to serve as a result of their respective death and/or disability. Notwithstanding anything contained herein to the contrary, in the event the earliest of the foregoing to occur is subparagraph (ii), the Capital Markets Committee shall continue in effect for a period of three (3) months following such termination without Cause (and Blewitt and Neumann shall continue to be members thereof during such three (3) month period, and members of the Board of Managers from and after such three (3) month period subject only to the terms and conditions of Section 3.2 herein). Notwithstanding anything contained herein to the contrary, in the event one of Blewitt and Neumann is no longer able to serve on the Capital Markets Committee as a result of death or disability, but the other of Blewitt and Neumann is able to serve on the Capital Markets Committee, the position occupied by the Capital Markets Committee member who is no longer able to serve on the Capital Markets Committee as a result of death or disability shall remain vacant and thereafter the Capital Markets Committee shall only be comprised of one member. Following the discontinuation of the Capital Markets Committee as provided under this Section 3.4(a), the powers granted to the Capital Markets Committee under this Section 3.4 shall revert back to the Board of Managers.

(b)    Compensation Committee. The Board of Managers shall form a Manager committee which shall be delegated the authority to make all decisions on matters directly related to employment agreements or employee compensation (the "Compensation Committee"). The Compensation Committee shall comprise four (4) Board of Managers; provided, that a Manager who serves on the Compensation Committee will not be eligible to receive compensation from the Company solely in their capacity as an employee or executive of the Company. The initial members of the Compensation Committee shall be the following Managers: (i) Dustin Mauldin, (ii) the H&H Designee, (iii) the CHGO Designee, and (iv) Neumann. Notwithstanding anything contained herein to the contrary, any decisions on matters directly related any employment agreement or employee compensation that is an Affiliate Agreement shall require the approval of Neumann; provided, however, in the event that Neumann does not approve an employment agreement or employee compensation that is an Affiliate Agreement, such employment agreement or employee compensation may be approved by the Board of Managers so long as the Board of Managers determines, in its reasonable judgment, that such employment agreement contains terms that are no less favorable to the Company than those which might be obtained from a third party which is not an Affiliated Person. Notwithstanding the foregoing or anything contained herein to the contrary, Neumann acknowledges and approves the current employee compensation arrangement between the Company and Drew Delaney.

3.5    No Third-Party or Member Authority. Unless authorized to do so by this Operating Agreement or by the Managers of the Company, no attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge

12

CONFIDENTIAL

SFR 23257

its credit or to render it liable for any purpose. No Member shall have any power or authority to bind the Company unless the Member has been authorized by the Managers to act as an agent of the Company in accordance with the previous sentence.

3.6    **Liability for Certain Acts.** Each Manager shall perform his duties as Manager in good faith. A Manager shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, gross negligence, willful misconduct or a wrongful taking by the Manager.

3.7    **Managers Have No Exclusive Duty to Company.** A Manager who is not employed by or serving as an officer of the Company shall not be required to manage the Company as his or her sole and exclusive function and he or she may have other business interests and engage in activities in addition to those relating to the Company on or prior to the date hereof, and may continue after the date hereof, including to make investments in (by way of capital contributions, loans or otherwise) or providing services to Persons engaged in businesses that directly or indirectly compete with business of the Company and its Affiliates as conducted from time to time. Neither the Company nor any Member shall have any right, by virtue of this Operating Agreement, to share or participate in such other investments or activities of the Manager who is not employed by or serving as an officer of the Company or to the income or proceeds derived therefrom.

3.8    **Bank Accounts.** The Managers may from time to time open bank accounts in the name of the Company, and at least two Managers shall be the sole signatories thereon.

3.9    **Resignation.** Any Manager of the Company may resign at any time by giving written notice to the Members of the Company. The resignation of any Manager shall take effect upon receipt of notice thereof or at such later date specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. The resignation of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of a Member.

3.10    **Removal.** Subject to the limitations provided in Section 3.2 herein, at a meeting called expressly for that purpose, all or any lesser number of Managers may be removed at any time, with or without cause, by the affirmative vote of Members holding a sixty-seven percent (67%) Membership Interest. The removal of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of a Member.

3.11    **Vacancies.** Subject to the limitations in Section 3.2 herein, any vacancy occurring for any reason (other than an increase in the number of Managers of the Company) may be filled by the affirmative vote of Members holding a Majority Interest and any Manager's position to be filled by reason of an increase in the number of Managers shall be filled by the election at a meeting of Members called for that purpose or by the Members' written consent of Members holding a Majority Interest in the Company. A Manager elected to fill a vacancy shall be elected for the unexpired term of his predecessor in office and shall hold office until the expiration of such term and until his successor shall be elected and qualified or until his earlier death, resignation or removal. A Manager chosen to fill a position resulting from an increase in the number of Managers shall hold office until his successor shall be elected and qualified, or until his earlier death, resignation or removal.

**CONFIDENTIAL**

SFR 23258

3.12   **Salaries.**  The salaries and other compensation of the Managers shall be fixed from time to time by the Managers, and no Manager shall be prevented from receiving such salary because he is also a Member of the Company.

3.13   **Meetings.**  Meetings of the Managers, for any purpose or purposes, may be called by any Manager.  Action to be taken by the Managers shall be by simple majority of all the Managers constituting a quorum.  A quorum at any meeting of Managers shall consist of a majority of Managers, represented in person or by proxy.  The Managers present at a duly called or held meeting at which a quorum is present may continue to transact business until adjournment, notwithstanding the early departure of a sufficient number of Managers from the meeting to leave less than a quorum, if the action taken, other than adjournment, is approved by the requisite voting majority of Managers as specified in this Operating Agreement or the Act.

3.14   **Place of Meetings.**  The Managers may designate any place, either within or outside the State of Illinois, as the place of meeting for any meeting of the Managers.  If no designation is made, the place of meeting shall be the principal place of business of the Company in the State of Illinois.

3.15   **Notice of Meetings.**  Except as otherwise provided in this Operating Agreement, written notice stating the place, day and hour of the meeting and the purpose or purposes for which the meeting is called shall be delivered not less than three (3) days nor more than thirty (30) days before the date of the meeting, either personally or by mail per Section 12.1, or by electronic communications with confirmation of receipt, by the Manager calling the meeting, to each Manager entitled to vote at such meeting.  If mailed, such notice shall be deemed to be delivered two (2) calendar days after being deposited in the United States mail, addressed to the Manager at his or her address as it appears on the books of the Company, with postage thereon prepaid.

3.16   **Meeting of All Managers.**  If all of the Managers shall meet at any time and place, either within or outside of the State of Illinois, and not object to the holding of a meeting at such time and place, such meeting shall be valid without call or notice, and at such meeting lawful action may be taken.  Managers may join the meeting telephonically or via video chat in accordance with Section 3.19 herein.

3.17   **Action by Managers Without a Meeting.**  Action required or permitted to be taken at a meeting of Managers may be taken without a meeting if the action is evidenced by one or more written consents describing the action taken, signed by each Manager entitled to vote and delivered for inclusion in the minutes or for filing with the Company records.  Action taken under this Section is effective when all Managers entitled to vote have signed the consent, unless the consent specifies a different effective date.

3.18   **Waiver of Notice.**  When any notice is required to be given to any Manager, a waiver thereof in writing signed by the person entitled to such notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of such notice; provided, that any notice which is required with respect to a meeting will be deemed to have been given if a Manager is present at such meeting and such Manager does not object to such Manager's failure to receive a timely notice of such meeting.

14

**CONFIDENTIAL**

SFR 23259

3.19   **Telephonic Meetings**. A Manager may participate in a meeting of Managers by means of conference telephone or similar communications equipment enabling all Managers participating in the meeting to hear one another. Participation in a meeting pursuant to this section shall constitute presence in person at such meeting.

3.20   **Proxies**. At all meetings of Managers, a Manager may vote in person or by proxy executed in writing by the Manager or by a duly authorized attorney-in-fact. Such proxy shall be filed with the Managers of the Company before or at the time of the meeting. No proxy shall be valid after eleven months from the date of its execution, unless otherwise provided in the proxy.

3.21   **Reimbursement of Expenses**. Except as otherwise set forth in a written agreement between the Company and a Manager (or an Affiliate of such Manager), no Manager, in the capacity as such, shall receive any fee, commission, salary reimbursement or other compensation for serving as a Manager, except as provided in Section 3.12 hereof and except that the Manager shall be entitled to reimbursement for all out-of-pocket expenses reasonably incurred by the Manager in the organization and operation of the Company, as well as for cost advanced for any administrative or contract services provided, such as, accounting, legal, technical, etc., including activities both prior to the date hereof and thereafter as approved by the Managers.

## ARTICLE IV.

## RIGHTS AND OBLIGATIONS OF MEMBERS

4.1   **Limitation of Liability**. Each Member's liability shall be limited as set forth in this Operating Agreement, the Act and other applicable law.

4.2   **Company Debt Liability**. A Member will not be personally liable for any debts or losses of the Company beyond such Member's Capital Contributions.

4.3   **Addresses; List of Members / Interest Holders**. The respective names and business addresses of the Members / Interest Holders, as well as their respective Membership Interests and Economic Interests subject to the provisions herein, are as set forth in Exhibit A, as may be amended from time to time to reflect any changes. Upon the written request of any Member, the Managers shall provide a list showing the names, addresses and Membership Interests and Economic Interests of all current Members / Interest Holders.

4.4   **Approval of Sale of All Assets; Bankruptcy; Reorganization**. Notwithstanding any other provision hereof, the Company shall not take any of the following actions without the approval of Members holding at least sixty seven percent (67%) of all Membership Interests: (a) to approve the sale, exchange or other disposition of all, or substantially all, of the Company's assets which is to occur as part of a single transaction or plan; (b) to file a petition in bankruptcy or enter into an arrangement among creditors; and (c) to enter into any transaction constituting a reorganization under the Code.

4.5   **Company Books**. The Managers shall maintain and preserve, during the term of the

15

**CONFIDENTIAL**

SFR 23260

Company, the accounts, books, and other relevant Company documents described in Section 7.11. Upon reasonable written request, each Member shall have the right, at a time during ordinary business hours, as reasonably determined by the Manager(s), to inspect and copy, at the requesting Member's expense, the Company documents identified in Section 1-40 of the Act, and such other documents which the Manager, in his discretion, deems appropriate.

4.6     **Priority and Return of Capital.** No Interest Holder shall have priority over any other Interest Holder, either as to the return of Capital Contributions or as to Net Profits, Net Losses or distributions; provided that this Section shall not apply to Outstanding Member Loans or other loans which a Member (or its Affiliate) has made to the Company.

4.7     **Liability of an Interest Holder to the Company.** An Interest Holder who receives a distribution or the return in whole or in part of its Capital Contribution is liable to the Company only to the extent provided by the Act.

4.8     **No Actions by Members.** No Member acting solely in the capacity of a Member is an agent of the Company, nor can any Member acting solely in the capacity of a Member bind the Company or execute any instrument on behalf of the Company.

## ARTICLE V.

### MEETINGS OF MEMBERS

5.1     **Meetings.** Meetings of the Members, for any purpose or purposes, may be called by any Manager or by any Member or Members holding at least twenty-five percent (25%) of the Membership Interests.

5.2     **Place of Meetings.** The Members may designate any place, either within or outside the State of Illinois, as the place of meeting for any meeting of the Members. If no designation is made the place of meeting shall be the principal place of business of the Company in the State of Illinois.

5.3     **Notice of Meetings.** Except as provided in Section 5.4, written notice stating the place, day and hour of the meeting and the purpose or purposes for which the meeting is called shall be delivered not less than three (3) days nor more than sixty (60) days before the date of the meeting, per Section 12.1 hereof.

5.4     **Meeting of All Members.** If all of the Members shall meet at any time and place, either within or outside of the State of Illinois, and do not object to the holding of a meeting at such time and place, such meeting shall be valid without call or notice, and at such meeting lawful action may be taken.

5.5     **Record Date.** For the purpose of determining Members entitled to notice of or to vote at any meeting of Members or any adjournment thereof, or Members entitled to receive payment of any distribution, or in order to make a determination of Members for any other purpose, the date on which notice of the meeting is mailed or the date on which the resolution declaring such

16

**CONFIDENTIAL**

SFR 23261

distribution is adopted, as the case may be, shall be the record date for such determination of Members. When a determination of Members entitled to vote at any meeting of Members has been made as provided in this Section, such determination shall apply to any adjournment thereof.

5.6   **Quorum**. Members holding at least a Majority Interest, represented in person or by proxy, shall constitute a quorum at any meeting of Members. In the absence of a quorum at any such meeting, a majority of the Membership Interests so represented may adjourn the meeting from time to time for a period not to exceed sixty (60) days without further notice. However, if the adjournment is for more than sixty (60) days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each Member of record entitled to vote at the meeting. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally noticed. The Members present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal during such meeting of that number of Membership Interests whose absence would cause loss of a quorum.

5.7   **Manner of Acting**. If a quorum is present, the affirmative vote of Members holding Majority Interest shall be the act of the Members, unless the vote of a greater or lesser proportion or number is otherwise required by the Act, by the Articles of Organization, or by this Operating Agreement. Unless otherwise expressly provided herein or required under applicable law, only Members who have a Membership Interest may vote or consent upon any matter and their vote or consent, as the case may be, shall be counted in the determination of whether the matter was approved by the Members.

5.8   **Proxies**. At all meetings of Members, a Member may vote in person or by proxy executed in writing by the Member or by a duly authorized attorney-in-fact. Such proxy shall be filed with the Managers of the Company before or at the time of the meeting. No proxy shall be valid after eleven months from the date of its execution, unless otherwise provided in the proxy. Pursuant to that certain Proxy Power dated on or about the date hereof executed by Howard and Howard Attorneys, PLLC in favor of Brian F. Hynes, it is hereby acknowledged and agreed by the Members and Managers that Brian F. Hynes has the proxy power to vote the Membership Interests of Howard and Howard Attorneys, PLLC as he so determines.

5.9   **Action by Members Without a Meeting**. Action required or permitted to be taken at a meeting of Members may be taken without a meeting if the action is evidenced by one or more written consents describing the action taken, signed by the Members holding a Super-Majority Interest and delivered to the Managers of the Company for inclusion in the minutes or for filing with the Company records. Action taken under this Section is effective when such Members holding a Super-Majority Interest have signed the consent, unless the consent specifies a different effective date.

5.10   **Waiver of Notice**. When any notice is required to be given to any Member, a waiver thereof in writing signed by the person entitled to such notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of such notice; provided, that any notice which is required with respect to a meeting will be deemed to have been given if a Member is present at such meeting and such Member does not object to such Member's failure to receive a timely notice of

17

**CONFIDENTIAL**

SFR 23262

such meeting.

5.11   **Telephonic Meetings.**  A Member may participate in a meeting of Members by means of telephone conference or similar communications equipment enabling all Members participating in the meeting to hear one another.  Participation in a meeting pursuant to this section shall constitute presence in person at such meeting.

5.12   **Membership Interest Certificates.**  The Company may, but shall not be required, to issue certificates evidencing Membership Interest ("Membership Interest Certificates") to Members of the Company.  Once Membership Interest Certificates have been issued, they shall continue to be issued as necessary to reflect current Membership Interests held by Members.  Membership Interest Certificates, if any, shall be in such form as may be approved by the Managers, shall be manually signed by at least two Managers, and shall bear conspicuous legends evidencing the restrictions on Transfer and the purchase rights of the Company and Members set forth in Article 9.  All issuances, reissuances, exchanges, and other transactions in Membership Interests involving Members shall be recorded in a permanent ledger as part of the books and records of the Company.

## ARTICLE VI.

## OFFICERS

6.1   **Officers of Company.**  The officers of the Company shall consist of a Chief Executive Officer, President, a Chief Financial Officer, Vice-President and Secretary, or other officers or agents as may be elected by the Managers.  The officers shall act in the name of the Company and shall supervise its operation under the direction and management of the Managers as further described below.  The officers of the Company are as follows:

| | |
|---|---|
| David Reape | Chief Executive Officer |
| Pattis Solis Doyle | President |
| Mitch Johnson | Chief Financial Officer |
| Jeff Balvanz | Chief Information Officer |
| Drew Delaney | Vice President and Secretary |

6.2   **Election and Term of Office.**  The officers of the Company shall be elected annually by the Managers.  Vacancies may be filled or new offices created and filled at any meeting or by written consent of the Managers.  Each officer shall hold office until his or her successor shall have been elected and shall have qualified or until he or she shall resign or shall have been removed in the manner hereinafter provided.  Election or appointment of an officer or agent shall not of itself create contract rights.

6.3   **Removal.**  Any officer or agent may be removed by the Managers whenever in their judgment the best interests of the Company would be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed.

6.4   **Vacancies.**  A vacancy in any office because of death, resignation, removal,

18

**CONFIDENTIAL**

SFR 23263

disqualification or otherwise may be filled by the Managers for the unexpired portion of the term.

6.5   **Chief Executive Officer.**  The Chief Executive Officer shall be the chief executive officer of the Company and shall, subject to the direction and control of the Board of Managers, supervise and control all of the business and affairs of the Company and shall (in the absence of the chairman of the Board of Managers or an agreement between the chairman and Board of Managers otherwise) shall preside at meetings of the Managers and shall have the powers and duties usually vested in a chief executive officer to make day-to-day management decisions regarding the operation of the Company's business. The Chief Executive Officer shall have such other powers and perform such duties as are specified in this Operating Agreement and as may from time to time be additionally assigned to him or her by the Managers of the Company.

6.6   **President.**  The President shall be an executive officer of the Company.  Subject to the direction and control of the Board of Managers and the Chief Executive Officer, the President shall be in charge of the business of the Company; he or she shall see that the resolutions and directions of the Board of Managers are carried into effect except in those instances in which that responsibility is specifically assigned to some other person by the Board of Managers; and, in general, he or she shall discharge all duties incident to the office of president and such other duties as may be prescribed by the Board of Managers or the Chief Executive Office from time to time. Except in those instances in which the authority to execute is expressly delegated to another officer or agent of the Company or a different mode of execution is expressly prescribed by the Board of Managers or this Operating Agreement, he or she may execute for the Company any contracts, deeds, mortgages, bonds, or other instruments which the Board of Managers has authorized to be executed, and he or she may accomplish such execution either individually or with the Secretary or any other officer thereunto authorized by the Board of Managers, according to the requirements of the form of the instrument.

6.7   **Chief Financial Officer.**  The Chief Financial Officer shall be the chief financial officer of the Company.  The Chief Financial Officer shall not be required to give a bond for the faithful discharge of his or her duties.  He or she shall:  (i) have charge and custody of and be responsible for all funds and securities of the Company; (ii) receive and give receipts for moneys due and payable to the Company from any source whatsoever; and deposit all such moneys in the name of the Company in such banks, trust companies or other depositaries as shall be selected by the Managers of the Company; and (iii) in general perform all the duties incident to the office of treasurer, chief financial officer and such other duties as from time to time may be assigned to him or her by the Chief Executive Officer, the President or by the Managers of the Company.

6.8   **Vice President.**  The Vice-President (or in the event there be more than one Vice-President, each of the Vice-Presidents) shall assist the Chief Executive Officer and the President in the discharge of his duties as the Chief Executive Officer or the President may direct and shall perform such other duties as the Chief Executive Officer or the President may direct and shall perform such other duties as from time to time may be assigned to him by the Chief Executive Officer, the President or by the Board of Managers. In the absence of the Chief Executive Officer or the President or in the event of his inability or refusal to act, the Vice-President (or in the event there be more than one Vice-President, the Vice-Presidents in the order designated by the Board of Managers, or by the Chief Executive Officer or the President if the Board of Managers has not made

19

**CONFIDENTIAL**

SFR 23264

such a designation, or in the absence of any designation, then in the order of seniority of tenure as Vice-President) shall perform the duties of the Chief Executive Officer or the President, and when so acting, shall have all the powers of and be subject to all the restrictions upon the president. Except in those instances in which the authority to execute is expressly delegated to another officer or agent of the Company or a different mode of execution is expressly prescribed by the Board of Managers or this Operating Agreement, the Vice-President (or each of them if there are more than one) may execute for the Company any contracts, deeds, mortgages, bonds or other instruments which the Board of Managers has authorized to be executed, and he or she may accomplish such execution either individually or with the Secretary or any other officer thereunto authorized by the Board of Managers, according to the requirements of the form of the instrument.

6.9     Secretary.  The Secretary shall:  (i) keep minutes of the meetings of Members and Managers in one or more books provided for that purpose; (ii) see that all notices are duly given in accordance with the provisions of this Operating Agreement or as required by law; (iii) be custodian of Company records; (iv) keep a register of the post office address of each Member or Manager which shall be furnished to the Secretary by such Member or Manager; (v) certify the resolutions of the Members and Managers, and other documents to the Company as true and correct thereof; (iv) in the absence of the Chief Executive Officer and Chief Financial Officer, preside at meetings of the Members and Managers and (vi) in general perform all duties incident to the office of secretary and such other duties as from time to time may be assigned to him or her by the Chief Executive Officer or the Managers of the Company.

## ARTICLE VII.

## CAPITAL ACCOUNTS, ALLOCATIONS, DISTRIBUTIONS AND INCOME TAX

7.1     Members' Capital Contributions.  Each Member has contributed its Initial Capital Contribution set forth in Exhibit A hereto.  No Member shall be obligated to make any additional Capital Contributions to the Company following the Initial Capital Contribution.

7.2     Capital Accounts.

(a)     A separate Capital Account will be maintained for each Interest Holder. Each Interest Holder's Capital Account will be increased by (1) the amount of money contributed by such Interest Holder to the Company; (2) the fair market value (which value shall be confirmed by a qualified independent appraiser if requested by any of the Members) of property contributed by such Interest Holder to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Code Section 752; (3) allocations to such Interest Holder of Net Profits; and (4) without duplication for amounts included in Net Profits or Net Losses, allocations to such Interest Holder of income described in Code Section 705(a)(1)(B). Each Interest Holder's Capital Account will be decreased by (1) the amount of money distributed to such Interest Holder by the Company; (2) the fair market value (which value shall be measured at the time of distribution and confirmed by a qualified independent appraiser if requested by any of the Members) of property distributed to such Interest Holder by the Company (net of liabilities secured by such distributed property that such Interest Holder is considered to assume or take subject to

20

CONFIDENTIAL

SFR 23265

under Code Section 752; (3) allocations to such Interest Holder of Net Losses; (4) without duplication for amounts included in Net Profits and Net Losses, allocation to such Interest Holder of expenditures described in Code Section 705(a)(2)(B); and (5) allocations to the account of such Interest Holder of Net Losses.

(b)     Unless otherwise agreed to by and between the Transferor, the Transferee, and each other Member, in the event of a Transfer of a Membership Interest or an Economic Interest (or portion thereof), the Capital Account of the Transferor (or portion thereof) (together with its attendant rights and obligations) shall become the Capital Account of the Transferee to the extent it relates to the Transferred Interest (or portion thereof) in accordance with Section 1.704-1(b)(2)(iv) of the Treasury Regulations.

(c)     The manner in which Capital Accounts are to be maintained pursuant to this Section 7.2 is intended to comply with the requirements of Code Section 704(b) and the Treasury Regulations promulgated thereunder. If the Managers determine that the manner in which Capital Accounts are to be maintained pursuant to the preceding provisions of this Section 7.2 should be modified in order to comply with Code Section 704(b) and the Treasury Regulations, then notwithstanding anything to the contrary contained in the preceding provisions of this Section 7.2, the method in which Capital Accounts are maintained shall be so modified; provided, however, that any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between or among the Members as set forth in this Operating Agreement.

(d)     Upon liquidation of the Company, liquidating distributions will be made to the Interest Holders pro rata in proportion to the respective Percentage Interests of the Interest Holders on the record date of such liquidating distribution; provided, however, in the event the liquidation of the Company does not result in sufficient cash such that each of Warren Hill and NAI would receive distributions equal to at least $750,000.00 (assuming distributions were made to all Members pro rata in accordance with each Member's Percentage Interest and taking into account all prior distributions received by Warren Hill and NAI other than Tax Distributions), then in such case, each of Warren Hill and NAI shall receive a priority distribution equal to $675,000 and each of JRB and North Fork shall receive a priority distribution equal to $75,000 (taking into account all prior distributions received by Warren Hill, NAI, JRB and North Fork other than Tax Distributions), and any remaining amounts shall be distributed to all Members pro rata in accordance with each Member's Percentage Interest. Liquidation proceeds will be paid within sixty (60) days of the end of the taxable year (or, if later, within one hundred twenty days after the date of the liquidation). The Company may offset damages for breach of this Operating Agreement by an Interest Holder whose interest is liquidated (either upon the withdrawal of the Member or the liquidation of the Company) against the amount otherwise distributable to such Interest Holder.

(e)     Except as otherwise required in the Act (and subject to Section 7.4), no Interest Holder shall have any liability to restore all or any portion of a deficit balance in such Interest Holder's Capital Account.

7.3     Withdrawal or Reduction of Members' Contributions to Capital.

(a)     A Member shall not receive out of the Company's property any part of its

21

CONFIDENTIAL

SFR 23266

Capital Contribution until all liabilities of the Company, except liabilities to Members on account of their Capital Contributions, have been paid or there remains property of the Company sufficient to pay them.

(b)     A Member, irrespective of the nature of its Capital Contribution, has only the right to demand and receive cash in return for its Capital Contribution.

7.4     <u>Allocations of Net Profits and Net Losses from Operations</u>.  The Net Profits and Net Losses for each Fiscal Year (as defined below) will be allocated among Interest Holders pro rata in accordance with their Percentage Interests.  If any Interest Holder unexpectedly receives any adjustment, allocation, or distribution described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) of the Treasury Regulations, items of Company gross income and gain shall be specially allocated to that Interest Holder in an amount and manner sufficient to eliminate any deficit balance in the Interest Holder's Capital Account created by such adjustment, allocation, or distribution as quickly as possible.  Any special allocation under this <u>Section 7.4</u> shall be taken into account in computing subsequent allocations of Net Profits and Net Losses so that the net amount of allocations of income and loss and all other items shall, to the extend possible, be equal to the net amount that would have been allocated if the unexpected adjustment, allocation, or distribution had not occurred.  The provisions of this <u>Section 7.4</u> and the other provisions of this Operating Agreement relating to the maintenance of the Capital Accounts are intended to comply with Sections 1.704-1(b) and 1.704-2 of the Treasury Regulations and shall be interpreted and applied in a manner consistent with such Regulations.

7.5     <u>Distributions</u>.

(a)     Except as may be explicitly set forth herein, an Interest Holder has no right to demand and receive any distribution in a form other than cash.  All distributions of cash or other property shall be made to the Interest Holders pro rata in proportion to the respective Percentage Interests of the Interest Holders on the record date of such distribution.  Except as provided in this <u>Section 7.5</u> and <u>Section 7.6</u>, all distributions of Distributable Cash and property shall be made at such time as determined by the Managers.  Notwithstanding the foregoing, the Managers shall meet on no less than a quarterly basis to analyze Distributable Cash and to make a determination on whether distributions shall be made pursuant to Section 7.5(e).  All amounts withheld pursuant to the Code or any provisions of state or local tax law with respect to any payment or distribution to the Interest Holders from the Company shall be treated as amounts distributed to the relevant Interest Holder(s) pursuant to this <u>Section 7.5</u>.

(b)     With respect to any Member, for any taxable year of the Company, a distribution (a "Tax Distribution") will be paid in an amount of cash in accordance with <u>Section 7.5(c)</u> equal to the product of (i) the Company's taxable income (or components thereof) allocable to such Member for such Taxable year as determined by the Managers pursuant to <u>Section 7.4</u> and (ii) the combined highest marginal effective federal, state and local income tax rates applicable to an individual resident of New York City (without taking into account the category of income subject to tax but with taking into account the deductibility of state and local taxes for federal income tax purposes) in effect from time to time during such taxable year.

22

**CONFIDENTIAL**

**SFR 23267**

(c)     Within seventy-five (75) days after the close of each taxable year of the Company, the Managers shall cause the Company to distribute to each Member an amount of Distributable Cash (or alternatively, borrowings of money approved by the Managers for distribution pursuant to this Section) equal to such Member's Tax Distribution with respect to such taxable year as calculated in accordance with Section 7.5(b).  The Managers may cause the Company to distribute a Member's Tax Distribution amount in respect of a particular taxable year in more than one installment, provided that the Member's entire Tax Distribution amount in respect of a particular taxable year is distributed no later than seventy-five (75) days after the close of such taxable year. Any amount distributed to a Member pursuant to this Section 7.5(c) shall be treated as an advance distribution of, and shall be credited dollar-for-dollar against, amounts otherwise distributable to such Member under this Section 7.5, if any.

(d)     Notwithstanding any other provision contained herein, the Company shall not make any distributions (other than a Tax Distribution) to its Members prior to the repayment in full of the Outstanding Member Loans.  For the avoidance of doubt, it is understood that such repayments of the Outstanding Member Loans will be made in accordance with the terms thereof notwithstanding the fact that the Company may have other outstanding payment obligations which are accruing at a higher rate of interest).

(e)     Upon the repayment in full of the Outstanding Member Loans, the Company shall make pro rata distributions to the Interest Holders in accordance with their Percentage Interests in an amount to be determined by the Managers of the Company.

7.6     **Limitation upon Distributions.**

(a)     No distributions or return of contributions shall be made and paid if, after the distribution or return of contribution is made either

1)     the Company would be insolvent; or

2)     the net assets of the Company would be less than zero.

(b)     The Managers may base a determination that a distribution or return of Capital Contributions may be made under Section 7.6(a) in good faith reliance upon a balance sheet and profit and loss statement of the Company represented to be correct by the person having charge of its books of account or certified by an independent public or certified public accountant or firm of accountants to fairly reflect the financial condition of the Company.

7.7     **Accounting Principles.**  The financial statements and financial books and records of the Company shall be prepared in accordance with generally accepted accounting principles applied on a consistent basis and shall be appropriate and adequate for the Company's business and/or carrying out the provisions of this Operating Agreement.

7.8     **Interest on and Return of Capital Contributions.**  No Member shall be entitled to interest on its Capital Contribution or to return of its Capital Contribution.

7.9     **Loans to Company; Payment of Expenses.**  Subject to the restriction on Affiliate

23

**CONFIDENTIAL**

SFR 23268

transactions and agreements set forth in Section 3.3, nothing in this Operating Agreement shall prevent any Member from making secured or unsecured loans to the Company by agreement with the Company.

7.10   **Accounting Period**.   The fiscal year of the Company for financial accounting purposes, and for federal, state and local income tax purposes, shall be the calendar year ("Fiscal Year").

7.11   **Records, Audits and Reports**.  At the expense of the Company, the Managers shall maintain records and accounts of the operations and expenditures of the Company.  At a minimum the Company shall (i) update Exhibit A as necessary to accurately reflect any changes or modifications which have been made in accordance with this Operating Agreement and (ii) keep at its principal place of business or the office of the registered agent of the Company the following records:

(a)   A current list of the full name and last known address of each Interest Holder setting forth the amount of cash each Interest Holder has contributed, a description and statement of the agreed value of the other property or services each Interest Holder has contributed or has agreed to contribute in the future, and the date on which each became an Interest Holder;

(b)   A current list of the full name and business address of each of the Managers;

(c)   A copy of the Articles of Organization and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any amendment has been executed;

(d)   Copies of the Company's federal, state, and local income tax returns and reports, if any, for the three (3) most recent years;

(e)   Copies of the Company's currently effective written Operating Agreement, and copies of any financial statements of the Company for the three (3) most recent years;

(f)   Minutes of every meeting of Members or Managers;

(g)   Any written consents obtained from Members or Managers for actions taken by Members or Managers without a meeting;

(h)   Unless contained in the Articles of Organization or this Operating Agreement, a writing prepared by the Managers setting out the following:

1)   The times at which or events on the happening of which any additional contributions agreed to be made by each Member are to be made.

2)   Any right of an Interest Holder to receive distributions that include a return of all or any part of the Interest Holder's contributions.

3)   Any power of an Interest Holder to grant the right to become an

24

**CONFIDENTIAL**

SFR 23269

assignee of any part of the Interest Holder's Interest, and the terms and conditions of the power.

7.12    **Returns and other Elections.** The Managers shall cause the preparation and timely filing of all tax returns required to be filed by the Company pursuant to the Code and all other tax returns deemed necessary and required in each jurisdiction in which the Company does business. Within reasonable period of time after the end of the Company's Fiscal Year, the Managers shall send to each of the Interest Holders information necessary for the Interest Holders to complete their federal and state income tax or information returns and a copy of the Company's federal, state, and local income tax or information returns for such year. All elections permitted to be made by the Company under federal or state laws shall be made by the Managers in their sole discretion.

7.13    **Tax Matters Member.** Howard & Howard is designated the "Tax Matters Member" (as defined in Code Section 6231), and is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including, without limitation, administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith. The Members agree to cooperate with each other and to do or refrain from doing any and all things reasonably required to conduct such proceedings.

7.14    **Financial Statements and Information.** At the end of each Fiscal Year, the books of the Company shall be closed and examined and statements reflecting the financial condition of the Company and its Net Profits or Net Losses shall be prepared, and a report thereon shall be issued by the Company's certified public accountants. Copies of the financial statements shall be given to all Members. In addition, all Members shall receive not less frequently than at the end of each calendar quarter, copies of such financial statements regarding the previous calendar quarter, as may be prepared in the ordinary course of business, by the Managers or accountants selected by the Managers. The Chief Financial Officer shall deliver to each Member, within 120 days after the end of the Fiscal Year, or as soon as practicable thereafter, a financial statement that shall include:

(a)    A balance sheet and income statement, and a statement of changes in the financial position of the Company as of the close of the Fiscal Year;

(b)    A statement showing the Capital Account of each Member at the close of the Fiscal Year and the distributions, if any, made to each Member during the Fiscal Year. Members may request interim balance sheets and income statements, and may, at their own discretion and expense, obtain an audit of the Company books, by certified public accountants selected by them; provided, however, that not more than one such audit shall be made during any fiscal year of the Company, unless discrepancies of more than five percent (5%) are found on any audit.

## ARTICLE VIII.

## TRANSFERABILITY AND ADDITIONAL ISSUANCES

8.1    **General.** Except (i) Transfers to an Affiliate of a Selling Member or (ii) as otherwise specifically provided herein, no Member / Interest Holder shall have the right, as to all or any part of

25

**CONFIDENTIAL**

SFR 23270

its Membership Interest or Economic Interest to Transfer such Interest for consideration or for no consideration (whether or not by operation of law, except in the case of bankruptcy). Notwithstanding the foregoing, the provisions of this paragraph shall only apply to Members, and in the event that a Member is a partnership or limited liability company, it shall not apply to the individual members or partners of any Member of the Company. (By way of example, the death of an individual partner/member of Howard & Howard shall not require Howard & Howard to sell its Interests in the Company).

8.2   **Right of First Refusal**.

(a)   If a Selling Member desires to Transfer all or any portion of its Membership Interest or Economic Interest in the Company to any Person (other than an Affiliate of such Selling Member), the Selling Member shall obtain from such Person a bona fide written offer to purchase such Interest, stating the terms and conditions upon which the purchase is to be made and the consideration offered.   The Selling Member shall give written notification to the remaining Members, by certified mail or personal delivery, of its intention to so Transfer such Interest, furnishing to the remaining Members a copy of the written offer to purchase such Interest, and the name and business and personal addresses of the proposed Transferee.

(b)   Within fifteen (15) days of the receipt of the notice of intention to Transfer a Membership Interest or Economic Interest by the last of the Members to receive such notice, each remaining Member may exercise an option to purchase that proportion of the Membership Interest or Economic Interest proposed to be Transferred which equals the proportion which the Membership Interest owned by such remaining Member at the time of his receipt of the notice bears to the total of the Membership Interests then owned by all the remaining Members. The purchase option granted in this subparagraph (b) is herein referred to as the "Primary Option".

(c)   If a Member fails to exercise a Primary Option granted to him to purchase the Membership Interest or Economic Interest proposed to be Transferred, each remaining Member who is granted and who exercises a Primary Option (a "Primary Option Member") may, within seven (7) days after the expiration of the fifteen (15) day option period provided for above, exercise an option to purchase the Membership Interest or Economic Interest with respect to which such Member has failed to exercise his Primary Option (hereinafter "the Option Interest").   In the case of a single remaining Primary Option Member, his option shall be to purchase all of the Option Interest.  In the case of two or more remaining Primary Option Members, each such remaining Primary Option Member's option shall be to purchase the portion of Option Interest which bears the same proportion to the total Option Interest as the Membership Interest owned by each such remaining Primary Option Member at the time of receipt of the notice provided for above bears to the total Membership Interests then owned by all such remaining Primary Option Members; provided that all such remaining Primary Option Members may, by agreement among themselves, determine the proportions in which some or all of their number may exercise the option granted in this subparagraph. The purchase option granted by this subparagraph (c) is referred to as the "Secondary Option".

(d)   In the event the remaining Members (or any one or more of the remaining Members) give written notice to the Selling Member of their desire to exercise this right of first

26

**CONFIDENTIAL**

SFR 23271

refusal and to purchase all of the Selling Member's interest in the Company which the Selling Member desires to sell upon the same terms and conditions as are stated in the aforesaid written offer to purchase, the remaining Members shall have the right to designate the time, date and place of closing, provided that the date of closing shall be within fifteen (15) days after written notification to the Selling Member of the remaining Member or Members' election to exercise their right of the first refusal.

(e)     As a condition to the Company recognizing the effectiveness of either the purchase of the Selling Member's Interest (including an Economic Interest) in the Company by any Person pursuant to this Section 8.2 and subject to Section 8.3, the Board of Managers may require the Selling Member or the proposed purchaser or successor-in-interest, as the case may be, to execute, acknowledge and deliver to the Board of Managers such instruments of transfer, assignment and assumption and such other certificates, representations and documents, and to perform all such other acts which the Board of Managers may deem reasonably necessary or desirable to:

1)     verify the Transfer;

2)     maintain the status of the Company as a partnership for federal tax purposes; and

3)     assure compliance with any applicable state and federal laws including securities laws and regulations.

(f)     Any Transfer of a Membership Interest or Economic Interest or admission of a Member in compliance with this Article 8 shall be deemed effective as of the last day of the calendar month in which the Board of Managers confirms the conditions set forth in Section 8.2(e) have been satisfied by the Selling Member and the proposed Transferee, and the Person desiring to acquire an Interest, or to be admitted as a Member, shall have executed a signature page to this Operating Agreement agreeing to be bound by all of the terms, obligations and conditions herein (whether or not such Person is to be admitted as a new Member). The Selling Member agrees, upon request of the Board of Managers, to execute such certificates or other documents and to perform such other acts as may be reasonably requested by the Board of Managers from time to time in connection with such Transfer. The Selling Member hereby indemnifies the Company and the remaining Members against any and all loss, damage, or expense (including, without limitation, tax liabilities or loss of tax benefits) arising directly or indirectly as a result of any Transfer or purported Transfer in violation of this Article 8.

8.3     **Transferee Not Member in Absence of Board of Managers' Consent.**

(a)     Notwithstanding anything contained herein to the contrary (including, without limitation, Section 8.2 hereof), unless the Board of Managers' approves of the proposed Transfer of the Transferring Member's Membership Interest or Economic Interest to a Transferee which is not a Member immediately prior to the Transfer (or an Affiliate of such Member) in accordance with Section 9.1, with such approval of the Board of Managers not to be unreasonably withheld or delayed, then the proposed Transferee shall have no right to participate in the management of the business and affairs of the Company or to become a Member and such Transferee shall be merely an

27

SFR 23272

**CONFIDENTIAL**

assignee of the Transferring Member's Economic Interest. No Transfer of a Member's Interest in the Company (including any Transfer of the Economic Interest or any other Transfer which has not been approved by the Board of Managers) shall be effective unless and until written notice (including the name and address of the proposed Transferee and the date of such Transfer) has been provided to the Company and the Board of Managers (along with a signature page to this Operating Agreement executed by the proposed Transferee evidencing such Person's agreement to be bound by the obligations, terms and conditions of this Operating Agreement). Notwithstanding such Transfer, a Transferee of an Economic Interest acquired under this Section 8.3 shall take such Economic Interest subject to, and shall be bound by, the obligations, terms and conditions of the Operating Agreement.

(b)     Upon and contemporaneously with any Transfer of a Transferring Member's Economic Interest in the Company which does not at the same time Transfer the balance of the rights associated with such Transferring Member's Membership Interest (including, without limitation, the rights of the Transferring Member to participate in the management of the business and affairs of the Company), all remaining rights and interests which were owned by the Transferring Member immediately prior to such Transfer or which were associated with the Transferred Economic Interest shall immediately lapse until either (1) the Board of Managers consents to reinstate such rights to the Transferring Member who did not previously obtain the Board of Managers' written consent of the Members or (2) the receipt of the consent of the Board of Managers, at which time such Membership rights shall Transfer to the proposed Transferee.   Notwithstanding any provision herein to the contrary, any Transfer by North Fork or JRB of its Membership Interests shall be deemed a Transfer of its Economic Interests and its Membership Interest and all other rights associated with such Membership Interests hereunder (except for the rights set forth in (i) the last two sentences of Section 3.2, (ii) the last paragraph of Section 3.3 and (iii) Section 3.4(a))

(c)     The restrictions on Transfer contained in this Section 8.3 are intended to comply (and shall be interpreted consistently) with the restrictions on Transfer set forth in Article 30 of the Act.

8.4     **Tag-Along Rights.**

(a)     Notwithstanding any provision contained herein to the contrary, if, after complying with the provisions of Section 8.2, any Member or group of the Members (collectively the "Sellers") agree to Transfer to a Person (other than to an Affiliate or Affiliates of such Member or Members), in a sale to be consummated in a single Transfer or a series of related Transfers to a single purchaser or a group of purchasers as part of a single transaction or group of related transactions a portion or all of their Membership Interests in the Company, which together equals or exceeds fifteen percent (15%) of the outstanding Membership Interests, then each Member other than the Sellers ("Tag-Along Members") shall have the right (the "Tag-Along Right") to require the proposed purchaser(s) (the "Purchaser") to purchase from them upon terms no less favorable than those set forth in the Tag-Along Notice under Section 8.4(b) herein, or as the Sellers, Tag-Along Members, and the Purchaser may otherwise agree, a portion of such Tag-Along Member's Membership Interest equal to such Member's Tag-Along Amount. "Tag-Along Amount" means, with respect to each Tag-Along Member, the amount of Membership Interests owned by such Member, multiplied by a fraction in which (i) the numerator equals the amount of Membership Interests to be sold by the Sellers and (ii) the denominator equals the amount of Membership

28

**CONFIDENTIAL**

SFR 23273

Interests owned by the Sellers.

(b)     The Sellers shall promptly notify the Tag-Along Members in the event they propose to make a Transfer giving rise to the Tag-Along Right, and shall furnish the Tag-Along Members with the terms and conditions of such Transfer and a copy of any written offer or agreement pertaining thereto. The Tag-Along Right may be exercised by any Tag-Along Member by delivering a written notice to each Seller proposing to sell the Membership Interests (the "Tag-Along Notice") within fifteen (15) days following such Tag-Along Member's receipt of such notice from the Sellers. In the event that the Purchaser does not purchase all of the Membership Interests from the Tag-Along Members which such Tag-Along Members are entitled to sell under this Section 8.4 on the terms and conditions of such Transfer, then the Sellers shall not be permitted to sell their Membership Interests to the proposed purchaser in the proposed Transfer.

(c)     At the settlement of any Transfer pursuant to this Section 8.4, the Purchaser shall remit to each selling Member the consideration for the total sales price of the Membership Interests of such Members sold pursuant hereto, upon delivery by such Members of such Transfer document or Membership Interest powers duly executed in blank, and the compliance by such Members with all other conditions to settlement generally applicable to the Sellers and all other Tag-Along Members.

8.5     <u>Preemptive Rights</u>.

(a)     The Company will be entitled to issue equity interests (or interests convertible into or exchangeable for equity interests) on such terms as the Board of Managers may determine from time to time. If the Company wishes to issue and sell any Membership Interests or other equity securities or any security convertible into, exercisable for, or exchangeable for Membership Interests or other equity securities in the Company or any subsidiary of the Company (other than a Special Purpose Trust subsidiary wholly-owned by the Company and the Trustee for such Special Purpose Trust) (the "New Securities") to any Person or Persons (collectively, the "Subject Purchasers"), then the Company shall also offer such New Securities to the Members (each, a "Preemptive Right Holder") by sending written notice (the "New Issuance Notice") to such Persons at least thirty (30) days (but not more than sixty (60) days) prior to the issuance and sale of the New Securities. The New Issuance Notice shall state (a) the amount or denomination of Membership Interests or other New Securities proposed to be issued and sold and the terms of such New Securities, (b) the purchase price of the New Securities (the "Proposed Price") and the other material terms and conditions of the purchase of such New Securities, (c) the proposed date on which the New Securities will be sold (the "New Issuance Closing Date") and (d) each Preemptive Right Holder's Proportionate Percentage. For purposes hereof, each Preemptive Right Holder's "Proportionate Percentage" means, with respect to any Preemptive Right Holder, the percentage of the New Securities allocated to such Preemptive Right Holder, which percentage shall equal such Preemptive Right Holder's Percentage Interest.

(b)     For a period of ten (10) days after the giving of the New Issuance Notice, each Preemptive Right Holder shall have the right to purchase all of its Proportionate Percentage of the New Securities at a purchase price equal to the Proposed Price and upon the terms and conditions set forth in the New Issuance Notice. The right of each Preemptive Right Holder to purchase the New

29

SFR 23274

Securities shall be exercisable by delivering written notice of the exercise thereof, prior to the expiration of the 10-day period referred to above, to the Company. The failure to respond within such 10-day period shall be deemed to be a waiver of such Preemptive Right Holder's rights under this Section 8.5 with respect to such New Securities (but not future issuances).

(c)     Each Preemptive Right Holder purchasing the New Securities shall deliver at the closing full cash payment in immediately available funds for the New Securities purchased by him, her or it on the New Issuance Closing Date and shall agree to the same terms and conditions, as agreed to by the Subject Purchasers. At such closing, all of the parties to the transaction shall execute such additional documents as are otherwise necessary or appropriate to consummate such transaction.

(d)     Notwithstanding the foregoing, the rights set forth in this Section 8.5 shall not be deemed to apply to Membership Interests that (i) are issued pro rata to all Members, as a dividend on, subdivision of or other distribution in respect of, the Membership Interests, (ii) constitute Employee Interests representing up to ten (10%) of Membership Interests outstanding as of the Effective Date, (iii) are issued in connection with or as consideration for any acquisition by the Company of another Person or of a business or division operated by another Person, whether by asset purchase, stock purchase, merger or otherwise, (iv) are issued in connection with commercial credit arrangements (including securitization transactions) or equipment financings or (v) are issued to JRB and North Fork in compliance with Section 8.6.

8.6     **Anti-Dilution Protection for Blewitt and Neumann.** Notwithstanding anything contained herein to the contrary, in the event there is (a) an issuance of New Securities by the Company after the Effective Date and (b) such issuance, along with all prior issuances of New Securities since the Effective Date, results in additional equity capital received by the Company after the Effective Date in an amount less than $50,000,000, the Company shall issue additional Membership Interests and take all other actions necessary to assure that JRB and North Fork will each retain a Percentage Interest in the Company of five percent (5%) on a fully diluted basis (after giving effect to such issuances, as well as the issuance of any interests in the Company that are exercisable for, convertible into, exchangeable for, or issuable as, equity securities of the Company), without requirement of such Members to make additional Capital Contributions to the Company, or pay any consideration for any Membership Interests issued to them to maintain such percentages. For the avoidance of doubt, if (i) prior to an issuance of New Securities, there shall have been less than $50,000,000 of additional equity capital received by the Company since the Effective Date and (ii) following such issuance of New Securities, there would be more than $50,000,000 of additional equity capital received by the Company since the Effective Date, then this Section 8.6 shall apply only to New Securities issued in respect of such additional equity capital up to $50,000,000 and (ii) the Company shall not circumvent the provisions of this Section 8.6 by (A) issuing Membership Interests with a preference as to distributions as compared to the Membership Interests outstanding as of the Effective Date or (B) causing any subsidiary of the Company to issue equity interests (other than a Special Purpose Trust subsidiary wholly-owned by the Company and the Trustee for such Special Purpose Trust).

ARTICLE IX.

30

SFR 23275

## ADDITIONAL MEMBERS

9.1     Subject to the terms and conditions of this Operating Agreement, any Person may become a Member in this Company with the prior written consent of the Super-Majority Interest of Members either by the issuance by the Company of Membership Interests for such consideration as the Board of Managers shall determine, or as a Transferee of a Member's Membership Interest or any portion thereof, subject to the terms and conditions of this Operating Agreement. No new Members shall be entitled to any retroactive allocation of losses, income or expense deductions incurred by the Company. The Managers may, at their option, at the time a Member is admitted, close the Company books (as though the Company's tax year has ended) or make pro rata allocations of loss, income and expense deductions to a new Member for that portion of the Company's tax year in which a Member was admitted in accordance with the provisions of Code Section 706(d) and the Treasury Regulations promulgated thereunder.

## ARTICLE X.

## DISSOLUTION AND TERMINATION

10.1    <u>Dissolution.</u>

(a)     Notwithstanding anything to the contrary in this Operating Agreement, if a Member or Members owning Membership Interests which in the aggregate constitute not less than the sixty seven percent (67%) of the Membership Interests vote to dissolve the Company at a meeting of the Company pursuant to <u>Article 5</u>, then the Company shall dissolve as promptly as practicable.

(b)     If a Member who is an individual dies or a court of competent jurisdiction adjudges him to be incompetent to manage his person or his property, the Member's executor, administrator, guardian, conservator, or other legal representative may exercise all of the Member's rights for the purpose of settling his estate or administering his property.

(c)     Unless otherwise approved by Members owning a Majority Interest, a Member whose Membership Interest is terminated by virtue of a Withdrawal Event (a "<u>Resigning Member</u>"), regardless of whether such Withdrawal Event was the result of a voluntary act by such Member, shall not be entitled to receive any distributions in excess of those distributions to which such Member would have been entitled had such Member remained a Member. Except as otherwise expressly provided herein, a Resigning Member's Interest in the Company shall thereafter be an Economic Interest.

10.2    <u>Winding Up, Liquidation and Distribution of Assets.</u>

(a)     Upon dissolution, an accounting shall be made by the Company's independent accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution. The Managers shall

31

**CONFIDENTIAL**

SFR 23276

immediately proceed to wind up the affairs of the Company.

(b)     If the Company is dissolved and its affairs are to be wound up, the Managers shall:

1)     Sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Managers may determine to distribute any assets to the Interest Holders in kind),

2)     Allocate any profit or loss resulting from such sales to the Interest Holders' Capital Accounts in accordance with Article 7 hereof,

3)     Discharge all liabilities of the Company, including liabilities to Interest Holders who are creditors, to the extent otherwise permitted by law, other than liabilities to Interest Holders for distributions, and establish such Reserves as may be reasonably necessary to provide for contingent liabilities of the Company (for purposes of determining the Capital Accounts, the amounts of such Reserves shall be deemed to be an expense of the Company),

4)     Distribute the remaining assets to the Interest Holders as set forth in Section 7.5.

(c)     Notwithstanding anything to the contrary in this Operating Agreement, upon a liquidation within the meaning of Section 1.704-1 (b)(2)(ii)(g) of the Treasury Regulations, if any Interest Holder has a Deficit Capital Account (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Interest Holder shall have no obligation to make any Capital Contribution, and the negative balance of such Interest Holder's Capital Account shall not be considered a debt owed by such Interest Holder to the Company or to any other Person for any purpose whatsoever.

(d)     Upon completion of the winding up, liquidation and distribution of the assets, the Company shall be deemed terminated.

(e)     The Managers shall comply with all requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

(f)     If any assets of the Company are to be distributed in kind, the net fair market value of such assets as of the date of dissolution shall be determined by independent appraisal or by agreement of the Members. Such assets shall be deemed to have been sold as of the date of dissolution for their fair market value, and the Capital Accounts of the Interest Holder shall be adjusted pursuant to the provisions of Article 7 of this Operating Agreement to reflect such deemed sale.

10.3     **Articles of Dissolution**.  When all debts, liabilities and obligations of the Company have been paid and discharged or adequate provisions have been made therefor and all of the remaining property and assets of the Company have been distributed, in each case, in accordance with Section 10.2, the articles of dissolution of the Company as required by the Act, shall be

32

SFR 23277

executed in duplicate and filed with the Illinois Secretary of State.

    10.4   **Effect of Filing of Articles of Dissolution**. Upon the filing of articles of dissolution with the Illinois Secretary of State, the existence of the Company shall cease, except for the purpose of suits, other proceedings and appropriate action as provided in the Act. The Managers shall have authority to distribute any Company property discovered after dissolution, convey real estate and take such other action as may be necessary on behalf of and in the name of the Company.

    10.5   **Return of Contribution Nonrecourse to Other Members**. Except as provided by law or as expressly provided in this Operating Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of its Capital Contribution. If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash contribution of one or more Members, such Member or Members shall have no recourse against any other Member, except as otherwise provided by law.

## ARTICLE XI.

## CONFIDENTIALITY; INDEMNIFICATION; ARBITRATION; ATTORNEY-IN-FACT

    11.1   **Confidentiality Provision**. Each Member / Interest Holder hereby covenants with the Company and each other Member that on the Transfer of the Member / Interest Holder's Interest, whether voluntary, involuntary, by operation of law, or by reason of any provision of this Operating Agreement, the Member / Interest Holder will not, directly or indirectly, through an affiliate or otherwise, use or disclose in any manner any Confidential Information and will otherwise exercise commercially reasonable steps to preclude dissemination to any third party and will not utilize any such Confidential Information in any manner not associated with the business.

    "Confidential Information" means all of the Company's information technologies, trade secrets, "technical know-how," patents, licenses, customer lists, pricing policies, operational methods, programs, and other business information of the Company.

    Each Member / Interest Holder hereby stipulates that a breach of the provisions of this Section 11.1 will result in irreparable damage and injury to the Company for which no money damages could adequately compensate it. If the Member / Interest Holder breaches the provisions of this Operating Agreement, in addition to all other remedies to which the Company may be entitled, and notwithstanding the provisions of Section 11.3, the Company shall be entitled to an injunction to enforce the provisions of this Operating Agreement, to be issued by any court of competent jurisdiction, to enjoin and restrain the Member / Interest Holder and each and every Person concerned or acting in concert with the Member from the continuance of such breach. Each Member/ Interest Holder expressly waives any claim or defense that an adequate remedy at law might exist for any such breach.

    If the provisions contained herein shall be deemed to exceed the time or geographic limits or any other limitation imposed by applicable law in any jurisdiction, then such provision shall be deemed reformed in such jurisdiction to the maximum limits permitted by applicable law.

33

SFR 23278

**CONFIDENTIAL**

11.2    Exculpation and Indemnification.

(a)    Exculpation.  To the full extent permitted by applicable law, no Covered Person shall be liable to the Company or any other Person who has an interest in or claim against the Company for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Operating Agreement; provided, that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of (i) acts or omissions by such Covered Person that are not made in good faith, or that involve intentional misconduct or a knowing violation of law, or (ii) any transaction from which such Covered Person derived an improper personal benefit.

(b)    Advancement of Expenses.  To the full extent permitted by applicable law, expenses (including reasonable attorneys' fees, disbursements, fines and amounts paid in settlement) incurred by a Covered Person defending any claim, demand, action, suit or proceeding for which the indemnification provisions under this Section 11.2 are applicable shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized by this Section 11.2.

(c)    Indemnification.  In addition to the advancement of expenses pursuant to Section 11.2(b), to the full extent permitted by applicable law, the Company agrees to indemnify, pay and hold each Covered Person harmless from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including any interest and penalties, out-of-pocket expenses and the reasonable fees and disbursements of counsel for such Covered Person in connection with any investigative, administrative or judicial proceedings, whether or not such Covered Person shall be designated a party thereto), whether absolute, accrued, conditional or otherwise and whether or not resulting from bona fide third party claims (collectively, "Indemnifiable Losses"), which may be imposed on, incurred by, or asserted against any such Covered Person, in any manner relating to or arising out of any act or omission performed or omitted by such Covered Person on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Operating Agreement; provided, that no Covered Person shall be entitled to be indemnified in respect of any Indemnifiable Losses incurred by such Covered Person by reason of (i) acts or omissions by such Covered Person that are not in good faith, or that involve intentional misconduct or a knowing violation of law, or (ii) any transaction from which such Covered Person derived an improper personal benefit; provided, further, that any indemnity payment under this Section 11.2(c) shall be provided out of and to the extent of Company assets only (including available insurance), and no Member shall have any personal liability on account thereof.

(d)    Good Faith Reliance.  A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Covered Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or

34

CONFIDENTIAL

SFR 23279

statements as to the value and amount of the assets, liabilities, or any other facts pertinent to the existence and amount of assets from which distributions to the Members might properly be paid.

(e)   Severability. To the full extent permitted by applicable law, if any portion of this Section 11.2 shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify each Covered Person and may indemnify each employee or agent of the Company as to costs, charges and expenses (including reasonable attorneys' fees), judgments, fines and amounts paid in settlement with respect to any action, suit or proceeding, whether civil, criminal, administrative or investigative, including an action by or in the right of the Company, in each case to the full extent permitted by applicable law.

(f)   Survival. The provisions of this Section 11.2 shall survive any termination of this Operating Agreement and shall continue as to a Person who has ceased to be a Covered Person and shall inure to the benefit of the heirs, executors, administrators, successors and assigns of such Covered Person.

(g)   Indemnification Not Exclusive. The indemnification and advancement of expenses provided by, or granted pursuant to, this Section 11.2 shall not be deemed exclusive of any other rights to which a Covered Person may be entitled at law or in equity, including common law rights to indemnification and/or contribution (if any). Nothing in this Section 11.2 shall affect the rights or obligations of any Covered Person (or the limitations on those rights or obligations) under any other agreement or instrument to which such Covered Person is a party.

11.3   Arbitration. Any action to enforce or interpret this Operating Agreement, or to resolve disputes with respect to this Operating Agreement as between the Managers or a Member / Interest Holder, or between or among the Member / Interest Holders, shall be settled by arbitration in accordance with the rules of the American Arbitration Association. Arbitration shall be the exclusive dispute resolution process in the State of Illinois, but arbitration shall be a nonexclusive process elsewhere. Any party may commence arbitration by sending a written demand for arbitration to the other parties. Such demand shall set forth the nature of the matter to be resolved by arbitration. The place of arbitration shall be Chicago, Illinois, unless the Managers shall select another place of arbitration. The substantive law of the State of Illinois shall be applied by the arbitrator to the resolution of the dispute. The prevailing party shall be entitled to reimbursement from the non-prevailing party of attorney fees, costs, and expenses incurred in connection with the arbitration. All decisions of the arbitrator shall be final, binding, and conclusive on all parties. Judgment may be entered upon any such decision in accordance with applicable law in any court having jurisdiction thereof. The arbitrator (if permitted under applicable law) or such court may issue a writ of execution to enforce the arbitrator's decision.

## ARTICLE XII.

## MISCELLANEOUS PROVISIONS

12.1   **Notices.** All notices, demands requests or other communications which may be or are required to be given to, served upon or sent by a Member, the Managers, or the Company pursuant to

CONFIDENTIAL

SFR 23280

this Operating Agreement shall be in writing and shall be deemed given as of delivery when sent by certified mail, postage and fees prepaid, in the United States mails; Federal Express, United Parcel Service, DHL WorldWide Express, or Airborne Express, charges prepaid or charged to the sender's account; when personally delivered to the recipient; when transmitted to the recipient by electronic means, and such transmission is electronically confirmed as having been successfully transmitted, delivered or addressed as follows:

    (a)    To the Company, by notice sent to each Member at the address specified in Exhibit A;

    (b)    To the Managers, by notice sent to each Manager at the address specified in Exhibit A;

    (c)    To the Member, by notice sent to each Member at the address specified in Exhibit A;

    (d)    To JRB or North Fork, by notice sent to JRB or North Fork, as the case may be, at the address specified in Exhibit A, in each case with a copy to the following, which shall not constitute notice:

    Ernest S. Wechsler
    Kramer Levin Naftalis & Frankel LLP
    1177 Avenue of the Americas
    New York, New York 10036
    Fax: 212-715-8086
    Email: EWechsler@KRAMERLEVIN.com

12.2    **Books of Account and Records.**  Proper and complete records and books of account shall be kept or shall be caused to be kept by the Managers in which shall be entered fully and accurately all transactions relating to the Company's business in such detail and completeness as is customary and usual for businesses of the type engaged in by the Company. Such books and records shall be maintained as provided in Section 7.11. The books and records shall at all times be maintained at the principal place of business of the Company or its attorneys.

12.3    **Application of Illinois Law.**  This Operating Agreement and its interpretation shall be governed exclusively by its terms and by the laws of the State of Illinois, and specifically the Act.

12.4    **Waiver of Action for Partition.**  Each Member / Interest Holder irrevocably waives during the term of the Company any right that it may have to maintain any action for the partition with respect to the property of the Company.

12.5    **Amendments.**  Any amendment to this Operating Agreement shall be in writing and shall require the written consent of Super-Majority Interest of the Membership Interests; provided, that (a) if such amendment would disproportionately and adversely affect any specific rights or obligations of any Member as compared to other Members holding the same class of Membership Interests, the amendment shall require the written consent of such Member and (b) any amendment to Sections 3.2, 3.3, 3.4(a), 3.7, 7.1, 7.2(d), 7.5, 8.1, 8.2, 8.3(b), 8.4, 8.5, 8.6, 9.1, 10.2(b) and this

36

CONFIDENTIAL

SFR 23281

Section 12.5 shall require the written consent of all of the Members.

12.6   **Execution of Additional Documents.**   Each Member to this Operating Agreement shall promptly execute and deliver any and all additional documents, instruments, notices, and other assurances, and shall do any and all other acts and things, reasonably necessary in connection with the performance of their respective obligations under this Operating Agreement and to carry out the intent of the parties.

12.7   **Construction.**   Whenever the singular number is used in this Operating Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

12.8   **Headings.**   The headings in this Operating Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Operating Agreement or any provision hereof.

12.9   **Waivers.**   The failure of any party to seek redress for default of or to insist upon the strict performance of any covenant or condition of this Operating Agreement shall not prevent a subsequent act, which would have originally constituted a default, from having the effect of an original default.

12.10   **Rights and Remedies Cumulative.**   The rights and remedies provided by this Operating Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any other remedy.   Said rights and remedies are given in addition to any other legal rights the parties may have.

12.11   **Severability.**   If any provision of this Operating Agreement or the application thereof to any person or circumstance shall be invalid, illegal or unenforceable to any extent, that provision shall, if possible, be construed as though more narrowly drawn, if a narrower construction would avoid such invalidity, illegality, or unenforceability or, if that is not possible, such provision shall, to the extent of such invalidity, illegality, or unenforceability, be severed, and the remainder of this Operating Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

12.12   **Heirs, Successors and Assigns.**   Subject to Article 8, each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Operating Agreement, their respective heirs, legal representatives, successors and assigns.

12.13   **Creditors.**   None of the provisions of this Operating Agreement shall be for the benefit of or enforceable by any creditors of the Company.

12.14   **Counterparts; Facsimile Signatures.**   This Operating Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.   The facsimile signature of any Manager or any Member may be used at all times and for all purposes in place of an original signature.

37

**CONFIDENTIAL**

SFR 23282

12.15   <u>Entire Agreement</u>. This Operating Agreement supersedes all agreements previously made between the parties relating to its subject matter. There are no other understandings or agreements between them. It contains the entire agreement of the parties. It may not be changed orally but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification, extension or discharge is sought.

12.16   <u>Joint Preparation</u>. The parties hereto have participated jointly in the negotiation and drafting of this Operating Agreement. In the event an ambiguity or question of intent or interpretation arises, this Operating Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Operating Agreement.

12.17   <u>Incorporation of Exhibits, Annexes, and Schedules</u>. The Exhibits, Annexes, and Schedules identified in this Operating Agreement are incorporated herein by reference and made a part hereof.

12.18   <u>Capacity and Authority to Execute Agreement</u>. Each Member represents and warrants to the other Members that the Member has the capacity and authority to enter into this Operating Agreement, and that doing so does not violate any applicable law or the rights of any third parties.

12.19   <u>Time of the Essence</u>. Time is of the essence of every provision of this Operating Agreement that specifies a time for performance.

12.20   <u>Limitation on Benefits of this Operating Agreement</u>. This Operating Agreement is made solely for the benefit of the Members to this Operating Agreement and their respective permitted successors and assigns, and no other Person shall have or acquire any right by virtue of this Operating Agreement.

12.21   <u>Attorneys</u>. Howard & Howard Attorneys PLLC provides legal services to the Company, the Managers, certain Affiliates of the Managers, one or more of the Members individually, and certain Affiliates of the Members, which may result in conflicts of interest for such counsel. Each Member is directed to seek such Member's own legal counsel related to this Operating Agreement and is encouraged to do so. By entering into this Operating Agreement, each Member, the Managers and the Company acknowledge the potential conflicts of interest and consent to this dual representation. Further, each party to this Operating Agreement acknowledges and understands that the law firm of Howard & Howard Attorneys PLLC prepared this Operating Agreement on behalf of and in the course of its representation of the Company and that:

(a)   The parties have each been advised by Howard & Howard Attorneys PLLC that a conflict exists among their individual interests;

(b)   The parties have each been advised by Howard & Howard Attorneys PLLC to seek the advice of independent counsel;

(c)   The parties waive any conflicts in the representation of the various related entities by Howard & Howard Attorneys PLLC and consent to its representation of the Company

**CONFIDENTIAL**

SFR 23283

notwithstanding any potential conflicts; and

(d)     The parties have each had the opportunity to seek the advice of independent counsel.

SIGNATURE PAGE FOLLOWS

39

SFR 23284

IN WITNESS WHEREOF, the parties hereto have caused their signatures, or the signatures of their duly authorized representatives, to be set forth below on the day and year first above written.

Howard & Howard Attorneys PLLC
200 South Michigan Avenue, Suite 1100
Chicago, IL 60604

By: _____
   Name: Brian F Hynes
   Title: Counsel/Proxy

SOLIS STRATEGIES, LLC, a District of Columbia limited
liability company
3719 Morrison Street NW
Washington, D.C. 20015

By: _____
   Name:
   Title:

DAM INVESTMENTS LLC, a Delaware limited liability company
880 Lee Street, Suite 302
Des Plaines, IL 60016

By: _____
   Name:
   Title:

WARREN HILL, LLC, a Delaware limited liability company
914 Sorrell Hill Drive
Malvern, PA 19355

By: _____
   Name:
   Title:

By: _____
   Name: DREW DELANEY
   1656 N. Cleveland Ave., Unit 1
   Chicago, IL 60614

CONFIDENTIAL

SFR 23285

**IN WITNESS WHEREOF**, the parties hereto have caused their signatures, or the signatures of their duly authorized representatives, to be set forth below on the day and year first above written.

Howard & Howard Attorneys PLLC
200 South Michigan Avenue, Suite 1100
Chicago, IL  60604

By: _____
      Name:
      Title:

SOLIS STRATEGIES, LLC, a District of Columbia limited
liability company
3719 Morrison Street NW
Washington, D.C. 20015

By: _____
      Name:
      Title:

DAM INVESTMENTS LLC, a Delaware limited liability company
880 Lee Street, Suite 302
Des Plaines, IL  60016

By: _____
      Name:
      Title:

WARREN HILL, LLC, a Delaware limited liability company
914 Sorrell Hill Drive
Malvern, PA 19355

By: _____
      Name:
      Title:

By: _____
      Name: DREW DELANEY
      1656 N. Cleveland Ave., Unit 1
      Chicago, IL  60614

**CONFIDENTIAL**

SFR 23286

**IN WITNESS WHEREOF**, the parties hereto have caused their signatures, or the signatures of their duly authorized representatives, to be set forth below on the day and year first above written.

Howard & Howard Attorneys PLLC
200 South Michigan Avenue, Suite 1100
Chicago, IL 60604

By: _____
     Name:
     Title:

SOLIS STRATEGIES, LLC, a District of Columbia limited
liability company
3719 Morrison Street NW
Washington, D.C. 20015

By: _____
     Name:
     Title:

DAM INVESTMENTS LLC, a Delaware limited liability company
880 Lee Street, Suite 302
Des Plaines, IL 60016

By: *Dustin Mauldin*
     Name: DUSTIN MAULDIN
     Title: MANAGING MEMBER

WARREN HILL, LLC, a Delaware limited liability company
914 Sorrell Hill Drive
Malvern, PA 19355

By: _____
     Name:
     Title:

By: _____
     Name: DREW DELANEY
        1656 N. Cleveland Ave., Unit 1
        Chicago, IL 60614

**CONFIDENTIAL**

SFR 23287

IN WITNESS WHEREOF, the parties hereto have caused their signatures, or the signatures of their duly authorized representatives, to be set forth below on the day and year first above written.

Howard & Howard Attorneys PLLC
200 South Michigan Avenue, Suite 1100
Chicago, IL 60604

By: _____
     Name:
     Title:

SOLIS STRATEGIES, LLC, a District of Columbia limited
liability company
3719 Morrison Street NW
Washington, D.C. 20015

By: _____
     Name:
     Title:

DAM INVESTMENTS LLC, a Delaware limited liability company
880 Lee Street, Suite 302
Des Plaines, IL 60016

By: _____
     Name:
     Title:

WARREN HILL, LLC, a Delaware limited liability company
914 Sorrell Hill Drive
Malvern, PA 19355

By: _____
     Name: JASON R CANNON
     Title: President

By: _____
     Name: DREW DELANEY
     1656 N. Cleveland Ave., Unit 1
     Chicago, IL 60614

**CONFIDENTIAL**

SFR 23288

CHGO REAL ESTATE CONSULTING GROUP, LLC,
an Illinois limited liability company
200 South Michigan Avenue, Suite 1100
Chicago, IL 60604

By: _Kathleen A Hynes_
        Name: Kathleen Hynes
        Title: Manager

NAI ARK FUNDING, LLC, a Delaware limited liability company
109 Masons Way
Newtown Square, PA 19073

By: _____
        Name:
        Title:

THE ELEVEN CORPORATION, LTD, a Colorado limited
liability company
2611 Bryant St
Denver, CO 80211

By: _____
        Name:
        Title:

JRB CA, LLC
211 Central Park West 6K
New York, NY 10024

By: _____
        Name:  J. Richard Blewitt
        Title:  Managing Member

NORTH FORK CAPITAL, LLC
750 East Mill Road
Mattituck, NY 11952

By: _____
        Name:  James Neumann
        Title:  Managing Partner

**CONFIDENTIAL**

SFR 23289

CHGO REAL ESTATE CONSULTING GROUP, LLC,
an Illinois limited liability company
200 South Michigan Avenue, Suite 1100
Chicago, IL  60604

By: _____
        Name:
        Title:

NAI ARK FUNDING, LLC, a Delaware limited liability company
109 Masons Way
Newtown Square, PA 19073

By: _____
        Name: DAVID REAVES
        Title: President

THE ELEVEN CORPORATION, LTD, a Colorado limited
liability company
2611 Bryant St
Denver, CO 80211

By: _____
        Name:
        Title:

JRB CA, LLC
211 Central Park West 6K
New York, NY 10024

By: _____
        Name:  J. Richard Blewitt
        Title:  Managing Member

NORTH FORK CAPITAL, LLC
750 East Mill Road
Mattituck, NY 11952

By: _____
        Name:  James Neumann
        Title:  Managing Partner

**CONFIDENTIAL**

SFR 23290

CHGO REAL ESTATE CONSULTING GROUP, LLC,
an Illinois limited liability company
200 South Michigan Avenue, Suite 1100
Chicago, IL 60604

By: _____
         Name:
         Title:

NAI ARK FUNDING, LLC, a Delaware limited liability company
109 Masons Way
Newtown Square, PA 19073

By: _____
         Name:
         Title:

THE ELEVEN CORPORATION, LTD, a Colorado limited
liability company
2611 Bryant St
Denver, CO 80211

By: _____
         Name:  JEFF GALVANE
         Title:  MANAGING MEMBER

JRB CA, LLC
211 Central Park West 6K
New York, NY 10024

By: _____
         Name:  J. Richard Blewitt
         Title:  Managing Member

NORTH FORK CAPITAL, LLC
750 East Mill Road
Mattituck, NY 11952

By: _____
         Name:  James Neumann
         Title:  Managing Partner

CONFIDENTIAL

SFR 23291

CHGO REAL ESTATE CONSULTING GROUP, LLC,
an Illinois limited liability company
200 South Michigan Avenue, Suite 1100
Chicago, IL 60604

By: _____
      Name:
      Title:

NAI ARK FUNDING, LLC, a Delaware limited liability company
109 Masons Way
Newtown Square, PA 19073

By: _____
      Name:
      Title:

THE ELEVEN CORPORATION, LTD, a Colorado limited
liability company
2611 Bryant St
Denver, CO 80211

By: _____
      Name:
      Title:

JRB CA, LLC
211 Central Park West 6K
New York, NY 10024

By: _J. Richard Blewitt_____
      Name: J. Richard Blewitt
      Title: Managing Member

NORTH FORK CAPITAL, LLC
750 East Mill Road
Mattituck, NY 11952

By: _____
      Name: James Neumann
      Title: Managing Partner

**CONFIDENTIAL**

SFR 23292

CHGO REAL ESTATE CONSULTING GROUP, LLC,
an Illinois limited liability company
200 South Michigan Avenue, Suite 1100
Chicago, IL 60604

By: _____
      Name:
      Title:

NAI ARK FUNDING, LLC, a Delaware limited liability company
109 Masons Way
Newtown Square, PA 19073

By: _____
      Name:
      Title:

THE ELEVEN CORPORATION, LTD, a Colorado limited
liability company
2611 Bryant St
Denver, CO 80211

By: _____
      Name:
      Title:

JRB CA, LLC
211 Central Park West 6K
New York, NY 10024

By: _____
      Name:  J. Richard Blewitt
      Title:  Managing Member

NORTH FORK CAPITAL, LLC
750 East Mill Road
Mattituck, NY 11952

By: _____
      Name:  James Neumann
      Title:  Managing Partner

CONFIDENTIAL

SFR 23293

EXHIBIT "D"

# Electronic Articles of Organization
## For
# Florida Limited Liability Company

L17000060308
FILED 8:00 AM
March 15, 2017
Sec. Of State
jafason

## Article I

The name of the Limited Liability Company is:

BLUESTONE CAPITAL MARKETS, LLC

## Article II

The street address of the principal office of the Limited Liability Company is:

700 W MORSE BOULEVARD
SUITE 220
WINTER PARK, FL. US  32789

The mailing address of the Limited Liability Company is:

700 W MORSE BOULEVARD
SUITE 220
WINTER PARK, FL. US  32789

## Article III

The name and Florida street address of the registered agent is:

CS SUNBIZ, LLC
700 W MORSE BOULEVARD
SUITE 220
WINTER PARK, FL.   32789

Having been named as registered agent and to accept service of process for the above stated limited liability company at the place designated in this certificate, I hereby accept the appointment as registered agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes relating to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.

Registered Agent Signature:  SARAH HAMPTON

## Article IV

The name and address of person(s) authorized to manage LLC:

L17000060308
FILED 8:00 AM
March 15, 2017
Sec. Of State
jafason

    Title:  MGR
    AHG MANAGER, LLC
    700 W MORSE BOULEVARD, SUITE 220
    WINTER PARK, FL.  32789  US

Signature of member or an authorized representative

Electronic Signature: GENE HARRIS

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.

Florida Department of State

DIVISION OF CORPORATIONS



Department of State  /  Division of Corporations  /  Search Records  /  Detail By Document Number  /

# Detail by Entity Name

Florida Limited Liability Company
BLUESTONE CAPITAL MARKETS, LLC

**Filing Information**

| | |
|---|---|
| **Document Number** | L17000060308 |
| **FEI/EIN Number** | 32-0521594 |
| **Date Filed** | 03/15/2017 |
| **State** | FL |
| **Status** | ACTIVE |

**Principal Address**

700 W MORSE BOULEVARD
SUITE 220
WINTER PARK, FL 32789

**Mailing Address**

700 W MORSE BOULEVARD
SUITE 220
WINTER PARK, FL 32789

**Registered Agent Name & Address**

CS SUNBIZ, LLC
700 W MORSE BOULEVARD
SUITE 220
WINTER PARK, FL 32789

**Authorized Person(s) Detail**

**Name & Address**

Title MGR

Hynes, Brian
200 S Michigan Avenue
Suite 1100
Chicago, IL 60604

Title MGR

Harris, Gene
700 W MORSE BOULEVARD
SUITE 220
WINTER PARK, FL 32789

Title MGR

Weems, Malcom
200 S Michigan Avenue
Suite 1100
Chicago, IL 60604

Title MGR

Reape, David
109 Masons Way
Newtown Square, PA 19073

Title MGR

Ryerson, Mark
200 S Michigan Avenue
Suite 1100
Chicago, IL 60604

Title MGR

Martin, Marty
200 S Michigan Avenue
Suite 1100
Chicago, IL 60604

**Annual Reports**

| **Report Year** | **Filed Date** |
| --- | --- |
| 2018 | 02/28/2018 |

**Document Images**

| | |
| --- | --- |
| 02/28/2018 -- ANNUAL REPORT | View image in PDF format |
| 03/15/2017 -- Florida Limited Liability | View image in PDF format |

# EXHIBIT "E"

# OPERATING AGREEMENT

## OF

## BLUESTONE CAPITAL MARKETS, LLC

**A Florida Limited
Liability Company**

THE UNITS REPRESENTED BY THIS DOCUMENT HAVE NOT BEEN REGISTERED UNDER ANY SECURITIES LAWS AND THE TRANSFERABILITY OF SUCH UNITS IS RESTRICTED. A UNIT MAY NOT BE SOLD, ASSIGNED OR TRANSFERRED, NOR WILL ANY ASSIGNEE, VENDEE, TRANSFEREE OR ENDORSEE THEREOF BE RECOGNIZED AS HAVING ACQUIRED ANY SUCH UNIT BY THE ISSUER FOR ANY PURPOSES, UNLESS (1) A REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933, AS AMENDED, WITH RESPECT TO SUCH UNIT WILL THEN BE IN EFFECT AND SUCH TRANSFER HAS BEEN QUALIFIED UNDER ALL APPLICABLE STATE SECURITIES LAWS, OR (2) THE AVAILABILITY OF AN EXEMPTION FROM SUCH REGISTRATION AND QUALIFICATION WILL BE ESTABLISHED TO THE SATISFACTION OF COUNSEL TO THE COMPANY.

3447558\

SFR 23206

**CONFIDENTIAL**

# OPERATING AGREEMENT
## OF
## BLUESTONE CAPITAL MARKETS, LLC

THIS OPERATING AGREEMENT (this "Agreement") is made and entered into effective as of the 15th day of March, 2017, by and among the persons listed on Exhibit A attached hereto and made a part hereof (hereinafter sometimes referred to collectively as the "Members" and individually as a "Member"). Capitalized terms not defined within this Agreement are defined as provided in Appendix A. The term "Section" refers to sections of this Agreement unless otherwise stated.

WHEREAS, the Members have formed the Company under the Florida Revised LLC Act (as defined below); and

WHEREAS, the Members desire to adopt this Agreement in order to set forth the regulations, terms and conditions under which the Company will be operated.

NOW, THEREFORE, set forth below are the terms and conditions of the operation of the Company.

## ARTICLE 1

## THE COMPANY

**1.1    Formation.** BLUESTONE CAPITAL MARKETS, LLC (the "Company") is a limited liability company formed pursuant to the provisions of the Florida Revised Limited Liability Company Act (Chapter 605, Florida Statutes) as amended (the "LLC Act"). The Articles of Organization of the Company (the "Articles") were filed with the Department of State of the State of Florida on March 15, 2017. The rights and liabilities of the Members will be as provided in the LLC Act except as otherwise provided in this Agreement.

**1.2    Company Name.** The name of the Company is **BLUESTONE CAPITAL MARKETS, LLC.**

**1.3    Purposes.** The purpose of the Company shall be to (a) hold equity interests in one or more trusts that hold receivables pursuant to the Illinois vendor assistance program; (b) enter into any lawful transaction and to engage in any operations, businesses or activities permitted under the LLC Act and any other applicable law or regulation, and (c) otherwise engage in any lawful activities in furtherance of, or necessary, ancillary or incidental to the foregoing purposes of the Company.

**1.4    Principal Office.** The initial principal office of the Company is located at 700 West Morse Boulevard, Suite 220, Winter Park, Florida 32789. The principal office of the Company may be relocated from time to time by determination of the Managers, and the Members shall be promptly provided notification of such relocation.

**1.5    Term.** The Company as herein constituted shall continue in existence for perpetuity, unless dissolved or terminated pursuant to law or the provisions of this Agreement.

3447558\

SFR 23207

**1.6     Filings; Registered Agent for Service of Process; Registered Office.**

(a)     The Articles have been filed with the Florida Department of State in accordance with the provisions of the LLC Act. The Managers will take any and all other actions reasonably necessary to perfect and maintain the status of the Company as a limited liability company under the laws of Florida.

(b)     The Managers will take any and all other actions as may be reasonably necessary to perfect and maintain the status of the Company as a limited liability company or similar type of entity under the laws of any states or jurisdictions other than Florida in which the Company engages in business.

(c)     The Company's registered agent for service of process on the Company in Florida shall be CS Sunbiz, LLC. The Managers may change, at any time and from time to time, such registered agent, and the Members shall be promptly provided notification of such change.

(d)     The Company's registered office in Florida shall at 700 West Morse Boulevard, Suite 220, Winter Park, Florida 32789. The Managers may change, at any time and from time to time, such registered office, and the Members shall be promptly provided notification of such change.

(e)     Upon the dissolution of the Company, the Managers will promptly execute and cause to be filed a certificate of cancellation in accordance with the LLC Act and the law of any other states or jurisdictions in which the Company has qualified to conduct business.

**1.7     Defined Terms.**  Unless the context otherwise requires or unless otherwise provided in this Agreement, capitalized terms used in this Agreement shall have the meanings ascribed to them as set forth in Appendix A to this Agreement.

## ARTICLE 2

## MEMBERS, UNITS AND PERCENTAGE INTERESTS

**2.1     Names, Addresses, Units and Percentage Interests of Members.**  The names, addresses and number of Units held by each Member and respective Percentage Interests of the Members are set forth on Exhibit A hereto. The Managers shall amend Exhibit A from time to time to reflect the admission or withdrawal of Members (which shall be accomplished consistent with the terms of this Agreement); the sale, grant, issuance or redemption of Units (which shall be accomplished consistent with the terms of this Agreement); the receipt of Capital Contributions; or a change of a Member's address.

**2.2     Certificates for Units.**  A Member's Units may, but need not, be represented by a Certificate of Membership. The Managers will determine the exact contents of a Certificate of Membership, if any.

**2.3     Authorized Units; Admission of Additional Members.**  The Company shall be authorized to issue up to 10,000 Units. As of the date of this Agreement, such Units shall be issued and outstanding as forth in Exhibit A. Subject to any approval of the Members required

2

3447558\

**CONFIDENTIAL**

SFR 23208

under **Section 6.1(e)**, additional Members may be admitted to the Company as Members and Units may be issued to those Persons upon the written consent of (i) the Members holding at least sixty seven percent (67%) of the Percentage Interests, and (ii) seventy five percent (75%) of the Managers, on such terms and conditions as the Managers may determine at the time of admission. Any such admission shall be effective only after the new Member has executed and delivered to the Managers a document including the new Member's notice address and its agreement to be bound by this Agreement.

2.4    **Voting.** Unless otherwise specified herein, any event, transaction or occurrence requiring approval of the Members shall be deemed to require an affirmative vote of the Members holding at least a majority of the Percentage Interests.

## ARTICLE 3

## CAPITAL CONTRIBUTIONS

3.1    **Capital Contributions.** The Members have made, or will make, Capital Contributions as set forth on Exhibit A to this Agreement, and the Managers shall revise such Exhibit A from time to time, as appropriate, to reflect any changes to the Capital Contributions, the transfer of Membership Interests or the addition of Additional Members, as the case may be. Except as set forth in **Section 3.3** below, no Member will be required to make any Capital Contributions other than the initial Capital Contributions that Members are required to make pursuant to this **Section 3.1.**

3.2    **Other Matters.**

(a)    Except as otherwise provided in this Agreement, no Member may demand or receive a return of his, her or its Capital Contribution or withdraw from the Company. Under circumstances requiring a return of any Capital Contribution, no Member will have the right to receive property other than cash, except as may be specifically provided in this Agreement.

(b)    No Member will be liable for the debts, liabilities, contracts or any other obligations of the Company except to the extent such Member independently agrees to be so liable. It is the intention of the Members that all Members shall have the benefit of Section 605.0304 of the LLC Act. In addition, no Member shall be obligated to make an additional Capital Contribution to the Company, to restore a negative Capital Account balance or otherwise.

3.3    **Additional Capital Contributions.**

(a)    Members may only be required to make additional Capital Contributions to the Company upon the unanimous approval of the Members. However, if the Managers determine that an Operating Deficit or a Shortfall (as defined in subsection (b) below) has occurred or is about to occur, then it may request that the Members make additional Capital Contributions to the Company as may be necessary to fund such Operating Deficit, as set forth below; provided, however, that no Member shall be obligated to make any such requested additional Capital Contributions.

3

3447558\

**CONFIDENTIAL**

SFR 23209

(b)     Notwithstanding the provisions of this **Section 3.3**, in the event that the Company lacks sufficient funds in order to accomplish the purposes of the Company's business (a "Shortfall"), the Company may, upon the reasonable discretion of the Managers, obtain from one or more Members, a financial institution or other sources, one or more loans to the Company to fund all or part of the cash required to fund the Shortfall. Any such loan shall bear interest at such rate, be secured in such manner and be repayable on such terms as the Managers deem advisable, in its sole and absolute discretion; provided, however, that if such loan is from a Member or one of its Affiliates, then the terms of such loan must either (i) be fair and reasonable as to the Company at the time such loan is made, or (ii) be approved in writing by all of the Members.

## ARTICLE 4

## CAPITAL ACCOUNTS AND ALLOCATIONS

4.1     **Capital Accounts.**

(a)     Creation and Maintenance. A separate capital account (each a "Capital Account") shall be established and maintained for each Member (including any Additional Member or Substitute Member) in accordance with the rules of Treasury Regulations Section 1.704-1(b)(2)(iv), and this **Section 4.1(a)** shall be interpreted and applied in a manner consistent therewith. The Capital Account of each Member shall, except as expressly stated herein to the contrary, initially consist of the amount of its Capital Contribution. The Member's Capital Account shall be increased by (i) the amount of cash it contributes to the Company and (ii) its allocable share of Profits and items thereof, including the Special Allocations of **Section 4.2(c)** and **Section 4.2(d)**, allocated to it pursuant to the provisions of this Agreement. Its Capital Account shall be decreased by (i) the amount of any cash distributed to it, (ii) the fair market value of any Company Property distributed to it (net of the amount of any Company liability assumed by such Member or which is secured by any Company Property distributed to such Member), (iii) its allocable share of Losses and items thereof, including the Special Allocations of **Section 4.2(c)** and **Section 4.2(d)**, allocated to it pursuant to the provisions of this Agreement, (iv) its share of any expenditures described in IRC Section 705(a)(2)(B), and (v) such other items as are required by the Regulations.

4.2     **Allocation of Profits and Losses.** After taking account of the special allocations of Sections **4.2(c)** and **4.2(d)**, Profits and Losses shall be allocated as follows:

(a)     Allocation of Profits. Profits for any taxable year or portion thereof shall be allocated among the Members in proportion to their respective Percentage Interests.

(b)     Allocation of Losses.

(1)     General. Losses for any taxable year or portion thereof shall be allocated among the Members in proportion to their respective Percentage Interests.

(2)     Loss Limitation. Notwithstanding any other provisions of this Agreement, no Losses (or items thereof) shall be allocated to a Member under this **Section 4.2(b)** to the extent that such allocation would result in or cause a further

4

**CONFIDENTIAL**

SFR 23210

increase in a deficit to its Adjusted Capital Account. In such event, such Losses (or portion thereof) shall be allocated among the remaining Members pro rata in proportion to their respective Percentage Interests, except to the extent not permitted under the previous sentence. If any Member is allocated Losses (or items thereof) under the first previous sentence, subsequent Profits shall be allocated to such Member(s) to offset such Loss allocation (pro rata in proportion to and to the extent of the Losses so allocated) prior to any further allocations under **Section 4.2(a)**. If no Member may be allocated any such Losses under the first sentence of this paragraph, then the Losses shall be allocated among all Members in proportion to their respective Percentage Interests.

(c)    Special Allocations. Notwithstanding anything to contrary contained in **Sections 4.2(a)** and **(b)**, the following special allocations sections of this **Section 4.2(c)** and the following **Sections 4.2(d)**  **4.2(e)** and **4.2(g)** shall in all events apply in determining the allocation of Profits and Losses among the Members and shall be made prior to any allocations required under **Sections 4.2(a)** and **(b)**.

(i)    Nonrecourse Deductions.    Nonrecourse Deductions shall be allocated to the Members in proportion to their Percentage Interests.

(ii)    Member Nonrecourse Deductions.    Any Member Nonrecourse Deductions for any taxable year shall be allocated to the Member(s) bearing the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Regulations §1.704-2 (i)(1).

(iii)    Company Minimum Gain. Notwithstanding any other provisions of this Agreement, in the event there is a net decrease in Company Minimum Gain during a taxable year, the Members shall be allocated items of income and gain in accordance with Treasury Regulations Section 1.704-2(f). This **Section 4.2(c)(iii)** is intended to comply with the minimum gain charge-back requirement of Treasury Regulations Section 1.704-2(f) and shall be interpreted and applied in a manner consistent therewith.

(iv)    Member Minimum Gain. Notwithstanding any provision of this Agreement to the contrary except **Section 4.2(c)(iii)** and subject to the exceptions set forth in Section 1.704-2(i)(4) of the Treasury Regulations, if there is a net decrease in Member Nonrecourse Debt Minimum Gain during any Company fiscal year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain, determined in accordance with Section 1.704-2(i)(3) of the Treasury Regulations, shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain, determined in accordance with Section 1.704-2(i)(5) of the Treasury Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Section 1.704-2(i)(4) of the Treasury Regulations. This **Section 4.2(c)(iv)** is intended to comply with the minimum gain chargeback requirement in such

3447558\

SFR 23211

CONFIDENTIAL

section of the Treasury Regulations and shall be interpreted consistently therewith. Solely for purposes of this **Section 4.2(c)(iv)**, each Member's Adjusted Capital Account Balance shall be determined prior to any other allocations pursuant to this **Article 4** of this Agreement with respect to such fiscal year, other than allocations pursuant to **Section 4.2(c)(iii)** hereof.

(v)   Qualified Income Offset. Any Member who unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) that causes a deficit balance in its Capital Account (in excess of any amounts which such Member is obligated to restore to the Company, or any deemed deficit restoration obligation pursuant to Treasury Regulations Sections 1.704-2(g)(1) and (i)(5)), shall be allocated items of income and gain in an amount and a manner sufficient to eliminate, to the extent required by the Treasury Regulations, such deficit balance as quickly as possible. This **Section 4.2(c)(v)** is intended to comply with the alternate test for economic effect set forth in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted and applied in a manner consistent therewith.

(vi)   Gross Income Allocation. If any Member has a deficit balance in its Adjusted Capital Account at the end of any Company taxable year, each such Member shall be specially allocated items of Company income and gain in the amount of such deficit as quickly as possible, provided that an allocation pursuant to this **Section 4.2(c)(vi)** shall be made only if and to the extent that such Member would have a deficit balance in its Adjusted Capital Account after all other allocations provided for in this **Article 4** have been made, as if this **Section 4.2(c)(vi)** and **Section 4.2(c)(v)** hereof were not in this Agreement.

(vii)   IRC Section 754 Adjustments. To the extent an adjustment to the adjusted basis of any Company asset pursuant to IRC Section 734(b) or IRC Section 743(b) is required, pursuant to the Regulations to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (of the adjustment decreases such basis), and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such section of the Regulations. In connection with any such adjustment under this Section, the Member who benefits from the election (i.e., the new Member or Member succeeding to a Membership Interest) shall bear the burden of the costs associated with making such election.

(d)   Corrective Allocations. The allocations set forth in **Section 4.2(c)** (the "Regulatory Allocations") are intended to comply with the requirements of Treasury Regulations Sections 1.704-1(b) and 1.704-2. Notwithstanding any other provisions of this **Article 4** (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account as provided in the following two sentences. Income, gain, loss and deduction shall be reallocated to the extent that such reallocation causes the net aggregate amount of allocations of income, gain, deduction and loss to each Member to be equal to or more closely approximate the net aggregate amount of such items that would have been allocated to each such Member if the Regulatory Allocations had not occurred. This

6

3447558\

**CONFIDENTIAL**

SFR 23212

Section 4.2(d) shall be interpreted and applied in such a manner and to such extent as is reasonably necessary to eliminate, as quickly as possible, permanent distortions to the intended economic arrangement among the Members, that would otherwise occur as a consequence of the Regulatory Allocations in the absence of this **Section 4.2(d)**.

(e)    Application of IRC Section 704(c).  Notwithstanding any other provision of this Agreement, to the extent required by law, taxable income, gain, loss, deduction, and items thereof attributable to property contributed to the Company by a Member, and Company Property that has been revalued pursuant to **Section 4.1(b)** shall be shared among the Members so as to take into account any variation between the basis of the property and the fair market value of the property at the time of contribution or revaluation in accordance with the requirements of IRC Section 704(c) and the applicable regulations thereunder.  Further, if IRC Section 704(c) applies to any such property, all required reallocations shall be made using the method(s) prescribed by the Managers in its sole discretion.

(f)    Distributions of Nonrecourse Liability Proceeds.  If, during a taxable year, the Company makes a distribution to any Member that is allocable to the proceeds of any nonrecourse liability of the Company that is allocable to an increase in Company Minimum Gain pursuant to Treasury Regulations Section 1.704-2(h), then the Company shall elect, to the extent permitted by Treasury Regulations Section 1.704-2(h)(3), to treat such distribution as a distribution that is not allocable to an increase in Company Minimum Gain.

(g)    Other Allocation Provisions.  Except as otherwise provided herein, any elections or other decisions relating to the allocations of Company items of income, gain, loss, deduction or credit shall be made by the Members in any manner that reasonably reflects the purpose and intention of this Agreement.

**4.3    Tax Representative.**  SFR Equities, LLC, a Florida limited liability company, is hereby designated as (i) the "Tax Matters Partner," as defined in Section 6231(a) (7) of the Code (as in effect for tax years beginning before December 31, 2017), and (ii) the partnership representative within the meaning of Section 6223(a) of the Code (as in effect for tax years beginning after December 31, 2017) (in either capacity, the "Tax Representative").  The Tax Representative shall make all elections required or permitted by the Code with respect to the Company's federal income tax returns, including whether to make the small partnership election out of the new partnership audit rules provided for under Section 6221(b)(1) (as in effect for tax years beginning before December 31, 2017).  In the event that a successor Tax Representative is required, the Managers shall have the authority to appoint a Person as Tax Representative.

**4.4    Notice of Tax Examinations; Tax Reporting.**  Any Member receiving advice that the Internal Revenue Service or any other government agency or official intends to examine any income tax return of the Company shall promptly notify the Managers.  No Member shall report items of income, gain, loss, or deduction to the Internal Revenue Service in a manner inconsistent with the Schedule K-1 to the Company's Federal income tax return provided by the Company without notifying the Managers.

7

3447558\

**CONFIDENTIAL**

SFR 23213

## ARTICLE 5

## DISTRIBUTIONS TO MEMBERS

**5.1    Distributions.**    Subject to **Section 5.2,** and except as otherwise provided in **Article 11** with respect to distributions upon liquidation of the Company, Distributable Cash, if any, shall be distributed to the Members at such times as the Managers may determine in their discretion, but in any event no later than ninety (90) days after the end of each calendar year, in accordance with and in proportion to their respective Percentage Interests.

**5.2    Distribution of Capital Proceeds.**    Prior to the dissolution of the Company, any Capital Proceeds shall be distributed to all of the Members, no later than thirty (30) days after the occurrence of the applicable Capital Event, following the payment or release by the Company of all outstanding debt and any expenses, as follows:

(a)    first, to each of the Members, pro rata in satisfaction of their respective positive Capital Account balances, after giving effect to all contributions, distributions, and allocations for all taxable periods; and

(b)    thereafter, to each of the Members in accordance with their respective Percentage Interests.

## ARTICLE 6

## MANAGEMENT AND CONTROL; INDEMNIFICATION

**6.1    Management of Company.**

(a)    <u>Managers</u>.    The Company shall be manager-managed by one or more managers (each such manager, the "<u>Manager</u>"), which shall initially be six (6) managers, in accordance with the provisions set forth in this Agreement.  The following individuals shall be designated as Managers:

(1)    Two (2) Managers shall be elected by CHGO Real Estate Consulting Group, LLC;

(2)    One (1) Manager shall be elected by SFR Equities, LLC;

(3)    One (1) Manager shall be elected by NAI Ark Funding, LLC;

(4)    One (1) Manager shall be elected by Brian F. Hynes, which such Manager must be a member of Howard & Howard Attorneys PLLC and be acceptable to Howard & Howard Attorneys PLLC, in its reasonable discretion; and

(5)    One (1) Manager shall be elected by a majority of the other Managers.

The initial Managers are set forth on <u>Exhibit B</u> attached hereto.

8

3447558\

SFR 23214

**CONFIDENTIAL**

(b)     Subject to the other provisions of this Agreement, the Managers shall manage the business and affairs of the Company. Except for decisions, actions or situations in which the approval of the Members, is expressly required by this Agreement or by non-waivable provisions of applicable law, the Managers shall have all powers permitted under the LLC Act as well as full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business.  The Managers shall devote such time to the Company as shall be reasonably required for its welfare and success.  Each Manager shall have full, exclusive and complete authority and discretion and all powers necessary or desirable for the performance by the Managers of all their duties and obligations under this Agreement and the Act upon the consent of a majority of the Managers to such duty or obligation.  Any action permitted or required to be taken at a meeting of the Managers may be taken without a meeting if a consent in writing, setting forth the action to be taken, is signed by Managers sufficient to approve such action and each Manager is provided with written notice one (1) business day prior to such written consent being executed (for the avoidance of doubt, the requirement that notice must be provided to each Manager does not alter the percentage threshold for such consent being approved).  Notwithstanding any other provision of this Agreement to the contrary, the Managers may not cause the Company to distribute money or property to the Members other than in the ratios or amounts set forth in this Agreement.

(c)     Powers and Duties of Managers.  Without limiting the generality of **Section 6.1(b)**, but subject to the limitations set forth in **Section 6.1(e)**, the Managers, after consent of 70% of the Managers, shall have power and authority, on behalf of the Company to:

(i)     Cause the Company to pay all required taxes (including any taxes required to be withheld under Section 1446 of the Code), assessments and other obligations of the Company;

(ii)     On behalf of the Company, execute and supervise contracts to be entered into by the Company and execute all other instruments and documents, including, without limitation, checks, drafts, notes and other negotiable instruments, mortgages or deeds of trust, security agreements, financing statements, documents providing for the acquisition, encumbrance or disposition of the Company's property, assignments, bills of sale, leases and any other instruments or documents necessary, in the opinion of the Managers, to the business of the Company;

(iii)     Borrow money for the Company from banks, other lending institutions, Members, or Affiliates of Members in accordance with this Agreement or on such terms as may be approved by the Managers, and in connection therewith, to hypothecate, encumber and grant security interests in the assets of the Company to secure repayment of the borrowed sums;

(iv)     Establish reserves to provide funds for anticipated capital expenditures and other expenses of the Company that the Managers anticipate

9

3447558\

SFR 23215

**CONFIDENTIAL**

will not be able to be funded out of the operating income of the Company and release funds from such reserves as may be reasonably appropriate;

(v)     Retain, discharge and replace the Company's accountants and attorneys, and hire and fire employees of the Company and other persons necessary or appropriate to carry out the Company's business;

(vi)     To the extent that funds of the Company are available therefor, pay all debts and other obligations of the Company;

(vii)     Maintain all funds of the Company in one or more bank accounts in such bank or banks as the Managers may from time to time select;

(viii)     Obtain and maintain such insurance as the Managers deem appropriate, in amounts and with deductibles that are deemed appropriate by the Managers;

(ix)     Take any action and do and perform all other acts which (A) are necessary or appropriate to the conduct of the Company's business, including, without limitation, all actions necessary to protect and preserve the titles and interests of the Company in the Company's assets, but (B) do not specifically require approval of the Members under this Agreement; and

(x)     Perform other normal business functions and otherwise operate and manage the business and affairs of the Company.

(d)     Responsibilities of Managers.  The Managers shall be responsible for and hereby covenants that:

(i)     they will cause the Tax Representative to provide (and the Tax Representative will provide): (A) notice of each Member's name, address and profits interest to be furnished to the IRS in accordance with § 6223(c) of the Code, provided the Tax Representative has knowledge of such Member's name, address and profits interest, (B) notice of all administrative and judicial proceedings for the adjustment at the partnership (Company) level of partnership (Company) items shall be sent to each known Member, and (C) if the IRS notifies the Company of any administrative proceeding, notice will be sent to the Service in accordance with § 6230(e) of the Code.  For the tax years beginning after December 31, 2017, the notice requirements of this Section 6.1(c)(i) shall apply as though the Code sections referenced in this Section 6.1(c)(i) were still in effect;

(ii)     it will withhold and remit to the relevant taxing authority all taxes required to be withheld pursuant to Section 1446 of the Code or any other provision of United States federal, state or local or foreign tax law; and

(iii)     it will, as soon as reasonably practicable after the end of each fiscal year of the Company, and at the expense of the Company, cause to be prepared and delivered to each Member all information with respect to the Company necessary for the Members' federal and state income tax returns.

10

3447558\

CONFIDENTIAL

SFR 23216

(c)  Restrictions on Authority of Managers and each Manager.  Neither the Manager nor any Manager shall have the authority to, and each covenants and agrees that it shall not do any of the following without the consent of the holders of at least sixty seven percent (67%) of the Percentage Interests:

(i)  sell or otherwise issue Units of the Company (including the addition of classes of Membership Interests for such sale), which action shall also require seventy five percent (75%) of the Managers as set forth in Section 2.3; or

(ii)  increase or decrease the aggregate number of Units, as adjusted for any subdivision of the Company's Units (by Unit split, Unit dividend or otherwise) or any combination of the Company's Units (by reverse Unit split or otherwise) or similar transaction; or

(iii)  sell, convey or otherwise dispose of all or substantially all of its property or business, or merge into or effect a consolidation or other reorganization with any other entity; or

(iv)  bring suit or compromise or settle any suit or claim against the Company in which the amount involved exceeds $10,000; or

(v)  use any asset of the Company for any reason unrelated to the Purpose of the Company; or

(vi)  fundamentally change the nature of the business of the Company; or

(vii)  declare or pay any distribution on, or redeem or repurchase or make any other distribution in respect of, any equity securities of the Company other than distributions made in accordance with **Article 5, Article 9** or **Article 11** hereto;

(viii)  voluntarily file for bankruptcy, liquidation, dissolution or winding up of the Company or knowing cause any event that would cause a dissolution or winding up of the Company, which in any event shall require the consent of each of the Managers; or

(ix)  take any action that would make it impossible to carry on the ordinary business of the Company.

11

3447558\

SFR 23217

**CONFIDENTIAL**

6.2   **Removal or Resignation of a Manager; Appointment of a New Manager.**

(a)   A Manager may be removed for any reason at the written request of the Person(s) entitled to designate such Manager as provided hereunder.

(b)   A Manager may be removed for Cause only upon the affirmative votes of the Members holding at least sixty seven percent (67%) of the Percentage Interests as of such time. The removal of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of a Member.

(c)   A Manager may, by written notice to the Members, resign as a Manager, which resignation will be effective upon receipt of notice thereof or at such later date specified in such notice. The resignation of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of a Member.

(d)   In the event that any Manager designated hereunder ceases to serve as a Manager during such Manager's term of office, the resulting vacancy shall be filled by a Manager designated by the Person(s) entitled to designate such Manager as provided hereunder. If any party fails to designate a Manager pursuant to the terms of this Article 6, such Manager's position shall remain vacant until the designation of a Manager by the Person(s) entitled to designate such Manager as provided hereunder.

6.3   **Officers.** The Managers may, but shall not be required to, appoint such officers as it may determine from time to time. Except as otherwise agreed, each officer of the Company shall hold office at the pleasure of the Managers, and the Managers may remove any officer at any time, with or without cause. If appointed by the Managers, the officers shall have the duties assigned to them by the Managers. Any such officer will have the same duties of care and loyalty and be afforded the same protections and limitations of liability with respect to the Company as a Managers have under the LLC Act.

6.4   **Indemnification.**

(a)   In carrying out its powers and duties hereunder, each Manager and each officer shall not be liable to the Company or to any other Member for any losses sustained or liabilities incurred for actions taken or omitted to be taken in a manner the Manager or officer reasonably believed to be in, or not opposed to, the best interests of the Company or applicable law and the conduct did not constitute bad faith, fraud, gross negligence or willful misconduct.

(b)   The Company shall indemnify, insure, defend and hold harmless (i) each officer and each Manager and each of its officers, directors, shareholders, principals, partners, agents, employees, heirs, legal representatives, successors, assigns and Affiliates (each, an "Indemnitee") and (ii) each Member and each of their respective Affiliates (each also an "Indemnitee") from and against, and reimburse each of them for, any and all losses, costs, liabilities, damages, expenses (including reasonable attorneys' fees) judgments, fines, settlements, and other amounts arising from any and all claims, demands, actions, suits or proceedings, civil, criminal, administrative or investigative, in which the Indemnitee may be involved, or threatened to be involved, as a party or otherwise by reason of the fact that such Person is or was an officer, a Manager or an

12

3447558\

**CONFIDENTIAL**

SFR 23218

Affiliate thereof or a shareholder, director, officer, agent, partner or employee thereof, or a Member of the Company an Affiliate thereof, which relate to, arise out of or are incidental to the Company, its assets, business or affairs, regardless of whether a Member continues to be a Member at the time any such liability or expense is paid or incurred; provided, however, that indemnification shall not be made to or on behalf of an Indemnitee if a judgment or other final adjudication establishes that the actions, or omissions to act, of such Indemnitee were material to the cause of action so adjudicated and constitute any of the following: (i) a violation of criminal law, unless the Indemnitee had no reasonable cause to believe such conduct was unlawful; (ii) a transaction from which the Indemnitee derived an improper personal benefit; (iii) a circumstance under which the liability provisions of Section 605.0405 of the LLC Act are applicable; or (iv) fraud, bad faith, gross negligence or willful misconduct or a conscious disregard for the best interests of the Company in a proceeding by or in the right of the Company to procure a judgment in its favor or in a proceeding by or in the right of a Member. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere, or its equivalent, will not, of itself, create a presumption that the Indemnitee acted in a manner contrary to that specified in (i) through (iv) above. Any indemnification pursuant to this **Section 6.4** is to be made only out of the assets of the Company, no Manager or Member shall have any personal liability on account thereof, and no Member shall be required to contribute any additional capital to the Company in respect of such indemnity.

(c)     Expenses (including reasonable legal fees) incurred by an Indemnitee in defending or investigating any actual or threatened claim, demand, action, suit or proceeding described in **Section 6.4(b)** above will, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Indemnitee to repay such amount if it shall be determined that the Indemnitee is not entitled to be indemnified as authorized in this **Section 6.4**.

(d)     The indemnification and advancement of expenses provided by, or granted pursuant to, this **Section 6.4** will not be exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any statute, the Articles, this Agreement, any other agreement, a vote of the Members, a policy of insurance, or otherwise, and will not limit in any way any right that the Company may have to make additional indemnifications with respect to the same or different Persons or classes of Persons. The indemnification and advancement of expenses provided for by this **Section 6.4** will continue as to a Person who has ceased to be a Manager or an officer and will inure to the benefit of the heirs, executors, administrators, successors, and assigns of such a Person.

(e)     Anything to the contrary notwithstanding, neither any Manager, any officer, nor any other Member shall be personally liable for the return of all or any portion of the Capital Contribution of any Member, and any such return shall be made solely from the assets and properties of the Company.

(f)     The Company may purchase insurance to insure against the liabilities contemplated by this **Section 6.4**.

13

3447558\

**CONFIDENTIAL**

SFR 23219

(g)     The provisions of this **Section 6.4** shall survive the termination of this Agreement.

(h)     To the full extent permitted by applicable law, if any portion of this Section 6.4 shall be invalidated on any ground or by any court of competent jurisdiction, then the Company shall nevertheless indemnify each employee or agent of the Company as to costs, charges and expenses (including reasonable attorneys' fees), judgments, fines and amounts paid in settlement with respect to any action, suit or proceeding, whether civil, criminal, administrative or investigative, including an action by or in the right of the Company, in each case to the full extent permitted by applicable law.

**6.5     Standard of Care.**   Each Manager and each officer shall perform its duties in good faith, in a manner it reasonably believes to be in, or not opposed to, the best interests of the Company and its Members.   The Company may transact business with any Member, their Affiliates and their respective directors, officers, employees and agents, provided the transaction has been approved by a majority of the Managers.

**6.6     Managers Have No Exclusive Duty to Company.**   A Manager who is not employed by or serving as an officer of the Company shall not be required to manage the Company as his or her sole and exclusive function and he or she may have other business interests and engage in activities in addition to those relating to the Company on or prior to the date hereof, and may continue after the date hereof, including to make investments in (by way of capital contributions, loans, otherwise) or providing services to Persons engaged in businesses that directly or indirectly compete with business of the Company and its Affiliates as conducted from time to time.   Neither the Company nor any Member shall have any right, by virtue of this Agreement, to share or participate in such other investments or activities of the Manager who is not employed by or serving as an officer of the Company or to the income or proceeds derived therefrom.

**6.7     Reliance on the Managers.**   Any Person dealing with the Company may rely (without duty of further inquiry) upon a certificate signed by a majority of the Managers as to:

(a)     The identity of such Manager or any Member;

(b)     The existence or nonexistence of any fact or facts which constitute a condition precedent to acts by such Manager or which are in any other manner germane to the affairs of the Company;

(c)     The Persons who are authorized to execute and deliver any instrument or document of the Company; or

(d)     Any act or failure to act by the Company or any other matters whatsoever involving the Company or any Member with respect to the business of the Company.

Furthermore, no financial institution or person, firm, corporation or other entity dealing with a Manager with respect to the Company or any of its assets and properties shall be obligated to see that the terms of this Agreement have been complied with, or be obligated to inquire into the necessity or expediency of any act or action of such Manager, and every contract, agreement, deed, note or other instrument or document executed by a Manager shall be conclusive evidence in favor of any financial institution, person, firm, corporation or other entity relying thereon that

14

3447558\

**CONFIDENTIAL**

SFR 23220

such instrument or document was duly executed and is binding upon the Company and the Members thereof, and that such Manager is duly authorized and empowered to execute and deliver such agreement, document or other instrument for and on behalf of the Company.

**6.8    Compensation of the Managers.**  Except as otherwise set forth in this **Section 6.8,** no Manager shall be entitled to compensation in the ordinary course of business unless approved by the Members holding at least sixty seven percent (67%) of the Percentage Interests as of such time.  However, the Company shall pay or reimburse each Manager for all reasonable costs and expenses incurred by such Manager in the course of managing the business and affairs of the Company, including any administrative and overhead costs.

## ARTICLE 7

## BOOKS AND RECORDS

**7.1    Books and Records.**  The Company will keep adequate books and records at its principal place of business, setting forth a true and accurate account of all transactions and other matters arising out of and in connection with the conduct of the Company's business, which books and records will be otherwise kept in accordance with the provisions of the LLC Act.  Any Member or its designated representative will have the right, to the extent provided by the LLC Act, to have access to and to inspect and copy the contents of such books or records with a three day written notice to the Manager.  A reasonable time and place will be designated by the Manager in its sole discretion

**7.2    Taxable Year.**  The accounting period and taxable year of the Company will end on December 31 of each year.

## ARTICLE 8

## TRANSFERABILITY AND ADDITIONAL ISSUANCES

**8.1    General.**  Except (i) Transfers to an Affiliate of a Selling Member, or (ii) as otherwise specifically provided herein, no Member shall have the right, as to all or any part of its Membership Interest or Economic Interest to Transfer such Membership Interest or Economic Interest for consideration or for no consideration (whether or not by operation of law, except in the case of bankruptcy). Notwithstanding the foregoing, the provisions of this paragraph shall only apply to Members, and in the event that a Member is a partnership or limited liability company, it shall not apply to the individual members or partners of any Member of the Company. (By way of example, the death of an individual partner/member of Howard & Howard shall not require Howard & Howard to sell its Membership Interest in the Company).

**8.2    Right of First Refusal.**

(a)    If a Selling Member desires to Transfer all or any portion of its Membership Interest or Economic Interest in the Company to any Person (other than an Affiliate of such Selling Member), the Selling Member shall obtain from such Person a bona fide written offer to purchase such Membership Interest or Economic Interest, stating the terms and conditions upon which the purchase is to be made and the consideration offered. The Selling Member shall give written notification to the remaining Members, by certified mail or personal delivery, of its intention to so Transfer such Membership

15

**CONFIDENTIAL**

SFR 23221

Interest or Economic Interest, furnishing to the remaining Members a copy of the written offer to purchase such Membership Interest, and the name and business and personal addresses of the proposed transferee.

(b)     Within fifteen (15) days of the receipt of the notice of intention to Transfer a Membership Interest or Economic Interest by the last of the Members to receive such notice, each remaining Member may exercise an option to purchase that proportion of the Membership Interest or Economic Interest proposed to be Transferred which equals the proportion which the Membership Interest or Economic Interest owned by such remaining Member at the time of his receipt of the notice bears to the total of the Membership Interest or Economic Interests then owned by all the remaining Members, The purchase option granted in this subparagraph (b) is herein referred to as the "Primary Option."

(c)     If a Member fails to exercise a Primary Option granted to him to purchase the Membership Interest or Economic Interest proposed to be Transferred, each remaining Member who is granted and who exercises a Primary Option (a "Primary Option Member") may, within seven (7) days after the expiration of the fifteen (15) day option period provided for above, exercise an option to purchase the Membership Interest or Economic Interest with respect to which such Member has failed to exercise his Primary Option (hereinafter "the Option Interest"). In the case of a single remaining Primary Option Member, his option shall be to purchase all of the Option Interest. In the case of two or more remaining Primary Option Members, each such remaining Primary Option Member's option shall be to purchase the portion of Option Interest which bears the same proportion to the total Option Interest as the Membership Interest or Economic Interest owned by each such remaining Primary Option Member at the time of receipt of the notice provided for above bears to the total Membership Interest or Economic Interests then owned by all such remaining Primary Option Members; provided that all such remaining Primary Option Members may, by agreement among themselves, determine the proportions in which some or all of their number may exercise the option granted in this subparagraph. The purchase option granted by this subparagraph (c) is referred to as the "Secondary Option."

(d)     In the event the remaining Members (or any one or more of the remaining Members) give written notice to the Selling Member of their desire to exercise this right of first refusal and to purchase all of the Selling Member's interest in the Company which the Selling Member desires to sell upon the same terms and conditions as are stated in the aforesaid written offer to purchase, the remaining Members shall have the right to designate the time, date and place of closing, provided that the date of closing shall be within fifteen (15) days after written notification to the Selling Member of the remaining Member or Members' election to exercise their right of the first refusal.

(e)     As a condition to the Company recognizing the effectiveness of either the purchase of the Selling Member's Membership Interest or Economic Interest  in the Company by any Person pursuant to this Section 8.2 and subject to Section 8.3, the Managers may require the Selling Member or the proposed purchaser or successor-in-interest, as the case may be, to execute, acknowledge and deliver to the Managers such instruments of transfer, assignment and assumption and such other certificates, representations and documents, and to perform all such other acts which the Managers may deem reasonably necessary or desirable to:

16

3447558\

SFR 23222

**CONFIDENTIAL**

(1)     verify the Transfer;

(2)     maintain the status of the Company as a partnership for federal tax purposes; and

(3)     assure compliance with any applicable state and federal laws including securities laws and regulations.

(f)     Any Transfer of a Membership Interest or Economic Interest or admission of a Member in compliance with this Article 8 shall be deemed effective as of the last day of the calendar month in which the Managers confirm the conditions set forth in Section 8.2(e) have been satisfied by the Selling Member and the proposed Transferee, and the Person desiring to acquire a Membership Interest or Economic Interest, or to be admitted as a Member, shall have executed a signature page to this Operating Agreement agreeing to be bound by all of the terms, obligations and conditions herein (whether or not such Person is to be admitted as a new Member). The Selling Member agrees, upon request of the Managers, to execute such certificates or other documents and to perform such other acts as may be reasonably requested by the Managers from time to time in connection with such Transfer. The Selling Member hereby indemnifies the Company and the remaining Members against any and all loss, damage, or expense (including, without limitation, tax liabilities or loss of tax benefits) arising directly or indirectly as a result of any Transfer or purported Transfer in violation of this Article 8.

**8.3**     **Transferee Not Member in Absence of Managers' Consent.**

(a)     Notwithstanding anything contained herein to the contrary (including, without limitation, Section 8.2 hereof), unless the Managers' approves of the proposed Transfer of the Transferring Member's Membership Interest or Economic Interest to a Transferee which is not a Member immediately prior to the Transfer (or an Affiliate of such Member) in accordance with Section 2.3, with such approval of the Managers not to be unreasonably withheld or delayed, then the proposed Transferee shall have no right to participate in the management of the business and affairs of the Company or to become a Member and such Transferee shall be merely an assignee of the Transferring Member's Economic Interest. For the avoidance of doubt (and in accordance with Section 8.1(i)), no approval of the Managers shall be required with respect to the Transfer of the Transferring Member's Economic Membership Interest or Economic Interest to a Transferee which is a Member immediately prior to a Transfer or an Affiliate of such Member. No Transfer of a Member's interest in the Company (including any Transfer of the Economic Interest or any other Transfer which has not been approved by the Managers) shall be effective unless and until written notice (including the name and address of the proposed Transferee and the date of such Transfer) has been provided to the Company and the Managers (along with a signature page to this Operating Agreement executed by the proposed Transferee evidencing such Person's agreement to be bound by the obligations, terms and conditions of this Operating Agreement). Notwithstanding such Transfer, a Transferee of an Economic Interest acquired under this Section 8.3 shall take such Economic Interest subject to, and shall be bound by, the obligations, terms and conditions of the Operating Agreement.

(b)     Upon and contemporaneously with any Transfer of a Transferring Member's Economic Interest in the Company which does not at the same time Transfer the balance of the

3447558\

**CONFIDENTIAL**

SFR 23223

rights associated with such Transferring Member's Membership Interest (including, without limitation, the rights of the Transferring Member to participate in the management of the business and affairs of the Company), all remaining rights and interests which were owned by the Transferring Member immediately prior to such Transfer or which were associated with the Transferred Economic Interest shall immediately lapse until either (I) the Managers consents to reinstate such rights to the Transferring Member who did not previously obtain the Managers' written consent of the Members or (2) the receipt of the consent of the Managers, at which time such Membership rights shall Transfer to the proposed Transferee.

### 8.4    Tag-Along Rights.

(a)    Notwithstanding any provision contained herein to the contrary, if, after complying with the provisions of Section 8.2, any Member or group of the Members (collectively the "Sellers") agree to Transfer to a Person (other than to an Affiliate or Affiliates of such Member or Members), in a sale to be consummated in a single Transfer or a series of related Transfers to a single purchaser or a group of purchasers as part of a single transaction or group of related transactions a portion or all of their Membership Interests in the Company, which together equals or exceeds fifteen percent (15%) of the outstanding Membership Interests, then each Member other than the Sellers ("Tag-Along Members") shall have the right (the "Tag-Along Right") to require the proposed purchaser(s) (the "Purchaser") to purchase from them upon terms no less favorable than those set forth in the Tag-Along Notice under Section 8.4(b) herein, or as the Sellers, Tag-Along Members, and the Purchaser may otherwise agree, a portion of such Tag-Along Member's Membership Interest equal to such Member's Tag-Along Amount. "Tag-Along Amount" means, with respect to each Tag-Along Member, the amount of Membership Interests owned by such Member, multiplied by a fraction in which (i) the numerator equals the amount of Membership Interests to be sold by the Sellers and (ii) the denominator equals the amount of Membership Interests owned by the Sellers.

(b)    The Sellers shall promptly notify the Tag-Along Members in the event they propose to make a Transfer giving rise to the Tag-Along Right, and shall furnish the Tag-Along Members with the terms and conditions of such Transfer and a copy of any written offer or agreement pertaining thereto. The Tag-Along Right may be exercised by any Tag-Along Member by delivering a written notice to each Seller proposing to sell the Membership Interests (the "Tag-Along Notice") within fifteen (15) days following such Tag-Along Member's receipt of such notice from the Sellers. In the event that the Purchaser does not purchase all of the Membership Interests from the Tag-Along Members which such Tag-Along Members are entitled to sell under this Section 8.4 on the terms and conditions of such Transfer, then the Sellers shall not be permitted to sell their Membership Interests to the proposed purchaser in the proposed Transfer.

(c)    At the settlement of any Transfer pursuant to this Section 8.4, the Purchaser shall remit to each selling Member the consideration for the total sales price of the Membership Interests of such Members sold pursuant hereto, upon delivery by such Members of such Transfer document or Membership Interest powers duly executed in blank, and the compliance by such Members with all other conditions to settlement generally applicable to the Sellers and all other Tag-Along Members.

### 8.5    Preemptive Rights.

18

3447558\

**CONFIDENTIAL**

SFR 23224

(a)      Subject to the requirements of Section 2.3, the Company will be entitled to issue equity interests (or interests convertible into or exchangeable for equity interests) on such terms as the Managers may determine from time to time.  If the Company wishes to issue and sell any Membership Interests or other equity securities or any security convertible into, exercisable for, or exchangeable for Membership Interests or other equity securities in the Company or any subsidiary of the Company (the "New Securities") to any Person or Persons (collectively, the "Subject Purchasers"), then the Company shall also offer such New Securities to the Members (each, a "Preemptive Right Holder") by sending written notice (the "New Issuance Notice") to such Persons at least thirty (30) days (but not more than sixty (60) days) prior to the issuance and sale of the New Securities.  The New Issuance Notice shall state (a) the amount or denomination of Membership Interests or other New Securities proposed to be issued and sold and the terms of such New Securities, (b) the purchase price of the New Securities (the "Proposed Price") and the other material terms and conditions of the purchase of such New Securities, (c) the proposed date on which the New Securities will be sold (the "New Issuance Closing Date") and (d) each Preemptive Right Holder's Proportionate Percentage.  For purposes hereof, each Preemptive Right Holder's "Proportionate Percentage" means, with respect to any Preemptive Right Holder, the percentage of the New Securities allocated to such Preemptive Right Holder, which percentage shall equal such Preemptive Right Holder's Percentage Interest.

(b)      For a period of ten (10) days after the giving of the New Issuance Notice, each Preemptive Right Holder shall have the right to purchase all of its Proportionate Percentage of the New Securities at a purchase price equal to the Proposed Price and upon the terms and conditions set forth in the New Issuance Notice.  The right of each Preemptive Right Holder to purchase the New Securities shall be exercisable by delivering written notice of the exercise thereof, prior to the expiration of the 10-day period referred to above, to the Company.  The failure to respond within such 10-day period shall be deemed to be a waiver of such Preemptive Right Holder's rights under this Section 8.5 with respect to such New Securities (but not future issuances).

(c)      Each Preemptive Right Holder purchasing the New Securities shall deliver at the closing full cash payment in immediately available funds for the New Securities purchased by him, her or it on the New Issuance Closing Date and shall agree to the same terms and conditions, as agreed to by the Subject Purchasers.  At such closing, all of the parties to the transaction shall execute such additional documents as are otherwise necessary or appropriate to consummate such transaction.

(d)      Notwithstanding the foregoing, the rights set forth in this **Section 8.5** shall not be deemed to apply to Membership Interests that (i) are issued pro rata to all Members, as a dividend on, subdivision of or other distribution in respect of, the Membership Interests, (ii) are issued in connection with or as consideration for any acquisition by the Company of another Person or of a business or division operated by another Person, whether by asset purchase, stock purchase, merger or otherwise, or (iii) are issued in connection with commercial credit arrangements (including securitization transactions) or equipment financings.

19

**CONFIDENTIAL**

SFR 23225

# ARTICLE 9
## NO RIGHT OF WITHDRAWAL; MEMBERS MEETINGS

9.1    **No Right of Withdrawal**. No Member shall have any right to withdraw from the Company and receive its capital contributions. Except as specifically stated in Article 10, no event that would constitute withdrawal of a Member under the LLC Act shall constitute a withdrawal under this Agreement or shall cause a dissolution of the Company.

9.2    **Meetings of Members.**

(a)    <u>Meetings</u>. Meetings of the Members may be called for any purpose or purposes upon the written request of a Manager or of the Members holding at least twenty-five percent (25%) of the Percentage Interests at such time. Calls for such meetings shall specify the purposes thereof. No business other than that specified in the call shall be considered at any meeting, unless otherwise agreed by all of the Members entitled to attend the meeting. Meetings of Members shall be held at the principal office of the Company unless the Manager determines that a meeting shall be held at some other place within or without the State of Florida and causes the notice thereof to so state.

(b)    <u>Notices of Meetings</u>. Unless waived, written notice of each meeting of the Members stating the time, place, and the purposes thereof shall be given to each Member of record entitled to vote at or entitled to notice of the meeting, not more than fifteen (15) days nor less than two (2) days before any such meeting. All such notices shall be in writing and may be mailed by registered or certified mail, postage prepaid, or otherwise delivered by hand or by messenger, addressed to such Member's address as set forth in the books and records of the Company. Notices may also be delivered by the Company to a Member by electronic mail ("email") or facsimile. Any such notice which is sent by the Company to the email address for such Member, as such address appears on the records of the Company, or sent by facsimile at the number appearing on the records of the Company, may be relied upon by the Company for purposes of this Section. Each such notice shall be treated as effective or having been given when delivered if delivered personally, or, if sent by mail, at the earlier of its receipt or 72 hours after the same has been deposited in a regularly maintained receptacle for the deposit of the United States mail, addressed and mailed as aforesaid, or, if sent by email, upon receipt by the Company of an email receipt indicating that the notice was delivered to the email address of the Member or, if sent by facsimile, upon confirmation of receipt at the number to which the facsimile was sent.

(c)    <u>Quorum</u>. The Members present in person or by proxy holding a majority of the then outstanding Units, shall constitute a quorum for the transaction of business to be considered at such meeting; provided, however, that no action required by law, by the Certificate or by the Agreement to be authorized or taken by the holders of a designated proportion of the Percentage Interests of any particular class or of each class may be authorized or taken by a lesser proportion. The holders of a majority of the voting Units represented at a meeting, whether or not a quorum is present, may adjourn such meeting from time to time, until a quorum shall be present.

(d)    <u>Record Date</u>. The Manager may fix a record date for any lawful purpose, including without limiting the generality of the foregoing, the determination of Members

20

3447558\

**CONFIDENTIAL**

SFR 23226

entitled to (i) receive notice of or to vote at any meeting, (ii) receive payment of any distribution (subject to any applicable requirements of the Internal Revenue Code of 1986, as amended), (iii) receive or exercise rights of purchase of or subscription for, or exchange or conversion of, interests, certificates or other securities, subject to any contract right with respect thereto, or (iv) participate in the execution of written consents, waivers or releases. Said record date shall not be more than fifteen (15) days preceding the date of such meeting, the date fixed for the payment of any distribution or the date fixed for the receipt or the exercise of rights, as the case may be. If a record date is not fixed, the record date for the determination of Members who are entitled to notice of, or who are entitled to vote at, a meeting of Members, shall be the close of business on the date next preceding the day on which notice is given, or the close of business on the date next preceding the day on which the meeting is held, as the case may be.

(e)     Proxies.  A person who is entitled to attend a Members' meeting, to vote thereat, or to execute consents, waivers or releases, may be represented at such meeting or vote thereat, and execute consents, waivers and releases, and exercise any of its other rights, by proxy or proxies appointed by a writing signed by such person.

(f)     Action by Written Consent or Telephone Conference.  Any action permitted or required to be taken at a meeting of the Members may be taken without a meeting if a consent in writing, setting forth the action to be taken, is signed by the Members holding Membership Interests sufficient to approve such action and each Member is provided with written notice two (2) business days prior to such written consent being executed (for the avoidance of doubt, the requirement that notice must be provided to each Member does not alter the percentage threshold for such consent being approved). Such consent shall have the same force and effect as a unanimous vote at a meeting. Such written consent may be delivered to the Company by a Member via email and any such consent which is received by the Company from the email address for such Member, as such address appears on the records of the Company, will be deemed "executed" and "signed" for purposes of this Section and may be relied upon by the Company for such purpose. Members may participate in and hold a meeting of the Members by means of a conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other, and participation in such meeting shall constitute attendance and presence in person at such meeting, except when a Person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

## ARTICLE 10

### DISSOLUTION OF THE COMPANY

10.1    **Dissolution Events**.  The Company will dissolve, terminate and commence winding up and liquidation upon the first to occur of any of the following (each, a "Dissolution Event"):

(a)     The sale or other transfer of all or substantially all of the Company's assets (which sale may not occur without the approval of Members holding at least a majority of the Percentage Interests as of such time, as set forth in **Section 6.1(e)** above);

21

3447558\

SFR 23227

**CONFIDENTIAL**

(b)      A merger or consolidation of the Company with one or more other entities in which the Company is not the surviving entity (which merger or consolidation may not occur without the approval of Members holding at least a majority of the Percentage Interests as of such time, as set forth in **Section 6.1(e)** above);

(c)      A decision by the Members holding at least sixty seven percent (67%) of the Percentage Interests as of such time to dissolve, wind up, and liquidate the Company, which consent must include the consent of the Manager, which consent may be withheld for any reason; or

(d)      The happening of any other event that makes it unlawful, impossible or impractical to carry on the business of the Company.

The Members hereby agree that, notwithstanding any provision of the LLC Act, the Company will not dissolve prior to the occurrence of a Dissolution Event.

**10.2    Winding Up.**   Upon the occurrence of the Dissolution Events listed in **Sections 11.1(a), (c), or (d)**, the Company will continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and Members. No Member will take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of the Company's business and affairs. The Company's assets will be liquidated as promptly as is consistent with obtaining the fair value thereof, and the proceeds therefrom, to the extent sufficient therefor, will be applied and distributed in the following order:

(a)      First, to the payment and discharge of all of the Company's debts and liabilities to creditors other than Members and the expenses of liquidation;

(b)      Second, to the payment and discharge of all of the Company's debts and liabilities to Members (but if the amount available for such discharge of debts and liabilities to Members is insufficient, then pro rata on account thereof);

(c)      Third, to the Members in satisfaction of their positive Capital Account balances, after giving effect to all contributions, distributions, and allocations for all taxable periods, including the period during which the Dissolution Event occurs; and

(d)      The balance, if any, to the Members in proportion to their Percentage Interests in the Company.

Any distribution to a Member pursuant to **Sections 11.2(b), (c) or (d)** above will be net of any amounts owed to the Company by such Member. No Member will receive any additional compensation for any services performed pursuant to this **Article 11**.

**10.3    Compliance with Timing Requirements of the Regulations.**   In the event the Company is "liquidated" within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Regulations, distributions will be made pursuant to this **Section 11.3** to the Members who have positive Capital Accounts in compliance with Section 1.704-1(b)(2)(ii)(b)(2) of the Regulations. If any Member has a deficit balance in its Capital Account (after giving effect to all contributions, distributions and allocations for all taxable years, including the year during which such liquidation occurs), such Member will have no obligation to make any contribution to the capital

22

3447558\

SFR 23228

of the Company with respect to such deficit, and such deficit will not be considered a debt owed to the Company or to any other Person for any purpose whatsoever. In the discretion of the Manager, a pro rata portion of the distributions that would otherwise be made to the Members pursuant to this **Section 11.3** may be:

(a)     distributed to a trust established for the benefit of the Members for the purposes of liquidating Company assets, collecting amounts owed to the Company, and paying any contingent or unforeseen liabilities or obligations of the Company or of the Members arising out of or in connection with the Company. The assets of any such trust shall be distributed to the Members from time to time, in the discretion of the Manager, in the same proportion as the amount distributed to such trust by the Company would otherwise have been distributed to the Members pursuant to this Agreement; or

(b)     withheld to provide a reserve for Company liabilities (contingent or otherwise) and to reflect the unrealized portion of any installment obligations owed to the Company, provided that such withheld amounts shall be distributed to the Members as soon as reasonably practicable.

**10.4     Rights of Members.** Except as otherwise provided in this Agreement, (a) each Member will look solely to the assets of the Company for the return of his Capital Contribution and will have no right or power to demand or receive property other than cash from the Company, and (b) no Member will have priority over any other Member as to the return of his Capital Contribution, distributions or allocations.

**10.5     No Petition for Dissolution.** The Members agree that irreparable damage would be done to the good will and reputation of the Company if any Member should bring an action in any court to dissolve the Company and to have a liquidator or receiver for the Company appointed. Care has been taken in this Agreement to provide what the parties feel is fair and just payment in liquidation of the Membership Interests of all Members. Accordingly, each Member hereby waives and renounces any right to file or pursue any such petition for dissolution of the Company or to seek the appointment by any court of a liquidator or receiver for the Company. If any Member, in violation of the foregoing provision, does file or pursue any such dissolution or liquidation petition or action in any court, the Company and/or any of the other Members shall be entitled to an injunction, as a matter of right, against such petition or action

## ARTICLE 11

## AMENDMENTS

**11.1     Authority to Amend.** Amendments to this Agreement shall be in writing and shall require the approval of the Members holding at least a majority of the Units entitled to vote on the matter; provided, however, that (i) that any amendment that would adversely alter or change the rights, preferences or privileges of the Membership Interests or create any new class of Membership Interest having any rights, preferences, or privileges senior to (or, solely with respect to **Sections 4.1, 4.2, 5.1 or 5.2**, pari passu with) then outstanding Membership Interests shall require the consent of (A) Members holding at least sixty seven percent (67%) of the Percentage Interests, and (B) any Member whose rights, preferences or privileges are being so adversely altered or changed, and (ii) any amendment to a section of this Agreement which requires a super-majority vote or a unanimous vote of the Members for action to be taken

23

3447558\

**CONFIDENTIAL**

SFR 23229

thereunder shall also require such super-majority or unanimous vote, as applicable, for amendment.

**11.2  Notice of Amendments.**  Every Member shall have the right to propose amendments to this Agreement.  A copy of any amendment to be approved by the Members pursuant to **Section 12.1** hereof shall be mailed in advance to each Member.

## ARTICLE 12

## REPRESENTATIONS, COVENANTS AND ACKNOWLEDGMENTS

**12.1  Representations, Covenants and Acknowledgments.**

(a)  Each Member hereby represents and warrants that such Member is acquiring such Member's Units solely for investment purposes and not with a view to the distribution or resale thereof.  Notwithstanding statements contained in other Sections of this Agreement, no Unit may be offered or sold and no transfer of a Membership Interest will be made either by the Company or the Members unless: (i) such Unit is registered under the Securities Act of 1933, as amended from time to time, and is registered under all applicable state securities laws, as amended, or (ii) an opinion of counsel, satisfactory to the Managers as to form, substance and counsel, is delivered to the Company by the Member desiring to offer, sell or transfer a Unit, to the effect that no such registration is necessary; provided that such requirement may be waived by the Managers.

(b)  Each of the parties hereto and each of the Substitute Members hereinafter becoming a signatory hereto, acknowledge that each such party or Substitute Member has been advised of and hereby approves of the application of the Company funds to pay all expenses incurred in connection with the formation of the Company and admission of the Members, including, without limitation, legal fees, registration fees and filing and recording charges.

## ARTICLE 13
## CONFIDENTIALITY

**13.1  Confidentiality.**  Each Member hereby covenants with the Company and each other Member that on the transfer of a Member's Interest, whether voluntary, involuntary, by operation of law, or by reason of any provision of this Agreement, the Member will not, directly or indirectly, through and affiliate or otherwise, use or disclose in any manner any Confidential Information and will otherwise exercise commercially reasonable steps to preclude dissemination to any third party and will not utilize any such Confidential Information in any manner not associated with the business.

"Confidential Information" means all of the Company's information technologies, trade secrets, "technical know-how", patents, licenses, customer lists, pricing policies, operational methods, programs, and other business information of the Company.

Each Member hereby stipulates that a breach of the provisions of this Section 13.1 will result in irreparable damage and injury to the Company for which no money damages could adequately compensate it.  If the Member breaches the provisions of this Agreement, in addition

24

3447558\

SFR 23230

**CONFIDENTIAL**

to all other remedies to which the Company may be entitled, the Company shall be entitled to an injunction to enforce the provisions of this Agreement, to be issued by an court of competent jurisdiction, to enjoin and restrain the Member and each and every Person concerned or action in concert with the Member from the continuance of such breach. Each Member expressly waives any claim or defense that an adequate remedy at law might exist for any such breach.

## ARTICLE 14

## MISCELLANEOUS

**14.1   Notices.** All notices, requests, demands and other communications under this Agreement must be in writing and will be deemed duly given, unless otherwise expressly indicated to the contrary in this Agreement, (a) when personally delivered, (b) two (2) days after having been deposited in the United States mail, certified or registered, return receipt requested, postage prepaid, (c) one (1) business day after having been dispatched by a nationally recognized overnight courier service, addressed to the parties or their permitted assigns with an acknowledgment of receipt requested at the following addresses, (d) upon receipt of confirmation of a telephonic facsimile transmission, or (e) upon receipt of confirmation of an e-mail:

(a)   If to the Company, to the Company at the address set forth in **Section 1.4** hereof;

(b)   If to a Member, to the address set forth on Exhibit A to this Agreement. Any Person may from time to time specify a different address by written notice to the Company; and

(c)   If the Managers, to the address set forth for the Company in **Section 1.4**.

**14.2   Binding Effect.** Except as otherwise provided in this Agreement, every covenant, term, and provision of this Agreement will be binding upon and inure to the benefit of the Members and their respective heirs, legatees, legal representatives, successors, transferees and assigns.

**14.3   Construction.** Every covenant, term and provision of this Agreement will be construed simply according to its fair meaning and not strictly for or against any Member. Except as otherwise provided herein, to the extent provisions or terms of this Agreement are subject to varying interpretations or constructions, the parties intend that such provisions and terms be interpreted consistent and in accordance with any similar provisions and terms set forth in Chapter 605, Florida Statutes, Chapter 607, Florida Statutes, or Chapter 620, Florida Statutes, as the case may be, and successor laws. In the event of any conflict between the provisions of Florida law with respect to any term, the provisions of the LLC Act (Chapter 605, Florida Statutes) shall take precedence.

**14.4   Waiver of Default.** No consent or waiver, express or implied, by the Company or a Member with respect to any breach or default by another Member hereunder shall be deemed or construed to be a consent or waiver with respect to any other breach or default by such Member of the same provision or any other provision of this Agreement. Failure on the part of the Company or a Member to complain of any act or failure to act of another Member or to

25

SFR 23231

**CONFIDENTIAL**

declare such other Member in default shall not be deemed or constitute a waiver by the Company or the Member of any rights hereunder.

**14.5   Title to Assets; Nature of Membership Interest in Company.** Title to the assets acquired by the Company will be held in the name of the Company. No Member individually has any ownership interest or rights in assets of the Company, except indirectly by virtue of such Member's ownership of a Membership Interest. No Member has any right to seek or obtain a partition of the assets of the Company, nor does any Member have the right to any specific assets of the Company upon the liquidation of or any distribution from the Company. A Member's Membership Interest is considered personal property for all purposes.

**14.6   Entire Agreement.** This Agreement, together with the Articles, as each of the foregoing may be amended in writing from time to time (the "Organizational Documents"), contains the entire understanding among the parties and supersedes any prior understandings and agreements among them respecting the subject matter of this Agreement.

**14.7   No Third Party Rights.** None of the provisions contained in this Operating Agreement are for the benefit of, or enforceable by, any third parties, including creditors of the Company. The parties to this Operating Agreement expressly retain any and all rights to amend this Operating Agreement as provided above, notwithstanding any interest in this Operating Agreement or in any party to this Operating Agreement held by any other Person.

**14.8   Headings.** Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define or limit the scope or extent of this Agreement or any provision hereof.

**14.9   Severability.** If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid, illegal or unenforceable to any extent, that provisions shall, if possible, be construed as though more narrowly drawn, if a narrower construction would avoid such invalidity, illegality, or unenforceability or, if that is not possible, such provision shall, to the extent of such invalidity, illegality or unenforceability, be severed, and the remainder of this Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law. .

**14.10   Incorporation by Reference.** Every appendix, exhibit, schedule, and other document attached to this Agreement and referred to herein is hereby incorporated into this Agreement by reference.

**14.11   Further Action.** Each Member agrees to perform all further acts and execute, acknowledge, and deliver any documents that may be reasonably necessary, appropriate, or desirable to carry out the provisions of this Agreement.

**14.12   Variation of Pronouns.** All pronouns and any variations will be deemed to refer to masculine, feminine, or neuter, singular or plural, as the identity of the Person or Persons may require.

**14.13   Governing Law; Consent to Jurisdiction.** The laws of the State of Florida will govern the validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties of the Managers and Members. Each Member hereby consents to the jurisdiction of any state or federal court located in Orange County, Florida for purposes of the

26

3447558\

SFR 23232

**CONFIDENTIAL**

enforcement of this Agreement and waives personal service of any and all process. Each Manager and each Member waives any objection to venue of any action instituted under this Agreement.

**14.14   Rights and Remedies Cumulative.**  The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any other remedy.  Said rights and remedies are given in addition to any other legal rights the parties may have.

**14.15   Specific Performance.**  The parties acknowledge that it is impossible to measure, in money, the damages that shall accrue to a party or to the personal representative of a decedent from a failure of a party to perform any of the obligations under this Agreement.  Therefore, if any party or the personal representative or executor of any party enters into any action or proceeding to enforce the provisions of this Agreement, any Person (including the Company) against whom the action or proceeding is brought waives the claim or defense that the moving party or representative has or shall have an adequate remedy at law, and the Person shall not urge in the action or proceeding the claim or defense that an adequate remedy at law exists.

**14.16   Counterpart Execution.**  This Agreement may be executed in any number of counterparts with the same effect as if all of the Members had signed the same document.  All counterparts will be construed together and will constitute one agreement.  The facsimile or electronic signature of any Manager or Member may be used at all times and for all purposes in place of an original signature.

**14.17   Attorneys.**  Howard & Howard Attorneys PLLC provides legal services to the Company, certain Managers, certain Affiliates of the Managers, one or more Members individually and certain Affiliates of the Members, which may result in conflicts of interest for such counsel. Each Member is directed to seek such Member's own legal counsel related to this Agreement and is encouraged to do so.  By entering into this Agreement, each Member, the Managers and the Company acknowledge the potential conflicts of interest and consent to this dual representation. Further, each party to this Agreement acknowledges and understands that the law firm of Howard & Howard Attorneys PLLC prepared this Agreement on behalf of and in the course of its representation of the Company and that:

(a)       The parties have each been advised by Howard & Howard Attorneys PLLC that a conflict exists among their individual interests;

(b)       The parties have each been advised by Howard & Howard Attorneys PLLC to seek the advice of independent counsel;

(c)       The parties waive any conflicts in the representation of the various related entities by Howard & Howard Attorneys PLLC and consent to its representation of the Company notwithstanding any potential conflicts; and

(d)       The parties have each had the opportunity to seek the advice of independent counsel.

[remainder of page intentionally left blank; signature page to follow]

27

SFR 23233

**CONFIDENTIAL**

[Counterpart signature page for
[BLUESTONE CAPITAL MARKETS, LLC Operating Agreement]

IN WITNESS WHEREOF, the parties have entered into this Operating Agreement of
BLUESTONE CAPITAL MARKETS, LLC as of the date first above written.

**MEMBERS:**

**SFR EQUITIES, LLC,** a Florida limited
liability company

By: AHG MANAGER, LLC, a Florida
limited liability company, its Manager

By: _____
Name: Gene Harris
Title: Manager

**CHGO REAL ESTATE CONSULTING
GROUP , LLC,** an Illinois limited liability
company

By: _____
Name: _____
Title: _____

**NAI ARK FUNDING , LLC,** a Delaware
limited liability company

By: _____
Name: _____
Title: _____

**HOWARD & HOWARD ATTORNEYS,
PLLC,** a Michigan professional limited
liability company

By: _____
Name: _____
Title: _____

28

3447558\

SFR 23234

**CONFIDENTIAL**

[Counterpart signature page for
[BLUESTONE CAPITAL MARKETS, LLC Operating Agreement]

IN WITNESS WHEREOF, the parties have entered into this Operating Agreement of BLUESTONE CAPITAL MARKETS, LLC as of the date first above written.

MEMBERS:

**SFR EQUITIES, LLC**, a Florida limited liability company

By: AHG MANAGER, LLC, a Florida limited liability company, its Manager

By: _____
      Name: Gene Harris
      Title: Manager

**CHGO REAL ESTATE CONSULTING GROUP , LLC**, an Illinois limited liability company

By: _____
      Name: Malcolm Weems
      Title: Manager

**NAI ARK FUNDING , LLC**, a Delaware limited liability company

By: _____
      Name: _____
      Title: _____

**HOWARD & HOWARD ATTORNEYS, PLLC**, a Michigan professional limited liability company

By: _____
      Name: MARK BIERON
      Title: MEMBER

28

3447558\

SFR 23235

[Counterpart signature page for
[BLUESTONE CAPITAL MARKETS, LLC Operating Agreement]

IN WITNESS WHEREOF, the parties have entered into this Operating Agreement of BLUESTONE CAPITAL MARKETS, LLC as of the date first above written.

**MEMBERS:**

**SFR EQUITIES, LLC,** a Florida limited liability company

By: **AHG MANAGER, LLC,** a Florida limited liability company, its Manager

By: _____
   Name: Gene Harris
   Title: Manager

**CHGO REAL ESTATE CONSULTING GROUP , LLC,** an Illinois limited liability company

By: _____
   Name: _____
   Title: _____

**NAI ARK FUNDING , LLC,** a Delaware limited liability company

By: _____
   Name: DAVID RENOE
   Title: President

**HOWARD & HOWARD ATTORNEYS, PLLC,** a Michigan professional limited liability company

By: _____
   Name: _____
   Title: _____

28

3447558\

SFR 23236

**CONFIDENTIAL**

[Counterpart signature page for
[BLUESTONE CAPITAL MARKETS, LLC Operating Agreement]

**BERESFORD ENERGY CORP.** a
Delaware corporation

By: _____
    Name:   ELLIOT GREENBERG
    Title:     VICE PRESIDENT


**MANCHESTER SECURITIES CORP,** a
New York corporation

By: _____
    Name:
    Title:    Elliot Greenberg
            Vice President

29

3447558\

**CONFIDENTIAL**

SFR 23237

[Counterpart signature page for
[BLUESTONE CAPITAL MARKETS, LLC Operating Agreement]

**THE ELEVEN CORP.**, a ___limited liability___
corporation

By: _____ *Jeff Balvanz* _____
Name:    Jeff Balvanz
Title:    Managing Member

3447558\

**CONFIDENTIAL**

SFR 23238

## APPENDIX A

## DEFINITIONS

"**Additional Member**" means any Person admitted as a Member pursuant to Section 2.3 hereof.

"**Adjusted Capital Account**" means, with respect to any Member, the balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:

 (i) Credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations; and

 (ii) Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6) of the Regulations.

The foregoing definition of Adjusted Capital Account is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and will be interpreted consistently therewith.

"**Affiliate**" means, with respect to any Person: (i) any Person directly or indirectly controlling, controlled by or under common control or management with such Person; (ii) any person owning or controlling 10% or more of the outstanding voting securities of such Person; (iii) any officer, director, manager, trustee or general partner of such Person; or (iv) any Person who is an officer, director, manager, trustee or general partner or holder of 10% or more of the voting securities of any Person described in clauses (i) through (ii).

"**Agreement**" means this Agreement, as originally executed and as amended from time to time. Terms such as "hereof," "hereto," hereby," "hereunder" and "herein" refer to this Agreement as a whole, unless the context otherwise requires.

"**Bankruptcy**" means (i) the entry of a decree or order for relief against the Member by a court of competent jurisdiction in any involuntary case brought against the Member under any bankruptcy, insolvency or other similar law ("Debtor Relief Laws") generally affecting the rights of creditors and relief of debtors now or hereafter in effect, (ii) the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator or other similar agent under applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property, (iii) the ordering of the winding up or liquidation of the Member's affairs, (iv) the filing of a petition in any such involuntary bankruptcy case, which petition remains undismissed for a period of 180 days or which is not dismissed or suspended pursuant to Section 305 of the United States Bankruptcy Code (or any corresponding provision of any future United States bankruptcy law), (v) the commencement by the Member of a voluntary case under any applicable Debtor Relief Law now or hereafter in effect, (vi) the consent by the Member to the entry of an order for relief in an involuntary case under any such law or the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar agent under any applicable Debtor Relief Law for the Member or for any substantial part of its assets or property, or (vii) the making by a Member of any general assignment for the benefit of its creditors.

31

3447558\

**CONFIDENTIAL**

SFR 23239

"**Capital Account**" means, with respect to any Member, the Capital Account maintained for such Member in accordance with the provisions of **Section 4.1**.

"**Capital Contributions**" means, with respect to any Member, the amount of money contributed to the Company with respect to the Membership Interest held by such Person. No Member shall be permitted to make a Capital Contribution of any property other than money.

"**Capital Event**" shall mean the condemnation, sale or other disposition (other than in a tax-free exchange in the ordinary course of the Company's business) of any asset of the Company or the occurrence of an insured casualty with respect to any Asset of the Company.

"**Capital Proceeds**" shall mean the net cash proceeds from a Capital Event, available for distribution by the Company after deducting the following from gross proceeds: (i) all costs of collecting such proceeds, and (ii) in the case of a casualty or condemnation, the costs of restoring any related asset to usable condition.

"**Cause**" shall mean, with respect to a Manager, (i) such Person's conviction or guilty plea as to a felony involving moral turpitude or (ii) such Person's fraud, embezzlement or theft against the Company or any Affiliate of the Company.

"**Code**" or "**IRC**" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

"**Company**" means BLUESTONE CAPITAL MARKETS, LLC.

"**Company Minimum Gain**" shall have the meaning given to the term "Partnership Minimum Gain" as set forth in §§ 1.704 2(b)(2) and 1.704 2(d) of the Regulations, and any Member's share of Company Minimum Gain shall be determined in accordance with Regulations § 1.704 2(g)(1).

"**Company Property**" means all real and personal property acquired by the Company and any improvements thereto, and shall include both tangible and intangible property.

"**Depreciation**" means, for each fiscal year or other period, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such year or other period, except that if the book value of an asset differs from its adjusted basis for federal income tax purposes as of the beginning of such year or other period, Depreciation will be an amount which bears the same ratio to such beginning book value as the federal income tax depreciation, amortization, or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis; provided, however, that if the federal income tax depreciation, amortization, or other cost recovery deduction for such year is zero, Depreciation will be determined with reference to such beginning book value using any reasonable method selected by the Manager.

"**Distributable Cash**" means the gross cash proceeds of the Company from any source other than Capital Contributions, including, without limitation, operating income, fees, interest and other income attributable to the Company's business, less the portion thereof used to pay or establish reserves for all Company expenses, payments, replacements and contingencies, all as determined by the Manager in its discretion; provided, however, Distributable Cash shall

32

**CONFIDENTIAL**

SFR 23240

not be reduced by depreciation, amortization, cost recovery deductions or similar non-cash allowances.

"**Economic Interest**" shall mean an Interest Holder's share of one or more of the Company's Profits, Losses and distributions of the Company's assets pursuant to this Operating Agreement and the LLC Act, but shall not include any right to participate in the management or affairs of the Company, including the right to vote on, consent to or otherwise participate in any decisions of the Members or Managers.

"**Financing**" means any loan obtained by the Company, including any loan from a Member made pursuant to **Section 3.3(d)**.

"**Interest Holder**" shall mean either a Member holding an Economic Interest or the Transferee of a Member's Economic Interest.

"**Managers**" shall mean the Company's Managers in accordance with the provisions of **Section 6.1** of this Agreement with respect to the management of the business and affairs of the Company, which Managers shall initially be as set forth on Exhibit B.

"**Member Minimum Gain**" shall have the meaning given to the term "Partner Nonrecourse Debt Minimum Gain" and shall mean an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i)(3) of the Regulations.

"**Member Nonrecourse Debt**" has the meaning set forth for "Partner Nonrecourse Debt" in Section 1.704-2(b)(4) of the Regulations.

"**Member Nonrecourse Deductions**" has the meaning set forth for "Partner Nonrecourse Deductions" in Section 1.704-2(i)(1) of the Regulations. The amount of Member Nonrecourse Deductions with respect to a Member Nonrecourse Debt for any fiscal year equals the excess, if any, of the net increase, if any, in the amount of Member Minimum Gain attributable to such Member Nonrecourse Debt during that fiscal year over the aggregate amount of any distributions during that fiscal year to the Member that bears the economic risk of loss for such Member Nonrecourse Debt to the extent such distributions are from the proceeds of such Member Nonrecourse Debt and are allocable to an increase in Member Minimum Gain attributed to such Member Nonrecourse Debt, determined in accordance with Sections 1.704-2(i)(2) and (3) of the Regulations.

"**Members**" means, collectively, those Members listed on Exhibit A as owning Membership Interests but each may be referred to individually as a "Member". A Member shall also mean any other person who is admitted to the Company pursuant to **Section 2.3** or **Article 8**. Solely for purposes of the allocation and distribution provisions of **Sections 4, 5** and 11 of this Agreement (and any definitions relating thereto), a Member shall also include an assignee or transferee of a Unit who has not been admitted to the Company as a Substitute Member.

"**Membership Interest**" means a Member's entire ownership interest in the Company represented by one or more Units, including, without limitation, rights to (i) vote on various Company matters as hereinafter set forth, and (ii) to receive distributions (liquidating or

33

3447558\

**CONFIDENTIAL**

otherwise) and allocations of profits and losses. Collectively, the Membership Interests of all the Members shall be referred to herein as "Membership Interests".

"**Nonrecourse Deductions**" has the meaning set forth in Section 1.704-2(b)(1) of the Regulations. The amount of Nonrecourse Deductions for any fiscal year equals the excess, if any, of the net increase, if any, in the amount of Company Minimum Gain during that fiscal year over the aggregate amount of any distributions during that fiscal year of proceeds of a Nonrecourse Liability that are allocable to an increase in Company Minimum Gain, determined according to the provisions of Sections 1.704-2(c) and (d) of the Regulations.

"**Nonrecourse Liability**" has the meaning set forth in Section 1.704-2(b)(3) of the Regulations.

"**Operating Deficit**" means the amount by which the costs of owning the Company's assets and operating the Company's business exceed, or the amount by which the Manager in good faith estimates that such costs during the next thirty (30) day period will exceed, the operating income and other cash available to the Company to pay all of such costs, including reserves.

"**Percentage Interest**" means, subject to the following sentence, with respect to any Member, the amount, expressed as a percentage, that the number of Units owned by such Member at any given time as set forth in Exhibit A hereto bears to the total number of Units owned by all Members as of such date, as such Percentage Interest may be adjusted in accordance with **Section 3.3(c)** of this Agreement.

"**Person**" means any individual, partnership, corporation, trust, limited liability company, or other entity.

"**Profits and Losses**" mean, for each fiscal year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with IRC Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to IRC Section 703(a)(1) will be included in taxable income or loss), with the following adjustments:

(i)     Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses will be added to such taxable income or loss;

(ii)     Any expenditures of the Company described in IRC Section 705(a)(2)(B) or treated as IRC Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(1), and not otherwise taken into account in computing Profits or Losses will be subtracted from such taxable income or loss;

(iii)     In the event the book value of any Company asset is adjusted, the amount of such adjustment will be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(iv)     Gain or loss resulting from any disposition of assets with respect to which gain or loss is recognized for federal income tax purposes will be computed by reference

34

**CONFIDENTIAL**

to the book value of the assets disposed of, notwithstanding that the adjusted tax basis of such asset differs from its book value;

(v)     In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing taxable income or loss, there will be taken into account Depreciation for such fiscal year or other period; and

(vi)     Any items that are specially allocated to a Member pursuant to **Sections 4.2(c), (d), (e), (f)** and **(g)** shall not be taken into account in determining Profits and Losses.

"**Selling Member**" means any Member that Transfers for consideration all or any portion of its Membership Interest.

"**Substitute Member**" means an Assignee who has been admitted to all of the rights of membership pursuant to this Agreement.

"**Transfer**" (whether or not such term is capitalized) means, as a noun, any voluntary or involuntary transfer, sale, pledge, hypothecation, assignment or other disposition by a Member and, as a verb, voluntarily or involuntarily to transfer, sell, pledge, hypothecate, assign or otherwise dispose of a Member's Membership Interest or Units.

"**Unit**" means a unit of Membership Interest in the Company, including the right to receive distributions of Distributable Cash and Capital Proceeds and allocations of Profits and Losses as specifically set forth in this Agreement, and shall represent an undivided interest in the holder's Capital Account balance. No fractional Units shall be issued.

3447558\

**CONFIDENTIAL**

SFR 23243

EXHIBIT A

MEMBERS' NAMES, ADDRESSES,
CAPITAL CONTRIBUTIONS
AND PERCENTAGE INTERESTS

(Bluestone Capital Markets, LLC)

| Names and Addresses of Members | Value of Initial Capital Contribution | Number of Units | Percentage Interest (Rounded) |
|---|---|---|---|
| SFR EQUITIES, LLC<br>700 West Morse Boulevard<br>Suite 220<br>Winter Park, Florida 32789<br>Attn: Gene Harris | $43,170 | 4,317 Units | 43.17% |
| CHGO REAL ESTATE CONSULTING GROUP, LLC<br>200 South Michigan Avenue<br>Suite 1100<br>Chicago, Illinois 60604<br>Attn: Brian Hynes | $33,560 | 3,356 Units | 33.56% |
| NAI ARK FUNDING, LLC<br>109 Masons Way<br>Newtown Square, PA 19073 | $13,530 | 1,353 Units | 13.53% |
| HOWARD & HOWARD ATTORNEYS, PLLC<br>200 South Michigan Avenue<br>Suite 1100<br>Chicago, Illinois 60604 | $5,010 | 501 | 5.01% |
| MANCHESTER SECURITIES CORP<br>c/o Elliott Management Corporation<br>40 West 57th Street<br>NY, NY 10019 | $1,356.80 | 135.68 | 1.3568% |
| BERESFORD ENERGY CORP.<br>c/o Elliott Management Corporation<br>40 West 57th Street<br>NY, NY 10019 | $2,883.20 | 288.32 | 2.8832% |
| THE ELEVEN CORP.<br>2611 Bryant St.<br>Denver, Colorado 80211 | $500 | 50 | 0.5% |
| TOTALS: | $100,000 | 10,000 Units | 100% |

3447558\

CONFIDENTIAL

SFR 23244

**EXHIBIT B**

Managers

Brian Hynes (CHGO Real Estate Consulting Group, LLC representative)

Gene Harris (SFR Equities, LLC representative)

Malcom Weems (CHGO Real Estate Consulting Group, LLC representative)

David Reape (NAI Ark Funding, LLC representative)

Mark Ryerson (Howard & Howard Attorneys PLLC representative)

Marty Martin (representative elected by majority of the other Managers)

4846-3949-9850, v. 4

3447558\

**CONFIDENTIAL**

SFR 23245

# EXHIBIT "F"

CONFIDENTIAL

**Execution Version**

## SERIES 2017-1 RISK RETENTION AGREEMENT

This Series 2017-1 Risk Retention Agreement (this "Agreement") is made and entered into as of June 21, 2017, by and among Barclay Capital Inc, as depositor and risk retention sponsor (the "Risk Retaining Sponsor") under the Amended and Restated Trust Agreement dated as of June 21, 2017 (the "Standard Trust Agreement"), establishing the IRT Funding Trust (the "Trust") and the Series Trust Agreement dated as of June 21, 2017 (the "Series Trust Agreement"), establishing Series 2017-1 thereof ("Series 2017-1"), and Vendor Assistance Program LLC, as manager of the Trust (the "VAP Sponsor").

WHEREAS, the VAP Sponsor and the Risk Retaining Sponsor are each "sponsors" under the Rule (as defined in Section 1) in connection with the securitization of Assigned Receivables pursuant to the Series Trust Agreement (the "Securitization");

WHEREAS, in connection with the Securitization, and in accordance with §244.4 of the Rule, the VAP Sponsor and the Risk Retaining Sponsor intend to satisfy the risk retention requirements under the Rule by having the Risk Retaining Sponsor retain an "eligible vertical interest" in the notes (the "Notes") issued pursuant to the Securitization representing a percentage of not less than 5% (the "Retained Interest");

WHEREAS, the Risk Retaining Sponsor has agreed to retain the Retained Interest in accordance with the Applicable Risk Retention Requirements; and

WHEREAS, the parties hereto wish to set forth the obligations of the Risk Retaining Sponsor in this Agreement to ensure the compliance by the VAP Sponsor and the Risk Retaining Sponsor with the Rule and the Risk Retaining Sponsor with the Applicable Risk Retention Requirements;

Now, therefore, in consideration of the premises and mutual agreements set forth herein, the parties agree as follows:

SECTION 1.   Defined Terms.

(a)     If any particular term or phrase is defined above in this Agreement, then that term or phrase will have the specified definition throughout this Agreement.

(b)     Whenever used in this Agreement, unless the context otherwise requires:

"Affiliate" and "affiliated" have the meanings set forth in §244.2 of the Rule.

"Applicable Risk Retention Requirements" means any requirement or obligation set forth in §244.4 and/or (to the extent compliance therewith is required pursuant to §244.4) §244.12 of the Rule, as such requirement or obligation may be amended from time to time, and subject to such clarification and interpretation as have been provided by the Regulatory Agencies in the adopting release (79 FR 77601 *et seq.*) or by the staff of any such agency, or as may be

DM_US 82286595-6.071370.0720

SFR 23673

CONFIDENTIAL

provided by any such agency or its staff from time to time, in each case, as effective from time to time.

"Business Day" means any day other than a Saturday, a Sunday or a day on which banking institutions in New York, the New York Stock Exchange or the Federal Reserve System of the United States of America, are authorized or obligated by law or executive order to remain closed.

"Closing Date" means the date on which the Notes will be initially issued pursuant to the Series Trust Agreement.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Governmental Authority" means, with respect to any Person, any (i) nation or government, (ii) state or local or other political subdivision thereof, (iii) central bank or similar monetary or regulatory authority, (iv) Person, agency, authority, instrumentality, court, regulatory body, central bank or other body or entity exercising executive, legislative, judicial, taxing, quasi-judicial, quasi-legislative, regulatory or administrative functions or powers of or pertaining to government, (v) court or arbitrator having jurisdiction over such Person or its assets or properties, (vi) stock exchange on which shares of stock of such Person are listed or admitted for trading, (vii) accounting board or authority that is responsible for the establishment or interpretation of national or international accounting principles, in each case, whether foreign or domestic, and (viii) supra-national body such as the European Union or the European Central Bank.

"Joinder Agreement" has the meaning set forth in Section 3 of this Agreement.

"MOA" means a "majority owned affiliate" of the Risk Retaining Sponsor as defined in the Rule that holds, or will hold, as applicable, all or a portion of the Retained Interest.

"Notes" has the meaning set forth in the recitals to this Agreement.

"Person" means any individual, corporation, limited liability company, partnership, joint venture, estate, trust, unincorporated association, bank, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"Regulatory Agencies" means the Department of Treasury, the Federal Reserve System, the Federal Deposit Insurance Corporation, the Federal Housing Finance Agency, the Securities and Exchange Commission and the Department of Housing and Urban Development.

"Retained Interest" has the meaning set forth in the preamble to this Agreement.

"Risk Retaining Sponsor" has the meaning set forth in the preamble to this Agreement.

"Rule" means the final rule that was promulgated to implement the credit risk retention requirements under Section 15G of the Exchange Act, as added by Section 941 of the

SFR 23674

CONFIDENTIAL

Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act") (79 F.R. 77601; pages 77740-77766), as such rule may be amended from time to time, and subject to such clarification and interpretation as have been provided by the Department of Treasury, the Federal Reserve System, the Federal Deposit Insurance Corporation, the Federal Housing Finance Agency, the Securities and Exchange Commission and the Department of Housing and Urban Development in the adopting release (79 FR 77601 *et seq.*) or by the staff of any such agency, or as may be provided by any such agency or its staff from time to time, in each case, as effective from time to time. References to specific provisions of the Rule are to the Rule as codified in the regulations of the Board of Governors of the Federal Reserve System, 12 CFR Part 244.

With respect to any representation, warranty or covenant referenced in this definition, no purported breach of any such representation, warranty or covenant that by its express terms requires the Risk Retaining Sponsor or any of its Affiliates to comply with any of the Applicable Risk Retention Requirements shall constitute a breach of the applicable representation, warranty or covenant with respect to any violation of the Rule arising out of any amendment, modification, clarification or interpretation of the Rule after the date of this Agreement if the Risk Retaining Sponsor has used or is using reasonable good faith efforts or actions to comply with the Applicable Risk Retention Requirements.

"Securitization" has the meaning set forth in the recitals to this Agreement.

"Series Trust Agreement" has the meaning set forth in preamble to this Agreement.

"Standard Trust Agreement" has the meaning set forth in the preamble to this Agreement..

"Trust" has the meaning set forth in the preamble to this Agreement.

"VAP Sponsor" has the meaning set forth in the preamble to this Agreement.

SECTION 2.   Representations and Warranties.

(a)   The Risk Retaining Sponsor represents and warrants to, and agrees with, the other parties hereto as follows:

(i)   (ii)   Organization of the Risk Retaining Sponsor. The Risk Retaining Sponsor is duly organized or formed, validly existing and in good standing under the laws of the jurisdiction of its organization or formation and has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby.

(iii)   Authority. The execution and delivery by the Risk Retaining Sponsor of this Agreement, and the performance by the Risk Retaining Sponsor of its obligations hereunder, have been duly and validly authorized by the Risk Retaining Sponsor. This Agreement has been duly and validly executed and delivered by the Risk Retaining Sponsor and constitutes a legal, valid and binding obligation of the Risk Retaining

SFR 23675

CONFIDENTIAL

Sponsor enforceable against the Risk Retaining Sponsor in accordance with the terms hereof, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(iv)   Governmental Approvals and Filings.   The execution, delivery and performance by the Risk Retaining Sponsor of this Agreement and the consummation of the transactions contemplated hereby does not require the consent or approval of, the giving of notice to, the registration with, or the taking of any other action in respect of, any Governmental Authority that, if not obtained, effected or taken, would materially and adversely affect the performance or enforceability of the Risk Retaining Sponsor's obligations under this Agreement.

(v)   No Legal Proceeding.   There are no actions, suits or proceedings pending or, to the Risk Retaining Sponsor's knowledge, threatened or likely to be asserted against or affecting the Risk Retaining Sponsor before or by any Governmental Authority (i) with respect to any of the transactions contemplated by this Agreement or (ii) with respect to any other matter that, in the reasonable judgment of the Risk Retaining Sponsor, if determined adversely to the Risk Retaining Sponsor, would materially and adversely affect its ability to perform its obligations under this Agreement.

(vi)   No Violation.   The Risk Retaining Sponsor is not in default with respect to any statute, law, rule, regulation, judgment, decree, demand or order of any Governmental Authority that is applicable to the Risk Retaining Sponsor, which default would materially and adversely affect the ability of the Risk Retaining Sponsor to perform its obligations under this Agreement.

(vii)   Investment Company Act.   The Risk Retaining Sponsor is not an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

(viii)   No Financing, Hedging, Pledging, Hypothecation and Transfer.   Neither the Risk Retaining Sponsor nor any of its Affiliates has entered into any financing, hedging, pledging, hypothecation, transfer or any other similar transaction or activity with respect to the Retained Interest in violation of §244.12 of the Rule.

(b)   The VAP Sponsor represents and warrants to, and agrees with, the other parties hereto that Bluestone Capital Markets, LLC, the sole owner of the certificate issued pursuant to the Series Trust Agreement, is owned by the same persons, who have the same proportionate interests therein, as the VAP Sponsor.

SECTION 3.   Covenants.

(a)   The Risk Retaining Sponsor covenants and agrees with the other parties hereto as follows:

SFR 23676

CONFIDENTIAL

(i) <u>Transfer of the Retained Interest</u>.  (i) Except as permitted in this Section 3 and the Applicable Risk Retention Requirements, the Risk Retaining Sponsor shall retain, and be the sole holder of any interest (whether direct or indirect) in, the Retained Interest and shall not directly or indirectly transfer, convey, sell, pledge, create a lien on (voluntarily or involuntarily) or otherwise dispose of the Retained Interest.  Any transfer, conveyance, sale, pledge, lien or other disposition of the Retained Interest (or any direct or indirect interest therein) in violation of the terms of this Agreement or the Applicable Risk Retention Requirements shall be void *ab initio* and of no effect.

(ii) <u>Permitted Transfer to an MOA</u>.  The Risk Retaining Sponsor may transfer all (or a portion) of the Retained Interest to an MOA, and any transferee MOA may transfer all (or any portion) of the Retained Interest to the Risk Retaining Sponsor or another MOA, in accordance with the terms of the Series Trust Agreement, provided that the Risk Retaining Sponsor, any such transferee MOA and, to the extent applicable, their Affiliates, shall comply with the Applicable Risk Retention Requirements and shall satisfy all of the additional requirements set forth below:

(A) A notice of the transfer is given to the VAP Sponsor upon the occurrence of the transfer, together with a description of the basis upon which the Risk Retaining Sponsor has concluded that the transferee qualifies as an MOA;

(B) Such MOA, and any subsequent transferee MOA, shall have executed and delivered to the VAP Sponsor a an executed joinder agreement substantially in the form attached hereto as <u>Exhibit A</u> pursuant to which such MOA has agreed to be bound by the terms of this Agreement to the same extent as if such MOA was the Risk Retaining Sponsor itself (each, a "<u>Joinder Agreement</u>"); and

(C) Such MOA is and shall remain an MOA of the Risk Retaining Sponsor.

(iii) <u>No Prohibited Financing, Hedging, Pledging or Hypothecation</u>.  Neither the Risk Retaining Sponsor nor any of its Affiliates shall enter into any hedging, financing, pledging, hypothecation or any other similar transaction or activity with respect to the Retained Interest in violation of §244.12 of the Rule.

(iv) <u>Notice of Material Events</u>.  To the extent the Risk Retaining Sponsor has knowledge thereof, the Risk Retaining Sponsor shall promptly notify the VAP Sponsor of the occurrence of any violation, or any event that, but for passage of time, would result in a violation, by the Risk Retaining Sponsor or any of its Affiliates of the Applicable Risk Retention Requirements.

(v) Annual Certification; Monitoring of Compliance; Cooperation.  The Risk Retaining Sponsor agrees as follows:

(vi) Provided that the VAP Sponsor has provided the Risk Retaining Sponsor no less than three (3) Business Days prior written notice of such delivery requirement (which notice may be provided by email), within thirty (30) days after the end of each

SFR 23677

CONFIDENTIAL

calendar year, commencing with the calendar year ending December 31, 2017, the Risk Retaining Sponsor shall deliver a written certification in the form attached to this Agreement as Exhibit B that it has complied with all of the covenants in this Agreement during the period from and including the Closing Date (in the case of the first such certification) or since the immediately preceding certification (in the case of subsequent certifications) and through and including the date of such certification.

(vii)     The Risk Retaining Sponsor agrees that if the VAP Sponsor is required to demonstrate to a Governmental Authority the VAP Sponsor's compliance with the VAP Sponsor's obligations under the Rule, the Risk Retaining Sponsor will use commercially reasonable efforts to provide such information as may be required by a Governmental Authority, or is otherwise reasonably necessary, to demonstrate the Risk Retaining Sponsor's compliance with the Rule in relation to the Securitization.

(b)     The VAP Sponsor covenants and agrees with the other parties hereto that until the termination of this Agreement the representation and warranty set forth in Section 2(b) hereof shall remain true and the Bluestone Capital Markets, LLC shall not transfer or otherwise dispose of any interest in the certificate referred to therein to any person other than the VAP Sponsor without the consent of the Risk Retaining Sponsor.

SECTION 4.   Indemnification.

(a)     Indemnification. Without limiting any other rights which any Person may have hereunder, under the Trust Agreements or under applicable laws, regulations or otherwise, the Risk Retaining Sponsor shall indemnify and hold harmless the VAP Sponsor and each of its Affiliates, and all members, managers, directors, shareholders, officers, employees and attorneys or agents (each an "Indemnified Party"), from and against any and all damages, losses, claims, liabilities, penalties, costs and expenses, including reasonable attorneys' fees and disbursements (collectively, "Indemnified Amounts"), as and when incurred, at the written request of the Indemnified Parties, awarded against or incurred by any of them arising out of, relating to or in connection with any breach by the Risk Retaining Sponsor, any MOA or any affiliate of the Risk Retaining Sponsor or any MOA of any representation, warranty or covenant set forth in this Agreement or in any Joinder Agreement to which any MOA is a party or any certification delivered by the Risk Retaining Sponsor or any MOA or any affiliate of the Risk Retaining Sponsor or any MOA under this Agreement or any Joinder Agreement to which any MOA is a party (any such breach by the Risk Retaining Sponsor or MOA being referred to hereunder as a "Breach"). With respect to any representation, warranty or covenant in this Agreement or any certification delivered by the Risk Retaining Sponsor or any MOA pursuant to this Agreement, no purported breach of any such representation, warranty or covenant that by its express terms requires the Risk Retaining Sponsor or any of its Affiliates to comply with any of the Applicable Risk Retention Requirements shall constitute a breach of such representation, warranty or covenant with respect to any violation of the Rule (including any of the Applicable Risk Retention Requirements) arising out of any amendment, modification, clarification or interpretation of the Rule (including any of the Applicable Risk Retention Requirements) after the date of this Agreement if the Risk Retaining Sponsor has used or is using reasonable good faith efforts or actions to comply with the Applicable Risk Retention Requirements.

SFR 23678

CONFIDENTIAL

(b)    Contribution. If for any reason the indemnification provided above in this Section 4 is unavailable to an Indemnified Party or is insufficient to hold an Indemnified Party harmless, then the Risk Retaining Sponsor shall contribute to the amount paid or payable by such Indemnified Party as a result of such loss, claim, damage, liability, penalty, cost or expense in such proportion as is appropriate to reflect the relative fault of the Risk Retaining Sponsor and such Indemnified Party as well as any other relevant equitable considerations.

(c)    Specific Performance. The parties acknowledge that money damages may not be a sufficient remedy for any violation of the terms of this Agreement and, accordingly, the VAP Sponsor shall be entitled to seek specific performance and/or injunctive relief as remedies for any violation, in addition to all other remedies available at law or equity.

SECTION 5.    Notices. All notices and other communications hereunder shall be in writing and shall be deemed duly given if (a) personally delivered, (b) mailed by registered or certified mail, postage prepaid and received by the addressee, (c) sent by express courier delivery service and received by the addressee or (d) transmitted by electronic mail or facsimile transmission (or any other type of electronic transmission agreed upon by the parties) and confirmed by a writing delivered by any of the means described in clause (a), clause  (b), or clause (c). Any such notice to the Risk Retaining Sponsor shall be directed to such party at 745 7th Avenue, New York, NY 10019, Attention:   Municipal Structured Products; telephone number: 212-528-1051, email: MSP@barclays.com. Any notice to the VAP Sponsor shall be directed to such party at 1201 N. Clark St., Suite 201, Chicago, Illinois 60610, Attention: David Reape, facsimile no.: 312-429-2027, email dreape@vendorassistance.com, with a copy to 700 West Morse Boulevard, Suite 220, Winter Park, Florida 32789.

SECTION 6.    Assignment and Successors. Except as provided in Section 3, this Agreement may not be assigned by the Risk Retaining Sponsor without the prior written consent of the VAP Sponsor.  The Trustee is an intended third party beneficiary of the covenants, representations and indemnities of the Risk Retaining Sponsor set forth in this Agreement. Subject to the foregoing, this Agreement shall bind the parties hereto and inure to the benefit of and be enforceable by the VAP Sponsor and its successors and assigns.

SECTION 7.    Termination. This Agreement shall terminate on the earliest of (i) the date upon which all Notes have been redeemed and the Series Trust Agreement has been terminated, (ii) the date specified in §244.12(f) of the Rule with respect to the termination on restrictions on hedging or transfer and (iii) subject to the consent of the VAP Sponsor (which consent shall not be unreasonably withheld), the date on which the Rule has been officially abolished or officially determined by the Regulatory Agencies to be no longer applicable to the Securitization or the Retained Interest, provided that Sections 4, 5, 6, 9 and 10 shall survive the termination of this Agreement and remain operative and in full force and effect regardless of the termination of this Agreement.

SFR 23679

CONFIDENTIAL

SECTION 8.   Amendment.  This Agreement may be amended, supplemented or modified only by a written instrument duly executed by each party hereto.  If either party reasonably determines that it would be advisable to amend this Agreement to comply with the Rule, the Exchange Act or other applicable laws and regulations or to conform to guidance with respect to the Rule provided by any applicable Governmental Authority, the parties agree to negotiate in good faith to amend this Agreement to so comply.  In the event that any restriction or limitation under the Applicable Risk Retention Requirements applicable to the Risk Retaining Sponsor hereunder is withdrawn, repealed or modified to be less restrictive, the parties hereto agree to modify any corresponding terms of this Agreement to reflect any such withdrawal, repeal or modification.

SECTION 9.   Governing Law; Submission to Jurisdiction; Waiver of Trial by Jury.

(a)     THIS AGREEMENT AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS AGREEMENT, THE RELATIONSHIP OF THE PARTIES TO THIS AGREEMENT, AND/OR THE INTERPRETATION AND ENFORCEMENT OF THE RIGHTS AND DUTIES OF THE PARTIES TO THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS AND DECISIONS OF THE STATE OF NEW YORK, WITHOUT REGARD TO THE CHOICE OF LAW RULES THEREOF.   THE PARTIES HERETO INTEND THAT THE PROVISIONS OF SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW SHALL APPLY TO THIS AGREEMENT.

(b)     EACH OF THE PARTIES HERETO IRREVOCABLY (I) SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK FOR THE PURPOSE OF ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT; (II) WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM IN ANY ACTION OR PROCEEDING IN ANY SUCH COURT; (III) AGREES THAT A FINAL JUDGMENT IN ANY ACTION OR PROCEEDING IN ANY SUCH COURT SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN ANY OTHER JURISDICTION BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW; AND (IV) CONSENTS TO SERVICE OF PROCESS UPON IT BY MAILING A COPY THEREOF BY CERTIFIED MAIL ADDRESSED TO IT AS PROVIDED FOR NOTICES HEREUNDER.

(c)     EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

SECTION 10.  Severability of Provisions.  If any one or more of the covenants, agreements, provisions or terms of this Agreement shall be for any reason whatsoever held invalid, then such covenants, agreements, provisions or terms shall be deemed severable from the

SFR 23680

CONFIDENTIAL

remaining covenants, agreements, provisions or terms of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement.

SECTION 11. <u>Miscellaneous</u>. (a) This Agreement may be signed in any number of counterparts, each of which shall be deemed an original, and which taken together shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page of this Agreement in Portable Document Format (PDF) or by facsimile transmission shall be as effective as delivery of a manually executed original counterpart of this Agreement.

(b)     For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(i)     the terms defined in this Agreement include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender;

(ii)     references herein to "Sections", "Subsections", "Paragraphs" and other subdivisions without reference to a document are to designated Sections, Subsections, Paragraphs and other subdivisions of this Agreement;

(iii)     a reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall also apply to Paragraphs and other subdivisions;

(iv)     the words "herein", "hereof", "hereunder", "hereto", "hereby" and other words of similar import refer to this Agreement as a whole and not to any particular provision; and

(v)     the terms "include" or "including" shall mean without limitation by reason of enumeration.

[SIGNATURE PAGES FOLLOW]

SFR 23681

CONFIDENTIAL

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

VENDOR ASSISTANCE PROGRAM, LLC

By:
    Name: David Reape
    Title: CEO

BARCLAYS CAPITAL INC.

By:
    Name:
    Title:

Signature Page to the Series 2017-1 Risk Retention Agreement

SFR 23682

CONFIDENTIAL

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

VENDOR ASSISTANCE PROGRAM, LLC

By: _____
Name: David Reape
Title: CEO

BARCLAYS CAPITAL INC.

By: _____
Name: Michael Wang
Title: Director

SFR 23683

CONFIDENTIAL

## Exhibit A

## [FORM OF JOINDER AGREEMENT]

This Joinder Agreement (this "Agreement"), dated as of [_____], is entered into by [_____], a [_____] (the "MOA"), Vendor Assistance Program LLC, as manager of the Trust ("VAP"), and [_____], as certificateholder (together with VAP, the "VAP Sponsor"), in connection with that certain 201[__]-[__] Risk Retention Agreement dated [__], 2017 (as the same may be supplemented, modified, amended or restated from time to time, the "Risk Retention Agreement"), between the VAP Sponsor, [_____], as the Risk Retaining Sponsor under the 201[__]-[__] Risk Retention Agreement (collectively, the "Original Parties").

I.    The MOA desires to receive from [_____] (the "Transferring Risk Retaining Sponsor") $[_____] of the Transferring Risk Retaining Sponsor's Retained Interest.

II.   Accordingly, the parties hereto agree as follows:

A.    The MOA hereby acknowledges, agrees and confirms that, by its execution of this Agreement, it shall be a party to the Risk Retention Agreement and a "Risk Retaining Sponsor" for all purposes of the Risk Retention Agreement and shall have all of the rights and obligations of a Risk Retaining Sponsor thereunder as if it had executed the Risk Retention Agreement as a "Risk Retaining Sponsor." The MOA hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Risk Retention Agreement applicable to it as a Risk Retaining Sponsor, including with respect to choice of law, submission to jurisdiction and remedies. Without limitation of the foregoing, the MOA represents and warrants that the representations and warranties in Section 2 of the Risk Retention Agreement applicable to the Risk Retaining Sponsor are true and correct as of the date hereof as to the MOA.

B.    The MOA acknowledges and confirms that it has received a copy of the Risk Retention Agreement and the exhibits thereto.

C.    Notwithstanding the transfer of all or a portion of the Transferring Risk Retaining Sponsor's Retained Interest, the Transferring Risk Retaining Sponsor agrees and acknowledges that it shall remain a party to the Risk Retention Agreement which shall remain in full force and effect with respect to it until such time as the Risk Retention Agreement is terminated with respect to the Transferring Risk Retaining Sponsor pursuant to Section 9 of the Risk Retention Agreement; provided that Sections 4, 5, 8 and 9 of the Risk Retention Agreement shall survive the termination of the Risk Retention Agreement and remain operative and in full force and effect regardless of the termination of the Risk Retention Agreement.

The address of the MOA for purposes of Section 7 of the Risk Retention Agreement shall be [_____].

Exhibit A-1

SFR 23684

CONFIDENTIAL

This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall constitute one and the same instrument.   Delivery of an executed counterpart hereof, or a signature page hereto, by facsimile or in a Portable Document Format (PDF) or similar file shall be effective as delivery of a manually executed original counterpart of this Agreement.

*[signature pages follow]*

DM_US 82286595-6.071370.0720

SFR 23685

CONFIDENTIAL

IN WITNESS WHEREOF, the MOA and the Original Parties have caused this Agreement to be duly executed and delivered as of the date first above written.

**[MOA]**

By:_____
     Name:
     Title:

**[RISK RETAINING SPONSOR]**

By:_____
     Name:
     Title:

Acknowledged and Agreed to:

[         ]

By: _____
     Name:
     Title:

**[VAP SPONSOR]**

By: _____
     Name:
     Title:

DM_US 82286595-6.071370.0720

SFR 23686

CONFIDENTIAL

**Exhibit B**


**[FORM OF ANNUAL COMPLIANCE STATEMENT]**

[Date]

[VAP Sponsor]
Attention: [_____]
Facsimile no. [_____]
Email: [_____]

[              ]
Attention: [_____]
Facsimile no. [_____]
Email: [_____]

[Issuing Trust]
Attention: [_____]
Facsimile no. [_____]
Email: [_____]


In connection with the 201[__]-[__] Risk Retention Agreement (the "Risk Retention Agreement"), made and entered into as of [__], 201_, among [_____] (the "VAP Sponsor") and [_____] (the "Risk Retaining Sponsor"), the undersigned hereby certifies that it has complied with all of the covenants in the Risk Retention Agreement during the period from and including the [Closing Date][INSERT DATE OF PRIOR COMPLIANCE CERTIFICATION] and through and including the date of this certification [END OF PRIOR YEAR] and the representations and warranties set forth set forth in Section 2 of the Risk Retention Agreement remain true and correct as of the date of this certification.

Capitalized terms used but not defined herein have the meanings assigned thereto in the Risk Retention Agreement.

[RISK RETAINING SPONSOR]


By: _____
      Name:
      Title:


Exhibit C-1

SFR 23687

# EXHIBIT "G"



Government of Puerto Rico
Department of State

Transaction Date: 13-Mar-2017
Register No: 392662
Order No: 1190052

# Government of Puerto Rico

## Certificate of Formation of a Limited Liability Company

### Article I - Limited Liability Company Name

The name of the Domestic Limited Liability Company is:  **BLUE STONE FINANCE LLC**
**Desired term for the entity name is: LLC**

### Article II - Principal Office and Resident Agent

Its principal office in the Government of Puerto Rico will be located at:

| | |
|---|---|
| Street Address | **1315 Ashford Avenue, PH1, SAN JUAN, PR, 00907** |
| Mailing Address | **1315 Ashford Avenue, PH1, SAN JUAN, PR, 00907** |
| Phone | **(787) 510-8005** |

The name, street and mailing address of the Resident Agent in charge of said office is:

| | |
|---|---|
| Name | **Hynes, Brian F.** |
| Street Address | **1315 Ashford Avenue, PH1, SAN JUAN, PR, 00907** |
| Mailing Address | **1315 Ashford Avenue, PH1, SAN JUAN, PR, 00907** |
| Email | **bhynes@HowardandHoward.com** |
| Phone | **(787) 510-8005** |

### Article III - Nature of Business

This is a For Profit entity whose nature of business or purpose is as follows:

**The Company is organized for the purpose of transacting any and all lawful business for which limited liability companies may be organized under the General Corporations Law for the Commonwealth of  Puerto Rico.**

### Article IV - Authorized Persons

The name, street and mailing address of each Authorized Person is as follows:

| | |
|---|---|
| Name | **Hynes, Brian F.** |
| Street Address | **1315 Ashford Avenue, PH1, SAN JUAN, PR, 00907** |
| Mailing Address | **1315 Ashford Avenue, PH1, SAN JUAN, PR, 00918** |
| Email | **bhynes@HowardandHoward.com** |

### Article V - Administrators

Faculties will not end by presenting this Certificate.



Government of Puerto Rico

# CERTIFICATE OF ORGANIZATION

I, **LUIS G. RIVERA MARÍN, Secretary of State** of the Government of Puerto Rico;

**CERTIFY:** That **BLUE STONE FINANCE LLC**, register number **392662**, is a **Domestic Limited Liability Company For Profit** organized under the laws of Puerto Rico on this **13th of March, 2017 at 02:19 PM**.



**IN WITNESS WHEREOF**, the undersigned by virtue of the authority vested by law, hereby issues this certificate and affixes the Great Seal of the Government of Puerto Rico, in the City of San Juan, Puerto Rico, today, **March 13, 2017.**

**LUIS G. RIVERA MARÍN**
Secretary of State

1190052 - $250.00



Government of Puerto Rico    Home (/) | PRDOS | Contact Us | Administration | 📧 Español | Help (/Help/Help_en.htm#MAININFO)

# Registry of Corporations and Entities

## Announcement

The content presented by this Registry is 'Public Information' and the online services are intended for interactive participation. We reserve the right to block access to the site if we detect automated bulk data gathering tools. For business need of structured data feeds, please contact support@estado.pr.gov (mailto:support@estado.pr.gov).

**Corporations and Entities**

Search (/CorporationSearch.aspx)

Create / Authorize (/CreationFilings/NameAvailability.aspx)

Amend (/CorporationSearch.aspx?m=ca)

Dissolve / Withdraw (/CorporationSearch.aspx?m=dis)

Convert (/CorporationSearch.aspx?m=cnv)

Merge / Consolidate (/Mergers/Selection.aspx)

Restore (/CorporationSearch.aspx?m=rst)

Reserve Name (/NameReservation/Prep.aspx)

**Annual Filings**

2017 Annual Report (/AnnualReportStart.aspx)

2017 LLC Fees (/AnnualReportStart.aspx?m=ad)

LLP Renewal (/CorporationSearch.aspx?m=lr)

Prior Years (/CorporationSearch.aspx?m=pyf)

_____

**Certificates**

Order Good Standing (/CorporationSearch.aspx?m=oc)

Order Existence (/CorporationSearch.aspx?m=oce)

Validate (/Validate/Default.aspx)

_____

## CORPORATION INFORMATION
(/Help/Help_en.htm#CORPINFO)

### BLUE STONE FINANCE LLC

Return to Search Results

I want to: [Select ▾]     [ Next ]

| Details | Articles | Annual Filings | Certificates |

### General Information

| Name | BLUE STONE FINANCE LLC | | |
|---|---|---|---|
| Register No. | 392662 | Status | ACTIVE |
| Class | Limited Liability Company | | |
| Type | For Profit | Jurisdiction | Domestic |

### Resident Agent

| Name | Hynes, Brian F. | | |
|---|---|---|---|
| Street Address | 1315 Ashford Avenue PH1 SAN JUAN, PR 00907 | Mailing Address | 1315 Ashford Avenue PH1 SAN JUAN, PR 00907 |

[ Return to Search Results ]

v5.6.12.1 (01)

# EXHIBIT "H"

# OPERATING AGREEMENT

## OF

## BLUE STONE FINANCE LLC

### A Puerto Rico Limited Liability Company

SFR 23174

**CONFIDENTIAL**

# OPERATING AGREEMENT
## OF
## BLUE STONE FINANCE LLC

THIS OPERATING AGREEMENT (this "Agreement") is made and entered into effective as of the 5ᵗʰ day of September 2017, by and among the persons listed on Exhibit A attached hereto and made a part hereof (hereinafter sometimes referred to collectively as the "Members" and individually as a "Member"). Capitalized terms not defined within this Agreement are defined as provided in Appendix A. The term "Section" refers to sections of this Agreement unless otherwise stated.

WHEREAS, the Members have formed the Company under the Act (as defined below); and

WHEREAS, the Members desire to adopt this Agreement in order to set forth the regulations, terms and conditions under which the Company will be operated.

NOW, THEREFORE, set forth below are the terms and conditions of the operation of the Company.

## ARTICLE 1

### THE COMPANY

**1.1    Formation.**  BLUE STONE FINANCE LLC (the "Company") is a limited liability company formed pursuant to the provisions of Chapter XIX of the Puerto Rico General Corporations Act of 2009, as amended (the "Act"). The Articles of Organization of the Company (the "Articles") were filed with the Department of State of the Commonwealth of Puerto Rico on March 13, 2017. The rights and liabilities of the Members will be as provided in the Act except as otherwise provided in this Agreement.

**1.2    Company Name.**  The name of the Company is **BLUE STONE FINANCE LLC**.

**1.3    Purposes.**  The purpose of the Company shall be to (a) enter into any lawful transaction and to engage in any operations, businesses or activities permitted under the Act and any other applicable law or regulation, and (b) otherwise engage in any lawful activities in furtherance of, or necessary, ancillary or incidental to the foregoing purposes of the Company.

**1.4    Principal Office.**  The initial principal office of the Company is located at 1362 Av Magdalena, Unit 1904, San Juan, PR 00907. The principal office of the Company may be relocated from time to time by determination of the Managers, and the Members shall be promptly provided notification of such relocation.

**1.5    Term.**  The Company as herein constituted shall continue in existence for perpetuity, unless dissolved or terminated pursuant to law or the provisions of this Agreement.

**CONFIDENTIAL**

**1.6     Filings; Registered Agent for Service of Process; Registered Office.**

(a)     The Articles have been filed with the Puerto Rico Department of State in accordance with the provisions of the Act. The Managers will take any and all other actions reasonably necessary to perfect and maintain the status of the Company as a limited liability company under the laws of Puerto Rico.

(b)     The Managers will take any and all other actions as may be reasonably necessary to perfect and maintain the status of the Company as a limited liability company or similar type of entity under the laws of any states or jurisdictions other than Puerto Rico in which the Company engages in business.

(c)     The Company's registered agent for service of process on the Company in Puerto Rico shall be Brian F. Hynes, with an address at 1362 Av Magdalena, Unit 1904, San Juan, PR 00907. The Managers may change, at any time and from time to time, such registered agent, and the Members shall be promptly provided notification of such change.

(d)     The Company's registered office in Puerto Rico shall be at 1362 Av Magdalena, Unit 1904, San Juan, PR 00907. The Managers may change, at any time and from time to time, such registered office, and the Members shall be promptly provided notification of such change.

(e)     Upon the dissolution of the Company, the Managers will promptly execute and cause to be filed a certificate of cancellation in accordance with the Act and the law of any other states or jurisdictions in which the Company has qualified to conduct business.

**1.7     Defined Terms.**     Unless the context otherwise requires or unless otherwise provided in this Agreement, capitalized terms used in this Agreement shall have the meanings ascribed to them as set forth in Appendix A to this Agreement.

## ARTICLE 2

## MEMBERS, UNITS AND PERCENTAGE INTERESTS

**2.1     Names, Addresses, Units and Percentage Interests of Members.**     The names, addresses and number of Units held by each Member and respective Percentage Interests of the Members are set forth on Exhibit A hereto. The Managers shall amend Exhibit A from time to time to reflect the admission or withdrawal of Members (which shall be accomplished consistent with the terms of this Agreement); the sale, grant, issuance or redemption of Units (which shall be accomplished consistent with the terms of this Agreement); the receipt of Capital Contributions; or a change of a Member's address.

**2.2     Certificates for Units.**     A Member's Units may, but need not, be represented by a Certificate of Membership. The Managers will determine the exact contents of a Certificate of Membership, if any.

**2.3     Authorized Units; Admission of Additional Members.**     The Company shall be authorized to issue up to 10,000 Units. As of the date of this Agreement, such Units shall be issued and outstanding as forth in Exhibit A. Subject to any approval of the Members required under **Section 6.1(e)**, additional Members may be admitted to the Company as Members and Units may

**CONFIDENTIAL**

SFR 23176

be issued to those Persons upon the written consent of (i) the Members holding at least sixty seven percent (67%) of the Percentage Interests, and (ii) seventy five percent (75%) of the Managers, on such terms and conditions as the Managers may determine at the time of admission. Any such admission shall be effective only after the new Member has executed and delivered to the Managers a document including the new Member's notice address and its agreement to be bound by this Agreement.

2.4    **Voting.**  Unless otherwise specified herein, any event, transaction or occurrence requiring approval of the Members shall be deemed to require an affirmative vote of the Members holding at least a majority of the Percentage Interests.

## ARTICLE 3

## CAPITAL CONTRIBUTIONS

3.1    **Capital Contributions.**  The Members have made, or will make, Capital Contributions as set forth on Exhibit A to this Agreement, and the Managers shall revise such Exhibit A from time to time, as appropriate, to reflect any changes to the Capital Contributions, the transfer of Membership Interests or the addition of Additional Members, as the case may be. Except as set forth in **Section 3.3** below, no Member will be required to make any Capital Contributions other than the initial Capital Contributions that Members are required to make pursuant to this **Section 3.1.**

3.2    **Other Matters.**

(a)    Except as otherwise provided in this Agreement, no Member may demand or receive a return of his, her or its Capital Contribution or withdraw from the Company. Under circumstances requiring a return of any Capital Contribution, no Member will have the right to receive property other than cash, except as may be specifically provided in this Agreement.

(b)    No Member will be liable for the debts, liabilities, contracts or any other obligations of the Company except to the extent such Member independently agrees to be so liable. It is the intention of the Members that all Members shall have the benefit of Article 19.19 of the Act. In addition, no Member shall be obligated to make an additional Capital Contribution to the Company.

3.3    **Additional Capital Contributions.**

(a)    Members may only be required to make additional Capital Contributions to the Company upon the unanimous approval of the Members. However, if the Managers determine that an Operating Deficit or a Shortfall (as defined in subsection (b) below) has occurred or is about to occur, then it may request that the Members make additional Capital Contributions to the Company as may be necessary to fund such Operating Deficit, as set forth below; provided, however, that no Member shall be obligated to make any such requested additional Capital Contributions.

(b)    Notwithstanding the provisions of this **Section 3.3**, in the event that the Company lacks sufficient funds in order to accomplish the purposes of the Company's business (a "Shortfall"), the Company may, upon the reasonable discretion of the

3

SFR 23177

Managers, obtain from one or more Members, a financial institution or other sources, one or more loans to the Company to fund all or part of the cash required to fund the Shortfall. Any such loan shall bear interest at such rate, be secured in such manner and be repayable on such terms as the Managers deem advisable, in its sole and absolute discretion; provided, however, that if such loan is from a Member or one of its Affiliates, then the terms of such loan must either (i) be fair and reasonable as to the Company at the time such loan is made, or (ii) be approved in writing by all of the Members.

## ARTICLE 4

## TAX TREATMENT

For Federal and Puerto Rico income tax purposes, the Company shall be treated as a corporation, except as otherwise determined by the affirmative votes of the Members holding at least sixty seven percent (67%) of the Percentage Interests.

## ARTICLE 5

## DISTRIBUTIONS TO MEMBERS

**5.1    Distributions.**  Subject to **Section 5.2,** and except as otherwise provided in **Article 11** with respect to distributions upon liquidation of the Company, Distributable Cash, if any, shall be distributed to the Members at such times as the Managers may determine in their discretion, but in any event no later than ninety (90) days after the end of each calendar year, in accordance with and in proportion to their respective Percentage Interests.

**5.2    Distribution of Capital Proceeds.**  Prior to the dissolution of the Company, any Capital Proceeds shall be distributed to all of the Members, no later than thirty (30) days after the occurrence of the applicable Capital Event, following the payment or release by the Company of all outstanding debt and any expenses, to each of the Members in accordance with their respective Percentage Interests.

## ARTICLE 6

## MANAGEMENT AND CONTROL; INDEMNIFICATION

**6.1    Management of Company.**

(a)    <u>Managers</u>.  The Company shall be manager-managed by one or more managers (each such manager, the "<u>Manager</u>"), which shall initially be six (6) managers, in accordance with the provisions set forth in this Agreement.  The following individuals shall be designated as Managers:

(1)    Two (2) Managers shall be elected by CHGO Real Estate Consulting Group, LLC;

(2)    One (1) Manager shall be elected by SFR Equities, LLC;

(3)    One (1) Manager shall be elected by NAI Ark Funding, LLC;

4

**CONFIDENTIAL**

SFR 23178

(4)     One (1) Manager shall be elected by Brian F. Hynes, which such Manager must be a member of Howard & Howard Attorneys PLLC and be acceptable to Howard & Howard Attorneys PLLC, in its reasonable discretion; and

(5)     One (1) Manager shall be elected by a majority of the other Managers.

The initial Managers are set forth on <u>Exhibit B</u> attached hereto.

(b)     Subject to the other provisions of this Agreement, the Managers shall manage the business and affairs of the Company. Except for decisions, actions or situations in which the approval of the Members, is expressly required by this Agreement or by non-waivable provisions of applicable law, the Managers shall have all powers permitted under the Act as well as full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business. The Managers shall devote such time to the Company as shall be reasonably required for its welfare and success. Each Manager shall have full, exclusive and complete authority and discretion and all powers necessary or desirable for the performance by the Managers of all their duties and obligations under this Agreement and the Act upon the consent of a majority of the Managers to such duty or obligation. Any action permitted or required to be taken at a meeting of the Managers may be taken without a meeting if a consent in writing, setting forth the action to be taken, is signed by Managers sufficient to approve such action and each Manager is provided with written notice one (1) business day prior to such written consent being executed (for the avoidance of doubt, the requirement that notice must be provided to each Manager does not alter the percentage threshold for such consent being approved). Notwithstanding any other provision of this Agreement to the contrary, the Managers may not cause the Company to distribute money or property to the Members other than in the ratios or amounts set forth in this Agreement.

(c)     <u>Powers and Duties of Managers</u>.   Without limiting the generality of **Section 6.1(b)**, but subject to the limitations set forth in **Section 6.1(e)**, the Managers, after consent of 70% of the Managers, shall have power and authority, on behalf of the Company to:

(i)     Cause the Company to pay all required taxes (including any taxes required to be withheld under pursuant to the Code), assessments and other obligations of the Company;

(ii)     On behalf of the Company, execute and supervise contracts to be entered into by the Company and execute all other instruments and documents, including, without limitation, checks, drafts, notes and other negotiable instruments, mortgages or deeds of trust, security agreements, financing statements, documents providing for the acquisition, encumbrance or disposition of the Company's property, assignments, bills of sale, leases and any other instruments or documents necessary, in the opinion of the Managers, to the business of the Company;

5

**CONFIDENTIAL**

SFR 23179

(iii)   Borrow money for the Company from banks, other lending institutions, Members, or Affiliates of Members in accordance with this Agreement or on such terms as may be approved by the Managers, and in connection therewith, to hypothecate, encumber and grant security interests in the assets of the Company to secure repayment of the borrowed sums;

(iv)   Establish reserves to provide funds for anticipated capital expenditures and other expenses of the Company that the Managers anticipate will not be able to be funded out of the operating income of the Company and release funds from such reserves as may be reasonably appropriate;

(v)   Retain, discharge and replace the Company's accountants and attorneys, and hire and fire employees of the Company and other persons necessary or appropriate to carry out the Company's business;

(vi)   To the extent that funds of the Company are available therefor, pay all debts and other obligations of the Company;

(vii)   Maintain all funds of the Company in one or more bank accounts in such bank or banks as the Managers may from time to time select;

(viii)   Obtain and maintain such insurance as the Managers deem appropriate, in amounts and with deductibles that are deemed appropriate by the Managers;

(ix)   Take any action and do and perform all other acts which (A) are necessary or appropriate to the conduct of the Company's business, including, without limitation, all actions necessary to protect and preserve the titles and interests of the Company in the Company's assets, but (B) do not specifically require approval of the Members under this Agreement; and

(x)   Perform other normal business functions and otherwise operate and manage the business and affairs of the Company.

(d)   Responsibilities of Managers.  The Managers shall be responsible for and hereby covenants that:

(i)   it will withhold and remit to the relevant taxing authority all taxes required to be withheld pursuant to the Code or any other provision of United States federal, state or local or foreign tax law; and

(ii)   it will, as soon as reasonably practicable after the end of each fiscal year of the Company, and at the expense of the Company, cause to be prepared and delivered to each Member all information with respect to the Company necessary for the Members' federal and state income tax returns.

(e)   Restrictions on Authority of Managers and each Manager.  Neither the Manager nor any Manager shall have the authority to, and each covenants and agrees that it shall not do any of the following without the consent of the holders of at least sixty seven percent (67%) of the Percentage Interests:

6

CONFIDENTIAL

SFR 23180

(i)      sell or otherwise issue Units of the Company (including the addition of classes of Membership Interests for such sale), which action shall also require seventy five percent (75%) of the Managers as set forth in Section 2.3; or

(ii)      increase or decrease the aggregate number of Units, as adjusted for any subdivision of the Company's Units (by Unit split, Unit dividend or otherwise) or any combination of the Company's Units (by reverse Unit split or otherwise) or similar transaction; or

(iii)      sell, convey or otherwise dispose of all or substantially all of its property or business, or merge into or effect a consolidation or other reorganization with any other entity; or

(iv)      bring suit or compromise or settle any suit or claim against the Company in which the amount involved exceeds $10,000; or

(v)      use any asset of the Company for any reason unrelated to the Purpose of the Company; or

(vi)      fundamentally change the nature of the business of the Company; or

(vii)      declare or pay any distribution on, or redeem or repurchase or make any other distribution in respect of, any equity securities of the Company other than distributions made in accordance with **Article 5, Article 9 or Article 11** hereto;

(viii)      voluntarily file for bankruptcy, liquidation, dissolution or winding up of the Company or knowing cause any event that would cause a dissolution or winding up of the Company, which in any event shall require the consent of each of the Managers; or

(ix)      take any action that would make it impossible to carry on the ordinary business of the Company.

**6.2      Removal or Resignation of a Manager; Appointment of a New Manager.**

(a)      A Manager may be removed for any reason at the written request of the Person(s) entitled to designate such Manager as provided hereunder.

(b)      A Manager may be removed for Cause only upon the affirmative votes of the Members holding at least sixty seven percent (67%) of the Percentage Interests as of such time.  The removal of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of a Member.

(c)      A Manager may, by written notice to the Members, resign as a Manager, which resignation will be effective upon receipt of notice thereof or at such later date specified in such notice.  The resignation of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of a Member.

(d)      In the event that any Manager designated hereunder ceases to serve as a Manager during such Manager's term of office, the resulting vacancy shall be filled by a

7

SFR 23181

Manager designated by the Person(s) entitled to designate such Manager as provided hereunder. If any party fails to designate a Manager pursuant to the terms of this Article 6, such Manager's position shall remain vacant until the designation of a Manager by the Person(s) entitled to designate such Manager as provided hereunder.

6.3   **Officers.** The Managers may, but shall not be required to, appoint such officers as it may determine from time to time. Except as otherwise agreed, each officer of the Company shall hold office at the pleasure of the Managers, and the Managers may remove any officer at any time, with or without cause. If appointed by the Managers, the officers shall have the duties assigned to them by the Managers. Any such officer will have the same duties of care and loyalty and be afforded the same protections and limitations of liability with respect to the Company as a Managers have under the Act.

6.4   **Indemnification.**

(a)   In carrying out its powers and duties hereunder, each Manager and each officer shall not be liable to the Company or to any other Member for any losses sustained or liabilities incurred for actions taken or omitted to be taken in a manner the Manager or officer reasonably believed to be in, or not opposed to, the best interests of the Company or applicable law and the conduct did not constitute bad faith, fraud, gross negligence or willful misconduct.

(b)   The Company shall indemnify, insure, defend and hold harmless (i) each officer and each Manager and each of its officers, directors, shareholders, principals, partners, agents, employees, heirs, legal representatives, successors, assigns and Affiliates (each, an "Indemnitee") and (ii) each Member and each of their respective Affiliates (each also an "Indemnitee") from and against, and reimburse each of them for, any and all losses, costs, liabilities, damages, expenses (including reasonable attorneys' fees), judgments, fines, settlements, and other amounts arising from any and all claims, demands, actions, suits or proceedings, civil, criminal, administrative or investigative, in which the Indemnitee may be involved, or threatened to be involved, as a party or otherwise by reason of the fact that such Person is or was an officer, a Manager or an Affiliate thereof or a shareholder, director, officer, agent, partner or employee thereof, or a Member of the Company an Affiliate thereof, which relate to, arise out of or are incidental to the Company, its assets, business or affairs, regardless of whether a Member continues to be a Member at the time any such liability or expense is paid or incurred; provided, however, that indemnification shall not be made to or on behalf of an Indemnitee if a judgment or other final adjudication establishes that the actions, or omissions to act, of such Indemnitee were material to the cause of action so adjudicated and constitute any of the following: (i) a violation of criminal law, unless the Indemnitee had no reasonable cause to believe such conduct was unlawful; (ii) a transaction from which the Indemnitee derived an improper personal benefit; (iii) a circumstance under which the liability provisions of Article 19.41 of the Act are applicable; or (iv) fraud, bad faith, gross negligence or willful misconduct or a conscious disregard for the best interests of the Company in a proceeding by or in the right of the Company to procure a judgment in its favor or in a proceeding by or in the right of a Member. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere, or its equivalent, will not, of itself, create a presumption that the Indemnitee acted in a manner contrary to that specified in (i) through (iv) above. Any indemnification pursuant to this **Section 6.4** is to be made

8

SFR 23182

only out of the assets of the Company, no Manager or Member shall have any personal liability on account thereof, and no Member shall be required to contribute any additional capital to the Company in respect of such indemnity.

(c)    Expenses (including reasonable legal fees) incurred by an Indemnitee in defending or investigating any actual or threatened claim, demand, action, suit or proceeding described in **Section 6.4(b)** above will, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Indemnitee to repay such amount if it shall be determined that the Indemnitee is not entitled to be indemnified as authorized in this **Section 6.4**.

(d)    The indemnification and advancement of expenses provided by, or granted pursuant to, this **Section 6.4** will not be exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any statute, the Articles, this Agreement, any other agreement, a vote of the Members, a policy of insurance, or otherwise, and will not limit in any way any right that the Company may have to make additional indemnifications with respect to the same or different Persons or classes of Persons. The indemnification and advancement of expenses provided for by this **Section 6.4** will continue as to a Person who has ceased to be a Manager or an officer and will inure to the benefit of the heirs, executors, administrators, successors, and assigns of such a Person.

(e)    Anything to the contrary notwithstanding, neither any Manager, any officer, nor any other Member shall be personally liable for the return of all or any portion of the Capital Contribution of any Member, and any such return shall be made solely from the assets and properties of the Company.

(f)    The Company may purchase insurance to insure against the liabilities contemplated by this **Section 6.4**.

(g)    The provisions of this **Section 6.4** shall survive the termination of this Agreement.

(h)    To the full extent permitted by applicable law, if any portion of this Section 6.4 shall be invalidated on any ground or by any court of competent jurisdiction, then the Company shall nevertheless indemnify each employee or agent of the Company as to costs, charges and expenses (including reasonable attorneys' fees) judgments, fines and amounts paid in settlement with respect to any action, suit or proceeding, whether civil, criminal, administrative or investigative, including an action by or in the right of the Company, in each case to the full extent permitted by applicable law.

**6.5    Standard of Care.** Each Manager and each officer shall perform its duties in good faith, in a manner it reasonably believes to be in, or not opposed to, the best interests of the Company and its Members. The Company may transact business with any Member, their Affiliates and their respective directors, officers, employees and agents, provided the transaction has been approved by a majority of the Managers.

**6.6    Managers Have No Exclusive Duty to Company.** A Manager who is not employed by or serving as an officer of the Company shall not be required to manage the Company

9

**CONFIDENTIAL**

SFR 23183

as his or her sole and exclusive function and he or she may have other business interests and engage in activities in addition to those relating to the Company on or prior to the date hereof, and may continue after the date hereof, including to make investments in (by way of capital contributions, loans, otherwise) or providing services to Persons engaged in businesses that directly or indirectly compete with business of the Company and its Affiliates as conducted from time to time. Neither the Company nor any Member shall have any right, by virtue of this Agreement, to share or participate in such other investments or activities of the Manager who is not employed by or serving as an officer of the Company or to the income or proceeds derived therefrom.

6.7 **Reliance on the Managers.** Any Person dealing with the Company may rely (without duty of further inquiry) upon a certificate signed by a majority of the Managers as to:

(a) The identity of such Manager or any Member;

(b) The existence or nonexistence of any fact or facts which constitute a condition precedent to acts by such Manager or which are in any other manner germane to the affairs of the Company;

(c) The Persons who are authorized to execute and deliver any instrument or document of the Company; or

(d) Any act or failure to act by the Company or any other matters whatsoever involving the Company or any Member with respect to the business of the Company.

Furthermore, no financial institution or person, firm, corporation or other entity dealing with a Manager with respect to the Company or any of its assets and properties shall be obligated to see that the terms of this Agreement have been complied with, or be obligated to inquire into the necessity or expediency of any act or action of such Manager, and every contract, agreement, deed, note or other instrument or document executed by a Manager shall be conclusive evidence in favor of any financial institution, person, firm, corporation or other entity relying thereon that such instrument or document was duly executed and is binding upon the Company and the Members thereof, and that such Manager is duly authorized and empowered to execute and deliver such agreement, document or other instrument for and on behalf of the Company.

6.8 **Compensation of the Managers.** Except as otherwise set forth in this **Section 6.8**, no Manager shall be entitled to compensation in the ordinary course of business unless approved by the Members holding at least sixty seven percent (67%) of the Percentage Interests as of such time. However, the Company shall pay or reimburse each Manager for all reasonable costs and expenses incurred by such Manager in the course of managing the business and affairs of the Company, including any administrative and overhead costs.

## ARTICLE 7

## BOOKS AND RECORDS

7.1 **Books and Records.** The Company will keep adequate books and records at its principal place of business, setting forth a true and accurate account of all transactions and other matters arising out of and in connection with the conduct of the Company's business, which books and records will be otherwise kept in accordance with the provisions of the Act. Any Member or its designated representative will have the right, to the extent provided by the Act, to have access

10

SFR 23184

to and to inspect and copy the contents of such books or records with a three day written notice to the Manager. A reasonable time and place will be designated by the Manager in its sole discretion

    **7.2**    **Taxable Year.** The accounting period and taxable year of the Company will end on December 31 of each year.

# ARTICLE 8

## TRANSFERABILITY AND ADDITIONAL ISSUANCES

    **8.1**    **General.** Except (i) Transfers to an Affiliate of a Selling Member, or (ii) as otherwise specifically provided herein, no Member shall have the right, as to all or any part of its Membership Interest or Economic Interest to Transfer such Membership Interest or Economic Interest for consideration or for no consideration (whether or not by operation of law, except in the case of bankruptcy). Notwithstanding the foregoing, the provisions of this paragraph shall only apply to Members, and in the event that a Member is a partnership or limited liability company, it shall not apply to the individual members or partners of any Member of the Company. (By way of example, the death of an individual partner/member of Howard & Howard shall not require Howard & Howard to sell its Membership Interest in the Company).

    **8.2**    **Right of First Refusal.**

    (a)    If a Selling Member desires to Transfer all or any portion of its Membership Interest or Economic Interest in the Company to any Person (other than an Affiliate of such Selling Member), the Selling Member shall obtain from such Person a bona fide written offer to purchase such Membership Interest or Economic Interest, stating the terms and conditions upon which the purchase is to be made and the consideration offered. The Selling Member shall give written notification to the remaining Members, by certified mail or personal delivery, of its intention to so Transfer such Membership Interest or Economic Interest, furnishing to the remaining Members a copy of the written offer to purchase such Membership Interest, and the name and business and personal addresses of the proposed transferee.

    (b)    Within fifteen (15) days of the receipt of the notice of intention to Transfer a Membership Interest or Economic Interest by the last of the Members to receive such notice, each remaining Member may exercise an option to purchase that proportion of the Membership Interest or Economic Interest proposed to be Transferred which equals the proportion which the Membership Interest or Economic Interest owned by such remaining Member at the time of his receipt of the notice bears to the total of the Membership Interest or Economic Interests then owned by all the remaining Members. The purchase option granted in this subparagraph (b) is herein referred to as the "Primary Option."

    (c)    If a Member fails to exercise a Primary Option granted to him to purchase the Membership Interest or Economic Interest proposed to be Transferred, each remaining Member who is granted and who exercises a Primary Option (a "Primary Option Member") may, within seven (7) days after the expiration of the fifteen (15) day option period provided for above, exercise an option to purchase the Membership Interest or Economic Interest with respect to which such Member has failed to exercise his Primary Option (hereinafter "the Option Interest"). In the case of a single remaining Primary Option Member, his option shall

**CONFIDENTIAL**

SFR 23185

be to purchase all of the Option Interest. In the case of two or more remaining Primary Option Members, each such remaining Primary Option Member's option shall be to purchase the portion of Option Interest which bears the same proportion to the total Option Interest as the Membership Interest or Economic Interest owned by each such remaining Primary Option Member at the time of receipt of the notice provided for above bears to the total Membership Interest or Economic Interests then owned by all such remaining Primary Option Members; provided that all such remaining Primary Option Members may, by agreement among themselves, determine the proportions in which some or all of their number may exercise the option granted in this subparagraph. The purchase option granted by this subparagraph (c) is referred to as the "Secondary Option."

(d)     In the event the remaining Members (or any one or more of the remaining Members) give written notice to the Selling Member of their desire to exercise this right of first refusal and to purchase all of the Selling Member's interest in the Company which the Selling Member desires to sell upon the same terms and conditions as are stated in the aforesaid written offer to purchase, the remaining Members shall have the right to designate the time, date and place of closing, provided that the date of closing shall be within fifteen (15) days after written notification to the Selling Member of the remaining Member or Members' election to exercise their right of the first refusal.

(e)     As a condition to the Company recognizing the effectiveness of either the purchase of the Selling Member's Membership Interest or Economic Interest in the Company by any Person pursuant to this Section 8.2 and subject to Section 8.3, the Managers may require the Selling Member or the proposed purchaser or successor-in-interest, as the case may be, to execute, acknowledge and deliver to the Managers such instruments of transfer, assignment and assumption and such other certificates, representations and documents, and to perform all such other acts which the Managers may deem reasonably necessary or desirable to:

(1)     verify the Transfer;

(2)     maintain the status of the Company as a corporation for federal tax purposes; and

(3)     assure compliance with any applicable state and federal laws including securities laws and regulations.

(f)     Any Transfer of a Membership Interest or Economic Interest or admission of a Member in compliance with this Article 8 shall be deemed effective as of the last day of the calendar month in which the Managers confirm the conditions set forth in Section 8.2(e) have been satisfied by the Selling Member and the proposed Transferee, and the Person desiring to acquire a Membership Interest or Economic Interest, or to be admitted as a Member, shall have executed a signature page to this Operating Agreement agreeing to be bound by all of the terms, obligations and conditions herein (whether or not such Person is to be admitted as a new Member). The Selling Member agrees, upon request of the Managers, to execute such certificates or other documents and to perform such other acts as may be reasonably requested by the Managers from time to time in connection with such Transfer. The Selling Member hereby indemnifies the Company and the remaining Members against any and all loss, damage, or expense (including, without limitation, tax liabilities or loss of tax benefits)

27

12

**CONFIDENTIAL**

SFR 23186

arising directly or indirectly as a result of any Transfer or purported Transfer in violation of this Article 8.

### 8.3    Transferee Not Member in Absence of Managers' Consent.

(a)    Notwithstanding anything contained herein to the contrary (including, without limitation, Section 8.2 hereof), unless the Managers' approves of the proposed Transfer of the Transferring Member's Membership Interest or Economic Interest to a Transferee which is not a Member immediately prior to the Transfer (or an Affiliate of such Member) in accordance with Section 2.3, with such approval of the Managers not to be unreasonably withheld or delayed, then the proposed Transferee shall have no right to participate in the management of the business and affairs of the Company or to become a Member and such Transferee shall be merely an assignee of the Transferring Member's Economic Interest. For the avoidance of doubt (and in accordance with Section 8.1(i)), no approval of the Managers shall be required with respect to the Transfer of the Transferring Member's Economic Membership Interest or Economic Interest to a Transferee which is a Member immediately prior to a Transfer or an Affiliate of such Member. No Transfer of a Member's interest in the Company (including any Transfer of the Economic Interest or any other Transfer which has not been approved by the Managers) shall be effective unless and until written notice (including the name and address of the proposed Transferee and the date of such Transfer) has been provided to the Company and the Managers (along with a signature page to this Operating Agreement executed by the proposed Transferee evidencing such Person's agreement to be bound by the obligations, terms and conditions of this Operating Agreement). Notwithstanding such Transfer, a Transferee of an Economic Interest acquired under this Section 8.3 shall take such Economic Interest subject to, and shall be bound by, the obligations, terms and conditions of the Operating Agreement.

(b)    Upon and contemporaneously with any Transfer of a Transferring Member's Economic Interest in the Company which does not at the same time Transfer the balance of the rights associated with such Transferring Member's Membership Interest (including, without limitation, the rights of the Transferring Member to participate in the management of the business and affairs of the Company), all remaining rights and interests which were owned by the Transferring Member immediately prior to such Transfer or which were associated with the Transferred Economic Interest shall immediately lapse until either (I) the Managers consents to reinstate such rights to the Transferring Member who did not previously obtain the Managers' written consent of the Members or (2) the receipt of the consent of the Managers, at which time such Membership rights shall Transfer to the proposed Transferee.

### 8.4    Tag-Along Rights.

(a)    Notwithstanding any provision contained herein to the contrary, if, after complying with the provisions of Section 8.2, any Member or group of the Members (collectively the "Sellers") agree to Transfer to a Person (other than to an Affiliate or Affiliates of such Member or Members), in a sale to be consummated in a single Transfer or a series of related Transfers to a single purchaser or a group of purchasers as part of a single transaction or group of related transactions a portion or all of their Membership Interests in the Company, which together equals or exceeds fifteen percent (15%) of the outstanding Membership Interests, then each Member other than the Sellers ("Tag-Along Members") shall have the right (the "Tag-Along Right") to require the proposed purchaser(s) (the "Purchaser") to

13

CONFIDENTIAL

SFR 23187

purchase from them upon terms no less favorable than those set forth in the Tag-Along Notice under Section 8.4(b) herein, or as the Sellers, Tag-Along Members, and the Purchaser may otherwise agree, a portion of such Tag-Along Member's Membership Interest equal to such Member's Tag-Along Amount. "Tag-Along Amount" means, with respect to each Tag-Along Member, the amount of Membership Interests owned by such Member, multiplied by a fraction in which (i) the numerator equals the amount of Membership Interests to be sold by the Sellers and (ii) the denominator equals the amount of Membership Interests owned by the Sellers.

(b)     The Sellers shall promptly notify the Tag-Along Members in the event they propose to make a Transfer giving rise to the Tag-Along Right, and shall furnish the Tag-Along Members with the terms and conditions of such Transfer and a copy of any written offer or agreement pertaining thereto. The Tag-Along Right may be exercised by any Tag-Along Member by delivering a written notice to each Seller proposing to sell the Membership Interests (the "Tag-Along Notice") within fifteen (15) days following such Tag-Along Member's receipt of such notice from the Sellers. In the event that the Purchaser does not purchase all of the Membership Interests from the Tag-Along Members which such Tag-Along Members are entitled to sell under this Section 8.4 on the terms and conditions of such Transfer, then the Sellers shall not be permitted to sell their Membership Interests to the proposed purchaser in the proposed Transfer.

(c)     At the settlement of any Transfer pursuant to this Section 8.4, the Purchaser shall remit to each selling Member the consideration for the total sales price of the Membership Interests of such Members sold pursuant hereto, upon delivery by such Members of such Transfer document or Membership Interest powers duly executed in blank, and the compliance by such Members with all other conditions to settlement generally applicable to the Sellers and all other Tag-Along Members.

## 8.5    Preemptive Rights.

(a)     Subject to the requirements of Section 2.3, the Company will be entitled to issue equity interests (or interests convertible into or exchangeable for equity interests) on such terms as the Managers may determine from time to time.  If the Company wishes to issue and sell any Membership Interests or other equity securities or any security convertible into, exercisable for, or exchangeable for Membership Interests or other equity securities in the Company or any subsidiary of the Company (the "New Securities") to any Person or Persons (collectively, the "Subject Purchasers"), then the Company shall also offer such New Securities to the Members (each, a "Preemptive Right Holder") by sending written notice (the "New Issuance Notice") to such Persons at least thirty (30) days (but not more than sixty (60) days) prior to the issuance and sale of the New Securities.  The New Issuance Notice shall state (a) the amount or denomination of Membership Interests or other New Securities proposed to be issued and sold and the terms of such New Securities, (b) the purchase price of the New Securities (the "Proposed Price") and the other material terms and conditions of the purchase of such New Securities, (c) the proposed date on which the New Securities will be sold (the "New Issuance Closing Date") and (d) each Preemptive Right Holder's Proportionate Percentage.  For purposes hereof, each Preemptive Right Holder's "Proportionate Percentage" means, with respect to any Preemptive Right Holder, the percentage of the New Securities allocated to such

14

CONFIDENTIAL

SFR 23188

Preemptive Right Holder, which percentage shall equal such Preemptive Right Holder's Percentage Interest.

(b)     For a period often (10) days after the giving of the New Issuance Notice, each Preemptive Right Holder shall have the right to purchase all of its Proportionate Percentage of the New Securities at a purchase price equal to the Proposed Price and upon the terms and conditions set forth in the New Issuance Notice.  The right of each Preemptive Right Holder to purchase the New Securities shall be exercisable by delivering written notice of the exercise thereof, prior to the expiration of the 10-day period referred to above, to the Company.  The failure to respond within such 10-day period shall be deemed to be a waiver of such Preemptive Right Holder's rights under this Section8.5 with respect to such New Securities (but not future issuances).

(c)     Each Preemptive Right Holder purchasing the New Securities shall deliver at the closing full cash payment in immediately available funds for the New Securities purchased by him, her or it on the New Issuance Closing Date and shall agree to the same terms and conditions, as agreed to by the Subject Purchasers.  At such closing, all of the parties to the transaction shall execute such additional documents as are otherwise necessary or appropriate to consummate such transaction.

(d)     Notwithstanding the foregoing, the rights set forth in this **Section 8.5** shall not be deemed to apply to Membership Interests that (i) are issued pro rata to all Members, as a dividend on, subdivision of or other distribution in respect of, the Membership Interests, (ii) are issued in connection with or as consideration for any acquisition by the Company of another Person or of a business or division operated by another Person, whether by asset purchase, stock purchase, merger or otherwise, or (iii) are issued in connection with commercial credit arrangements (including securitization transactions) or equipment financings.

## ARTICLE 9
## NO RIGHT OF WITHDRAWAL; MEMBERS MEETINGS

**9.1     No Right of Withdrawal**.  No Member shall have any right to withdraw from the Company and receive its capital contributions.  Except as specifically stated in Article 10, no event that would constitute withdrawal of a Member under the Act shall constitute a withdrawal under this Agreement or shall cause a dissolution of the Company.

**9.2     Meetings of Members**.

(a)     Meetings.  Meetings of the Members may be called for any purpose or purposes upon the written request of a Manager or of the Members holding at least twenty-five percent (25%) of the Percentage Interests at such time.  Calls for such meetings shall specify the purposes thereof.  No business other than that specified in the call shall be considered at any meeting, unless otherwise agreed by all of the Members entitled to attend the meeting.  Meetings of Members shall be held at the principal office of the Company unless the Manager determines that a meeting shall be held at some other place within or without the Commonwealth of Puerto Rico and causes the notice thereof to so state.

(b)     Notices of Meetings.  Unless waived, written notice of each meeting of the Members stating the time, place, and the purposes thereof shall be given to each Member

15

SFR 23189

of record entitled to vote at or entitled to notice of the meeting, not more than fifteen (15) days nor less than two (2) days before any such meeting. All such notices shall be in writing and may be mailed by registered or certified mail, postage prepaid, or otherwise delivered by hand or by messenger, addressed to such Member's address as set forth in the books and records of the Company. Notices may also be delivered by the Company to a Member by electronic mail ("email") or facsimile. Any such notice which is sent by the Company to the email address for such Member, as such address appears on the records of the Company, or sent by facsimile at the number appearing on the records of the Company, may be relied upon by the Company for purposes of this Section. Each such notice shall be treated as effective or having been given when delivered if delivered personally, or, if sent by mail, at the earlier of its receipt or 72 hours after the same has been deposited in a regularly maintained receptacle for the deposit of the United States mail, addressed and mailed as aforesaid, or, if sent by email, upon receipt by the Company of an email receipt indicating that the notice was delivered to the email address of the Member or, if sent by facsimile, upon confirmation of receipt at the number to which the facsimile was sent.

(c)    Quorum. The Members present in person or by proxy holding a majority of the then outstanding Units, shall constitute a quorum for the transaction of business to be considered at such meeting; provided, however, that no action required by law, by the Certificate or by the Agreement to be authorized or taken by the holders of a designated proportion of the Percentage Interests of any particular class or of each class may be authorized or taken by a lesser proportion. The holders of a majority of the voting Units represented at a meeting, whether or not a quorum is present, may adjourn such meeting from time to time, until a quorum shall be present.

(d)    Record Date. The Manager may fix a record date for any lawful purpose, including without limiting the generality of the foregoing, the determination of Members entitled to (i) receive notice of or to vote at any meeting, (ii) receive payment of any distribution (subject to any applicable requirements of the Internal Revenue Code of 1986, as amended), (iii) receive or exercise rights of purchase of or subscription for, or exchange or conversion of, interests, certificates or other securities, subject to any contract right with respect thereto, or (iv) participate in the execution of written consents, waivers or releases. Said record date shall not be more than fifteen (15) days preceding the date of such meeting, the date fixed for the payment of any distribution or the date fixed for the receipt or the exercise of rights, as the case may be. If a record date is not fixed, the record date for the determination of Members who are entitled to notice of, or who are entitled to vote at, a meeting of Members, shall be the close of business on the date next preceding the day on which notice is given, or the close of business on the date next preceding the day on which the meeting is held, as the case may be.

(e)    Proxies. A person who is entitled to attend a Members' meeting, to vote thereat, or to execute consents, waivers or releases, may be represented at such meeting or vote thereat, and execute consents, waivers and releases, and exercise any of its other rights, by proxy or proxies appointed by a writing signed by such person.

(f)    Action by Written Consent or Telephone Conference. Any action permitted or required to be taken at a meeting of the Members may be taken without a meeting if a consent in writing, setting forth the action to be taken, is signed by the Members holding Membership Interests sufficient to approve such action and each Member is provided with

16

SFR 23190

written notice two (2) business days prior to such written consent being executed (for the avoidance of doubt, the requirement that notice must be provided to each Member does not alter the percentage threshold for such consent being approved). Such consent shall have the same force and effect as a unanimous vote at a meeting. Such written consent may be delivered to the Company by a Member via email and any such consent which is received by the Company from the email address for such Member, as such address appears on the records of the Company, will be deemed "executed" and "signed" for purposes of this Section and may be relied upon by the Company for such purpose. Members may participate in and hold a meeting of the Members by means of a conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other, and participation in such meeting shall constitute attendance and presence in person at such meeting, except when a Person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

## ARTICLE 10

## DISSOLUTION OF THE COMPANY

**10.1   Dissolution Events.** The Company will dissolve, terminate and commence winding up and liquidation upon the first to occur of any of the following (each, a "<u>Dissolution Event</u>"):

(a)    The sale or other transfer of all or substantially all of the Company's assets (which sale may not occur without the approval of Members holding at least a majority of the Percentage Interests as of such time, as set forth in **Section 6.1(e)** above);

(b)    A merger or consolidation of the Company with one or more other entities in which the Company is not the surviving entity (which merger or consolidation may not occur without the approval of Members holding at least a majority of the Percentage Interests as of such time, as set forth in **Section 6.1(e)** above);

(c)    A decision by the Members holding at least sixty seven percent (67%) of the Percentage Interests as of such time to dissolve, wind up, and liquidate the Company, which consent must include the consent of the Manager, which consent may be withheld for any reason; or

(d)    The happening of any other event that makes it unlawful, impossible or impractical to carry on the business of the Company.

The Members hereby agree that, notwithstanding any provision of the Act, the Company will not dissolve prior to the occurrence of a Dissolution Event.

**10.2   Winding Up.**   Upon the occurrence of the Dissolution Events listed in **Sections 11.1(a), (c),** or **(d)**, the Company will continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and Members. No Member will take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of the Company's business and affairs. The Company's assets will be liquidated as promptly as is consistent with obtaining the fair value thereof, and the proceeds therefrom, to the extent sufficient therefor, will be applied and distributed in the following order:

17

**CONFIDENTIAL**

SFR 23191

(a)      First, to the payment and discharge of all of the Company's debts and liabilities to creditors other than Members and the expenses of liquidation;

(b)      Second, to the payment and discharge of all of the Company's debts and liabilities to Members (but if the amount available for such discharge of debts and liabilities to Members is insufficient, then pro rata on account thereof); and

(c)      The balance, if any, to the Members in proportion to their Percentage Interests in the Company.

Any distribution to a Member pursuant to **Sections 11.2(b), (c)** or **(d)** above will be net of any amounts owed to the Company by such Member. No Member will receive any additional compensation for any services performed pursuant to this **Article 11**.

**10.3     Rights of Members**.  Except as otherwise provided in this Agreement, (a) each Member will look solely to the assets of the Company for the return of his Capital Contribution and will have no right or power to demand or receive property other than cash from the Company, and (b) no Member will have priority over any other Member as to the return of his Capital Contribution, distributions or allocations.

**10.4     No Petition for Dissolution**.  The Members agree that irreparable damage would be done to the good will and reputation of the Company if any Member should bring an action in any court to dissolve the Company and to have a liquidator or receiver for the Company appointed. Care has been taken in this Agreement to provide what the parties feel is fair and just payment in liquidation of the Membership Interests of all Members. Accordingly, each Member hereby waives and renounces any right to file or pursue any such petition for dissolution of the Company or to seek the appointment by any court of a liquidator or receiver for the Company. If any Member, in violation of the foregoing provision, does file or pursue any such dissolution or liquidation petition or action in any court, the Company and/or any of the other Members shall be entitled to an injunction, as a matter of right, against such petition or action

## ARTICLE 11

## AMENDMENTS

**11.1     Authority to Amend**.  Amendments to this Agreement shall be in writing and shall require the approval of the Members holding at least a majority of the Units entitled to vote on the matter; provided, however, that (i) any amendment that would adversely alter or change the rights, preferences or privileges of the Membership Interests or create any new class of Membership Interest having any rights, preferences, or privileges senior to (or, solely with respect to **Sections 4.1, 4.2, 5.1 or 5.2**, pari passu with) then outstanding Membership Interests shall require the consent of (A) Members holding at least sixty seven percent (67%) of the Percentage Interests, and (B) any Member whose rights, preferences or privileges are being so adversely altered or changed, and (ii) any amendment to a section of this Agreement which requires a super-majority vote or a unanimous vote of the Members for action to be taken thereunder shall also require such super-majority or unanimous vote, as applicable, for amendment.

**11.2     Notice of Amendments**.   Every Member shall have the right to propose amendments to this Agreement. A copy of any amendment to be approved by the Members pursuant to **Section 12.1** hereof shall be mailed in advance to each Member.

18

---

**CONFIDENTIAL**

SFR 23192

# ARTICLE 12

## REPRESENTATIONS, COVENANTS AND ACKNOWLEDGMENTS

**12.1    Representations, Covenants and Acknowledgments.**

(a)    Each Member hereby represents and warrants that such Member is acquiring such Member's Units solely for investment purposes and not with a view to the distribution or resale thereof.  Notwithstanding statements contained in other Sections of this Agreement, no Unit may be offered or sold and no transfer of a Membership Interest will be made either by the Company or the Members unless: (i) such Unit is registered under the Securities Act of 1933, as amended from time to time, and is registered under all applicable state securities laws, as amended, or (ii) an opinion of counsel, satisfactory to the Managers as to form, substance and counsel, is delivered to the Company by the Member desiring to offer, sell or transfer a Unit, to the effect that no such registration is necessary; provided that such requirement may be waived by the Managers.

(b)    Each of the parties hereto and each of the Substitute Members hereinafter becoming a signatory hereto, acknowledge that each such party or Substitute Member has been advised of and hereby approves of the application of the Company funds to pay all expenses incurred in connection with the formation of the Company and admission of the Members, including, without limitation, legal fees, registration fees and filing and recording charges.

# ARTICLE 13
# CONFIDENTIALITY

**13.1    Confidentiality.**  Each Member hereby covenants with the Company and each other Member that on the transfer of a Member's Interest, whether voluntary, involuntary, by operation of law, or by reason of any provision of this Agreement, the Member will not, directly or indirectly, through and affiliate or otherwise, use or disclose in any manner any Confidential Information and will otherwise exercise commercially reasonable steps to preclude dissemination to any third party and will not utilize any such Confidential Information in any manner not associated with the business.

"Confidential Information" means all of the Company's information technologies, trade secrets, "technical know-how", patents, licenses, customer lists, pricing policies, operational methods, programs, and other business information of the Company.

Each Member hereby stipulates that a breach of the provisions of this Section 13.1 will result in irreparable damage and injury to the Company for which no money damages could adequately compensate it.  If the Member breaches the provisions of this Agreement, in addition to all other remedies to which the Company may be entitled, the Company shall be entitled to an injunction to enforce the provisions of this Agreement, to be issued by an court of competent jurisdiction, to enjoin and restrain the Member and each and every Person concerned or action in concert with the Member from the continuance of such breach.  Each Member expressly waives any claim or defense that an adequate remedy at law might exist for any such breach.

19

SFR 23193

**CONFIDENTIAL**

## ARTICLE 14

## MISCELLANEOUS

**14.1    Notices**. All notices, requests, demands and other communications under this Agreement must be in writing and will be deemed duly given, unless otherwise expressly indicated to the contrary in this Agreement, (a) when personally delivered, (b) two (2) days after having been deposited in the United States mail, certified or registered, return receipt requested, postage prepaid, (c) one (1) business day after having been dispatched by a nationally recognized overnight courier service, addressed to the parties or their permitted assigns with an acknowledgment of receipt requested at the following addresses, (d) upon receipt of confirmation of a telephonic facsimile transmission, or (e) upon receipt of confirmation of an e-mail:

(a)     If to the Company, to the Company at the address set forth in **Section 1.4** hereof;

(b)     If to a Member, to the address set forth on Exhibit A to this Agreement. Any Person may from time to time specify a different address by written notice to the Company; and

(c)     If the Managers, to the address set forth for the Company in **Section 1.4**.

**14.2    Binding Effect**. Except as otherwise provided in this Agreement, every covenant, term, and provision of this Agreement will be binding upon and inure to the benefit of the Members and their respective heirs, legatees, legal representatives, successors, transferees and assigns.

**14.3    Construction**. Every covenant, term and provision of this Agreement will be construed simply according to its fair meaning and not strictly for or against any Member. Except as otherwise provided herein, to the extent provisions or terms of this Agreement are subject to varying interpretations or constructions, the parties intend that such provisions and terms be interpreted consistent and in accordance with any similar provisions and terms set forth in Chapter XIX of the Act and successor laws. In the event of any conflict between the provisions of Puerto Rico law with respect to any term, the provisions of Chapter XIX of the Act shall take precedence.

**14.4    Waiver of Default**. No consent or waiver, express or implied, by the Company or a Member with respect to any breach or default by another Member hereunder shall be deemed or construed to be a consent or waiver with respect to any other breach or default by such Member of the same provision or any other provision of this Agreement. Failure on the part of the Company or a Member to complain of any act or failure to act of another Member or to declare such other Member in default shall not be deemed or constitute a waiver by the Company or the Member of any rights hereunder.

**14.5    Title to Assets; Nature of Membership Interest in Company**. Title to the assets acquired by the Company will be held in the name of the Company. No Member individually has any ownership interest or rights in assets of the Company, except indirectly by virtue of such Member's ownership of a Membership Interest. No Member has any right to seek or obtain a partition of the assets of the Company, nor does any Member have the right to any specific assets of the Company upon the liquidation of or any distribution from the Company. A Member's Membership Interest is considered personal property for all purposes.

20

**CONFIDENTIAL**

SFR 23194

**14.6   Entire Agreement**. This Agreement, together with the Articles, as each of the foregoing may be amended in writing from time to time (the "Organizational Documents"), contains the entire understanding among the parties and supersedes any prior understandings and agreements among them respecting the subject matter of this Agreement.

**14.7   No Third Party Rights**. None of the provisions contained in this Operating Agreement are for the benefit of, or enforceable by, any third parties, including creditors of the Company. The parties to this Operating Agreement expressly retain any and all rights to amend this Operating Agreement as provided above, notwithstanding any interest in this Operating Agreement or in any party to this Operating Agreement held by any other Person.

**14.8   Headings**. Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define or limit the scope or extent of this Agreement or any provision hereof.

**14.9   Severability**. If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid, illegal or unenforceable to any extent, that provisions shall, if possible, be construed as though more narrowly drawn, if a narrower construction would avoid such invalidity, illegality, or unenforceability or, if that is not possible, such provision shall, to the extent of such invalidity, illegality or unenforceability, be severed, and the remainder of this Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

**14.10   Incorporation by Reference**. Every appendix, exhibit, schedule, and other document attached to this Agreement and referred to herein is hereby incorporated into this Agreement by reference.

**14.11   Further Action**. Each Member agrees to perform all further acts and execute, acknowledge, and deliver any documents that may be reasonably necessary, appropriate, or desirable to carry out the provisions of this Agreement.

**14.12   Variation of Pronouns**. All pronouns and any variations will be deemed to refer to masculine, feminine, or neuter, singular or plural, as the identity of the Person or Persons may require.

**14.13   Governing Law; Consent to Jurisdiction**. The laws of the Commonwealth of Puerto Rico will govern the validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties of the Managers and Members. Each Member hereby consents to the jurisdiction of any state or federal court located in San Juan, Puerto Rico for purposes of the enforcement of this Agreement and waives personal service of any and all process. Each Manager and each Member waives any objection to venue of any action instituted under this Agreement.

**14.14   Rights and Remedies Cumulative**. The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any other remedy. Said rights and remedies are given in addition to any other legal rights the parties may have.

**14.15   Specific Performance**. The parties acknowledge that it is impossible to measure, in money, the damages that shall accrue to a party or to the personal representative of a decedent

CONFIDENTIAL

SFR 23195

from a failure of a party to perform any of the obligations under this Agreement. Therefore, if any party or the personal representative or executor of any party enters into any action or proceeding to enforce the provisions of this Agreement, any Person (including the Company) against whom the action or proceeding is brought waives the claim or defense that the moving party or representative has or shall have an adequate remedy at law, and the Person shall not urge in the action or proceeding the claim or defense that an adequate remedy at law exists.

**14.16   Counterpart Execution.**  This Agreement may be executed in any number of counterparts with the same effect as if all of the Members had signed the same document. All counterparts will be construed together and will constitute one agreement. The facsimile or electronic signature of any Manager or Member may be used at all times and for all purposes in place of an original signature.

**14.17   Attorneys.**  Howard & Howard Attorneys PLLC provides legal services to the Company, certain Managers, certain Affiliates of the Managers, one or more Members individually and certain Affiliates of the Members, which may result in conflicts of interest for such counsel. Each Member is directed to seek such Member's own legal counsel related to this Agreement and is encouraged to do so. By entering into this Agreement, each Member, the Managers and the Company acknowledge the potential conflicts of interest and consent to this dual representation. Further, each party to this Agreement acknowledges and understands that the law firm of Howard & Howard Attorneys PLLC prepared this Agreement on behalf of and in the course of its representation of the Company and that:

(a)   The parties have each been advised by Howard & Howard Attorneys PLLC that a conflict exists among their individual interests;

(b)   The parties have each been advised by Howard & Howard Attorneys PLLC to seek the advice of independent counsel;

(c)   The parties waive any conflicts in the representation of the various related entities by Howard & Howard Attorneys PLLC and consent to its representation of the Company notwithstanding any potential conflicts; and

(d)   The parties have each had the opportunity to seek the advice of independent counsel.

**[remainder of page intentionally left blank; signature page to follow]**

22

**CONFIDENTIAL**

SFR 23196

[Counterpart signature page for
[BLUE STONE FINANCE LLC Operating Agreement]

IN WITNESS WHEREOF, the parties have entered into this Operating Agreement of BLUE STONE FINANCE LLC as of the date first above written.

MEMBERS:

**SFR EQUITIES, LLC,** a Florida limited liability company

By: AHG MANAGER, LLC, a Florida limited liability company, its Manager

By: _____
Name: Gene Harris
Title: Manager

**CHGO REAL ESTATE CONSULTING GROUP , LLC,** an Illinois limited liability company

By: _____
Name:
Title: Manager

**NAI ARK FUNDING , LLC,** a Delaware limited liability company

By: _____
Name: David Reape
Title: Manager

**HOWARD & HOWARD ATTORNEYS, PLLC,** a Michigan professional limited liability company

By: _____
Name: Mark Ryerson
Title: Member

23

CONFIDENTIAL

SFR 23197

**[Counterpart signature page for
[BLUE STONE FINANCE LLC Operating Agreement]**

IN WITNESS WHEREOF, the parties have entered into this Operating Agreement of
BLUE STONE FINANCE LLC as of the date first above written.

**MEMBERS:**

**SFR EQUITIES, LLC,** a Florida limited
liability company

By:  **AHG MANAGER, LLC,** a Florida
limited liability company, its Manager

By: _____
   Name: Gene Harris
   Title:  Manager

**CHGO REAL ESTATE CONSULTING
GROUP , LLC,** an Illinois limited liability
company

By: _____
   Name: Brian Hynes
   Title:  Manager Manage

**NAI ARK FUNDING , LLC,** a Delaware
limited liability company

By: _____
   Name: David Reape
   Title:  Manager

**HOWARD & HOWARD ATTORNEYS,**
**PLLC,** a Michigan professional limited
liability company

By: _____
   Name: Mark Ryerson
   Title:  Member

23

SFR 23198

**CONFIDENTIAL**

[Counterpart signature page for
[BLUE STONE FINANCE LLC Operating Agreement]

    IN WITNESS WHEREOF, the parties have entered into this Operating Agreement of BLUE STONE FINANCE LLC as of the date first above written.

**MEMBERS:**

**SFR EQUITIES, LLC,** a Florida limited liability company

By: **AHG MANAGER, LLC,** a Florida limited liability company, its Manager

By: _____
    Name: Gene Harris
    Title: Manager


**CHGO REAL ESTATE CONSULTING GROUP , LLC,** an Illinois limited liability company

By: _____
    Name: _____
    Title: _____


**NAI ARK FUNDING , LLC,** a Delaware limited liability company

By: _____
    Name: _____
    Title: _____


**HOWARD & HOWARD ATTORNEYS, PLLC,** a Michigan professional limited liability company

By: _____
    Name: MARK RYERSON
    Title: MEMBER

23

SFR 23199

**THE ELEVEN CORP.,** a limited liability corporation

By: _____

Name: Jeff Balvanz

Title:  Managing Member

478520

**CONFIDENTIAL**

SFR 23200

**APPENDIX A**

## DEFINITIONS

"**Additional Member**" means any Person admitted as a Member pursuant to **Section 2.3** hereof.

"**Affiliate**" means, with respect to any Person: (i) any Person directly or indirectly controlling, controlled by or under common control or management with such Person; (ii) any person owning or controlling 10% or more of the outstanding voting securities of such Person; (iii) any officer, director, manager, trustee or general partner of such Person; or (iv) any Person who is an officer, director, manager, trustee or general partner or holder of 10% or more of the voting securities of any Person described in clauses (i) through (ii).

"**Agreement**" means this Agreement, as originally executed and as amended from time to time. Terms such as "hereof," "hereto," hereby," "hereunder" and "herein" refer to this Agreement as a whole, unless the context otherwise requires.

"**Bankruptcy**" means (i) the entry of a decree or order for relief against the Member by a court of competent jurisdiction in any involuntary case brought against the Member under any bankruptcy, insolvency or other similar law ("Debtor Relief Laws") generally affecting the rights of creditors and relief of debtors now or hereafter in effect, (ii) the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator or other similar agent under applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property, (iii) the ordering of the winding up or liquidation of the Member's affairs, (iv) the filing of a petition in any such involuntary bankruptcy case, which petition remains undismissed for a period of 180 days or which is not dismissed or suspended pursuant to Section 305 of the United States Bankruptcy Code (or any corresponding provision of any future United States bankruptcy law), (v) the commencement by the Member of a voluntary case under any applicable Debtor Relief Law now or hereafter in effect, (vi) the consent by the Member to the entry of an order for relief in an involuntary case under any such law or to the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar agent under any applicable Debtor Relief Law for the Member or for any substantial part of its assets or property, or (vii) the making by a Member of any general assignment for the benefit of its creditors.

"**Capital Contributions**" means, with respect to any Member, the amount of money contributed to the Company with respect to the Membership Interest held by such Person. No Member shall be permitted to make a Capital Contribution of any property other than money.

"**Capital Event**" shall mean the condemnation, sale or other disposition (other than in a tax-free exchange in the ordinary course of the Company's business) of any asset of the Company or the occurrence of an insured casualty with respect to any Asset of the Company.

"**Capital Proceeds**" shall mean the net cash proceeds from a Capital Event, available for distribution by the Company after deducting the following from gross proceeds: (i) all costs of collecting such proceeds, and (ii) in the case of a casualty or condemnation, the costs of restoring any related asset to usable condition.

25

**CONFIDENTIAL**

SFR 23201

"**Cause**" shall mean, with respect to a Manager, (i) such Person's conviction or guilty plea as to a felony involving moral turpitude or (ii) such Person's fraud, embezzlement or theft against the Company or any Affiliate of the Company.

"**Code**" or "**IRC**" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

"**Company**" means BLUE STONE FINANCE LLC.

"**Company Property**" means all real and personal property acquired by the Company and any improvements thereto, and shall include both tangible and intangible property.

"**Depreciation**" means, for each fiscal year or other period, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such year or other period, except that if the book value of an asset differs from its adjusted basis for federal income tax purposes as of the beginning of such year or other period, Depreciation will be an amount which bears the same ratio to such beginning book value as the federal income tax depreciation, amortization, or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis; provided, however, that if the federal income tax depreciation, amortization, or other cost recovery deduction for such year is zero, Depreciation will be determined with reference to such beginning book value using any reasonable method selected by the Manager.

"**Distributable Cash**" means the gross cash proceeds of the Company from any source other than Capital Contributions, including, without limitation, operating income, fees, interest and other income attributable to the Company's business, less the portion thereof used to pay or establish reserves for all Company expenses, payments, replacements and contingencies, all as determined by the Manager in its discretion; provided, however, Distributable Cash shall not be reduced by depreciation, amortization, cost recovery deductions or similar non-cash allowances.

"**Economic Interest**" shall mean an Interest Holder's share of one or more of the Company's profits, losses and distributions of the Company's assets pursuant to this Operating Agreement and the Act, but shall not include any right to participate in the management or affairs of the Company, including the right to vote on, consent to or otherwise participate in any decisions of the Members or Managers.

"**Financing**" means any loan obtained by the Company, including any loan from a Member made pursuant to **Section 3.3(d)**.

"**Interest Holder**" shall mean either a Member holding an Economic Interest or the Transferee of a Member's Economic Interest.

"**Managers**" shall mean the Company's Managers in accordance with the provisions of **Section 6.1** of this Agreement with respect to the management of the business and affairs of the Company, which Managers shall initially be as set forth on Exhibit B.

"**Members**" means, collectively, those Members listed on Exhibit A as owning Membership Interests but each may be referred to individually as a "Member". A Member shall also mean any other person who is admitted to the Company pursuant to **Section 2.3** or **Article 8**.

**CONFIDENTIAL**

SFR 23202

Solely for purposes of the allocation and distribution provisions of **Sections 4, 5** and **11** of this Agreement (and any definitions relating thereto), a Member shall also include an assignee or transferee of a Unit who has not been admitted to the Company as a Substitute Member.

**"Membership Interest"** means a Member's entire ownership interest in the Company represented by one or more Units, including, without limitation, rights to (i) vote on various Company matters as hereinafter set forth, and (ii) to receive distributions (liquidating or otherwise) and allocations of profits and losses.  Collectively, the Membership Interests of all the Members shall be referred to herein as "Membership Interests".

**"Operating Deficit"** means the amount by which the costs of owning the Company's assets and operating the Company's business exceed, or the amount by which the Manager in good faith estimates that such costs during the next thirty (30) day period will exceed, the operating income and other cash available to the Company to pay all of such costs, including reserves.

**"Percentage Interest"** means, subject to the following sentence, with respect to any Member, the amount, expressed as a percentage, that the number of Units owned by such Member at any given time as set forth in Exhibit A hereto bears to the total number of Units owned by all Members as of such date, as such Percentage Interest may be adjusted in accordance with **Section 3.3(c)** of this Agreement.

**"Person"** means any individual, partnership, corporation, trust, limited liability company, or other entity.

**"Selling Member"** means any Member that Transfers for consideration all or any portion of its Membership Interest.

**"Substitute Member"** means an Assignee who has been admitted to all of the rights of membership pursuant to this Agreement.

**"Transfer"** (whether or not such term is capitalized) means, as a noun, any voluntary or involuntary transfer, sale, pledge, hypothecation, assignment or other disposition by a Member and, as a verb, voluntarily or involuntarily to transfer, sell, pledge, hypothecate, assign or otherwise dispose of a Member's Membership Interest or Units.

**"Unit"** means a unit of Membership Interest in the Company, including the right to receive distributions of Distributable Cash and Capital Proceeds and allocations of Profits and Losses as specifically set forth in this Agreement.  No fractional Units shall be issued.

**CONFIDENTIAL**

SFR 23203

EXHIBIT A

EXHIBIT A

MEMBERS' NAMES, ADDRESSES,
CAPITAL CONTRIBUTIONS
AND PERCENTAGE INTERESTS

(Blue Stone Finance, LLC)

| Names and Addresses of Members | Value of Initial Capital Contribution | Number of Units | Percentage Interest (Rounded) |
|---|---|---|---|
| SFR EQUITIES, LLC<br>700 West Morse Boulevard<br>Suite 220<br>Winter Park, Florida 32789<br>Attn: Gene Harris | $45,077.17 | 4,508 Units | 45.08% |
| CHGO REAL ESTATE CONSULTING GROUP, LLC<br>200 South Michigan Avenue<br>Suite 1100<br>Chicago, Illinois 60604<br>Attn: Brian Hynes | $35,043.17 | 3,504 Units | 35.04% |
| NAI ARK FUNDING, LLC<br>109 Masons Way<br>Newtown Square, PA 19073<br>Attn: David Reape | $14,125.00 | 1,413 Units | 14.13% |
| HOWARD & HOWARD ATTORNEYS, PLLC<br>200 South Michigan Avenue<br>Suite 1100<br>Chicago, Illinois 60604 | $5,231.48 | 523 | 5.23% |
| THE ELEVEN CORP.<br>2611 Bryant St.<br>Denver, Colorado 80211<br>Attn: Jeff Balvanz | $523.18 | 52 | 0.523% |
| TOTALS: | $100,000 | 10,000 Units | 100% |

CONFIDENTIAL

SFR 23204

**EXHIBIT B**

Managers

Brian Hynes (CHGO Real Estate Consulting Group, LLC representative)

Gene Harris (SFR Equities, LLC representative)

Malcom Weems (CHGO Real Estate Consulting Group, LLC representative)

David Reape (NAI Ark Funding, LLC representative)

Mark Ryerson (Howard & Howard Attorneys PLLC representative)

Marty Martin (representative elected by majority of the other Managers)

4840-7666-8494, v. 1

SFR 23205

**CONFIDENTIAL**

# EXHIBIT "I"

WRITTEN CONSENT RESOLUTIONS
OF
THE MANAGERS OF
BLUE STONE FINANCE , LLC

The undersigned, being the managers of Blue Stone Finance LLC, a Puerto Rico limited liability company (the "Company"), acting by written consent without a meeting and without a vote, do hereby waive all notice and do hereby consent to the adoption of the following resolutions as of the date hereof with the same force and effect as if such resolutions were approved and adopted at a duly constituted meeting of the managers pursuant to the provisions of Chapter XIX of the Puerto Rico General Corporations Act of 2009, as amended:

RESOLVED, that the undersigned managers of the Company (collectively, the "Managers") hereby accept, acknowledge and ratify the Articles of Organization of the Company as filed with the Department of State of the Commonwealth of Puerto Rico on or about March 13, 2017;

RESOLVED, that all fees, costs and other expenses incurred in effecting the organization of the Company and the commencement of its business operations be and the same hereby are ordered to be paid as promptly as possible and/or reimbursement paid to the organizer upon evidence of payment;

RESOLVED, that the Operating Agreement in the proposed form prepared by counsel for the Company and submitted to the Managers and the members be and it hereby is ratified and approved by the Company;

WHEREAS, that the members have indicated their willingness to acquire and hold 100% of the membership interests of the Company, all such membership interests having full governance (voting) rights and financial rights, as further described in and governed by the Operating Agreement;

RESOLVED, that each subscription of the members be and hereby is accepted subject to the payment of each member's respective initial capital contribution;

RESOLVED, that the Managers have determined it is desirable and in the best interest of the Company and the members to call each member's respective initial capital contribution for the general commercial purposes of the Company;

RESOLVED, that the following persons are hereby elected to the offices set forth opposite his name, to serve until the next election and until his successors shall have been duly elected and qualified:

OFFICE:                    NAME:

CONFIDENTIAL

SFR 23566

CONFIDENTIAL

Managing Director          David Reape

Managing Director          Gene Harris

Managing Director          Brian Hynes

**RESOLVED,** that the fiscal year of the Company shall be the calendar year;

**RESOLVED,** that David Reape shall designate a bank as a depository for the funds of the Company and that David Reape and Gene Harris of the Company shall be authorized to make deposits therein and withdraw funds therefrom; and

**RESOLVED,** that all documents, agreements and instruments previously executed and delivered, and any and all actions previously taken by any manager, officer, employee or agent of the Company in connection with or related to the matters set forth in, or reasonably contemplated or implied by, the foregoing resolutions be, and each of them hereby is, adopted, ratified, confirmed and approved in all respects and for all purposes as the acts and deeds of the Company.

**[SIGNATURE PAGE FOLLOWS]**

2

CONFIDENTIAL

SFR 23567

CONFIDENTIAL

IN WITNESS WHEREOF, the undersigned have duly executed these Written Consent Resolutions effective as of September ___ 8 ___, 2017.

David Reape

Gene Harris

Brian Hynes

Mark Ryerson

Malcolm Weems

Marty Martin

4831-1421-8062, v. 1

**CONFIDENTIAL**

SFR 23568

**CONFIDENTIAL**

IN WITNESS WHEREOF, the undersigned have duly executed these Written Consent Resolutions effective as of September _____, 2017.

_____
David Reape

_____
Gene Harris

_____
Brian Hynes

_____
Mark Ryerson

_____
Malcolm Weems

_____
Marty Martin

4831-1421-8082, v. 1

3

CONFIDENTIAL

SFR 23569

CONFIDENTIAL

IN WITNESS WHEREOF, the undersigned have duly executed these Written Consent Resolutions effective as of September _____, 2017.

_____
David Reape

_____
Gene Harris

_____
Brian Hynes

_____
Mark Ryerson

_____
Malkolm Weems

_____
Marty Martin

4831-1421-8082, v. 1

3

**CONFIDENTIAL**

SFR 23570

**CONFIDENTIAL**

IN WITNESS WHEREOF, the undersigned have duly executed these Written Consent Resolutions effective as of September _____, 2017.

_____
David Reape

_____
Gene Harris

_____
Brian Hynes

_____
Mark Ryerson

_____
Malcolm Weems

_____
Marty Martin

4631-1421-0002, v. 1

3

CONFIDENTIAL

SFR 23571

CONFIDENTIAL

IN WITNESS WHEREOF, the undersigned have duly executed these Written Consent Resolutions effective as of September _____, 2017.

_____
David Reape

_____
Gene Harris

_____
Brian Hynes

_____
Mark Ryerson

_____
Malcolm Weems

_____
Marty Martin

4831-1421-8062, v. 1

3

CONFIDENTIAL

SFR 23572

CONFIDENTIAL

# EXHIBIT "J"

WRITTEN CONSENT RESOLUTIONS
OF
THE MANAGERS OF
BLUESTONE CAPITAL MARKETS, LLC

The undersigned, being the managers of Bluestone Capital Markets, LLC, a Florida limited liability company (the "Company"), acting by written consent without a meeting and without a vote, do hereby waive all notice and do hereby consent to the adoption of the following resolutions as of the date hereof with the same force and effect as if such resolutions were approved and adopted at a duly constituted meeting of the managers pursuant to the Florida Revised Limited Liability Company Act:

RESOLVED, that the undersigned managers of the Company (collectively, the "Managers") hereby accept, acknowledge and ratify the Articles of Organization of the Company as filed with the Department of State of the State of Florida on or about March 15, 2017;

RESOLVED, that all fees, costs and other expenses incurred in effecting the organization of the Company and the commencement of its business operations be and the same hereby are ordered to be paid as promptly as possible and/or reimbursement paid to the organizer upon evidence of payment;

RESOLVED, that the Operating Agreement in the proposed form prepared by counsel for the Company and submitted to the Managers and the members be and it hereby is ratified and approved by the Company;

WHEREAS, that the members have indicated their willingness to acquire and hold 100% of the membership interests of the Company, all such membership interests having full governance (voting) rights and financial rights, as further described in and governed by the Operating Agreement;

RESOLVED, that each subscription of the members be and hereby is accepted subject to the payment of each member's respective initial capital contribution;

RESOLVED, that the Managers have determined it is desirable and in the best interest of the Company and the members to call each member's respective initial capital contribution for the general commercial purposes of the Company;

RESOLVED, that the following persons are hereby elected to the offices set forth opposite his name, to serve until the next election and until his successors shall have been duly elected and qualified:

OFFICE:                    NAME:

CONFIDENTIAL

SFR 23573

CONFIDENTIAL

| | |
|---|---|
| Managing Director | David Reape |
| Managing Director | Gene Harris |
| Managing Director | Brian Hynes |

**RESOLVED,** that fiscal year of the Company shall be the calendar year;

**RESOLVED,** that David Reape shall designate a bank as a depository for the funds of the Company and that David Reape and Gene Harris of the Company shall be authorized to make deposits therein and withdraw funds therefrom; and

**RESOLVED,** that all documents, agreements and instruments previously executed and delivered, and any and all actions previously taken by any manager, officer, employee or agent of the Company in connection with or related to the matters set forth in, or reasonably contemplated or implied by, the foregoing resolutions be, and each of them hereby is, adopted, ratified, confirmed and approved in all respects and for all purposes as the acts and deeds of the Company.

**[SIGNATURE PAGE FOLLOWS]**

2

CONFIDENTIAL

SFR 23575

CONFIDENTIAL

IN WITNESS WHEREOF, the undersigned have duly executed these Written Consent Resolutions effective as of September _____, 2017.

**SFR EQUITIES, LLC**, a Florida limited liability company

By: **AHG MANAGER, LLC**, a Florida limited liability company, its Manager

By: _____
    Name: Gene Harris
    Title:  Manager

**CHGO REAL ESTATE CONSULTING GROUP , LLC**, an Illinois limited liability company

By: _____
    Name: _____
    Title: _____

**NAI ARK FUNDING , LLC**, a Delaware limited liability company

By: _____
    Name: _____
    Title: _____

**HOWARD & HOWARD ATTORNEYS, PLLC**, a Michigan professional limited liability company

By: _____
    Name: _____
    Title: _____

**THE ELEVEN CORP.**, a ____ limited liability corporation

By: *Jeff Balvanz* _____
    Name:  Jeff Balvanz
    Title:   Managing Member

4851-1779-8223, v. 1

3

**CONFIDENTIAL**

SFR 23574

**CONFIDENTIAL**

IN WITNESS WHEREOF, the undersigned have duly executed these Written Consent Resolutions effective as of September 7, 2017.

_____
David Reape

_____
Gene Harris

_____
Brian Hynes

_____
Mark Ryerson

_____
Malcolm Weems

_____
Marty Martin

4633-0307-8990, v. 1

3

CONFIDENTIAL

SFR 23576

CONFIDENTIAL

# EXHIBIT "K"

## CONSENT OF MANAGERS

The undersigned managers ("**Managers**") of Vendor Assistance Program, LLC, an Illinois limited liability company ("**VAP**"), hereby waive all notice and do hereby consent to the adoption of the following preambles and resolutions, as of September _____, 2017, without a meeting and without a vote, with the same force and effect as if such preambles and resolutions were approved and adopted at a duly constituted meeting of the managers, all pursuant to the Illinois Limited Liability Company Act.

**WHEREAS**, VAP is the registered holder of Trust Certificate No. 1 representing a Percentage Interest of 100% (the "**Trust Certificate**") in VAP Funding Master Trust II (Illinois) (the "**Trust**"), authenticated and issued to VAP pursuant to the terms of the Amended and Restated Trust Agreement between U. S. Bank Trust National Association, as Trustee, and VAP, as Manager and Certificateholder, dated December 15, 2016 (as amended, modified, substituted or restated from time to time, the "**Trust Agreement**");

**WHEREAS**, the Trust and Barclays Bank PLC ("**Barclays Bank**") have entered into the Revolving Credit Agreement dated December 15, 2016 (as amended, modified, substituted or restated from time to time, the "**Credit Agreement**") pursuant to which Barclays Bank has made available to the Trust a credit facility to finance the purchase of Assigned Receivables (as defined in the Trust Agreement);

**WHEREAS**, VAP, as the appointed manager of the Trust under the Management Agreement between VAP and the Trust dated December 15, 2016, is responsible to service and administer the Assigned Receivables and other assets of the Trust on the terms and conditions set forth in said Management Agreement and receives fees as compensation for such activities (the "**Fees**");

**WHEREAS**, the members of VAP have created Bluestone Capital Markets, LLC, a Florida limited liability company ("**Bluestone**"), and the managers of VAP and Bluestone wish to reorganize the businesses and assets of VAP and Bluestone to result in (a) VAP retaining responsibility as manager of the Trust in exchange for the Fees, and (b) Bluestone holding the Trust Certificate and all interests therein (collectively, the "**Reorganization**");

**WHEREAS**, the Managers deem that the Reorganization is in VAP's best interests because it will permit the respective rights and responsibilities of VAP and Bluestone with respect to the Trust to be more appropriately aligned and will result in more clarity in the marketplace and certain economic and administrative advantages and efficiencies;

**WHEREAS**, VAP issued to Bridgeview Bank Group (the "**Bank**") a Secured Term Note dated March 3, 2017 (as amended, modified, substituted or restated from time to time (the "**Term Note**"), secured by a blanket security interest in substantially all of VAP's assets, as more fully set forth in the Security Agreement between VAP and the Bank dated March 3, 2017 (as amended, modified, substituted or restated from time to time, the "**Security Agreement**;" the Term Note and Security Agreement, together with all other agreements, certificates and other documents executed and delivered by VAP or its members in connection with the Term Note and the loan extended thereunder, as amended, modified, substituted or restated from time to time, are referred to as the "**Loan Documents**");

CONFIDENTIAL

SFR 23577

CONFIDENTIAL

WHEREAS, to fully effectuate the Reorganization, VAP must transfer the Trust Certificate to Bluestone, which transfer requires the consents of the Barclays Bank and Bank and compliance with applicable provisions of the Trust Agreement, the Credit Agreement, the Loan Documents and related agreements;

WHEREAS, it is expected that the Bank will require modifications of the Loan Documents as a condition to its consent, which may include Bluestone's agreement to be bound under the Loan Documents.

RESOLVED, that the Reorganization providing for a re-alignment of the businesses and assets of VAP and Bluestone, including without limitation VAP transferring the Trust Certificate to Bluestone, and such modifications of the Loan Documents as required by Bank, are hereby adopted and approved.

RESOLVED, that David Reape as Chief Executive Officer and Gene Harris as Secretary (each, an "Authorized Person") be, and each of them is, authorized and directed to execute and deliver all agreements, affirmations, consents, notices, certificates and any related or ancillary agreements or instruments, to pay or cause to be paid all expenses and to take all other actions as either one of them shall deem necessary, desirable, advisable or appropriate to effectuate or further the Reorganization, including without limitation to transfer the Trust Certificate to Bluestone, obtain all consents required therefor, modify the Loan Documents, acknowledge and include Bluestone under the Loan Documents on such terms as required by the Bank and satisfy any conditions imposed to obtain said consents (any one or more of the foregoing being referred to as the "Transaction Documents"), with such modifications therein as the Authorized Person executing same may approve, such approval and the approval thereof by the Managers to be conclusively established by such execution and delivery.

RESOLVED, that, without limiting the generality of the foregoing, the Authorized Persons be, and each of them is, authorized and directed to take all such further action and to execute and deliver all such promissory notes, security agreements, pledge agreements, subordination agreements, guaranties, agreements, affirmations, consents, notices, amendments, certificates and any related or ancillary agreements or instruments either one of them shall deem necessary, desirable, advisable or appropriate to modify the Loan Documents on such terms as required by the Bank, with such modifications, amendments or changes therein as the Authorized Person executing same may approve, such approval and the approval thereof by the Managers to be conclusively established by such execution and delivery.

RESOLVED, that in connection with the transactions contemplated by the Transaction Documents, the Authorized Persons be, and each of them is, authorized and directed to certify any more formal or detailed resolutions as such person may deem necessary, desirable, advisable or appropriate to consummate, effectuate, carry out or further the transactions contemplated by and the intent and purposes of the Transaction Documents, and that thereupon, such resolutions shall be deemed adopted as and for the resolutions of the Managers as if set forth at length herein.

RESOLVED, that the omission from these resolutions of any agreement or other arrangement contemplated by any of the Transaction Documents or any action to be taken in accordance with any requirements of any of the Transaction Documents shall in no manner derogate from the authority of the Authorized Persons to take all actions necessary, desirable, advisable or

CONFIDENTIAL

SFR 23578

CONFIDENTIAL

appropriate to consummate, effectuate, carry out or further the transactions contemplated by and the intent and purposes of the foregoing resolutions.

**RESOLVED,** that these Resolutions are in conformity with the Certificate of Organization and Operating Agreement of VAP and the actions taken hereunder are within the Managers' powers. The authority given hereunder shall be deemed, to the extent necessary in order to carry these Resolutions into effect, retroactive. In that event, acts performed prior to the adoption of these Resolutions but which are necessary or convenient for the carrying of these Resolutions into effect, are ratified, adopted and affirmed. The authority conferred by these Resolutions shall continue in full force and effect until actual written notice of revocation of these Resolutions.

**RESOLVED,** that these Resolutions may be signed in two or more counterparts, all of which taken together shall constitute the original, and that in addition to physical delivery, a manually signed copy delivered via pdf attachment to an electronic transmission or via facsimile transmission is deemed delivered for all purposes.

[signature page to follow]

CONFIDENTIAL

SFR 23579

CONFIDENTIAL

**IN WITNESS WHEREOF,** the undersigned have executed this Consent as of the day first above written.

_____
David Reape

_____
Gene Harris

_____
Brian Hynes

_____
Mark Ryerson

_____
Malcolm Weems

4817-1070-8559, v. 1

[Signature Page to Consent of VAP – Barclays Certificate]

CONFIDENTIAL

SFR 23580

CONFIDENTIAL

**IN WITNESS WHEREOF,** the undersigned have executed this Consent as of the day first above written.

_____
David Reape

_____
Gene Harris

_____
Brian Hynes

_____
Mark Ryerson

_____
Malcolm Weems

4817-1070-8559, v. 1

[Signature Page to Consent of VAP – Barclays Certificate]

CONFIDENTIAL

SFR 23581

CONFIDENTIAL

IN WITNESS WHEREOF, the undersigned have executed this Consent as of the day first above written.

_____
David Reape

_____
Gene Harris

_____
Brian Hynes

_____
Mark Ryerson

_____
Malcolm Weems

4817-1070-0559, v. 1

[Signature Page to Consent of VAP – Barclays Certificate]

CONFIDENTIAL

SFR 23582

CONFIDENTIAL

**IN WITNESS WHEREOF,** the undersigned have executed this Consent as of the day first above written.

_____
David Reape

_____
Gene Harris

_____
Brian Hynes

_____
Mark Ryerson

_____
Malcolm Weems

4817-1070-8559, v. 1

[Signature Page to Consent of VAP – Barclays Certificate]

CONFIDENTIAL

SFR 23583

CONFIDENTIAL

**IN WITNESS WHEREOF**, the undersigned have executed this Consent as of the day first above written.

_____
David Reape

_____
Gene Harris

_____
Brian Hynes

_____
Mark Ryerson

_____
Malcolm Weems

4817-1070-8559, v. 1

[Signature Page to Consent of VAP – Barclays Certificate]

CONFIDENTIAL

SFR 23584

CONFIDENTIAL

**IN WITNESS WHEREOF,** the undersigned have executed this Consent as of the day first above written.

_____
David Reape

_____
Gene Harris

_____
Brian Hynes

_____
Mark Ryerson

_____
Malcolm Weems

4817-1070-9559, v. 1

[Signature Page to Consent of VAP -- Barclays Certificate]

CONFIDENTIAL

SFR 23585

CONFIDENTIAL

**IN WITNESS WHEREOF**, the undersigned have executed this Consent as of the day first above written.

_____
David Reape

_____
Gene Harris

_____
Brian Hynes

_____
Mark Ryerson

_____
Malcolm Weems

4817-1070-5659, v. 1

[Signature Page to Consent of VAP -- Barclays Certificate]

CONFIDENTIAL

SFR 23586

CONFIDENTIAL

**IN WITNESS WHEREOF,** the undersigned have executed this Consent as of the day first above written.

_____
David Reape

_____
Gene Harris

_____
Brian Hynes

_____
Mark Ryerson

_____
Malcolm Weems

4817-1070-8559, v. 1

[Signature Page to Consent of VAP – Barclays Certificate]

CONFIDENTIAL

SFR 23587

CONFIDENTIAL

**IN WITNESS WHEREOF**, the undersigned have executed this Consent as of the day first above written.

_____
David Reape

_____
Gene Harris

_____
Brian Hynes

_____
Mark Ryerson

_____
Malcolm Weems

4817-1070-8559, v. 1

[Signature Page to Consent of VAP – Barclays Certificate]

CONFIDENTIAL

SFR 23588

CONFIDENTIAL

# EXHIBIT "L"

## CONSENT OF MANAGERS

The undersigned managers ("**Managers**") of Bluestone Capital Markets, LLC, a Florida limited liability company ("**Bluestone**"), hereby waive all notice and do hereby consent to the adoption of the following preambles and resolutions, as of September 22, 2017, without a meeting and without a vote, with the same force and effect as if such preambles and resolutions were approved and adopted at a duly constituted meeting of the managers, all pursuant to the Florida Revised Limited Liability Company Act.

**WHEREAS**, the members of Bluestone are also the members of Vendor Assistance Program, LLC, an Illinois limited liability company ("**VAP**");

**WHEREAS**, VAP is the registered holder of Trust Certificate No. 1 representing a Percentage Interest of 100% (the "**Trust Certificate**") in VAP Funding Master Trust II (Illinois) (the "**Trust**"), authenticated and issued to VAP pursuant to the terms of the Amended and Restated Trust Agreement between U. S. Bank Trust National Association, as Trustee, and VAP, as Manager and Certificateholder, dated December 15, 2016 (as amended, modified, substituted or restated from time to time, the "**Trust Agreement**");

**WHEREAS**, the Trust and Barclays Bank PLC ("**Barclays Bank**") have entered into the Revolving Credit Agreement dated December 15, 2016 (as amended, modified, substituted or restated from time to time, the "**Credit Agreement**") pursuant to which Barclays Bank has made available to the Trust a credit facility to finance the purchase of Assigned Receivables (as defined in the Trust Agreement);

**WHEREAS**, VAP, as the appointed manager of the Trust under the Management Agreement between VAP and the Trust dated December 15, 2016, is responsible to service and administer the Assigned Receivables and other assets of the Trust on the terms and conditions set forth in said Management Agreement and receives fees as compensation for such activities (the "**Fees**");

**WHEREAS**, the managers of VAP and Bluestone wish to reorganize the businesses and assets of VAP and Bluestone to result in (a) VAP retaining responsibility as manager of the Trust in exchange for the Fees, and (b) Bluestone holding the Trust Certificate and all interests therein (collectively, the "**Reorganization**");

**WHEREAS**, the Managers deem that the Reorganization is in Bluestone's best interests because it will permit the respective rights and responsibilities of VAP and Bluestone with respect to the Trust to be more appropriately aligned and will result in more clarity in the marketplace and certain economic and administrative advantages and efficiencies;

**WHEREAS**, VAP issued to Bridgeview Bank Group (the "**Bank**") a Secured Term Note dated March 3, 2017 (as amended, modified, substituted or restated from time to time (the "**Term Note**"), secured by a blanket security interest in substantially all of VAP's assets, as more fully set forth in the Security Agreement between VAP and the Bank dated March 3, 2017 (as amended, modified, substituted or restated from time to time, the "**Security Agreement;**" the Term Note and Security Agreement, together with all other agreements, certificates and other documents executed and delivered by VAP or its members in connection with the Term Note and the loan extended thereunder, as amended, modified, substituted or restated from time to time, are referred to as the

CONFIDENTIAL

SFR 23589

CONFIDENTIAL

"Loan Documents");

WHEREAS, to fully effectuate the Reorganization, VAP must transfer the Trust Certificate to Bluestone, which transfer requires the consents of the Barclays Bank and Bank and compliance with applicable provisions of the Trust Agreement, the Credit Agreement, the Loan Documents and related agreements;

WHEREAS, it is expected that the Bank will require modifications of the Loan Documents as a condition to its consent, which may include Bluestone's agreement to be bound by or guaranty VAP's obligations under the Loan Documents.

RESOLVED, that the Reorganization providing for a re-alignment of the businesses and assets of VAP and Bluestone, including without limitation VAP transferring the Trust Certificate to Bluestone, and such modifications of the Loan Documents as required by Bank, are hereby adopted and approved.

RESOLVED, that David Reape as Chief Executive Officer and Gene Harris as Secretary (each, an "Authorized Person") be, and each of them is, authorized and directed to execute and deliver all agreements, affirmations, consents, notices, certificates and any related or ancillary agreements or instruments, to pay or cause to be paid all expenses and to take all other actions as either one of them shall deem necessary, desirable, advisable or appropriate to effectuate or further the Reorganization, including without limitation to transfer the Trust Certificate to Bluestone, obtain all consents required therefor, and modify or affirm the Loan Documents or acknowledge and include Bluestone as guarantor or co-borrower under the Loan Documents on such terms as required by the Bank and satisfy any conditions imposed to obtain said consents (any one or more of the foregoing being referred to as the "Transaction Documents"), with such modifications therein as the Authorized Person executing same may approve, such approval and the approval thereof by the Managers to be conclusively established by such execution and delivery.

RESOLVED, that, without limiting the generality of the foregoing, the Authorized Persons be, and each of them is, authorized and directed to take all such further action and to execute and deliver all such guaranties, promissory notes, security agreements, pledge agreements, subordination agreements, agreements, affirmations, consents, notices, amendments, certificates and any related or ancillary agreements or instruments either one of them shall deem necessary, desirable, advisable or appropriate for Bluestone to agree to be bound by or guaranty VAP's obligations under the Loan Documents, secured by such collateral and on such terms as required by the Bank, with such modifications, amendments or changes therein as the Authorized Person executing same may approve, such approval and the approval thereof by the Managers to be conclusively established by such execution and delivery.

RESOLVED, that in connection with the transactions contemplated by the Transaction Documents, the Authorized Persons be, and each of them is, authorized and directed to certify any more formal or detailed resolutions as such person may deem necessary, desirable, advisable or appropriate to consummate, effectuate, carry out or further the transactions contemplated by and the intent and purposes of the Transaction Documents, and that thereupon, such resolutions shall be deemed adopted as and for the resolutions of the Managers as if set forth at length herein.

RESOLVED, that the omission from these resolutions of any agreement or other arrangement contemplated by any of the Transaction Documents or any action to be taken in

CONFIDENTIAL

SFR 23591

CONFIDENTIAL

accordance with any requirements of any of the Transaction Documents shall in no manner derogate from the authority of the Authorized Persons to take all actions necessary, desirable, advisable or appropriate to consummate, effectuate, carry out or further the transactions contemplated by and the intent and purposes of the foregoing resolutions.

**RESOLVED,** that these Resolutions are in conformity with the Certificate of Organization and Operating Agreement of Bluestone and the actions taken hereunder are within the Managers' powers. The authority given hereunder shall be deemed, to the extent necessary in order to carry these Resolutions into effect, retroactive. In that event, acts performed prior to the adoption of these Resolutions but which are necessary or convenient for the carrying of these Resolutions into effect, are ratified, adopted and affirmed. The authority conferred by these Resolutions shall continue in full force and effect until actual written notice of revocation of these Resolutions.

**RESOLVED,** that these Resolutions may be signed in two or more counterparts, all of which taken together shall constitute the original, and that in addition to physical delivery, a manually signed copy delivered via pdf attachment to an electronic transmission or via facsimile transmission is deemed delivered for all purposes.

[signature page to follow]

CONFIDENTIAL

SFR 23592

CONFIDENTIAL

**IN WITNESS WHEREOF**, the undersigned have executed this Consent as of the day first above written.

_____
David Reape

_____
Gene Harris

_____
Brian Hynes

_____
Mark Ryerson

_____
Malcolm Weems

_____
Marty Martin

4816-9596-7823, v. 1

[Signature Page to Consent of Bluestone – Barclays Certificate]

CONFIDENTIAL

SFR 23593

CONFIDENTIAL

**IN WITNESS WHEREOF,** the undersigned have executed this Consent as of the day first above written.

_____
David Reape

_____
Gene Harris

_____
Brian Hynus

_____
Mark Ryerson

_____
Malcolm Weems

_____
Marty Martin

4818-9596-7823, v. 1

[Signature Page to Consent of Bluestone – Barclays Certificate]

CONFIDENTIAL

SFR 23594

CONFIDENTIAL

**IN WITNESS WHEREOF**, the undersigned have executed this Consent as of the day first above written.

_____
David Reape

_____
Gene Harris

_____
Brian Hynes

_____
Mark Ryerson

_____
Malcolm Weems

_____
Marty Martin

4816-9596-7823, v. 1

[Signature Page to Consent of Bluestone – Barclays Certificate]

CONFIDENTIAL

SFR 23595

CONFIDENTIAL

**IN WITNESS WHEREOF,** the undersigned have executed this Consent as of the day first above written.

David Reape

Gene Harris

Brian Hynes

Mark Ryerson

Malcolm Weems

Marty Murpin

4816-9596-7823, v. 1

[Signature Page to Consent of Bluestone – Barclays Certificate]

CONFIDENTIAL

SFR 23596

CONFIDENTIAL

EXHIBIT "M"

CONSENT OF MANAGERS

The undersigned managers ("Managers") of Vendor Assistance Program, LLC, an Illinois limited liability company ("VAP"), hereby waive all notice and do hereby consent to the adoption of the following preambles and resolutions, as of ~~October 31st~~, 2017, without a meeting and without a vote, with the same force and effect as if such preambles and resolutions were approved and adopted at a duly constituted meeting of the managers, all pursuant to the Illinois Limited Liability Company Act.

WHEREAS, VAP is the registered holder of Trust Certificate No. 1 representing a Percentage Interest of 100% (the "Trust Certificate") in VAP Funding Master Note Trust (Illinois) (the "Trust"), authenticated and issued to VAP pursuant to the terms of the Amended and Restated Trust Agreement between U. S. Bank Trust National Association, as Owner Trustee, and VAP, as Manager and Administrator, dated November 30, 2012 (as amended, modified, substituted or restated from time to time, the "Trust Agreement");

WHEREAS, VAP, as the appointed manager of the Trust under the Management Agreement among U. S. Bank National Association, VAP and the Trust dated November 30, 2012, is responsible to service and administer the Assigned Receivables (as defined in the Management Agreement) and other assets of the Trust on the terms and conditions set forth in said Management Agreement and receives fees as compensation for such activities (the "Fees");

WHEREAS, the members of VAP have created Bluestone Capital Markets, LLC, a Florida limited liability company ("Bluestone"), and the managers of VAP and Bluestone wish to reorganize the businesses and assets of VAP and Bluestone to result in (a) VAP retaining responsibility as manager of the Trust in exchange for the Fees, and (b) Bluestone holding the Trust Certificate and all interests therein (collectively, the "Reorganization");

WHEREAS, the Managers deem that the Reorganization is in VAP's best interests because it will permit the respective rights and responsibilities of VAP and Bluestone with respect to the Trust to be more appropriately aligned and will result in more clarity in the marketplace and certain economic and administrative advantages and efficiencies;

WHEREAS, VAP issued to Bridgeview Bank Group (the "Bank") a Secured Term Note dated March 3, 2017 (as amended, modified, substituted or restated from time to time (the "Term Note"), secured by a blanket security interest in substantially all of VAP's assets, as more fully set forth in the Security Agreement between VAP and the Bank dated March 3, 2017 (as amended, modified, substituted or restated from time to time, the "Security Agreement;" the Term Note and Security Agreement, together with all other agreements, certificates and other documents executed and delivered by VAP or its members in connection with the Term Note and the loan extended thereunder, as amended, modified, substituted or restated from time to time, are referred to as the "Loan Documents"); and

WHEREAS, to fully effectuate the Reorganization, VAP must transfer the Trust Certificate to Bluestone, which transfer requires the consents of the Required Noteholders (as defined in the Trust Agreement) and the Bank and compliance with applicable provisions of the Trust Agreement, the Loan Documents and related agreements.

RESOLVED, that the Reorganization providing for a re-alignment of the businesses and assets of VAP and Bluestone, including without limitation VAP transferring the Trust Certificate to Bluestone, subject to required consents, is hereby adopted and approved.

Citi - VAP

CONFIDENTIAL

SFR 23597

CONFIDENTIAL

RESOLVED, that David Reape as Chief Executive Officer and Gene Harris as Secretary (each, an "**Authorized Person**") be, and each of them is, authorized and directed to execute and deliver all agreements, affirmations, consents, notices, certificates and any related or ancillary agreements or instruments, to pay or cause to be paid all expenses and to take all other actions as either one of them shall deem necessary, desirable, advisable or appropriate to effectuate or further the Reorganization, including without limitation to transfer the Trust Certificate to Bluestone and obtain all consents required therefor, on such terms as required by the Bank and satisfy any conditions imposed to obtain said consents (any one or more of the foregoing being referred to as the "**Transaction Documents**"), with such modifications therein as the Authorized Person executing same may approve, such approval and the approval thereof by the Managers to be conclusively established by such execution and delivery.

RESOLVED, that, without limiting the generality of the foregoing, the Authorized Persons be, and each of them is, authorized and directed to take all such further action and to execute and deliver all such promissory notes, security agreements, pledge agreements, subordination agreements, guaranties, agreements, affirmations, consents, notices, amendments, certificates and any related or ancillary agreements or instruments either one of them shall deem necessary, desirable, advisable or appropriate to modify or affirm the Loan Documents, on such terms as required by the Bank, with such modifications, amendments or changes therein as the Authorized Person executing same may approve, such approval and the approval thereof by the Managers to be conclusively established by such execution and delivery.

RESOLVED, that in connection with the transactions contemplated by the Transaction Documents, the Authorized Persons be, and each of them is, authorized and directed to certify any more formal or detailed resolutions as such person may deem necessary, desirable, advisable or appropriate to consummate, effectuate, carry out or further the transactions contemplated by and the intent and purposes of the Transaction Documents, and that thereupon, such resolutions shall be deemed adopted as and for the resolutions of the Managers as if set forth at length herein.

RESOLVED, that the omission from these resolutions of any agreement or other arrangement contemplated by any of the Transaction Documents or any action to be taken in accordance with any requirements of any of the Transaction Documents shall in no manner derogate from the authority of the Authorized Persons to take all actions necessary, desirable, advisable or appropriate to consummate, effectuate, carry out or further the transactions contemplated by and the intent and purposes of the foregoing resolutions.

RESOLVED, that these Resolutions are in conformity with the Certificate of Organization and Operating Agreement of VAP and the actions taken hereunder are within the Managers' powers. The authority given hereunder shall be deemed, to the extent necessary in order to carry these Resolutions into effect, retroactive. In that event, acts performed prior to the adoption of these Resolutions but which are necessary or convenient for the carrying of these Resolutions into effect, are ratified, adopted and affirmed. The authority conferred by these Resolutions shall continue in full force and effect until actual written notice of revocation of these Resolutions.

RESOLVED, that these Resolutions may be signed in two or more counterparts, all of which taken together shall constitute the original, and that in addition to physical delivery, a manually signed copy delivered via pdf attachment to an electronic transmission or via facsimile transmission is deemed delivered for all purposes.

[signature page to follow]

CONFIDENTIAL

SFR 23599

CONFIDENTIAL

IN WITNESS WHEREOF, the undersigned have executed this Consent as of the day first above written.

_____
David Keane

_____
Gena Harris

_____
Brian Hynes

_____
Mark Ryerson

_____
Malcolm Weems

_____
Marty Martin

4846-5011-6804, v. 1

[Signature Page to Consent of VAP Funding Master Note Trust (Illinois) Certificate]

CONFIDENTIAL

SFR 23598

CONFIDENTIAL

IN WITNESS WHEREOF, the undersigned have executed this Consent as of the day first above written.

_____
David Reape

_____
Gene Harris

_____
Brian Flynn

_____
Mark Ryerson

_____
Malcolm Wennie

_____
Marty Martin

4848-6011-0804, v. 1

[Signature Page to Consent of VAP Funding Master Note Trust (Illinois) Certificate]

CONFIDENTIAL

SFR 23600

CONFIDENTIAL

IN WITNESS WHEREOF, the undersigned have executed this Consent as of the day first above written.

_____
David Reese

_____
Gene Harris

_____
Brian Hayes

_____
Mark Ryerson

_____
Malcolm Wright

_____
Marty Martin

4848-6014-0804, v. 1

[Signature Page to Consent of VAP Funding Master Note Trust (Illinois) Certificate]

CONFIDENTIAL

SFR 23601

CONFIDENTIAL

# EXHIBIT "N"

## CONSENT OF MANAGERS

The undersigned managers ("**Managers**") of Bluestone Capital Markets, LLC, a Florida limited liability company ("**Bluestone**"), hereby waive all notice and do hereby consent to the adoption of the following preambles and resolutions, as of October 31st, 2017, without a meeting and without a vote, with the same force and effect as if such preambles and resolutions were approved and adopted at a duly constituted meeting of the managers, all pursuant to the Florida Revised Limited Liability Company Act.

**WHEREAS**, the members of Bluestone are also the members of Vendor Assistance Program, LLC, an Illinois limited liability company ("**VAP**");

**WHEREAS**, VAP is the registered holder of Trust Certificate No. 1 representing a Percentage Interest of 100% (the "**Trust Certificate**") in VAP Funding Master Note Trust (Illinois) (the "**Trust**"), authenticated and issued to VAP pursuant to the terms of the Amended and Restated Trust Agreement between U. S. Bank Trust National Association, as Owner Trustee, and VAP, as Manager and Administrator, dated November 30, 2012 (as amended, modified, substituted or restated from time to time, the "**Trust Agreement**");

**WHEREAS**, VAP, as the appointed manager of the Trust under the Management Agreement among U. S. Bank National Association, VAP and the Trust dated November 30, 2012, is responsible to service and administer the Assigned Receivables (as defined in the Management Agreement) and other assets of the Trust on the terms and conditions set forth in said Management Agreement and receives fees as compensation for such activities (the "**Fees**");

**WHEREAS**, the managers of VAP and Bluestone wish to reorganize the businesses and assets of VAP and Bluestone to result in (a) VAP retaining responsibility as manager of the Trust in exchange for the Fees, and (b) Bluestone holding the Trust Certificate and all interests therein (collectively, the "**Reorganization**");

**WHEREAS**, the Managers deem that the Reorganization is in Bluestone's best interests because it will permit the respective rights and responsibilities of VAP and Bluestone with respect to the Trust to be more appropriately aligned and will result in more clarity in the marketplace and certain economic and administrative advantages and efficiencies;

**WHEREAS**, VAP issued to Bridgeview Bank Group (the "**Bank**") a Secured Term Note dated March 3, 2017 (as amended, modified, substituted or restated from time to time (the "**Term Note**"), secured by a blanket security interest in substantially all of VAP's assets, as more fully set forth in the Security Agreement between VAP and the Bank dated March 3, 2017 (as amended, modified, substituted or restated from time to time, the "**Security Agreement**;" the Term Note and Security Agreement, together with all other agreements, certificates and other documents executed and delivered by VAP or its members in connection with the Term Note and the loan extended thereunder, as amended, modified, substituted or restated from time to time, are referred to as the "**Loan Documents**");

**WHEREAS**, Bluestone has agreed to guaranty VAP's obligations under the Loan Documents pursuant to the Guaranty dated October 12, 2017; and

**WHEREAS**, to fully effectuate the Reorganization, VAP must transfer the Trust Certificate

Citi – BCM

CONFIDENTIAL

SFR 23603

CONFIDENTIAL

to Bluestone, which transfer requires the consents of the Required Noteholders (as defined in the Trust Agreement) and the Bank and compliance with applicable provisions of the Trust Agreement, the Loan Documents and related agreements.

RESOLVED, that the Reorganization providing for a re-alignment of the businesses and assets of VAP and Bluestone, including without limitation VAP transferring the Trust Certificate to Bluestone, subject to required consents, is hereby adopted and approved.

RESOLVED, that David Reape as Chief Executive Officer and Gene Harris as Secretary (each, an "Authorized Person") be, and each of them is, authorized and directed to execute and deliver all agreements, affirmations, consents, notices, certificates and any related or ancillary agreements or instruments, to pay or cause to be paid all expenses and to take all other actions as either one of them shall deem necessary, desirable, advisable or appropriate to effectuate or further the Reorganization, including without limitation to transfer the Trust Certificate to Bluestone and obtain all consents required therefor, on such terms as required by the Bank and satisfy any conditions imposed to obtain said consents (any one or more of the foregoing being referred to as the "Transaction Documents"), with such modifications therein as the Authorized Person executing same may approve, such approval and the approval thereof by the Managers to be conclusively established by such execution and delivery.

RESOLVED, that, without limiting the generality of the foregoing, the Authorized Persons be, and each of them is, authorized and directed to take all such further action and to execute and deliver all such guaranties, promissory notes, security agreements, pledge agreements, subordination agreements, agreements, affirmations, consents, notices, amendments, certificates and any related or ancillary agreements or instruments either one of them shall deem necessary, desirable, advisable or appropriate for Bluestone to modify or affirm its guaranty of VAP's obligations under the Loan Documents, on such terms as required by the Bank, with such modifications, amendments or changes therein as the Authorized Person executing same may approve, such approval and the approval thereof by the Managers to be conclusively established by such execution and delivery.

RESOLVED, that in connection with the transactions contemplated by the Transaction Documents, the Authorized Persons be, and each of them is, authorized and directed to certify any more formal or detailed resolutions as such person may deem necessary, desirable, advisable or appropriate to consummate, effectuate, carry out or further the transactions contemplated by and the intent and purposes of the Transaction Documents, and that thereupon, such resolutions shall be deemed adopted as and for the resolutions of the Managers as if set forth at length herein.

RESOLVED, that the omission from these resolutions of any agreement or other arrangement contemplated by any of the Transaction Documents or any action to be taken in accordance with any requirements of any of the Transaction Documents shall in no manner derogate from the authority of the Authorized Persons to take all actions necessary, desirable, advisable or appropriate to consummate, effectuate, carry out or further the transactions contemplated by and the intent and purposes of the foregoing resolutions.

RESOLVED, that these Resolutions are in conformity with the Certificate of Organization and Operating Agreement of Bluestone and the actions taken hereunder are within the Managers' powers. The authority given hereunder shall be deemed, to the extent necessary in order to carry these Resolutions into effect, retroactive. In that event, acts performed prior to the adoption of these

CONFIDENTIAL

SFR 23604

CONFIDENTIAL

Resolutions but which are necessary or convenient for the carrying of these Resolutions into effect, are ratified, adopted and affirmed. The authority conferred by these Resolutions shall continue in full force and effect until actual written notice of revocation of these Resolutions.

**RESOLVED**, that these Resolutions may be signed in two or more counterparts, all of which taken together shall constitute the original, and that in addition to physical delivery, a manually signed copy delivered via pdf attachment to an electronic transmission or via facsimile transmission is deemed delivered for all purposes.

[signature page to follow]

CONFIDENTIAL

SFR 23605

CONFIDENTIAL

IN WITNESS WHEREOF, the undersigned have executed this Consent as of the day first above written.

_____
David Reape

_____
Gene Harris

_____
Brian Hynes

_____
Mark Ryerson

_____
Malcolm Weems

_____
Marty Martin

4846-5011-0804, v. 1

[Signature Page to Consent of VAP Funding Master Note Trust (Illinois) Certificate]

CONFIDENTIAL

SFR 23606

CONFIDENTIAL

EXHIBIT "O"

## CONSENT OF MANAGERS

The undersigned managers ("**Managers**") of Vendor Assistance Program, LLC, an Illinois limited liability company ("**VAP**"), hereby waive all notice and do hereby consent to the adoption of the following preambles and resolutions, as of ___October 31st___, 2017, without a meeting and without a vote, with the same force and effect as if such preambles and resolutions were approved and adopted at a duly constituted meeting of the managers, all pursuant to the Illinois Limited Liability Company Act.

**WHEREAS**, VAP is the registered holder of Trust Certificate No. 1 representing a Percentage Interest of 100% (the "**Trust Certificate**") in VAP RRT MASTER TRUST 2016 (the "**Trust**"), authenticated and issued to VAP pursuant to the terms of the Amended and Restated Trust Agreement between U. S. Bank Trust National Association, as Owner Trustee, and VAP, as Manager and Administrator, dated August 30, 2016 (as amended, modified, substituted or restated from time to time, the "**Trust Agreement**");

**WHEREAS**, VAP, as the appointed manager of the Trust under the Management Agreement among U. S. Bank National Association, VAP and the Trust dated August 30, 2016, is responsible to service and administer the Assigned Receivables (as defined in the Management Agreement) and other assets of the Trust on the terms and conditions set forth in said Management Agreement and receives fees as compensation for such activities (the "**Fees**");

**WHEREAS**, the members of VAP have created Bluestone Capital Markets, LLC, a Florida limited liability company ("**Bluestone**"), and the managers of VAP and Bluestone wish to reorganize the businesses and assets of VAP and Bluestone to result in (a) VAP retaining responsibility as manager of the Trust in exchange for the Fees, and (b) Bluestone holding the Trust Certificate and all interests therein (collectively, the "**Reorganization**");

**WHEREAS**, the Managers deem that the Reorganization is in VAP's best interests because it will permit the respective rights and responsibilities of VAP and Bluestone with respect to the Trust to be more appropriately aligned and will result in more clarity in the marketplace and certain economic and administrative advantages and efficiencies;

**WHEREAS**, VAP issued to Bridgeview Bank Group (the "**Bank**") a Secured Term Note dated March 3, 2017 (as amended, modified, substituted or restated from time to time (the "**Term Note**"), secured by a blanket security interest in substantially all of VAP's assets, as more fully set forth in the Security Agreement between VAP and the Bank dated March 3, 2017 (as amended, modified, substituted or restated from time to time, the "**Security Agreement**;" the Term Note and Security Agreement, together with all other agreements, certificates and other documents executed and delivered by VAP or its members in connection with the Term Note and the loan extended thereunder, as amended, modified, substituted or restated from time to time, are referred to as the "**Loan Documents**"); and

**WHEREAS**, to fully effectuate the Reorganization, VAP must transfer the Trust Certificate to Bluestone, which transfer requires the consents of the Required Noteholders (as defined in the Trust Agreement) and the Bank and compliance with applicable provisions of the Trust Agreement, the Loan Documents and related agreements.

**RESOLVED**, that the Reorganization providing for a re-alignment of the businesses and assets of VAP and Bluestone, including without limitation VAP transferring the Trust Certificate to Bluestone, subject to required consents, is hereby adopted and approved.

RRT – VW

CONFIDENTIAL

SFR 23607

CONFIDENTIAL

RESOLVED, that David Reape as Chief Executive Officer and Gene Harris as Secretary (each, an "**Authorized Person**") be, and each of them is, authorized and directed to execute and deliver all agreements, affirmations, consents, notices, certificates and any related or ancillary agreements or instruments, to pay or cause to be paid all expenses and to take all other actions as either one of them shall deem necessary, desirable, advisable or appropriate to effectuate or further the Reorganization, including without limitation to transfer the Trust Certificate to Bluestone and obtain all consents required therefor, on such terms as required by the Bank and satisfy any conditions imposed to obtain said consents (any one or more of the foregoing being referred to as the "**Transaction Documents**"), with such modifications therein as the Authorized Person executing same may approve, such approval and the approval thereof by the Managers to be conclusively established by such execution and delivery.

RESOLVED, that, without limiting the generality of the foregoing, the Authorized Persons be, and each of them is, authorized and directed to take all such further action and to execute and deliver all such promissory notes, security agreements, pledge agreements, subordination agreements, guaranties, agreements, affirmations, consents, notices, amendments, certificates and any related or ancillary agreements or instruments either one of them shall deem necessary, desirable, advisable or appropriate to modify or affirm the Loan Documents, on such terms as required by the Bank, with such modifications, amendments or changes therein as the Authorized Person executing same may approve, such approval and the approval thereof by the Managers to be conclusively established by such execution and delivery.

RESOLVED, that in connection with the transactions contemplated by the Transaction Documents, the Authorized Persons be, and each of them is, authorized and directed to certify any more formal or detailed resolutions as such person may deem necessary, desirable, advisable or appropriate to consummate, effectuate, carry out or further the transactions contemplated by and the intent and purposes of the Transaction Documents, and that thereupon, such resolutions shall be deemed adopted as and for the resolutions of the Managers as if set forth at length herein.

RESOLVED, that the omission from these resolutions of any agreement or other arrangement contemplated by any of the Transaction Documents or any action to be taken in accordance with any requirements of any of the Transaction Documents shall in no manner derogate from the authority of the Authorized Persons to take all actions necessary, desirable, advisable or appropriate to consummate, effectuate, carry out or further the transactions contemplated by and the intent and purposes of the foregoing resolutions.

RESOLVED, that these Resolutions are in conformity with the Certificate of Organization and Operating Agreement of VAP and the actions taken hereunder are within the Managers' powers. The authority given hereunder shall be deemed, to the extent necessary in order to carry these Resolutions into effect, retroactive. In that event, acts performed prior to the adoption of these Resolutions but which are necessary or convenient for the carrying of these Resolutions into effect, are ratified, adopted and affirmed. The authority conferred by these Resolutions shall continue in full force and effect until actual written notice of revocation of these Resolutions.

RESOLVED, that these Resolutions may be signed in two or more counterparts, all of which taken together shall constitute the original, and that in addition to physical delivery, a manually signed copy delivered via pdf attachment to an electronic transmission or via facsimile transmission is deemed delivered for all purposes.

[signature page to follow]

CONFIDENTIAL

SFR 23608

CONFIDENTIAL

IN WITNESS WHEREOF, the undersigned have executed this Consent as of the day first above written.

_____
David Reape

_____
Gene Harris

_____
Brian Hynes

_____
Mick Ryerson

_____
Malcolm Weems

_____
Marty Martin

4827-5831-5626, v. 1

[Signature Page to Consent of VAP Funding Note Trust (Illinois) Certificate]

CONFIDENTIAL

SFR 23609

CONFIDENTIAL

IN WITNESS WHEREOF, the undersigned have executed this Consent as of the day first above written.

_____
David Reape

_____
Gene Harris

_____
Brian Hynes

_____
Mark Ryerson

_____
Malcolm Weems

_____
Marty Martin

4827-0431-0628, v. 1

[Signature Page to Consent of VAP Funding Master Note Trust (Illinois) Certificate]

CONFIDENTIAL

SFR 23610

CONFIDENTIAL

# EXHIBIT "P"

### CONSENT OF MANAGERS

The undersigned managers ("**Managers**") of Bluestone Capital Markets, LLC, a Florida limited liability company ("**Bluestone**"), hereby waive all notice and do hereby consent to the adoption of the following preambles and resolutions, as of _October 31st_, 2017, without a meeting and without a vote, with the same force and effect as if such preambles and resolutions were approved and adopted at a duly constituted meeting of the managers, all pursuant to the Florida Revised Limited Liability Company Act.

**WHEREAS**, the members of Bluestone are also the members of Vendor Assistance Program, LLC, an Illinois limited liability company ("**VAP**");

**WHEREAS**, VAP is the registered holder of Trust Certificate No. 1 representing a Percentage Interest of 100% (the "**Trust Certificate**") in VAP RRT MASTER TRUST 2016 (the "**Trust**"), authenticated and issued to VAP pursuant to the terms of the Amended and Restated Trust Agreement between U. S. Bank Trust National Association, as Owner Trustee, and VAP, as Manager and Administrator, dated August 30, 2016 (as amended, modified, substituted or restated from time to time, the "**Trust Agreement**");

**WHEREAS**, VAP, as the appointed manager of the Trust under the Management Agreement among U. S. Bank National Association, VAP and the Trust dated August 30 2016, is responsible to service and administer the Assigned Receivables (as defined in the Management Agreement) and other assets of the Trust on the terms and conditions set forth in said Management Agreement and receives fees as compensation for such activities (the "**Fees**");

**WHEREAS**, the managers of VAP and Bluestone wish to reorganize the businesses and assets of VAP and Bluestone to result in (a) VAP retaining responsibility as manager of the Trust in exchange for the Fees, and (b) Bluestone holding the Trust Certificate and all interests therein (collectively, the "**Reorganization**");

**WHEREAS**, the Managers deem that the Reorganization is in Bluestone's best interests because it will permit the respective rights and responsibilities of VAP and Bluestone with respect to the Trust to be more appropriately aligned and will result in more clarity in the marketplace and certain economic and administrative advantages and efficiencies;

**WHEREAS**, VAP issued to Bridgeview Bank Group (the "**Bank**") a Secured Term Note dated March 3, 2017 (as amended, modified, substituted or restated from time to time (the "**Term Note**"), secured by a blanket security interest in substantially all of VAP's assets, as more fully set forth in the Security Agreement between VAP and the Bank dated March 3, 2017 (as amended, modified, substituted or restated from time to time, the "**Security Agreement;**" the Term Note and Security Agreement, together with all other agreements, certificates and other documents executed and delivered by VAP or its members in connection with the Term Note and the loan extended thereunder, as amended, modified, substituted or restated from time to time, are referred to as the "**Loan Documents**");

**WHEREAS**, Bluestone has agreed to guaranty VAP's obligations under the Loan Documents pursuant to the Guaranty dated October 12, 2017; and

**WHEREAS**, to fully effectuate the Reorganization, VAP must transfer the Trust Certificate

RRT - Bluestone

CONFIDENTIAL

SFR 23611

CONFIDENTIAL

to Bluestone, which transfer requires the consents of the Required Noteholders (as defined in the Trust Agreement) and the Bank and compliance with applicable provisions of the Trust Agreement, the Loan Documents and related agreements.

**RESOLVED,** that the Reorganization providing for a re-alignment of the businesses and assets of VAP and Bluestone, including without limitation VAP transferring the Trust Certificate to Bluestone, subject to required consents, is hereby adopted and approved.

**RESOLVED,** that David Reape as Chief Executive Officer and Gene Harris as Secretary (each, an **"Authorized Person"**) be, and each of them is, authorized and directed to execute and deliver all agreements, affirmations, consents, notices, certificates and any related or ancillary agreements or instruments, to pay or cause to be paid all expenses and to take all other actions as either one of them shall deem necessary, desirable, advisable or appropriate to effectuate or further the Reorganization, including without limitation to transfer the Trust Certificate to Bluestone and obtain all consents required therefor, on such terms as required by the Bank and satisfy any conditions imposed to obtain said consents (any one or more of the foregoing being referred to as the **"Transaction Documents"**), with such modifications therein as the Authorized Person executing same may approve, such approval and the approval thereof by the Managers to be conclusively established by such execution and delivery.

**RESOLVED,** that, without limiting the generality of the foregoing, the Authorized Persons be, and each of them is, authorized and directed to take all such further action and to execute and deliver all such guaranties, promissory notes, security agreements, pledge agreements, subordination agreements, agreements, affirmations, consents, notices, amendments, certificates and any related or ancillary agreements or instruments either one of them shall deem necessary, desirable, advisable or appropriate for Bluestone to modify or affirm its guaranty of VAP's obligations under the Loan Documents, on such terms as required by the Bank, with such modifications, amendments or changes therein as the Authorized Person executing same may approve, such approval and the approval thereof by the Managers to be conclusively established by such execution and delivery.

**RESOLVED,** that in connection with the transactions contemplated by the Transaction Documents, the Authorized Persons be, and each of them is, authorized and directed to certify any more formal or detailed resolutions as such person may deem necessary, desirable, advisable or appropriate to consummate, effectuate, carry out or further the transactions contemplated by and the intent and purposes of the Transaction Documents, and that thereupon, such resolutions shall be deemed adopted as and for the resolutions of the Managers as if set forth at length herein.

**RESOLVED,** that the omission from these resolutions of any agreement or other arrangement contemplated by any of the Transaction Documents or any action to be taken in accordance with any requirements of any of the Transaction Documents shall in no manner derogate from the authority of the Authorized Persons to take all actions necessary, desirable, advisable or appropriate to consummate, effectuate, carry out or further the transactions contemplated by and the intent and purposes of the foregoing resolutions.

**RESOLVED,** that these Resolutions are in conformity with the Certificate of Organization and Operating Agreement of Bluestone and the actions taken hereunder are within the Managers' powers. The authority given hereunder shall be deemed, to the extent necessary in order to carry these Resolutions into effect, retroactive. In that event, acts performed prior to the adoption of these

CONFIDENTIAL

SFR 23612

CONFIDENTIAL

Resolutions but which are necessary or convenient for the carrying of these Resolutions into effect, are ratified, adopted and affirmed. The authority conferred by these Resolutions shall continue in full force and effect until actual written notice of revocation of these Resolutions.

**RESOLVED,** that these Resolutions may be signed in two or more counterparts, all of which taken together shall constitute the original, and that in addition to physical delivery, a manually signed copy delivered via pdf attachment to an electronic transmission or via facsimile transmission is deemed delivered for all purposes.

[signature page to follow]

CONFIDENTIAL

SFR 23613

CONFIDENTIAL

IN WITNESS WHEREOF, the undersigned have executed this Consent as of the day first above written.

_____
David Reape

_____
Gene Harris

_____
Brian Hynes

_____
Mark Ryerson

_____
Malcolm Weems

_____
Marty Martin

4827-8631-0028, v. 1

[Signature Page to Consent of VAP Funding Master Note Trust (Illinois) Certificate]

CONFIDENTIAL

SFR 23614

CONFIDENTIAL

# EXHIBIT "Q"

WRITTEN CONSENT RESOLUTIONS OF THE BOARD OF MANAGERS
OF VENDOR ASSISTANCE PROGRAM, LLC

RESOLVED, that the Managers of the Company declare it advisable and in the best interest of the Company and its members to enter into (i) that certain Corporate Services Agreement by and between the Company and Blue Stone Finance, LLC ("BSF") substantially in the form attached hereto as Exhibit A (the "BSF Corporate Services Agreement"), (ii) that certain Services Agreement by and between the Company and BSF substantially in the form attached hereto as Exhibit B (the "BSF Services Agreement"), and (iii) that certain Services Agreement by and between the Company and Bluestone Capital Markets, LLC substantially in the form attached hereto as Exhibit C (the "BCM Services Agreement" and together with the BSF Corporate Services Agreement and the BSF Services Agreement, collectively the "Servicing Agreements").

RESOLVED, that each of the Servicing Agreements is hereby adopted and approved.

RESOLVED, that David Reape, in his capacity as Chief Executive Officer, and Gene Harris, in his capacity as Secretary (each, an "Authorized Person") be, and each of them is, authorized and directed, for and on behalf of the Company, to execute, deliver, accept and act upon each of the Servicing Agreements and any related or ancillary agreements, certificates or instruments described therein or required thereby (together with the Servicing Agreements, collectively the "Transaction Documents"), with such modifications, amendments or changes in any of the Transaction Documents as the Authorized Person executing same may approve, such approval and the approval thereof by the Managers to be conclusively established by such execution and delivery.

RESOLVED, that each of the Authorized Persons be, and each of them is, authorized and directed to take all such further action and to execute, deliver and file all such further agreements, certificates, instruments and documents, in the name and on behalf of the Company; to pay or cause to be paid all expenses, and to take all such other actions as they or any one of them shall deem necessary, desirable, advisable or appropriate to consummate, effectuate, carry out or further the transactions contemplated by and the intent and purposes of the Transaction Documents.

RESOLVED, that in connection with the transactions contemplated by the Transaction Documents, each of the Authorized Persons be, and each of them is, authorized in the name and on behalf of the Company, to certify any more formal or detailed resolutions as such person may deem necessary, desirable, advisable or appropriate to consummate, effectuate, carry out or further the transactions contemplated by and the intent and purposes of the Transaction Documents, and that thereupon, such resolutions shall be deemed adopted as and for the resolutions of the Managers as if set forth at length herein.

RESOLVED, that the omission from these resolutions of any agreement or other arrangement contemplated by any of the Transaction Documents or any action to be taken in accordance with any requirements of any of the Transaction Documents shall in no manner derogate from the authority of the Authorized Persons to take all actions necessary, desirable,

CONFIDENTIAL

SFR 23615

CONFIDENTIAL

advisable or appropriate to consummate, effectuate, carry out or further the transactions contemplated by and the intent and purposes of the foregoing resolutions.

**RESOLVED,** that these Resolutions can be signed in counterparts, including counterpart signature pages or counterpart facsimile signature pages or via electronic mail (including pdf or electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g. www.docusign.com) or other transmission method, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument deemed delivered for all purposes.

**RESOLVED,** that these Resolutions are in conformity with the Articles of Organization and Operating Agreement of the Company and are within its powers. The authority given hereunder shall be deemed, to the extent necessary in order to carry these Resolutions into effect, retroactive. In that event, acts performed prior to the adoption of these Resolutions but which are necessary or convenient for the carrying of these Resolutions into effect, are ratified, adopted and affirmed. The authority conferred by these Resolutions shall continue in full force and effect until actual written notice of revocation of these Resolutions.

[remainder of page intentionally left blank; signature page to follow]

2

CONFIDENTIAL

SFR 23617

CONFIDENTIAL

**IN WITNESS WHEREOF,** the undersigned have executed this Consent as of January _____, 2018.

Signature: _____  
David Reape (Jun 25, 2018)  
**Email:** dreape@vendorassistance.com

Signature: _____  
Gene Harris (Jun 25, 2018)  
**Email:** gharris@ahg-group.com

Signature: _____  
Mark Byerson (Jun 28, 2018)  
**Email:** mryerson@howardandhoward.com

Signature: _____  
Brian Hynes (Jun 25, 2018)  
**Email:** bhynes@vendorassistance.com

Signature: _____  
Malcolm Weems (Jun 29, 2018)  
**Email:** mweems@vendorassistance.com

Signature: _____  
Marty Martin (Jun 26, 2018)  
**Email:** martywmartin@icloud.com

CONFIDENTIAL

SFR 23616

CONFIDENTIAL

# EXHIBIT "R"

WRITTEN CONSENT RESOLUTIONS OF THE BOARD OF MANAGERS
OF BLUE STONE FINANCE, LLC

RESOLVED, that the Managers of the Company declare it advisable and in the best interest of the Company and its members to enter into (i) that certain Corporate Services Agreement by and between the Company and Vendor Assistance Program, LLC ("VAP") substantially in the form attached hereto as Exhibit A (the "VAP Corporate Services Agreement"), (ii) that certain Services Agreement by and between the Company and Bluestone Capital Markets, LLC ("BCM") substantially in the form attached hereto as Exhibit B (the "BCM Services Agreement"), (iii) that certain Services Agreement by and between the Company and VAP substantially in the form attached hereto as Exhibit C (the "VAP Services Agreement"), (iv) that certain Corporate Services Agreement by and between the Company and Healthcare Finance, LLC substantially in the form attached hereto as Exhibit D (the "HCF Corporate Services Agreement"), and (v) that certain Corporate Services Agreement by and between the Company and BCM substantially in the form attached hereto as Exhibit C (the "BCM Corporate Services Agreement" and together with the VAP Corporate Services Agreement, the BCM Services Agreement, the VAP Services Agreement and the HCF Corporate Services Agreement, collectively the "Servicing Agreements").

RESOLVED, that each of the Servicing Agreements is hereby adopted and approved.

RESOLVED, that David Reape, in his capacity as Chief Executive Officer, and Gene Harris, in his capacity as Secretary (each, an "Authorized Person") be, and each of them is, authorized and directed, for and on behalf of the Company, to execute, deliver, accept and act upon each of the Servicing Agreements and any related or ancillary agreements, certificates or instruments described therein or required thereby (together with the Servicing Agreements, collectively the "Transaction Documents"), with such modifications, amendments or changes in any of the Transaction Documents as the Authorized Person executing same may approve, such approval and the approval thereof by the Managers to be conclusively established by such execution and delivery.

RESOLVED, that each of the Authorized Persons be, and each of them is, authorized and directed to take all such further action and to execute, deliver and file all such further agreements, certificates, instruments and documents, in the name and on behalf of the Company; to pay or cause to be paid all expenses, and to take all such other actions as they or any one of them shall deem necessary, desirable, advisable or appropriate to consummate, effectuate, carry out or further the transactions contemplated by and the intent and purposes of the Transaction Documents.

RESOLVED, that in connection with the transactions contemplated by the Transaction Documents, each of the Authorized Persons be, and each of them is, authorized in the name and on behalf of the Company, to certify any more formal or detailed resolutions as such person may deem necessary, desirable, advisable or appropriate to consummate, effectuate, carry out or further the transactions contemplated by and the intent and purposes of the Transaction Documents, and that thereupon, such resolutions shall be deemed adopted as and for the resolutions of the Managers as if set forth at length herein.

1

CONFIDENTIAL

SFR 23619

CONFIDENTIAL

**RESOLVED**, that the omission from these resolutions of any agreement or other arrangement contemplated by any of the Transaction Documents or any action to be taken in accordance with any requirements of any of the Transaction Documents shall in no manner derogate from the authority of the Authorized Persons to take all actions necessary, desirable, advisable or appropriate to consummate, effectuate, carry out or further the transactions contemplated by and the intent and purposes of the foregoing resolutions.

**RESOLVED**, that these Resolutions can be signed in counterparts, including counterpart signature pages or counterpart facsimile signature pages or via electronic mail (including pdf or electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g. www.docusign.com) or other transmission method, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument deemed delivered for all purposes.

**RESOLVED**, that these Resolutions are in conformity with the Articles of Organization and Operating Agreement of the Company and are within its powers. The authority given hereunder shall be deemed, to the extent necessary in order to carry these Resolutions into effect, retroactive. In that event, acts performed prior to the adoption of these Resolutions but which are necessary or convenient for the carrying of these Resolutions into effect, are ratified, adopted and affirmed. The authority conferred by these Resolutions shall continue in full force and effect until actual written notice of revocation of these Resolutions.

[remainder of page intentionally left blank; signature page to follow]

2

CONFIDENTIAL

SFR 23621

CONFIDENTIAL

Signature:   David Reape (Nov 27, 2018)
Email:   dreape@vendorassistance.com

Signature:   Gene Harris (Nov 29, 2018)
Email:   gharris@ahg-group.com

Signature:   Brian Hynes
Brian Hynes (Nov 29, 2018)
Email:   bhynes@vendorassistance.com

Signature:   Malcolm Weems
Malcolm Weems (Jan 28, 2019)
Email:   mweems@vendorassistance.com

Signature:   Mark Ryerson (Nov 28, 2018)
Email:   mryerson@howardandhoward.com

Signature:   Marty Martin (Jan 23, 2019)
Email:   martywmartin@icloud.com

CONFIDENTIAL

SFR 23620

CONFIDENTIAL

IN WITNESS WHEREOF, the undersigned have executed this Consent as of January _____, 2018.

Signature: _____
Gene Harris [Jan 29, 2018]
Email: gharris@ahg-group.com

Signature: _____
Brian Hynes [Jan 29, 2018]
Email: bhynes@vendorassistance.com

Signature: _____
Malcolm Weems [Jan 29, 2018]
Email: mweems@vendorassistance.com

Signature: _____
Mark Ryerson [Jan 29, 2018]
Email: mryerson@howardandhoward.com

Signature: _____
Marty Martin [Jan 29, 2018]
Email: martywmartin@icloud.com

Signature _____
E-Mail: drcope@vendorassistance.com

CONFIDENTIAL

SFR 23622

CONFIDENTIAL



# Written Consent Resolutions of BSF re Servicing Agreements (1-18) 4839-1669-8456 v.2

Adobe Sign Document History                              01/29/2018

| | |
|---|---|
| Created: | 01/28/2018 |
| By: | David Reape (dreape@healthcare-finance.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAqlzdWzhIPUg41w0kUdVztz07eNa_8EVa |

## "Written Consent Resolutions of BSF re Servicing Agreements ( 1-18) 4839-1669-8456 v.2" History

- Document created by David Reape (dreape@healthcare-finance.com)
  01/28/2018 - 7:46:51 PM CST- IP address: 71.230.248.43

- Document emailed to Gene Harris (gharris@ahg-group.com) for signature
  01/28/2018 - 7:47:34 PM CST

- Document emailed to Brian Hynes (bhynes@vendorassistance.com) for signature
  01/28/2018 - 7:47:34 PM CST

- Document emailed to Malcolm Weems (mweems@vendorassistance.com) for signature
  01/28/2018 - 7:47:34 PM CST

- Document emailed to Mark Ryerson (mryerson@howardandhoward.com) for signature
  01/28/2018 - 7:47:34 PM CST

- Document emailed to Marty Martin (martywmartin@icloud.com) for signature
  01/28/2018 - 7:47:34 PM CST

- Document viewed by Marty Martin (martywmartin@icloud.com)
  01/28/2018 - 7:47:53 PM CST- IP address: 99.117.105.76

- Marty Martin (martywmartin@icloud.com) has agreed to the terms of use and to do business electronically with Vendor Assistance Program, LLC
  01/28/2018 - 7:51:48 PM CST- IP address: 99.117.105.76

- Document e-signed by Marty Martin (martywmartin@icloud.com)
  Signature Date: 01/28/2018 - 7:51:48 PM CST - Time Source: server- IP address: 99.117.105.76



Adobe Sign

CONFIDENTIAL

SFR 23623

CONFIDENTIAL

Document viewed by Mark Ryerson (mryerson@howardandhoward.com)
01/28/2018 - 10:04:25 PM CST- IP address: 107.77.227.172

Mark Ryerson (mryerson@howardandhoward.com) has agreed to the terms of use and to do business electronically with Vendor Assistance Program, LLC
01/29/2018 - 0:25:22 AM CST- IP address: 107.77.227.172

Document e-signed by Mark Ryerson (mryerson@howardandhoward.com)
Signature Date: 01/29/2018 - 0:25:22 AM CST - Time Source: server- IP address: 107.77.227.172

Document viewed by Gene Harris (gharris@ahg-group.com)
01/29/2018 - 3:14:47 AM CST- IP address: 50.59.217.38

Gene Harris (gharris@ahg-group.com) has agreed to the terms of use and to do business electronically with Vendor Assistance Program, LLC
01/29/2018 - 3:19:25 AM CST- IP address: 71.41.122.30

Document e-signed by Gene Harris (gharris@ahg-group.com)
Signature Date: 01/29/2018 - 3:19:25 AM CST - Time Source: server- IP address: 71.41.122.30

Document viewed by Brian Hynes (bhynes@vendorassistance.com)
01/29/2018 - 8:38:53 AM CST- IP address: 173.9.237.254

Brian Hynes (bhynes@vendorassistance.com) has agreed to the terms of use and to do business electronically with Vendor Assistance Program, LLC
01/29/2018 - 8:57:15 AM CST- IP address: 173.9.237.254

Document e-signed by Brian Hynes (bhynes@vendorassistance.com)
Signature Date: 01/29/2018 - 8:57:15 AM CST - Time Source: server- IP address: 173.9.237.254

Document viewed by Malcolm Weems (mweems@vendorassistance.com)
01/29/2018 - 9:40:57 AM CST- IP address: 173.9.237.254

Malcolm Weems (mweems@vendorassistance.com) has agreed to the terms of use and to do business electronically with Vendor Assistance Program, LLC
01/29/2018 - 9:41:18 AM CST- IP address: 173.9.237.254

Document e-signed by Malcolm Weems (mweems@vendorassistance.com)
Signature Date: 01/29/2018 - 9:41:18 AM CST - Time Source: server- IP address: 173.9.237.254

Signed document emailed to all eligible parties.
01/29/2018 - 9:41:18 AM CST

**VAP** Vendor Assistance Program | Powered by Adobe Sign

CONFIDENTIAL

SFR 23624

CONFIDENTIAL

# EXHIBIT "S"

WRITTEN CONSENT RESOLUTIONS OF THE BOARD OF MANAGERS
OF BLUESTONE CAPITAL MARKETS, LLC

**RESOLVED**, that the Managers of the Company declare it advisable and in the best interest of the Company and its members to enter into (i) that certain Services Agreement by and between the Company and Blue Stone Finance, LLC ("BSF") substantially in the form attached hereto as Exhibit A (the "BSF Services Agreement"), (ii) that certain Corporate Services Agreement by and between the Company and BSF substantially in the form attached hereto as Exhibit B (the "BSF Corporate Services Agreement"), and (iii) that certain Services Agreement by and between the Company and Vendor Assistance Program, LLC substantially in the form attached hereto as Exhibit C (the "VAP Services Agreement" and together with the BSF Services Agreement and the BSF Corporate Services Agreement, collectively the "Servicing Agreements").

**RESOLVED**, that each of the Servicing Agreements is hereby adopted and approved.

**RESOLVED**, that David Reape, in his capacity as Chief Executive Officer, and Gene Harris, in his capacity as Secretary (each, an "Authorized Person") be, and each of them is, authorized and directed, for and on behalf of the Company, to execute, deliver, accept and act upon each of the Servicing Agreements and any related or ancillary agreements, certificates or instruments described therein or required thereby (together with the Servicing Agreements, collectively the "Transaction Documents"), with such modifications, amendments or changes in any of the Transaction Documents as the Authorized Person executing same may approve, such approval and the approval thereof by the Managers to be conclusively established by such execution and delivery.

**RESOLVED**, that each of the Authorized Persons be, and each of them is, authorized and directed to take all such further action and to execute, deliver and file all such further agreements, certificates, instruments and documents, in the name and on behalf of the Company; to pay or cause to be paid all expenses, and to take all such other actions as they or any one of them shall deem necessary, desirable, advisable or appropriate to consummate, effectuate, carry out or further the transactions contemplated by and the intent and purposes of the Transaction Documents.

**RESOLVED**, that in connection with the transactions contemplated by the Transaction Documents, each of the Authorized Persons be, and each of them is, authorized in the name and on behalf of the Company, to certify any more formal or detailed resolutions as such person may deem necessary, desirable, advisable or appropriate to consummate, effectuate, carry out or further the transactions contemplated by and the intent and purposes of the Transaction Documents, and that thereupon, such resolutions shall be deemed adopted as and for the resolutions of the Managers as if set forth at length herein.

**RESOLVED**, that the omission from these resolutions of any agreement or other arrangement contemplated by any of the Transaction Documents or any action to be taken in accordance with any requirements of any of the Transaction Documents shall in no manner derogate from the authority of the Authorized Persons to take all actions necessary, desirable,

1

CONFIDENTIAL

SFR 23625

CONFIDENTIAL

advisable or appropriate to consummate, effectuate, carry out or further the transactions contemplated by and the intent and purposes of the foregoing resolutions.

**RESOLVED,** that these Resolutions can be signed in counterparts, including counterpart signature pages or counterpart facsimile signature pages or via electronic mail (including pdf or electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g. www.docusign.com) or other transmission method, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument deemed delivered for all purposes.

**RESOLVED,** that these Resolutions are in conformity with the Articles of Organization and Operating Agreement of the Company and are within its powers. The authority given hereunder shall be deemed, to the extent necessary in order to carry these Resolutions into effect, retroactive. In that event, acts performed prior to the adoption of these Resolutions but which are necessary or convenient for the carrying of these Resolutions into effect, are ratified, adopted and affirmed. The authority conferred by these Resolutions shall continue in full force and effect until actual written notice of revocation of these Resolutions.

[remainder of page intentionally left blank; signature page to follow]

2

CONFIDENTIAL

SFR 23627

CONFIDENTIAL

Document e-signed by Malcolm Weems (mweems@vendorassistance.com)
Signature Date: 03/14/2018 - 1:29:00 PM CDT - Time Source: server- IP address: 173.9.237.254

Signed document emailed to all eligible parties.
03/14/2018 - 1:29:00 PM CDT

**VAP** Vendor Assistance Program    Adobe Sign

CONFIDENTIAL

SFR 23626

CONFIDENTIAL

IN WITNESS WHEREOF, the undersigned have executed this Consent as of January _____, 2018.

CONFIDENTIAL

SFR 23628

CONFIDENTIAL