## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

WARREN HILL, LLC,

                    Plaintiff,

v.

SFR EQUITIES, LLC,

                    Defendant.

No. 2:18-01228-HB

## <u>ORDER</u>

**NOW**, on this ___ day of _____, 2018, upon consideration of Defendant SFR Equities, LLC's Motion for Partial Summary Judgment, and Plaintiff Warren Hill, LLC's response thereto, it is **HEREBY ORDERED** that the Motion is **DENIED**.

BY THE COURT:

_____
Harvey Bartle III
United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| WARREN HILL, LLC,<br><br>                              Plaintiff,<br><br>v.<br><br>SFR EQUITIES, LLC,<br><br>                              Defendant. | No. 2:18-01228-HB |

**PLAINTIFF WARREN HILL, LLC'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANT SFR EQUITIES, LLC'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

**ELLIOTT GREENLEAF, P.C.**

Gregory S. Voshell
Thomas B. Helbig, Jr.
925 Harvest Drive, Suite 300
Blue Bell, PA 19422
(215) 977-1000 (p) / (215) 977-1099 (f)
gsv@elliottgreenleaf.com
tbh@elliottgreenleaf.com

*Counsel for Plaintiff Warren Hill, LLC*

Dated: December 21, 2018

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................... 1

FACTUAL BACKGROUND ........................................................ 2

    I.    THE VENDOR PAYMENT PROGRAM AND VENDOR SUPPORT
        INITIATIVE ............................................................. 2

    II.   THE CREATION OF VAP AND ITS STATUS AS A QUALIFIED
        PURCHASER ............................................................ 2

    III.  ██████████████████████████████████████ .................. 2

    IV.  WARREN HILL PURCHASES AND THEN SELLS ITS INTEREST
        IN VAP .................................................................. 3

    V.   THE CREATION OF THE BLUESTONE ENTITIES .......................... 4

LEGAL ARGUMENT ............................................................ 4

    I.    THE SECTION 1.2(D) FORMULA IS NOT IMPACTED BY BSF OR
        BCM .................................................................... 5

        A.    "Revenue" in Section 1.2(d) Is Defined to Include "Fees
              Earned" by VAP .................................................. 5

        B.    SFR Cannot Avoid Section 1.2(d) Payments by Funneling
              VAP's Fees to Bluestone. ........................................ 6

            1.    The MIPA Does Not Permit SFR to Exclude Fees Earned by
                 VAP........................................................ 6

            2.    Program Terms and ██████████████ Preclude
                 VAP From "Assigning" or "Subcontracting" ██████
                 ██████████ .......................................... 9

            3.    All Funds "Allocable to the Interests" Must Be Included ................. 12

        C.    SFR's Motion Is Premature under Federal Rule 56(d) ........................... 14

    II.   SECTION 1.2(D)'S EARNOUT PAYMENT IS BASED ON A
        SPECIFIC AND UNIQUE FORMULA, NOT ROUTINE "CASH"
        ACCOUNTING ......................................................... 16

        A.    SFR's Interpretation of Section 1.2(d) Is Again Unreasonable ............... 17

        B.    SFR Fails to Evaluate the MIPA in its Entirety, Cherry-Picking
              One Line and Materially Misquoting Schedule 1.2(d) Instead ................. 20

        C.    SFR's Alleged ██████████████ Argument Is Meritless ........... 23

    III.  SFR IMPROPERLY REFERENCES ISSUES RELATING TO
        SECTION 1.2(E) ....................................................... 25

CONCLUSION ................................................................ 25

## TABLE OF AUTHORITIES

**Cases**

*933 Van Buren Condo. Ass'n v. Van Buren*,
  61 N.E.3d 929 (Ill. App. Ct. 2016) ................................................................. 10

*Am. States Ins. Co. v. A.J. Maggio Co.*,
  229 Ill. App. 3d 422, 593 N.E.2d 1083 (1992) ....................................... 7

*Arcor, Inc. v. Textron, Inc.*,
  1990 U.S. Dist. LEXIS 7101 (N.D. Ill. June 6, 1990) ........................... 24

*Atwood v. St. Paul Fire & Marine Ins. Co.* ,
  363 Ill. App. 3d 861 (2006) ......................................................................... 19

*Cent. Ill. Pub. Serv. Co. v. Atlas Minerals, Inc.*,
  965 F. Supp. 1162 (C.D. Ill. 1997) ........................................................... 24

*Cent. States, Se. & Sw. Areas Pension Fund v. Blue Ridge Trucking Co.* ,
  1993 U.S. Dist. LEXIS 10998 (N.D. Ill. Aug. 6, 1993) ........................... 8

*Checkers, Simon & Rosner v. Lurie Corp.* ,
  864 F.2d 1338 (7th Cir. 1988) ................................................................... 23

*Chi. Dist Council Of Carpenters Pension Fund v. P.M.Q.T., Inc.*,
  169 F.R.D. 336 (N.D. Ill. 1996) ................................................................. 14

*Chi. Dist. Council of Carpenters Pension Fund v. Cotter*,
  914 F. Supp. 237 (N.D. Ill. 1996) ............................................................. 14

*Chilmark Ptnrs v. Mts, Inc.*,
  2003 U.S. Dist. LEXIS 7077 (N.D. Ill. Apr. 23, 2003) ........................... 5

*Christoph v. BCA, L.L.C.*,
  2008 U.S. Dist. LEXIS 94256 (N.D. Ill. Nov. 17, 2008) ....................... 18

*Cole v. Comm'r*,
  637 F.3d 767 (7th Cir. 2011) ............................................................. 11, 12

*Czapski v. Maher*,
  2011 IL App (1st) 100948 (2011) ............................................................. 19

*Grede v. Bank of N.Y. Mellon*,
  598 F.3d 899 (7th Cir. 2010) ..................................................................... 21

*Howell v. United States*,
  775 F.2d 887 (7th Cir. 1985) ..................................................................... 12

*IBM v. ACS Human Servs., L.L.C.*,
  999 N.E.2d 880 (Ind. Ct. App. 2013) ....................................................... 22

*Int'l Fin. Servs. Corp. v. Chromas Techs. Can., Inc.*,
  2005 U.S. Dist. LEXIS 20822 (N.D. Ill. Sept. 19, 2005) ................................. 14, 15

*Int'l Fin. Servs. Corp. v. Didde Corp.*,
  2002 U.S. Dist. LEXIS 6878 (N.D. Ill. Apr. 16, 2002) ........................................ 14

*K's Merch. Mart, Inc. v. Northgate L.P.*,
  359 Ill. App. 3d 1137 (2005) ................................................................. 23

*Kellers Sys. v. Transp. Int'l Pool, Inc.*,
  172 F. Supp. 2d 992 (N.D. Ill. 2001) ......................................................... 14

*Kinesoft Dev. Corp. v. Softbank Holdings*,
  139 F. Supp. 2d 869 (N.D. Ill. 2001) ..................................................... 23, 24

*Laborers' Pension Fund v. Excellence Quest Paving & Maint.* ,
  2007 U.S. Dist. LEXIS 81514 (N.D. Ill. Oct. 31, 2007) ...................................... 14

