**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

WARREN HILL, LLC,

                        Plaintiff,

v.

SFR EQUITIES, LLC,

                  Defendant.

No. 2:18-01228-HB

---

**PLAINTIFF WARREN HILL, LLC'S RESPONSE TO
DEFENDANT SFR EQUITIES, LLC'S STATEMENT OF UNDISPUTED FACTS**

---

ELLIOTT GREENLEAF, P.C.
925 Harvest Drive, Suite 300
Blue Bell, PA 19422
(215) 977-1000

Dated: December 21, 2018

*Counsel for Plaintiff Warren Hill, LLC*

Plaintiff Warren Hill, LLC ("Warren Hill"), through its undersigned counsel, hereby responds to the Statement of alleged Undisputed Facts that Defendant SFR Equities, LLC ("SFR") filed in support of its Motion for Partial Summary Judgment.  The Court's policies do not expressly call for a separate Statement of Facts, which SFR nevertheless filed in connection with its Motion.  In an effort to preserve its rights, and to avoid any impression that SFR's Statement of Facts is "undisputed" for purposes of Rule 56, Warren Hill has prepared the following responses with specific citation to the record.[1]

### RESPONSE TO SFR'S STATEMENT OF ALLEGED FACTS

1.      Gene Harris is one of three managers of the AHG Group ("AHG") and companies it owns.  AHG is a company based in Winter Park, Florida.  AHG, among other things, invests in real estate and other business.

**RESPONSE:**  Admitted.

2.      Over the years, AHG created numerous other companies that own and manage AHG's investments.

**RESPONSE:**  Admitted in part; disputed in part.  Warren Hill admits that AHG created SFR to serve as the entity that purchased Warren Hill's interest in Vendor Assistance Program, LLC.  Discovery is ongoing and Warren Hill lacks knowledge concerning, and therefore disputes, whether "numerous other companies" have been created to manage companies that are not relevant to this case.

---

[1] Warren Hill reviewed the Court's published decisions in connection with responding to SFR's separately filed Statement of Facts.  Warren Hill located only a few such decisions where the Court appeared to consider a separate factual statement and corresponding response.  *See A.G. v. Lower Merion Sch. Dist.*, 2012 U.S. Dist. LEXIS 140250, at *26 n.10 (E.D. Pa. Sep. 28, 2012); *Hlywiak v. AMTRAK*, 223 F. Supp. 3d 395, 396 n.2 (E.D. Pa. 2016); *Blunt v. Lower Merion Sch. Dist.*, 826 F. Supp. 2d 749, 752 n.1 (E.D. Pa. 2011). While these cases appear to represent the minority of the Court's summary judgment opinions, Warren Hill wanted to provide an appropriate response to SFR's statement for the Court's consideration.

3.      One such company is SFR Equities, LLC ("SFR").  Harris is one of three

Managers and the lead Manager of SFR.  As the lead Manager, he is responsible for SFR's day-

to-day operations.

**RESPONSE:**  Admitted in part; disputed in part.  SFR is managed by Mr. Harris together

with Mr. Alan Ginsburg, a billionaire real estate investor in Florida.  Mr. Harris testified that he

is the lead manager, but evidence adduced so far in discovery tends to show that Mr. Ginsburg

provides the financial backing to SFR.  (*See* Ex. 1, Member Interest Purchase Agreement at C-1

(guaranty of payment to Warren Hill of $1 million signed by Mr. Ginsburg, not Mr. Harris).)  At

this stage, therefore, Warren Hill disputes Mr. Harris' characterization of himself as the "lead"

manager.[2]

4.      Prior to 2016 SFR made a loan to CHGO Real Estate Consulting Group, LLC

owned by Brian Hynes or his family members that, in turn, owned an equity interest in Vendor

Assistance Program, LLC ("VAP").  VAP is a specialty finance company that earns fees for

managing trusts that purchase millions of dollars of receivables owed by the state of Illinois to its

vendors.  As a result, Harris generally became aware of VAP's business and knew some of its

principals prior to 2016.  SFR converted its debt to equity in CHGO effective January 1, 2016.

SFR also made a loan to a VAP affiliate, Healthcare Finance, LLC in 2015.

**RESPONSE:**  Admitted in part; disputed in part.  By way of further response: (1)

Warren Hill agrees that VAP is a specialty finance company; (2) Warren Hill further agrees with

SFR's admission in this Paragraph that "**VAP** . . . **earns fees** for managing trusts[;]" (emphasis

added); and (3) while Warren Hill was unaware at the time of the loan made by SFR to CHGO,

Mr. Harris testified that such loan did in fact occur and there is no evidence in the record yet to

---

[2] The parties had been negotiating the deposition of Mr. Ginsburg, with SFR suggesting
that the deposition be taken via written question.  Warren Hill is considering that proposal.

contradict this testimony (*see* Ex. 5, Harris Dep. at 58:2-59:24.) Warren Hill lacks knowledge concerning, and therefore disputes, whether a loan was made to Healthcare Finance, LLC. Discovery is ongoing in this case, and Warren Hill will supplement this response if/when new documents or testimony address the issue.

     5.     In 2015, Harris learned that Warren Hill, LLC ("Warren Hill"), also an investor in and lender to VAP, wished to sell its approximate 1/3 interest in VAP to a new investor.

