# EXHIBIT 3

Page 1

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA DIVISION


WARREN HILL, LLC,                    )
                                     )
            Plaintiff,               )
                                     )
      vs.                            ) No. 2:17-01228-HB
                                     )
SFR EQUITIES, LLC,                   )
                                     )
            Defendant.               )



            The deposition of DAVID REAPE, called by
the Plaintiff for examination, pursuant to notice and
pursuant to the Rules of Civil Procedure for the
United States District Courts pertaining to the taking
of depositions, taken before Erin McLaughlin, CSR, at
200 S. Michigan Avenue, Suite 1000, Chicago, Illinois,
on Monday, October 15, 2018, commencing at the hour of
9:00 o'clock a.m.



```
                                                          Page 2
 1   APPEARANCES:

 2

 3        ELLIOTT GREENLEAF, P.C.
          925 Harvest Drive, Suite 300
 4        Blue Bell, PA  19422
          gsv@elliotgreenleaf.com, by:
 5        MR. GREGORY VOSHELL,

 6             appeared on behalf of the Plaintiff;

 7

          WHITE & WILLIAMS LLP
 8        One Liberty Place, Suite 1800
          Philadelphia, PA  19103-7395
 9        onufrakm@whiteandwilliams.com, 215.864.7174, by:
          MR. MICHAEL N. ONUFRAK,

10

               appeared on behalf of the Defendant;

11

12        HOWARD & HOWARD
          200 S. Michigan Avenue, Suite 100
13        Chicago, Illinois  60604
          SML@h2law.com, 312.456.3418, by:
14        MR. SCOTT M. LEVIN,

15             appeared on behalf of the VAP;

16

17        ALSO PRESENT:

18             MR. LOUIS A. BALLEZZI
               Corporate Counsel, Warren Hill, LLC;

19

               MR. JASON CANNON;

20

               MR. JEFF MAIER, Videographer.

21

22

23             *    *    *    *    *

24
```



1   my entire question out before you answer, and I'll try
2   to extend you the same courtesy.
3       A   Fair enough.
4       Q   So let me ask that again.  Are you
5   familiar with an entity known as Vendor Assistance
6   Program LLC?
7       A   Yes.
8       Q   And do you hold a position with that
9   company?
10      A   Yes.
11      Q   What is that position?
12      A   Chief Executive Officer.
13      Q   And for purposes of this deposition, if I
14  refer to Vendor Assistance Program LLC as a VAP,
15  V-A-P, will you understand that to be the same?
16      A   Yes.
17      Q   Do you have any familiarity with a company
18  known, named I should say Warren Hill LLC?
19      A   Yes.
20      Q   What is your familiarity with that entity?
21      A   I know the owners.
22      Q   Who would those owners be?
23      A   I think Jason Cannon, and Jackie Delaney,
24  and I'm not sure whether Jim Delaney has an interest

1   or not.
2       Q   You yourself do not have an interest in
3   that entity; correct?
4       A   That's correct.
5       Q   Again for purposes of the deposition
6   today, if I refer to Warren Hill LLC as Warren Hill,
7   would you understand the two to be synonymous?
8       A   Yes.
9       Q   Do you have any familiarity with a company
10  by the name of SFR Equities LLC?
11      A   I know one of the owners, and they are a
12  member of vendor assistance.
13      Q   When you say Vendor Assistance, you're
14  referring to VAP?
15      A   Yes.  Sorry.
16      Q   Are you aware of a dispute between Warren
17  Hill and SFR?
18      A   Yes.
19      Q   Is that the dispute that's brought us here
20  today?
21      A   Yes.
22      Q   And you understand that that dispute is
23  pending in a Federal Court in Philadelphia?
24      A   Yes.

1       Q   You just mentioned that SFR is a member of
2   VAP.  Is that currently they're a member?
3       A   They have a membership interest, correct.
4       Q   We will talk about the scope of that
5   membership interest later.
6           But do you know approximately what
7   percentage of an ownership interest they have in VAP?
8       A   I know there has been some transfers.
9   I believe 30 percent.
10      Q   To the best of your recollection, does the
11  interest that SFR currently holds in VAP date back to
12  when Warren Hill sold its interest in VAP to SFR?
13      A   That's correct, yes.
14      Q   And that happened in or around February of
15  2016?
16      A   Yes.
17      Q   Are you familiar with an entity by the
18  name of Blue Stone Finance, LLC?
19      A   Yes.
20      Q   And just for the court reporter's benefit,
21  is there a space between Blue and Stone in the name of
22  that entity?
23      A   That's correct.
24      Q   If I refer to Blue Stone Finance as BSF or

1   Blue Stone Finance throughout the deposition, you
2   understand those to be synonymous?
3       A   Yes.
4       Q   Are you familiar with an entity by the
5   name of Bluestone Capital Markets, LLC?
6       A   Yes.
7       Q   And for court reporter's benefit, there is
8   no space between Blue and Stone in the name of that
9   entity; correct?
10      A   Yes.
11      Q   If I refer to Bluestone Capital Markets,
12  LLC as Bluestone Capital or BSC -- I'm sorry, BCM
13  during the deposition, will you understand them to be
14  synonymous?
15      A   Yes.
16      Q   I'll do my best to keep referring to them
17  as one entity, but there are a lot of acronyms in the
18  documents as we will see.
19          You mentioned that you are currently
20  the CEO or Chief Executive Officer of VAP.  Do you
21  also have a position with Blue Stone Finance?
22      A   Yes.
23      Q   What is that position?
24      A   CEO.



Page 14

1     Q   Do you currently hold a position with
2 Bluestone Capital?
3     A   Yes.
4     Q   What is that position?
5     A   CEO.
6     Q   Do you derive a salary from VAP?
7     A   Yes.
8     Q   Do you derive a salary from Blue Stone
9 Finance?
10     A   Not a salary.
11     Q   Can you explain?
12     A   I get a consulting fee from Blue Stone
13 Finance.
14     Q   Is that consulting fee set forth in any
15 type of an agreement?
16     A   No.
17     Q   So how is the consulting fee that you
18 derive from Blue Stone Finance memorialized?
19     A   It's not.
20     Q   Where did it arise from?  Strike that.
21         How did it come to be that you receive
22 a consulting fee from Blue Stone Finance?
23     A   As part of the formation of Blue Stone
24 Finance, I get a fee for the services I'm performing.

Page 15

1     Q   What is that fee?
2     A   It's approximately 3,000 a month.
3     Q   Is that a static number, or is there I
4 guess an upward mobility to that?
5     A   It's a static number.
6     Q   Is that the only fee, salary, or bonus
7 that you derive from your services is as the CEO of
8 Blue Stone Finance?
9     A   As the CEO, yes.
10     Q   Do you derive any fee or bonus or salary
11 from providing services to Blue Stone Finance other
12 than in your capacity as CEO?
13     A   I'm a member of all three entities and as
14 such would get the benefit of distributions from those
15 entities.
16     Q   But outside of your membership interest
17 and the consulting fee with Blue Stone Finance, is
18 there any other financial arrangement that you have
19 with that entity?
20     A   No.
21     Q   Do you hold a position with Bluestone
22 Capital?  You said you were CEO?
23     A   Yes.
24     Q   Do you derive any income other than a

Page 16

1 membership interest from performing services as CEO
2 for Bluestone Capital?
3     A   No.
4     Q   No bonus associated with any services you
5 provide as CEO of Bluestone Capital?
6     A   Just benefit as a member.
7     Q   We have premarked these as Exhibits 1, 2
8 and 3.  I'll hand them to you all at the same time;
9 and counsel can have a copy as well.  If you could
10 take a moment to review those documents, I'll have a
11 few questions on them.
12     MR. ONUFRAK:  Is this Reape 1?
13     MR. VOSHELL:  Yeah.  These are marked as Reape
14 1, 2 and 3.
15     Q   Mr. Reape, have you had a chance to review
16 what's been marked as Reape 1, 2 and 3?
17     A   Quickly, yes.
18     Q   Have you seen these documents before?
19     A   Yes.
20     Q   Can you just provide for the record a
21 brief description of what your understanding of the
22 documents is?
23     A   They're financial audits.
24     Q   The documents themselves are subpoenas for

Page 17

1 the testimony of a corporate representative of Vendor
2 Assistance Program, Bluestone Finance, and Bluestone
3 Capital Markets; correct?
4     A   Correct.
5     Q   And do you understand that you are here
6 today not only testifying in your individual capacity
7 but also as the corporate representative for Vendor
8 Assistance Program, Bluestone Finance, and Bluestone
9 Capital Markets?
10     A   Yes.
11     Q   If you could flip to -- There is a
12 schedule attached to each of the subpoenas which lists
13 an itemization of the topics for your testimony today.
14     A   Is that Exhibit?  A.
15     Q   Yes.  It is Exhibit A to each of the
16 subpoenas.
17         Have you reviewed this before?
18     A   Yes, at the time the subpoena was issued.
19     Q   If you could, take a moment to review
20 those and then let me know if you are prepared to
21 testify on the topics identified in each of the
22 Exhibits A's to the corporate designee subpoenas.
23     A   I am.
24     Q   Going back briefly to your role as CEO for



Page 18

1    VAP, do you derive a salary from that role?
2        A    Yes.
3        Q    What is that salary?
4        A    It's approximately 220,000 a year.
5        Q    And is there any bonus payment that you
6    are eligible for serving as CEO of VAP?
7        A    We have an employee bonus pool.
8        Q    When you say we, what are you referring
9    to?
10       A    Vendor Assistance Program has an employee
11   bonus pool, as does BSF.
12       Q    And are those distinct pools?
13       A    Yes.
14       Q    To the best of your recollection, when was
15   the BSF or Blue Stone Finance pool created?
16       A    At some point during 2017.  If I could
17   clarify, we have had an existing bonus pool for VAP
18   since 2014.  No payments were made under it.
19       Q    So the VAP bonus pool that you're
20   referring to, the one that's been existing since about
21   2014 had a pool of money but no bonuses we're paid out
22   of it, is that what you're saying?
23       A    It existed, but there was never any money
24   to pay under it.

Page 19

1        Q    There was actually no money in the fund
2    for a period of time?
3        A    No.
4        Q    Is there money in that fund now?
5        A    We have made employee bonuses.
6        Q    Just to clarify, when you say we, you're
7    referring to VAP?
8        A    VAP as well as BCM and BSF.
9        Q    The BSF, so if you are labeled as a BSF
10   employee, are you eligible for the a Vendor Assistance
11   bonus pool?
12       A    Yes, all of the employees -- and we have
13   some consultants that are in that pool -- are eligible
14   for the three entities and any bonuses due under the
15   three entities.
16       Q    Can you briefly describe your educational
17   background for the record?
18       A    I have a degree in mechanical engineering
19   from Yale University, and I have a Master's Degree in
20   applied mathematics from the University of Virginia.
21       Q    I'm sorry.  Can you speak up on the latter
22   part of that answer?
23       A    Sure.  Yale was the Bachelor's Degree in
24   mechanical engineering, and I have a Master's Degree

Page 20

1    in applied mathematics from the University of
2    Virginia.
3        Q    Is that the extent of your education, your
4    formal education?
5        A    Some additional graduate courses, but --
6        Q    But no degrees associated with those
7    graduate courses?
8        A    No.
9        Q    Do you hold any certificates or anything
10   along those lines outside of a formal degree?
11       A    No.
12       Q    You are not at CPA?
13       A    No.
14       Q    Could you also briefly describe your
15   professional background for the record?
16       A    I was an options trader in Chicago for
17   four years.  I worked for an industrial distribution
18   company that's based in Chicago for four years.  I was
19   the chief operating officer of J.G. Wentworth for
20   13 years.  I had a Series 7 license and worked for
21   Kildare Capital for three years.  And since 2012 I've
22   been the CEO of Vendor Assistance Program.
23       Q    If we can go back a bit -- let's kind of
24   frame this out from a time standpoint -- when did you

Page 21

1    get your degree from Yale?
2        A    1984.
3        Q    What about the degree from the University
4    of Virginia?
5        A    1986.
6        Q    Then did you become an options trader in
7    Chicago right after that?
8        A    Yes.
9        Q    From a time period standpoint, how long
10   did that last?
11       A    Four years.
12       Q    So that brings us to approximately 1990?
13       A    1990.
14       Q    Who were you an options trader with when
15   you were in Chicago?
16       A    I was an independent.  I worked,
17   self-employed.
18       Q    Then where did you go in 1990 when you
19   made the shift from options trader to another company?
20       A    I worked for McMaster-Carr Supply Company.
21       Q    How long were you with McMaster?
22       A    Four years.
23       Q    That brings us to approximately 1994;
24   fair?



Page 26

1      Q    When I speak in terms of transacting
2   business, you are sending emails relating to the
3   business of all three entities in King of Prussia,
4   Pennsylvania?
5      A    Yes.
6      Q    And you are receiving emails relating to
7   all three entities in King of Prussia, Pennsylvania?
8      A    Correct.
9      Q    And you are making phone calls relating to
10  all three entities out of your office in King of
11  Prussia, Pennsylvania?
12     A    Yes.
13     Q    And you are receiving phone calls relating
14  to all three entities out of your office in King of
15  Prussia, Pennsylvania?
16     A    Yes.
17     Q    And do you receive regular mail for all
18  three entities at your King of Prussia in
19  Pennsylvania?
20     A    We don't receive a lot of -- We receive
21  mail, a lot of mail for the trusts we manage; and
22  those come to Pennsylvania. I think that's
23  primarily -- We're trying to go paperless.
24     Q    We're going to get to the trusts later,

Page 27

1   but when you say you receive mail for the trusts, what
2   type of documents are you referring to?
3      A    Statements.
4      Q    Would those be what we'll see later as the
5   note holder reports?
6      A    No.
7      Q    What type of a statement?
8      A    Every time there is a transfer of money in
9   or out of a trust, they send a statement. There are
10  multiple accounts associated with every trust.
11  They're just monthly statements.
12     Q    Are those addressed to the vendor
13  assistance program?
14     A    They are.
15     Q    Are they sent to you in King of Prussia in
16  your capacity as the CEO for VAP?
17     A    Just had them sent there because it was a
18  central place to have them sent.
19     Q    How often are you in or are you working
20  out of your office in King of Prussia, Pennsylvania?
21     A    Primarily there.
22     Q    So in a given month are you there more
23  than three weeks?
24     A    Yes.

Page 28

1      Q    Does anybody else associated with VAP,
2   Blue Stone Finance or Bluestone Capital Markets work
3   out the offices in King of Prussia, Pennsylvania?
4      A    Occasionally they visit the office. They
5   might work out of the office. I have an employee
6   there right now.
7      Q    Who is that employee?
8      A    Andrew Reape.
9      Q    I'm going to guess by the nature of his
10  last name this is a relative of yours?
11     A    Correct.
12     Q    What is the family relationship?
13     A    He's a second cousin.
14     Q    Where does Mr. Andrew Reape reside?
15     A    San Juan Puerto Rico.
16     Q    How long has Mr. Andrew Reape been
17  residing in San Juan, Puerto Rico?
18     A    Since 2017.
19     Q    If you know, does he claim San Juan,
20  Puerto Rico as his principal address?
21     A    Yes.
22     Q    That's for tax purposes?
23     A    No. He lives there. He's got a -- He's a
24  resident of Puerto Rico.

