# EXHIBIT 4

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

WARREN HILL, LLC                )
                                )
        Plaintiff,              )
                                )
    vs.                         ) No. 2:18-cv-01228-HB
                                )
SFR EQUITIES, LLC               )
                                )
        Defendant.              )

    The deposition of ALAN SCOTT WILSON, taken before Janet L. Brown, CSR, pursuant to the provisions of the Code of Civil Procedure of the State of Illinois and the Rules of the Supreme Court thereof pertaining to the taking of depositions, taken at 200 South Michigan Avenue, Chicago, Illinois, commencing at 9:16 a.m. on the 16th day of October, 2018.

MAGNA LEGAL SERVICES
(866)624-6221
www.MagnaLS.com



```
1    APPEARANCES:
2       ELLIOTT GREENLEAF, P.C.
        925 Harvest Drive, Suite 300
3       Blue Bell, Pennsylvania 19422
        BY:  MR. GREGORY S. VOSHELL
4              and
           MR. LOUIS BALLEZZI
5       (gsv@elliotgreenleaf.com)
           appeared on behalf of the Plaintiff;
6
7       HOWARD & HOWARD
        200 South Michigan Avenue, Suite 1100
8       Chicago, Illinois 60604
        BY:  MR. SCOTT M. LEVIN
9       (312)456-3648
        (SML@h2law.com)
10         appeared on behalf of the Deponent;
11
        WHITE AND WILLIAMS, LLP
12      1650 Market Street, Suite 1800
        Philadelphia, Pennsylvania 19103
13      BY:  MR. MICHAEL N. ONUFRAK
        (215)864-7174
14      (onufrakm@whiteandwilliams.com)
           appeared on behalf of the Defendant.
15
16   ALSO PRESENT:
17      Jason Cannon
        Jeff Wilhite - Videographer.
18
19
20
21
22
23
24
```



Page 34

1   Q. A computer programmer?
2   A. Uh-huh.
3   Q. Okay. Do you know where Tealbridge is
4   located out of?
5   A. I believe Colorado.
6   Q. Do you know where Fulcra is located
7   out of?
8   A. I'm not sure. I would guess Colorado,
9   but that's a guess.
10  Q. Why would that be your guess?
11  A. Because that's kind of what sticks in
12  my mind with their invoice, but ...
13  Q. Do you know whether Tealbridge and
14  Fulcra are related entities in any respect?
15  A. I don't believe they are.
16  Q. Now, in terms of who actually makes
17  the payments -- let's start with NAI Ark. Which
18  entity pays Mr. Reape's company $3,000 a month?
19  A. We're talking all these were Blue
20  Stone Finance. The question was who consults for
21  BSF, and so BSF is going to be the one that pays
22  all those people.
23  Q. Is BSF -- is Blue Stone Finance
24  reimbursed by any other entity for paying those

Page 35

1   costs?
2   A. No.
3   Q. And the accountants are paid directly
4   by BSF as well?
5   A. ClearPath, correct.
6   Q. What about RSM?
7   A. RSM is paid by BCM, and it's -- the
8   cost of the audit is then allocated to the
9   affiliates, BCM, VAP, and BSF.
10  Q. So all three of those entities, BCM,
11  BSF, and VAP, pay a portion of whatever the cost
12  is for --
13  A. Right.
14  Q. -- the audit performed by RSM --
15  A. Right. BCM pays --
16  Q. Please let me finish my question.
17     BCM pays originally, and then
18  it's reimbursed by the other entities?
19  A. That is correct.
20  Q. Which entity pays the legal fees to
21  PMA?
22  A. BSF.
23  Q. Same question with respect to Howard &
24  Howard.

Page 36

1   A. Probably all three, but the -- we were
2   talking about BSF, so BSF pays for the work I
3   described that Howard & Howard does for BSF.
4   Q. And with respect to IT, BSF makes
5   payments directly to Tealbridge?
6   A. Correct.
7   Q. To your knowledge, is Tealbridge paid
8   by either Bluestone Capital Markets or VAP?
9   A. No.
10  Q. Blue Stone Finance makes direct
11  payments to Fulcra?
12  A. Yes.
13  Q. To the best of your knowledge, is
14  Fulcra paid by either Bluestone Capital Markets
15  or VAP?
16  A. No.
17  Q. Prior to the creation of Blue Stone
18  Finance, was Fulcra paid any fee by the Vendor
19  Assistance Program?
20  A. Yes.
21  Q. So Fulcra was a consultant for VAP
22  before the creation of Blue Stone Finance?
23  A. Yes.
24  Q. And what services does Fulcra provide

Page 37

1   to BSF?
2   A. Fulcra provides IT services.
3   Q. And what do those entail?
4   A. Software, network, running the IT, and
5   the -- the proprietary software.
6   Q. And were these the same type of
7   services that Fulcra provided to VAP before the
8   creation of Blue Stone Finance?
9   A. Yes.
10  Q. And you mentioned proprietary
11  software. Does that refer to software that was
12  in place before the existence of Blue Stone
13  Finance?
14  A. Yes.
15  Q. And so that would have been VAP's
16  proprietary software?
17  A. Yes.
18  Q. Which, I guess, based on your
19  testimony, now Blue Stone Finance is using?
20  A. It licenses -- VAP licenses the
21  software to Blue Stone Finance.
22  Q. And is there a fee associated with
23  that license?
24  A. There is.



Page 54

1  for Mr. Harris.
2      Q.  And just from a timing standpoint, did
3  you work for Mr. Harris from the time you got to
4  AHG Group until you actually became an employee
5  of Blue Stone Finance?
6      A.  Correct.
7      Q.  So that's approximately 11 years?
8      A.  It's less.  It's nine and a half.
9      Q.  Do you consider yourself to be a
10 friend of Mr. Harris's?
11     A.  Yeah.  We -- you know, work friend.
12     Q.  Do you see him in social settings?
13     A.  No.  No.
14     Q.  Prior to moving to Puerto Rico, did
15 you see him in social settings?
16     A.  Rarely.
17     Q.  Did you take direction from Mr. Harris
18 in your capacity -- or during your employment
19 with the AHG Group?
20     A.  Yes.
21     Q.  Do you still take direction from
22 Mr. Harris in connection with your consulting
23 arrangement with AHG?
24     A.  From Mr. Harris and from Mr. Ginsburg.

Page 55

1      Q.  In your current consulting capacity
2  with AHG, you take direction from both
3  individuals?
4      A.  Correct.
5      Q.  What percentage would you say of your
6  consulting now with AHG is affiliated with
7  Mr. Harris?
8      A.  It's a 50/50.
9      Q.  When you say "it's a 50/50," is that
10 the deal or is that how it plays out in practice?
11     A.  It's the duties are I work for
12 Mr. Ginsburg project-specific stuff, half, and I
13 work for things that I show Mr. Harris, like
14 here's our benefit -- here's my recommendations
15 for the benefit program, here's a 401-K plan,
16 here's the -- stuff like that.
17     Q.  Now, with respect to the work you're
18 doing now for Mr. Harris under this consulting
19 agreement, how much of that is related to Blue
20 Stone Finance?
21     A.  Zero.
22     Q.  So how much time a week are you
23 spending in connection with the consulting work
24 that you perform for Mr. Harris?

Page 56

1      A.  I would say ten, ten hours.
2      Q.  And your testimony here today is that
3  those ten hours do not relate in any way to Blue
4  Stone Finance?
5      A.  That's correct.  And the ten is -- ten
6  hours is combined with Mr. Ginsburg and
7  Mr. Harris.
8      Q.  So approximately five hours associated
9  with each of them?
10     A.  Yeah.
11     Q.  In connection with your either
12 employment or consulting with Mr. Harris, has he
13 ever altered your work product that you provided
14 to him, to your knowledge?
15     A.  I'm -- I know he's given me feedback,
16 caught errors.
17     Q.  You don't know if he's made any
18 alterations, though, without your knowledge?
19     A.  Don't know.
20     Q.  Does Mr. Ginsburg have any business
21 connections to Puerto Rico?
22     A.  Mr. Ginsburg is -- has a membership
23 interest through one of his entities in Blue
24 Stone Finance.

