# EXHIBIT 5

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA


CASE NO.:  2:18-01228-HB



WARREN HILL, LLC,

     Plaintiff,

vs.

SFR EQUITIES, LLC,

     Defendant.

_____/


VIDEOTAPED DEPOSITION - VOLUME I

DEPOSITION OF:        GENE C. HARRIS

DATE TAKEN:           December 3, 2018

TIME:                 9:11 a.m. - 1:28 p.m.

PLACE:                CPLS, P.A.

                       201 East Pine Street, Suite 445

                       Orlando, Florida  32801

REPORTED BY:          Lisa Craft

                       Court Reporter, Notary Public


* * * * * * * * * * * * * * * * * * * * * * * * * *



Page 2

```
 1   APPEARANCES:
 2         APPEARING ON BEHALF OF THE PLAINTIFF
 3             GREGORY S. VOSHELL, ESQUIRE
               Elliott Greenleaf, P.C.
 4             925 Harvest Drive, Suite 300
               Blue Bell, PA  19422
 5             gsv@elliottgreenleaf.com
 6         Also Present:  Louis A. Ballezzi, Esquire
 7
 8
 9         APPEARING ON BEHALF OF THE DEFENDANT
10             MICHAEL N. ONUFRAK, ESQUIRE
               White & Williams, LLP
11             1650 Market Street
               One Liberty Place, Suite 1800
12             Philadelphia, PA  19103-7395
               onufrakm@whiteandwilliams.com
13
14
15
           APPEARING ON BEHALF OF THE DEFENDANT AND
16         GENE C. HARRIS
17             KEREY M. CARPENTER, ESQUIRE
               AHG Group, LLC
18             700 West Morse Boulevard, Suite 220
               Winter Park, Florida  32789
19             kcarpenter@ahg-group.com
20
21
22
23         Videographer:  Khalid Musrati (Magna Legal
                           Services)
24
25
```



Page 177

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA


WARREN HILL, LLC,

                         Plaintiff,          2:18-01228-HB

v.

SFR EQUITIES, LLC,

                         Defendant.

---


VIDEOTAPED DEPOSITION - VOLUME II


DEPOSITION OF:     GENE C. HARRIS

DATE TAKEN:        December 4, 2018

TIME:              9:41 a.m. - 1:28 p.m.

PLACE:             CPLS, P.A.

                   201 East Pine Street

                   Suite 445

                   Orlando, Florida  32801


REPORTED BY:       STACY PACE, RPR, CRR, FPR

                   Court Reporter and Notary Public



Page 178

```
 1    A P P E A R A N C E S:
 2
 3    APPEARING ON BEHALF OF THE PLAINTIFF
 4        GREGORY S. VOSHELL, ESQUIRE
          Elliott Greenleaf, P.C.
 5        925 Harvest Drive, Suite 300
          Blue Bell, Pennsylvania    19422
 6        gsv@elliottgreenleaf.com
 7
 8    APPEARING ON BEHALF OF THE DEFENDANT
 9        MICHAEL N. ONUFRAK, ESQUIRE
          White & Williams, LLP
10        1650 Market Street
          One Liberty Place, Suite 1800
11        Philadelphia, Pennsylvania   19103
          onufrakm@whiteandwilliams.com
12
13    APPEARING ON BEHALF OF THE DEFENDANT
      AND GENE C. HARRIS
14
          KEREY M. CARPENTER, ESQUIRE
15        AHG Group, LLC
          700 West Morse Boulevard
16        Suite 220
          Winter Park, Florida  32789
17        kcarpenter@ahg-group.com
18
19    ALSO PRESENT:   Khalid Musrati, Videographer
                      Louis Ballezzi, Esquire
20                    Jason Cannon
21
22
23
24
25
```



Page 38

1  new things, so --
2      Q   When you say "new things," new deals, new
3  opportunities?
4      A   New type of business deals, yes.  I'm sorry.
5      Q   When you began with Mr. Ginsburg com --
6  Mr. Ginsburg's company, were you a salaried employee?
7      A   Yes.
8      Q   Eligible for a bonus?
9      A   Yes.
10     Q   And you said that eventually transitioned to
11 you becoming a partner with him?
12     A   Yes.
13     Q   Can you walk me through that transition and
14 how -- I guess how you were compensated after it went
15 through?
16     A   There is no clear path.  There were -- I drew
17 a salary, and then as certain business opportunities
18 became available, I became a partner in some of those
19 opportunities.  And over the years it became more and
20 more opportunities, so --
21     Q   Okay.  Mr. Harris, I'm going to place in front
22 of you what's been previously marked as Exhibit 52,
23 Warren Hill Exhibit 52.
24         Mr. Harris, are you familiar with the document
25 that we've placed in front of you as Exhibit 52?

Page 39

1      A   This looks familiar.
2      Q   You'll note in the bottom right-hand corner,
3  again, there's a marking bearing the initials SFR;
4  correct?
5      A   Yes.
6      Q   I will represent to you that this was produced
7  to Warren Hill by counsel for SFR Equities; okay?
8      A   Okay.
9      Q   Can you please describe briefly what
10 Exhibit 52 represents?
11     A   This would be an organiz -- a chart reflecting
12 the ultimate beneficial owners of SFR Equities.
13     Q   And it -- it -- let me ask you just this
14 question.  Is this accurate as of today?
15     A   The Aaron Bluerock and the Elizabeth Bluerock
16 may be now something called Gorovitz Family Partnership
17 and those two interests combined.  I believe
18 Mr. Gorovitz has been doing some restructuring of it,
19 so --
20     Q   But in terms of their relative ownership
21 percentages, are they still the same even if they're now
22 aggregated?
23     A   Yes.
24     Q   Now, if you start at the AHG Group, LLC,
25 line -- do you see that?

Page 40

1      A   Yes.
2      Q   It seems like that is split into essentially
3  two wings.  One would be what I'll call the Ginsburg
4  wing; is that fair?
5      A   He owns 50 percent of that -- of -- of AHG
6  Group, yes.
7      Q   And the other is what's titled the Bluerock
8  Real Estate Holdings, LLC, wing; right?
9      A   Yes.
10     Q   And sticking with the Bluerock side of things,
11 that appears to be split essentially 50 percent
12 Gorovitz, 50 percent Harris; is that right?
13     A   That's correct.
14     Q   And I'll note that the -- the name of the
15 company is Bluerock Real Estate Holdings; do you see
16 that?
17     A   I do.
18     Q   And there are a number of other Bluerock
19 entities underneath that umbrella; right?
20     A   Yes.
21     Q   Does that refresh your recollection as to who
22 came up with the name Bluestone?
23     A   No.  It's possible it was me, but it's
24 possible it was Mr. Hynes, so --
25     Q   But it would have -- it would have either been

Page 41

1  you or Mr. Hynes?
2      A   Probably.  Malcolm Weems was involved at the
3  same time as we were setting that up, and -- and he may
4  have come up with that name as well, so --
5      Q   And who is Mr. Weems?
6      A   He is currently a manager of VAP.  I believe
7  he's a manager of BCM, and I believe he's a manager of
8  BSF.
9      Q   And when you say manager, he sits on the Board
10 of Managers; correct?
11     A   That's what I'm referring to, yes.
12     Q   And the Board of Managers for all three
13 companies is -- is the same; right?
14     A   I believe so.
15     Q   And we'll get into that a bit more -- bit more
16 later.
17         How did you come to know Mr. Weems?
18     A   I came to know him through Mr. Hynes.
19     Q   And about when was that?
20     A   2016 sometime, I believe.
21     Q   You have no recollection of meeting Mr. Weems
22 prior to 2016?
23     A   It's possible I met him sometime in 2015, but
24 I do not think so.
25     Q   Has the AHG Group in-house counsel -- in-house



Page 58

1    A   (Reviewing.)  Yes, okay.
2    Q   The first sentence reads:  Prior to 2016, SFR
3  made a loan to CHGO Real Estate Consulting Group, LLC,
4  that, in turn, owned an equity interest in Vendor
5  Assistance Program, LLC.
6        Did I read that correctly?
7    A   Yes.
8    Q   It just says here "prior to 2016."  Do you
9  know when or around when the loan was made?
10   A   It was either sometime in -- in the latter
11  part of 2014 or 2015.
12   Q   And do you recall the circumstances
13  surrounding that loan?
14   A   At that time we had some conversation
15  about Mr. -- with Mr. Hynes about this business.  And we
16  had some interest, and so we made him a loan that was
17  convertible into entity.
18   Q   And when you say you made "him" a loan, you
19  made a loan --
20   A   I'm sorry --
21   Q   -- to his -- his company, CHGO?
22   A   We made a loan to CHGO; yes, that's right.
23   Q   And when you said that you were interested in
24  "this business," were you referring to the business of
25  the Vendor Assistance Program?

Page 59

1    A   I was interested in the business of financing
2  receivables from vendors in the state of Illinois.
3    Q   So you were familiar with that business, at
4  least in the latter part of 2014, 2015?
5    A   Yes.  We had become aware of it.
6    Q   And did you perform some type of due diligence
7  in connection with the loan that was made to Brian's
8  company?
9    A   We looked at some of the historical -- he
10  shared some information regarding the business and its
11  activity levels.
12   Q   And it says here, again in paragraph 4, that
13  the loan was converted to equity effective January 1st,
14  2016.  Correct?
15   A   That's correct.
16   Q   When did the actual conversion take place?
17   A   It was probably very similar in time to when
18  we closed on the Warren Hill interest -- when SFR -- I'm
19  sorry, when SFR would have closed on the Warren Hill
20  interest.
21   Q   So -- so I guess the -- the conversion
22  occurred after two thousand -- 1st, 2016, but was dated
23  as effective on the 1st?
24   A   Yes.
25   Q   Did SFR ever, to your knowledge, inform Warren

Page 60

1  Hill that it was a lender to Brian's company, Brian
2  Hynes' company?
3    A   I am not aware of that.
4    Q   Did anyone at SFR make Warren Hill aware that
5  it had the ability to convert that loan into an equity
6  interest in Brian Hynes' company prior to the MIPA being
7  signed?
8    A   I'm not aware if there were any conversations
9  or not.
10   Q   The loan itself, the one that was made in the
11  latter part of 2014, do you recall what the amount was?
12   A   It was more than a million and less than two.
13   Q   It states here there's, I guess, a right to
14  convert it into entity.  Is that --
15   A   When we made the loan, yes.
16   Q   Okay.  And what -- what were the circumstances
17  that, I guess, triggered the ability to convert it from
18  a loan to equity?
19   A   It was at our discretion.
20   Q   So I guess at the time that the deal with
21  Warren Hill closed, SFR was a direct holder of
22  approximately 33 percent of VAP; correct?
23   A   At the --
24   Q   The time the deal with Warren Hill closed.
25   A   -- you're saying the minute after we acquired

Page 61

1  the Warren Hill interest --
2    Q   Correct.
3    A   -- we had 33 percent; yes.
4    Q   Directly --
5    A   Yes --
6    Q   As of --
7    A   -- SFR deal; yes.
8    Q   And then there's a conversion of equity into
9  Brian's CHGO company as well at about that time; right?
10   A   Close to that time; yes.
11   Q   And so SFR also held an interest in -- in VAP
12  through its ownership interest in Brian's company;
13  correct?
14   A   That would be true once -- after it converted,
15  yes.
16   Q   And after it converted, what was SFR's equity
17  stake in Brian Hynes' CHGO company?
18   A   Well, it -- it grew during 2016.
19   Q   So what was it when the conversion itself took
20  place?
21   A   It would have been an additional 5 percent of
22  VAP.
23   Q   So what -- what does that translate to in
24  terms of an ownership interest in -- in Brian Hynes' --
25   A   It was roughly 20 percent.



