IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

WARREN HILL, LLC                    :        CIVIL ACTION
                                    :
        v.                          :
                                    :
SFR EQUITIES, LLC                   :        NO. 18-1228


MEMORANDUM

Bartle, J.                                   February 8, 2019


Plaintiff Warren Hill, LLC has brought this diversity action against defendant SFR Equities, LLC, for damages for breach of contract. Defendant has purchased plaintiff's interest in a company named Vendor Assistance Program, LLC ("VAP") and agreed to pay plaintiff a percentage of VAP's net income for a three-year period. Plaintiff claims that defendant has improperly calculated its payments for the years 2017 and 2018 and paid it significantly less than is due.

Before the court is the motion of defendant for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure with respect to two legal issues. Specifically, defendant maintains that its contract with plaintiff provides that the earnout payments should exclude any monies paid by VAP to the later created entities Bluestone Capital Markets, LLC and Bluestone Finance, LLC (collectively, "Bluestone entities"). Defendant also argues that the contract

requires that payments to plaintiff be based on revenue VAP actually receives and not on earnings accrued.

I

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The material facts underlying the issues now before the court are not in dispute. The focus is on the interpretation of the contract between the parties.

II

We begin with the stark undisputed fact lurking behind this entire dispute that the State of Illinois does not pay its bills on time. To address its cash flow deficits and assure that its vendors can be promptly paid for goods supplied or services rendered, Illinois established the Vendor Payment Program ("VPP") in 2011. Under this program, Illinois gives "Qualified Purchasers" the opportunity to purchase outstanding accounts receivable directly from vendors at 90% of their face value. The Qualified Purchasers provide the vendors with needed funds and become creditors of the state through the assignment of those accounts. The vendors recover their remaining 10% and Qualified Purchasers in turn profit by receiving interest

-2-

penalties from Illinois when the accounts receivable are finally
paid.  Under the Illinois' State Prompt Payment Act, if a
payment owed to a vendor is not paid within 90 days of receipt
of the invoice, then an interest penalty will accrue in the
amount of 1% per month on any unpaid debt.  30 Ill. Comp.
Stat. 540.  The amount of profit of a Qualified Purchaser
therefore depends on when the state finally pays its debts.

In order to become a Qualified Purchaser, an entity
must meet certain criteria and be approved by the state.  The
criteria include, among others, the agreement of the Qualified
Purchaser to commit a minimum purchase amount based on needs of
the VPP and the Qualified Purchaser's demonstrated ability to
fund its commitment.

A Qualified Purchaser may also work with
Sub-Participants, defined as any entity that intends to purchase
assigned receivables through the Qualified Purchaser for the
purposes of the VPP, provided that the Sub-Participant also can
demonstrate that it can fund its portion of the Qualified
Purchaser's minimum purchase commitment.  Illinois has the right
to review and approve any proposed Sub-Participant and may
require a Qualified Purchaser to exclude a proposed Sub-
Participant in order to earn or maintain its approval to
participate in the VPP.  Qualified Purchasers have an

affirmative obligation to notify the state of any proposed change in the identity of a Sub-Participant.

VAP is a Qualified Purchaser under the VPP. As a Qualified Purchaser, VAP purchases accounts receivable from the state's vendors and borrows money from a bank to do so. The accounts receivable are placed in one of a number of trusts established by the U.S. National Bank, a bank different from the lending bank. VAP is designated as the manager of certain trusts holding the accounts receivable in accordance with management agreements between VAP and the trusts. When Illinois ultimately pays a debt, it makes payments directly to a trust, including the accrued interest penalty. The loan from the lending bank is then paid off with interest. The trust thereafter pays VAP via wire transfer the management fees VAP earned under the management agreements. A management fee to VAP is possible because the interest penalty paid by Illinois is higher than the interest rates charged by the lending banks.