*Litwin v. Timbercrest Estates, Inc.*,
  37 Ill. App. 3d 956 (1976) ................................................................... 10

*LLMD of Mich., Inc. v. Marine Midland Realty Credit Corp.*,
  789 F. Supp. 657 (E.D. Pa. 1992) ............................................................. 4

*Mach. Tool Tech. 21 v. United Grinding Techs.*,
  2003 U.S. Dist. LEXIS 4400 (N.D. Ill. Mar. 20, 2003) ...................................... 23

*Mastrobuono v. Shearson Lehman Hutton*,
  514 U.S. 52 (1995) ....................................................................... 8, 21

*Museum Pointe Condo. Ass'n v. Tower Residences Condo. Ass'n*,
  2017 IL App (1st) 152929-U ................................................................. 19

*Premier Title Co. v. Donahue*,
  328 Ill. App. 3d 161, 765 N.E.2d 513 (2002) ............................................... 8, 19

*Right Field Rooftops, L.L.C. v. Chi. Cubs Baseball Club, L.L.C.*,
  870 F.3d 682 (7th Cir. 2017) ............................................................... 18

*Roubik v. Merrill Lynch, Pierce, Fenner & Smith* ,
  285 Ill. App. 3d 217, 674 N.E.2d 35 (1996) ............................................... 8, 21

*Rush Presbyterian-St. Lukes Med. Ctr. v. Prudential Ins. Co. of Am.*,
  2004 U.S. Dist. LEXIS 5187 (N.D. Ill. Mar. 30, 2004) ........................................ 7

*Smith v. Hunter*,
  171 Ill. App. 30 (1912) ..................................................................... 10

*Sphere Drake Ins. v. All Am. Life Ins. Co.*,
  300 F. Supp. 2d 606 (N.D. Ill. 2003) ..................................................... 9, 10

*Thompson v. Gordon*,
   241 Ill. 2d 428, 948 N.E.2d 39 (2011) ............................................................... *passim*

*Tishman Midwest Mgmt. Corp. v. Wayne Jarvis, Ltd.*,
   146 Ill. App. 3d 684 (1986) ...................................................................... 23

*Travelers Indem. Co. v. DiBartolo*,
   1998 U.S. Dist. LEXIS 10060 (E.D. Pa. June 24, 1998) ........................................... 4

*Trustmark Ins. Co. v. Transamerica Occidental Life Ins. Co.*,
   484 F. Supp. 2d 850 (N.D. Ill. 2007) ................................................................ 7

*United States v. Bartlett*,
   567 F.3d 901 (7th Cir. 2009) ................................................................ 21-22

*Van Dorn Co. v. Future Chem. & Oil Corp.* ,
   753 F.2d 565 (7th Cir. 1985) ................................................................ 14, 15

*Woods v. Elgin, Joliet & E. Ry.* ,
   2000 U.S. Dist. LEXIS 226 (N.D. Ill. Jan. 10, 2000) ........................................... 18

**Rules**

Fed. R. Civ. P. 54 ............................................................................... 16

**Other**

Bryan Garner, *Legal Writing in Plain English* (2001) ........................................... 21, 22

iv

Plaintiff Warren Hill, LLC ("Warren Hill"), through counsel, submits this Memorandum of Law in Opposition to Defendant SFR Equities, LLC's ("SFR") Motion for Partial Summary Judgment.  Warren Hill respectfully requests that the Court deny SFR's Motion.

## PRELIMINARY STATEMENT

This case involves the sale of Warren Hill's equity interest in Vendor Assistance Program, LLC ("VAP") to SFR and SFR's post-closing efforts to deprive Warren Hill of money owed to it under the Member Interest Purchase Agreement ("MIPA") the parties signed.  The parties agreed that SFR would make several post-closing payments to Warren Hill.  The payments are tied to VAP's financial performance and must be calculated pursuant to carefully negotiated formulas. Rather than adhere to these formulas, however, SFR led the charge to create two new companies, Bluestone Capital Markets, LLC ("BCM") and Blue Stone Finance, LLC ("BSF"), and funneled more than ███████ in fees VAP earned to them.  SFR now claims it can exclude these fees from what SFR owes to Warren Hill.

SFR's position finds no support in the MIPA's language.   The creation of the Bluestone entities does not impact the amount of money SFR owes Warren Hill.  The relevant formula includes fees *earned by VAP* for ████████████, and there is no dispute that VAP earned *all* of the fees at issue.  SFR cannot avoid its obligations simply by creating new companies and hiding VAP's earned fees in them.  SFR is also wrong to contend that the MIPA is governed by "cash accounting."   In reality, Section 1.2(d) contains a specifically negotiated formula that includes concepts traceable to both *accrual* and *cash* accounting.  When viewed together with Schedule 1.2(d)—which was incorporated to display how the payment formula worked—it is clear that SFR's "cash" accounting argument is meritless.

SFR's motion lacks merit, is premature in many respects, and should be denied.

1

## FACTUAL BACKGROUND

### I.      THE VENDOR PAYMENT PROGRAM AND VENDOR SUPPORT INITIATIVE

Due to budgetary constraints (or at times the lack of a budget), the State of Illinois may not have sufficient funds to pay invoices from its vendors.  (Ex. 9, Program Terms at 1.)    Thus, Illinois created the Vendor Payment Program and the Vendor Support Initiative (together, the "Program") to help to manage the State's cash flow and to help the State's vendors receive payment for services provided to the State.  (*Id.*; Ex. 3, Reape Dep. at 29:1-34:4.)   The Program is governed by promulgated Program Terms and permits a vendor to receive most of an invoice's face value upon assigning the total invoice value (*i.e.*, a "receivable") to a type of entity referred to as a "Qualified Purchaser," with the vendor later receiving the balance of the invoice's face value. (Ex. 3, Reape Dep. at 32:19-33:4; Ex. 9 at 1; Ex. 10 (Program Terms apply to Vendor Support Initiative).)  In short, vendors get a large portion of the invoices paid up front, and in exchange, the Qualified Purchasers become entitled to late payment penalties from the State.

### II.     THE CREATION OF VAP AND ITS STATUS AS A QUALIFIED PURCHASER

VAP was created in 2010 to operate under the Program. (Ex. 2, Delaney Decl. ¶¶ 3-6.) VAP completed the State's vetting process and received the "Qualified Purchaser" designation. (Ex. 3, Reape Dep. at 80:16-23.)  Neither BSF nor BCM sought or received designations as Qualified Purchasers under the Program, ███████████████████████████████████
███████████████████████ (*Id.* at 82:21-85:16.)

### III.    ████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████. (Ex. 3, Reape Dep. at 105:4-23; Ex. 11,

██████████████████████████; Exs. 12-18 (██████████████████).) ████████

████████████████████████████████████████████████

2

███████████████████████████████.[1] ████████████████████████████████████████.

(Ex. 3, Reape Dep. at 119:23-121:16, 180:21-181:19; Ex.11 █████████████████████

██████ s).) ███████████████████████████████████████████████████████

██████████████████████████████████████████████. (Ex. 3, Reape Dep.

at 150:14-151:6; *see also* Ex. 20, G. Harris Email (████████████████████████████

████████████████████████ ").)

███████████████████████████████████████████. (Ex. 3, Reape Dep. at 152:3-153:13.)