     **RESPONSE:** Admitted.

     6.     Negotiations between SFR and Warren Hill started in 2015 and dragged on for months.  Harris negotiated with Jim Delaney representing Warren Hill and, at times, its attorney Louis Ballezzi, Esquire.  The negotiations finally resulted in a written Membership Interest Purchase Agreement ("MIPA") between the patties that was signed on or about February 17, 2016, but took effect on January 1, 2016.

     **RESPONSE:** Admitted in part; disputed in part.  Warren Hill admits that negotiations between the parties began in 2015 and continued until February 2016.  Warren Hill further admits that it was represented by Mr. Delaney and counsel in connection with the negotiations. Warren Hill admits that the negotiations resulted in the MIPA.  Warren Hill disputes that the negotiations "dragged on" as the parties were negotiating.  (*See* Ex. 2, Declaration of Jim Delaney ("Delaney Decl.") ¶¶ 28-40 (explaining complex nature of the detailed negotiations).)

     7.     Under the MIPA, Warren Hill sold its 33.246% of the member interests of VAP (collectively the "Interests") to SFR effective January 1, 2016.

     **RESPONSE:** Admitted.

8.      As part of the consideration for the purchase of the membership interests in VAP from Warren Hill, SFR agreed to pay an earn out, based on revenue earned by VAP in 2016, 2017, and 2018 as follows [block quotation from MIPA omitted].

**RESPONSE:** Admitted in part; disputed in part. Warren Hill admits that the MIPA includes Section 1.2(d), which the parties have referred to as the earnout provision. Warren Hill disputes SFR's characterization of the contents of that provision. Section 1.2(d) bases the earnout payments on the definition of "Net Income", which itself is broken down into "Revenue" and "Expenses," both of which are specifically defined terms. The "Revenue" to be included in the earnout payment encompasses, *inter alia*, "any and all **fees earned** by VAP in its capacity as a manager or an administrator" of trusts relating to the business at issue **and** "any and all other revenues **received** by VAP other than the Reserve Amounts," which were separately defined and accounted for in Section 1.2(e). (*See* Ex. 1, MIPA at § 1.2(d)(i)(A), (D) (emphases added); *compare id.* to § 1.2(e) (addressing "Reserve Amounts").) Thus, the specifically negotiated definition of "Revenue," which is the backbone of the earnout provision, explicitly includes fees earned (which fees may not necessarily be paid to VAP in the form of cash until sometime after they have been earned), **as well as** other revenue that was received by VAP during the years in question. (*See* Ex. 1, MIPA at § 1.2(d)(i)(A), (D).)

9.      The MIPA contains an integration clause [block quotation omitted in light of admission].

**RESPONSE:** Admitted.

10.      The MIPA is governed by Illinois law [block quotation omitted in light of admission.]

**RESPONSE:** Admitted.

4

11.     The MIPA contains a schedule, Schedule 1.2(d) that, "for purposes of clarity . . . illustrates an example of the calculation and payment of VAP's Net Income allocable to the "Interests".

**RESPONSE:**  Admitted.   By way of further response, SFR principal Gene Harris testified that Schedule 1.2(d) was incorporated into the Agreement.  (Ex. 5, Harris Dep. at138:8-139:20, 189:11-22.)

12.  Schedule 1.2(d) was prepared by Jim Delaney on behalf of Warren Hill and is set forth on a spreadsheet he prepared.

**RESPONSE:**  Disputed.  Schedule 1.2(d) is a component of the MIPA, which was the product of negotiation between SFR and Warren Hill.  (Ex. 2, Delaney Decl. ¶¶ 28-40.) Moreover, the CEO of VAP, David Reape, provided input for the Schedule.  (See Ex. 5,  Harris Dep. at 128:15-130:20; Ex. 29 (correspondence from Mr. Delaney to Mr. Harris alerting him to the fact that the Schedule was being prepared in conjunction with VAP's CEO Mr. Reape).  Mr. Harris agreed to the form and content of the Schedule when he signed the MIPA on behalf of SFR.  (Ex. 5, Harris Dep. at 138:8-139:20, 189:11-22.)

13.     Schedule 1.2(d), MIPA at 18 states:  "Income when received"; "Expenses when paid" and is calculated on a cash, not an accrual basis.

**RESPONSE:**  Disputed. SFR has misquoted Schedule 1.2(d) in a material way.  The actual Schedule reads "Income **'when received'**" and "Expenses **'when paid.'**" (Emphasis added to denote phrases actually in quotation marks.)  As set forth in Warren Hill's responsive brief, this is a factually and legally significant distinction, as the placement of the quotation marks signifies that the terms "when received" and "when paid" carry a specific connotation under the terms of the agreement.  (*See* Warren Hill Br. at Argument § II.B.)  Moreover,

Schedule 1.2(d) is not calculated on a "cash" basis—rather, Section 1.2(d) features a formula that is a hybrid of accrual-based and cash-based elements.  (*See* Warren Hill Br. at Argument § I.A-C (detailing relevant terms of MIPA, including Schedule 1.2(d).)

14.     When the parties, in early 2017, calculated the earn out for calendar year 2016 (the first year for which an earn out was due under the MIPA) the earnout was calculated based on cash income paid to VAP in calendar year 2016, not on an accrual basis.