Page 29

1      Q    Now, we've talked about the Vendor
2   Assistance Program or VAP generally speaking, but can
3   you describe for the record what VAP is and what it
4   does?
5      A    So VAP is a purchaser of State of Illinois
6   receivables.
7      Q    Can you just describe in a little bit more
8   detail what it means to be the purchaser of a State of
9   Illinois receivable?
10     A    Sure. The State of Illinois runs very
11  large deficits on their annual budget; and, as such,
12  in order manage cash flow, they defer the payment of
13  receivables for goods and services to their vendors by
14  a number of months.
15        Those receivables after 90 days accrue
16  prompt payment interest; and VAP is in the business of
17  managing trusts, financial trusts that purchase those
18  receivables.
19     Q    So to break that down a bit, when you are
20  referring to receivables -- Let me strike that.
21        When you say the word receivable, what
22  are you referring to?
23     A    So IBM sells the State of Illinois a
24  server, so they bill the State $7 million. So that's



Page 30

1    a receivable.
2        Q   So the State receives an invoice from a
3    vendor and at that point owes the vendor for a service
4    that has been provided?
5        A   Yes.
6        Q   Is that a fair way to say it?
7        A   Uh-huh.
8        Q   Is one of the vendors to the State Blue
9    Cross and Blue Shield of Illinois?
10       A   Yes.  They're an HMO provider to the
11   State.
12       Q   And, again, we will get to this later.
13           In your interacting with Blue
14   Cross/Blue Shield of Illinois, have they also been
15   referred to as Health Care Service Corp.?
16       A   Yes.
17       Q   Do you understand those two entities to
18   the extent they are distinct to be affiliates of each
19   other?
20       A   So Blue Cross/Blue Shield of Illinois is
21   just the d/b/a for Health Care Service Corp.
22       Q   And you referred to a Prompt Payment
23   Penalty.  Does that arise under a particular statute
24   or regulation under Illinois?

Page 31

1        A   It does.
2        Q   Are you aware of what that statute or
3    regulation is?
4        A   When I can remember it, yes.  It's the
5    state Prompt Payment Act.  I don't have -- The
6    statutory reference escapes me.  It's actually been
7    codified under Public Act 1089?
8        Q   What is the Prompt Payment Penalty or
9    interest that accrues?  Could you describe that for
10   the record?
11       A   Sure.  90 days after the State receives
12   and acknowledges and verifies and puts in line for
13   payment an invoice, that invoice starts accruing
14   Prompt Payment Penalty on a daily basis on an amount
15   that amounts to 1 percent per month.
16       Q   How long will that interest or that
17   penalty accrue?
18       A   It accrues until the point at which the
19   State issues a payment against the invoice.
20       Q   When you say issues a payment against the
21   invoice, are you referring to the face value of the
22   invoice or the face value plus the penalty that has
23   accrued up to the point of the payment?
24       A   The face value.  The penalty payments are

Page 32

1    paid separately.
2        Q   If the face value of the invoice is paid
3    off, does a penalty accrue on I guess the balance of
4    the penalty that had been earned at that point?
5        A   No.
6        Q   Now, what enables VAP to purchase
7    receivables, State of Illinois receivables?  Strike
8    that.
9            Is there a program that the State of
10   Illinois runs under which VAP is able to purchase
11   these receivables?
12       A   So there have been in existence one formal
13   program and one not so formal program.
14       Q   Let's start with the formal program.
15   What's the formal program?
16       A   It's the Vendor Payment Program.
17       Q   Is that sometimes referred to as the VPP?
18       A   Yes.
19       Q   What is the Vendor Payment Program or the
20   VPP?
21       A   So it was a bicameral program that was put
22   together in 2011 that allowed for an assignment of
23   base invoices as well as their prompt payment
24   penalties, and it set forth a set of rules for

Page 33

1    purchasing those receivables.
2        Q   And are those rules codified in part in
3    what are referred to as program terms?
4        A   Yes.
5        Q   And what I guess Illinois regulatory body
6    would issue those program terms?
7        A   So, again, the group was called JCAR which
8    is a joint cameral group that issued those terms.
9        Q   Is that a subdivision of any state agency
10   to the best of your knowledge?
11           Let me ask it a bit more specifically.
12   Are you familiar with a regulatory body known as CMS
13   within the State of Illinois?
14       A   Yes.
15       Q   And do you know what the acronym CMS
16   refers to?
17       A   Central Management Services.
18       Q   Is the J --
19           What did you refer to that as?
20       A   JCAR.
21       Q   Is the JCAR subsumed within CMS to the
22   best of your knowledge?
23       A   No.  It's separate from it.
24       Q   So your testimony is you don't believe



Page 34

1  that CMS issued the program terms?
2      A   No.
3      Q   But the CMS regulated and enforced the
4  program terms to the best of your knowledge?
5      A   In conjunction with the comptroller.
6      Q   Now, VAP is a limited liability company;
7  correct?
8      A   Correct.
9      Q   So it has a number of members or
10 beneficial owners?
11     A   Yes.
12     MR. VOSHELL:  Mark this -- Actually I'm going
13 to change the marking.  Can we make it Warren Hill 4
14 and we'll change 1, 2 and 3.
15     THE REPORTER:  Can I just put W.H.?
16     MR. VOSHELL:  That's fine.
17         (W.H. Deposition Exhibit No. 4 was
18          marked for identification.)
19     Q   Mr. Reape, I've placed in front of you
20 what's been marked as Warren Hill 4?
21     MR. ONUFRAK:  Could I get a copy?
22     MR. VOSHELL:  That's fair.
23     Q   Could you take a moment and review the
24 document; and when you've had that opportunity, can

Page 35

1  you just let me know, please?
2      A   Sure.
3      MR. VOSHELL:  And while you do that, I'll just
4  note for the record we're going to change the
5  designation from Reape 1, 2, 3 to Warren Hill 1, 2, 3.
6  We will be using a number of the same exhibits over
7  the course of the next three days, so we will just
8  keep a running tally of them.
9      MR. ONUFRAK:  You'll keep going consecutively?
10     MR. VOSHELL:  That's right.  We're going to
11 going consecutively.
12     MR. ONUFRAK:  So I'm crossing out Reape and
13 writing in Warren Hill.
14     MR. VOSHELL:  You got it.
15     Q   Mr. Reape, have you had an opportunity to
16 review what's been marked as Warren Hill 4?
17     A   I have.
18     Q   And can you please describe for the record
19 what this document is?
20     A   It's the second amended and restated
21 operating agreement of VAP.
22     Q   And this is dated September 21, 2012;
23 correct?
24     A   Correct.

Page 36

1      Q   And has there been a subsequent operating
2  agreement or an amended operating agreement for the
3  Vendor Assistance Program?
4      A   There has not.
5      Q   There have been new owners who have come
6  into VAP since September 21, 2012; correct?
7      A   Correct.
8      Q   Yet there has been no amendment to the
9  operating agreement to reflect that?
10     A   That's correct.
11     Q   Is there a reason for that?
12     A   Yes.
13     Q   What is that reason?
14     A   This agreement requires that all members
15 consent to any amendments or any replacement
16 agreements.
17         One of our members is a $30 billion
18 hedge fund that I can barely get to return to my calls
19 that has indicated they are not interested in
20 reviewing any amendments to this agreement.
21     Q   What is the name of the member that you
22 just referred to as the hedge fund that will not
23 consent to any amendments to this agreement?
24     A   So they're subsidiaries of Elliott

Page 37

1  Management.
2      Q   We will flip to it.  Do you recall the
3  name of the subsidiary?
4      A   It's Manchester Securities I believe.
5      Q   Have you attempted to have them consent to
6  an amendment to this operating agreement?
7      A   We have had discussions, and they have
8  indicated it's not something they're interested in
9  reviewing.
10     Q   Did they explain to you the reason for
11 that?
12     A   They're a $30 billion hedge fund.
13     Q   Well, I get the scope they're a hedge
14 fund.  Have they explained to you in words or in
15 substance why they don't want to consent to any
16 amendments to the operating agreement for VAP?
17     A   They don't want to spend any time looking
18 at any documents.
19     Q   If you could, please flip to the page
20 marked in the bottom right-hand corner as 223286.
21 It's toward the back end.
22     A   223 --
23     Q   232.  Excuse me?
24     A   23286?



Page 78

1   Payment Penalty, there is series of things you had to
2   comply with, including some reporting abilities.
3   There is series of requirements on the deferred
4   payments and things of that to be done.  They're laid
5   out throughout these terms.
6       Q   There's a checklist of things that a
7   "qualified purchaser" would have to satisfy before
8   obtaining that designation?"
9       A   A list.  The State at one point had
10  drafted a checklist of things that they thought
11  qualified purchasers should be required to follow, but
12  that was never formally made part of this program.
13      Q   Now, if you turn to Page 4 of the program
14  terms which are in front of you, it lists the
15  definition for qualify purchaser; correct?
16      A   Yes.
17      Q   And you agree -- Well, let me back up.
18          To the best of your knowledge, these
19  program terms are dated December 13 of 2012; correct?
20      A   Correct.
21      Q   To the best of your knowledge, have these
22  formal program terms being amended at all by CMS or
23  the Illinois legislature?
24      A   So these terms are now part of Public Act

Page 79

1   1089 which amends the Prompt Payment Penalty statute.
2   It includes these terms but also puts down additional
3   requirements for people participating in this
4   business.
5       Q   But these programs terms to the best of
6   your knowledge are still the operative program terms
7   for the VPP and VSI; correct?
8       A   For the VPP.  I would argue the VSI
9   doesn't have program terms.
10      Q   Even if the CMS says otherwise?
11      A   It's a representation on the website.
12      Q   By CMS which is you testified to earlier
13  was the regulatory body in charge of overseeing the
14  VPP; correct?
15      A   So, to clarify, CMS is not I don't believe
16  a regulatory body.  They're a state agency.
17      Q   That oversees and operates the VPP;
18  correct?
19      A   In conjunction with the comptroller, yes.
20      Q   VAP participates in the Vendor Payment
21  Program; correct?
22      A   Yes.
23      Q   VAP also participates in the Vendor
24  Support Initiative; correct?

Page 80

1       A   VAP did.  As of about two, three weeks
2   ago, the Vendor Support Initiative is no longer in
3   operation.
4       Q   Why is that?
5       A   In conjunction with the last budget and
6   with the implementation of 1089, the State has made
7   the decision that everything will be vouchered prior
8   to assignment so that everything will need to go
9   through these terms now.
10      Q   And everything may have had to go through
11  these terms previously.  You just aren't sure because
12  you haven't checked the CMS website in a while?
13      A   No.  Everything could not have gone
14  through these because it couldn't have gone through
15  the comptroller process.
16      Q   VAP is a qualified purchaser under the
17  Vendor Payment Program; correct?
18      A   Yes.
19      Q   It went through the process that is set
20  forth in Illinois to achieve that designation;
21  correct?
22      A   Yes.  I think we were the only ones that
23  did.
24      Q   Do you recall when VAP went through the

Page 81

1   process of becoming a qualified purchaser?
2       A   2011.
3       Q   When did you arrive at VAP as the CEO,
4   Mr. Reape?
5       A   January of 2012.
6       Q   So when you arrived at VAP, VAP already
7   had its qualified purchaser designation?
8       A   Correct.
9       Q   Who was involved in obtaining that on
10  behalf of VAP?
11      A   Brian Hynes.
12      Q   And Brian Hynes is the attorney at Howard
13  & Howard?
14      A   Yes.
15      Q   And did Mr. Hynes start the Vendor
16  Assistance Program himself?
17      A   Yes.
18      Q   Did he have any other founding members
19  when he himself started the company before you got
20  there?
21      A   It predates me.  I know Howard & Howard
22  was involved; and I know Patty was involved, Patty
23  Solis.
24      Q   When you say Patty Solis, you're



Page 82

1  preferring to the woman who worked on Hilary Clinton's
2  campaign?
3      A  Yes.
4      Q  And she was the one I believe you
5  testified earlier who had a number of political
6  connections here in Illinois; is that correct?
7      A  Correct.
8      Q  Do you know if Mr. Hynes has political
9  connections here in Illinois?
10     A  Yes.
11     Q  Would you describe them as extensive?
12     A  He was a lobbyist, so I would they were
13  pretty extensive.
14     Q  And did he have to register as a lobbyist
15  to the best of your knowledge here in Illinois?
16     A  I'm not sure of the law with regard to
17  registration.
18     Q  We talked about Blue Stone Finance
19  earlier?
20     A  Correct.
21     Q  Is Blue Stone Finance a qualified
22  purchaser under the Vendor Payment Program?
23     A  No.
24     Q  And we talked about Bluestone Capital

Page 83

1  Markets earlier as well; correct?
2      A  Correct.
3      Q  Is Bluestone Capital Markets a qualified
4  purchaser under the Vendor Payment Program?
5      A  No.
6      Q  Are either Bluestone entities qualified
7  purchasers under the Vendor Support Initiative?
8      A  I would argue the Vendor Support
9  Initiative doesn't have qualified purchasers.
10     Q  To the extent that CMS or the law would
11  disagree, do either of the Bluestone entities hold a
12  qualified purchaser designation under any program in
13  Illinois?
14     A  No.
15     Q  If we just look to the definition of
16  qualified purchaser on Page 4 of what's been marked as
17  Warren Hill Number 7, it states that qualified
18  purchaser means any entity that during any application
19  period is approved by CMS to participate in the
20  program on the basis of certain qualified criteria set
21  forth in -- and there is a legal citation.
22         Did I read that correctly?
23     A  Yes.
24     Q  And this is the process that VAP would

Page 84

1  have gone through to become a qualified purchaser?
2      A  Correct.
3      Q  Were there any efforts by VAP or the
4  Bluestone entities to have either Bluestone entity to
5  become a qualified purchaser?
6      A  No need to.
7      Q  That wasn't my question.
8      A  No.
9      Q  Were there any efforts taken?
10     A  No.
11     Q  Is Bluestone Capital Markets registered in
12  any way with the State of Illinois to do business
13  here?
14     A  No.
15     Q  Is Blue Stone Finance registered with the
16  State of Illinois in any way to do business here in
17  the State?
18     A  No.
19     Q  Has VAP notified CMS or any other
20  legislative or regulatory body in Illinois as to the
21  existence of Bluestone Capital Markets?
22     A  No.
23     Q  Has VAP identified Blue Stone Finance to
24  CSM or any other regulatory body here in the State of

Page 85

1  Illinois?
2      A  No.
3      Q  Is it fair to say that VAP is the outward
4  facing company when it comes to the Vendor Payment
5  Program?
6      MR. ONUFRAK:  I object to the form.
7      MR. VOSHELL:  Q  Is it fair to say that CMS
8  recognizes VAP as the entity that operates under the
9  Vendor Payment Program?
10     A  Yes.  It's fair to say that, yes, VAP is
11  an entity that operates under the Vendor Payment
12  Program.
13     Q  Is it fair to say that CMS would recognize
14  VAP as the entity that is operating under the Vendor
15  Payment Program as opposed to the Bluestone entities?
16     A  Yes.
17     Q  When you came to VAP in I guess January of
18  2012 -- Strike that.
19        How is it that you learned of VAP in
20  either late 2011 or early 2012?
21     A  Jim Delaney approached me in November,
22  December of 2011.
23     Q  And what was I guess his pitch to you, or
24  what did he tell you about this program out here in



Page 102

1  tell us, this is what I'm owed and this is when it's
2  due.
3      Q    Once you are able to verify that the
4  receivable is, in fact, linked to a real invoice that
5  is now owed by the State, what happens next?
6      A    So we would generate an assignment
7  agreement in our system for anything that had come
8  over.
9      Q    And when you say anything that had come
10 over, you mean the value of the receivable?
11     A    Yeah, the query.  So we query the system,
12 and six receivables come over.  We're going to
13 generate a contract, sign the agreement and send it to
14 you for those six receivables.
15     Q    When you say the receivables, you're
16 referring to specific invoices?
17     A    They're state vouchers.
18     Q    State vouchers.
19     A    So voucher number, your own internal
20 invoice number, State-recognized acceptance date,
21 proper bill date is what they call it and amount.
22     Q    So to the point we're at now, is it fair
23 to kind of I guess categorize the first portion as
24 kind of a registration of the vendor portion?