Page 57

1      Q.  Is that separate and apart from SFR's
2  interest in Blue Stone Finance?
3      A.  It's -- SFR on January 1st, '18
4  distributed its Blue Stone Finance member
5  interest to three entities that were the same as
6  the owners of SFR, you know, common -- common
7  interest.
8      Q.  And what were the name of those three
9  entities?  Or what is the name of those three
10 entities?
11     A.  I would call them -- I'm not sure the
12 exact one is Gorovitz Family Trust.  Gorovitz
13 Family Trust.  One, which is an Aaron Gorovitz
14 entity; one is HFP something, which is a Gene
15 Harris entity; and then one is AHG something,
16 which is Ginsburg.
17     Q.  Why was SFR Equities' membership
18 interest in Blue Stone Finance split into these
19 three different entities at the beginning of
20 2018?
21     A.  The 2017 tax reform passed in December
22 2017.  After analyzing that, it was advantageous
23 from a tax perspective for the ownership of BSF
24 to be changed that way.



Page 62

```
 1  transaction?
 2       A.  I would need the documents.  I could
 3  give a general overview.
 4       Q.  Please do.
 5       A.  SFR Equities was -- is a member of
 6  CHGO Real Estate.  CHGO Real Estate is a member
 7  of the three initials, VAP, BSF, BCM, and the
 8  members in CHGO Real Estate are BFH Investments
 9  and SFR Equities.  And at January 1st, 2018, the
10  SFR entities moved a piece of its ownership, some
11  percentage of its ownership in the three entities
12  in to CHGO, and there was some cash or agreement
13  where Mr. Hynes bought that or some transaction
14  to make it that the economics were fair, and the
15  goal was to have CHGO be a 50/50 partner.
16       Q.  Between SFR --
17       A.  Yeah.  Just the CHGO piece.
18       Q.  So -- I'm sorry.  I didn't mean to
19  interrupt you.
20           So the goal was to have CHGO Real
21  Estate be owned half by SFR and half by BFH?
22       A.  That was the end result.
23       Q.  And BFH, again, is the company
24  affiliated with Mr. Brian Hynes?
```

Page 63

```
 1       A.  Correct.
 2       Q.  And do you know why that was the goal
 3  or what prompted these transactions?
 4       A.  No.
 5       Q.  Were you involved in the transactions
 6  in any way?
 7       A.  I did math.
 8       Q.  You said you did math?
 9       A.  Yeah.
10       Q.  And would your involvement in these
11  transactions be memorialized in email
12  communications?
13       A.  Definitely in spreadsheets, yes.  They
14  would have been emailed.
15       Q.  And where would those spreadsheets and
16  emails be maintained currently?
17       A.  On the server in the cloud.
18       Q.  Which --
19       A.  Blue Stone Finance.
20       Q.  Okay.  So they would be on the Blue
21  Stone Finance cloud?
22       A.  Correct.
23       Q.  And similar to the QuickBooks, that
24  would be some -- those type of documents would be
```

Page 64

```
 1  something that you could access and put onto a
 2  zip file or a CD?
 3       A.  Yes.
 4       Q.  And has anybody asked you to do so
 5  prior to today?
 6       A.  I don't think so.
 7       Q.  Okay.  Did SFR, to your knowledge, own
 8  any interest in CHGO Real Estate prior to 2014?
 9       A.  I don't think so.
10       Q.  Do you have an estimated date as to
11  when SFR owned any part or was a member in any
12  respect of CHGO Real Estate?
13       A.  I don't know when it was.
14       Q.  Who would know?
15       A.  Mr. Harris.  Or Mr. Hynes.
16       Q.  Do you know whether Mr. Hynes and
17  Mr. Harris have other business deals that are
18  either -- that either have been consummated or in
19  the process of being consummated unrelated to
20  Blue Stone Finance or Bluestone Capital Markets?
21       A.  I don't.
22       Q.  You don't know --
23       A.  I don't know of any.
24       Q.  Do you know whether Mr. Hynes has any
```

Page 65

```
 1  business dealings either completed or ongoing
 2  with Mr. Ginsburg?
 3       A.  He does not.
 4       Q.  And when I refer to Mr. Ginsburg, I'm
 5  also referring to any of Mr. Ginsburg's
 6  affiliated companies.
 7       A.  Yeah.  I'm not aware of any.
 8       Q.  Well, those are two different -- two
 9  different answers.  First you said he is not --
10       A.  Yes.
11       Q.  -- and then you said you're not aware.
12       A.  Yes.
13       Q.  So which one is it?
14       A.  I am not aware.
15       Q.  In connection with the splitting of
16  the interest -- SFR's interest in Blue Stone
17  Finance, were there any studies undertaken to
18  value the interest?
19       A.  I don't know.
20       Q.  Well, you said you were involved in
21  doing the, quote, math; right?
22       A.  Correct.
23       Q.  Did you speak to anybody else about
24  valuing the interest in Blue Stone Finance?
```



Page 66

1  A. No. I didn't -- my point was purely
2  cap tables and percentages.
3  Q. If a study of any sort was performed,
4  who would know about that?
5  A. Mr. Hynes and Mr. Harris.
6  Q. At any point did you advise Mr. Hynes
7  or Mr. Harris that they should engage in some
8  sort of a study to value the interest that they
9  were transferring among themselves?
10 A. No.
11 Q. In your role at Blue Stone Finance as
12 vice president, who do you report to?
13 A. David Reape.
14 Q. Is there anybody between you and
15 Mr. Reape in the reporting chain?
16 A. No.
17 Q. Why did you move from your role at AHG
18 to your current role at Blue Stone Finance?
19 A. I wanted the adventure of moving to
20 Puerto Rico and starting up Blue Stone Finance.
21 Q. And what -- when you say "starting up
22 Blue Stone Finance," what are you referring to?
23 A. Blue Stone Finance was created in 2017
24 and is the back office provider for VAP and BCM.

Page 67

1  Q. And that --
2  A. And HCF.
3  Q. And you said HCF; correct?
4  A. Correct.
5  Q. And what does that acronym stand for?
6  A. Healthcare Finance.
7  Q. And is that an operating business
8  currently?
9  A. It still has some trickling
10 operations.
11 Q. And what would fall under the umbrella
12 of a trickling operation?
13 A. It has -- it has collections of some
14 receivables.
15 Q. And what receivables would those be?
16 A. They would be timely pay, which is
17 different than prompt pay, receivable, medical
18 receivables.
19 Q. And what do you mean by the term
20 "medical receivables"?
21 A. Healthcare Finance did a transaction
22 with a third-party administrator HealthLink, and
23 HealthLink is the third -- is one of the
24 third-party administrators for the State of

Page 68

1  Illinois health insurance.
2  Q. Going back for a moment, you said that
3  Blue Stone Finance performs back office work for
4  VAP and Bluestone Capital Management?
5  A. Correct.
6  Q. That's the same back office work that
7  had been performed by VAP prior to the creation
8  of the Bluestone entities; correct?
9  A. Correct.
10 Q. So when you say you were excited for
11 the adventure of moving to Puerto Rico and
12 starting BSF, are you really just referring to
13 moving an existing business to a new office in
14 Puerto Rico?
15 A. No.
16 Q. Do you recall whose idea it was to
17 start BSF or Blue Stone Finance?
18 A. No.
19 Q. Was it your idea?
20 A. No.
21 Q. Who first raised the idea with you?
22 A. I believe it was from either board
23 discussion or conversation with Mr. Harris about
24 the tax incentives for Puerto Rican entities. So