Page 66

1  owned by SFR.
2     Q   Okay.  So that approximately 37 percent, at
3  least as of this time, of CHGO was effectively owned by
4  SFR?
5     A   Yes.
6     Q   And we mentioned Mr. Weems earlier.
7  Mr. Weems, to the best of your knowledge, has no
8  relationship with WML Enterprises?
9     A   The WM stands for West Morse, which is our
10 address, so --
11    Q   Now, this ownership or this capital table is
12 as of the end or so of 2016?
13    A   That's correct.
14    Q   Is -- is this still accurate as of today, the
15 relative percentages?
16    A   As of January 1st of 2018, SFR Equities
17 transferred some of its ownership to CHGO and acquired a
18 greater interest in CHGO.  So as of January 1st of 2018,
19 SFR has a direct ownership interest of about 26 or 27
20 percent and CHGO owns 50 percent.  And that would be the
21 same in both VAP and BCM.
22    Q   Let's back up a bit.  Those transfers relate
23 to the ownership interest in -- in VAP, BCM, and BSF;
24 correct?
25    A   Not BSF.

Page 67

1     Q   VAP and BCM?
2     A   (Witness nods head.)
3     Q   What about the ownership interest in CHGO
4  itself?
5     A   It's 50 percent SFR, 50 percent C -- or BFH.
6     Q   Now, we referenced earlier the Board of
7  Managers for VAP and the Bluestone entities; do you
8  recall?
9     A   Yes.  We talked about that earlier.
10    Q   And the Board is, for each of those three
11 entities, is comprised of six seats; correct?
12    A   Yes.
13    Q   Now, CHGO has the ability to appoint two
14 people to the Board; correct?
15    A   Yes.
16    Q   And that would be -- the two appointees, one
17 is Mr. Hynes; correct?
18    A   Yes.
19    Q   And the second appointee from CHGO is
20 Mr. Weems; correct?
21    A   That's my understanding, yes.
22    Q   And do you also understand that Mr. Weems
23 previously worked for the Illinois regulatory body that
24 oversaw the Vendor Payment Program?
25    A   Was it CMS?  Was it CMS?  I knew he worked for

Page 68

1  one of the government -- or one of the regulatory
2  agenc -- or governmental agencies.
3     Q   Okay.  So those are the CHGO seats; right?
4     A   Yes.
5     Q   Okay.  And Mr. Harris, you sit on the Board of
6  each of the three companies by virtue of SFR's
7  investment; correct?
8     A   Correct.
9     Q   And we've referenced earlier the law firm of
10 Howard & Howard; do you recall?
11    A   Yes.
12    Q   And Howard & Howard has a seat on the Board of
13 Managers as well; correct?
14    A   Yes.
15    Q   And as we discussed earlier, Howard & Howard
16 has some sort of a relationship with Mr. Hynes; correct?
17    A   Yes.
18    Q   And then Mr. Reape, by virtue of his company's
19 investment in the three entities, has a seat on the
20 Board as well; correct?
21    A   Yes.
22    Q   And then if -- if I recall, the majority of
23 the Board selects the sixth person; correct?
24    A   I'm not sure of the exact process, but that
25 could very well be.

Page 69

1     Q   And who is the sixth person on the Board?
2     A   It's an individual by the name of -- I don't
3  know -- we call him Marty Martin.  I don't know if his
4  official name is Martin Martin or if he's just Marty
5  Martin, so --
6     Q   And who is Mr. Martin?
7     A   He is an acquaintance of Mr. Hynes.
8     Q   And did Mr. Hynes suggest Mr. Martin as the
9  sixth member of the Board for each of the three
10 companies?
11    A   I believe so.
12    Q   So if we kind of walk through the Board,
13 Mr. Hynes is affiliated with Mr. Weems; correct?
14    A   I don't know if he's affiliated.  They are --
15 you know, they have a long-term relationship.
16    Q   Well, that's two seats on the Board --
17    A   Oh, yes, yes.
18    Q   -- right?  And Mr. Harris, you sit for SFR
19 which also is directly affiliated with Mr. Hynes'
20 company; correct?
21    A   SFR has an ownership, no voting control, but
22 an ownership piece of CHGO.
23    Q   So that's three of the six seats; correct?
24    A   Mr. -- yes.  Mr. Hynes, through CHGO, gets to
25 appoint two, SFR gets to appoint one.



Page 70

1    Q   And that right there is a majority, at least
2   in terms of electing the sixth member; correct?
3    A   Three -- three over five is a majority, yes.
4    Q   And Howard & Howard, again, is also affiliated
5   with Mr. Reape -- Mr. Hynes; correct?
6    A   Yes.
7    Q   And Mr. Hynes suggested Mr. Martin as well;
8   correct?
9    A   Yes.
10    Q   So five of the six seats are directly
11   affiliated with either SFR or Mr. Hynes; correct?
12    A   Well, four are directly affiliated with -- as
13   you say, with Mr. Hynes, and one with SFR.
14    Q   And SFR itself is directly affiliated with
15   Mr. Hynes and his company; correct?
16    A   I -- it is a business partner, just like SFR
17   would be a business partner with Mr. Reape.  Because
18   we're partners in a -- in a -- we both have member
19   interests in a business.
20    Q   Mr. Harris, can you pull up Exhibit 52?  It's
21   the first one, I believe, or the second one we looked at
22   today.  It's the ownership chart.
23    A   This one (indicating)?
24    Q   Yes.
25    A   Okay.

Page 71

1    Q   If you flip to the BCM side, I believe it
2   specifically states that the sixth member is selected by
3   the majority of the Board; is that right?
4    A   That's what it says.
5    Q   Does that refresh your recollection?
6    A   That's what it says.
7    Q   And to the best of your knowledge, is that the
8   same with respect to VAP and BSF?
9    A   I would assume VAP is -- is this way.  I'm not
10   sure if BSF has any other provisions, but it could very
11   well be the same.
12    Q   Let's switch gears for a moment, Mr. Harris.
13   We talked briefly at the beginning about VAP and its
14   business.  Can you just describe again for the record
15   what your understanding of VAP's business is?
16    A   Um --
17    Q   Actually, strike that.
18       MR. VOSHELL:  Before -- before we go there,
19   can you mark one more?  What are we up to?  96?
20       COURT REPORTER:  93.
21       (Plaintiff's Exhibit 93 was marked for
22   identification.)
23       THE WITNESS:  Thank you.
24   BY MR. VOSHELL:
25    Q   Mr. Harris, we placed in front of you what's

Page 72

1   been marked as Exhibit 93.  If you just take a moment,
2   and I just have a few brief questions on it.
3    A   Okay.  (Reviewing.)  Okay.
4    Q   Are you familiar with this document,
5   Mr. Harris?
6    A   I'm familiar with what it talks about.
7    Q   And what is your -- what is -- to the best of
8   your knowledge, what does it talk about?
9    A   Due to the change in the recent tax law, we
10   had to change the ownership of Blue Stone Finance.
11    Q   It -- so this is -- this is a spreadsheet that
12   relates to Blue Stone Finance specifically; correct?
13    A   Ye -- yes.  This -- this reflects the
14   ownership of the mem -- yeah, the member informa -- the
15   ownership of Blue Stone Finance.
16    Q   And if you look in the left-hand column, it
17   lists a number of entities.  Do you see that?
18    A   Yes.
19    Q   And then there is -- there is a total column
20   where BFH and AHG are combined.  Do you see that?  It
21   says Total BFH/A --
22    A   Yes.
23    Q   Okay.  And that -- is -- is -- is it fair to
24   say that that is an aggregate view of Mr. Hynes' company
25   and Mr. Ginsburg and your company --

Page 73

1    A   It -- it --
2    Q   -- and their investment in Blue Stone Finance?
3    A   -- it -- it was an attempt to segregate those
4   entities that were going to have to change their
5   ownership versus those entities who did not have to
6   change their ownership.
7    Q   It also mentions Manchester Securities Corp
8   and Beresford Energy Corp; correct?
9    A   It does.
10    Q   Those are two companies affiliated with the
11   Elliott Fund; correct?
12    A   Yes.
13    Q   Did the Elliott Fund, either through these
14   companies or any other company, ever hold a direct
15   ownership interest in Blue Stone Finance?
16    A   They have not.  They have been offered.  They
17   have not taken the company up on that.
18    Q   You can put that aside.
19       Now moving to VAP.
20    A   Okay.
21    Q   If you could briefly describe your
22   understanding of VAP's business for the record, please.
23    A   VAP has received a designation from the State
24   of Illinois under its Vendor Payment Program that allows
25   it to be a qualified purchaser.  And there's a series of



Page 82

1    Q   So the Services Agree -- your position is that
2  a Services Agreement between VAP and Blue Stone Finance
3  constitutes an assignment that is permitted under the
4  terms of this Management Agreement?
5    A   Because it's an affiliate.
6    Q   I'm asking about an assignment, sir.
7    A   This Agreement says affiliates are allowed to
8  provided the services, so they can assign the affil --
9  they can assign the services to an affiliate. That's
10 under this term -- the terms of this Agreement, and that
11 has occurred.
12   Q   But the only manager that has ever been
13 recognized under the terms of this Agreement, Manager,
14 capital M, is VAP; correct?
15   A   Under -- VAP's role as a qualified purchaser
16 is to sign as manager, which it can assign its duties,
17 and to receive the acknowledgment. Those are the only
18 two things that VAP is required to do as qualified
19 purchaser.
20   Q   If you flip to Section 2.01, sir. Section
21 2.01 appoints VAP as the manager under the terms of this
22 Agreement; correct?
23   A   First sentence says that, yes.
24   Q   And then the third sentence states that in
25 consideration for the performance of its duties

Page 83

1  hereunder, the manager, which is VAP, shall be paid the
2  manager fee and the manager incentive fee, and then it
3  goes on from there; correct?
4        MR. ONUFRAK: Well, I object because the
5     Manager, M, is the capital term, and you've already
6     been through that with the witness, whether it
7     includes assignees or permitted assignees and so on
8     and so forth.
9        MR. VOSHELL: Yeah, I'm talking about a
10    completely different provision now.
11       MR. ONUFRAK: Well --
12       MR. VOSHELL: So that would --
13       MR. ONUFRAK: -- but that provision is in the
14    same document that has the capital M that was the
15    subject of your original questioning.
16       And may I also say arguing with the witness
17    about these points is unnecessary and fruitless
18    since the document is here, it speaks for itself.
19       MR. VOSHELL: I'm going to go back to actually
20    asking questions about this section now.
21       MR. ONUFRAK: Section 2.01?
22       MR. VOSHELL: Section 2.01, which is a
23    different section than we discussed earlier.
24 BY MR. VOSHELL:
25   Q   This is section -- this section, Mr. Harris,

Page 84

1  deals with the appointment of the manager; correct?
2    A   That's what the title of the section is.
3    Q   Okay. And it says that the Manager, capital
4  M, is entitled to receive the manager fee and the
5  manager incentive fee; correct?
6    A   That's what it says.
7    Q   Can you please turn to page 9, Mr. Harris?
8  Section 4.08 is titled Limitation On Assignment of
9  Rights and Obligations; correct?
10   A   That's what the title is.
11   Q   And then the first sentence, I'll read the
12 first part of it, it says: The Manager, capital M,
13 shall not assign, sell, or otherwise transfer its
14 rights, obligations, duties, and agreements hereunder
15 except in certain circumstances. Correct?
16   A   That's what the sentence says.
17   Q   And you would agree this is a limitation on
18 the Manager's right to assign -- to an assignment;
19 correct?
20   A   Unless the document already gives it the right
21 to do that, so --
22   Q   Do you know whether the conditions set forth
23 in subsection A or subsection B have been satisfied by
24 VAP under the terms of this Agreement?
25   A   This section doesn't apply to affiliates