Defendant agreed to purchase plaintiff's interest in VAP pursuant to a contract entitled Membership Interest Purchase Agreement ("MIPA") effective January 1, 2016. Under the MIPA, defendant must pay plaintiff a portion of VAP's Net Income for the years 2016, 2017, and 2018. Section 1.2(d) of the agreement, which is at the heart of the pending motion before the court, provides:

> . . . [defendant] shall . . . pay
> [plaintiff] an amount equal to 50% of VAP's
> Net Income . . . allocable to the Interests
> for such year. "Net Income" is defined to
> mean (i) the sum of (A) any and all fees
> earned by VAP in its capacity as a manager
> or an administrator of (1) the Vendor
> Assistance Trust and/or (2) any other trust
> or account maintained in the course of VAP's
> business, (B) any and all interest income,
> (C) any and all fees earned from providing
> services to affiliates or third parties, and
> (D) any and all other revenues received by
> VAP other than the Reserve Amounts (as
> defined below), less (ii) the sum of
> (A) $50,000 per month for each month in
> which VAP's average outstanding receivables
> are greater than or equal to $50,000,000,
> (B) $25,000 per month for each month in
> which VAP's average outstanding receivables
> are less than $50,000,000, (C) interest paid
> by VAP on debt for which VAP is the debtor
> and any member of VAP is the lender solely
> to the extent that (1) such debt was
> outstanding as of the Closing Date, (2) the
> original principal of such debt, in the
> aggregate, does not exceed $4,000,000, and
> (3) the interest rate to which such debt is
> subject does not exceed 12% per annum, and
> (D) any consulting fees paid to any member
> of VAP or any third party in exchange for
> introducing any new business opportunity to
> VAP, . . .

Items (A) through (D) of clause (i) are defined in § 1.2(d) as

"**Revenue**" and items (A) through (D) of clause (ii) are defined

as "**Expenses**." Significantly, the final sentence of § 1.2(d)

reads: "For the purposes of this Agreement, all Revenues are

recognized when they are received by VAP, and all Expenses are

recognized when they are paid by VAP."

Section 6.1 of the MIPA contains an integration clause.  Section 6.4 states that the MIPA "shall be governed by and construed in accordance with the internal law of the State of Illinois without regard to its principles of conflicts of laws."

In 2017, over a year after the MIPA was executed, VAP created the Bluestone entities to assist it in its business operations.  VAP is governed by a six-member board, with one seat controlled by defendant.  The Bluestone entities have ownership identical to or substantially in common with VAP but are not organized VAP subsidiaries.  Defendant owns the largest percent interest in each Bluestone entity at over 40% and, as with VAP, controls one of the six seats on each company's board of managers.  The Bluestone entities are not recognized by the State of Illinois as Qualified Purchasers or Sub-Participants in the VPP.

VAP compensates the Bluestone entities for certain services they provide to VAP and the trusts holding the accounts receivable.  Bluestone Capital Markets holds the trust certificates, transferred to it by VAP, in order to consolidate the trusts for tax purposes.  Bluestone Financial Services provides services including accounting and tax work, administrative and IT support, and legal and structuring work in closing new transactions.  When VAP is paid its management fees

by a trust after the trust receives payment from the State of
Illinois, VAP compensates the Bluestone entities out of these
fees.

## III

In support of its motion for partial summary judgment,
defendant first argues that the description of net income set
forth in the MIPA formula in § 1.2(d) for earnout payments to
plaintiff allows for the deduction of any fees paid by VAP to
the Bluestone entities.

Under Illinois law, "the meaning of a written contract
is ordinarily a question of law and not one of fact." Hufford
v. Balk, 497 N.E.2d 742, 744 (Ill. 1986), quoting Chicago Daily
News v. Kohler, 196 N.E. 445, 451 (Ill. 1935).  The court's
primary objective in interpreting the meaning of a contract is
to give effect to the intent of the contracting parties.
United Airlines, Inc. v. City of Chicago, 507 N.E.2d 858, 861
(Ill. 1987).

The contract language is ordinarily the best evidence
of the intention of the parties.  Id.  When assessing intent,
the court must construe the contract as a whole, viewing each
provision in light of other provisions so that they are
consistent with one another and giving effect to each clause and
word.  Thompson v. Gordon, 948 N.E.2d 39, 47 (Ill. 2011);
Hufford, 497 N.E.2d at 744; In re Halas, 470 N.E.2d 960, 964

(Ill. 1984). If the words of the contract are unambiguous, the court must give them their ordinary meaning. Thompson, 948 N.E.2d at 47. However, the court is not confined to the strict and literal construction of the language used if doing so would frustrate the intention of the parties in light of the entire contract. United Airlines, 507 N.E.2d at 861.