## IV.   WARREN HILL PURCHASES AND THEN SELLS ITS INTEREST IN VAP

Warren Hill invested in VAP in early 2012.  (Ex. 2, Delaney Decl. ¶¶ 1-10.)  Around that

same time, Warren Hill facilitated VAP's hiring of David Reape and Jason Cannon, who

thereafter successfully handled the day-to-day operations of VAP.   (*Id.* ¶¶ 12-18.)  Mr. Hynes

applauded Warren Hill's involvement, stating that while he and a co-founder "had an idea" for

VAP, Mr. Reape and a Warren Hill representative "actually made it a company." (*Id.* ¶ 18.)

Warren Hill's relationship with Mr. Hynes, however, began to deteriorate in late 2013.

(*Id.* ¶¶ 21-23.)  Mr. Hynes expressed an interest in buying Warren Hill's stake in VAP in late

2014, and he eventually introduced Warren Hill to Gene Harris, a manager of AHG Group, LLC

("AHG").  (*Id.* ¶¶ 24-28.)  After detailed negotiations, SFR (an affiliate of AHG) and Warren

Hill entered into the MIPA (*id.* ¶ 29), which included formulas for calculating post-closing

payments to Warren Hill. (Ex. 1, MIPA at § 1.2(d) (setting formula for arriving at "Net

Income"); *id.* § 1.2(e) (setting formula for "Reserve Amounts").)

---

[1] (Ex. 3, Reape Dep. at 105:4-23; *id.* at 113:12-16 (testifying that ████████████████████
███████████████████ emphasis added); *id.* at 119:21-138:19138 (discussing ████████████████
██████████████████████); *id.* at 180:6-181:19 (testifying that ███████████████████████████
████████████████████; Exs. 7-8 ██████████████████████; ████████████████████████████████).

## V.     THE CREATION OF THE BLUESTONE ENTITIES

Just days after Warren Hill contacted SFR concerning the first earnout payment due

under the MIPA, ███████████████████████████████████████

███████████████████████. (Warren Hill Response to Stat. Facts ("RSF") ¶ 19.)

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████. (See Ex. 21 at 2 ████████████████).)

       ████████████████████████████████████████

██████████████████████████████████. (*Id.* at 2.) ████████

██████████████████████████████████████████████.

(*Compare id. with* Ex. 5, Harris Dep. at 167:6-9 and Ex. 4, Wilson Dep. at 175:4-177:21.) He

██████████████████████████████████████████████████.

(Ex. 22; *see also* Ex. 4, Wilson Dep. at 177:22-178:12.) ███████████████

████████████████████████████. (*See* Ex. 21.)  SFR omitted from the Section

1.2(d) earnout calculation all fees earned by VAP █████████████████

██████.  By doing so, SFR used a depressed "Revenue" figure of ███████████████, rather

than the approximately █████████████████████████. (Ex. 23, ████████████.)

## LEGAL ARGUMENT[2]

Warren Hill's breach of contract claim is governed by Illinois law.  Under Illinois law,

"[i]n construing a contract, the primary objective is to give effect to the intention of the parties."

---

[2]  Summary judgment is only proper where the movant can show that "there are no genuine issues of material fact" and that those undisputed facts "entitle [the movant] to judgment as a matter of law."  *Travelers Indem. Co. v. DiBartolo*, 1998 U.S. Dist. LEXIS 10060, at *2 (E.D. Pa. June 24, 1998) (Bartle, J.). "In deciding whether this standard has been met the evidence must be viewed in the light most favorable to the non-moving party." *LLMD of Mich., Inc. v. Marine Midland Realty Credit Corp.*, 789 F. Supp. 657, 659 (E.D. Pa. 1992) (Bartle, J.).  "Accordingly, all facts in the record, and all reasonable inferences deduced therefrom, will be construed by this Court in the light most favorable to [the non-moving party]," Warren Hill.  *Id.*

4

*Thompson v. Gordon*, 241 Ill. 2d 428, 441, 948 N.E.2d 39, 47 (2011).  "Illinois subscribes to the 'four corners' theory of contract interpretation" to determine the intent of the parties.  *Chilmark Ptnrs v. Mts, Inc.*, 2003 U.S. Dist. LEXIS 7077, at *10-11 (N.D. Ill. Apr. 23, 2003).  Under this approach, "[a] court will first look to the language of the contract itself to determine the parties' intent" and "[i]f the words in the contract are clear and unambiguous, they must be given their plain, ordinary and popular meaning."  *Thompson*, 241 Ill. 2d at 441.

# I.     THE SECTION 1.2(D) FORMULA IS NOT IMPACTED BY BSF OR BCM

## A.     "Revenue" in Section 1.2(d) Is Defined to Include "Fees Earned" by VAP

Section 1.2(d) entitles Warren Hill to a set percentage of "Net Income," which is calculated using two defined terms, "Revenue" and "Expenses."  The term "Revenue" is expressly defined to include, *inter alia*, all "fees earned" by VAP in its capacity as manager of the trusts at issue. When calculating "Revenue," therefore, SFR must include any fees (1) earned by VAP (2) in VAP's capacity as manager.  Both elements are present for the fees at issue.

*First*, ████████████████████████████████████████. (Ex. 3, Reape Dep. at 105:4-23, 113:12-16, 180:6-181:19; Ex. 11 (████████████████████ ████████.) ████████████████████████████████████. (Ex. 3, Reape Dep. at 105:4-23; Ex. 4, Wilson Dep. at 150:22-151:24.) ████████████████ ████████████████████████████████████████████████. (Ex. 3, Reape Dep. at 128:14-17, 224:1-6; *see* Ex. 19 at 2 ████████████████████ ████) ████████████████████████████████████████ ████████████████████████. (Ex. 3, Reape Dep. at 82:21-83:5, 198:1-3; Ex. 9, Program Terms at 4-6 (████████████████████).)

*Second*, ████████████████████████████████████ ████████████████████. (Ex. 3, Reape Dep. at 154-55,180:21-181:19; Ex. 11 (██████████

███████████████████████).) ████████████████████████████████

███████████████████████. (Ex. 7-8 █████████████████████████

████████████████████████) In doing so, VAP's CEO represented that VAP

earned approximately ██████████████████. (Ex. 8 ████████████████████).)

Even SFR admits this fact, conceding that "VAP is a specialty finance company *that earns fees*

*for* ████████████████ under the Program. (SFR Stat. of Facts ("SOF") (emphasis added).)[3]

    Thus, the two components of Section 1.2(d)(i)(A) are present: ██████████████████

█████████████████████████████████████████████████████████.

Accordingly, all "fees earned" by VAP constitute "Revenue" under the plain language of Section

1.2(d). For 2017, VAP earned ██████████ in fees, not the mere ███████ SFR used when

calculating the Section 1.2(d) earnout for 2017.

## B. SFR Cannot Avoid Section 1.2(d) Payments by Funneling VAP's Fees to Bluestone.

    SFR inexplicably ignores the definition of "Revenue" in Section 1.2(d), arguing instead

that it can create new companies ████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████ The exact basis of SFR's position is something of a moving target, but

whatever version SFR ultimately adopts will fail for numerous reasons.