**RESPONSE:** Disputed.  In the run-up to the first earnout payment, Warren Hill sought information about VAP's financial performance from Mr. Reape, who provided Warren Hill with a limited amount of information. (Ex. 2, Delaney Decl. ¶¶ 41-42.)  Mr. Reape subsequently informed Warren Hill that his business partners were upset with him for having shared that information. (*Id.* ¶ 44.)  Warren Hill used that limited information to create a spreadsheet relating to 2016 and shared that spreadsheet with SFR. (*Id.* ¶ 43.)  When SFR responded to the spreadsheet, it provided comments relating to expenses that it planned to deduct when calculating the first earnout payment, but SFR did not supplement the spreadsheet with VAP's earned fees to the extent they were not already listed in the spreadsheet. (*Id.* ¶ 45.)   During the following weeks, SFR and Warren Hill corresponded about SFR's stated intentions (from which it ultimately relented) to take ineligible deductions for amounts relating to purported expenses that were not permitted to be included in the earnout calculation. (*Id.* ¶ 47.)   At no time during this correspondence did Warren Hill ever agree that earned but unpaid fees would be excluded from "Revenue", as defined in Section 1.2(d), or that the formula set forth in Section 1.2(d), which includes both cash and accrual concepts, was instead calculable on a strictly cash accounting basis.  (*Id.* ¶ 35-40.)

Warren Hill further disputes that SFR based the earnout on "cash income," as SFR used a figure of just $6.1 million, whereas VAP actually received approximately $15 million in cash during 2017.  (*Compare* Ex. 23 *with* Ex. 8, Confirmation Request (difference between VAP's fees earned column and outstanding column representing paid amount of approximately $15 million); Ex. 3, Reape Dep. at 170:18-173:13 (explaining VAP's confirmation requests and detailing differences between the columns therein); *see also id.* at 154:7-159:20 (explaining that VAP received at least $14.385 million in 2017).)

15.     In early 2017, SFR received a spreadsheet (attached to Harris Dec. at Exhibit B) from Jim Delaney acting on behalf of Warren Hill calculating the 2016 earn out on a cash basis. The spreadsheet is in a form similar to the spreadsheet Delaney also prepared that is attached as Schedule 1.2(d) to the MIPA.

**RESPONSE:**  Disputed.  Warren Hill incorporates its response to Paragraph 14 as though set forth fully herein.

16.     SFR paid the 2016 earn out to Warren Hill in the amount of $675,924 in two installments on March 17 and March 29, 2017 on a cash basis based on revenue received and expenses paid in 2016.   Warren Hill accepted the earn out payments and never questioned the cash basis of the payments until after this litigation began.

**RESPONSE:**  Disputed.  Warren Hill incorporates its response to Paragraph 14 as though set forth fully herein.  By way of further response, the operating expenses used to calculate the 2016 earnout were based on the predefined, fixed operating expense allowances set forth in Section 1.2(d)(ii), not on VAP's actual cash operating expenses as SFR asserts.  (Ex. 1, MIPA § 1.2(d)(ii)(A)-(B).)

17.     Brian Hynes is the founder of Vendor Assistance Program, LLC ("VAP").  He founded VAP in 2010 and has been continuously involved in its management since that time.  He is also the manager of CHGO Real Estate Finance, LLC ("CHGO").  CHGO is a member of VAP.

**RESPONSE:** Admitted in part; disputed in part.  Warren Hill admits that Mr. Hynes was a founder of VAP in or around 2010, that Mr. Hynes is a manager of CHGO, and that CHGO is a member of VAP.  Warren Hill disputes that Mr. Hynes has been "continuously involved" in the management of VAP since its inception.  From 2012 through Warren Hill's sale of its interest in VAP, the operational day-to-day role was handled primarily by Mr. David Reape and/or Mr. Jason Cannon. (Ex. 2, Delaney Decl. ¶ 17.) Further, evidence adduced thus far suggests that Mr. Hynes does not currently have any meaningful day-to-day role at VAP or its affiliates.  (Ex. 6, *Compare* Ex. 30 (allocating 80% of Mr. Hynes' time—referred to on page 2 of Exhibit as "BFH" for Brian Hynes—to BCM) *with* Ex. 6, Hynes Dep. at 77:9-13 (testifying that he could not think of anything he was asked to do on a day-to-day basis at BCM).)

18.     Hynes is active in Illinois politics and is an attorney admitted to practice law in Illinois.  He is also a business man residing in Puerto Rico.  He was deposed in this case on October 17, 2018.

**RESPONSE:** Admitted in part; disputed at this stage in part.  Warren Hill admits that Mr. Hynes is a lobbyist in Illinois, that he has many political ties within Chicago politics, that he is an attorney at Howard & Howard, and that he described himself as a businessman. At this stage, Warren Hill lacks information sufficient to determine whether Mr. Hynes "resides" in Puerto Rico.  While Mr. Hynes does claim to have a residence there, it is unclear at this stage of discovery whether Mr. Hynes meets the legal requirements for residency.

19.     Hynes is one of VAP's six managers.  Hynes has been a manager of VAP since he founded it in 2010.  VAP's Operating Agreement stating that VAP's business shall be conducted by a majority vote of its Board of Manages at Article III, Sec. 3.1 is attached to the Hynes Dec. at Exh. "C."  No single member of VAP controls VAP.  SFR is a member of VAP and was entitled to appoint one Manager of VAP, Gene Harris.

**RESPONSE:**  Admitted in part; disputed in part. Warren Hill admits that VAP has six managers, it admits that VAP has an Operating Agreement, and it admits that the Operating Agreement provides that business will be conducted by a majority vote.