Page 103

1      A    Yes.
2      Q    And then we just described what I would
3  categorize as a verification process; is that fair?
4      A    And we're now at the level actual creating
5  an assignment.
6      Q    Right.  So we have verified, and we're now
7  moving into Stage 3 which is you are creating an
8  assignment.  How does that process work?
9      A    So our system actually, it's for the
10 Vendor Payment Program, it's a State-specified
11 assignment agreement that we use.  It's a form that we
12 have to use, and our system generates that form.
13     Q    And what happens once that form is
14 generated?
15     A    That electronic link is transmitted to the
16 vendor.
17     Q    And what is the purpose of that electronic
18 link?
19     A    It's to get the assignment agreement
20 executed electronically.
21     Q    So now the vendor has received the
22 assignment agreement which has been populated by VAP
23 and sent to the vendor.  The vendor signs the
24 agreement?

Page 104

1      A    Well, the vendor would review it and
2  decide, first of all, whether they want to
3  participate.  It's not unusual for vendors to look at
4  a list of receivables and say, I don't want to sign
5  the $30 receivables.  I just want to do the $30,000
6  receivables.
7      Q    Okay.  Say it's a vendor that wants to
8  participate though and wants to sign the assignment
9  agreement.  What happens next?
10     A    So they would execute the assignment
11 electronically.
12     Q    And then after that assignment is executed
13 and received by VAP, what happens?
14     A    So it would then go through VAP's
15 underwriting process.
16     Q    And please explain just briefly that
17 process.
18     A    So prior to transmitting the assignment
19 agreement to the State, we do an underwriting
20 verification to confirm that those receivables, the
21 public record doesn't indicate those receivables have
22 previously been pledged, assigned.
23          We check vendors for tax liens,
24 bankruptcies.  Anything that would affect our priority

Page 105

1  first interest in that receivable we would check for,
2  but that's primarily a U.C.C. search and a tax lien
3  search.
4      Q    Just one step back.  You mentioned these
5  assignment agreements.  Who are the assignment
6  agreements between?  Like who the parties to them?
7      A    The parties are the vendor and whatever
8  particular trust the receivable's being assigned to.
9      Q    Once I guess the priority of position
10 analysis is complete by VAP, what happens next?
11     A    So a third of the time there is actually
12 some type of encumbrance that we would attempt to
13 resolve.
14     Q    Going back to the assignment agreements,
15 VAP is a party to those agreements but as a manager;
16 correct?
17     A    Correct, for the entity that's actually
18 taking the assignment, yes.
19     Q    A manager for the trust; correct?
20     A    Correct.
21     Q    And the Bluestone entities aren't managers
22 for these trusts; correct?
23     A    No.
24          You're talking again about the Vendor



Page 110

1    Q   After the funding request is made, what
2   happens next?
3    A   At some point the lender would transmit
4   into a trust DDA the money that we would then forward
5   on to the vendor that represents their advance.
6    Q   And when you say their advance, what are
7   you referring to?
8    A   So our vendors under the VPP get a
9   90 percent advance of the receivables.  So if your
10  invoice was for $10,000, we issue an advance for 9,000
11  to you.
12   Q   And when is the remaining 10 percent paid
13  to the vendor?
14   A   So that's paid in two, a series of
15  deferred payments, two deferred payments.
16   Q   And what's the timing of those payments?
17   A   It could be anywhere from six months to
18  this point we're going on 30 months or a couple of our
19  deals.
20   Q   For the second payment?
21   A   For the second payment.
22   Q   What triggers the first payment?
23   A   The first payment to the vendor?
24   Q   I'm sorry.  That's a good question.

Page 111

1        So what triggers the first deferred
2   payment?
3    A   So when base payments are made, base
4   invoice payment, VAP keeps its 90 percent plus any
5   accrued penalty; and if there was, if there is any
6   difference at that point, the difference goes to the
7   vendor.  So if there is less than ten months of
8   accrual, there would be a difference so the vendor
9   would get a deferred payment.
10   Q   When you referred to accrual, what are you
11  referring to?
12   A   The accrual on that, that would be the
13  number of months or amount of penalty accrued from the
14  prompt, from the proper bill date to the payment date.
15   Q   How does that penalty accrue?  What is the
16  magnitude of the penalty?
17   A   It's on a daily.  It's a daily fraction,
18  but it's 1 percent per month.
19   Q   So 12 percent per year?
20   A   Yes.
21       THE VIDEOGRAPHER:  The time is 11:17.  We're
22  off the record.
23
24

Page 112

1        (Whereupon a brief recess was had,
2        after which the deposition of
3        Mr. Reape continued as follows:)
4        (W.H. Deposition Exhibit Nos. 9-12
5        were marked for identification.)
6        The time is 11:25.  We're back on the
7   record beginning Disk 2.
8        MR. VOSHELL:  Q   Mr. Reape, you understand you
9   are back on the record and still under oath?
10   A   Yes.
11   Q   We have placed in front of you four
12  documents which are marked as Warren Hill 9, 10, 11
13  and 12.  Would you please take a moment to review
14  those documents, and I'll have some questions on each
15  of them.
16   A   Okay.
17   Q   Having had the opportunity to review those
18  documents, are you familiar with them?
19   A   I am.
20   Q   Can you please describe for the record
21  what they are?
22   A   They're a series of management agreements.
23   Q   What do the management agreements relate
24  to?

Page 113

1    A   They relate to different receivables
2   trusts.
3    Q   When you say receivables trusts, are these
4   the same trust agreements or -- I'm sorry.  Strike
5   that.
6        When you say receivables trusts, are
7   these the trusts you're referring to with respect to
8   the Vendor Payment Program that we just discussed?
9   Strike that.
10       What do you mean by the phrase
11  receivables trusts?
12   A   Sure.  So we manage, VAP manages as the
13  documents will indicate certain receivables trusts.
14  There are a couple variants of those trusts.  Some are
15  revolving trusts, and I can elaborate if you need an
16  explanation.
17   Q   Why you don't you pause there and
18  elaborate on a revolving trust?
19   A   So a revolving trust is a facility that's
20  set up where the trust has a lender or lenders, and
21  those lender or lenders agree for a period of time to
22  make advances up to a maximum commitment amount as we
23  request.  And they are revolving because as
24  receivables come in and are applied to the outstanding



1    Q   So this transaction is dated February 12,
2   2016; correct?
3    A   Correct.
4    Q   It involved Blue Cross/Blue Shield of
5   Illinois receivables?
6    A   Yes.
7    Q   With Bank of America providing the funding
8   source?
9    A   Yes.
10    Q   And I guess behind Bank of America there
11   were a number of institutional investors that may also
12   be involved?
13    A   So the way these transactions typically
14   work, the Bank of America would take this down and
15   then may resell this.
16        So with the disposition of the first
17   series under this list 2016-1, and there was an A and
18   B series, I'm not entirely sure whether they held all
19   of that on the balance sheet or whether they sold that
20   off. Obviously there is some benefit for them doing
21   both.
22        From a capacity standpoint, I'm
23   guessing they probably held this on balance sleet and
24   the subsequent series they sold off.

1    Q   And if you know given your experience in
2   in this field, there would be I guess any number of
3   contracts between Bank of America and whoever they
4   were dealing with respect to any sales; right?
5    A   Sure. These could get very freely traded,
6   and certainly some of these series have been sold down
7   to hedge funds that have multiple sub participant
8   funds.
9    Q   It's a lot of contracts floating around in
10   the ether here; correct?
11    A   I would think not visible to us because
12   the series transaction here, Bank of America took down
13   all of the notes originally.
14    Q   If you flip to the third page of the
15   exhibit which begins -- At the very top it says
16   Management Agreement. Do you see that?
17    A   Uh-huh.
18    MR. ONUFRAK: 3706?
19    MR. VOSHELL: Yeah. It's Page 1 of the
20   agreement.
21    Q   It's title Management Agreement; correct?
22    A   Correct.
23    Q   And then it has kind of a preamble here
24   which lists Vendor Assistance Program, LLC as manager;

1   correct?
2    A   Correct.
3    Q   It says together with its successors and
4   permitted assigns; correct?
5    A   Correct.
6    Q   In the third paragraph on this page it
7   references specifically Health Care Services
8   Corporation and Blue Cross/Blue Shield of Illinois;
9   correct?
10    A   Correct.
11    Q   Now, if you move to the second page, it
12   lists -- Let me back up.
13        Back to the preamble, when it lists
14   VAP, Vendor Assistance Program as the manager, it
15   defines that as Manager with a capital M; correct?
16   It's a defined term in the preamble?
17    A   Correct.
18    Q   In the definitional section of this
19   management agreement, it lists two fees, a Manager fee
20   and a Manager incentive fee; and each time the word
21   manager is capitalized; correct?
22    A   Correct.
23    Q   Can you describe for the record what the
24   manager fee is?

1    A   So it's a senior fee. There is a priority
2   of payment for everything that occurs under these
3   series.
4    Q   Can you please elaborate what you mean by
5   senior fee?
6    A   Sure. In this case it was a 1 percent
7   fee.
8    Q   That's based on the 360-day year?
9    A   It is, and it's on receivables
10   outstanding, not on note outstanding.
11    Q   What about the Manager incentive fee, what
12   is your understanding of that term?
13    A   That's the subordinated fee.
14    Q   Is that -- and we will see other documents
15   later. Would that be equivalent to the junior fee?
16    A   Yes.
17    Q   If you flip the page to Page 4 and Section
18   2.01 --
19    A   Okay.
20    Q   -- this section is titled Appointment and
21   Authority of Manager; correct?
22    A   Correct.
23    Q   And it states that the certificate holder
24   representative which is Bank of America; right?



Page 122

1    A    Yes.
2    Q    And the trust hereby appoint the manager
3  to perform on the trust's behalf and subject to the
4  certificate holder representative's direction the
5  duties set forth herein.  Did I read that correctly?
6    A    Yes.
7    Q    So this is the I guess section that
8  formally appoints VAP as the manager; correct?
9    A    Correct.
10   Q    And then in the next paragraph it states
11  the manager which is VAP --
12        Correct?
13   A    As defined, yes.
14   Q    -- shall perform all duties of the trust
15  including with respect to the each series of the trust
16  that the manager is directed in writing by the
17  certificate holder representative to perform.
18        Did I read that correctly?
19   A    Correct.
20   Q    We can flip to --
21        Were there other series of trusts
22  issued under this kind of master trust agreement or
23  master management agreement?
24   A    We're actually trying to do one today; but

Page 123

1  yeah, my appearance here certainly is interfering with
2  that.  Yeah.  There have been multiple series issued.
3    Q    And is VAP the manager under each of those
4  multiple series?
5    A    VAP as defined in this document as
6  manager, yes.
7    Q    If you flip to the next document which I
8  believe is Warren Hill 10, this states it's an amended
9  and restated management agreement; correct?
10   A    Correct.
11   Q    Is this one of the amended management
12  agreements you referred to earlier?
13   A    Yes.
14   Q    This one is dated August 10th of 2016;
15  correct?
16   A    Correct.
17   Q    Do you recall why there was an amendment
18  to this management agreement in August of 2016?
19   A    I don't.  There have been a number of
20  amendments, including on the transaction we're trying
21  to complete today.  So without seeing a red line, I'm
22  not sure what changed here.
23   Q    But, again, this agreement, the management
24  agreement is among Vendor Assistance Program as the

Page 124

1  manager; right?
2    A    Yes.
3    Q    The Illinois Receivables Trust 2; right?
4    A    Yes.
5    Q    And Bank of America as the certificate
6  holder representative; right?
7    A    Correct.
8    Q    Very briefly because I believe it follows
9  a similar structure to the last exhibit, in the
10  preamble, Vendor Assistance Program is defined as the
11  Manager; correct?
12   A    Correct.
13   Q    With a capital M.
14        And on Page 2 there are three fees that
15  are referenced which may be the difference; but there
16  is a Manager fee, a Manager fee rate, and a Manager
17  incentive fee all with capital M's; correct?
18   A    Correct.
19   Q    The Manager fee, is that still the senior
20  fee?
21   A    Yes.
22   Q    And the Manager fee rate, can you describe
23  your understanding of that term?
24   A    Give me a moment here.  I might be able to

Page 125

1  remember why this was amended.
2    Q    Sure.
3    A    So this was amended to reflect
4  unfortunately that our rates were changing.  So the
5  initial management agreement had set in that we were
6  getting a 1 percent Manager rate and a 3 percent
7  Manager fee rate.
8        By August the market had changed, and
9  there were concerns about timing of payment, of base
10  payment to prompt payment.  So we got squeezed here a
11  little bit.
12        So instead of formally defining 1
13  percent and 3 percent, they added the concept of
14  Manager fee rate so that each series would then define
15  what the Manager fee and Manager incentive fee for
16  that series were.
17        So the economics on these series have
18  changed over time and are actually different every
19  series we enter into.
20   Q    And while the fee itself may have
21  differed, we're still referring to manager fees that
22  are earned by VAP in its capacity as the manager;
23  correct?
24   A    Correct.

Page 126

```
 1      Q   Then if you flip to Section 2.01 which is
 2   on Page 4, would you agree this section formally
 3   appoints VAP as the manager?
 4      A   Yes.
 5      Q   And it again lays out that VAP will
 6   perform the various duties under the terms of this
 7   management agreement?
 8      A   Correct.
 9      Q   And it also entitles VAP to, VAP as the
10   manager to the manager fees we just described;
11   correct?
12      A   Correct.
13      Q   You can flip to the next document which is
14   Warren Hill 11.  Are you familiar with this document?
15      A   I am.
16      Q   Can you please describe for the record
17   what this document is.
18      A   This is the management agreement for VAP
19   Funding Master Note Trust.
20      Q   This one is dated November 30, 2012?
21      A   Correct.
22      Q   Does this align with the Citi deal?
23      A   This is the Citi deal.
24      Q   This is the first -- This trust was
```

Page 127

```
 1   created in connection with the first real financing
 2   that you were able to obtain as VAP's CEO; correct?
 3      A   Correct.
 4      Q   And I think you said it was $320 million?
 5      A   It was 321, but it was actually reduced
 6   pretty quickly.
 7      Q   And this management agreement is among
 8   Vendor Assistance Program, LLC as the manager;
 9   correct?
10      A   Correct.
11      Q   VAP Funding Master Note Trust Illinois as
12   the issuer; correct?
13      A   Correct.
14      Q   And U.S. Bank National Association as the
15   indentured trustee; correct?
16      A   Correct.
17      Q   If you flip to Page 1 of the agreement
18   which appears just after the Table of Contents, in the
19   preamble, again Vendor Assistance Program is referred
20   as to the manager; correct?
21      A   Correct.
22      Q   Section 2.01 which appears on Page 2 is
23   titled Acceptance of Appointment and Other Matters
24   Relating to the Manager; correct?
```

Page 128

```
 1      A   Correct.
 2      Q   And Subsection A, since this is 2.01A
 3   states:  The issuer hereby hires and appoints VAP but
 4   without transfer to VAP of the issuer's right to
 5   service the assigned receivables, and VAP agrees to
 6   act as the initial manager.
 7          Did I read that correctly?
 8      A   Yes.
 9      Q   So this I guess comparable to the last
10   Section 2.01 we saw in the Bank of America deal in
11   that appoints VAP as the manager?
12      A   It's a little different in that this
13   obviously contemplates VAP could be replaced.
14      Q   Could be.  But VAP has not been replaced
15   as the manager under the terms of this management
16   agreement, has it?
17      A   No.
18      Q   Subsection B in Section 2.01, this lays
19   out various duties that the managers shall undertake;
20   correct?
21      A   Correct.
22      Q   And that relates to servicing the trust;
23   correct?
24      A   Correct.
```

Page 129

```
 1      Q   Then if you flip the page to Page 3,
 2   Section 2.02 is labeled Management Compensation
 3   correct?
 4      A   Correct.
 5      Q   And this provides that the manager shall
 6   be entitled to receive a management fee; correct?
 7      A   Yes.
 8      Q   And the manager which is VAP is earning
 9   that fee in its capacity as manager of this particular
10   trust; correct?
11      A   Yes.
12      Q   And this again references the concept of
13   the fee being potentially divided between senior and
14   subordinate fees; correct?
15      A   Yes.
16      Q   If you can flip to the next document,
17   Mr. Reape, this document -- Strike that.
18          Are you familiar with this document,
19   Mr. Reape?
20      A   Yes.
21      Q   And could you please describe for the
22   record what this is?
23      A   This is the management agreement for VAP
24   Funding Master Trust 2.
```

Page 130

1    Q   And is there a different bank that is
2  affiliated with this transaction?
3    A   Yes.
4    Q   And what is that bank?
5    A   Barclays.
6    Q   This is dated December 15, 2016; correct?
7    A   Correct.
8    Q   This trust, this management agreement is
9  among Vendor Assistance Program as the manager;
10 correct?
11   A   Yes.
12   Q   And VAP Funding Master Trust 2 as the
13 trust; correct?
14   A   Yes.
15   Q   If you flip to Page 1, please, which again
16 follows the Table of Contents, in the preamble, again
17 VAP is listed as the manager; correct?
18   A   Correct.
19   Q   In Section 2.01A the Trust is hiring and
20 appointing VAP as the manager; correct?
21   A   Correct.
22   Q   In Section 2.01B, the manager which is VAP
23 is now obligated to provide various services relating
24 to the assigned receivables; correct?