Page 69

1  that's -- and then I heard that -- that it was
2  moving forward.
3  Q. And what was the time frame when you
4  first heard about the creation of Blue Stone --
5  or the potential creation of Blue Stone Finance?
6  A. I would say 2016, 2017.
7  Q. And I believe you referred to Act 20
8  earlier today. What is Act 20?
9  A. Act 20 is Puerto Rican law where --
10 the summary is if you create a company in Puerto
11 Rico that meets Act 20 requirements, which
12 basically are you provide a list that -- the list
13 of goods and services that you provide are in the
14 Act 20 list, then your Act 20 entity pays 4
15 percent tax on income that is derived from the
16 mainland states.
17 Q. And were you familiar with Act 20
18 prior to the discussion concerning the creation
19 of Blue Stone Finance?
20 A. I had an overview of it.
21 Q. Just a general awareness of it?
22 A. Yeah, just an article here and there.
23 Q. Did you, I guess, study up on Act 20
24 after this Blue Stone Finance idea was floated by



### Page 70

1 either board of manager discussions or
2 Mr. Harris?
3    A.  I did when I started my due diligence
4 to becoming an employee of Blue Stone Finance.
5    Q.  Do you know whether either VAP or any
6 other entity affiliated with VAP engaged a law
7 firm to provide a legal opinion as to Act 20
8 compliance in advance of creating Blue Stone
9 Finance?
10    A.  I do not know.
11    Q.  Do you know who would know if such a
12 legal opinion was procured?
13    A.  Mr. Harris or Mr. Hynes or Mr. Reape.
14    Q.  Is there an application that goes
15 along with an Act 20 designation?
16    A.  Yes.
17    Q.  And who fills out that application?
18    A.  The company, Blue Stone Finance.
19    Q.  Did you fill out that application for
20 Blue Stone Finance?
21    A.  David Reape and I worked on the
22 application that was then completed by PMA.
23    Q.  And PMA is the law firm in Puerto
24 Rico?

### Page 71

1    A.  Correct.
2    Q.  Did Mr. Harris have any role in that
3 application?
4    A.  He had to provide a resume and
5 signatures or, you know, a letter of reference
6 from a bank or something like that.
7    Q.  Is that application process distinct
8 from the "Know Your Customer" requirements or are
9 they one and the same?
10    A.  I don't think there's a K --
11 "Know Your Customer," KYC, I don't think there's
12 a KYC -- I don't think of Act 20 with a KYC.
13    Q.  So you think of them as distinct?
14    A.  Yes.
15    Q.  Is the Act 20 application submitted to
16 the United States Internal Revenue Service?
17    A.  It's submitted to one of the Puerto
18 Rican divisions, government.  The Puerto Rican
19 government.
20    Q.  Okay.  But are you saying it's not
21 submitted to the federal IRS?
22    A.  I don't think it does.
23    Q.  Are you familiar with the term
24 "transfer pricing study"?

### Page 72

1    A.  Yes.
2    Q.  And what -- can you explain for the
3 record what that term means to you?
4    A.  It means valuing the goods and
5 services provided between entities.
6    Q.  And to the best of your knowledge, was
7 any transfer pricing study performed in
8 connection with the creation of Blue Stone
9 Finance in Puerto Rico?
10    A.  Internally.
11    Q.  Who internally was involved in what
12 you're purporting to be a transfer pricing study?
13    A.  It was David Reape and myself.
14    Q.  And Mr. Reape is the CEO of Blue Stone
15 Finance?
16    A.  Yes.
17    Q.  And you're a vice president of Blue
18 Stone Finance?
19    A.  Yes.  And Mr. Harris and Mr. Hynes
20 might have -- were -- I know Mr. Harris was
21 involved, and Mr. Hynes I believe was involved
22 also.
23    Q.  Okay.  Isn't the concept of a transfer
24 pricing study to ensure that there's an arm's

### Page 73

1 length transaction occurring?
2    A.  Yes.
3    Q.  And in your experience, are transfer
4 pricing studies often performed by external
5 accountants or consultants?
6    A.  This is my first experience.
7    Q.  Did Mr. Reape ever suggest hiring an
8 external consultant or accountant to perform this
9 transfer pricing study?
10    A.  I don't know.
11    Q.  Well, you said you worked on this
12 internally with him.  Did he ever raise the
13 concept to you?
14    A.  Not to me.
15    Q.  Okay.  Same question with respect to
16 Mr. Harris.
17    A.  Not to me.
18    Q.  Same question with respect to
19 Mr. Hynes.
20    A.  Not me.
21    Q.  So we have Mr. Harris, who's through
22 his company an owner of VAP and Blue Stone
23 Finance; correct?
24    A.  Correct.



Page 74

1  Q. We have Mr. Harris -- I'm sorry,
2  Mr. Reape, who is through his company an owner of
3  VAP and Blue Stone Finance; right?
4  A. Uh-huh.
5  Q. And we have Mr. Hynes, who through
6  himself or his company, is an owner of VAP and
7  Blue Stone Finance; correct?
8  A. Correct.
9  Q. And these three individuals, along
10 with you, decided to do the transfer pricing
11 study without the use of any outside consultant?
12 A. Correct. It was reviewed.
13 Q. Who reviewed it?
14 A. The law firm of PMA, the law firm of
15 Lowndes Drosdick, and RSM Accounting, and
16 ClearPath Accounting.
17     MR. VOSHELL: I'm sorry. Could you read
18 that back?
19     COURT REPORTER: Sure.
20     MR. VOSHELL: Thanks.
21        (Record read as follows:
22         The law firm of PMA, the law
23         firm of Lowndes Drosdick, and
24         RSM Accounting, and ClearPath

Page 75

1         Accounting.)
2  BY MR. VOSHELL:
3  Q. What was provided by either VAP or
4  Blue Stone Finance to PMA in connection with what
5  you are testifying to as a review conducted by
6  that law firm?
7  A. It was a list of all the tasks
8  involved from start -- from cradle to grave of
9  transactions. So a list of all the tasks, which
10 entity performs the task, and then a percentage
11 was derived of the value of those tasks to come
12 up with the hundred percent.
13 Q. And when you're referring to tasks,
14 you're referring to tasks that up until the
15 creation of Bluestone had been performed
16 exclusively by VAP?
17 A. Up until the creation of both
18 Bluestones.
19 Q. Both Bluestone entities had been
20 performed exclusively by VAP?
21 A. Correct.
22 Q. And what you're referring to as a
23 transfer pricing study was a, what, allocation of
24 those tasks among the three entities?

Page 76

1  A. That's a better term for the -- what
2  we're talking about.
3  Q. Allocation as opposed to transfer
4  pricing study?
5  A. Correct.
6  Q. So you would agree that there was
7  really no transfer pricing study conducted by
8  you, Mr. Reape, Mr. Harris, and Mr. Hynes?
9  A. I would call it an allocation study.
10 Q. And what went into that allocation
11 study, as you put it?
12 A. As I described, analysis of every duty
13 task that's involved. Then grouping -- grouping
14 those tasks into logical categories, and then
15 identifying which entity is providing or going to
16 provide those tasks, and then determining a value
17 of what those tasks are contribute to the VAP to
18 the total value.
19 Q. And was this process documented via
20 email?
21 A. Yes.
22 Q. And did either -- well, let me ask you
23 this. Did Mr. Harris ever talk to you about
24 arriving at certain profitability margins for

Page 77

1  each of the entities at the outset of the
2  process?
3  A. No.
4  Q. Do you know whether Mr. Harris raised
5  the idea of profitability of the entities with
6  anybody else affiliated with Blue Stone Finance?
7  A. No.
8  Q. Do you know whether Mr. Harris had
9  started with a desired outcome and then worked
10 backwards to achieve that outcome?
11 A. No.
12 Q. Would that trouble you if he did?
13 A. I know as a framework you -- the -- no
14 desired outcome. You would -- can you repeat the
15 question?
16 Q. Sure. My question is if Mr. Harris
17 started out with a desired outcome and then
18 backfilled to achieve that outcome, would that
19 trouble you?
20 A. Yes.
21 Q. When you were going through the --
22 well, let me back up.
23     Who identified, if you know, the
24 various tasks that went into this allocation