Page 85

1  because they already have the right to -- to have the
2  services performed by affiliates.
3    Q   Setting aside services for a moment,
4  Mr. Harris, you referenced an assignment earlier and
5  said that an assignment occurred when VAP and Blue Stone
6  Finance entered into a Services Agreement; correct?
7    A   The -- the Services Agreement had BSF agreeing
8  to assume -- to take on the obligations and -- and
9  receive the benefits of the Agreement. The Manager has
10 not changed its role with the third-party lender. It's
11 not required to do so.
12   Q   Has VAP --
13   A   The lenders have all been notified BSF is the
14 servicer. They've never raised any issues. Their -- if
15 they ever had an issue -- in fact, during the
16 conversations, they may have even said because on these
17 provisions there's no reason to do anything differently,
18 so I --
19   Q   Were you involved in the alleged notification
20 of -- or notification to the banks of Blue Stone
21 Finance?
22   A   The alleged. I don't know what that means.
23   Q   Well, you read the testimony of Mr. Reape;
24 correct?
25   A   I don't remember every phrase in there, but



Page 94

1  been marked as Exhibit Warren Hill 94.
2       MR. ONUFRAK: Excuse me, is this produced by
3  SFR or --
4       MR. VOSHELL: It's publicly available.
5       MR. ONUFRAK: From the website.
6  BY MR. VOSHELL:
7     Q  If you can take a moment to review that,
8  Mr. Harris. I just have a few questions for you.
9     A  (Reviewing.)
10      MR. VOSHELL: Oh, and actually while -- while
11  we're on that, because my eyes are going as well,
12  let's mark this as Exhibit 95, which is a blow-up
13  of the fifth page of Exhibit 94.
14      (Plaintiff's Exhibit 95 was marked for
15  identification.)
16  BY MR. VOSHELL:
17     Q  And let me know when you've had a chance to
18  review that, Mr. Harris.
19     A  I -- I have looked at this, so go ahead.
20     Q  Have you seen this document before,
21  Mr. Harris?
22     A  I don't recall seeing this. I mean, it's
23  possible it's come through, but I don't recall seeing
24  it.
25     Q  You stated that you knew or you testified that

Page 95

1  you knew that there was some sort of disclosure that was
2  in the works from VAP to the State of Illinois; right?
3     A  I knew that there were new requirements under
4  the Vendor Payment Program. I'm not aware what those
5  were. If -- if there -- the fact that there were
6  disclosures, I guess, is not surprising to me, so --
7     Q  Do you know -- do you know who would have been
8  involved in preparing this document?
9     A  I'm -- I do not know.
10     Q  And you'll note on the first page, it -- it
11  states that Vendor Assistance Program, LLC, is the
12  qualified purchaser; correct?
13     A  Yes.
14     Q  And if you go to the second page, you see
15  Option 3 requires essentially the identification of
16  individuals or entities holding direct or indirect
17  financial interests in VAP; correct?
18     A  Yes.
19     Q  And then if you look on page 5, step 3 -- I'm
20  sorry, is the page numbered wrong? It's actually page
21  4. Their num -- the -- the document itself is numbered
22  incorrectly.
23     A  Yeah.
24     Q  It begins on page 2 instead of page 1.
25     A  So page 4 or page 5?

Page 96

1     Q  Page 4 of the document. It's listed as page 5
2  in the exhibit.
3     A  Got it, okay.
4     Q  And you'll see there's a step 3.
5     A  Yes.
6     Q  It states: Have you previously or currently
7  retained or contracted any registered lobbyist, lawyer,
8  accountant, or other consultant to prepare the financial
9  disclosure required by 30 ILCS space 540 dash 9?
10      Did I read that correctly?
11     A  Yes.
12     Q  And VAP has checked "no" here. Do you see
13  that?
14     A  I see that.
15     Q  Do you recall Mr. Wilson testifying concerning
16  BSF's role in preparing this document?
17      MR. ONUFRAK: This document?
18  BY MR. VOSHELL:
19     Q  You can answer. There wasn't an objection.
20     A  Yeah, I don't recall that. I don't recall the
21  discussion in Mr. Wilson's deposition, so --
22     Q  If you could turn to -- I guess we'll look at
23  the larger of the two, page -- the actual page 5 that's
24  blown up.
25     A  Uh-huh.

Page 97

1     Q  And this -- I guess two charts, at the very
2  top, it states Vendor Assistance Program, LLC; correct?
3     A  Yes.
4     Q  And it says, Ownership Share and Distributive
5  Income; correct?
6     A  Yes.
7     Q  And if you look at footnote 1 to the first
8  chart or note 1 to the first chart --
9     A  Yes.
10     Q  -- it states that this chart relates to fees
11  earned from July 1st, 2018, through September 30th,
12  2018; correct?
13     A  Okay.
14     Q  Is that correct?
15     A  That's what it says.
16     Q  And then if you look to the far right-hand
17  column in the first chart, the top chart, it lists the
18  total value of distributive income as 8.1 --
19  approximately 8.1 million dollars; right?
20     A  Yes.
21     Q  To the best of your knowledge, is that all
22  money that came in to VAP between July 1st, '18, and
23  September 30th, '18?
24     A  It's possible.
25     Q  But you don't know?



Page 98

1    A   Yeah, that's -- that is possible.
2    Q   Okay.  And then the aggregate 8.1 million
3    dollars or so is broken up between a number of entities;
4    correct?
5    A   Correct.
6    Q   If this 8.1 million dollars did, in fact, come
7    into VAP during the three-month time frame at issue, is
8    it your testimony that some portion of that was then
9    allocated to Blue Stone Finance?
10   A   Yes.
11   Q   Now, Manchester Securities Corp is listed in
12   the left-hand column.  Do you see that?
13   A   Yes.
14   Q   Again, this is the entity associated with
15   Elliott; correct?
16   A   Yes.
17   Q   And it lists the percentage ownership for
18   Manchester Security as 4.24 percent; correct?
19   A   Yes.
20   Q   Okay.  And then it -- in the far right-hand
21   column, it ascribes approximately $345,000 with that
22   ownership interest; correct?
23   A   Yes.
24   Q   If a -- if a portion of the 8.1 million
25   dollars received by VAP was sent to Blue Stone Finance,

Page 99

1    then that $345,000 number would be incorrect because
2    Manchester does not own an interest in Blue Stone
3    Finance; right?
4    A   It's -- it's allocable to their interest, and
5    we assume some day they will exercise and will get paid
6    that amount.
7    Q   But they -- they haven't to date; correct?
8    A   They have not.
9    Q   Is Manchester Securities or Elliott in any --
10   did -- did they receive this $345,000 that's -- that's
11   referenced in this chart?
12   A   No, they have not.  They have received some
13   distributions during the year, but there would be no
14   direct rel -- relationship between what's received and
15   what's distributive anyway, so --
16   Q   So -- so this says -- this far right-hand
17   column says, Value of Distributive Income.  Right?
18   A   Yes.
19   Q   Well, the value of the distributive income to
20   Manchester Securities would be less than that, right,
21   because they aren't an owner of VAP -- of BSF?
22   A   That's -- I don't -- I don't know the answer
23   to that question, so --
24   Q   Okay.  I know you testified that the Elliott
25   Group Entities have been offered an ownership interest

Page 100

1    in BSF; right?
2    A   Yes.
3    Q   Are they aware that portions of -- of fees
4    that are earned by VAP in its capacity as manager are
5    being later allocated to Blue Stone Finance?
6    A   Blue Stone Finance has been explained to them
7    and its role that it plays.
8    Q   Who explained Blue Stone Finance's role to the
9    Elliott Group?
10   A   It would have been either Mr. Hynes,
11   Mr. Reape, or myself, or some combination of us.
12   Q   And who at the Elliott Group would have
13   received that explanation?
14   A   There's an individual by the name of Pat
15   Frayne, F-R-A-Y-N-E, who has been our contact.
16   Q   And where is Mr. Frayne based out of?
17   A   New York City.
18       Can I put these away?
19   Q   You can.
20   A   Thank you.
21       MR. VOSHELL:  96.
22       (Plaintiff's Exhibit 96 was marked for
23   identification.)
24       MR. VOSHELL:  97, please.  It's different
25       believe it or not.

Page 101

1        (Plaintiff's Exhibit 97 was marked for
2    identification.)
3        THE WITNESS:  Thank you.
4        MS. CARPENTER:  This is 96 and 97?
5        MR. VOSHELL:  That's correct.  They are
6    different.
7        MR. ONUFRAK:  Is that also from the website
8    for the State of Illinois?
9        MR. VOSHELL:  They are.
10   BY MR. VOSHELL:
11   Q   And Mr. Harris, I'm not going to ask you
12   specifics about --
13   A   Thank you.
14   Q   -- the volumes of pages here.  But I did want
15   the document to be complete.  So if you could just take
16   a moment to review what have been marked as Exhibits 96
17   and 97, I would appreciate it.
18   A   (Reviewing.)  Okay.
19   Q   Have you had a chance to review them?
20   A   I glanced through them.
21   Q   Sure.  Have you seen either of these documents
22   before, Mr. Harris?
23   A   I have not.
24   Q   You'll note at the top of each page in the
25   left-hand corner it says Vendor Assistance Program?



Page 126

1     A    That's what he said here, yes.
2     Q    And you were aware at the time that Mr. Reape
3  was aiding in developing that definition; correct?
4     A    That, I'm not sure. I knew that Mr. Reape and
5  Mr. Delaney had a long business relationship. And so
6  the fact he would have been talking to him was not a
7  surprise.
8     Q    And Mr. Delaney is telling you that --
9     A    Yeah.
10    Q    -- he's talking to --
11    A    Yeah.
12    Q    -- Mr. Reape; right?
13    A    That's what it says, yeah.
14         (Plaintiff's Exhibit 103 was marked for
15  identification.)
16  BY MR. VOSHELL:
17    Q    Okay. Mr. Harris, we've placed in front you
18  what's been marked as Warren Hill 103. It's another
19  email exchange. When you've had a chance to review it,
20  please let me know. I just have a few questions.
21    A    (Reviewing.) Okay.
22    Q    And this email is dated -- is also dated, I'm
23  sorry, January -- strike that.
24         You'll see that this email chain is a
25  continuation of the last one that we just looked at;

Page 127

1  right?
2     A    I see that at the very bottom, yes.
3     Q    And then -- so that was the email we just
4  reviewed where Mr. Delaney is letting you know that he's
5  going to meet with Mr. Reape to work on the reserve
6  account's language; right?
7     A    Yes.
8     Q    And then you responded a little while later
9  and said: I will call you later today.
10         Right?
11    A    Actually, I think I was probably referring to
12  I would call Lou later today, but --
13    Q    Oh, okay. And that was at 1:22 p.m.; correct?
14    A    Yes.
15    Q    And on the same day, so we're still on the
16  same day for all these emails, Mr. Delaney writes you
17  again to fill you in on his meeting with Mr. Reape;
18  correct?
19    A    Yes.
20    Q    And he wrote, quote, just finished a good
21  meeting with David, end quote; right?
22    A    Yes.
23    Q    And then he continued and said, Will update
24  net income schedule for your review, end quote.
25         Right?