When a contract is susceptible to two interpretations, one of which is "fair, customary, and such as prudent persons would naturally execute, while the other makes it inequitable, unusual, or such as reasonable persons would not be likely to enter into," the court must construe the contract reasonably to avoid absurd results and adopt the rational and probable interpretation. Foxfield Realty, Inc. v. Kubala, 678 N.E.2d 1060, 1063 (Ill. App. Ct. 1997). The court must also interpret the contract to be in compliance with the law. Illinois State Police v. Fraternal Order of Police Troopers Lodge No. 41, 751 N.E.2d 1261, 1266 (Ill. App. Ct. 2001). If the court determines that there is doubt as to the meaning of the contract after considering the rules of construction, then the question of interpretation must be left to the trier of fact. Countryman v. Indus. Comm'n, 686 N.E.2d 61, 64 (Ill. App. Ct. 1997).

The Supreme Court of Illinois has held that the presence of an integration clause in a contract, as exists here, signals the intention of the contracting parties to protect

themselves against misinterpretations that might arise from
extrinsic evidence.  <u>Air Safety, Inc. v. Teachers Realty Corp.</u>,
706 N.E.2d 882, 885 (Ill. 1999).  Accordingly, the "four
corners" rule applies and precludes the consideration of
extrinsic evidence when a contract contains an integration
clause and is facially unambiguous.  <u>Id.</u> at 886.  Because § 6.1
of the MIPA contains an integration clause, we will not look
beyond the MIPA's four corners to interpret its meaning.

The MIPA describes the formula under which the earnout
payments to plaintiff are to be calculated.  The formula
requires a payment to plaintiff of a percentage of VAP's annual
Net Income for the years in issue.  Net Income is calculated as
the sum of all "Revenues" less the sum of all "Expenses."
Section 1.2(d)'s definition of Revenue includes:

> (i) the sum of (A) <u>any and all fees earned by
> VAP in its capacity as a manager or an
> administrator of (1) the Vendor Assistance
> Trust and/or (2) any other trust</u> or account
> maintained in the course of VAP's business,
> (B) any and all interest income, (C) any and
> all fees earned from providing services to
> affiliates or third parties, and (D) any and
> all other revenues received by VAP other than
> the Reserve Amounts.  (Emphasis added).

The record is undisputed that VAP is the only manager
of trusts holding the accounts receivable.  The trusts continue
to send fees to VAP as manager via wire transfer once the State
of Illinois pays its debts.  It is only thereafter that VAP

compensates the Bluestone entities from these fees. Under the plain language of the MIPA, defendant must include "any and all fees" paid to VAP by the trusts for serving as their manager. Interpreting the contract to exclude any fees received by VAP from the trusts would contradict the plain language of the formula and fundamentally undermine the agreement reached by the contracting parties. What VAP does with a portion of these fees after it receives them does not alter the MIPA designation of such fees as Revenue. Defendant therefore may not exclude from the calculation of Net Income any monies VAP receives as a manager and then pays the Bluestone entities.

To the extent that defendant argues that the Bluestone entities, rather than VAP, "earned" the management fees at issue, this argument is without merit. We must interpret the MIPA to comply with Illinois law, and under Illinois law, the Bluestone entities were neither Qualified Purchasers nor Sub-Participants in the VPP. While the Bluestone entities have agreements with VAP to be compensated for services rendered, we will not look beyond the four corners of the MIPA to interpret its meaning. The MIPA's language unambiguously includes "any and all fees earned by VAP in its capacity as manager" of the trusts, and it is undisputed that the Bluestone entities are not and cannot be managers of any trusts.

Moreover, the formula for Net Income in the MIPA specifies that the only sums defendant may subtract are what the MIPA defines as VAP's "Expenses." The Bluestone payments do not fit the definition of Expenses, and defendant does not argue that they do.