### 1. The MIPA Does Not Permit SFR to Exclude Fees Earned by VAP

    SFR contends that the "Revenue" component of Section 1.2(d) does not include any of

VAP's earned fees ████████████████████████████████████. In other words, while

---

[3] SFR's argument flows from an indisputably false assertion that "████████████████████████
████████████████ SFR Br. at 3 (emphasis added).) This is simply not true.████████████████
████████████████████████████████████████(Ex. 3, Reape Dep. at 154:7-155:2, 170-73,
180:21-181:19; Exs. 7-8.) ██████████████████████████████████.
███████████████████████████████████████████
████████████████████████████." (SFR SOF ¶ 31.)



***VAP*** earned ██████████ in fees for 2017, SFR argues that it is permitted to exclude ████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████   A good example of SFR's position is SFR's treatment of ████████

██████████████████.   VAP earned, and was paid, ████████████████████

████████.   (Ex. 3, Reape Dep. at 181:20-182:22; Ex. 4, Wilson Dep. at 224:19-225:8.)   When

calculating Warren Hill's earn-out payment, however, SFR excluded these fees because,

██████████████████████████████████.   (Ex. 21 at 2 (██████████████████████

██████████████████); Ex. 4, Wilson Dep. at 221:4-16, 224:19-225:24).)

Section 1.2(d)(i)(A) does not contain any language to support SFR's position.   Under

SFR's reading, "Revenue" includes "any and all fees earned by VAP in its capacity as a manager

of . . . any trust ... maintained in the course of VAP's business [***except if VAP subsequently uses***

***those earned fees*** ██████████████████████████████████]."   The MIPA does not

contain the bracketed language, and thus, SFR is asking this Court to re-write the MIPA to

include it.   SFR's position is unreasonable because it "add[s] new terms or conditions to which

the parties do not appear to have assented."   *Thompson*, 241 Ill. 2d at 450, 948 N.E.2d at 51; *see*

*also Am. States Ins. Co. v. A.J. Maggio Co*., 229 Ill. App. 3d 422, 427, 593 N.E.2d 1083, 1086

(1992) ("A court will not add another term about which an agreement is silent; no word can be

added to or taken from the agreement to change the plain meaning of the parties as expressed

therein."); *Trustmark Ins. Co. v. Transamerica Occidental Life Ins. Co*., 484 F. Supp. 2d 850,

853 (N.D. Ill. 2007) (same); *Rush Presbyterian-St. Lukes Med. Ctr. v. Prudential Ins. Co. of Am*.,

2004 U.S. Dist. LEXIS 5187, at *8 (N.D. Ill. Mar. 30, 2004) (same).

Moreover, it is well-established that "[a] court will not interpret a contract . . . in a way

that is contrary to the plain and obvious meaning of the language used." *Thompson*, 241 Ill. 2d at 442, 948 N.E.2d at 47. Here, Section 1.2(d)(i)(A) provides that "Revenue" includes "***any and all*** fees earned by VAP in its capacity as a manager of ... any trust ... maintained in the course of VAP's business." (Emphasis added). VAP earned all of the fees in dispute, and thus it would distort the plain language of Section 1.2(d)(i)(A) to permit SFR to excise ████████████

███████████████████████████████████████████████████████

████████. (Ex. 21 ████████████████████████).)

In addition, the MIPA permits SFR to reduce the "Revenue" set forth in Section 1.2(d)(i) only by defined categories of expenses expressly set forth in Section 1.2(d)(ii)(A)-(D)—not by █ ██████████████████████████████████████. Section 1.2(d)(ii) provides four categories that are to be deducted from "Revenue" to arrive at "Net Income," none of which would permit SFR to deduct from "Revenue" ████████████████████ ██████████████████████████. Therefore, SFR's proffered interpretation puts Section 1.2(d)(i) in an irreconcilable conflict with the more specific Section 1.2(d)(ii). Under SFR's interpretation, Section 1.2(d)(i) would permit SFR to deduct items from "Revenue" that Section 1.2(d)(ii) does not permit. SFR cannot circumvent the constraining parameters on "Expense" deductions by ████████████████████████████████████ ████████████ *Mastrobuono v. Shearson Lehman Hutton*, 514 U.S. 52, 63 (1995) (reminding that "a document should be read to give effect to all its provisions and to render them consistent with each other"); *Roubik v. Merrill Lynch, Pierce, Fenner & Smith*, 285 Ill. App. 3d 217, 220, 674 N.E.2d 35, 37 (1996) (confirming same)[4] ████████████████████

---

[4] Moreover, "[w]here two provisions of a single contract apparently conflict, the more specific controls." *Cent. States, Se. & Sw. Areas Pension Fund v. Blue Ridge Trucking Co.*, 1993 U.S. Dist. LEXIS 10998, at *18 (N.D. Ill. Aug. 6, 1993); *Premier Title Co. v. Donahue*, 328 Ill. App. 3d 161, 167, 765 N.E.2d 513, 518 (2002) ("in the event of a conflict, specific provisions are entitled to more weight in ascertaining the parties' intent than general

███████████████████████████. (Ex. 4, Wilson Dep. at 261:6-262:7.) SFR

cannot deduct that "expense," as Section 1.2(d) strictly limits allowable "Expenses."

Simply put, SFR's interpretation of Section 1.2(d) is contrary to the language of the

MIPA, asks the Court to graft non-existent clauses onto Section 1.2(d) that would fundamentally

undermine its structure, and puts provisions of the MIPA in irreconcilable conflict with one

another. This interpretation is unreasonable as a matter of law.

### 2. Program Terms ███████████████ Preclude VAP From "Assigning" or "Subcontracting" █████████

SFR has suggested that it was permitted to omit fees earned by VAP from the Section

1.2(d) formula ███████████████████████████████

███████████████████████████. (Ex. 5, Harris Dep. at 82:1-19, 85:3-11

██████████████████████████).) This argument fails for three reasons.

*First*, Section II.5 of the Program Terms prohibits the assignment of any "Assigned

Receivable (or ***any interest therein***)" without approval from the State of Illinois. (Ex. 9,

Program Terms, at § II.5 (emphasis added).) ████████████████████

██████████████████████████████████████

██████████████████████████████████

███████████████████████. (*Id.*) The Program Terms further

specify that any purported assignment made in violation of the Program Terms is "void *ab*

*initio*," (*id.*), meaning that any assigned amounts must return to the assigning party,[5] *see Sphere*

*Drake Ins., Ltd. v. All Am. Life Ins. Co.,* 300 F. Supp. 2d 606, 629 (N.D. Ill. 2003) ("the Unicare

---

provisions."). Here, Section 1.2(d)(ii) is the specific provision addressing what can be deducted from "Revenue," and if the Court adopts SFR's interpretation of Section 1.2(d)(i), it would place the two provisions at odds.

[5] █████████████████████████████████
███████████████████████████████████████
███████████████████████████████████
███████████████████████████

Retrocession was *void ab initio*. It will be required to return the Unicare Retrocession premiums paid by All American"); *Smith v. Hunter*, 171 Ill. App. 30, 36 (1912).