Warren Hill disputes that no single member controls VAP.  VAP's six person board of managers is, in fact, controlled by SFR and its principal, Mr. Harris, and by CHGO and its principal, Mr. Hynes, as described below.  CHGO, the entity through which Mr. Hynes holds his stake in VAP and in which SFR holds a 50% equity interest, can appoint two members of the VAP board.  (Ex. 5, Harris Dep. at 67:13-21.)  CHGO appointed Mr. Hynes and his friend, Malcolm Weems, to those two board seats.  (*Id.*)  In addition, SFR can directly appoint one member to VAP's board, and it appointed Mr. Harris to that seat.  (*Id.* at 68:5-8.)  Mr. Hynes' law firm Howard & Howard also has a seat on the board.  (*Id.* at 68:9-17; Ex. 31, Board of Managers Chart).  Mr. Reape sits on the Board.  (Ex. 5, Harris Dep. at 68:18-21.)

The holders of the five board seats described above select the sixth and final board member by majority vote (Mr. Hynes and Mr. Harris together control the majority).  (*Id.*, at 68:22-25.)  Thus, five of the six members of the board are directly affiliated with Mr. Hynes and Mr. Harris (CHGO's two seats, SFR's seat, Howard & Howard's seat, and the seat filled by the majority).  (*Id.* at 67:13-21, 68:5-25, 209.)  Internal documents obtained through discovery by Warren Hill go so far as to explicitly aggregate the ownership interests of SFR and Mr. Hynes'

company, showing that they command approximately 80% of the equity ownership interest in

VAP and the alleged affiliates of VAP at issue in this case.  (Ex. 32, Spreadsheet Displaying

Combined Ownership.)  Mr. Harris conceded that all of these individuals were "affiliated."  (Ex.

5, Harris Dep. at 69:12-70:19.)

20.     In late 2016, VAP's Board of Managers, including Hynes, learned that the Federal

Government issued new lender risk retention regulations, 12 CFR sec. 244.1, et seq., that would

affect VAP's business.  As a result of the passage of those regulations, VAP would have to retain

a 5% interest in all future securitization transaction in which VAP was the certificate holder.  In

2016 and 2017 VAP was the certificate holder for numerous trusts financing millions of dollars

of receivables owed to vendors by the State of Illinois.

**RESPONSE:**  Admitted in part; disputed in part, including as to the legal conclusions

embedded in the alleged "fact."  Warren Hill admits that VAP was the trust certificate holder for

trusts associated with VAP's business.  Warren Hill further admits that certain regulatory

changes **may** have impacted **VAP's** risk retention obligations, depending on how VAP chose to

conduct its business, and this topic may ultimately be the subject of expert testimony at a later

stage in the case.

Warren Hill lacks knowledge concerning, and therefore disputes, the timing of when

individuals associated with VAP "learned" of these regulations.  There is no contemporaneous

evidence supporting the assertion of when VAP's members learned of the new regulations or

vetted compliance with counsel.   The only written evidence on the issue was actually a

memorandum drafted by Mr. Reape (VAP's CEO) **after** this litigation was initiated, which was

later shared with counsel for SFR and produced as manufactured "evidence" by SFR in this case.

(*See* Ex. 3, Reape Dep. at 214:6-215:9; *see also* Ex. 33 (screen shot showing that the date the memorandum was created occurred after this litigation was filed).)

21.     After consulting with legal counsel, VAP's members decided to create a new affiliate, Bluestone Capital Markets, LLC ("BCM") as a vehicle to comply with the new risk retention regulations.

**RESPONSE:** Disputed, including as to the legal conclusions contained therein (*i.e.*, the conclusion that BCM was needed to "comply" with new regulations). Warren Hill (1) disputes that VAP needed to create BCM, or any affiliate, to "comply" with new risk retention regulations; and (2) disputes that the alleged need to "comply" with new regulations was the true motivation for creating BCM.

As to the first point, the new risk retention requirements did not, as a matter of law, require VAP to create a new entity for purposes of compliance, and SFR proffers no argument in its Statement of Facts or Memorandum of Law to suggest otherwise. VAP itself could have simply fulfilled the roles that SFR claims BCM was created to fulfill.  Indeed, the creation of BCM as a separate entity complicated the attempted compliance with the risk retention regulations cited by SFR because SFR and VAP had to ensure that the ownership of BCM was held by the same members, and in the exact same proportions, as the ownership of VAP.  (*See, e.g.,* SFR's Motion at Mr. Hynes Declaration at Ex. F, Risk Retention Agreement at 4, 6 (a risk retention agreement between Barclay Capital Inc. and VAP in which the sole representation and warranty required of VAP (§2(b)) states that BCM "is owned by the same persons, who have the same proportionate interests therein, as [VAP]" and the sole covenant required of VAP (§3(b)) provides that "the representation and warranty set forth in Section 2(b)" must remain true for the duration of the agreement and that BCM "shall not transfer or otherwise dispose of any interest

in the certificate referred to therein to any person other than [VAP] without the consent of [Barclay Capital Inc.]").)

As to the second point, Warren Hill has adduced substantial evidence already (even though discovery is still ongoing) to show that BCM was created for the express purpose of funneling money out of VAP to support SFR's effort to depress the amount of money it owed to Warren Hill under the terms of the MIPA.  Specifically:

(1) BCM was created by SFR's counsel and was domiciled as a Florida company (just like SFR) (*See* Ex. 5, Harris Dep. at 197:10-17, 199:23-200:1; Ex. 3, Reape Dep. at 210:16-211:16.)