Page 131

1    A   Correct.
2    Q   If you look at Page 2, there is a section
3  2.02; correct?
4    A   Correct.
5    Q   And that section is titled Management
6  Compensation; correct?
7    A   Correct.
8    Q   And this provision provided that the
9  manager "shall be entitled to receive the management
10 fee specified in the trust agreement;" correct?
11   A   Correct.
12   Q   And as with the previous management
13 agreement, here VAP is earning this management fee in
14 its capacity as manager to this particular trust;
15 correct?
16   A   Correct.
17        (W.H. Deposition Exhibit Nos.
18        13-14 were marked for
19        identification.)
20   Q   Mr. Reape, we have just handed you what's
21 be marked as Warren Hill 13 and 14 which are exhibits
22 to your deposition.  If you could, take a moment to
23 review them.  Then I have a few questions.
24   A   Okay.

Page 132

1        MR. ONUFRAK:  Would you just repeat which one
2  is 13 and which is 14?
3        MR. VOSHELL:  Sure.  13 is the management
4  agreement dated June 21, 2017, and 14 is another
5  management agreement dated August 30 of 2016.
6    Q   Have you had an opportunity to review the
7  documents, Mr. Reape?
8    A   Yes.
9    Q   If you need more time, feel free to let me
10 know.
11        Are you familiar with what's been
12 marked as Warren Hill 13?
13   A   I am.
14   Q   And what is this document?
15   A   That's the management agreement between
16 Vendor Assistance and the IRT funding trust.
17   Q   And I don't know if we have seen that
18 terminology before.  Can with please describe for the
19 record what IRT stands for?
20   A   It's just the name of the trust.
21   Q   Is it an acronym for Illinois Receivable
22 Trust?
23   A   Not meant to be.  I don't think this trust
24 was particularly well-named because the other trust if

Page 133

1  you were going to abbreviate it would be IRT, and I
2  don't think having a totally separate trust with a
3  totally separate vendor with a similar name is good,
4  but I didn't name the trust.
5    Q   Who did name it?
6    A   It was the name that Barclays came up
7  with.
8    Q   Who named the prior trust that we just
9  reviewed?
10   A   Probably just the name -- The VAP trust,
11 just straight forward.  Nobody's very creative with
12 these names.
13   Q   So this management agreement, Warren Hill
14 13 is dated June 21 of 2017; correct?
15   A   Correct.
16   Q   And this would be after the creation of
17 Blue Stone Finance; correct?
18   A   And Bluestone Capital, yes.
19   Q   That was my next question.
20   A   It was after both.
21   Q   And it lists Vendor Assistance Program,
22 LLC as the manager; correct?
23   A   Correct.
24   Q   And it also references Bluestone Capital

Page 134

1    Markets, LLC as the certificate holder representative;
2    correct?
3        A    Correct.
4        Q    And what does that mean?
5        A    So you would note all of the trusts have a
6    certificate holder, certificate holders or certificate
7    holder representatives.
8              So all trusts have to have, if nothing
9    else, a beneficial owner.  So at the bottom of a trust
10   there is a beneficial owner that has a certificate in
11   that trust.  That may be of nominal benefit.  There
12   may be no benefit to having that certificate.  It all
13   depends on the structure of the financing above it.
14       Q    So if you again can flip to Page 1 of the
15   agreement which again follows the Table of Contents,
16   this June, 2017 management agreement again in the
17   preamble lists VAP as the manager; correct?
18       A    Correct.
19       Q    And again it's the defined term Manager
20   with a capital M; correct?
21       A    Yes.
22       Q    And in the third whereas clause which is
23   the fourth paragraph of the entire document, it states
24   that the manager shall -- Strike that.  It states that

Page 135

1    the manager which is VAP shall perform the services
2    set forth herein on behalf of the trust; correct?
3        A    I'm sorry.  Which paragraph are you on?
4        Q    Sure.  It's still on Page 1, Mr. Reape.
5    It's the third whereas clause.
6        MR. ONUFRAK:  15831, correct?
7        MR. VOSHELL:  That's correct.
8        MR. ONUFRAK:  Second line from the bottom of
9    the paragraph.
10       MR. VOSHELL:  Q  It begins whereas on the terms
11   and subject to the conditions hereinafter set forth.
12       A    Okay.
13       Q    Do you see it?
14       A    Yes.  Got it.
15       Q    The manager which is VAP shall perform the
16   services set forth herein on behalf of the trust;
17   correct?
18       A    Correct.
19       Q    And again if we move to Page 2 which is
20   the definitional portion of this contract, it lists a
21   Manager fee and a Manager incentive fee; correct?
22       A    Correct.
23       Q    And both of those defined terms have a
24   capital M before the word manager; correct?

Page 136

1        A    Correct.
2        Q    And these just set forth the fees that the
3    manager is going to earn in its capacity as manager;
4    correct?
5        A    They set forth how it will be calculated.
6    The Manager fee rate obviously we have seen previously
7    is set to define what the given series will actually
8    pay.
9        Q    But pay to the manager; correct?
10       A    Pay to the manager or certificate holder.
11       Q    If, in fact -- Well, we will get to that
12   later?
13       A    If we look at all of the series, we will
14   see there are different variants.
15       Q    In fact, some of the more recent series
16   don't structure the transactions in a way that allow
17   for a senior or junior fees but instead put the value
18   of the management services into a trust certificate;
19   correct?
20       A    Sure.
21       Q    But not this one in particular; right?
22       A    Not the master trust; but, again, there is
23   an ability on the individual series issued under it to
24   define -- So, for example, a Manager Incentive Fee

Page 137

1    might be 0 in a given series because it's defined.
2        Q    In Section 2.01 which appears on Page 4,
3    this states again that VAP will be appointed as the
4    manager; correct?
5        A    Correct.
6        Q    Then about halfway through that paragraph
7    in a sentence that begins with the word in, it says:
8    In consideration of the performance of its duties
9    hereunder, the manager which is VAP shall be paid the
10   Manager fee and the Manager incentive fee with respect
11   to any series in accordance with the terms of the
12   related series trust agreement and subject at all
13   times to the availability of amounts in the collection
14   account for such series; correct?
15       A    Correct.
16       Q    If you turn to Page 5, Article 3 and
17   Section 3.01, this sets forth the duties of the
18   manager; correct?
19       A    Yes.
20       Q    And so these are the duties that VAP was
21   undertaking as manager of this particular trust;
22   correct?
23       A    Correct.
24       Q    If you can flip to what's been marked now



1  as Warren Hill 14, are you familiar with this
2  document, Mr. Reape?
3      A   I am.
4      Q   Can you please describe for the record
5  what it is?
6      A   It's the Manager Agreement for VAP RRT
7  Master Trust 2016.
8      Q   And VAP is the manager of this, is the
9  listed manager in this management agreement as well;
10 correct?
11     A   Correct.
12     Q   If you flip to Page 3, Section 2.02, again
13 it's titled Management Compensation; correct?  It's on
14 Page 3 of the agreement, Mr. Reape.
15     A   Correct.
16     Q   That's sets forth the compensation that
17 the manager which is VAP will receive for performing
18 its duties as manager under this trust?
19     A   Correct.
20     Q   You can put that aside as well.
21         (W.H. Deposition Exhibit No. 15
22          was marked for identification.)
23         Mr. Reape, we have just placed in front
24 you a document that's been marked as Warren Hill 15.

1  If you could, just take a moment to review it; and I
2  have just a few questions for you on it.
3      A   Sure.
4      Q   Okay?  All set?
5      A   Yeah.
6      Q   Now, this is a letter with letterhead from
7  CMS; correct?
8      A   Correct.
9      Q   Is that the same CMS we have referred to
10 throughout your deposition?
11     A   Yes.
12     Q   It states that Michael A. Hoffman is the
13 acting director; correct?
14     A   Correct.
15     Q   Is the director role the one that
16 Mr. Weems had filled that we had discussed?
17     A   Yes.  He was an acting director
18 previously.
19     Q   Was there anybody else between Mr. Weems
20 and Mr. Hoffman to your knowledge in that role?
21     A   It's a revolving door there.  Tim McDevitt
22 is the current acting director, but I'm sure that will
23 change in a couple of months.
24     Q   At least in terms of who, people who you

1  are familiar with today, Mr. Weems was the acting
2  director when you came to VAP; correct?
3      A   Yes.
4      Q   At least of December 13, 2016 it was
5  Mr. Hoffman; correct?
6      A   Yes.
7      Q   And then it's somebody else today?
8      A   It is.
9      Q   And just you don't just don't recall if
10 there was anybody else in between Mr. Weems and
11 Mr. Hoffman?
12     A   I'm sure there was, and the name escapes
13 me; and I also know that it's periodically a position
14 without a director.
15     Q   This letter which is signed by Mr. Hoffman
16 is addressed to VAP Funding Master Trust 2; correct?
17     A   Correct.
18     Q   And it's care of Vendor Assistance
19 Program; correct?
20     A   Correct.
21     Q   And to the best of your knowledge, is that
22 because Vendor Assistance Program is the manager to
23 the VAP Funding Master Trust?
24     A   Yes.

1      Q   And also been because VAP is the qualified
2  purchaser under Illinois law?
3      A   So VAP was the qualified purchaser and
4  trust managed by VAP and by virtue of that work were
5  qualified.  This is a document that the vendor asked
6  us to get produced.
7      Q   And the vendor for this particular deal
8  judging by the date is Barclays; correct?
9      A   Correct.
10     Q   And the re line is Approval of Qualified
11 Purchaser Status; correct?
12     A   Correct.
13     Q   And in the second paragraph, it reads:
14 Pursuant the definition of qualified purchaser under
15 the program terms, this letter shall constitute CM's
16 approval of VAP Funding Master Trust 2.
17         Did I read that correctly?
18     A   Yes.
19     Q   As a qualified purchaser, just to finish
20 that.  Did I read that correctly?
21     A   Yes.
22     Q   Then it says:  This approval is in
23 reliance upon representations and warranties made by
24 Vendor Assistance Program, LLC, VAP that, one, the



Page 150

1     Q   And only Vendor Assistance Program as the
2   servicer; correct?
3     A   Correct.
4     Q   You can put those aside.
5             (W.H. Deposition Exhibit No. 21
6             was marked for identification.)
7          You can set that aside, Mr. Reape.  We
8   will come back to that in a second.
9          We have just spent a good amount of
10  time talking about manager fees that are earned by VAP
11  as the manager.  How does VAP actually obtain that
12  money that are earned?  Strike that.  That's a
13  terrible question.
14         Fees are earned but not necessarily
15  paid at the same time; correct.
16    A   Correct.
17    Q   And can you just explain the difference
18  between earning a manager fee or VAP earning a manager
19  fee and VAP being paid that manager fee from the
20  trust?
21    A   Sure.  Being paid means you get paid cash.
22    Q   Can you be explain the lag in time between
23  earning the fee and actually having the fee paid by
24  the trust?

Page 151

1     A   Sure.  So if there is no money coming in
2   to a given series, there is no way to pay anybody.
3   There are no -- Other than the trustees' expenses,
4   there is no pre funding of any expenses for anybody,
5   interest.  There is no interest reserves, manager fee
6   reserves anything like that.
7     Q   But the manager fee is nevertheless
8   accruing on a monthly basis; correct?
9     A   Accruing.  It doesn't mean it will ever be
10  paid, but accruing, yes.
11    Q   My point is accruing under the terms of
12  the management agreements we just looked at; correct?
13    A   To be clear, accruing under the terms
14  which means there have to be outstanding base payment
15  receivables.  You could you have a note balance
16  outstanding with no receivables.
17    Q   So when the State makes a payment, walk me
18  through the mechanics of how that payment is applied
19  to the trust?
20    A   So it's different for every trust.
21    Q   Why don't you -- You are familiar with all
22  of these trusts, aren't you, Mr. Reape?
23    A   Sure.
24    Q   Why don't you pick one and walk me

Page 152

1   through?
2     A   Sure.  They're very different.
3     Q   Let's start with the Blue Cross Blue
4   Shield deal which was I think inked in February
5   of 2016?
6     A   Specific to the transaction you are asking
7   about which is Illinois Receivables Trust 2, 2016-1,
8   which has two sub series, the priority of payments on
9   that series is trustees' fees, note interest, manager
10  fee, note principal, manager incentive fee; and then
11  to the extent there was any balance which these aren't
12  priced to have, this particular transaction was not
13  priced to have to the certificate holder.
14    Q   Now, you refer to the manager fee.  That's
15  equivalent to the senior fee?
16    A   The senior fee.
17    Q   Then you refer to the manager incentive
18  fee.  That's equivalent to the junior fee?
19    A   Correct.
20    Q   Now, say a payment comes in and it's
21  enough to make the payments to the trustee, make the
22  interest payment and make the senior fee payment, how
23  does the trust go about I guess sending that payment
24  to VAP?

Page 153

1     A   They send a wire.
2     Q   That goes directly to VAP?
3     A   It does.
4     Q   And what bank holds the account that
5   receives that wire transfer from the trust?
6     A   Bridgeview.
7     Q   That's Bridgeview Bank?
8     A   Bridgeview Bank.  It's a local bank.
9     Q   Local here in Chicago?
10    A   Local here in Chicago.
11    Q   Is that just an operating account with
12  Bridgeview?
13    A   It is.
14    Q   Do the wire payments for the other
15  affiliated trusts come to Bridgeview as well?  Let me
16  back up.
17         Is there any payment from any of the
18  trusts that we have talked about so far that would go
19  to a bank other than, go to an account other than
20  VAP's account as Bridgeview Bank?
21    A   Yes.
22    Q   Walk me through that.
23    A   Bluestone Capital Markets who is a
24  certificate holder has an account at Bank of America.