Page 126

```
 1   and then I have a few questions for you.
 2                (Exhibit No. 21 identified.)
 3   BY THE WITNESS:
 4       A.   Okay.
 5   BY MR. VOSHELL:
 6       Q.   Mr. Wilson, are you familiar with the
 7   document that has been previously marked Warren
 8   Hill 21?
 9       A.   Yes. Page 1 and 2, but not page 3.
10       Q.   Okay. Well, I can represent to you
11   that this was a document produced in this
12   litigation by SFR.
13       A.   Okay.
14       Q.   Can you please describe for the record
15   your understanding of this document.
16       A.   Yes. Page 1 is the record -- or a
17   summary of payments received.
18       Q.   Okay. What about page 2?
19       A.   Page 2 is the payments received
20   allocated to the -- between the three entities.
21       Q.   And you said page 3 you're not
22   familiar with?
23       A.   I don't recall this document.
24       Q.   Okay. It looks to me like this is an
```

Page 127

```
 1   Excel sheet that's been printed out; correct?
 2       A.   Correct.
 3       Q.   And if you look in the bottom
 4   right-hand corner of page 1, it has the file name
 5   of the Excel sheet; correct?
 6       A.   Yes.
 7       Q.   Is this an Excel sheet that you
 8   maintained, Mr. Wilson?
 9       A.   Yes.
10       Q.   And is this an Excel sheet that was
11   maintained -- or that is currently maintained on
12   the cloud that you testified about earlier?
13       A.   Yes.
14       Q.   Does this Excel sheet exist in a
15   native format on that cloud; i.e., in an Excel
16   format as opposed to a printed out PDF?
17       A.   I believe so.
18       Q.   And for better or worse, you're fairly
19   familiar with Excel sheets, correct, Mr. Wilson?
20       A.   Yes, sir.
21       Q.   Now, in the bottom left-hand corner of
22   this particular document there's a date 4/2/2018;
23   correct?
24       A.   Yes.
```

Page 128

```
 1       Q.   And based on your experience over the
 2   years with Excel sheets, this is a -- this is a
 3   print date; correct?
 4       A.   That is a print date.
 5       Q.   Are you aware when this lawsuit was
 6   filed, Mr. Wilson?
 7       A.   I am.
 8       Q.   Could you --
 9       A.   It was March 2017.
10       Q.   So prior to the print date of this
11   document; correct?
12       A.   Correct.
13       Q.   And on the top left-hand corner on
14   page 1 there is a notation to "VAP 2017 Cash
15   Receipts" that is crossed out; correct?
16       A.   Correct.
17       Q.   And then there -- above it and below
18   it there are what seem to be handwritten notes;
19   correct?
20       A.   Correct.
21       Q.   Do you know whose handwriting that is?
22       A.   That is Gene Harris's.
23       Q.   Okay. And then above the -- let me
24   back up.
```

Page 129

```
 1           The phrase "VAP 2017 Cash
 2   Receipts" that is crossed out here, is that --
 3   would that appear unimpacted in the native
 4   format?
 5       A.   Unless I -- unless I made that change.
 6       Q.   But as of 4/2/2018 --
 7       A.   Right.
 8       Q.   -- which is after the lawsuit was
 9   filed that brings us here today, the native
10   format of this document, at least with respect to
11   this page, in the top left-hand corner it would
12   read "VAP 2017 Cash Receipts"; correct?
13       A.   Correct.
14       Q.   Did Mr. Wilson instruct you at any
15   point in time --
16       MR. ONUFRAK:  Mr. Harris.
17       MR. VOSHELL:  I'm sorry. Thank you.
18   BY MR. VOSHELL:
19       Q.   Did Mr. Harris instruct you at any
20   time to change the notation in the top left-hand
21   corner of this document in the native Excel file?
22       A.   I don't know. I don't think so.
23       Q.   If we had a native version of this
24   document, would it reflect any changes you made
```



33 (Pages 126 to 129)

MAGNA
LEGAL SERVICES

Page 150

1  Q. 5A.
2  A. You're correct.
3  Q. It seems like that's an error that the
4  "A" in one of the Section 5s is not capitalized;
5  correct?
6  A. Yes.
7  Q. Okay. Also, capitalized terms in
8  contracts, Mr. Wilson, generally have a
9  definition; correct?
10 A. Yes.
11 Q. Do you see a definition for applicable
12 management agreement in either of these services
13 agreements?
14 A. No.
15 Q. Is that another error, Mr. Wilson?
16 A. I don't know. I'm not a lawyer.
17 Q. Also, compensation under the terms of
18 each of these provisions relates to an assigned
19 portion of a receivable under applicable
20 management agreements. Do you see that?
21 A. Uh-huh.
22 Q. Bluestone Capital Markets is not the
23 manager under any management agreement that
24 exists under the vendor payment program, is it?

Page 151

1  A. I don't think so.
2  Q. And neither is Blue Stone Finance;
3  correct?
4  A. Repeat the question.
5  Q. Blue Stone Finance is not a manager
6  under any of the management agreements that exist
7  under the umbrella of the vendor payment program;
8  correct?
9  A. They're a manager of a 2018
10 transaction.
11 Q. And what transaction is that?
12 A. It's a Medicare transaction.
13 Q. Do you mean Medicaid, Mr. Wilson?
14 A. Medicaid.
15 Q. And Medicaid is -- there's an
16 exemption under the vendor payment program for
17 Medicaid transactions; correct?
18 A. It's a -- yes. It's a timely pay.
19 Q. So back to my original question. Blue
20 Stone Finance is not the manager under any
21 management agreement that would fall within
22 the -- under the umbrella of the vendor payment
23 program?
24 A. Correct.

Page 152

1  Q. So does it make sense to define
2  compensation in either of these Section 5s in
3  terms of receivables under applicable management
4  agreements?
5  A. I don't think so.
6  Q. And did you have any role in drafting
7  Section 5 of either of these services agreements
8  between Bluestone Capital Markets and Blue Stone
9  Finance?
10 A. Yes.
11 Q. Did you review Section 5 before these
12 agreements were executed?
13 A. Yes.
14 Q. Did this error not -- was this error
15 not apparent to you when you reviewed it?
16 A. No.
17 Q. No, it wasn't?
18 A. It wasn't.
19 Q. It wasn't apparent?
20    It would seem to me that these
21 compensation schedules don't make any sense given
22 how the vendor payment program actually works.
23 Would you agree?
24 A. No, I don't agree with that statement.

Page 153

1  Q. What do you not agree with about that
2  statement?
3  A. That as -- this agreement provides for
4  the fees that certificate holder, Bluestone
5  Capital Market, receives that they compensate
6  Blue Stone Finance for a portion of those fees.
7  Q. So --
8  A. And they -- they receive.
9  Q. -- is your testimony today that the
10 compensation under the terms of the services
11 agreements between BCM and BSF is solely based on
12 trust certificates that are held by BCM?
13 A. No. It's also based on junior fees
14 that BCM receives.
15 Q. In what context does BCM junior fees?
16 A. Under the VAP/BCM service agreement
17 that we reviewed earlier.
18    (Exhibit No. 56 marked.)
19 THE WITNESS: Put these away?
20 MR. VOSHELL: You can. Thank you.
21 BY MR. VOSHELL:
22 Q. I've placed in front of you,
23 Mr. Wilson, what we've marked as Warren Hill 56.
24 Take a moment to review that. I just have a few



Page 170

1  A. I don't know.
2  MR. ONUFRAK: Could we have a break if
3  you're switching topics?
4  MR. VOSHELL: That's fine.
5  THE VIDEOGRAPHER: This is the end of DVD
6  number 2. Time is 1:27 PM. We are off the
7  record.
8  (Discussion off the record.)
9  THE VIDEOGRAPHER: This is the beginning
10 of DVD number 3. The time is 1:46 PM. We're
11 back on the record.
12 BY MR. VOSHELL:
13 Q. Okay. Mr. Wilson, we're back on the
14 record, and you remain under oath. Okay?
15 A. Correct.
16 Q. I'm going to place in front of you a
17 document that was marked yesterday during
18 Mr. Reape's deposition as Warren Hill 49. If you
19 can take a moment and look at that document and
20 then I have a few questions.
21 (Exhibit No. 49 identified.)
22 BY THE WITNESS:
23 A. Okay.
24