Page 128

1     A    Yes.
2     Q    To the best of your knowledge, is Mr. Delaney
3  referring to what ultimately became schedule 1.2(d) of
4  the Member Interest Purchase Agreement?
5     A    I don't know if that's what this references or
6  not. It could be.
7     Q    But again, before we move on, this is, again,
8  Mr. Delaney keeping you apprised as to his ongoing
9  discussions with Mr. Reape; right?
10    A    Yes.
11         MR. VOSHELL: Mark two while we're here.
12         (Plaintiff's Exhibits 104 and 105 were
13  marked for identification.)
14  BY MR. VOSHELL:
15    Q    Mr. Harris, we have placed in front of you two
16  exhibits, one marked Warren Hill 104 and one marked 105.
17  And I can tell you, again, for the benefit of
18  everybody's eyes, what we have done is blown up in
19  Exhibit 105 what was an attachment to Exhibit 104. So
20  if you can take a moment to review them, and then I have
21  a few questions.
22    A    Okay. There's a lot of numbers. I may have
23  some questions if you have -- have to go back and refer
24  if you have specifics.
25    Q    Sure. So if you look, first, at Exhibit 104,

Page 129

1  Mr. Harris, it's an email dated January 28, 2016; right?
2  The first page?
3     A    Oh, yes.
4     Q    And it's an email from Mr. Delaney to you;
5  correct?
6     A    Yes.
7     Q    And it includes the attachment that is
8  ultimately displayed in Exhibit 105?
9     A    Yes.
10    Q    Which is the blow-up. Now, turning to
11  Exhibit 105, Mr. Harris, do you recall receiving this
12  document from Mr. Delaney?
13    A    I know that I did. I don't know that I really
14  recall it, but I know that I did.
15    Q    And again, this was dated January 28, 2016?
16    A    Okay.
17    Q    The email; right?
18    A    Yes, it is.
19    Q    Okay. And this would -- strike that.
20         You're aware that there was a transaction
21  between VAP and relating to Blue Cross receivables that
22  went into effect February of 2016?
23    A    Yes.
24    Q    Okay. So this would predate what I'll call
25  the Blue Cross transaction; right?



Page 130

1    A   Okay.
2    Q   Would you agree with that, at least from a
3  time line standpoint?
4    A   Yeah.  It happened in February, so --
5    Q   Okay.  Now, is this a document that, with
6  amendment, ultimately became schedule 1.2(d) of the
7  Member Interest Purchase Agreement?
8    A   It -- it could have, yes.
9    Q   It looks like Schedule 1.2(d); right?
10    A   It's trying to accomplish similar things.
11    Q   Okay.  And you'll note in the upper right-hand
12  corner there's a notation that says -- I'm sorry, upper
13  left-hand corner, says: Based on city model and
14  discussion with David Reape.
15        Correct?
16    A   Yes, that's what it says.
17    Q   So this, again, is being, I guess, up --
18  this -- this attachment is disclosing the fact that it
19  was created in consultation with Mr. Reape; right?
20    A   Yes.
21    Q   Now, if you start working down the left-hand
22  side of this document, you'll reach the phrase
23  "waterfall schedule"; right?
24    A   Yes.
25    Q   And then at the bottom of that, it says, Total

Page 131

1  PPP.  Do you see that?
2    A   Yes.
3    Q   And then for each month running January 16 to
4  December 16, it lists approximately 1.2 million dollars;
5  right?
6    A   Yes.
7    Q   And that number is the aggregate of a number
8  of fees that are listed above the total line; correct?
9    A   Yes.
10    Q   And these are fees, Mr. Harris, that have
11  accrued or that were anticipating would be accrued in
12  2016; correct?
13    A   To be honest, I'm not sure exactly.  He
14  missed -- mixed cash and accrual kind of all across, and
15  I've always found this schedule to be incredibly
16  confusing.  It did reflect that if you made the
17  assumption all these amounts were received, then this is
18  how that would work.
19    Q   So you don't know sitting here today,
20  Mr. Harris, whether the 1.2 million dollars that is
21  reflected in each and every month for 2016 were accruals
22  or cash?
23    A   I -- the relevance in the discussion about
24  the -- I don't know exactly what he was trying to
25  accomplish.  He made assumptions here that did not

Page 132

1  reflect what would happen in the real world.  But he was
2  trying to put across a point that if these amounts were
3  received, or I guess that's -- then the -- the earn-out
4  payment would be based on the cash received.  So it --
5  it was an overcomplicated, confusing schedule.
6    Q   Going actually to the top of the page, do you
7  see the yellow box that has percentage amounts for
8  various fees?
9    A   Yes.
10    Q   Do you understand those fees to be tied to the
11  Management Agreements that we looked at earlier?
12    A   Except that the math doesn't make sense,
13  but --
14    Q   And what -- go ahead.
15    A   Yeah.  He has a combination of spreads and --
16  and other components that come in here.  So it's --
17  he -- he made certain static assumptions that if all of
18  this worked this way, and possibly in the line in
19  history it had, so that's what I assumed he was trying
20  to refer to, but it obviously did not work that way in
21  the State of Illinois' economic problems in the
22  following years.
23    Q   But you do see that in the yellow box there is
24  a percentage for senior fee and junior fee; right?
25    A   Yes.

Page 133

1    Q   And that this is based on, according to the
2  sheet, the city model; correct?
3    A   That sounds right, yes.
4    Q   And you -- would you agree that fees earned
5  under the various Management Agreements, be they senior
6  or junior, can accrue on a monthly basis?
7    A   The -- yes, fees would -- well, the -- the
8  fees are paid out based on a certain cash waterfall.
9  Assuming normal times and the normal timing of the
10  payment of the interest, then the fee amounts are
11  approximate.  But they -- what they represent are
12  amounts that get paid if cash is available.
13    Q   Let me back up.  Assume -- assume there's no
14  payment made for January and February of we'll call it
15  2016.  The management fees, be they senior or junior,
16  under the terms of the relevant Agreements, are
17  nevertheless accruing to VAP; correct?
18    A   But they're only paid if there's ever cash.
19  And there may not ever be sufficient cash to pay the
20  junior fee.
21    Q   Well, let -- let's back up to the question.
22  Do the fees accrue, regardless of whether they're paid,
23  are they accruing every single month under the terms of
24  the various Management Agreements?
25    A   Under the terms of the City Agreement they do,



1  strike that.
2       If you could turn to page -- if you look at
3  the Bates marking at the -- I'm sorry, at the ticker at
4  the very top of the page --
5       A   Uh-huh.
6       Q   -- you'll see page 18 of 27 -- 37.
7       A   Okay.
8       Q   Would you agree that this is schedule 1.2(d)
9  to the MIPA?
10      A   Yes.
11      Q   And would you agree that this schedule was
12 attached to and incorporated into the MIPA?
13      A   Yes.
14      Q   And, in fact, if you turn back to page 3,
15 which is part of section 1.2(d), the last sentence of
16 Section 1.2(d) specifically references schedule one
17 point -- Schedule 1.2(d); right?
18      A   Yes.
19      Q   Now, if you look at what's been marked as
20 Exhibit 106, which is the blow-up of Schedule 1.2(d), it
21 states in the top left-hand corner, first, Vendor
22 Assistance Program/Vendor Support Initiative; right?
23      A   Should that have been Vendor Payment Program
24 and Vendor Support Initiative?  I'm not -- I don't know.
25      Q   And -- but it does reference specifically the

1  Vendor Support Initiative; right?
2       A   Yes.
3       Q   And underneath that, it says Schedule
4  1.2(d) --
5       A   Yes.
6       Q   -- right?  And then under that, it says:
7  Example of calculation and payment of VAP's net income
8  allocable to the interest.
9       Right?
10      A   Yes.
11      Q   And you, Mr. Harris, signed the MIPA on behalf
12 of SFR; correct?
13      A   Yes.
14      Q   And in doing so, you agreed to its terms;
15 correct?
16      A   Yes.
17      Q   And, again, we just referenced that Schedule
18 1.2(d) was incorporated into the MIPA that you signed;
19 correct?
20      A   Yes.
21      Q   There are a few waterfall schedules
22 referenced -- actually, let me back up.  Do you see
23 there is, in kind of the middle of the page, there's a
24 gray box that said:  Estimated calculation of daily
25 average principal balance?

1       A   Yes.
2       Q   And do you have an understanding as to what
3  that is referring to?
4       A   It -- it possibly is the outstanding balance
5  on the City line.
6       Q   And -- and it says Source there, Report to
7  security holders.  Right?
8       A   Yes.
9       Q   And have you seen those type of security
10 holder reports?
11      A   I have seen, not all of them, but I have seen
12 some.
13      Q   And are those often referred to as the
14 noteholder reports?
15      A   Could be.
16      Q   Have you ever heard them referred to as the
17 noteholder reports?
18      A   I believe I've heard that term before.
19      Q   And then if you move to the left-hand side,
20 right before the first waterfall schedule, in all
21 capital letters, it states:  Will be updated to actual
22 per report to security holders.
23      Did I read that correctly?
24      A   I see that.
25      Q   And to best of your knowledge having signed

1  the MIPA, does this refer to the noteholder reports?
2       A   I will be honest, I don't know what he's
3  referring to because it makes no sense to me.
4       Q   Well, this is part of an Agreement that you
5  signed, right, Mr. Harris?
6       A   I understand that.
7       Q   And -- and you've been in business for the
8  better part of, what, three or four decades?
9       A   Yes.  But I go to the bottom where I say
10 income when received.  I have no idea what the top part
11 of the schedule does.  But income when received, which
12 is what we've always -- if this was the income that was
13 received, these would be the expenses, this would be the
14 net income under 1.2(d), and this would be what gets
15 paid.  So the bottom piece I do understand.  I really
16 don't understand the top piece.
17      Q   Moving back to the top, Mr. Harris, the first
18 waterfall schedule, it lists Total PPP as 1.4 million
19 for every single month of 2016; correct?
20      A   That's what he shows in the schedule.
21      Q   That's what -- that -- strike that.
22      That's what is shown in the schedule that you
23 agreed to when you signed the MIPA, correct, Mr. Harris?
24      A   Yes.
25      Q   And would you agree --

Page 166

1   representatives of Warren Hill attempting to provide SFR
2   with information concerning, for example, the
3   investigation of Blue Cross Blue Shield as a potential
4   customer of VAP prior to the MIPA being signed?
5       A   I received some emails, I can't remember from
6   which -- which party, whether that be Jason Cannon or
7   Mr. Delaney or Mr. Balluz -- Ballezzi, that reflected
8   contacts that had been made.  But I never saw any
9   evidence of -- of significant in -- investigation that
10  would ever lead to closing a transaction.
11      Q   Just -- just to get the timing straight.  This
12  dispute arose around the same time -- the dispute
13  between SFR and Warren Hill arose around the same time
14  that the Blue Stone entities were created; right?
15      A   The discussions would have started, I would
16  have thought, in April or May.  I mean, they could have
17  surfaced first in -- in -- in March, but it would have
18  been somewhere around April or May.  And there were no
19  payments in 2016, so I think the conversation just --
20  under the commission program -- so the conversation just
21  dropped because there was nothing ripe to talk about.
22      Q   But around the time -- around that same time
23  period, the Blue Stone entities were being created;
24  right, Mr. Harris?
25      A   I believe they were both formed in March of

Page 167

1   2017.
2       Q   But if I recall correctly, the Services
3   Agreements are dated November 2017; correct?
4       A   The Services Agreements are -- are effective
5   November, yes, of 2017.
6       Q   And Mr. Harris, did Blue Stone Finance have
7   any operational capacity in April of 2017?
8       A   No.  They started business basically
9   November 1st of 2017.
10      Q   And that would have been after the dispute
11  between SFR and Warren Hill concerning this deduction
12  under the terms of the MIPA had -- had arisen; right?
13      A   The -- the -- November came after the
14  discussions that occurred in April or May of 2017.
15      Q   Mr. Harris, the exhibit that's been marked
16  Warren Hill 38, do you recall receiving this email from
17  Mr. Delaney?
18      A   I do recall receiving an email from
19  Mr. Delaney that had some documents attached to it,
20  particularly referencing Drew Delaney.
21      Q   And you don't have any reason to doubt that
22  you received the email that's been marked as Exhibit 38;
23  correct?
24      A   I -- no, I don't have any reason to doubt
25  having received that.