Accordingly, since §1.2(d) of the MIPA does not allow defendant to exclude the fees VAP pays to the Bluestone entities from the Net Income due to plaintiff, defendant's motion for partial summary judgement seeking the contrary result will be denied.

IV

Finally, we turn to defendant's argument that it is entitled to summary judgment as a matter of law on its interpretation of the MIPA that the calculation of the earnout payments to plaintiff includes fees VAP received from the various trusts during the year in question but not fees to which VAP may be entitled during the year in question but did not actually receive. Plaintiff counters that the MIPA requires that fees earned but not received must be included in the calculation.

The MIPA first describes VAP's Net Income to consist of items (A) through (D) of clause (i) of §1.2(d) less items (A) through (D) of clause (ii). Item (A) of clause (i) provides that Net Income includes "any and all fees <u>earned</u> by VAP in its

capacity as a manager . . . of (1) the Vendor Assistance Trust and/or (2) any other trust . . . maintained in the course of VAP's business." (Emphasis added). Section 1.2(d) then defines the items (A) through (D) of clause (i) as "**Revenue**" and items (A) through (D) of clause (ii) as "**Expenses**." As noted above, § 1.2(d) concludes with the following sentence: "For purposes of this Agreement, all Revenues are recognized when they are received by VAP, and all Expenses are recognized when they are paid by VAP." (Emphasis added).

Thus the fees earned by VAP as part of its Net Income as a manager of a trust constitute Revenue, but Revenue is only recognized for purposes of the MIPA when it is received. Plaintiff, as noted above, rests its argument on the language of item (A) of clause (i) which characterized Net Income as including fees earned by VAP as a trust manager. According to plaintiff, this means that it is entitled to have included in the payment formula fees that are earned even though VAP has received no payments from the State of Illinois to cover that fee. Plaintiff in effect seeks to apply the accrual method of accounting to this item of the calculation of the earnout payments despite the fact that the MIPA states that all Revenues, of which the fees of VAP are a part, are recognized when received by VAP. Defendant in contrast maintains that the

MIPA mandates the use of cash based accounting and thus the inclusion only of money received.

We recognize that the word earned can include the notion of services performed for which payment has not yet been received. Yet, earned can also encompass receipt. To earn means "to receive as return for effort and especially for work done or services rendered." Earn, Mirriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/earn.

Under Illinois law, we must, where possible, interpret the provisions of a contract to be in harmony with one another. In re Halas, 470 N.E.2d at 964. "Fees earned" are deemed to be Revenue under § 1.2(d), and Revenue is only recognized under § 1.2(d) when received. By reading "fees earned" to mean "fees received," the language of item (A) in clause (i) is consistent with the definition of Revenue. If we were to adopt plaintiff's interpretation, we have a fatal inconsistency. "Fees earned" would include fees not received, but the definition of Revenue, which includes "fees earned," is limited to what is received. Adopting plaintiff's interpretation would require the court to read out of the contract the MIPA's definition of Revenue in the penultimate sentence of § 1.2(d). Doing so would be contrary to Illinois law, as a court is to give meaning to all clauses and words of a contract. Hufford, 497 N.E.2d at 744.

When interpreting the MIPA, we must also be careful to construe §1.2(d) reasonably so as to avoid absurd outcomes. Foxfield Realty, 678 N.E.2d at 1063. Interest penalties are due to VAP and thus its fees accrue daily, but VAP only receives money when Illinois pays what is due. It is undisputed that Illinois is dilatory in satisfying its obligations. VAP does not know when the state will pay its debts and how much interest will accrue on any given account receivable. If plaintiff were entitled to earnout payments based on fees to which VAP is entitled but has not yet actually received, defendant could be forced to pay plaintiff money that it does not have and may not have for a long time. It is unreasonable to interpret the MIPA signed by two sophisticated parties in a way that could result in such an outcome.

Accordingly, we will grant defendant's motion for partial summary judgment that the MIPA requires the calculation of the Net Income and thus the Revenue of VAP based only on fees actually received by VAP as manager of the trusts established under the Vendor Payment Program of the State of Illinois.