Here, however, VAP did not seek approval ███████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████ (Ex. 3, Reape Dep. at 224:7-24, 228:10-230:13.) ███████████

███████████, therefore, would be "void *ab initio*" ████████████████████████████

████████████████████ *See Sphere Drake Ins., Ltd.,* 300 F. Supp. 2d at 629; *Smith*, 171 Ill. App.

at 36. ████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████ [6]

*Second*, even assuming *arguendo* ███████████████████████████████████████

████ "an assignment is a transfer of some identifiable property, claim or right from the

assignor to the assignee," and therefore, "one cannot convey that which he does not have."

*Litwin v. Timbercrest Estates, Inc.*, 37 Ill. App. 3d 956, 958, (1st Dist. App. 1976); *Montalbano*

*Family Inv., LLC v. Vill. of Lemont*, 2016 IL App 152915-U, ¶ 21 (1st Dist. App. 2016)

("HomeWerks's assignee could not acquire from HomeWerks a right HomeWerks did not

have."). █████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████. (Exs. 25-27, ████████████████████████

████████████████████. ████████████████████████████████████████████

███████████████████████████████████████████████████████████████████. *See*

*Litwin*, 37 Ill. App. 3d at 958; *Montalbano Family Inv., LLC*, 2016 IL App 152915-U, at ¶ 21.

---

[6] Additionally, when interpreting a contract, "statutes and laws in existence at the time a contract is executed are considered part of the contract." *933 Van Buren Condo. Ass'n v. Van Buren*, 61 N.E.3d 929, 940 (Ill. App. 1st Dep't 2016).  Thus, the State regulations restricting assignments are incorporated into the MIPA.

Moreover, when an entity or individual assigns its right under something, the assignment of income doctrine states that the assigned income is still *earned by the assignor*, VAP. *Cole v. Commissioner*, 637 F.3d 767, 777 (7th Cir. 2011) ("Under the assignment of income doctrine, taxpayers may not shift their tax liability by merely assigning income that the taxpayer earned to someone else.") ████████████████████████████████████████

████████████████████████████████████████

*Finally*, ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████ (Ex. 3, Reape Dep. at 195:14

██████████████████████████████ "); Ex. 4, Wilson Dep. at

252:5-10 ████████████████████████████████████

██████████████████████████████████ ).)[7] ████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████████

████████████████████████████████████

████████████████████████████████████

---

[7] To be sure, there is a significant dispute as to ███████████████████████████
██████████████████████████████████ (Ex. 36-37 (██████████████████).) ██████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████

11

██████████████████████████████████████████████████████

████████████████████ *Cole*, 637 F.3d at 778; *see also Howell v. United States,* 775 F.2d 887, 889

(7th Cir. 1985).  Here, Section 1.2(d)(ii) restricts the "Expenses" that can be deducted from

"Revenue" to four specific categories, ██████████████████████████████████████

██████████████████,"[8]

Thus, it does not matter where SFR ultimately lands in describing the VAP-Bluestone

relationship ████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████ Under either characterization, SFR's position fails.

### 3.   All Funds "Allocable to the Interests" Must Be Included

Section 1.2(d) requires SFR to pay Warren Hill "50% of VAP's Net Income . . . *allocable*

*to the Interests* for such year."  The phrase "allocable to the Interests" embraces amounts███

██████████████████████████████████ to the extent SFR's beneficial interest in those

amounts relates back to the Interests in VAP that SFR purchased from Warren Hill.

Specifically, ████████████████████████████████████████████

██████████████ ███████████████████████████████████████

██████████████████████████████████████████████████████

_____

[8] ████████████████████████████████████████████████████

██████████████████████████████████████ (Ex.11███████).)

███████████ that is "allocable to the Interests" that SFR purchased from Warren Hill cannot

be rendered otherwise███████████████████████.

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████. (Ex. 5, Harris Dep. at 96:22-97:18.) ██████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████ (*Id.* at 98:2-23.) ██████████████████

███████████████████████████████████████████████████. (*Id.*

at 98:11-99:6) █████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████s. (*Id.* at 98:24-99:8; Ex. 28 at 5 ██████████████).)

Even though the disclosure form to the State failed to account for this, ████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████████

██████ (Ex. 5, Harris Dep. at 99:4.) ████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████. (*Id.*)

SFR's own principal, therefore, ███████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████

In summary, the phrase "allocable to the Interests" requires that all of the fees earned by

VAP—███████████████████████—be included within Section 1.2(d).[9]

### C.   SFR's Motion Is Premature under Federal Rule 56(d)

Discovery to date has demonstrated ███████████████████████████ ██████ and that, under Illinois law, they should be treated as a single entity.  Fact and expert discovery on this issue are ongoing, which renders SFR's request for judgment at this stage premature under Federal Rule 56(d).[10]

Illinois' alter ego doctrine treats "nominally separate business entities as if they were a single, continuous employer." *Chi. Dist. Council Of Carpenters Pension Fund v. P.M.Q.T., Inc.*, 169 F.R.D. 336, 341-42 (N.D. Ill. 1996); *Int'l Fin. Servs. Corp. v. Chromas Techs. Can., Inc.*, 2005 U.S. Dist. LEXIS 20822, at *13 (N.D. Ill. Sep. 19, 2005) ("Where one corporation is merely the alter ego of another, courts will disregard the corporate form."); *Kellers Sys. v. Transp. Int'l Pool, Inc.*, 172 F. Supp. 2d 992, 1000 (N.D. Ill. 2001) ("Illinois recognizes the 'single-entity' theory of piercing the corporate veil.")  There are two elements which must be met in order to treat separate business entities as a "single-entity."  *First*, it be shown that the entities in question are a "mere instrumentality of [one] another." *Van Dorn Co. v. Future Chem. & Oil Corp.*, 753 F.2d 565, 570 (7th Cir. 1985) (applying Illinois law); *Int'l Fin. Servs. Corp.*, 2005 U.S. Dist. LEXIS 20822, at *13-14 ("there must be such unity of interest and ownership that the separate personalities of the corporation and the individual [or other corporation] no

---

[9] ███████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████

[10] Whether one entity is the alter ego of another "is a question of fact to be determined by the circumstances of each case."  *Int'l Fin. Servs. Corp. v. Didde Corp.*, 2002 U.S. Dist. LEXIS 6878, at *11 (N.D. Ill. Apr. 16, 2002) (denying summary judgment because there were "genuine issues of material fact regarding the relationship between CTI, CTC, DWP and 'Chromas Technologies' that must be decided at trial"); *Chi. Dist. Council of Carpenters Pension Fund v. Cotter*, 914 F. Supp. 237, 244 (N.D. Ill. 1996); *Laborers' Pension Fund v. Excellence Quest Paving & Maint.*, 2007 U.S. Dist. LEXIS 81514, s*15 (N.D. Ill. Oct. 31, 2007).

longer exist."). *Second*, it must appear that the observance of a separate existence for each entity "would, under the circumstances, sanction a fraud or promote injustice." *Van Dorn Co.* 753 F.2d at 570; *Int'l Fin. Servs. Corp.,* 2005 U.S. Dist. LEXIS 20822, at *14.