(2) BCM has the exact same members as VAP and each member holds the same relative ownership in BCM as it does in VAP, (a) meaning that those members receive the same return on investment in BCM as they would have from VAP if BCM had never been created and (b) meaning that only SFR could possibly benefit from the "transfer" of the trust certificates in that SFR would later argue that sums associated with the transferred certificates would not be subject to the earnout provisions in the MIPA (Ex. 5, Harris Dep. at 197:10-25; *see also* Ex. 31, BCM Ownership Chart);

(3) SFR took the lead in creating BCM and Blue Stone Finance, LLC ("BSF") and took the lead in preparing initial drafts of how fees that VAP had earned, and would continue to earn, would be internally reallocated among VAP, BCM, and BSF (Ex. 21 (email from Mr. Harris of SFR taking lead in allocating responsibilities among new companies); Ex. 30 (same)) ;

(4) ultimately, at SFR's insistence, approximately 80% of VAP's earned fees were "allocated" to BCM and BSF (Ex. 21 (reallocating—without any analysis—more than $50 million of VAP's earned fees to BCM and BSF));

(5) indeed, despite the fact that BCM had just been created in March 2017, Mr. Harris—SFR's alleged "lead manager"—allocated to BCM more than $20 million of fees that VAP had already earned over the course of several years, (*id.*);

(6) SFR led the charge to allocate funds to BCM and BSF, and from the outset SFR was focused on "profitability" among the three affiliated entities when deciding how much revenue should be reallocated from VAP to each of BCM and BSF and also the prospect of making a "presentation" to the IRS (Ex. 3, Reape Dep. at 287:18-288:14; Ex. 4, Wilson Dep. at 175:4-177:21; Ex 30 (Mr. Harris taking first draft of dividing responsibilities with focus on "profitability"); Ex. 34 (Mr. Harris advocating papering up the re-allocations in anticipation of IRS review).)

(7) BCM received significant monetary allocations despite there not having been much "activity" in the entity and even though Mr. Hynes, who was supposed to be dedicating the majority of his time to BCM, could not think of a single thing he did for BCM on a given day (Ex. 22 (email admitting lack of activity in BCM); Ex.6, Hynes Dep. at 77:9-13);

(8) no one affiliated with VAP conducted studies—such as "transfer pricing studies"—to value (a) the trust certificates when they were effectively gifted to BCM or (b) the alleged "services" that BSF and BCM were supposed to provide to VAP (Ex. 3, Reape Dep. at 202:15-23; Ex. 4, Wilson Dep. at 65:15-66:10, 71:23;  Ex. 5 Harris Dep. at 231:18-233:8.)

(9) VAP received nothing of value in connection with transferring the trust certificates to BCM—the very resolutions that approved the transfers provide that, in exchange for transferring valuable trust certificates to BCM, VAP would merely be allowed to retain certain fees **to which it was already entitled** under the terms of the various management agreements (*see* Warren Hill Resp. to ¶ 30, *infra*);

(10) in new deals consummated after the creation of BCM, VAP and SFR sought to set the fees that VAP earned to have zero value, instead shunting the economic benefit of such transactions to the ultimate holder of the underlying trust certificates (BCM), following which, SFR would later claim that VAP earned no fees from such trusts that could be included in the earnout payment owed by SFR to Warren Hill (Ex. 3, Reape Dep. at 136:15-20); and

(11) the "Services Agreement" between VAP and BCM is set to expire on the last day of final year of the earnout period (Ex. 27, VAP-BCM Services Agreement at 1).

Discovery is still ongoing, and additional documents have been sought from SFR that Warren Hill expects will further confirm that SFR pushed to create BCM and BSF not to comply with risk retention regulations, but instead to funnel away and hide fees earned by VAP as a means of depressing the amounts SFR would later claim to owe Warren Hill.

22. On or about March 15, 2017, SFR on behalf of certain members of VAP, filed Articles of Organization for BCM with the Florida Secretary of State. A true and correct copy of the electronic Articles of Organization for BCM attached [sic] to the Hynes Declaration as fully as though [sic] set forth at length as Exhibit "D" [sic].

**RESPONSE:** Admitted. By way of further response, Warren Hill admits that SFR, using its counsel in Florida, created BCM in March 2017, just days after Warren Hill inquired about the first earnout payment owed by SFR to Warren Hill. (Ex. 2, Delaney Decl. ¶¶ 41-42.)

23. The members of BCM entered into an Operating Agreement for BCM dated March 15, 2017 attached to the Hynes Declaration as though set forth at length as Exhibit "E".

**RESPONSE:** Admitted in part; disputed in part. Warren Hill admits that there is a BCM Operating Agreement. Warren Hill disputes the suggestion that such operating agreement makes SFR's treatment of BCM with respect to SFR's obligations under the MIPA somehow

14

appropriate and disputes the suggestion that BCM is a separately existing company from VAP—

the evidence adduced thus far in discovery shows that BCM is nothing more than a shelter for, or

alter ego of, VAP.  (*See* Warren Hill Br. at Argument § I.C).

24.　　VAP entered into a series of risk retention agreements with Barclay's Bank for

trusts that VAP manages and for which VAP held trust certificates.  The trust certificates entitled

the certificate holders to residual income from each trust.  The risk retention agreements (one of

which is attached to the Hynes Dec. at Exhibit "F") entered into by VAP after the new

regulations took effect, identify BCM as an affiliate that is the sole owner of the trust certificate

issued pursuant to each trust agreement, and confirm that BCM is owned by the same persons, in

the same proportionate interest therein, as the owners of VAP.  As a result of the entering into

the risk retention agreements, VAP complied with the new federal risk retention regulations.