Page 154

1    Q   And would a payment go to Bluestone
2   Capital Markets under this structure only to the
3   extent that there was a residual or trust certificate
4   amount?
5    A   It would depend.  We'd have to look at the
6   individual series.
7    Q   When we're talking about the senior fees
8   and junior fees, we're talking Bridgeview Bank and
9   VAP; correct?
10   A   On initial direction, correct.
11   Q   And when you say initial direction, you
12  mean from the trust?
13   A   We're going to get into later the
14  servicing agreement between the entities; but, yes,
15  they're directed to VAP.
16   Q   So VAP actually receives the revenues from
17  the trust itself?
18   A   Yes.  The payments, yes.
19   Q   Which are revenue; correct?
20   A   Yeah.
21   Q   Correct?
22   A   Correct.
23   Q   Is it a single account that Bridgeview
24  Bank holds for VAP where all of the fees from the

Page 155

1   trusts flow into or are there separate accounts?
2    A   It's one account.
3    Q   Is it just an operating account?
4    A   Just an operating account.
5    Q   If you could look at now the exhibit
6   that's been marked Warren Hill 21, I just want to ask
7   you a few questions about it.  Let me know when you've
8   had enough time to review it.
9    A   We're going to go page by page?
10   Q   We'll do portions of it.
11   A   As we go to subsequent pages, I may need
12  time.
13   Q   That's fine.  If you need more time, just
14  let me know.
15   A   I'm good with the first page.
16   Q   So in the top left-hand corner, this
17  appears to be a Excel spread sheet printout; correct?
18   A   Correct.
19   Q   The top left-hand corner it looks like the
20  name of it, at least as tabbed, was VAP 2017 Cash
21  Receipts.  Do you see?
22   A   That's what it appears to be under this
23  cross-out.
24   Q   Yeah.  That's my next question.  Do you

Page 156

1   see that?  That's crossed out here in either pen or
2   pencil; correct?
3    A   Right.
4    Q   Then there are a number of other notations
5   written in, handwritten in?
6    A   Correct.
7    Q   Is that your handwriting?
8    A   No.
9    Q   Are you familiar with this handwriting?
10   A   I'm not sure.  I'm not sure whose
11  handwriting that is?
12   Q   Do you have a suspicion as to who this is
13  based upon your suspicions involved in VAP's business?
14   A   No.
15   Q   In the bottom right-hand corner it
16  references 2017 cash received; correct?
17   A   Cash receipts.  Cash received, yes.
18   Q   Then in the bottom left-hand corner, it
19  looks like -- You're pretty familiar with Excel,
20  right, Mr. Reape?
21   A   Yes.
22   Q   It looks like that is the print date for
23  this one?
24   A   That's correct.

Page 157

1    Q   And that's 4/2/2018; correct?
2    A   Correct.
3    Q   April 2nd, 2018.
4        Are you aware of when this lawsuit was
5   initiated, Mr. Reape?
6    A   I'm not.
7    Q   Are you aware of whether this lawsuit was
8   initiated before this spread sheet was printed out?
9    A   I'm not.
10   Q   Going back to the numbers here in these
11  various columns, the first column, the label is as of
12  12/31/17; correct?
13   A   Correct.
14   Q   And it lists a series of trusts; correct?
15   A   Correct.
16   Q   I should be more specific given the use of
17  the word series.  It lists about a dozen or more
18  trusts by their name; correct?
19   A   By trust name and series, yes.
20   Q   As of 12/31/17, were these all of the
21  trusts affiliated with VAP's business?
22   A   I'm going to need to change power here.
23  Give me a moment.
24   Q   Sure.

Page 158

1      A   This document is a little thin and light.
2   It's hard to read.
3      Q   I apologize.  This was the manner in which
4   it was produced.
5      MR. ONUFRAK:  Could you repeat the question,
6   please.
7           (Whereupon the last question
8           was read.)
9           Are you referring to the first page or
10  to all of the pages?
11     MR. VOSHELL:  I think you'll see that they're
12  all the same.
13     A   I will need you to ask the question again.
14  Were these all of the trusts?
15     MR. VOSHELL:  Q  Yeah.  Were these all of the
16  trusts affiliated with VAP's business as of 12/31/17?
17     MR. ONUFRAK:  Again, are you asking --
18     MR. VOSHELL:  Still on the first page, Mike.
19     A   No.
20     MR. VOSHELL:  Q  Do you know which ones are
21  missing?
22     A   VAP RRT which doesn't have any senior fees
23  or management fees for that matter, and the Citi trust
24  is not listed here.

Page 159

1      Q   And I guess the VAP RRT, you are saying
2   there are no manager fees associated with that
3   particular trust?
4      A   Correct.
5      Q   So I guess with respect to that trust,
6   were there cash receipts for VAP in 2017?
7      A   You know, I'm not sure.
8      Q   Well, it lists, if you then go to the
9   bottom right-hand corner of this particular page of
10  this the spread sheet, it lists 14.385 million as
11  VAP's receipts for 2017.  Did I read that correctly?
12     A   Correct.
13     Q   Then if you flip to the third page in this
14  particular spread sheet -- and I'll give you a moment
15  to review it.  Tell me when you've had the time?
16     A   Okay.
17     Q   The top left-hand corner of this
18  particular page reads Vendor Assistance Program
19  Operating Account Receipts; correct?
20     A   Correct.
21     Q   And it looks like it's broken up into two
22  banks.  Do you see that?
23     A   Yes.
24     Q   So for January, February, and March, VAP's

Page 160

1   receipts are affiliated with Wintrust; right?
2      A   Correct.
3      Q   Is that a bank that you are familiar with
4   that VAP utilizing?
5      A   Sure.  That was where we had our operating
6   account primarily prior to us entering into a loan
7   with Bridgeview Bank who of course then required to us
8   have an operating agreement with their bank.
9      Q   So as of I guess March of 2017, did VAP's
10  relationship with Wintrust end?
11     A   No.  We still have an open account with
12  them.  We didn't have -- They were not a lender to
13  VAP.  They were just accounts.  As of March 3rd,
14  Bridgeview Bank was a lender to VAP.
15     Q   Also an operating account that would
16  receive for VAP any fees that came in from the trust?
17     A   Anything coming from the trusts, correct.
18     Q   And again you'll see the bottom right-hand
19  corner, again it's the 14.385 million number we saw on
20  Page 1; correct?
21     A   Correct.
22     Q   Let me ask you a question.  Are you
23  familiar with this spread sheet?
24     A   I didn't prepare this schedule.

Page 161

1      Q   You didn't prepare these schedules.  Do
2   you know who did?
3      A   I'm not sure.
4      Q   Have you seen this document before today?
5      A   I may have.  I don't think so, but I may
6   have.
7      Q   You can put that one aside, Mr. Reape.
8           (W.H. Deposition Exhibit No. 22
9           was marked for identification.)
10          Mr. Reape, we have just put in front of
11  you a document marked Warren Hill 22 which is an email
12  string that was produced to my client, Warren Hill by
13  the defendant SFR in connection with this litigation.
14  If you can take a moment to review it, I have a few
15  questions.
16     A   Okay.
17     Q   Mr. Reape, are you familiar with this
18  email chain?
19     A   I'm on it; but to be honest, at this point
20  this late in the year, I don't really remember it.
21     Q   If you look at the second email, you did
22  in fact respond to the email.  You are not just copied
23  on it; correct?
24     A   The second email?

Page 170

1    Q   Now, the letter asks for confirmation
2  relative to the trusts as of December 31, 2016;
3  correct?
4    A   Correct.
5    Q   It doesn't have a start date, but would
6  these numbers run -- the numbers contained in the
7  letter run from January 1st of 2016 to December 31 of
8  2016?
9    A   No.  They would be for all of time.  So to
10  the extent that fees were owed and have accrued, it
11  would not just be for that calendar period.
12    Q   That's a good distinction.  Let's actually
13  look at the columns that are contained in the chart in
14  your letter because I think those will help clarify.
15        The first column is labeled trust name;
16  correct?
17    A   Correct.
18    Q   Did you prepare this table?
19    A   I think we worked on it with RSM.  They
20  may have -- They probably prepared this off the note
21  holder reports.
22        And just to clarify, when I said all of
23  time, the RRT trust was put together in 2016.  All of
24  the note trusts were put together December 30 of 2016

Page 171

1  forward.  So all of time might only include one day
2  beyond 2017.
3    Q   So the first column is Trust Name;
4  correct?
5    A   Correct.
6    Q   And does this list all of the trusts as of
7  December 31, 2016 that are affiliated with VAP's
8  business?
9    A   Yes.
10    Q   We looked at a number of management
11  agreements earlier, but is VAP the manager of each of
12  these trusts?
13    A   Yes.
14    Q   The second column is labeled Total Note
15  Balance as of December 31, 2016; right?
16    A   Yes.
17    Q   Can you explain for the record what the
18  numbers in this column represent?
19    A   So the series, the note series is issued.
20  It has a note balance which would be receivable,
21  purchase, place, plus whatever expenses are being
22  capitalized in there, legal fees, expenses for setting
23  up the trust, prefunding of trust accounts.  So when
24  the note's issued, it's issued for more than just the

Page 172

1  receivables, just for the receivable purchase price.
2        So in the first instance you can see
3  that the note issued was for 116 million, but there
4  were only 115,400,000 of receivables under that note.
5    Q   And when you say 115,400,000, you're
6  referring to the column to the direct right of the one
7  that we were talking about?
8    A   Correct.
9    Q   And that column is labeled Vendor
10  Receivables Outstanding as of December 31, 2016?
11    A   Correct.
12    Q   And then the next column to the immediate
13  right is labeled Total Fees Earned During the Year
14  Ended December 31, 2016; correct?
15    A   Correct.
16    Q   What does this column represent?
17    A   So those are the fees that accrued during
18  the year.
19    Q   There is fees that that are accruing
20  because VAP is managing the trusts that are identified
21  in the first column to the left?
22    A   Yeah.  Pursuant to the management
23  agreement based on receivable balances, fees accrue.
24    Q   And then the column to the direct right

Page 173

1  says, Management fees owed to VAP as of December 31,
2  2016; right?
3    A   Correct.
4    Q   And what do the numbers in this column
5  represent?
6    A   So fees owed would had been fees earned
7  minus fees paid.
8    Q   So if we looked at -- So we're talking --
9  Strike that.
10        The difference between the fees earned
11  category and the fees owed category, is that the cash
12  that came in in 2016?
13    A   Yes.
14    Q   A quick question on Page 2.  There are
15  closing fees and closing fees earned.  Strike that.
16        There is one additional table on
17  Page 2.  It's two columns, and the first is named
18  Trust Name; correct?
19    A   Correct.
20    Q   The second one is Closing Fee Earned At
21  Trust Origination?
22    A   Correct.
23    Q   Can you just describe for the record what
24  this chart represents?



Page 178

1   been obtained from Bridgeview Bank; correct?
2       A   Yes.
3       Q   Is this that loan?
4       A   It is.
5       Q   What was the purpose of the loan?
6       A   To pay off high interest member debt,
7   among other things and for working capital purposes.
8       Q   And which members had debt that were
9   subject to high interest rates?
10      A   SFR and NAI.
11      Q   When you stay SFR, you're referring to SFR
12  Equities which is the defendant in this case?
13      A   Yes.
14      Q   And what was the total amount of member
15  debt that SFR had at the time it was paid down?
16      A   Without looking at the balance sheet, I
17  couldn't tell you.
18      Q   Do you have a general sense of it?
19      A   It could have been north of 3,000,000.
20  There was some additional loans that were made in
21  connection with some financing we did to get certain
22  vendors to a hundred percent.
23          Without seeing all of the loan
24  schedules in front of me and what the actual payoff

Page 179

1   was, I can't tell you the balance sheet balance March
2   of 2007.
3       Q   But fair to say it was millions of
4   dollars?
5       A   Yes.
6       Q   And how much of the member debt associated
7   with SFR was paid off?
8       A   Again, without looking at what
9   distributions had been done on that day, I know a
10  significant portion was paid off.  I know a
11  significant portion to NAI was paid off, but I know
12  there were open balances on both after that date.
13      Q   NAI, does that refer to Mr. Hynes's
14  company?
15      A   No.  That refers to my company, NAI Arc
16  Funding.
17      Q   Do these pay-downs relates to any of the
18  original member debt that was associated with VAP's
19  functions?
20      A   So the SFR debt would be debt they
21  acquired from Warren Hill.
22          (W.H. Deposition Exhibit No. 25
23          was marked for identification.)
24      Q   Mr. Reape, we have placed in front of you

Page 180

1   what's been marked as SFR -- I'm sorry, Warren Hill
2   25. Have you had a chance to review the document?
3       A   I have.
4       Q   Are you familiar with it?
5       A   Yes.
6       Q   Could you please describe for the record
7   what it is?
8       A   It's the audit confirm, audit confirmation
9   for 2017.
10      Q   And this is again on VAP letterhead;
11  correct?
12      A   Correct.
13      Q   And that's reflected in the upper
14  left-hand corner?
15      A   It is.
16      Q   And it again references the qualified
17  purchaser designation that VAP has?
18      A   Yes.
19      Q   And that's in the top right-hand corner?
20      A   Correct.
21      Q   And if you turn to Page Number 3 this
22  time, it's signed by yourself in your capacity as the
23  chief executive office for VAP; correct?
24      A   Correct.

Page 181

1       Q   And the chart itself follows the same type
2   of a format that we saw for 2016?
3       A   Correct.
4       Q   The first column lists trust name;
5   correct?
6       A   Correct.
7       Q   It lists a number of trusts or series of
8   trusts; correct?
9       A   Correct.
10      Q   And is VAP the manager of all of these
11  trusts?
12      A   Yes.
13      Q   And the fourth column from the left again
14  states, total fees earned during the year ended
15  December 31, 2017; correct?
16      A   Correct.
17      Q   And these would be fees that VAP earned in
18  its capacity as manager of the trust; correct?
19      A   Correct.
20      Q   If you could flip to the second page,
21  please, again there is another two column chart there.
22  Do you see that?
23      A   Yes.
24      Q   Again it's listed trust name and closing



Page 194

1  extent that there were changes in revisions, do you
2  recall any of them today?
3      A   No.
4      Q   You would have to actually look at the
5  documents to see what --
6      A   Go back through my whole email chain.
7      Q   Are you aware as to the time or the date
8  that the earn out payment at issue in this case
9  concludes?
10     A   I think you said earlier it's 2018,
11 December, but only from that.  I haven't read it.
12     Q   Did Mr. Harris suggest, Mr. Gene Harris
13 suggest December 31, 2018 as the date that these
14 services agreements would terminate?
15     A   I don't have any recollection specifically
16 that he was the one driving that.
17     Q   Let's stick with Exhibit 27.  Compensation
18 of service provider is defined in Paragraph 5 on
19 Page 2.  Do you see that?
20     A   Yes.
21     Q   And can you just describe for me your
22 understanding of how Blue Stone Finance is compensated
23 for its alleged, any alleged services provided to
24 Vendor Assistance Program?