Page 171

1  BY MR. VOSHELL:
2  Q. This is an October 2nd, 2017, email
3  from Gene Harris to Brian Hynes; correct?
4  A. Correct.
5  Q. And Mr. Harris is copying David Reape
6  and you, Al Wilson; correct?
7  A. Correct.
8  Q. And the subject is intercompany
9  agreements; right?
10 A. Correct.
11 Q. And to the best of your recollection,
12 does the term "intercompany agreements"
13 ultimately relate to the servicing arrangements
14 that we reviewed today?
15 A. Correct.
16 Q. Now, as of October 2nd, 2017, there
17 were no intercompany agreements; correct?
18 A. That is correct.
19 Q. In fact, Mr. Harris begins his email
20 by stating that "We are going to need a series of
21 interco agreements between our companies for
22 services"; right?
23 A. Yes.
24 Q. Then at the very end of this email

Page 172

1  Mr. Harris writes "I have some thoughts as to who
2  should draft the agreements"; right?
3  A. Yes.
4  Q. Okay. And do you know who he was
5  considering, Mr. Harris?
6  A. No.
7  Q. Okay. Put that aside.
8  Mr. Wilson, I'm placing in front
9  of you a document that has been previously marked
10 as Warren Hill or WH 50. If you could just take
11 a moment. I have a few questions for you.
12 (Exhibit No. 50 marked.)
13 BY THE WITNESS:
14 A. Okay.
15 BY MR. VOSHELL:
16 Q. This is an email from Mr. Gene Harris
17 to Mr. Brian Hynes; correct?
18 A. Correct.
19 Q. Dated October 9th, 2017; right?
20 A. Correct.
21 Q. And Mr. Harris includes an attachment
22 to this email; correct?
23 A. Yes.
24 Q. And if you look to the attachment,

Page 173

1  Mr. Harris has a number of questions about what's
2  happening with Blue Stone Finance; right?
3  A. Yes.
4  Q. Including the quote, What are we doing
5  in October, end quote; right?
6  A. Uh-huh.
7  Q. Does it surprise you that Mr. Harris
8  was not all that familiar with what was happening
9  with Blue Stone Finance in Puerto Rico in this
10 time frame?
11 A. I don't know if that was the
12 hurricane. What are we doing in October?
13 Because the hurricane hit in September.
14 Q. Okay. Well, Mr. Harris does not
15 reference a hurricane here; correct?
16 A. Yeah.
17 Q. And in fact after he asks about what's
18 happening in October, he asks a number of
19 questions about the operations -- the operation
20 readiness of Blue Stone Finance in Puerto Rico;
21 right?
22 A. Yes. Did we file.
23 Q. Let me go back to my original
24 question. Does it surprise you that Mr. Harris

Page 174

1  in this time frame of October 2017 was seemingly
2  unaware of what was happening with Blue Stone
3  Finance in Puerto Rico?
4       A.  Yes.
5       Q.  You can put that aside.
6            (Exhibit No. 57 marked.)
7  BY MR. VOSHELL:
8       Q.  Okay.  Mr. Wilson, I'm placing in
9  front of you a document that we've now marked as
10 WH 57 or Warren Hill 57.  Please take a moment to
11 look at this and then I'll ask you a few
12 questions.
13      A.  Okay.
14      Q.  Are you familiar with this document,
15 Mr. Wilson?
16      A.  I'm copied here.  I don't -- I don't
17 remember this.
18      Q.  You don't have any doubt that you
19 received it, though?
20      A.  No.  I'm sure I did.
21      Q.  Okay.  In fact --
22      A.  I could have worked on it.  I just
23 don't recall the --
24      Q.  And you use email in the ordinary

Page 175

1  course of your business activities at Blue Stone
2  Finance; right?
3       A.  Yes.
4       Q.  And this is a November 11th, 2017,
5  email from Mr. Harris to Mr. Reape; correct?
6       A.  Correct.
7       Q.  And it copies you, Mr. Wilson, and
8  Mr. Hynes; correct?
9       A.  Correct.
10      Q.  And Mr. Harris writes "This is my
11 first cut of how we allocate the various fees."
12 Did I read that correctly?
13      A.  Uh-huh.
14      Q.  He says "Using this as a starting
15 point, we should put together the intercompany
16 agreements."  Did I read that correctly as well?
17      A.  Uh-huh.
18      Q.  So as of November 11th, 2017, this
19 would indicate that there is still no
20 intercompany agreement that has been drafted and
21 finalized; correct?
22      A.  Yes.
23      Q.  Yes, I'm correct that there is no
24 agreement?

Page 176

1       A.  That's what it says, "we should put
2  together the intercompany agreements."
3       Q.  And Mr. Harris's email here does not
4  reference any service or services that Blue Stone
5  Finance would allegedly provide under those
6  services agreements; correct?
7       A.  Not in this email.
8       Q.  All right.  Same question with respect
9  to Bluestone Capital Markets.
10      A.  Not in this email.
11      Q.  Okay.  And if you flip to the
12 attachment -- actually, real quick, this email is
13 approximately one month after the previous email
14 we looked at where Mr. Harris's questioning
15 what's going on in Puerto Rico; right?
16      A.  Yes.
17      Q.  So if you look to the attachment --
18 and this is, you would agree, Mr. Harris's,
19 quote, first cut at allocating the fees?
20      A.  That's what he said.
21      Q.  And the allocation here, this looks
22 like a spreadsheet; right?
23      A.  Yes.
24      Q.  And if you look at the column titled

Page 177

1  "BSF" -- do you see that column?
2       A.  Uh-huh.
3       Q.  The total allocation that Mr. Harris
4  has included in this first cut is $32.1 million;
5  correct?
6       A.  Correct.
7       Q.  So one month after not knowing what
8  was happening in Puerto Rico, Mr. Harris is
9  allocating $32.1 million to Blue Stone Finance;
10 right?
11      A.  Yes.
12      Q.  Without a reference to any services in
13 this spreadsheet either; correct?
14      A.  Yes.
15      Q.  And you'll note at the top here, it
16 says "As of October 31st, 2017"; right?
17      A.  Correct.
18      Q.  And as of October 31st, 2017, there
19 was no servicing arrangement or agreement between
20 Blue Stone Finance and VAP; correct?
21      A.  Correct.
22      Q.  If you look at the BCM column --
23 that's Bluestone Capital Markets, right,
24 Mr. Harris?



| Page 178 | Page 180 |
|---|---|
| 1  A. Yes. Wilson.<br>2  Q. I'm sorry. What was that?<br>3  A. Wilson.<br>4  Q. Wilson. I apologize. Thank you for<br>5  correcting me.<br>6      Here Mr. Harris has allocated $21<br>7  million to Bluestone Capital Markets; right?<br>8  A. Yes.<br>9  Q. And as of this time period there's no<br>10 agreement, servicing agreement between Bluestone<br>11 Capital Markets and VAP; correct?<br>12 A. Correct.<br>13 Q. You can put that aside.<br>14      (Exhibit No. 58 marked.)<br>15 BY MR. VOSHELL:<br>16 Q. Mr. Harris, I'm placing in front of<br>17 you a document that we've marked WH 58. Let me<br>18 know when you've had a chance to review.<br>19 A. Okay.<br>20 Q. And this is an email -- the email at<br>21 the top of the page, I should say, is an email<br>22 from you, Mr. Wilson, to Mr. Harris, at 1:20 PM<br>23 on November 11th, 2017; correct?<br>24 A. Correct. | 1  given, that were produced, were missing an entry<br>2  for the member bonus commission.<br>3  Q. And what's your understanding of the<br>4  member bonus commission?<br>5  A. There's a member bonus agreement where<br>6  on transactions that a member was responsible for<br>7  bringing in they receive a percentage commission,<br>8  and so there's certain transactions that BFH<br>9  Investments accrues commission on.<br>10 Q. And BFH Investments is Mr. Brian<br>11 Hynes's company; correct?<br>12 A. Correct.<br>13 Q. And when you say Brian here in your<br>14 email on November 11, 2017, you're referring to<br>15 Mr. Hynes?<br>16 A. To BFH Investments.<br>17 Q. Well, you know Brian; correct?<br>18 A. Yes.<br>19 Q. And are they synonymous to you in your<br>20 head?<br>21 A. They're not synonymous, no.<br>22 Q. Well, you wrote Brian here, not BFH;<br>23 right?<br>24 A. Correct. |