Page 168

1       Q   And it is addressed to your AHG email account;
2   correct?
3       A   Yes.
4           MR. VOSHELL:  Mike, a couple more quick ones
5   and then --
6           MR. ONUFRAK:  Certainly.
7           MR. VOSHELL:  Okay.  Just trying to be mindful
8   of your -- your parameters.
9   BY MR. VOSHELL:
10      Q   Okay.  Mr. Harris, you can put those aside.
11  I'm going to put two more exhibits in front of you.
12  They've been previously marked as Exhibits Warren Hill
13  39 and Warren Hill 40.
14      A   Okay.
15      Q   Mr. Harris, have you had a chance to review
16  them?
17      A   (Reviewing.)
18      Q   Mr. Harris, let me -- let me trade with you.
19  This is the original; I'll take the copy.  And same with
20  respect to the other one.  Quick trade (indicating).
21      A   Okay.  (Reviewing.)  Okay.
22      Q   And Mr. Harris, you're not copied on either of
23  these emails, but I just want to use them from a -- from
24  a timing standpoint.  The first email is dated
25  December 30th, 2015; right?

Page 169

1       A   Correct.
2       Q   And it includes among the distribution list
3   Mr. Hynes and -- and Ms. Doyle; right?
4       A   Yes.
5       Q   And this is -- this December 30th, 2015, time
6   frame occurred while SFR and Warren Hill were
7   negotiating the MIPA; correct?
8       A   Yes.
9       Q   And this -- this references a finance -- this
10  email references a financing arrangement with Bank of
11  America and the purchase of certain Blue Cross Blue
12  Shield receivables; right?
13      A   Yes.
14      Q   Okay.  Are you aware, Mr. Harris, that there
15  was a Blue Cross deal completed in December of 2015?
16      A   Yes.
17      Q   Were you aware that there was a Blue Cross
18  deal completed in December of 2015 when you were
19  negotiating the MIPA?
20      A   Yes.
21      Q   If you can flip to the next exhibit, please,
22  Mr. Harris.  This email is dated February 12th, 2016;
23  correct?
24      A   Yes.
25      Q   And it again includes Mr. Hynes and Ms. Solis

MAGNA
LEGAL SERVICES

Page 186

1    Q   And similar to the term "Net Income," it is
2  boldface, correct?
3    A   Yes.
4    Q   And it carries a capital R, right?
5    A   Yes.
6    Q   And for the record, the term "Revenue" is
7  defined to include all components of section 1.2D,
8  little "i," big A -- capital A through capital D,
9  correct?
10   A   Yes.
11   Q   And section 1.2D, Mr. Harris, also includes a
12 defined term "Expenses," correct?
13   A   Yes.
14   Q   And as with the prior defined terms,
15 "Expenses" is again in boldface, right?
16   A   Yes.
17   Q   And it carries a capital E, correct?
18   A   Yes.
19   Q   And the term "Expenses" includes all of the
20 components in section 1.2D, little two "i," capital A
21 through capital D, correct?
22   A   Yes.
23   Q   And the expenses, Mr. Harris, is it fair to
24 describe them as offsets or deductions that SFR is
25 permitted to take, where appropriate, from the defined

Page 187

1  term "Revenue"?
2    A   I would -- expenses, in my mind, is an
3  appropriate term.  Deductions may be the same thing,
4  so...
5    Q   But -- but would you agree it's an offset to
6  the defined term "Revenue" in section 1.2D?
7    A   Expenses act to reduce revenues.
8    Q   Thank you.
9        And I'd like to focus on the first category
10 of expenses, which is section 1.2D, little two "i".
11       Do you see that?  And then A.
12   A   So it's less romanette "ii" --
13   Q   Uh-huh.
14   A   -- the sum of?  Is that what you're referring
15 to?
16   Q   That's correct.
17   A   Okay.
18   Q   And let's just focus on the first one,
19 subparagraph capital A.  It says:  50,000 per month for
20 each month in which VAPs -- that's V-A-P -- average
21 outstanding receivables are greater than or equal to
22 $50 million, correct?
23   A   That's what it says, yes.
24   Q   Okay.  Now, SFR would be able to take this
25 deduction under this subparagraph regardless of whether

Page 188

1  an expense was paid in a given month, correct?
2    A   No.
3    Q   Why is that?
4    A   Because later in section 1.2D, it says, all
5  expenses are recognized when they are paid by VAP.
6    Q   So it's your position, Mr. Harris, that if no
7  expenses were paid for a given month, that the deduction
8  under subsection capital A would not apply?
9    A   That is true.
10   Q   Mr. Harris, if you could flip to -- and I
11 think we have the blow-up -- schedule 1.2D.  It's --
12 it's Exhibit 106.
13       MR. VOSHELL:  Do you have -- do you have the
14 blow-up?
15       THE WITNESS:  I'm okay with this.
16 BY MR. VOSHELL:
17   Q   You're okay with that?  Okay.
18       And for the sake of your eyes, I'm not
19 going -- we're not going to focus on any numbers right
20 now.
21   A   Thank you.
22   Q   We -- we did yesterday reference a few places
23 where the term "security holders" appeared, correct --
24 or strike that -- where the -- where the term "report to
25 security holders" appeared?

Page 189

1    A   Yes, I see once -- yeah, I see -- see it two
2  places.
3    Q   And there was some discussion yesterday about
4  whether that phrase was synonymous with noteholder
5  reports.  Do you recall that?
6    A   Yes.
7    Q   And do you understand those to be synonymous?
8    A   I -- I assume that that is that what -- when
9  this was prepared, what they were referring to, so I
10 don't have any disagreement with that.
11   Q   And just so the record is clear, you -- you
12 agreed to incorporate this schedule into the MIPA when
13 you signed it, correct?
14   A   It -- it says that section 1.2 illustrates
15 examples of the calculation and payment --
16   Q   And it's --
17   A   -- so it is included.
18   Q   And it's attached to what you signed --
19   A   Yes.
20   Q   -- correct?
21   A   Yes.
22   Q   I'd like to show you now what's been marked
23 previously as Exhibit Warren Hill 17, Mr. Harris
24 (handing).
25       MR. VOSHELL:  And, Mike, I -- I do have a copy



Page 194

1    Q   So Ms. Wilson was an AHG lawyer?
2    A   She had done work for AHG before.
3    Q   Just going back briefly to Mr. Reape.
4  Mr. Reape is the chief executive officer of Bluestone
5  Capital Markets, correct?
6    A   I believe so.
7    Q   You -- you had testified earlier he was a
8  consultant; but he's, in reality, the -- the CEO, right?
9    A   But he doesn't draw a salary from -- from the
10 company; he draws a consulting fee.
11   Q   So in connection with the creation of
12 Bluestone Capital Markets, were -- was the law firm of
13 Howard & Howard retained in any capacity?
14   A   I'm not aware that they were.
15   Q   So is it fair to say, at least based on your
16 knowledge today, that Howard & Howard's involvement in
17 the creation of Bluestone Capital Markets would have
18 been limited to their role as a beneficial owner of
19 that?
20   A   As a member, I believe that's true.  It's
21 possible there was some conversation with them at the
22 very initial point before we decided to set up in
23 Florida, but I don't recall.
24   Q   Why was Bluestone Capital Markets created?
25   A   The banking rules had changed, and there's a

Page 195

1  policy called -- or a section in the -- the new banking
2  regs dealing with risk retention that required a
3  different ownership structure.
4    Q   You said the banking rules had changed.  In
5  what respect?
6    A   I believe this goes back to Dodd-Frank.  And
7  so it was the implementation of some of the rules from
8  Dodd-Frank.
9    Q   And you said that there's a section relating
10 to risk retention.  What -- what was that section?
11   A   Mr. Reape is -- is the individual with -- we
12 were notified by one or two of the financing sources we
13 dealt with about this issue.  Mr. Reape got involved
14 and investigated it and developed the policy.
15   Q   Do you know whether or not Mr. Reape sought
16 any legal advice concerning the changes in the banking
17 rules you just testified to?
18   A   I'm not sure who he talked to, if he -- he
19 may have worked with the financing sources themselves
20 and gotten information from them.
21   Q   Did you, Mr. Harris, seek any legal counsel
22 concerning these new banking changes?
23   A   I don't recall doing so.
24   Q   Did anyone affiliated with SFR or AHG, to your
25 knowledge, seek su- -- seek such advice?

Page 196

1    A   I don't recall anyone doing so.
2    Q   Do you recall whether there was any evaluation
3  as to whether VAP was already in compliance with the new
4  banking regulations?
5    A   It's my understanding that Mr. Reape looked
6  at that issue.
7    Q   Do you know why VAP couldn't continue to -- to
8  hold the trust certificates?
9    A   That was -- Mr. Reape researched the area.
10 My knowledge is -- other than hearing about the issue
11 from the financing sources, is sort of the extent of my
12 knowledge.
13   Q   So is it your testimony today that you relied
14 upon what Mr. Reape told you with respect to these
15 banking regulation changes?
16   A   I relied on his recommendation to the
17 companies.
18   Q   And do you recall whether that recommendation
19 was ever made in writing?
20   A   I don't recall.
21   Q   Do you recall any meetings concerning
22 Mr. Reape's recommendation with respect to the trust
23 certificates?
24   A   Face-to-face meetings?
25   Q   Face-to-face or telephonic.

Page 197

1    A   May have been telephonic.  I don't recall any
2  face-to-face.  May have been telephonic.
3    Q   Whose idea was it specifically to create
4  Bluestone Capital Markets?
5    A   To set up a new company?
6    Q   Uh-huh, yes.
7    A   I don't know the specific person.  I think
8  it's a joint decision by the management and the
9  members.
10   Q   Whose decision was it to utilize AHG counsel
11 in Florida to set up Bluestone Capital Markets as a
12 Florida company?
13   A   It may have been my suggestion to set up in
14 Florida for tax reasons.  And it made sense to use
15 counsel that we knew in Florida, since Illinois or
16 other counsel would not do Florida organizational
17 documents.
18   Q   What type of tax benefits would there be for
19 setting up in Florida?
20   A   Florida doesn't have state tax, state income
21 tax, for individuals.
22   Q   And, Mr. Harris, are you the only individual
23 residing in Florida that was a direct beneficiary of the
24 Bluestone Capital Markets creation?
25   A   SFR is located in Florida.



Page 198

1    Q   So the -- moving BCM to Florida wouldn't
2  impact the tax implications for any member of VAP other
3  than SFR, right?
4    A   I don't know how Elliott is structured.  They
5  may not be -- they may be -- I don't -- I don't know
6  what their domicile or their tax position is.
7        Mr. Reape would not be subject to paying
8  Illinois tax on Illinois income from that situation.
9  So it's a fairly common and logical thing to do, to set
10 up domicile in a state that has no state income tax,
11 because then everybody deals with, on their own, just
12 their own state tax.
13   Q   So sitting here today, can you articulate one
14 benefit to Mr. Reape with having Bluestone Capital
15 Markets based in Florida?
16   A   He doesn't have to pay Illinois state tax.
17   Q   Would he have to pay Illinois state tax
18 otherwise?
19   A   If it was an Illinois company.
20   Q   But Mr. Reape himself is based in
21 Pennsylvania, correct?
22   A   But if he owns a piece of an Illinois
23 business, he may have to pay tax in Illinois.
24   Q   May have to, is that your testimony?
25   A   Yes, that is my testimony.