To determine whether an entity is a "mere instrumentality" of another, courts consider the following factors: "(1) the failure to maintain adequate corporate records or to comply with corporate formalities, (2) the commingling of funds or assets, (3) undercapitalization, and (4) one corporation treating the assets of another corporation as its own." *Van Dorn Co.* 753 F.2d at 570.  Some courts have also considered whether the entities are "holding one's self out as being a unified entity" and the "failure to operate at arm's length." *Int'l Fin. Servs. Corp.,* 2005 U.S. Dist. LEXIS 20822, at *15. "Once the first element of the test is established, either the sanctioning of a fraud (intentional wrongdoing) or the promotion of injustice, will satisfy the second element." *Van Dorn Co.* 753 F.2d at 570. Such "injustice" has been found where the failure to treat the entities as a single entity would mean that "former partners would be permitted to skirt the legal rules concerning monetary obligations" or "a party would be unjustly enriched." *Int'l Fin. Servs. Corp.,* 2005 U.S. Dist. LEXIS 20822, at *15.

Discovery has shown thus far that ███████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████. For example:

- ████████████████████████████████ (Ex. 3, Reape Dep. at 10-14), ███████████ ████████████████████████████████ (Ex. 35, SFR RFA Resp. ¶ 28; SFR Mot., Hynes Decl. Exs. E, H, Q, R, S; Ex. 6, Harris Dep. at 41), ████████████████ ████████████████████████████████ (Ex. 35, SFR RFA Resp. ¶ 28; Ex. 5, Harris Dep. at 97-99; Ex. 4, Wilson Dep. at 57), ████████████████████ ████████████████████████████████ (SFR Mot., Hynes Decl. Exs. E, F, H; Ex. 4, Wilson Dep. at 57).

- ████████████████████████ (Ex. 3, Reape Dep. at 19, 270-77);



- ██████████████████████████████████████ ██████████████████████████████████ (SFR SOF ¶ 31; Ex. 4, Wilson Dep. at 234-37, 257-58);

- █████████████████████████████████████" (Ex. 4, Wilson Dep. at 35, 126, 222, 258-59; Ex. 21);

- ████████████████████████████████████████ ██████████████████████████████████ ██████ (SFR SOF ¶ 30; Ex. 5, Harris Dep. at 204-12);

- ████████████████████████████████████████ ██████████████████████████████████████ (Ex. 5, Harris Dep. at 232-34; Ex. 3, Reape Dep. at 202; Ex. 4, Wilson Dep. at 76);

- ████████████████████████████████████ ██████ Ex. 5, Harris Dep. at 200; Ex. 28); and

- ████████████████████████████████████████ ██████████████████████████████████ ████████████ (*see* Exs. 7-8, ████████████████).

These facts strongly support a finding of ████████████, and additional discovery on this issue is still ongoing (including forthcoming expert discovery). At this stage, it would be premature for the Court to decide this issue in SFR's favor. *See* Fed. R. Civ. P. 56(d).[11]

## II.  SECTION 1.2(D)'S EARNOUT PAYMENT IS BASED ON A SPECIFIC AND UNIQUE FORMULA, NOT ROUTINE "CASH" ACCOUNTING

SFR next contends that it ███████████████████████████████████ ████████████████████████," such that ██████████████████████████████████ ████████████████" as opposed to ██████████████████ (Br. at 7.)  This argument is misleading, as SFR is asking to Court to view the relevant question as a binary choice between

---

[11] Moreover, Warren Hill has sought leave to amend its Complaint to add, *inter alia*, a component of its breach of contract claim relating to SFR's breach of its duty of good faith and fair dealing.  SFR does not oppose Warren Hill's request to supplement its breach of contract claim in this regard.  The facts concerning ███████████████ ████████████████████ supports Warren Hill's proposed good faith and fair dealing argument, which further renders SFR's motion premature.

whether ████████████████████████████████████████.  In reality, however, Section 1.2(d) features a carefully crafted formula that is a hybrid of accrual-based and cash-based elements.  The parties did not agree to an "either/or" accounting metric at all, and ████████ ████████████████████████████████.[12]  Rather, the sophisticated parties to the MIPA negotiated and defined a formula for calculating payments owed to Warren Hill under Section 1.2(d).  The real question for the Court, therefore, is whether SFR complied with the formula specifically defined in Section 1.2(d) and the corresponding Schedule 1.2(d).  SFR did not.

### A.      SFR's Interpretation of Section 1.2(d) Is Again Unreasonable

Section 1.2(d) defines both "Revenue" and "Expenses."  Each definition has several sub-components, some of which are defined in a manner traceable to concepts of accrual accounting and some of which are traceable to concepts of cash accounting.  For instance, "Revenue" includes any and all "fees *earned*" in connection with VAP managing trusts, as well as all "fees *earned*" in connection with VAP providing services to third parties or affiliates. (*See* §§ 1.2(d)(i)(A) and 1.2(d)(i)(C)). Earning a fee (but not necessarily receiving payment for it) is an accrual concept. (Ex. 20, ████████; Ex. 3, Reape Dep. at 150:14-151:6.).  On the other hand, Section 1.2(d)(i)(D) embraces "revenues *received*."  Thus, Section 1.2(d) incorporates accrual concepts in Section 1.2(d)(i)(A), (C) and cash concepts in Section 1.2(d)(i)(D). This hybrid pattern holds true when evaluating the definition of "Expenses":  some expenses are pre-defined and fixed, meaning that SFR may deduct such expenses regardless of whether or when they are paid (*id.* § 1.2(d)(ii)(A)-(B) (pre-agreed operating expenses)); other expenses arise only to the

---

[12] Indeed, SFR fails to inform the Court that it did not even calculate the earnout based on the cash received by VAP. ███████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████. (Ex. 3, Reape Dep. at 154:7-155:2.)  These amounts must be included in the Section 1.2(d) earnout calculation because they constitute "revenue received."  (Ex. 1, MIPA § 1.2(d)(i)(D).) ████████████████████████ ███████████████████████████ (Ex. 23.) █████████████████████████ █████████████████████████

extent they are paid.  (*Id.* § 1.2(d)(ii)(C)-(D) (eligible deductions when "paid by VAP").)

  SFR's request ████████████████████████████████████ is inconsistent with the MIPA because Section 1.2(d) contains a specifically defined formula that the parties did not tether solely to "accrual" or "cash" concepts.  SFR is again asking the Court to re-write aspects of the contract.  If the parties wanted to define "Revenue" based solely on cash that came into VAP's operating accounts, they could have easily drafted Section 1.2(d) to say that: "Revenue is all money that is paid to VAP in a given year."  Given the nature of VAP's business, however, the parties instead negotiated a detailed formula to govern the Section 1.2(d) earnout.

  SFR's attempt to distance itself from this defined formula violates the interpretive principle that "when parties to the same contract use . . . different language to address parallel issues . . . it is reasonable to infer that they intend this language to mean different things." *Right Field Rooftops, LLC v. Chi. Cubs Baseball Club, LLC*, 870 F.3d 682, 690 (7th Cir. 2017) (quoting *Taracorp v. NL Indus.*, 73 F.3d 738, 744 (7th Cir. 1996)); *Christoph v. BCA, LLC*, 2008 U.S. Dist. LEXIS 94256, at *11-12 (N.D. Ill. Nov. 17, 2008); *Woods v. Elgin, Joliet & E. Ry.*, 2000 U.S. Dist. LEXIS 226, at *14 (N.D. Ill. Jan. 10, 2000).  In *Thompson v. Gordon*, for instance, the Illinois Supreme Court explained: "Because the parties used the term 'improvements' in section 2A of the contract, and used the term 'replacement' in section 2B of the contract, we presume that the parties chose the word purposefully, and will give effect to that language." *Thompson*, 241 Ill. 2d at 441.  In light of this, the Court held that "[i]t is clear the parties did not intend for the term 'replacement' to mean 'improvement.'"  *Id*.