**RESPONSE:**  Admitted in part; disputed in part.  Warren Hill admits that VAP entered

into risk retention agreements and that it transferred valuable trust certificates to BCM.  Warren

Hill disputes that these transfers were necessary or legal, for the reasons Warren Hill articulates

in its responses to Paragraphs 21- 23 and 30, which responses Warren Hill incorporates herein.

25.　　VAP transferred all its trust certificates to BCM, and all new trust certificates

were created in the name of BCM.

**RESPONSE:**  Admitted in part; disputed in part.  Warren Hill admits that VAP, at SFR's

insistence, transferred valuable trust certificates to BCM.  Warren Hill disputes that these

transfers were necessary or legal, for the reasons Warren Hill articulates in its responses to

Paragraphs 21-23, and 30, which responses Warren Hill incorporates herein.

26.　　On or about March 13, 2017, Hynes filed a certificate of formation of a limited

liability company with the government of Puerto Rico creating a new limited liability company

called Blue Stone Finance, LLC ("BSF") 1315 Ashford Avenue PH1 San Juan, PR 00907 for the "purpose of transacting any and all lawful business for which limited liability companies may be organized under the General Corporations Law for the Commonwealth of Puerto Rico."

**RESPONSE:**  Admitted in part; disputed in part.  Warren Hill admits that in March 2017, SFR and Hynes spearheaded the creation of BSF in Puerto Rico.  Warren Hill denies that the company was, in fact, created to conduct generic lawful business.  At this stage of discovery, Warren Hill has adduced significant evidence to show that BSF was created so that (1) certain members of VAP could avoid paying federal income taxes and (2) SFR could funnel even more money out of VAP that SFR would later claim (incorrectly) to be excludable from the earnout provisions of the MIPA.

Specifically, BSF has only a handful of employees and consultants, who previously worked directly for VAP until they were re-branded as BSF "employees" or "consultants".  (Ex. 3, Reape Dep. at 273:20-277:7.)  Even though BSF was not operating until November 2017, Mr. Harris—SFR's lead manager—allocated approximately $30 million of VAP's earned fees to BSF as of October 31, 2017.  (Ex. 5, Harris Dep. at 167:6-9; Ex. 21 (showing allocations "as of October 31, 2017").)  Moreover, even though BSF was supposedly providing services to VAP as of November 2017, the services agreements between the two entities were not executed until on or about January 28, 2018. (Dkt. No. 38, SFR Motion, Hynes Decl. ¶ 15.) This also happens to be the very day that a Puerto Rican bank flagged suspicious wire transfers between VAP and BSF that occurred at the very end of 2017.  (*Compare  id. with* Ex. 36-37 (Banco Popular flagging as suspicious series of wire transfers between VAP and BSF).)

Those suspicious wire transfers—which occurred between December 27 and 29, 2017— included an aggregate of approximately $6.8 million in wire transfers from VAP to BSF's bank

in Puerto, and then a corresponding aggregate of $6.8 million in transfers from BSF back to VAP the next day.  (Ex. 36.)  When questioned why the funds merely touched down in Puerto Rico for a day at the end of the 2017 tax year, BSF represented to the Puerto Rican bank that the transfer from VAP to BSF was the result of VAP paying for services that BSF rendered to VAP during 2017.  (*Id.* (showing draft response); *see also* Ex. 37 (showing that draft response was indeed sent).)  The transfer of the money back to VAP, according to BSF, was a supposed loan.  (*Id.*; *see also* Ex. 4, Wilson Dep. at 257:6-9 (discussing response to bank representative, testifying that the loan was "working capital" for VAP, but resorting to "I don't know" response when questioned on why VAP would need "working capital" if VAP's work was allegedly being completed by Bluestone.)  These representations to the bank were false for a host of reasons, including the fact that BSF never provided VAP with an applicable invoice (contrary to BSF's statement to the bank) (Ex. 5, Harris Dep. at 322:22-323:2) and that the circumstances of the supposed "loan" from BSF to VAP were so dubious that BSF's CFO could only guess at the supposed purpose for such loan under oath.  (Ex. 4, Wilson Dep. at 258:8-12).  Indeed, the supposed "loan" was not even papered up until months later.  (*Id.* at 257:6-16.)

Furthermore, as set forth in Warren Hill's Responsive Brief, SFR and BSF actually disagree about the nature of the relationship between VAP and BSF, with SFR characterizing it as involving an "assignment" and VAP and BSF referring to the relationship as a "customer" or "subcontracting" arrangement.  (*See* Warren Hill Br. at Argument § I.B.2.)

While discovery is ongoing, Warren Hill has already adduced facts to show that BSF was not created for lawful purposes, that it was created to again assist SFR in evading its responsibilities under the MIPA, and that SFR and BSF do not even agree on the nature of the relationship between BSF and VAP.

17

27.     The members of BSF entered into an Operating Agreement for BSF on or about September 5, 2017 and it is attached to the Hynes Declaration as Exhibit "H".

**RESPONSE:**  Admitted in part; disputed in part.  Warren Hill admits that there is a BSF Operating Agreement.   Warren Hill disputes the suggestion that such operating agreement makes SFR's treatment of BSF with respect to SFR's obligations under the MIPA somehow appropriate and disputes the suggestion that BSF is a separately existing company from VAP— the evidence adduced thus far in discovery shows that BSF is nothing more than a shelter for, or alter ego of, VAP.  (*See* Warren Hill Br. § I.C.)