Page 195

1      A   It's entitled to a percentage of the fees
2  that VAP would otherwise be entitled to.  I guess put
3  another way, there is an assignment of some of the
4  future fees from VAP to Bluestone as consideration for
5  Bluestone providing those services.
6      Q   So it's still fees that I guess VAP is
7  earning.  They're just assigning a portion of those
8  fees to the Blue Stone Finance entity?
9      A   Yeah.  I think earning is an accounting
10 term here.  So as to how the entities are earning
11 fees, the trusts were hard wired.  The payments had to
12 go to a certain place.
13         So the trust specifies that VAP is
14 getting that fee; but if VAP subcontracted to 30
15 different entities, when VAP got the fee, it might
16 distribute all of the money to those entities.
17     Q   Sure.  In fact, that's an interesting
18 point.  If you could look back at the confirmation
19 request for 2017 which I believe was Exhibit 25 --
20     A   Correct.
21     Q   -- this speaks in terms of fees earned by
22 VAP for 2017; correct?
23     A   Yeah.  This is what's been directed to
24 VAP, right.  So this is what the trustee has as do VAP

Page 196

1  under those agreements.
2      Q   In Column 4 on this confirmation request,
3  it say total fees earned; correct?
4      A   Correct.
5      Q   Going back to Section 5 of the services
6  agreement which is that compensation provision, it
7  seems to define -- by all means correct me if you
8  disagree -- compensation in terms of "gross receipts
9  of the company."
10         Did I read that correctly?
11     A   I'm sorry.  Which paragraph are you on?
12     Q   Subparagraph 2, so A2, it says gross
13 receipts of the company?
14     A   Yes.  That's what it says.
15     Q   So the calculations here seems to be some
16 sort of a percentage applied to "gross receipts" of
17 the company; right?
18     A   Yes.
19     Q   And the company if you flip back to Page 1
20 is defined to mean Vendor Assistance Program; correct?
21     A   Yes.
22     Q   So a portion of money received I guess by
23 VAP is being assigned to Blue Stone Finance?
24     A   Correct.  Earned versus received is

Page 197

1  obviously different here.
2      Q   It states its gross receipts of the
3  company under the "applicable management agreement".
4  Do you see that?
5      A   Yes.
6      Q   Then if you look in the next section of
7  the definitions, applicable management agreement is
8  defined, I believe it to mean the management
9  agreements we were referring to earlier today;
10 correct?
11     A   Correct.
12     Q   And these are the management agreements
13 that label or appoint I should say VAP as the manager
14 of the all of the trusts at issue; correct?
15     A   Correct.
16     Q   If you go to Section 9 which is the reps
17 and warranty section, there is a Subsection D; and it
18 says the service provider, and that's Blue Stone
19 Finance in this agreement --
20     A   Uh-huh.
21     Q   -- represents and warrants that all
22 services will be performed in compliance with all
23 federal, state, and local laws and regulations; right?
24     A   Right.



1    Q   Blue Stone Finance is not a qualified
2   purchaser under Illinois law; correct?
3    A   Correct.
4    Q   The next section, Section E in the reps
5   and warranties -- Strike that.
6       So Section 9E states that the service
7   provider which is Blue Stone Finance represents and
8   warrants that all services provided hereunder shall
9   conform with applicable specifications and
10  requirements set forth in the applicable management
11  agreements. Do you see that?
12   A   Yes.
13   Q   And the applicable management agreements
14  again are the ones associated with the trusts;
15  correct?
16   A   Correct.
17   Q   Was there any due diligence done into why
18  this services agreement between VAP and Blue Stone
19  Finance complied with the management agreements that
20  govern the trusts?
21   A   Sure.
22   Q   Can you please describe what that due
23  diligence was?
24   A   Yeah. We looked at the trust agreements.

1   We didn't see any problem with Blue Stone Finance
2   providing these services.
3    Q   Did you look at the management agreements?
4    A   Sure.
5    Q   And you said we. Who is we?
6    A   Most definitely I did.
7    Q   Anybody else?
8    A   Probably reviewed this with Howard &
9   Howard.
10   Q   Who at Howard & Howard did you review it?
11   A   Mark Ryerson. I may have had discussions
12  with other individuals. Again, this was a long time
13  ago.
14   Q   Just going real quick back to Section 5
15  which is the compensation section, the first sentence
16  says -- and I think you alluded to this -- it says, A
17  portion of VAP's gross receipts will be "assigned to
18  Blue Stone Finance"; is that right?
19   A   Correct.
20   Q   Can you just describe for the record what
21  is actually purported to be assigned under the terms
22  of this agreement?
23   A   I think as you just read, a portion of the
24  receipts.

1    Q   Well, I'm a little bit confused because
2   the first sentence says you are hereby assigned a
3   portion of the receivable. Do you see that?
4    A   Okay.
5    Q   Then later on it says gross receipts. I'm
6   not sure -- Did you see the difference there?
7    A   I think they're meant to be the same
8   thing.
9    Q   Who drafted this agreement?
10   A   You know, again I would almost have to
11  look at emails to see. Howard & Howard may have. We
12  may have had the outside firm in Florida draft this.
13   Q   Do you know who the outside firm is in
14  Florida?
15   A   Amanda Wilson is the attorney. I'm not
16  sure of the firm she is with.
17   Q   If you could switch to Exhibit A, Exhibit
18  A lists a number of services; correct?
19   A   Correct.
20   Q   Could you just describe for the record
21  what that exhibit represents?
22   A   Everything that all of our entities do.
23   Q   Then there are percentages associated with
24  each category; correct?

1    A   Correct.
2    Q   What do those percentages represent?
3    A   So looking at every activity that's done,
4   if you look at the consolidated companies because we
5   obviously file a consolidated audit -- it's all of the
6   activities those entities perform.
7       And then it's broken into three trust
8   variants. So one is one type of note transaction.
9   The other is another type of note transaction, and
10  then the third one is a revolving note transaction.
11   Q   And those three different types of
12  transactions, who developed the idea that you had to
13  separate the three of them?
14   A   I did.
15   Q   Who allocated the relative percentages
16  that are reflected in this chart for each them?
17   A   So when we made certain decisions because
18  of risk retention requirements and we made certain
19  decisions regarding the moving of services to Puerto
20  Rico for tax benefits for the members, I put a fairly
21  extensive list together of all activities and how I
22  saw those activities being allocated among the three
23  companies that are being consolidated.
24   Q   So you reference moving or creating a



Page 202

1    company in Puerto Rico.  Whose idea was it to do that?
2        A   So we, my partner, Brian Hynes moved to
3    Puerto Rico in 2014 and was getting certain tax
4    benefits down there.
5            We became aware that there is an
6    opportunity for companies in the U.S. to move certain
7    services to Puerto Rico and get certain tax benefits.
8    It's under Act 20.  It's a way -- They're trying to
9    stimulate the Puerto Rico economy.  So many businesses
10   in the financial services area, mortgage companies,
11   insurers, banks have moved operations down to Puerto
12   Rico to take advantage of Act 20.
13           So Blue Stone Finance was created to
14   save the members of that a substantial amount in tax.
15       Q   Going back to Exhibit A -- we're
16   delineating services -- are you familiar with what is
17   referred to as a transfer pricing study?
18       A   Only when somebody asks me about it.
19   I did a little Googling on it.  I would say there was
20   no formal study done by an independent auditor here.
21   These were activities that I allocated but that
22   obviously in a subsequent audit our auditors have
23   validated.
24       Q   That's the auditing firm that Mr. Harris

Page 203

1    used to be a partner of?
2        A   Yes.
3            MR. ONUFRAK:  I'm serious.  If he does it
4    again, I'm going to ask him to be excused.  I'm not
5    going to put up with it.  I've agreed --
6            MR. VOSHELL:  He's a corporate representative.
7    He's going to stay here.  I will talk to him, but I
8    doubt he's doing anything that's remotely offensive or
9    inappropriate.
10           MR. ONUFRAK:  He is.  He is.
11           MR. VOSHELL:  Mike you've had your head down
12   for half of the deposition.  I don't understand how
13   you could have even seen it happen, if it did which I
14   don't believe.  So we're going to move on.
15       Q   All of the services that are set forth in
16   Exhibit A, are these services that were performed by
17   VAP exclusively prior to the creation of the Bluestone
18   entities?
19       A   Yes.
20       Q   Could VAP itself complete and perform all
21   of these services today if the Bluestone entities were
22   dissolved?
23       A   Yes.
24       Q   If you could go to the second Blue Stone

Page 204

1    Finance agreement, please.  We're now looking at the
2    second Blue Stone Finance agreement.  This one, Warren
3    Hill 28 addresses the time period prior to
4    November 1st, 2017; correct?
5        A   Correct.
6        Q   And it too has a Section 5 for
7    compensation of service provider; correct?
8        A   Correct.
9        Q   And, again, it defines compensation here
10   by way of an assignment; correct?
11       A   I think the same definition as the
12   previous agreement.
13       Q   Well, on that -- And I do think the
14   calculation is done slightly differently here;
15   correct?
16       A   Okay.  Let me take a look.
17       A   Yeah.  Take a look.
18       A   Okay.
19       Q   Would you agree that the calculation
20   itself as to what is purporting to be assigned is
21   slightly different than the prior agreement?
22       A   Yes.
23       Q   Do you know why that is?
24       A   I think it's really it's addressing

Page 205

1    activities that have already occurred versus the other
2    agreement is forward looking.
3        Q   If there were discussions I guess in terms
4    of how to structure this compensation provision or the
5    compensation provision in the other Blue Stone Finance
6    agreement that we looked at, would that be done via
7    email?
8        A   I suspect it probably happened when I was
9    in Puerto Rico.  I sat down with Alan Wilson who
10   assisted me with all of this.
11       Q   When were you in Puerto Rico working on
12   this, if you recall?
13       A   I'm in Puerto Rico once a month.
14       Q   Do you recall when you were specifically
15   working on this, this meaning the two Blue Stone
16   Finance service agreements?
17       A   Yeah.  I was in Puerto Rico in November.
18   Prior I was down there I think twice in August.  Some
19   of it may have been under way then.
20       Q   If you flip to Section 9 of Exhibit
21   Number 28, would you agree that it has representations
22   concerning compliance with applicable laws in
23   compliance with management agreements comparable to
24   the other Blue Stone Finance agreement?



Page 206

1      A   Yes.
2      Q   If you could now flip to the Bluestone
3  Capital Markets agreement which is Exhibit 29?
4      A   Okay.
5      Q   You alluded to it.  But why was Bluestone
6  Capital Markets created?
7      A   So in December of 2016 the risk retention
8  requirements under Dodd Frank, Section 15G which
9  amends the Securities and Exchange Act of I think 1934
10  changed requirements with regard to risk that has to
11  be held by entities that are doing securitization for
12  non-residential backed securitization.
13          Basically the requirement says that if
14  you've acquired receivables and you are selling them
15  off in a transaction, a series, a note, whatever that
16  you have to retain 5 percent of the interest of
17  whatever you're selling off.
18          It's an outshoot from the asset backed
19  mortgage market meltdown of 2008 where there were a
20  lot of really bad loans originally that were
21  securitized and the entities selling them off didn't
22  have any interest in what was being sold.  The thought
23  was requiring retention would make an entity a lot
24  more careful about what they were doing.  So those

Page 207

1  requirements came into place the end of December,
2  2016.
3          When we started working with Barclays
4  on putting a note transaction together which was
5  January of 2017, I was aware of the requirements
6  because of some discussions I had had with BAML.  But
7  the way we were structuring the Barclays transactions,
8  we were going to be the certificate holder; and that's
9  the entity that has to meet the risk retention
10  requirements, the structure we were putting together.
11          So talking with Barclays at the time, I
12  had to get up to speed with risk retention.  So I
13  contacted Foley and Lardner, an attorney that had put
14  together a transaction for us previously that I knew
15  had a lot of structured finance experience just to
16  have him kind of teach me up on risk retention
17  requirements and ways that we could potentially
18  address it.
19          One of the things that came out with
20  the initial suggestion was that we create a special
21  purpose entity to hold the risk.  And our initial
22  thought was that maybe Barclays could loan us the
23  money for us to purchase 5 percent of each one of the
24  notes being issued and have the terms of that so that

Page 208

1  it would be neutral, so that if the note was paying 9
2  percent, we'd just have to pay 9 percent.
3          In ongoing discussions with Foley and
4  Barclays, Foley came up with a way that we could
5  address this.  We would still set up an entity to hold
6  the risk, but we would enter into a risk retention
7  agreement where basically Barclays would agree to, for
8  want of a better word, insure our risk, assume our
9  risk.  So it was quite a bit of negotiation on form.
10          There is a couple of different types of
11  risk retention, vertical, horizontal, whatever.  So we
12  went through a couple of iterations with Foley and
13  Barclays before we settled on the way we were going to
14  address these.
15          So Bluestone Capital Markets was formed
16  for the purpose of holding that risk.  One of the
17  reasons why we obviously had to expedite creating an
18  operating agreement was we were, Bluestone Capital
19  Markets had to be KYC.  They were going to be part of
20  all of these note transactions, so we had to have
21  everything in place for this entity to transact
22  business.
23      Q   Two quick points of clarification.  Then
24  we may need to switch the tape.  You said BAML during

Page 209

1  your answer.  That refers to Bank of America?
2      A   Yes.
3      Q   And you just said KYC, Know Your Customer
4  regulations which respect to doing business in Puerto
5  Rico and elsewhere?
6      A   Well, principally here.  Well, Puerto Rico
7  and the United States are --
8          MR. VOSHELL:  We have to switch the tape.
9  Okay.
10          THE VIDEOGRAPHER:  The time is 1:58.  We're off
11  the record.
12          (Whereupon a brief recess was had,
13              after which the deposition of
14              Mr. Reape continued as follows:)
15          The time is 2:06.  We're back on the
16  record, beginning Disk 3
17          MR. VOSHELL:  Q  Mr. Reape, I'll remind you you
18  are still under oath, and we're back on the record.
19      A   Okay.  Understood.
20      Q   We left off with Exhibit 29 which was a
21  services agreement between Vendor Assistance Program
22  and Bluestone Capital Markets; correct?
23      A   Correct.
24      Q   I think I asked you this with respect to



53  (Pages 206 to 209)

Page 210

1    the Blue Stone Finance Services agreements, but do you
2    recall who drafted the Bluestone Capital Markets
3    services agreement?
4         A    So again it was kind of to my recollection
5    a collaborative effort.  I know that there was a
6    version -- and it can be this agreement -- that Howard
7    & Howard drafted.  I believe the firm in Florida
8    probably had what hand in it, but I mean we would have
9    to take a kind of take the whole email chain to figure
10   it out.
11        I think the agreement's actually a
12   fairly standard style agreement.  Obviously the input
13   I strongly provided with the exhibits of all of the
14   activities the company, you know, amongst our internal
15   discussions how we would allocate among consolidated.
16        Q    So in large measure the same cast of
17   characters were involved with the Bluestone Capital
18   Markets servicing agreements as with the Blue Stone
19   Finance ones?
20        A    Correct.  Again I would have to check with
21   PMA.  PMA would not have reviewed the Bluestone
22   Capital Markets.  My recollection certainly is I
23   showed it to them at the physical meeting in Puerto
24   Rico.  We discussed it.

Page 211

1         Q    Quick question on Bluestone Capital
2    Markets.  Whose idea was it to make it a Florida
3    company?
4         A    So we made it a Florida company because we
5    needed to set it up quickly, and I used one of the
6    members that's got a lot of experience setting up
7    entities and had a lot of capacity which is SFR.
8         Q    That's Mr. Harris?
9         A    Resources down there, yeah.  I mean,
10   again, we're a very small company.  So I try to use
11   all of the member resources and whatever external
12   resources I can.
13        They have an attorney down there that
14   I'm told just sets up entities because they have
15   multiple real estate transactions.  It's just an easy
16   way to get things set up quickly.
17        Q    SFR is affiliated with another company as
18   well; correct?
19        A    So there are multiple entities down there,
20   correct.
21        Q    Are you familiar with the name Alan
22   Ginsburg (phonetic)?
23        A    Yes.
24        Q    To the best of your knowledge, is SFR

Page 212

1    affiliated with Mr Ginsburg or one of his affiliate
2    companies?
3         A    There is an entity called AHG, and there
4    is some intercompany affiliation there.
5         You know, from our perspective, what
6    our members do among their entities and allocations,
7    we're really not that very concerned about that.  It
8    doesn't really impact.
9         To the extent their transfers are
10   governed by the operating agreements, obviously we
11   would get consent.  But certainly I would be free with
12   my interest in NAI to do transfers or bring people in
13   or whatever.  It's just if I transferred outside of
14   that entity, there is a consent provision.
15        Q    But when you refer to the resources in
16   Florida, are you referring to both SFR and also its
17   affiliates like AHG?
18        A    Sure.  I guess I think of them all as one
19   kind of combined entity.
20             (W.H. Deposition Exhibit No. 30
21             was marked for identification.)
22        Q    Take a moment and look at what's been
23   marked as Exhibit Number 30, please.
24        A    Yes.