| Page 179 | Page 181 |
|---|---|
| 1  Q. And would you agree that your email to<br>2  Mr. Harris is in response to an email that he<br>3  sent you?<br>4  A. It doesn't flow that the -- it looks<br>5  like I might have replied, changed the subject.<br>6  Because it doesn't say RE. It has a new subject.<br>7  And the fact that financial statements I gave him<br>8  didn't have a member bonus accrual have nothing<br>9  to do with his email from below. So I could have<br>10 been -- used bad email technique when I sent him<br>11 that. That's what it appears.<br>12 Q. Okay. And in the bottom right-hand<br>13 corner, you'll note, Mr. Wilson, that it bears<br>14 the Bates stamped number SFR 23924?<br>15 A. Correct.<br>16 Q. Okay. And I'll represent to you that<br>17 this was a document produced to Warren Hill by<br>18 the defendant SFR in the case.<br>19 A. Sure.<br>20 Q. Okay. What were you referring to when<br>21 you said in your email at the top of this chain<br>22 "The statements I gave you today do not have<br>23 Brian's commission in them"?<br>24 A. That financial statements that were | 1  Q. Now, I thought you testified earlier<br>2  that BFH has a consulting agreement with one of<br>3  the three entities; is that right?<br>4  A. That is correct.<br>5  Q. And Mr. Hynes is also a beneficial<br>6  owner of each three; correct?<br>7  A. That is correct.<br>8  Q. And he also receives a potential<br>9  member bonus?<br>10 A. Correct.<br>11 Q. And what is -- how much is his member<br>12 bonus worth?<br>13 A. I'd need a financial statement in<br>14 front of me.<br>15 Q. Can you ballpark it?<br>16 A. 5 million.<br>17 Q. Is that on an annual basis?<br>18 A. No.<br>19 Q. So what's the time frame that<br>20 Mr. Hynes obtained approximately $5 million in<br>21 member bonus amounts?<br>22 A. Through -- through today.<br>23 Q. Okay. When did those start?<br>24 A. Probably 2016. |



46 (Pages 178 to 181)

### Page 218

1   Q.   Thank you.
2        (Exhibit No. 71 marked.)
3   BY MR. VOSHELL:
4   Q.   Mr. Wilson, I've just handed you a
5   document that we've marked as Exhibit WH 71,
6   which is an email and an attachment. When you've
7   had a chance to review, please let me know.
8   A.   Okay.
9   Q.   Mr. Wilson, are you familiar with the
10  document that has been marked as Exhibit 71?
11  A.   Yes.
12  Q.   And could you please explain for the
13  record what that document is?
14  A.   It is a draft of the allocation
15  worksheet and includes a tax forecast.
16  Q.   And what is the allocation worksheet,
17  Mr. Wilson?
18  A.   It is -- it is the Excel worksheet
19  that takes the -- the receipts, receivables,
20  accrued revenue and allocates it between the
21  various entities per the service agreement.
22  Q.   Okay. You mentioned the service
23  agreements. Do you believe that as of the date
24  of this email, which is January 17th, 2018, that

### Page 219

1   there were in fact service agreements in place?
2   A.   Yes.
3   Q.   Okay. And why do you hold that
4   belief?
5   A.   I think there were.
6   Q.   Anything other than your general
7   belief that there were?
8   A.   No.
9   Q.   Between, I guess it was the middle of
10  December email that we looked at a few exhibits
11  ago, and this January 17th email, have I reviewed
12  with you any emails that would entail the review
13  and comment process that we discussed earlier?
14  A.   No, you haven't.
15  Q.   Okay. And I note that this allocation
16  worksheet which is attached is listed as version
17  one; correct?
18  A.   Yes.
19  Q.   And you're sending this to Mr. Gene
20  Harris; correct?
21  A.   That is correct.
22  Q.   Is there a reason that you're not
23  copying David Reape on this email?
24  A.   No.

### Page 220

1   Q.   Mr. Reape at this time is your boss;
2   correct?
3   A.   Correct.
4   Q.   Mr. Harris is affiliated with a
5   company that you have a consulting arrangement
6   with; correct?
7   A.   Right. Mr. Reape should have been
8   copied.
9   Q.   And I believe earlier you testified
10  that your consulting arrangement with Mr. Harris
11  was independent of your work at Blue Stone
12  Finance; correct?
13  A.   It is.
14  Q.   Then why is it that you're emailing
15  only Mr. Harris the first version of an
16  allocation worksheet relating to Blue Stone
17  Finance, VAP, and Bluestone Capital Markets and
18  omitting the CEO of all those companies?
19  A.   I don't know. Mr. Reape should have
20  been copied.
21  Q.   Does that have anything to do with the
22  fact that SFR ultimately paid your bonus?
23  A.   No.
24  Q.   If you look to the one, two -- fourth

### Page 221

1   page, please. This is listed income statement
2   year ending 12/31/17; correct?
3   A.   Correct.
4   Q.   And there's a line item for
5   origination fees. Do you see that?
6   A.   Yes.
7   Q.   And it's $840,000; correct?
8   A.   Yes.
9   Q.   Do you know what that $840,000 relates
10  to?
11  A.   Fees at closing on one or two of the
12  trust transactions.
13  Q.   Are you referring to the trust
14  transactions where VAP is the manager under the
15  terms of the management agreements?
16  A.   Correct.
17  Q.   And are you familiar with something
18  called a confirmation request that VAP sends to
19  U.S. Bank?
20  A.   No.
21  Q.   Are you aware as to whether VAP
22  represented to U.S. Bank -- VAP and its CEO,
23  Mr. Reape, represented to U.S. Bank that in 2017
24  it was VAP that earned the $840,000 in closing



Page 222

1  fees, not Bluestone Capital Markets?
2    A.  I don't know.
3    Q.  Did you prepare this income statement
4  year ending 12/31/17?
5    A.  Yes.
6    Q.  Would you have liked to have seen
7  representations that VAP and the VAP CEO made to
8  U.S. Bank concerning fees earned by VAP in the
9  year ending 12/31/17 in connection with preparing
10 this document?
11   A.  Yes.
12   Q.  And that's because you would want to
13 be accurate; correct?
14   A.  Correct.
15   Q.  Let me show you a document that's been
16 marked WH 25.
17       (Exhibit No. 25 identified.)
18 BY THE WITNESS:
19   A.  Are we done with this?
20 BY MR. VOSHELL:
21   Q.  We are not done with that.  Please
22 hang on to it.
23       That was a document that we
24 marked yesterday during Mr. Reape's deposition as

Page 223

1  WH 25.  And I'll just ask you this, Mr. Wilson.
2  Have you ever seen that before?
3    A.  Yes.
4    Q.  Okay.  Under what circumstances did
5  you see that document?
6    A.  In conjunction with the 2017 audit.
7    Q.  Was that document provided to RSM?
8    A.  Correct.
9    Q.  And how do you know the document was
10 provided to RSM?
11   A.  I was -- I would have drafted or
12 reviewed this document.
13   Q.  Well, if you look at the second page,
14 Mr. Wilson, it's a letter -- let's start at the
15 beginning.  That's a letter that's on VAP
16 letterhead; correct?
17   A.  Uh-huh.
18   Q.  And you'll note in the upper
19 right-hand corner there's the qualified purchaser
20 designation; right?
21   A.  Yes.
22   Q.  And the bottom in the center there's
23 VAP's website address; correct?
24   A.  Uh-huh.