Page 199

1    Q   Sitting here today, can you identify a single
2  benefit, from the tax side, to Howard & Howard for
3  having the company based here in your hometown of
4  Florida?
5    A   I -- I don't ha- -- I don't know.  I don't do
6  anything with their tax position, so I don't know how
7  they're set up.
8    Q   Is it fair to say that the only thing you knew
9  at the time was that moving Bluestone Capital Markets to
10 Florida would help yourself and SFR?
11   A   It's -- it's an advantage to people who are
12 located in a variety of different states to have a
13 company domiciled in a state that's -- where no state
14 income tax is due to the individuals.
15       MR. VOSHELL:  Would you please read back the
16 question?
17 BY MR. VOSHELL:
18   Q   And I'd like you, Mr. Harris, to answer the
19 question, not -- I'm not referring to other people.  I'm
20 referring to you, sir, and SFR specifically.
21       (Requested portion of the record was read
22 back by the court reporter.)
23       THE WITNESS:  First, we did not move.  It was
24 originally set up here.  I had made the suggestion
25 to people that we consider Florida.  Everyone went

Page 200

1  along with that.
2  BY MR. VOSHELL:
3    Q   But with respect to tax benefits,
4  Mr. Harris -- and I'm focusing solely on tax benefits --
5  you were aware only that it would benefit SFR; you had
6  no idea whether it would benefit any of your -- the
7  other members of -- of VAP, correct?
8    A   The other members all agreed to this.  So I
9  assume they were okay with the tax position.
10   Q   If the tax benefits of Florida were so great
11 for the group, was there any consideration given to
12 redomesticating VAP as a Florida company?
13   A   VAP is a qualified purchaser in the state of
14 Illinois, and the members of VAP consider it important
15 to keep an Illinois presence.
16   Q   So the members of VAP -- and would that
17 include SFR?
18   A   Yes.
19   Q   The members of VAP wanted to keep VAP itself
20 as the face of the company in Illinois; is that right?
21   A   VAP has -- does business -- has a
22 relationship with state regulatory entities.
23   Q   And who holds those relationships, Mr. Harris?
24   A   There are certain employees and certain
25 consultants who do so.

Page 201

1    Q   Let's start with the certain employees as you
2  referred to them.  Who -- who would they be?
3    A   Patrick -- and I'm going to mispronounce his
4  last name, Dol- -- D-O-L-O-U-G-H --
5        THE WITNESS:  Jason, I don't know if you know
6  Pat- -- Patrick's last name.
7  BY MR. VOSHELL:
8    Q   Dougherty maybe?
9    A   Something like that, yeah.
10       There is a -- I'm trying to remember her
11 name, Sol- -- Solis --
12   Q   Maris (sic)?
13   A   That could be -- yes, yes.  She has a
14 relationship.  Mr. Hynes does.  Actually, employ- --
15 yes, I believe Mr. Hynes and Mr. Reape both do, and
16 they both draw some compensation as employees from VAP.
17 And then as consultants, Mr. Weems would.
18   Q   Uh-huh.  Mr. Hynes resides in Puerto Rico,
19 correct?
20   A   He does.
21   Q   And he's maintaining his relationship with the
22 state of Illinois while living in Puerto Rico, correct?
23   A   He does.
24   Q   So Mr. Hynes didn't find it important to
25 retain his relationship -- strike that.



Page 202

1        Mr. Hynes did not find living in Illinois to
2   be a driving factor in his relationship with the state,
3   correct?
4        A   You would have to ask him.
5        Q   Mr. Reape doesn't reside in Illinois either,
6   correct?
7        A   Correct.
8        Q   Mr. Reape resides outside of Philadelphia,
9   Pennsylvania, right?
10       A   Correct.
11       Q   So Mr. Reape didn't find it important, to
12  maintaining his relationship with the state of Illinois,
13  to actually live there, right?
14       A   You would have to ask him.
15       Q   Would you agree that limited liability
16  companies are pass-through entities?
17       A   The -- limited liability companies do not pay
18  tax at the entity level.  The members are subject to
19  the tax consequences.
20       (Pause in proceedings.)
21  BY MR. VOSHELL:
22       Q   Mr. Harris, outside of SFR, are you able to
23  identify a single concrete benefit that any other member
24  of VAP received by moving the trust certificates from
25  VAP to Bluestone Capital Markets?

Page 203

1        A   I don't know that we've had any conversation
2   about that.  We've talked about why is Bluestone
3   Capital Markets domiciled in -- in -- in Florida.
4        Q   I --
5        A   We talked about why the company was set up in
6   Florida.
7        Q   So it is your testimony today that the only
8   potential benefit to the other members is that they may
9   have paid less taxes?
10       MR. ONUFRAK:  Well, wait a minute, I object.  I
11  think Mr. Harris is correct.  You asked numerous
12  questions about being domiciled in Florida, and then
13  I think you asked about the assignment of the
14  certificates to Bluestone Capital Management.  So
15  which -- would you rephrase and ask --
16       MR. VOSHELL:  That -- that's fine.
17  BY MR. VOSHELL:
18       Q   So what -- what benefits were there to
19  transferring the trust certificates from VAP to
20  Bluestone Capital Markets?
21       MR. ONUFRAK:  Okay, new subject matter having
22  nothing to do with Florida?
23       MR. VOSHELL:  I don't need the
24  characterization.  If you have an objection, then
25  levy it.  If not, then we'll move on.

Page 204

1        THE WITNESS:  Could you repeat the question,
2   please?
3        MR. VOSHELL:  Sure.
4        Could you please read that back?
5        (Requested portion of the record was read
6   back by the court reporter.)
7        THE WITNESS:  The -- there -- there was a very
8   good explanation of that in the manager -- in the
9   approval by the board of managers for why that
10  happened.
11  BY MR. VOSHELL:
12       Q   In fact, let's -- let's move to that right
13  now.
14       MR. VOSHELL:  I believe it's Exhibit 90 or 91,
15  Mike, if you could help out, please.
16       It's the statement of facts to the motion for
17  partial summary judgment.
18  BY MR. VOSHELL:
19       Q   And, Mr. Harris, I'd like to direct your
20  attention to page seven, paragraph 30.
21       A   Okay.
22       Q   Let me know when you've had a moment to
23  review.
24       A   (Reviewing document.)  Okay.
25       Q   In paragraph 30, Mr. Harris, would you agree

Page 205

1   that counsel for SFR has excerpted certain portions of
2   manager consents relating to the transfer of trust
3   certificates from VAP to Bluestone Capital Markets?
4        A   I believe that's where the exact language
5   came from.
6        Q   And let's look at the first paragraph of the
7   where- -- the quoted language, which begins "Whereas."
8   Do you see that?
9        A   Yes, I do.
10       Q   Okay.  And it references what VAP and
11  Bluestone Capital Markets will receive in connection
12  with the transfer of these trust certificates, right, in
13  subparagraph A and subparagraph B?  First "Whereas"
14  clause.
15       A   Oh, okay, yes.
16       Q   Do you see that?
17       A   I -- I see where it talks about which role
18  each company will have.
19       Q   And let's start with VAP's role --
20       A   Uh-huh.
21       Q   -- subparagraph A.  "VAP retains
22  responsibility for the trust in exchange for the fees."
23       Did I read that correctly?
24       A   Yes.  Under the terms of the manager
25  agreement, they have.



Page 206

1    Q   Right. This is referring to fees that VAP
2  earns under the terms of the management agreement,
3  right?
4    A   It -- it refers to the fees from the manager
5  agreement, yes.
6    Q   And it states that VAP will receive those
7  fees, correct?
8    A   Yes. They are the payment agent for all the
9  parties.
10   Q   And prior to the transfer of the trust
11 certificates from VAP to Bluestone Capital Markets, VAP
12 was still receiving the fees under the terms of those
13 management agreements, right?
14   A   VAP receives the fees and -- receives the
15 fees under the management agreement and acts as a
16 payment collection agent for the parties.
17   Q   But with respect to receiving the fees,
18 Mr. Harris, nothing changed for VAP pre and post
19 transfer of the trust certificates, did it?
20   A   It did not.
21   Q   And VAP is also retaining responsibility for
22 the trust, correct?
23   A   Yes, in its capacity as manager.
24   Q   So VAP is -- and -- strike that.
25       VAP was responsible for maintaining the trust

Page 207

1  before the transfer of the trust certificates to
2  Bluestone Capital Markets, right?
3    A   Yes.
4    Q   So VAP's role and the receipt of fees by VAP
5  is unchanged by the transfer of the trust certificates
6  from VAP to Bluestone Capital Markets, right?
7    A   Yes. I -- I do believe this all happened
8  before the service -- the services agreements went into
9  place as well, so...
10   Q   Now, moving to subparagraph B, so VAP -- so we
11 start with subparagraph A, nothing changes with VAP.
12       Subparagraph B, nevertheless, Bluestone
13 Capital Markets will receive the trust certificates; is
14 that right?
15   A   Bluestone is -- the managers applov- (sic) --
16 approved Bluestone holding the trust certificates, yes.
17   Q   So what did VAP get out of the deal?
18   A   VAP continues in the role they were
19 continuing in; they continue in the role, retain
20 responsibility for the trusts.
21   Q   So nothing changed with respect to VAP; is
22 that right, Mr. Harris?
23   A   That can be your interpretation.
24   Q   I'm asking you, Mr. Harris, and you're under
25 oath. Nothing changed with respect to VAP and its

Page 208

1  responsibilities and rights under the terms of the
2  management agreements when it transferred the trust
3  certificates to Bluestone Capital Markets?
4    A   I don't recall the exact date that these were
5  done, and so I don't know all of the other changes that
6  were happening at that moment.
7    Q   Did you review this statement of facts,
8  Mr. Harris, before it was filed in federal court in this
9  case?
10   A   I did.
11   Q   And did you review this paragraph
12 specifically?
13   A   I did.
14   Q   So now with re- --
15   A   Because --
16   Q   Go ahead, please finish.
17   A   Because the -- this is what the managers
18 approved.
19   Q   Now, the one thing that did change for VAP was
20 that it no longer had the trust certificates held in its
21 name, correct?
22   A   That is what the managers approved.
23   Q   So VAP retains responsibility for servicing
24 the trusts, right?
25   A   In exchange for the compensation it had under

Page 209

1  the agreements, yes.
2    Q   In exchange for the compensation it had
3  already been receiving under the terms of the agreement,
4  with the exception that it now lost the trust
5  certificates; is that right?
6    A   The -- the managers made this decision.
7    Q   The managers being you, Mr. Harris, right?
8    A   I'm one of the six.
9    Q   Mr. Brian Hynes, correct?
10   A   Yes, he's one of the six.
11   Q   Whose company, SFR, owns 50 percent of, right?
12   A   Well, I mean, if you want to make that same
13 comment, we own the greater percentage of Mr. Reape's.
14       So all of us are affiliated because -- un- --
15 under your analysis, all of us are affiliated, yes.
16   Q   Now, we've been -- we've been talking about
17 the -- the fees, Mr. Harris. Would you agree that the
18 management agreements have what are often referred to as
19 manager fees and manager incentive fees?
20   A   There is sim- -- different terms between
21 senior fee or manager fee, junior fee or manager
22 incentive fees. So, yes.
23   Q   You --
24   A   That's --
25   Q   You were going to my next question.



Page 210

1    A   Okay.
2    Q   The terms in the contract roughly correlate to
3  senior fee, junior fee, right?
4    A   Correct.
5    Q   And would you agree that in connection with
6  some of the newer deals, more recent ones, the jun- --
7  junior fee and senior fee values are set to zero and the
8  value of the trust is held by the trust certificate?
9    A   I'm not -- I'm not sure I understand.  I
10  mean, that -- that's -- do you have a specific
11  reference?
12    Q   I --
13    A   Things have changed in two thous- -- I was
14  quite familiar with what was going on in 2016.  There
15  may have been some of the Barclays related trusts that
16  I'm not quite as familiar with.  And certainly in the
17  most recent Bank of America trusts, with the -- there's
18  some structures I'm not that familiar with.
19    Q   Okay.  Then, Mr. Harris, if there were -- if
20  there was a new deal with the senior and junior fees
21  were set at zero --
22    A   I was not aware that there was any.
23    Q   I'm asking you if there were, in fact, such a
24  deal, turning back to paragraph 30, what would VAP get
25  for servicing the trust?