  Likewise, here, Section 1.2(d) uses the term "earned" when addressing when *fees* should be included in "Revenue," but uses a different term, "received", when addressing when other revenue should be included.  SFR's interpretation, however, would give both these terms the

same meaning, interpreting both "earned" and "received" to mean "received", despite the parties' intentional use of distinct terms.  As in *Thompson*, this Court should "presume that the parties chose the word[s] purposefully" and therefore "did not intend for the term '[earned]' to mean '[received].'" *Thompson*, 241 Ill. 2d at 441.

Furthermore, 

(Ex. 3, Reape Dep. at 154:7-155:2.) Therefore, if Section 1.2(d) were interpreted to include fees only after ███████████ as SFR argues, Section 1.2(d)(i)(A) would be subsumed by Section 1.2(d)(i)(D). ███████████████

███████████████████████████

████████████ it would fall under the SFR's interpretation of Section 1.2(d)(i)(D). Thus, under SFR's interpretation, Section 1.2(d)(i)(A) and (C) are rendered meaningless.

This means that SFR's interpretation violates a third well-established principle of contract interpretation that "[a] court will not interpret a contract in a manner that would nullify or render provisions meaningless."  *Thompson*, 241 Ill. 2d at 441; *Atwood v. St. Paul Fire & Marine Ins. Co*., 363 Ill. App. 3d 861, 864 (2006); *Premier Title Co. v. Donahue*, 328 Ill. App. 3d 161, 166-67 (2002).  And significantly, Illinois courts have expressly held that, as a matter of law, "[a]n interpretation that renders a provision meaningless is not reasonable."  *Czapski v. Maher*, 2011 IL App (1st) 100948, ¶ 37 (2011); *Museum Pointe Condo. Ass'n v. Tower Residences Condo. Ass'n*, 2017 IL App (1st) 152929-U, ¶ 35 ("We find that Tower has not offered a reasonable interpretation of the easement agreement, because Tower's interpretation renders much of the language meaningless.").  Accordingly, SFR's interpretation that Section 1.2(d) ███████████████ is unreasonable as a matter of law.

B.      **SFR Fails to Evaluate the MIPA in its Entirety, Cherry-Picking One Line and Materially Misquoting Schedule 1.2(d) Instead**

To support its argument, SFR cherry-picks the phrase, "all Revenues are recognized when they are received by VAP and all Expenses are recognized when they are paid by VAP" from Section 1.2(d) and claims that, based on the words, "paid" and "received," VAP's "Net Income" ███████████████████████. This too is misleading because, as discussed, the definition of "Revenue," which leads off that sentence, includes "fees earned" ***and*** "revenue received."  When the contract is viewed as a whole—rather than looking at this phrase in isolation—it is clear that this phrase was not intended to exclude earned fees from "Revenue." *Thompson*, 241 Ill. 2d at 441 ("A contract must be construed as a whole, viewing each provision in light of the other provisions. The parties' intent is not determined by viewing a clause or provision in isolation, or in looking at detached portions of the contract.").

The phrase SFR relies upon must be interpreted in light of the definitions of "Revenue" and "Expenses," as well as Schedule 1.2(d), which was incorporated into the MIPA.  In the sentence following the one SFR identifies, the MIPA incorporates Schedule 1.2(d) to clarify how the earnout formula works in practice.  Consistent with the plain language of Section 1.2(d)(i)(A), Schedule 1.2(d) estimates the total amount of fees that VAP will accrue (*i.e.*, earn) as ██████ for each month of 2016 and includes those accrual figures in the Schedule 1.2(d) earnout calculation.  (Ex. 3, Reape Dep. at 240:20-241:9 ██████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████ Schedule 1.2(d) also includes the pre-defined and fixed expenses that SFR was permitted to use as offsets pursuant to Sections 1.2(d)(ii)(A) and (B).  *Id.* § 1.2(d)(ii)(A)-(B).  Thus, Schedule 1.2(d) confirms the plain language of Section 1.2(d)(i)(A) that "Revenue" includes all fees *earned*, *i.e.*, accrued, during the year: the

20

parties used Schedule 1.2(d) to estimate what this would look like.

This means that SFR's interpretation of "all Revenues are recognized when they are received by VAP" is in a direct conflict with Schedule 1.2(d).  SFR argues that this phrase should be interpreted to mean that "Revenue" █████████████████████████, but the schedule of the MIPA that "clarif[ies]" this phrase *does not* use strictly cash accounting. (Ex. 3, Reape Dep. at 240:20-241:9███████████████████ *See Mastrobuono*, 514 U.S. at 63 ("a document should be read to give effect to all its provisions and to render them consistent with each other."); *Roubik*, 285 Ill. App. 3d at 220 ("Another cardinal rule of contract construction is that a document should be read to give effect to all its provisions and to render them consistent with one another.")  In contrast, Schedule 1.2(d) is consistent with Warren Hill's interpretation of Section 1.2(d): the formula was specifically negotiated to include concepts of both accrual and cash concepts, which is precisely what flows through to Schedule 1.2(d).

Next, SFR ████████ what are referred to as scare quotes in Schedule 1.2(d), in a thinly veiled effort to explain away the irreconcilable conflict prompted by SFR's proposed interpretation.  *See* Bryan A. Garner, *Legal Writing in Plain English* 157 (2001) (explaining that scare quotes are used "when you mean 'so-called' or 'self-styled' or even 'so-call-but-not-really'".)  SFR argues that two of the entries in Schedule 1.2(d) read █████████████ and ████████████████   (Br. at 8.)  However, these entries actually read "Income **'when received'**" and "Expenses **'when paid**.'"  (Emphasis added to show language quoted in MIPA).)