28.     On or about September 8, 2017, the Boards of BCM and BSF each signed unanimous written consent resolutions ratifying the Articles of Organization that were filed earlier in the year in March, 2017 and ratifying and approving the Operating Agreements for both companies.  True and Correct copies of the written Consent Resolutions are attached to the Hynes Declarations as fully as though set forth at length [sic] as Exhibits "I" and "J."

**RESPONSE:**  Admitted.

29.     In September and October, 2017 the Boards of VAP and BCM entered into a series of Consent Resolutions attached hereto as Exhibits "K, L, M, N, O and P" respectively transferring all the trust certificates in which VAP maintained a residual interest to BCM.  These transactions were approved by VAP's lender, Bridgeview Bank, which held a security interest in the Certificates as collateral for a loan to VAP.  As a result of these transactions, BCM, holds the trust certificates which will produce residual income for BCM in the future.  As a result of these transactions, VAP no longer holds any interest in the trust certificates and was no longer entitled to any revenue derived from them.  Hynes Decl. ¶ 13.

**RESPONSE:**  Admitted in part; disputed in part.  Warren Hill admits that the trust certificates were transferred, but disputes the legality of the transfer, including for the reasons set forth in its response to Paras. 21-23, and 30.  Warren Hill also disputes the claim that VAP no longer holds any interest in the certificates, including because the value of the trust certificates are allocable to the interest that BCM's beneficial owners hold in VAP (*see* Warren Hill Br. at § I.B.3) and because of the alter ego nature of VAP and BCM (*id.* at § I.C).

30.     In the written "Consents of Managers" attached hereto as exhibits "K", "M" and "O" the Managers of VAP stated, among other things:

> "**WHEREAS,** the Members of VAP have created Bluestone Capital Markets, LLC, a Florida limited liability company ("**Bluestone**"), and the Managers of VAP and Bluestone wish to reorganize the business and assets of VAP and Bluestone to result in (a) VAP retaining responsibility for the Trust in exchange for the Fees, and (b) Bluestone holding the Trust Certificate and all interests therein (collectively the "**Reorganization**");

> **WHEREAS,** the Managers deem that the Reorganization is in VAP's best interests because it will permit the respective rights and responsibilities of VAP and Bluestone with respect to the Trust to be more appropriately aligned and will result in more clarity in the marketplace and certain economic and administrative advantages and effectiveness."

The Managers of BCM executed resolutions attached to the <u>Hynes Decl.</u> as Exhs "L", "N" and "P" containing similar language.

**RESPONSE:**  Admitted in part; disputed in part.  Warren Hill admits that the resolutions contain the quoted recitals, among others.  Warren Hill disputes that those recitals or the resolutions themselves alter SFR's obligations under the MIPA, as it relates to the transfer of the trust certificates.  The plain language of the first quoted recital confirms that VAP received nothing of value in exchange for the "transfer" of the trust certificates.  While the first quoted

recital is structured to look like an "exchange," the "reorganization" described therein is manifestly not an exchange between VAP and BCM.

Instead, under the supposed reorganization, VAP seemingly gifts the valuable trust certificates to BCM without receiving any consideration of value in return.  According to quoted language, VAP allegedly abandons the economic value of the trust certificates while retaining its existing responsibilities to the applicable trusts "in exchange for the Fees."  However, review of the immediately preceding recital in the applicable exhibits reveals that the referenced "Fees" are the fees that VAP already earns under its various management agreements with applicable trusts. VAP, and only VAP, earns fees for managing the trusts at issue.  (Ex. 3, Reape Dep, at 119:23-121:16, 170:18-173:13, 180:21-181:19.)

In summary, under this supposed "reorganization," VAP (1) retains its existing responsibilities, (2) loses valuable trust certificates, and (3) continues to earn fees that it was already entitled to.  In other words, VAP is supposedly abandoning assets while receiving nothing of value in return.  Moreover, VAP remained as the only entity guaranteeing performance of the management agreements relating to the applicable trusts.  Thus, as to existing trusts, VAP received nothing of value for transferring the trust certificates, yet it remained the ultimate obligor under the terms of the management agreements.  (Ex. 5, Harris Dep. at 205:6-207:20.)  Further, for certain new trusts that were created after these resolutions, the "Fees" referred to in the quoted language were set to a value of zero (0).  (Ex. 3, Reape Dep. at 136:15-20.)  In those instances, the entirety of the economic value of such transactions was held in the form of the applicable trust certificates.   (Ex. 5, Harris Dep. at 210:19-212:7.)

Evidence adduced so far in discovery suggests that the supposed "reorganization" referenced in the quoted recitals was, in fact, a scheme by SFR to shunt valuable assets (*i.e.*, the

trust certificates) from VAP without compensation so as to wrongfully deflate the amounts that

SFR would later claim it may owe to Warren Hill.

31.     On or about January 28, 2018 each of the VAP, BSF and BCM Boards approved a

series of services agreements to document services BSF already was performing for BCM and

VAP in connection with the Trusts managed by VAP beginning on or about November 1, 2017.

Attached to the Hynes Declaration as Exhibits "Q", "R" and "S" are three written consent

resolutions of the Boards of Managers of VAP, BSF and BCM adopting and ratifying drafts of

the services agreements.  Hynes Dec., at ¶ 14.