Page 213

1         Q    Are you familiar with that document?
2         A    I prepared it.
3         Q    And who asked you -- Who if anybody asked
4    that you prepare that document?
5         A    So when you served us with
6    interrogatories, depositions, requests for
7    information, we retained Howard & Howard.  Dan Rubin
8    is primarily the attorney I've dealt with in
9    representation for both VAP, Bluestone Capital, and
10   Blue Stone Finance in connection with this litigation
11   that none of our entities are a party to, none of the
12   three entities I've just mentioned.
13        So it became clear in my discussions
14   with Dan that one of the sets of questions that would
15   come out at some point would be what was the genesis
16   to creating these affiliated entities, and it occurred
17   to me to put a time line together of events for a day
18   like today since my memory month by month is not
19   always the best because of the pure level of activity.
20        I talked to Dan.  I hand wrote out my
21   recollections.  I typed them up quickly.  As the IT
22   record will indicate, there is one version of this
23   document.  When I look at it now, there is some typos
24   and some things stylistically I don't like.  But it



Page 214

1  was more internally to share with Howard & Howard as
2  our counsel just to say, Despite what other claims
3  might come out here, if I ever have to discuss the
4  time line of events, it would help to have them lined
5  up here.
6         So I put this together in July probably
7  after one of your depositions.  You sent a very stoic
8  guy who delivered one of them, but he was fairly nice.
9         So I put this together.  I shared it
10  with Dan Rubin.  We talked a little bit about it; and
11  I said, listen, here are the set of events that
12  happened and here is what I've outlined.
13         He at some later date probably within a
14  week of me preparing this said, Can I share this
15  with SFR's counsel, and I said yes.
16         Internally as the email record will
17  indicate, I did share this with Alan Wilson who works
18  for me; and then at some point when Dan told me that
19  this had been shared with like Mike, I sent Gene a
20  copy.
21    Q   Did Gene as in Mr. Harris ever ask you to
22  compile this time line?
23    A   No.
24    Q   So the decision to undertake this time

Page 215

1  line was yours?
2    A   Yes.
3    Q   But that decision did come after the
4  lawsuit that we're all here today about was filed;
5  correct?
6    A   After it became clear that whether we were
7  party to this action or not which we're not that we
8  would be brought in to give testimony, and that was
9  the point at which I prepared this memo.
10    Q   Was that a decision you made in connection
11  with Mr. Rubin?
12    A   Yeah.
13    Q   And would there be emails from you to
14  Mr. Rubin attaching the draft memorandum that's in
15  front of you as Exhibit 30?
16    A   Yeah.  This is the only version.  This
17  document has no drafts to it.  So if I turn my laptop
18  on right now, you could look at my documents and see
19  there is as pdf a July 9th document.  There is as pdf a
20  moment later.  There is my email to Dan.  There is an
21  email a week later, Should I share this with SFR's
22  counsel and then an email that has been shared at
23  which point I sent Gene a copy.
24    Q   Who did you share the email that you sent

Page 216

1  to Gene attaching a copy?
2    A   No.  I just forwarded it to him.
3    Q   Have you provided that email to anybody in
4  connection with this litigation?
5    A   I have.
6    Q   Who have you provided it to?
7    A   I sent it to Mike.
8    Q   And you're referring to Mr. Onufrak?
9    A   Yes.
10    Q   When did you send that email to
11  Mr. Onufrak?
12    A   Last Friday.
13    Q   Last Friday.  Are you aware that we have
14  been asking Mr. Onufrak for receipt of that very email
15  for the better part of the last two weeks?  I'm asking
16  the witness a question, Mr. Onufrak?
17        MR. ONUFRAK:  Well, I object to your question.
18        MR. VOSHELL:  That's fine.
19    Q   You can answer.  Are you aware we have
20  been asking Mr. Onufrak for that very email?
21    A   No.
22    Q   Would it surprise you he didn't produce it
23  to us?
24        MR. ONUFRAK:  Sir, your question presupposes

Page 217

1  that it's discoverable in the first place; and I've
2  brought the emails with me, and we can discuss them at
3  the appropriate time.
4        MR. VOSHELL:  I think this is the appropriate
5  time.  Why do I not have those emails, Mr. Onufrak?
6        MR. ONUFRAK:  If you have more questions to the
7  witness, go ahead and ask them.
8        MR. VOSHELL:  So you are not going to answer my
9  question?
10        MR. ONUFRAK:  No.  I'm not.
11        MR. VOSHELL:  So this is not the appropriate
12  time to discuss this issue in your view?
13        MR. ONUFRAK:  Yes.  That's correct.
14        MR. VOSHELL:  Q  So let's track who you sent
15  this email to because this is going to be an issue we
16  will have to address.  You sent the original draft to
17  Mr. Rubin?
18    A   Yes.
19    Q   Mr. Rubin of Howard & Howard?
20    A   Correct.
21    Q   He then responded to you asking if he
22  could share it with counsel for SFR; correct?
23    A   Correct.
24    Q   To the best of your knowledge, he did in



Page 222

1  deposition activity that we might be involved in; and
2  I told him about the memo, and I shared it with him.
3      Q   So you specifically shared the memorandum
4  that's been marked as Warren Hill 30 with Mr. Wilson
5  in part to prepare him for deposition testimony that
6  he may have to give in this case?
7      A   No, more of a, hey, this is what's going
8  on and this is what I prepared.
9      Q   To the best of your knowledge, does
10 Mr. Wilson have a consulting arrangement with the AHG
11 group?
12     A   I believe he is still does some work for
13 them, yes.
14     Q   That's a group again affiliated with SFR?
15     A   Correct.
16     Q   Why did you share the -- Strike that.
17         So, to the best of your recollection,
18 all of the exchanges relating to this particular
19 document, Warren Hill 30 occurred in and were
20 completed in July of 2018?
21     A   Correct.
22     Q   Mr. Reape, I'm going to have to ask you to
23 dig back into the pile.  We're going to go back to
24 Exhibit Number 9, the management agreement dated

Page 223

1  February 12, 2016 involving the Blue Cross/Blue Shield
2  receivables.
3      A   Okay.
4      Q   If you could, please flip to Section 4.08.
5  This section is on Page 9 of Exhibit 9; correct?
6      A   Correct.
7      Q   And it reads at:  The manager which is VAP
8  shall not assign, sell, or otherwise transfer its
9  rights, obligations, duties and agreements hereunder
10 except in certain circumstances; right?
11     A   That's what it says, yes.
12     Q   The first of the circumstances is except
13 as permitted by Sections 4.07 or 5.02; correct?
14     A   Correct.
15     Q   If you flip to Section 4.07, that relates
16 to the resignation of VAP as the manager; correct?
17     A   Correct.
18     Q   VAP has not resigned as manager of any
19 trust; correct?
20     A   Correct.
21     Q   The next section referenced by 4.08 is
22 Section 5.02 which relates to any successors to VAP as
23 manager; correct?
24     A   Correct.

Page 224

1      Q   There is no successor to VAP as manager;
2  correct?
3      A   Correct.
4      Q   And VAP has not been terminated as manager
5  of any trust; correct?
6      A   That's correct.
7      Q   Back to Section 4.08.  Okay.  Subsection B
8  says that an assignment I guess could conceivably be
9  proper if there was consent in writing by "the trustee
10 acting upon written direction of the super majority
11 holders of notes of each series or the certificate
12 holder representative."  Correct?
13     A   Correct.
14     Q   Has there been consent in writing by the
15 trustee to the assignment of anything from VAP to Blue
16 Stone Finance?
17     A   On this particular series transaction?
18     Q   Let's stick with this one.
19     A   No.
20     Q   Has there been consent in writing to the
21 assignment of any right that VAP has under the terms
22 of this management agreement by the certificate holder
23 representative?
24     A   No.

Page 225

1      Q   If you could, please, flip to Section
2  6.01.  This appears on Page 11; correct?
3      A   Correct.
4      Q   And this relates to subcontracting;
5  correct?
6      A   Correct.
7      Q   There it states that the manager which is
8  VAP may subcontract with any other person for the
9  performance of any such services with the "prior
10 written consent of the certificate holder
11 representative."
12         Did I read that correctly?
13     A   Yes.
14     Q   Has there been any written consent
15 provided by the certificate holder representative to
16 any subcontracting agreement relating to this
17 management agreement?
18     A   No.
19     Q   If you could please flip to Exhibit 10,
20 we're going to go through the management agreements
21 again if you want to grab all of them.
22         For the record, this is Exhibit 10 to
23 your deposition, and this is the amended management
24 agreement that's dated August 10th, 2016; correct?

MAGNA
LEGAL SERVICES

Page 226

1      A    Correct.
2      Q    This is again the Bank of America/Blue
3  Cross deal; right?
4      A    This is an amendment to the management
5  agreement.  To be clear, there are other vendors.
6  There is another vendor in this trust.
7      Q    But this is an amendment to the
8  February --
9      A    This is an amendment to that management
10  agreement.
11     Q    If you turn to Page 9 again, there is a
12  limitation on assignment of rights and obligations;
13  correct?
14     A    Correct.
15     Q    And it's the same as the limitation we saw
16  in Section 4.08 of the February, 2016 management
17  agreement; right?
18     A    That's correct.
19     Q    And it contains the same limitations;
20  correct?
21     A    It does.
22     Q    And would your answers if I asked them be
23  the same concerning the consents required under this
24  section as they were when we referred to the

Page 227

1  February 2, 2016 one?
2      A    They would.
3      Q    If you turn to Page 12, there is a Section
4  6.01; correct?
5      A    Correct.
6      Q    And it's again relating to subcontracting?
7      A    Correct.
8      Q    It again provides:  Subcontracting may be
9  appropriate but only with the prior written consent of
10  the certificate holder representative; right?
11     A    Correct.
12     Q    And was there a prior written consent to
13  any subcontracting agreement under the terms of this
14  management agreement?
15     A    No.
16     Q    Go to the next trust agreement, please.
17  This is the management agreement which is Exhibit 11
18  dated November 30, 2012.  If you could, please turn --
19  one second -- to Section 2.10.  This section
20  introduces the concept of a sub manager; correct?
21     A    It does.
22     Q    There is no sub manager under the terms of
23  this particular agreement, is there, Mr. Reape?
24     A    I have to see how sub manager is defined.

Page 228

1      Q    Sure.  Let's back up a second.  Section
2  2.10 starts by reading:  The manager shall not be
3  permitted to appoint an agent, a co-manager or
4  affiliate which is then defined as sub manager to
5  perform all or any portion of its obligations as
6  manager hereunder.  Did I read that section correctly
7  so far?
8      A    Yeah.  To clarify, maybe you could ask the
9  question again.
10     Q    Sure.  It then goes on to say:  Unless the
11  manager has received confirmation from the State of
12  Illinois that such appointment and delegation is
13  permitted under the program terms.
14          Did I read that correctly?
15     A    Correct.
16     Q    And then there is some additional
17  requirements in here as well; correct?
18     A    Correct.
19     Q    Did VAP seek confirmation that any
20  appointment or delegation of it's duties to either
21  Bluestone entity was permitted under the program
22  terms?
23     A    No.
24     Q    And as to the other requirements in this

Page 229

1  section, did VAP attempt to obtain any of the consents
2  that are delineated herein?
3      A    No.
4      Q    If you'd turn to what's been marked as
5  Exhibit 12 which is the Barclays deal or what you
6  testified as being the Barclays deal.
7          Again, just to get everyone on the same
8  page, this is Exhibit 12 to your deposition which we
9  looked at earlier.  It's a management agreement dated
10  December 15, 2016.
11          If you turn to again Section 2.10 on
12  Page 7, it is the section entitled sub manager.
13     A    201?
14     Q    2.10.  So it's on Page 7.
15     A    Okay.
16     Q    This provision reads:  The manager which
17  is VAP shall not be permitted to appoint an agent,
18  comanager or affiliate, a sub manager to perform any,
19  all or any portion of its obligations as manager
20  hereunder.  And then it goes on to identify certain
21  conditions that VAP must meet; correct?
22     A    Correct.
23     Q    The first one is that the manager has
24  received the consent of the bank as well as



1  confirmation from the State that such appointment and
2  delegation is permitted under the program terms.
3        Did I read that correctly?
4    A   Yes.
5    Q   Did VAP obtain the consent of any bank
6  with respect to work being performed by Blue Stone
7  Finance under the terms of this particular management
8  agreement?
9    A   No.
10   Q   Did it receive confirmation from the State
11 that such appointment and delegation of any entity
12 other than VAP was permitted under the program terms?
13   A   No.
14   Q   Just so the record is clear, when I refer
15 to program terms, do you understand that I'm referring
16 to the program terms under the VPP?
17   A   That's the definition in the agreement,
18 yes.
19   Q   In fact, while we're discussing the
20 program terms, if you could just pull them out
21 quickly, I would appreciate it.  They were Exhibit
22 Number I think 8.  I'm sorry.  They're Exhibit
23 Number 7.
24   A   Okay.

1    Q   We looked at these program terms earlier.
2  But this time if you could turn to Page 7, please.
3    A   Okay.
4    Q   There is a Section 5.  Do you see that?
5    A   Yes.
6    Q   It says an assigned receivable (or any
7  interest therein) may not be subsequently assigned,
8  sold, or otherwise transferred by a qualified
9  purchaser to any person or entity without the prior
10 execution and delivery to CMS of a qualified purchaser
11 designation with respect to the subsequent assignee
12 and a representation letter in the form attached
13 hereto as Exhibit E, together with written notice of
14 such subsequent assignment to CMS and the
15 participating vendor who initially assigned the
16 assigned receivable.
17       Did I read that correctly?
18   A   Yes.
19   Q   VAP did not deliver to CMS a qualified
20 purchaser designation for Blue Stone Finance; correct?
21   A   That section doesn't apply I believe.
22   Q   Can you please answer my question?
23   A   No.
24   Q   VAP did not deliver to CMS a qualified

1  purchaser designation for Bluestone Capital Markets;
2  correct?
3    A   No.
4        MR. LEVIN:  Just to be clear, no it is not
5  correct or no they didn't?
6        THE WITNESS:  No.  This section doesn't apply
7  to -- There was no designation of any of the
8  receivables we purchased.
9        MR. VOSHELL:  Q  To the extent that this
10 provision does, in fact, apply to Mr. Reape, did VAP
11 take any steps to comply with it?
12   A   It doesn't.
13   Q   That's not my question.
14   A   No.
15   Q   To the extent that a court of law were to
16 find that Section 5 applies, did VAP take any steps to
17 comply with it?
18   A   No.
19   Q   In the middle of Section 5 it reads:  Any
20 purported assignment, sale, or otherwise transfer in
21 violation of this Subsection 5 shall be deemed void
22 ab initio.  Did I read that correctly?
23   A   That's what it says.
24       MR. VOSHELL:  Can we take a quick break.