Page 224

1    Q.  And VAP's phone number; correct?
2    A.  Sure.
3    Q.  You know that because it's a 312 area
4  code, which indicates Chicago; right?
5    A.  Yes.
6    Q.  And it's signed by Mr. Reape; correct?
7    A.  Yes.
8    Q.  And it's signed by Mr. Reape in his
9  capacity as CEO of VAP; correct?
10   A.  Yes.
11   Q.  And would you agree there's no
12 reference in that document anywhere to Blue Stone
13 Finance?
14   A.  Yes.
15   Q.  Would you also agree that there's no
16 reference in that document anywhere to Bluestone
17 Capital Markets?
18   A.  Yes.
19   Q.  On the second page, you'll note that
20 there is a second table with two columns and two
21 or three rows; correct?
22   A.  Correct.
23   Q.  And that relates to closing or --
24 closing fees; correct?

Page 225

1    A.  Yes.
2    Q.  And if you were to tally those two
3  numbers, what number would you arrive at?
4    A.  840,000.
5    Q.  Is that the same 840,000 that you've
6  allocated to Bluestone Capital Markets in Exhibit
7  71?
8    A.  Yes.
9    Q.  Are you sure you saw that confirmation
10 request letter from VAP and its CEO, Mr. Reape,
11 prior to working on what's been marked as Warren
12 Hill 71?
13   A.  Okay.  So now repeat your question.
14   Q.  Let me rephrase it.  The confirmation
15 request letter is dated subsequent to your work
16 on --
17   A.  Yes.
18   Q.  -- Warren Hill 71; correct?
19   A.  Right.
20   Q.  Did you ever alter the allocation
21 spreadsheet that is reflected in Warren Hill 71
22 to account for what VAP represented to U.S. Bank
23 as fees that it earned in 2017?
24   A.  No.



Page 234

1  A. Yes.
2  Q. And what does that mean?
3  A. That I was needing David Reape's
4  assistance on item 7.
5  Q. Okay. And item 7 reads "Document I/C
6  loans at year end at 6 percent. Need to now
7  revenue amount first"; right?
8  A. Right.
9  Q. What are you referring to by I/C
10  loans?
11  A. Intercompany.
12  Q. And just to get a timeline here, this
13  email is dated January 17th, 2018; correct?
14  A. Correct.
15  Q. And note number 7 refers to, I guess,
16  intercompany loans that were year-end loans?
17  A. Yes.
18  Q. So were those loans that were extended
19  in 2017?
20  A. Yes.
21  Q. But as of January 17th, 2018, there
22  was no documentation for those loans?
23  A. There weren't formal loan agreements,
24  correct.

Page 235

1  Q. There were no formal loan --
2  A. Correct.
3  Q. And then you wrote "Need to" --
4  A. Well, let me back up. This document
5  could be out of date and I can't just say because
6  this file was sent on January 17th that all these
7  notes have been updated. This was on a -- like
8  an extra tab, so I don't know when the
9  intercompany notes were documented.
10  Q. Okay. But if you look at the
11  attachment name --
12  A. Uh-huh.
13  Q. It says January 17th email, but the
14  file itself is titled 2018.1.14; correct?
15  A. Correct.
16  Q. So that's January 14th; right?
17  A. Right. My comment still is the gist
18  of this file was not for anybody to look at my --
19  my notes, my follow-up notes. So I don't know if
20  these were current -- currently updated as of
21  this file date.
22  Q. So do you believe that there had been
23  loans documented as of the date the file was
24  created?

Page 236

1  A. I'm not sure.
2  Q. But it states it's version one of the
3  file; correct?
4  A. Yes.
5  Q. And the file is dated January 14th;
6  correct?
7  A. Right.
8  Q. Do you have some reason to believe
9  that you would put a note about needing to create
10  documents for a loan --
11  A. I could --
12  Q. -- that -- go ahead.
13  A. Let me give you an example. If -- if
14  say this file is in April, it's dated April. It
15  might have these same notes still in it because
16  they weren't went back and updated. Like these
17  were one-time notes. And I know that loans were
18  documented. So that's my only point is we can't
19  just leap to that conclusion.
20  Q. Okay. But if the document was -- this
21  document --
22  A. Uh-huh.
23  Q. -- this Excel spreadsheet --
24  A. On the 14th.

Page 237

1  Q. -- was created on the 14th -- okay?
2  A. Right.
3  Q. -- and you made a notation about
4  needing to document loans that happened
5  previously, do you have any reason to believe
6  that those loans were already documented? It
7  doesn't seem to make sense.
8  A. No.
9  Q. So in all likelihood, you believe that
10  those loans had yet to be documented as of at
11  least January 14th, 2018; right?
12  A. Okay.
13  Q. Do you agree with that?
14  A. Yeah.
15  Q. You can put that aside for now,
16  Mr. Wilson. Thank you.
17      (Exhibit No. 72 marked.)
18  BY MR. VOSHELL:
19  Q. Showing you Exhibit 72. Take your
20  time to review that, Mr. Wilson.
21  A. Okay.
22  Q. Okay. Mr. Wilson, are you familiar
23  with the document that's been marked WH 73?
24  A. 72.

Page 254

1  invoice with the customer and the -- you know, to
2  VAP from Blue Stone Finance and with a
3  description of the invoice.
4      Q.  Now, the transactions that Ms. Leon is
5  discussing occurred in late December 2017;
6  correct?
7      A.  Yes.
8      Q.  Do you know whether Blue Stone Finance
9  had even entered a services agreement with VAP as
10 of the date of the transactions flagged by
11 Ms. Leon and Banco Popular?
12     A.  Repeat that.
13     Q.  Sure.  Was there a services agreement
14 between VAP and Blue Stone Finance in place at
15 the time of the $6.8 million wire transfer from
16 VAP to Blue Stone Finance?
17     A.  I think we determined that there
18 wasn't a service agreement yet.
19     Q.  There was not; correct?
20     A.  Right.
21     Q.  Yet BSF, according to you in this
22 draft email, had presented VAP an invoice for
23 services provided; is that right?
24     A.  Uh-huh.

Page 255

1      Q.  You're nodding in the affirmative?
2      A.  Yes.
3      Q.  Why would BSF be presenting VAP with
4  an invoice if there's not even a services
5  agreement completed yet?
6      A.  There was -- there was the
7  understanding and the -- the framework.
8      Q.  In or around December 2017, weren't
9  there still discussions about BSF being a wholly
10 owned subsidiary of VAP?
11     A.  There were, and that was ended when
12 the research on the tax reform came through.
13     Q.  You note that VAP is one of BSF's
14 largest customers; right?
15     A.  Right.
16     Q.  If there was no services agreement in
17 place, wouldn't it be truthful to say largest
18 potential customers?
19     A.  There was the -- the corporate service
20 agreements also, but I don't know what -- when
21 they were finalized.  So those -- those -- those
22 agreements were much less moving parts, and so
23 they might have been in the file.
24     Q.  Okay.  But if -- we'll come back to

Page 256

1  the corporate services agreements.  If there were
2  no service agreements in place, wouldn't it have
3  been more accurate and truthful to tell Ms. Leon
4  that VAP was a potential customer?
5      A.  We were set up doing the work for VAP,
6  so they were a customer.
7      Q.  You continue in point number 1 to say
8  VAP paid the invoice in two payments over 12/27
9  and 12/28 in the aggregate of $6.8 million;
10 correct?
11     A.  Correct.
12     Q.  And then there was an additional
13 $70,000 payment under the corporate services
14 invoice; right?
15     A.  Correct.
16     Q.  So the 12/29 payment actually relates
17 to any potentially -- or any potential corporate
18 service agreement; right?
19     A.  Yes.
20     Q.  The $6.8 million would have nothing to
21 do with any then existing corporate service
22 agreement; correct?
23     A.  Correct.
24     Q.  Okay.  So why did you bring up

Page 257

1  corporate services agreements just a moment ago
2  to try to justify the veracity of your statement?
3      A.  Because they're customers.  You're
4  saying are there any customers, and I'm saying
5  there are corporate service customers.
6      Q.  Okay.  Number 3, you wrote "BSF
7  entered into a short-term loan agreement with
8  VAP"; is that right?
9      A.  Yes.
10     Q.  We just reviewed an email with a
11 spreadsheet, Mr. Wilson, that noted that loan
12 agreements had to be created sometime after
13 January 14th --
14     A.  Correct.
15     Q.  -- 2018; right?
16     A.  Yeah.
17     Q.  Was there in actuality a loan
18 agreement in place, in words or in substance,
19 between VAP and BSF in 2007?
20     A.  There was --
21     Q.  2017.
22     A.  There was not a document.
23     Q.  Was there an agreement of any kind in
24 2017?