Page 211

1    A   The question -- I mean, one, I'm not aware
2  that that is the case.  If that happened, if that -- if
3  such a structure did happen and that happened in 2018,
4  Bluestone Capital Markets was set up, if they entered
5  the transaction as -- they got what they bargained for.
6        And if VAP decided they may have had some
7  business re- -- I -- I don't know why they would have
8  decided to do that.  They may have said there was a
9  business reason to do that, client relations or
10  whatever.
11    Q   What -- what client relations could VAP
12  possibly have in deciding to get rid of its fee?
13    A   The members of VAP, the members of Bluestone
14  Capital Markets, the -- the members of Blue Stone
15  finance, all have one common motivation, and that's to
16  increase or maximize the after-tax income of the
17  members.  That's what its motivation is.
18    Q   So if there were a new deal where the senior
19  and junior fees were set at zero and the value of the
20  trust was held solely by Bluestone Capital Markets, can
21  you describe for the record any benefit to VAP?
22    A   The members of VAP could say, yes, we get a
23  benefit from that.
24    Q   Could -- could say; is that your testimony?
25    A   (Witness nods head.)

Page 212

1    Q   And do you know what this benefit would be
2  sitting here today?
3    A   The members of VAP, along with the members of
4  Blue Stone Finance and the members of Bluestone Capital
5  Markets, want to maximize the after-tax income of the
6  members.  So if a transaction results in that
7  happening, I could see the managers approving such.
8        (Pause in proceedings.)
9  BY MR. VOSHELL:
10    Q   If you could turn, Mr. Harris, to the second
11  "Whereas" clause in paragraph 30.
12    A   Sure.  Yes.
13    Q   And you'll see toward the back end of this
14  paragraph, there's language that describes certain --
15  quote, certain economic and administrative advantages
16  and effectiveness.
17        Do you see that?
18    A   Yes, I do.
19    Q   What certain economic advantages was the board
20  referring to in this "Whereas" clause?
21    A   The day this was presented, the managers
22  believed that to be true.  I don't recall the specifics
23  right now, so...
24    Q   What administrative advantages or
25  effectiveness was the board referring to here?

Page 213

1    A   Could be a number of things.  I -- off the
2  top of my head, I don't recall specifics.
3    Q   So sitting here today, you can't recall any
4  specific economic advantages or any specific
5  administrative advantages?
6    A   I thought you said administrative advantages
7  and effectiveness.
8    Q   Well, can you recall any economic advantages
9  or effectiveness sitting here today?
10    A   Yes.  We -- we have talked about there's tax
11  advantages and there's other -- the managers set up the
12  companies to perform the tasks as they laid out.
13    Q   You can put that aside, Mr. Harris.
14    A   (Witness complies.)
15    Q   I'd like to talk about Blue Stone Finance --
16    A   Okay.
17    Q   -- LLC.  Why was Blue Stone Finance created?
18    A   For as long as I've been talking to
19  Mr. Hynes, he had been advocating the company set up a
20  servicing arm in Puerto Rico.  I believe he had moved
21  there -- I don't know if he moved there in '13 or '14
22  or when he did.
23        But as early -- I know as early as 2015, in
24  conversations with myself and conversations with
25  different lenders that we talked to, it's my

Page 230

```
 1      Q   And in your response, you didn't say, "Well,
 2  we don't need to do this because it's an affiliate," did
 3  you?
 4      A   I did not.  It's -- it seems obvious in this
 5  that there were still conversations going on.  So we
 6  were still pursuing getting this done.
 7      Q   The word "affiliate" doesn't appear anywhere
 8  in your response to Mr. Reape, does it?
 9      A   No, it doesn't.
10      Q   And then Mr. Reape responded to you,
11  Mr. Harris, and he said, quote:  Agreed.  Obviously we
12  want to push for a new trust so that we can ink our
13  entities in up front.
14          Right?
15      A   Yes.
16      Q   And would you agree that Mr. Reape is
17  referring to essentially new deals that would include
18  Blue Stone Finance and/or Bluestone Capital Markets
19  expressly in the agreements?
20      A   I believe that's what he's referring to.
21      Q   And do you know whether that's permissible,
22  given the fact that neither Blue Stone Finance nor
23  Bluestone Capital Markets is a qualified purchaser under
24  the terms of the Vendor Payment Program?
25      A   There's no requirement anywhere in the vendor
```

Page 231

```
 1  -- in the Vendor Payment Program that parties servicing
 2  trusts, owning residual interests in trusts need to be
 3  a qualified purchaser.
 4          A qualified purchaser needs to be involved in
 5  the transaction, and VAP is.  There is no -- there's no
 6  requirements for them to get any compensation or
 7  anything in that process.
 8          MR. VOSHELL:  Let's take a quick break and move
 9  on.
10          THE VIDEOGRAPHER:  Off the record at 10:44.
11          (Brief recess.)
12          THE VIDEOGRAPHER:  We're on the record at
13      10:57, beginning media two.
14  BY MR. VOSHELL:
15      Q   Okay.  Mr. Harris, we're back on the record,
16  and you remain under oath.  All right?
17      A   Yes.
18      Q   Are you familiar with the term "transfer
19  pricing study"?
20      A   I've heard that term before, yes.
21      Q   And do you have an understanding as to what
22  that term means?
23      A   General understanding.
24      Q   And what is your general understanding,
25  Mr. Harris?
```

Page 232

```
 1      A   That if -- it's -- if a company is providing
 2  services or good- -- probably more -- more often goods,
 3  a manufacturing system where they have one step is done
 4  in one geographic location and another step is done in
 5  another geographic location, they have to determine a
 6  methodology to deal with their intercompany pricing.
 7      Q   And in connection with the transfer of the
 8  trust certificates from Bluestone Capital Markets -- I'm
 9  sorry, from VAP to Bluestone Capital Markets, was there
10  a transfer pricing study conducted?
11      A   I don't believe so.
12      Q   We were talking about the auditors yesterday,
13  RSM?
14      A   Yes.
15      Q   Did any of the auditors suggest a -- that a
16  transfer pricing study be completed?
17      A   They did not audit the individual companies,
18  so that was not a relevant point to them.
19      Q   Did anybody suggest the need for a transfer
20  pricing study in connection with the transfer of the
21  trust certificates from VAP to Bluestone Capital
22  Markets?
23      A   I'm not the -- aware that the managers felt
24  that was necessary.
25      Q   Do you know why no -- none of the managers
```

Page 233

```
 1  felt that was necessary?
 2      A   I think they wanted to -- as stated earlier,
 3  the objectives of the managers is to maximize the
 4  after-tax income of the members.
 5      Q   During the process of transferring the trust
 6  certificates, Mr. Harris, did the idea of a transfer
 7  pricing study ever cross your mind?
 8      A   I'm not aware it did.
 9      Q   Can you just explain what you're not being
10  aware --
11      A   I don't --
12      Q   -- means for the record?
13      A   I don't recall.  I don't recall.
14      Q   Now, let's move on to Blue Stone Finance.
15          You testified yesterday that Blue Stone
16  Finance is now performing a number of services,
17  correct?
18      A   Blue Stone Finance is providing the -- the
19  servicing for the trusts.  That's its function.
20      Q   And in connection with the decision to, I
21  guess, create a ser- -- a second servicer, was there any
22  attempt by VAP to bid out the work to a third party?
23      A   If -- if -- as I mentioned earlier, the
24  members -- or the -- the managers' motivation was to
25  maximize the after-tax income to the members, and
```



Page 234

1   that's why they decided to set up the Puerto Rican
2   servicing operation. And that --
3     Q  I'm --
4     A  -- had to be -- it would -- that would not
5   make any sense.
6     Q  I'm going to go back to my question. Was
7   there any discussion about bidding out the servicing
8   work to see if there were other competitive bids?
9     A  I don't understand why any- -- I mean, the --
10     Q  It's a yes or no, Mr. Harris, and then you can
11   expound upon it if you need to.
12     Were -- was there any discussion about
13   competitively bidding the work that is now being
14   performed by Blue Stone Finance?
15     A  No. The managers had decided that they would
16   set up an operation -- or that an operation would be
17   set up in Puerto Rico because that was what they wanted
18   to do. And bidding out to a third party made no sense.
19     Q  Is there -- strike that.
20     Was there any effort to determine what the
21   market rate was for the services that were being
22   provided by Blue Stone Finance?
23     A  As this process occurred, there was a
24   discussion with tax counsel as to how to go about and
25   the process and the things necessary. And the result

Page 235

1   of that was the services agreement that we've provided.
2     Q  Let me go back to the question. Was there any
3   discussion as to what the market rate for the services
4   being provided by Blue Stone Finance was? The market
5   rate?
6     A  The discussion for -- the -- the managers
7   went through a process to determine the pricing and how
8   that would be determined. And in their minds they
9   believe that's -- that that was satisfactory.
10     Q  In connection with the managers making that
11   decision, was there any research done into what -- the
12   costs of the services that Blue Stone Finance was going
13   to provide?
14     You look -- you look at the market and say,
15   okay, this is how much it would cost to have an
16   accountant down in Puerto Rico. Was any of that
17   analysis done?
18     A  The managers went through the process, and
19   a -- and their decision was to do what was -- after
20   consultation with advisors and their -- was the
21   services agreement that we came up with or that was put
22   in place.
23     Q  What type of services does Blue Stone Finance
24   provide, Mr. Harris?
25     A  If I can refer --

Page 236

1     Q  Can -- can you answer that question without
2   referring to the services agreement, Mr. Harris?
3     A  It's a very long list of services. It's all
4   the servicing -- it's basically all the servicing of
5   the trust.
6     Q  And what type of services fall under that
7   umbrella, Mr. Harris?
8     A  It's the services that were laid out in the
9   managers agreement for the -- what -- what needed to be
10   provided to the trust.
11     Q  And I'm asking you, without -- sitting here
12   today, without looking at the -- the man- -- strike
13   that.
14     Without looking at the management agreement
15   or the services agreement, are you able to identify any
16   particular services that are performed by Blue Stone
17   Finance?
18     A  I could name two or three, but there's a list
19   of 25 in the document, so -- I'm not involved in the
20   day-to-day servicing.
21     Q  What were the two to three that you were just
22   referring to?
23     A  They provide periodic reports or review --
24   provide periodic reporting to the noteholders and the
25   trustee. They deal with cash receipts when they come

Page 237

1   in, review the trustees' reports.
2     Q  When you say deal with cash receipts, what are
3   you referring to?
4     A  The trust receives payments from the state,
5   then Blue Stone Finance would determine what trust
6   that -- or when they get notified that a trust is re-
7   -- or the bank account for a trust is received, then
8   they determine if it's supposed to be payments to the
9   noteholders, payments to the diff- -- to the manager,
10   payments of trustee, wherever the cash should go.
11     And it's -- that's done in conjunction with
12   the trustee.
13     Q  And would -- is it fair to describe that as an
14   accounting function?
15     A  A servicing function, I think, would be a
16   better term.
17     Q  And sitting here today, do you have any idea
18   what the market rate for that servicing function would
19   be?
20     A  I don't spend any time thinking about the
21   market rates for servicing functions.
22     Q  Mr. Harris, where is the income of VAP
23   sourced?
24     A  By source, where do they receive it from?
25   Is -- I'm trying -- when you say source --



Page 254

```
1    debt.
2    Q    Are you finished with your answer, Mr. Harris?
3    A    Yes, I am.  Sorry.
4    Q    Okay.  You referenced, I think, two sets of
5    transactions.  I want -- I want to start first with
6    advances by SFR.
7    A    Yes.
8    Q    What advances were made by SFR and what form
9    did they take?
10   A    They would have been in the form of loans,
11   member loans.
12   Q    Okay.  How many advances were there?
13   A    I don't know the exact number.  An aggregate,
14   there was probably almost $4 million.
15   Q    And what interest rate was --
16   A    Twelve percent.
17   Q    And do you recall when those loans were made?
18   A    They would have been made several different
19   points in time in 2016 and possibly early 2017.
20   Q    And were those loans documented?
21   A    I believe so.
22   Q    And if they were documented, would they be
23   within SFR's possession?
24   A    I believe so.
25   Q    And was there any correspondence relating to
```