This is significant because the scare quotes around "when received" and "when paid" indicate an "abnormal" usage of the phrases. *Grede v. Bank of N.Y. Mellon*, 598 F.3d 899, 900 (7th Cir. 2010) ("We put 'standing' in scare quotes because the usage is abnormal."); *United States v. Bartlett*, 567 F.3d 901, 910 (7th Cir. 2009) ("We put 'object' in scare quotes because

remonstration with the judge is not an objection as usually understood."); *IBM v. ACS Human Servs., LLC*, 999 N.E.2d 880, 889 n.5 (Ind. Ct. App. 2013) ("The term, scare quotes, convey the idea that what is labeled in quotes is 'so-called-but-not-really.'" (quoting Bryan A. Garner, *supra*)).  In other words, the parties did not intend "when received" and "when paid" to be used in the normal sense, *i.e.*, a strictly cash-based accounting for when fees were "received" or when expenses were "paid."  The parties appropriately used these scare quotes because the phrases "when received" and "when paid" were "self-styled," *Garner, supra*, and must be interpreted in light of the rest of the Schedule 1.2(d) (including accrued fees), as well as Sections 1.2(d)(i) and (ii), which incorporate both cash and accrual concepts.  Accordingly, the use of scare quotes around "when received" in Schedule 1.2(d) further demonstrates that the parties intended "Revenue" to include both cash and accrual concepts, which appears to be the reason that SFR ███████████████████, in a final attempt to re-write the MIPA.[13]

In sum, the only reasonable interpretation of Section 1.2(d) is that "Net Income" includes both cash and accrual concepts.  The plain language of the definition of "Revenue" includes both "fees earned" and "revenue received" and, therefore, this interpretation is the only one that gives meaning and effect to all sub-components of "Revenue."  Moreover, this interpretation is consistent with the phrase "Revenues are recognized when they are received by VAP" because when the MIPA is viewed in its entirety, particularly the "clarify[ing]" Schedule 1.2(d),  it is clear that this phrase is not intended to confine "Net Income" to strictly cash concepts.  Accordingly, Warren Hill's interpretation of the carefully negotiated Section 1.2(d) formula is consistent with the plain language of the MIPA and reasonable as a matter of law.

In contrast, SFR's interpretation—that "Net Income" is ███████████████—(1) is

───────────────

[13] ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████

contrary to the plain language of the contract, which includes "fees *earned*" within "Revenue"; (2) fails to give meaning and effect to the parties' intentional use of the two distinct terms, "earned" and "received"; (3) would write the "fees earned" provision, §1.2(d)(i)(A), out of the contract, rendering it meaningless; and (4) is contrary to Schedule 1.2(d), which provides a clear roadmap for calculating the earnout payment that is consistent with Warren Hill's interpretation of the formula set forth in Section 1.2(d). SFR's interpretation is thus patently unreasonable.

###    C.    SFR's Alleged ███████████████ Argument Is Meritless

Finally, SFR resorts to the frivolous argument that the court can consider extrinsic evidence at this stage.  (Br. at 8-10.)  SFR's argument again lacks merit for a bevy of reasons.

*First*, Illinois law is quite clear: ███████████████ evidence is "extrinsic to the contract."  *Kinesoft Development Corp. v. Softbank Holdings*, 139 F. Supp. 2d 869, 890 n.9 (N.D. Ill. 2001).  "The trial court may not consider extrinsic evidence outside the contract itself when the contract is unambiguous." *Tishman Midwest Mgmt. Corp. v. Wayne Jarvis, Ltd*., 146 Ill. App. 3d 684, 689 (1986); *Mach. Tool Tech. 21 v. United Grinding Techs*., 2003 U.S. Dist. LEXIS 4400, at *15 (N.D. Ill. Mar. 20, 2003) (holding that "any argument based on course of performance is also unavailing" because "[t]he court has determined that the parties' contract is unambiguous"); *Checkers, Simon & Rosner v. Lurie Corp*., 864 F.2d 1338, 1347 (7th Cir. 1988) (applying Illinois law) ("Because this term of the lease was unambiguous, its construction was a matter of law on which extrinsic evidence was not to be admitted.").

In an attempt to circumvent this precedent, SFR ███████████ *K's Merchandise Mart, Inc. v. Northgate Limited Partnership*, 359 Ill. App. 3d 1137, 1144 (2005).  In so doing, SFR shields the Court from the entire quote, which makes clear that the holding relates only to cases "involving the sale of goods" under the Illinois UCC.  *K's Merch. Mart, Inc*., 359 Ill. App. 3d at 1144.  This action does not involve the sale of goods and thus *K's Merchandise Mart* is

inapposite. SFR's reliance on *Kinesoft Development Corp.* fares no better, as the Court only looked to evidence of course of performance after finding that the parties' agreement was ambiguous.  There, the Court explained that the language of the parties' contract "creates an ambiguity," and thus, "the parties' course of performance is admissible to help to resolve the ambiguity identified in the 1997 Agreement."  *Kinesoft Dev. Corp.,* 139 F. Supp. 2d at 890. SFR's case law is inapplicable.

*Second*, even assuming *arguendo* that this evidence could be considered at this stage, the evidence that SFR relies upon is not even a ▮▮▮▮▮▮▮▮▮▮▮. SFR's argument is based upon on a singular incident—▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  (Br. at 9-10.)  However, where, as here, the alleged ▮▮▮▮▮▮▮ evidence "involved a single occasion for performance, and not repeated occasions for performance . . . the course-of-performance part of the parol evidence rule is inapplicable." *Arcor, Inc. v. Textron, Inc*., 1990 U.S. Dist. LEXIS 7101, at *1-2 (N.D. Ill. June 6, 1990); *Cent. Ill. Pub. Serv. Co. v. Atlas Minerals, Inc*., 965 F. Supp. 1162, 1176 (C.D. Ill. 1997) ("a single instance of conduct does not amount to course of performance.").

*Finally*, in any event, even assuming the Court could consider this extrinsic evidence, and even assuming that one instance could constitute a ▮▮▮▮▮▮▮▮▮▮, the evidence here weighs in favor of Warren Hill's interpretation.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, (Ex. 29); the parties intended Schedule 1.2(d) to be "updated" based on actual accruals as the year went on (Ex. 1, MIPA at Schedule 1.2(d) (referring to security holder report updates); SFR did not provide the full array of information needed for Warren Hill, (Ex. 2, Delaney Decl. ¶¶ 41-43); and Warren

Hill will present testimony that it never agreed to omit fees that VAP earned from the earnout payment simply because the fees were not paid yet (*id.* ¶ 40). If the Court were to decide that there is some ambiguity or conflict in Section 1.2(d), Warren Hill will present testimony on the *actual* intent and conduct of the parties after discovery closes.

## III.   SFR IMPROPERLY REFERENCES ISSUES RELATING TO SECTION 1.2(E)

SFR must make payments to Warren Hill relating to "Reserve Amounts" under Section 1.2(e). SFR does not cite or discuss Section 1.2(e) in its motion. However, at various points, SFR references alleged ███████████████████████████████████████

██████ ██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

SFR has not moved for judgment concerning ████████████████████████

████████. ██████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████. But, to avoid any doubt, there is no conceivable path SFR could traverse to win this issue at this stage because, *inter alia*, ████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████. Thus, even if the Court considers SFR to have raised issues relating to Section 1.2(e), SFR's motion should be denied, including because it is premature.

## **CONCLUSION**

For these reasons, Warren Hill respectfully requests that this Court deny SFR's Motion.

Respectfully submitted,

*/s/ Gregory S. Voshell*
Gregory S. Voshell
Thomas B. Helbig, Jr.
ELLIOTT GREENLEAF, P.C.
925 Harvest Drive, Suite 300
Blue Bell, PA 19422
(215) 977-1000

Dated: December 21, 2018                    *Counsel for Plaintiff Warren Hill, LLC*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on this date, I have caused a true and correct copy of the forgoing to be served upon each attorney of record via electronic mail, the Court's ECF system, and U.S. mail.

*/s/ Gregory S. Voshell*
GREGORY S. VOSHELL

Dated: December 21, 2018