**RESPONSE:**  Admitted in part; disputed in part.  Warren Hill admits that the services

agreements were approved on or about January 28, 2018.  Warren Hill disputes that BSF was

performing the services because (1) VAP's disclosures to the State of Illinois indicate that VAP

(and not BSF) is performing various services that are supposedly to be performed by BSF under

the applicable services agreements (VAP Disclosures,[3] at 97 (representing work as performed by

VAP), (2) evidence adduced so far in discovery reveals that the supposed assignments or

subcontracting from VAP to BSF are prohibited by the Program Terms governing the VPP and

the VSI, as well as by applicable management agreements (Warren Hill Br. § I.B.2), and (3)

Warren Hill contends that VAP, BSF, and BCM are essentially the same company under an alter

ego theory (*id.* § I.C).

32.     Despite Hurricane Maria, BSF found office space in Puerto Rico, hired and

moved several former VAP employees, and one former AHG employee, to Puerto Rico, and

---

[3] These disclosures were used as Warren Hill Deposition Exhibits 96 and 97, but due to
their volume, Warren Hill directs the Court to the online version.  (Ex. 5, Harris Dep. at 100:22-
101:17);     Illinois     Comptroller     Website,     VAP     Disclosures,     *available     at*
https://illinoiscomptroller.gov/comptroller/assets/File/QualifiedPurchaserMonthlyReports/2018/
October/VendorAssistanceProgramLLC_October%202018.pdf.  Warren Hill will provide a hard
copy if the Court would prefer.

conducted business under the services agreements to benefit VAP, including the large volume of business that occurred in November and December 2017.  At that time, the State of Illinois paid VAP millions of dollars in invoices which generated management fees for BSF.  With the payment from the State of Illinois, VAP repaid the trusts managed by VAP that previously purchased the receivables that had been repaid.  The trusts, in turn, repaid the lenders that had financed the purchase of the receivables.  In addition, BCM earned fees for holding the trust certificates in place of VAP.  Hynes Dec., at ¶ 15.

**RESPONSE:**  Admitted in part; disputed in part.  Warren Hill admits that various VAP and AHG personnel travelled to Puerto Rico.  Warren Hill disputes that BSF conducted business under the services agreements in November and December 2017 because evidence adduced so far in discovery shows that (1) such services agreements were not finalized until on or about January 28, 2018 (Dkt. No. 38, SFR Motion, Hynes Decl. ¶ 15) and (2) not only were such services agreement not finalized in November and December 2017, but copious correspondence among Mr. Harris, Mr. Wilson, and others reveals that significant economic terms of what would ultimately become such services agreements were actively being debated and altered during that period (Ex. 21 (allocating fees), Ex. 34 (discussing agreements to work up in preparation for potential IRS audit, Ex. 40 (considering wholly owned subsidiary concept in December); Ex. 41 (still working on draft of alleged "BSF tasks and duties" in December 2017)  Any business conducted by BSF during this period could not have been "under the services agreements."  Rather, any such business was retroactively shoehorned into the later services agreements.  (*Id.*)

Moreover, Warren Hill disputes that BSF was performing the services for the reasons Warren Hill articulates in its response to Paragraph 31, which response Warren Hill incorporates herein.

Further, Warren Hill disputes that payments by the State of Illinois "generated management fees for BSF" because VAP, and only VAP, earns fees for managing the trusts at issue.  (Ex. 3, Reape Dep, at 119:23-121:16, 170:18-173:13, 180:21-181:19.)

In addition, Warren Hill disputes that "BCM earned fees for holding the trust certificates in place of VAP" for the reasons Warren Hill articulates in its response to Paras. 21- 23, and 30, which responses Warren Hill incorporates herein.

33.     BSF and BCM each are limited liability companies in good standing and filed tax returns in 2018 reporting income earned in 2017 by each limited liability company.

**RESPONSE:**  Admitted in part; disputed in part.  Warren Hill admits that BSF and BCM were each formed as limited liability companies. Warren Hill lacks knowledge concerning, and therefore disputes, (1) whether BSF and BCM are in good standing and (2) the accuracy or appropriateness of tax filings by BSF or BCM.

34.     SFR paid the 2017 earn out in the amount of $633,549 on or about March 7, 2018 based on VAP's 2017 cash revenue and cash expenses and not the cash revenue or cash expenses of BCM or BSF.  Harris Dec., at 14.

**RESPONSE:**  Admitted in part; disputed in part.  Warren Hill admits that SFR paid Warren Hill $633,549 on or about March 7, 2018, which payment SFR claims to represent the 2017 earn out.  Warren Hill further admits that SFR excluded from its calculation of such payment revenues that SFR attributes to BCM and BSF.  Warren Hill disputes the sufficiency of such payment under the terms of the MIPA as well as the methods by which SFR apparently calculated such payment.

Respectfully submitted,

*/s/ Gregory S. Voshell*

Gregory S. Voshell
Thomas B. Helbig, Jr.
ELLIOTT GREENLEAF, P.C.
925 Harvest Drive, Suite 300
Blue Bell, PA 19422
(215) 977-1000

Dated: December 21, 2018

*Counsel for Plaintiff Warren Hill, LLC*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on this date, I have caused a true and correct copy of the forgoing to be served upon each attorney of record via electronic mail, the Court's ECF system, and U.S. mail.


*/s/ Gregory S. Voshell*
GREGORY S. VOSHELL

Dated: December 21, 2018