1        THE VIDEOGRAPHER:  The time is 2:27.  We're off
2  the record.
3            (Whereupon a brief recess was had,
4            after which the deposition of
5            Mr. Reape continued as follows:)
6        The time is 2:49.  We're back on the
7  record continuing Disk 3.
8            (W.H. Deposition Exhibit Nos.
9            32-33 were marked for
10           identification.)
11       MR. VOSHELL:  Q  Mr. Reape, we have placed in
12 front of you two emails that have just been handed to
13 me during the last break.  We have marked them as
14 Exhibits 32 and 33.  Are you familiar with these
15 emails?
16   A   Yes.
17   Q   You see at the top of each of them -- If
18 you wouldn't mind looking at both of them together, I
19 think we can move faster that way.
20       At the top of each of them, there is a
21 header line that says Onufrak, Michael?
22   A   Correct.
23   Q   Are you familiar with a Michael Onufrak?
24   A   Am I familiar Michael Onufrak, yes.

Page 238

1    A   I may have a stronger set.
2    Q   We won't spend much time on it.
3    A   Okay.
4    Q   At the top left-hand corner you see it
5   reads Schedule 1.2(d)?
6    A   Yes.
7    Q   And if you could now compare it to Exhibit
8   Number 35 which is the colorful printout, the cover
9   email to Exhibit 35 is from James Delaney, Jim Delaney
10   to Gene Harris on January 28, 2016.  Do you see that?
11   I think it's under your agreement there.
12    A   Okay.
13    Q   And it attaches a draft or an initial
14   draft of Schedule 1.2(d)?  Do you see that?
15    A   Yes.
16    Q   It says that at the top left-hand corner?
17    A   That's this multi colored --
18    Q   That's correct, the multi colored.
19        It says in the top left-hand corner,
20   based on Citi model and discussion with David Reape.
21   Do you see that?
22    A   Okay.  Yes.
23    Q   Does this refresh your recollection as to
24   having worked with Jim to help develop what ultimately

Page 239

1   became Schedule 1.2(d) of the purchase agreement?
2    A   Nothing specific.  I'm sure I would have
3   provided to Jim as an exiting member anything he would
4   have requested just as I'm sure I would have provided
5   to Gene as an entering member anything they requested.
6        Jim might have the asked for note
7   holder reports or, you know, I'm not really -- or, for
8   that matter, just an explanation of how these trusts
9   work.
10        This is a classic Jim Delaney spread
11   sheet, and anyone that's ever seen a spread sheet of
12   his would recognize this.  This is not something that
13   I prepared.
14    Q   If you look back to the schedule of the
15   contract --
16        You can put the colorful version aside?
17    A   The readable version.
18    Q   Yeah.
19        You'll see there are a number of
20   notations in the left-hand column in gray to senior
21   fees and junior management fees.  Do you see those?
22    A   Yes.
23    Q   It's under the heading waterfall schedule?
24    A   Yes.

Page 240

1    Q   Now, the senior fees as you follow them to
2   the right row by row, it's a hundred -- in this
3   schedule it's 161,000 dollar each month.  Do you see
4   that?
5    A   I'm sorry.  I must not be on the right
6   column.
7    Q   Sure.  Do you see the heading waterfall
8   schedule?
9        MR. LEVIN:  The grayed in area there.
10        MR. VOSHELL:  Q  Do we have you correctly
11   oriented now?
12    A   Close to blind.  But, yes, 161,000 a
13   month.
14        MR. VOSHELL:  Q  You could it's about 161,000
15   each month?
16    A   Yes.
17    Q   When we talked earlier about fees accruing
18   but not necessarily being paid, do you remember that?
19    A   Yes.
20    Q   Given your experience with VAP's business,
21   would these $161,000 reflect amounts accrued or
22   amounts paid?
23    A   It depends on the period of time you're
24   asking me about.

Page 241

1    Q   Well, this is as of the first quarter of
2   2016.
3    A   No fees were being paid.
4    Q   So these would be accruals; correct?
5    A   These would be accruals.  Well, there may
6   have been periods of time during the first quarter
7   where we were paid.  I'm certain in March and going
8   forward from March, very intermittent activity for
9   most of this particular trust.
10    Q   But the senior fee is a 1 percent per
11   month fee in a lot of management agreements that we
12   saw; right?
13    A   Not on the Citi trust, different fee
14   structure.
15    Q   Let me back up.  The numbers here are
16   $161,000 every month, correct, on this schedule?
17    A   That's what's listed there yes.
18    Q   And again you think, you believe that's
19   consistent with it being accruals as opposed to cash
20   payments?
21    A   So I'd have to do the math.  That's an
22   accrual on the Citi line on the senior fee of probably
23   approximately 75 or $80 million of outstanding.
24   I think that's right, yeah.



Page 270

1  Q   And it states that during employment with
2  the company --
3        Now, company is defined on Page 1 as
4  Blue Stone Finance, LLC; right?
5     A   It is.
6     Q   -- employee, which is Mr. Wilson, may be
7  eligible to receive payment of an annual bonus as set
8  forth in the Vendor Assistance Program, LLC Employee
9  Bonus Plan. Did I read that correct?
10    A   Yes.
11    Q   Is this the Employee Bonus Plan you
12 referred to earlier today?
13    A   Yes.
14    Q   So as an employee of Blue Stone Finance,
15 Mr. Wilson is eligible for a bonus payable through
16 Vendor Assistance Program?
17    A   So along with the employee agreement --
18 I'll take the hundred percent blame on this -- I did
19 not produce, there is a separate acknowledgment of the
20 Employee Bonus Plan that are our employees sign.
21        And to make it clear, it could be
22 coming from, the bonus could be coming from any of the
23 entities potentially.
24    Q   And you said that's an acknowledgment?

Page 271

1     A   Yeah. It's a separate stand-alone.
2        When I decided to clean up all of the
3  employment agreements, we brought Chris Nybo who is an
4  attorney -- I also think a state representative --
5     MR. LEVIN:   Senator.
6     A   Senator. He's on the wrong side, a
7  Republican which is the right or wrong side, depending
8  on where you sit which means he's in the minority.
9        I think Chris Nybo did a whole bunch of
10 things for us. We looked at compensation studies to
11 determine how our employees were being compensated,
12 and then I had him put together an employment
13 agreement for the employees of the different entities
14 and, along with that the acknowledgment of the
15 employee, what I would call profit participation bonus
16 agreement which is kind of a one-page agreement that
17 everyone signs. It's not really part of the
18 employment agreement per se which is why I didn't
19 include it here.
20    MR. VOSHELL:   Q   And that's the acknowledgment
21 you referred to earlier?
22    A   It's kind of -- You have to kind of opt
23 into the plan; and, again, it makes it clear that it's
24 100 percent discretionary as to whether anything will

Page 272

1  be paid. So nothing is guaranteed, and it doesn't fix
2  percentages.
3        So it's all subject to board of manager
4  approval. Yes, we're going to pay a bonus; and then
5  we're going to pay Reape a million dollars and
6  everyone else $50,000.
7     Q   You referenced Mr. Nybo?
8     A   Chris Nybo, an Illinois attorney?
9     Q   What firm is he affiliated with?
10    A   Much Shelist I believe is the firm. He's
11 an employment specialist.
12    Q   You said you brought him in to "clean up
13 the employment agreements"?
14    A   No. One of my big focuses last year was
15 general governance; so I wanted to get employees under
16 a formal agreement, under confidentiality.
17        In the beginning of VAP we did have new
18 employees sign like a confidentiality agreement but
19 really not much more than that. So it's a small
20 company with a lot of essential people, so I kind of
21 wanted to get everybody under an agreement.
22    Q   When you say it's a small company, what
23 are you referring to?
24    A   It's a small -- Collectively it's a

Page 273

1  small -- our affiliates. And, again, we've
2  consolidated the affiliates on a financial statement
3  basis. It's a small group of people collectively
4  working on this.
5     Q   I guess while we're on that point, who
6  comprises that small group of people?
7     A   So for VAP -- and some of this is counting
8  distinction. So VAP, we will talk about who has
9  employment agreements first.
10    Q   Okay.
11    A   So for VAP, Patrick Doloughty and Marisol
12 Solis.
13        For Blue Stone Finance --
14    Q   Do you have an employment agreement with
15 VAP?
16    A   I don't have an employment agreement.
17    Q   Do you have an employment agreement with
18 any entity?
19    A   No.
20    Q   For BSF?
21    A   Alan Wilson, Jeff Balvanz, Andrew Reape;
22 and Cody Williams is an employee. He does not have an
23 employment agreement, but he acknowledged -- We made
24 him like an offer letter that he acknowledged terms

Page 274

1    on.
2        Q    What about Bluestone Capital Markets?
3        A    No employees.
4        Q    No employees.
5        A    I am paid through VAP; but on an
6    accounting basis based on the allocations of
7    activities we have done under this servicing
8    agreement, Bluestone Capital Markets reimburses VAP
9    for my salary and expenses.  So I get a W-2 from VAP
10   as a paymaster.
11       Q    You mentioned Mr. Balvanz being a BSF
12   employee; right?
13       A    Yes.
14       Q    Does his company, that Fulcra company do
15   work for BSF?
16       A    They also provide consulting services.
17       Q    Do they provide consulting services to VAP
18   currently?
19       A    You know, I'd almost have to kind of check
20   the accounting records on the way it breaks down, but
21   I think all of our IT is serviced and managed through
22   Blue Stone Finance.
23       Q    And Fulcra is based you said in Colorado
24   somewhere?

Page 275

1        A    Yes.
2        Q    Prior to the creation of Bluestone
3    entities, were all of these individuals considered VAP
4    employees?
5        A    So prior to the creation of the Bluestone
6    entities, Jeff was a consultant.
7        Q    For VAP; correct?
8        A    For VAP.
9        Q    And was his company a consultant, Fulcra a
10   consultant for VAP as well?
11       A    Yeah.  It's kind of -- It's evolved.  So
12   in the beginning, it was entirely Fulcra.  And at one
13   point it got split off between Fulcra and I think one
14   of Jeff's other entities, and now it's strictly Jeff's
15   a W-2 BSF employee and we have used some of Fulcra's
16   resources.  Fulcra has its own employees.
17       Q    Why don't we go one by one.
18       A    Sure.
19       Q    Prior to the creation of the Bluestone
20   entities, was Alan Wilson an employee of VAP?
21       A    No.
22       Q    He was at the time an employee of AHG;
23   correct?
24       A    Yes.

Page 276

1        Q    As least to the best of your knowledge?
2        A    Yes.
3        Q    Prior to the creation of the Bluestone
4    entities, was Andrew Reape an employee of VAP?
5        A    He was.
6        Q    Prior to the creation of the Bluestone
7    entities, was Cody Williams an employee of VAP?
8        A    I believe he was paid as a consultant, so
9    not an employee.
10       Q    When Blue Stone Finance was created, was
11   Mr. Williams paid as a consultant for a period of
12   time?
13       A    On the timing he may have been.
14       Q    But he would have been paid by Bluestone
15   Finance for any of that consulting?
16       A    You know, on allocation basis, who's
17   making payments could be different than who's
18   ultimately responsible.
19       Q    What about Mr. Doloughty, prior to the
20   creation of Bluestone Finance and Bluestone Capital
21   Markets, was he an employee of VAP?
22       A    Yes, and he still is.
23       Q    Same question with respect to Miss Solis,
24   Marisol Solis I should say?

Page 277

1        A    So she has always been an employee of VAP.
2            Let me step back from that.  She was a
3    consultant to Health Care Finance which is one of the
4    entities that's not subject to these activities.  She
5    moved from being an employee of Health Care Finance, a
6    consultant to Health Care Finance to an employee of
7    VAP?
8        Q    Now, you referenced there was I guess
9    internal accounting as to which entity pays for which
10   service or agreement?
11       A    Sure.
12       Q    Is there a spread sheet or a series of
13   spread sheets that would show that flow of money from
14   one company to another?
15       A    Yes.
16       Q    And how was that stored?
17       A    So obviously each entity has its own set
18   of accounting records and books.  You know, with
19   regard to the intercompany transfers, you know, there
20   are going to be a lot of documents out there.
21           You showed an email from the bank
22   obviously that showed an intercompany transfer.
23   Obviously when you have affiliated companies that are
24   performing different services for each other, there



Page 286

```
1        Q    And that attachment is reflected in the
2   second page of the exhibit?
3        A    It is.
4        Q    I should say the second and the third
5   page.
6             And Mr. Harris writes, As a follow-up
7   to a meeting, I have put together the attached outline
8   separating services, responsibilities, and revenue
9   sources by companies.
10            Did I read that correctly?
11       A    Yes.
12       Q    And he's referring to separating up
13  services, responsibilities, and revenue sources among
14  VAP, Bluestone Capital Markets, Blue Stone Financial
15  Services and also Health Care Finance?
16       A    Uh-huh.
17       THE REPORTER:  Is that yes?
18       THE WITNESS:  Yes.
19       MR. VOSHELL:  Q  And he says this a rough first
20  draft.  Do you see that?
21       A    Yes.
22       Q    Is this the first time that anybody either
23  at VAP or another other entity attempted to separate
24  out services, responsibilities, and revenue services
```

Page 287

```
1   by company?
2        A    So, you know, again I'd have to kind of
3   check to see if I have any email records.  Obviously I
4   had -- because Gene would not have had the ability --
5   identified all of the services, all of the activities
6   being performed across all of the trusts.
7             So I think separately I had my own
8   notes, and I don't know what documents I may have
9   created in Word, but certainly my own notes.
10            Also I would point out that I was at
11  the meeting with him in San Juan, and he and I spent
12  quite a bit of time there and quite a bit of time
13  talking about this.
14       Q    Who is Edgar that you met with?
15       A    That's our attorney at PMA.
16       Q    In Puerto Rico?
17       A    In Puerto Rico.
18       Q    And Mr. Harris then writes, as a next
19  step, I will start to work through the economics
20  (profitability by entity) to see what sort of results
21  this gives us; right?
22       A    Sure, yes.
23       Q    So Mr. Harris here is focusing on the
24  profitability of each entity; correct?
```

Page 288

```
1        A    Yes.
2        Q    And he's focused on the results of
3   separating out these various alleged services;
4   correct?
5        A    Right.
6        Q    And seeing what profit results various
7   permutations of that separation would develop; right?
8        A    So results here actually refers to the
9   absolute and principal purpose of creating Blue Stone
10  Finance, tax impact.
11       Q    And that's your understanding as to why
12  you believe it was created correct?
13       A    No.  That's why it was created.
14       Q    Are you aware that it was created just
15  weeks after a dispute with respect to the member
16  purchase agreement arose?
17       A    No.
18       Q    And you don't speak for Mr. Harris, do
19  you, Mr. Reape?
20       A    I don't.
21       Q    And do you don't know what his motives
22  were, do you?
23       A    No.
24       Q    And you're aware that SFR in this case is
```

Page 289

```
1   taking the position that any money assigned or
2   allocated to Blue Stone Finance should not be included
3   in the provision of the member purchase agreement?
4        A    I am aware of that via this litigation.
5        Q    At this time, August 5th, 2017, was there
6   an office for Blue Stone Finance in Puerto Rico?
7        A    We were in the process of leasing space.
8        Q    So no?
9        A    No.
10            Let me, if I could, step back from
11  that.  Brian Hynes's principal residence in Puerto
12  Rico was our listed office address.
13       Q    But you said he moved in there in 2014?
14       A    Correct.
15       Q    And Blue Stone Finance wasn't created
16  until March of 2017?
17       A    Right.
18       Q    So there was no new office for Blue Stone?
19       A    No.  At the time Blue Stone Finance was
20  created, our principal office was Brian's house or
21  Brian's condo.
22       Q    Were there any employees of Blue Stone
23  Finance as of August 5th, 2017?
24       A    No.
```