65 (Pages 254 to 257)

MAGNA
LEGAL SERVICES

Page 258

1  A. There was a verbal.
2  Q. Okay. Who was the alleged verbal
3  agreement between?
4  A. Between the managers.
5  Q. And who were the managers?
6  A. David Reape, Gene Harris, or Brian
7  Hynes.
8  Q. And what was the purpose, if you know,
9  of the alleged verbal agreement for BSF to extend
10 a loan to VAP?
11 A. I don't know the exact purpose.
12 Working capital.
13 Q. You said "working capital"?
14 A. Yeah.
15 Q. My understanding was that all of the
16 services at or around the end of 2017 and going
17 into 2018 were being allocated, to use your term,
18 to Blue Stone Finance and Bluestone Capital
19 Markets; right?
20 A. Right.
21 Q. So why would VAP need a $6.8 million
22 loan at the end of 2017 for operating expenses?
23 A. I don't know.
24 Q. When did BSF begin performing

Page 259

1  services, or alleged services to VAP, Mr. Wilson?
2  A. Mid October.
3  Q. Was there an October invoice
4  submitted, or presented, to use the language
5  you're using in this email, to VAP?
6  A. No.
7  Q. Was there an invoice for alleged
8  services presented by BSF to VAP in November?
9  A. No.
10 Q. And your testimony is that you
11 believe, although you're not sure sitting here
12 today, that an invoice was created and presented
13 by BSF to VAP in December?
14 A. Yes.
15 Q. And you believe sitting here today
16 that there are documents that would support that
17 assertion?
18 A. Yes.
19 Q. Why was no invoice for services
20 rendered, or allegedly rendered by BSF to VAP
21 created in October of 2017?
22 A. The -- the moving pieces of what were
23 the service agreement schedules, what were the
24 numbers, what was the allocation table.

Page 260

1  Q. Would that be --
2  A. So that --
3  Q. Go ahead.
4  A. So that wasn't created in October.
5  Q. Would that be your answer for why
6  there was no invoice created in November?
7  A. Yes.
8  Q. And sitting here today, though, you
9  don't know whether there was a services agreement
10 with a finalized schedule in December of 2017;
11 right?
12 A. I know that there was a schedule
13 that -- the 6.8 ended up being something like 6.3
14 or 6.2, but that was the preliminary estimate.
15 Q. So the $6.8 million number was not
16 even the accurate number at the end of the day?
17 A. No. It ended up -- it ended up being
18 revised down.
19 Q. Was there a rush on the part of the
20 managers, Mr. Reape, Mr. Harris, and Mr. Hynes,
21 to get this wire payment from VAP to BSF before
22 the end of the year?
23 A. Yes.
24 Q. Even though there may not have been a

Page 261

1  services agreement finalized yet?
2  A. There's -- there was definitely a
3  structure of the agreement. And yes, the -- for
4  a cash basis taxpayer, the payment needs to be
5  made within the year.
6  Q. That's a good segue, Mr. Wilson.
7       VAP obviously had the $6.8
8  million that it wired to BSF in its operating
9  account; correct?
10 A. Yes.
11 Q. As of the time of the wire in December
12 of 2017; right?
13 A. Yes.
14 Q. And that $6.8 million constitutes fees
15 that VAP earned in its capacity as manager of the
16 various trusts involved in the vendor payment
17 program; correct?
18 A. That it collected and then would owe
19 to the affiliates.
20 Q. But VAP collected it because VAP is
21 the manager under the terms of the management
22 agreements with the trust; correct?
23 A. Yes.
24 Q. And VAP is entitled to that fee as a



Page 262

1  result of its position as the manager of those
2  trusts; correct?
3      A.  Uh-huh.
4      Q.  Okay. Did VAP recognize or claim that
5  $6.8 million on its 2017 tax return?
6      A.  It did. That was a deduction -- an
7  expense.
8      Q.  It was an expense?
9          Did BSF claim that $6.8 million
10 on the return that it filed with the Puerto Rican
11 -- the relevant Puerto Rican authorities?
12     A.  It claimed much more, because BSF
13 claims on an accrual basis.
14     Q.  Reading up in the chain, Mr. Wilson,
15 David Reape responds "I think your response is
16 fine." Do you see that?
17     A.  Uh-huh.
18     Q.  And then he writes "Don't see any need
19 to provide anything more, and she is not in the
20 compliance department." Do you see that?
21     A.  Yes.
22     Q.  Mr. Reape -- is Mr. Reape instructing
23 you not to give Ms. Leon anymore detail about
24 these transactions?

Page 263

1      A.  He's saying my response is fine.
2      Q.  And, in particular, it's fine because
3  Ms. Leon is not part of Banco Popular's
4  compliance department; correct?
5      A.  I think he's just added that, yes.
6      Q.  Well, he wrote that in an email to you
7  in response to some pretty serious questions from
8  Banco Popular; right?
9      A.  Yep.
10     Q.  And he seems comforted by the fact
11 that at least for now the individual raising
12 these concerns for the bank is not in compliance;
13 correct?
14     A.  Right. So that would be for you to
15 ask Mr. Reape.
16     Q.  I will.
17         And then Mr. Harris chimes in and
18 writes simply "Ok by me"; correct?
19     A.  Uh-huh.
20     Q.  Did you talk to Mr. Harris on the
21 telephone about your response to Banco Popular?
22     A.  I doubt it.
23     Q.  After Mr. Reape and Mr. Harris signed
24 off on your proposed response -- let me back up.

Page 264

1      Do you know whether Mr. Reape
2  took any steps as CEO of VAP and Blue Stone
3  Finance to verify the accuracy of your draft
4  email?
5      A.  I don't know.
6      Q.  Well, your draft -- your draft email
7  was sent to Mr. Reape at 5:23 PM; correct?
8      A.  Uh-huh.
9      Q.  And Mr. Reape responded to you six
10 minutes later; right?
11     A.  Correct.
12     Q.  It doesn't leave a lot of time to
13 double-check the accuracy of your draft, does it?
14     A.  These were large transactions that I'm
15 sure he recalled.
16     Q.  Well, would that leave him enough time
17 to check to see if an invoice had in fact been
18 presented by BSF to VAP?
19     A.  Yeah.
20     Q.  It would?
21     A.  Well, he would have probably known
22 back in December.
23     Q.  Well, I'm talking about David Reape,
24 not Andrew Reape, Mr. Wilson.

Page 265

1      A.  Yeah.
2      Q.  Would David Reape know back in
3  December whether an actual invoice had been
4  presented by BSF to VAP?
5      A.  I don't know.
6      Q.  Because earlier you said that
7  Mr. Andrew Reape was responsible for actually
8  compiling these supposed invoices; right?
9      A.  Correct.
10     Q.  And would six minutes leave Mr. Reape
11 much time to ascertain whether there had been a
12 short-term loan agreement between BSF and VAP in
13 December of 2017?
14     A.  Yes.
15     Q.  That would leave him enough time?
16     A.  Yes.
17     Q.  Is that because Mr. Reape is the
18 architect of the so-called short-term loan
19 agreement?
20     A.  Yes.
21     Q.  Mr. Wilson, did you send the email
22 that is referenced here as a draft to Ms. Leon?
23     A.  I'm sure I did.
24     Q.  Did you make -- sitting here today, do



67 (Pages 262 to 265)