Page 255

```
1    SFR lending these amounts to -- to VAP?
2    A    I would think that they were approved by the
3    board of managers.
4    Q    Were the loans themselves to VAP or to Blue
5    Stone Finance or Bluestone Capital Markets?
6    A    They were to VAP.
7    Q    And do you know whether any of the
8    documentation relating to these loans has been produced
9    in this case?
10   A    I'm not aware.
11   Q    Were any loans -- were any of these loans made
12   to Healthcare Finance as opposed to VAP?
13   A    No.  I -- there were separate advances made
14   to Healthcare Finance but that are outside what I was
15   discussing earlier.
16   Q    So the $4 million or so in the aggregate, that
17   was all to VAP?
18   A    Yes.
19   Q    And what amount of that $4 million loan or
20   aggregation of loans from SFR to VAP was paid down in
21   connection with this Bridgeview Bank loan?
22   A    Not 100 percent, but a substantial portion of
23   it.
24   Q    So 90 percent, Mr. Harris?
25   A    I don't -- I don't know the exact percentage.
```

Page 256

```
1    Q    Just about all of it, though, Mr. Harris?
2    A    More than half.
3    Q    Is the balance still outstanding?
4    A    No, it's all been repaid.
5    Q    Has any of the -- the loan, the -- the
6    original set of loans from Warren Hill to VAP been
7    repaid as of today?
8    A    A portion was paid in 2017.  The remainder
9    was paid in 2018.  So -- so they're -- and I don't
10   remember the exact date.  It may have been May -- April
11   or May of 2018 that those loans were completely
12   retired.
13   Q    Does the same go for mis- -- the --
14   A    Yes.
15   Q    -- the loan for Mr. Reape?
16   A    Yes.
17   Q    And is there documentation relating to the --
18   the repayment of the -- we'll call them the Warren Hill
19   loans and the -- the Mr. Reape loan?
20   A    There would be information in the accounting
21   records that -- or a cash re- -- we could provide the
22   date we received the funds in SFR and the payments.
23   Q    You mentioned there was a policy of last loans
24   in paid off first?
25   A    Yes.  That's fairly common in -- in small
```

Page 257

```
1    businesses.
2    Q    And who -- was that a policy at the time you
3    joined VAP, Mr. Harris?
4    A    I think that was discussed at the time that
5    we agreed to advance additional funds.
6    Q    So this was a -- this policy, last loan in
7    paid off first, was implemented at the time that SFR
8    agreed to begin advancing funds to VAP?
9    A    Yes.
10   Q    So it was a new policy at that time, right,
11   Mr. Harris?
12   A    It was agreed upon by the managers.
13   Q    As a new policy at the time that SFR was
14   advancing funds to VAP?
15   A    I don't know what the old policy was.  It may
16   have been the old policy.
17        MR. VOSHELL:  Just one second.
18        (Pause in proceedings.)
19   BY MR. VOSHELL:
20   Q    Okay.  Mr. Harris, (handing) I'm placing in
21   front of you a document that's been marked Warren Hill
22   81.
23   A    Okay.
24   Q    Take a moment to review that, and then just
25   let me know when you're finished.
```



Page 258

1    A  Okay. (Reviewing document.) Okay.
2    Q  The first email in the chain, starting from
3  the bottom, is from you to Mr. Wilson, correct?
4    A  Yes. Looks like I made a mistake. There was
5  $50,000 paid against that loan at the time.
6    Q  Okay. We'll get to that, Mr. Harris.
7    A  Yeah.
8    Q  Let's just kind of frame out the time period
9  here.
10     Your email was on March 7th, 2018, correct?
11    A  Yes.
12    Q  And it's titled "2017 Member Interest,"
13  correct?
14    A  Yes.
15    Q  And is fair to say that this is an email that
16  you sent to Mr. Wilson in connection with your
17  development -- or your calculation of the earn-out owed
18  to Warren Hill under 1.2D?
19    A  Yes.
20    Q  And, Mr. Harris, why did you reach out to
21  Mr. Wilson asking him this question?
22    A  Because Mr. Wilson was handling the
23  accounting for all of the entities.
24    Q  And you begin your email by stating that
25  "I" -- you, Mr. Harris -- "can only count interest from

Page 259

1  the original $3 million loan."
2    A  Yes.
3    Q  Did I read that correctly?
4    A  Yes.
5    Q  And then you reference the -- the partial
6  pay-down, right?
7    A  Yes.
8    Q  Mr. Wilson responded to you, and he wrote:
9  Here's G, slash, L details on the three member loans,
10  period.
11    A  Yes.
12    Q  Did I read that correctly?
13    A  Yes.
14    Q  Do you know what three member loans he's
15  referring to here?
16    A  I would guess they were the three SFR member
17  loans. So the original loans that we acquired from
18  Warren Hill and the subsequent advances.
19    Q  And he says that two of these can't count,
20  right?
21    A  Yes.
22    Q  It looks like he's attaching information
23  regarding the three loans to his email. Do you see
24  that?
25    A  Yes.

Page 260

1    MR. VOSHELL: I don't think we have that
2  attachment, Mike, so if that's something you could
3  look for. It looks like in the -- there's a
4  subsequent email where Mr. Harris just responds and
5  doesn't carry forward the attachment.
6    MR. ONUFRAK: Yes.
7    MR. VOSHELL: So if we could just get those.
8  Thanks.
9    MR. ONUFRAK: I'll work on that.
10    MR. VOSHELL: Appreciate it.
11  BY MR. VOSHELL:
12    Q  You can put that aside, Mr. Harris.
13    A  Do you need the -- are we going to talk any
14  more about the financial we looked at?
15    Q  We're finished with that.
16    A  Okay. Thank you.
17    (Pause in proceedings.)
18  BY MR. VOSHELL:
19    Q  Okay. Mr. Harris, I'm placing in front of you
20  (handing) a document that's been previously marked as
21  Warren Hill 44. If you take moment to review that, I
22  have some questions.
23    A  Okay.
24    THE VIDEOGRAPHER: Counsel, your microphone
25  (indicating).

Page 261

1    THE WITNESS: (Reviewing document.) Okay.
2  BY MR. VOSHELL:
3    Q  Mr. Harris, are you familiar with the email
4  that has been marked as Warren Hill 44?
5    A  Yes.
6    Q  And it's an email from you, Mr. Harris, to
7  Mr. Hynes and Mr. Reape on August 5th, 2017, right?
8    A  Yes.
9    Q  And it begins: "As a follow-up to meeting
10  with Edgar yesterday" -- and I'll pause there. Who's
11  Edgar?
12    A  He is our Puerto Rican tax counsel.
13    Q  You continue by stating that you put together
14  an outline separating services, responsibility, and
15  revenue sources by companies.
16    Did I read that right?
17    A  Yes.
18    Q  And you refer to it as a, quote, rough first
19  draft, end quote; is that right?
20    A  Yes.
21    Q  Is -- is this the first attempt by anybody
22  affiliated with VAP to divide up or separate the
23  services, responsibilities, and revenue sources by
24  company?
25    A  We had met with our tax counsel and got his



MAGNA
LEGAL SERVICES

Page 322

1    A   Yes.
2        Is there a balance sheet in here?
3    Q   You can put that aside, Mr. Harris.
4    A   Okay.
5    Q   I'm going to hand you a document (handing)
6  that's been previously marked as Warren Hill 78.
7        If you'll just take a moment to review that,
8  Mr. Harris, I have a few brief questions on it.
9    A   (Reviewing document.) Okay.
10   Q   This is an email exchange between you and
11 Mr. Wilson, correct?
12   A   Yes. Mr. Wilson sent me an email, and I
13 responded, "Thank you," yes.
14   Q   In Mr. Wilson's email, in the second
15 paragraph, he notes that BSF received $6.8 million from
16 VAP for estimated invoice for 2017 services, right?
17   A   The -- yeah, it's -- based on the schedules
18 they had done at year end, that was the initial
19 estimate of what the revenues -- or the revenues BSF
20 would have earned out of the funds that were collected
21 by VAP.
22   Q   Do you know whether there was an invoice,
23 similar to the corporate services invoice that we looked
24 at earlier, that corresponds to the $6.8 million number?
25   A   I've seen schedules that were put together

Page 324

1    A   Well, it's based on the services of each of
2  the entities provided, and that's what the agreement
3  lays out, yeah.
4    Q   Now, Mr. Harris, you're aware that SFR has
5  asserted a counterclaim in this action, correct?
6    A   Was this for -- was this for the overpayment
7  of fees related to 2016 for the release from the
8  reserve?
9    Q   I would love to know what the counterclaims
10 were, Mr. Harris.  You're looking at your counsel.  But
11 can you -- can you describe on the record right now what
12 the coun- -- what the basis of SFR's counterclaim is?
13       MR. ONUFRAK:  Do -- do you want to show him the
14 document?
15       MR. VOSHELL:  I'm just asking Mr. Harris if he
16 knows what claim his company has brought against my
17 client.
18 BY MR. VOSHELL:
19   Q   Can you do so without looking at the -- at the
20 document, Mr. Harris?
21   A   In 2016, in the collected revenues that VAP
22 showed on the schedule, it included payments that were
23 released from the reserve account, which would have
24 been deemed excluded reserve amounts in section 1.2E.
25       Since the time of our filing and the actual

Page 323

1  where these numbers were computed.  I would not think
2  they would have sent invoices.
3        Now --
4    Q   And --
5    A   -- maybe they sent some sort of payment
6  notice or "here's the amount you're supposed to remit
7  to us" from what came out of the collection account.
8  They could have possibly done something like that.
9    Q   Mr. Wilson continues, "The actual invoice was
10 $5.6 million," right?
11   A   That's what he said, yes.
12   Q   Do you know whether there was an actual
13 invoice created corresponding to that $5.6 million
14 figure?
15   A   I think he was trying to -- at least my
16 understanding of what he was saying was that the actual
17 amount that BSF earned in fees was $5.6 million and, in
18 effect, VAP had overpaid them 1.2 million.
19   Q   And is it fair to describe this as an internal
20 reallocation of the earned fees, Mr. Harris?
21   A   I don't know what an internal -- what do you
22 mean by an internal reallocation?
23   Q   Well, it's internal to BSF, VAP, and BCM,
24 correct?  It's a reallocation of fees among those
25 entities?

Page 325

1  total receipt and close-out of the reserve account in
2  2012 -- or the 2012 trust -- that claim would be, in
3  effect, no long- -- moot --
4    Q   And --
5    A   -- because it resolved itself in the payout
6  of the 2012 reserve payment that was made several
7  months ag- -- a couple months ago.  So --
8    Q   So is it fair to say that the counterclaim
9  that was filed before that reserve account was released
10 is now extinguished?
11   A   I haven't talked to counsel, but the -- the
12 purpose for filing it is now moot.
13   Q   And that's because, Mr. Harris, in your view,
14 there's been no overpayment by SFR to Warren Hill,
15 correct?
16   A   We took into account, in the payment of the
17 reserve amount, the full excluded reserve as of
18 January 1 of '16.  So there was no longer any need --
19 that -- it's already been addressed in how that payment
20 was calculated.
21       MR. VOSHELL:  And, Mike, we can talk about
22 potentially withdrawing that claim with prejudice
23 off the record.
24 BY MR. VOSHELL:
25   Q   I'd like to hand you (handing), Mr. Harris, a