**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

WARREN HILL, LLC,

                   Plaintiff,

v.

SFR EQUITIES, LLC,

                   Defendant.

No. 2:18-01228-HB

## <u>ORDER</u>

      **NOW**, on this ___ day of _____, 2019, upon consideration of Plaintiff Warren

Hill, LLC's Motion for Summary Judgment, and any response thereto, it is **HEREBY**

**ORDERED** that the Motion is **GRANTED**.


BY THE COURT:


_____
                Harvey Bartle III
         United States District Judge

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| WARREN HILL, LLC,<br><br>          Plaintiff,<br><br>v.<br><br>SFR EQUITIES, LLC,<br><br>          Defendant. | No. 2:18-01228-HB |

---

## PLAINTIFF WARREN HILL, LLC'S MOTION FOR SUMMARY JUDGMENT

---

Plaintiff Warren Hill, LLC ("Warren Hill"), through its undersigned counsel, hereby files this Motion for Summary Judgment.  For the reasons set forth in Warren Hill's Memorandum of Law, which is incorporated herein, Warren Hill respectfully requests that the Court grant its Motion and enter judgment in favor of Warren Hill on Counts I and II of its Amended Complaint.

Respectfully submitted,

*/s/ Gregory S. Voshell*
Gregory S. Voshell
Thomas B. Helbig, Jr.
ELLIOTT GREENLEAF, P.C.
925 Harvest Drive
Suite 300
Blue Bell, PA 19422
(215) 977-1000

Date: April 25, 2019                    *Counsel for Plaintiff Warren Hill, LLC*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| WARREN HILL, LLC,<br><br>                    Plaintiff,<br><br>v.<br><br>SFR EQUITIES, LLC,<br><br>                    Defendant. | No. 2:18-01228-HB |

**PLAINTIFF WARREN HILL, LLC'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**ELLIOTT GREENLEAF, P.C.**

Gregory S. Voshell
Thomas B. Helbig, Jr.
925 Harvest Drive, Suite 300
Blue Bell, PA 19422
(215) 977-1000 (p) / (215) 977-1099 (f)
gsv@elliottgreenleaf.com
tbh@elliottgreenleaf.com

*Counsel for Plaintiff Warren Hill, LLC*

Dated: April 25, 2019

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

UNDISPUTED FACTS & ARGUMENT ............................................................................... 3

    I.    MIPA SECTION 1.2(E):  SFR MUST INCLUDE TRUST
         CERTIFICATE  INCOME IN ITS SECTION 1.2(E) PAYMENTS
         TO WARREN HILL .......................................................................................... 4

         A.    The Parties' Trust Certificate Dispute (Counts I-II) ..................................... 4

         B.    The Plain Language of Section 1.2(e) Includes the Trust
              Certificate Income. ...................................................................................... 8

         C.    The Transfer of the Trust Certificates to BCM Is Irrelevant
              for the Purposes of 1.2(e). ........................................................................ 11

         D.    SFR's Reliance on Risk Retention Regulations Is a Red
              Herring. .................................................................................................... 14

    II.    MIPA SECTION 1.2(D):  THE COURT SHOULD ENTER
         JUDGMENT FOR WARREN HILL BECAUSE SFR EXCLUDED
         MONEY ALLOCATED TO THE BLUESTONE ENTITIES FROM
         THE SECTION 1.2(D) EARNOUT .................................................................. 17

    III.    SECTION 1.2(D)(ii): THE COURT SHOULD ENTER
         JUDGMENT FOR WARREN HILL BECAUSE SFR TOOK
         INELGIBLE EXPENSE DEDUCTIONS WHEN CALCULATING
         THE SECTION 1.2(D) EARNOUT IN 2017 AND 2018. ................................... 17

    IV.    SFR'S COUNTERCLAIM:  THIS COURT SHOULD GRANT
         JUDGMENT IN FAVOR OF WARREN HILL ON SFR'S
         COUNTERCLAIM. ........................................................................................... 22

CONCLUSION ...................................................................................................................... 23

# TABLE OF AUTHORITIES

**Cases**

*Am. States Ins. Co. v. A.J. Maggio Co.*,
  229 Ill. App. 3d 422, 593 N.E.2d 1083 (1992) ...................... 12

*Chilmark Ptnrs v. Mts, Inc.*,
  No. 02 C 5339, 2003 U.S. Dist. LEXIS 7077 (N.D. Ill. Apr. 23, 2003) ............................ 8-9

*EBS Dealing Res., Inc. v. Intercontinental Exch., Inc.*,
  379 F. Supp. 2d 521 (S.D.N.Y. 2005) ..................................... 9

*Rush Presbyterian-St. Lukes Med. Ctr. v. Prudential Ins. Co. of Am.*,
  2004 U.S. Dist. LEXIS 5187 (N.D. Ill. Mar. 30, 2004) ........................................ 12

*Swinson v. City of Phila.*,
  2016 U.S. Dist. LEXIS 47008 (E.D. Pa. Apr. 7, 2016) ............................................. 3

*Thompson v. Gordon*,
  241 Ill. 2d 428, 948 N.E.2d 39 (2011) ................................ 8, 9, 11, 12

*Trustmark Ins. Co. v. Transamerica Occidental Life Ins. Co.*,
  484 F. Supp. 2d 850 (N.D. Ill. 2007) ................................... 12

*United States v. Shaw*,
  2017 U.S. Dist. LEXIS 59450 (C.D. Ill. Apr. 19, 2017) .................................. 9, 10

*Warren Hill, L.L.C. v. SFR Equities, L.L.C.*,
  2019 U.S. Dist. LEXIS 23265 (E.D. Pa. Feb. 8, 2019) ................................................ *passim*

**Other**

12 C.F.R. pt. 349 ............................................................. 16

12 C.F.R. § 244.1 ............................................................. 15

12 C.F.R. § 244.2 ............................................................. 16

12 C.F.R. § 244.3 ............................................................. 16

12 C.F.R. § 244.4 ............................................................. 16

Plaintiff Warren Hill, LLC ("Warren Hill"), through counsel, submits this Memorandum of Law in Support of its Motion for Summary Judgment.  Warren Hill respectfully requests that the Court grant its Motion.

## PRELIMINARY STATEMENT

In 2016, Warren Hill sold its equity interest in Vendor Assistance Program, LLC ("VAP") to Defendant SFR Equities, LLC ("SFR").  In addition to certain upfront payments and other consideration, Warren Hill and SFR agreed that SFR would make additional payments to Warren Hill relating to (1) VAP's "Net Income" (which is derived principally from management fees earned by VAP from managing trusts) and (2) funds defined by the parties as "Reserve Amounts."  The parties accomplished this via two earnout provisions in a Membership Interest Purchase Agreement ("MIPA"): Section 1.2(d) embraces the management fees and Section 1.2(e) embraces the Reserve Amounts, including amounts that VAP refers to as "trust certificate income."  SFR has failed to pay Warren Hill the amounts owed under the parties' contract. Warren Hill now moves for summary judgment on four issues:

*First*, Warren Hill is entitled to summary judgment because SFR failed to make payments due under Section 1.2(e).  VAP enters into financing arrangements to finance the purchase of receivables from vendors to the State of Illinois, in exchange for late payment penalties the State must make.  VAP profits "because the interest penalty paid by Illinois is higher than the interest rates charged by the lending banks."  *Warren Hill, LLC v. SFR Equities, LLC*, 2019 U.S. Dist. LEXIS 23265, at *4 (E.D. Pa. Feb. 8, 2019)   This spread—the difference between payment penalties and borrowing rates—is captured via management fees and trust certificate income.

The timing of the release of funds comprising the "Reserve Amounts" such as the trust certificates depends on a number of factors, including when the State makes payments and when the trusts pay expenses.  Because of this, Warren Hill and SFR did not know when the Reserve

Amounts would be released. The parties therefore developed Section 1.2(e), which provides a mechanism for SFR to pay Warren Hill, on a rolling basis, within 5 days of the release of "Reserve Amounts."  The income tied to trust certificates falls within the plain and ordinary meaning of Section 1.2(e)(iii) because the trust certificates are "financial instruments" that are required as a part of the "financing arrangements among VAP and its lenders."  The trusts have released trust certificate income from the trusts, but SFR did not pay Warren Hill its share.

SFR contends—much like it did when the Court addressed Section 1.2(d)—that the trust certificate income does not fall within Section 1.2(e) because the trust certificates were gifted to Bluestone Capital Markets ("BCM") in 2017.  This argument is unpersuasive.  The plain language of the contract does not support SFR's position, the monetary value associated with the certificates was earned by VAP for managing the trusts, and SFR's interpretation would lead to the absurd result of SFR retaining 100% of its share of the trust certificate income by virtue of its ownership in BCM, while Warren Hill would receive nothing.  The Court should reject SFR's attempt to avoid is plain obligations under Section 1.2(e).

*Second*, under Section 1.2(d), this Court has already held that SFR must include all management fees funneled to the Bluestone entities as part of "Net Income."  Warren Hill is entitled to judgment on this issue based on the Court's prior rulings.

*Third*, under Section 1.2(d)(ii), SFR is permitted to deduct certain "Expenses" during the calculation of "Net Income."  Section 1.2(d)(ii)(D) permits SFR to deduct consulting fees paid to individuals who generate new business leads.  However, the MIPA expressly prohibits SFR from deducting consulting fees relating to "vendors" or "parties" that VAP had "previously investigated, transacted with or paid any consultant with respect to."  In 2017 and 2018, SFR took nearly $3 million in deductions for bonuses paid to Brian Hynes, claiming the bonuses

qualified under Section 1.2(d)(ii)(D).  But, the undisputed facts show that the bonuses were tied to vendors and parties that VAP investigated, transacted with, and/or paid a consultant regarding long before the MIPA was signed.  Therefore, the bonuses are not eligible "Expenses," and SFR breached Section 1.2(d) by deducting such amounts.

***Finally***, SFR filed a counterclaim against Warren Hill on the grounds that SFR inadvertently miscalculated the 2017 Section 1.2(d) earnout payment, resulting in SFR overpaying Warren Hill.  SFR contends that when calculating the 1.2(d) payment for 2017, it forgot to exclude money that had been "allocated" to the Bluestone entities.  This, according to SFR, resulted in SFR using too high a figure for VAP's "Net Income."  SFR's claim fails, however, because the Court already concluded that SFR breached the contract by not including all of the money allocated to the Bluestone entities as part of its Section 1.2(d) calculation.  Accordingly, SFR underpaid Warren Hill, not the other way around.

## UNDISPUTED FACTS & ARGUMENT

"Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Swinson v. City of Phila.*, 2016 U.S. Dist. LEXIS 47008, at *5-6 (E.D. Pa. Apr. 7, 2016) (Bartle, J.)  "A dispute is genuine if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party."  *Id*.  Thus, "[s]ummary judgment is granted where there is insufficient record evidence for a reasonable factfinder to find for the nonmovant."  *Id*.  "The mere existence of a scintilla of evidence in support of the [nonmoving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]."  *Id*.  Here, Warren Hill seeks summary judgment on four separate issues, each of which involves a discrete set of undisputed, material facts.  Each issue is presented below, together with the corresponding undisputed facts.

3

## I.   MIPA SECTION 1.2(E):  SFR MUST INCLUDE TRUST CERTIFICATE INCOME IN ITS SECTION 1.2(E) PAYMENTS TO WARREN HILL

### A.   The Parties' Trust Certificate Dispute (Counts I-II)[1]

"[T]he State of Illinois does not pay its bills on time[,]" so "[t]o address its cash flow deficits and assure that its vendors can be promptly paid for goods supplied or services rendered," Illinois created the Vendor Payment Program and the Vendor Support Initiative (together, the "Program").  *Warren Hill, LLC*, 2019 U.S. Dist. LEXIS 23265, at *2.  The Program, which is governed by Program Terms promulgated by the state, permits a vendor to receive most of an invoice's face value upon assigning the total invoice value (*i.e.*, a "receivable") to a type of entity referred to as a "Qualified Purchaser," with the vendor later receiving the balance of the invoice's face value. (*Id.* at *2-3; *see also* Ex. 2 Program Terms at 4.)  "[T]o become a Qualified Purchaser, an entity must meet certain criteria and be approved by the state."  *Warren Hill, LLC*, 2019 U.S. Dist. LEXIS 23265, at *3.  VAP is a "Qualified Purchaser" under the Program.  (*Id.* at *4.)  The Bluestone entities "are not recognized by the State of Illinois as Qualified Purchasers or Sub-Participants in the" Program.  (*Id.* at *7.)

VAP's business model is straight-forward.  "VAP purchases accounts receivable from the state's vendors and borrows money from a bank to do so. The accounts receivable are placed in one of a number of trusts established by the U.S. National Bank, a bank different from the lending bank."  (*Id.* at *4.)  As the Qualified Purchaser under the Program, VAP is "designated as the manager of certain trusts holding the accounts receivable in accordance with management

---

[1] In Count I, Warren Hill alleges that SFR breached the MIPA by failing to pay amounts owed to Warren Hill.  In Count II, Warren Hill seeks a declaratory judgment as to the scope and meaning of Section 1.2(e).  Warren Hill did not know the extent to which SFR breached Section 1.2(e) because, as explained *infra*, payment of Section 1.2(e) trust certificate amounts is not due annually but, rather, due within 5 days of when the trust certificate income is released by the trusts.  Warren Hill now knows that substantial amounts of trust certificate income were released from the trusts in 2018 and 2019, but SFR did not make Section 1.2(e) payments that Warren Hill is owed.  Given these breaches by SFR, the Court can fully resolve the trust certificate issue by granting Warren Hill relief under Counts I and II.

agreements between VAP and the trusts." (*Id.* at \*5.)  The Bluestone entities are not managers of any of the trusts, as they are not qualified to participate in the Program. (*Id.* at \*11.)

As the Court noted, VAP makes money on the spread between the state's late payment penalties and the interest rates VAP is able to secure from its lenders.  (*Id.* at \*4 (explaining that fees paid to VAP are made possible "because the interest penalty paid by Illinois is higher than the interest rates charged by the lending banks").)  The value of this "spread" is captured by two principal income streams.  First, VAP earns management fees for managing the trusts, which VAP refers to as "**Trust Fee Income**" and which can be viewed economically as an advance on the spread.  Second, the remainder resides in financial instruments known as trust certificates, which VAP refers to as "**Trust Certificate Income**".  Trust certificate income is all residual cash remaining in the trust after "all related fees and payments are made."  (Ex. 5, Consol. Fin. at 7.)

For example, if the State makes a payment to a trust, the trust will use that money to first pay various fees and costs, such as interest payments, VAP's management fees, and other general expenses.  (*Id.*; *see also* Ex. 3 Reape Dep. at 509:23-511:12.) If the payment from the State is greater than the cost of paying those fees and costs, the remaining funds are held in financial instruments known as trust certificates pursuant to the financing arrangements among VAP and its lenders. (Ex. 3 Reape Dep. at 509:23-511:12)  After all of the State's payments are made, and all fees, costs, and principal are paid off, the residual cash held in the trust certificates is released.  (*Id.*)

The financial statements explain the difference between these income streams:

> *Trust Fee Income*
> The Company earns both a management fee and an incentive fee as the manager and administrator of the trusts in which it participates, which is controlled by the trust documents. These fees are recognized as incurred, based on a percentage of either average daily funded amount or the average daily receivable amount of the related trust of the immediately preceding payment period. The Company believes these fees are reasonably collectible as they are due from the trusts, and dependent on the trusts' collection from the State of Illinois.
>
> *Trust Certificate Income*
> The Company earns trust certificate income as the manager and administrator of certain trusts in which it participates, which is controlled by the trust documents. The trust certificate entitles the Company to all residual cash after all related fees and payments are made. The payments and fees are paid first in accordance with the controlling trust document.  The Company recognizes trust certificate income as the amount is reasonably collectible as they are due from the trusts, and dependent on the trusts' collection from the State of Illinois.

Thus, for serving as the "manager and administrator of the trusts in which it participates," VAP is entitled to trust fee income (management fees), and VAP is entitled to trust certificate income. (*Id.*)  The trust certificate income can be significant if the trust is effectively and efficiently managed by VAP.  At one point in 2018, VAP valued the trust certificate income as exceeding $27 million.  (*See* Ex. 6, at 1 (identifying value of "trust certificate income receivable" as $27.4 million at the end of August 31, 2018).)

Section 1.2(d) and Section 1.2(e) of the MIPA—the two earnout provisions—track VAP's two income streams and were designed by the parties to capture the entire "spread" for purposes of calculating what SFR owes to Warren Hill under the MIPA.  The Court has already construed Section 1.2(d), which captures the management fees or "trust fee income" and requires that SFR make payments to Warren Hill at set times for each of three years.  (Ex. 1, MIPA at § 1.2(d)).  Section 1.2(e) addresses "Reserve Amounts," which are specifically excluded from Section 1.2(d).  (*Id.* § 1.2(d)(i)(D).)  "Reserve Amounts" are defined as follows in Section 1.2(e):

(e)    For purposes of this Agreement, "**Reserve Amounts**" are defined to mean any and all amounts (i) deposited in VAP's series 2012-1 Reserve Account, (ii) deposited in any other reserve account held by, on behalf of, or for the benefit of, VAP, and/or (iii) held in the form of any financial instrument, in each case as may be required pursuant to the terms of any financing arrangement among VAP and any of its lender(s).  The accounts and financial instruments described in clauses (i), (ii), and (iii) of the preceding sentence are herein defined as

The Section 1.2(e) "Reserve Amounts" are funds that are earned through the operation of VAP's business under the Program, but are not eligible for release by the trusts until some point in the future.  (*See* Ex. 5, Fin. Stat. at 7.)  Thus, the trust certificate income, which is held in the form of financial instruments in accordance with the terms of the financing arrangements among VAP and its lenders, plainly falls within the scope of Section 1.2(e).[2]  At the time the parties drafted the MIPA, the final value of the trust certificates (and the timing of the release of funds from the trusts) was not known, but would instead depend on the subsequent, post-closing operation of VAP's business.  (*Id.;* Ex. 3, Reape Dep. at 242-43, 304, 394-97, 420-25, 507-11.)  Therefore, in contrast to the payments required by Section 1.2(d), the parties did not set specific dates on which SFR was to make Section 1.2(e) payments. Instead, the parties agreed that SFR would make Section 1.2(e) payments on a rolling basis, "within five days of the release of any Included Reserve Amount."[3]

---

[2] Along similar lines, Section 1.2(e) also addresses money that is held in certain bank accounts. (*See* Ex. 1, MIPA § 1.2(e)(i), (ii).)  These funds are not released until various conditions required by VAP's lenders are satisfied.  This occurred recently, as $5 million was released from VAP's series 2012-01 Reserve Account, and SFR made a corresponding Section 1.2(e) payment to Warren Hill.  (*See id.* § 1.2(e)(i); *see* Ex. 3, Reape Dep. at 395-97 (discussing former reserve in the Citi account, and noting that the current deals do not have reserve accounts, but do have trust certificates).)  While the reserve accounts are separate from the trust certificates, VAP treats these reserve amounts as part of the trust certificate income in their financial statements, because they all represent "liquidating value."  (Ex. 3, Reape Dep. at 394-95.)

[3] The balance of the 2012-1 Reserve Account as of the closing of the MIPA was expressly excluded from the scope of Section 1.2(e) as the "Excluded Reserve Amount". (Ex. 1, MIPA § 1.2(e).)  All other Reserve Amounts (excepting re-deposited advances) are defined as "Included Reserve Amounts." (*Id.*) The distinction between the "Excluded Reserve Amount" and the "Included Reserve Amounts" is not implicated in the present dispute over trust certificate income.

Warren Hill contends that the plain terms of the MIPA require SFR to pay Warren Hill 16.623% of the trust certificate income pursuant to Section 1.2(e).  (*See* Ex. 1, MIPA § 1.2(e)(iii).)  SFR disagrees, and argues that the trust certificate income—which is earned by the operation of VAP's business as the "manager and administrator" of the trusts, (*see* Ex. 5, at 7)— is somehow exempted from Section 1.2(e) because the trust certificates were transferred from VAP to BCM beginning in 2017, (*see* D.E. 46, SFR Reply Br. at 4).  VAP, which remained the manager of all trusts, did not receive anything of value from BCM in exchange for the certificates.  Indeed, in the resolutions approving the transfers, VAP's Board of Managers (including Gene Harris of SFR) made clear that VAP (1) would retain its right to receive the management fees, (2) would retain its obligation to manage the trusts, but (3) would transfer the valuable trust certificates to BCM for nothing in return.  (Ex. 7, Board Resolutions at 1, ¶ 5**.**)

Because "[t]he Bluestone entities have ownership identical to or substantially in common with VAP," *Warren Hill, LLC*, 2019 U.S. Dist. LEXIS 23265, at *6-7, SFR is still receiving its portion of the trust certificate income. SFR's attempt to avoid making Section 1.2(e) payments to Warren Hill based on the uncompensated transfer of trust certificates to BCM is contrary to the MIPA and exudes bad faith.  In any case, the fact that BCM now holds the trust certificates is irrelevant for purposes of SFR's obligations under the MIPA because the plain language of Section 1.2(e) applies without regard to the identity of the holder of the applicable financial instruments.  (Ex. 1, MIPA § 1.2(e)(iii).)

**B.     The Plain Language of Section 1.2(e) Includes the Trust Certificate Income.**

Under Illinois law, "[i]n construing a contract, the primary objective is to give effect to the intention of the parties." *Thompson v. Gordon*, 241 Ill. 2d 428, 441, 948 N.E.2d 39, 47 (2011).  "Illinois subscribes to the 'four corners' theory of contract interpretation" to determine the intent of the parties. *Chilmark Ptnrs v. Mts, Inc*., 2003 U.S. Dist. LEXIS 7077, at *10-11

(N.D. Ill. Apr. 23, 2003).  "A court will first look to the language of the contract itself to determine the parties' intent" and "[i]f the words in the contract are clear and unambiguous, they must be given their plain, ordinary and popular meaning."  *Thompson*, 241 Ill. 2d at 441.

Pursuant to the plain and unambiguous language of Section 1.2(e)(iii), Warren Hill is entitled to its share of the trust certificate amounts so long as those amounts are: (1) "held in the form of any financial instrument" and (2) required to be so held pursuant to the "financing arrangements" with the banks who finance VAP's purchase of receivables.  Here, the undisputed evidence shows that these two plain and unambiguous requirements are satisfied:

*First*, trust certificates are "financial instruments."  A financial instrument is defined broadly as "[a] document such as a check, draft, bond, share, bill of exchange, futures or options contract, that has a monetary value or represents a legally enforceable (binding) agreement between two or more parties regarding a right to payment of money."  *United States v. Shaw*, 2017 U.S. Dist. LEXIS 59450, at *5 n.2 (C.D. Ill. Apr. 19, 2017*); EBS Dealing Res., Inc. v. Intercontinental Exch., Inc*., 379 F. Supp. 2d 521, 526 (S.D.N.Y. 2005) (defining "financial instrument as "[a]ny enforceable instrument having a monetary value"); BLACK'S LAW DICTIONARY (defining a "financial instrument" as "[a] document with monetary value and is legally enforceable.")  Here, VAP CEO David Reape testified that each trust certificate has a monetary value and that "at any point . . . you can calculate a value for that certificate" based upon a number of factors such as loan outstanding, trust expenses, etc.  (Ex. 3, Reape Dep., at 394:6-14.)   The trust certificates represent a beneficial interest in the Trust and its future proceeds.  For example, one of the trust agreements provides as follows:

> (b)    Each Trust Certificate evidences a beneficial interest in the Trust and the right to receive certain future payments on the Collateral and other Trust Property after making the payments described in Section 5.02.

(Ex. 8, at 10, § 2.06(b); Ex. 6, at 1 (valuing trust certificate income at $27 million).)  Thus, the

undisputed evidence shows that a trust certificate is a "document ... that has a monetary value,"

and thus constitutes a "financial instrument."  *Shaw*, 2017 U.S. Dist. LEXIS 59450, at *5 n.2.

 ***Second***, the trust certificates are required pursuant to the financing arrangements among

VAP and the banks that finance the purchase of the receivables.  These voluminous financing

arrangements (which span hundreds of pages) contain cover sheets that list exactly which entities

are "Parties" to the applicable financing deal.  One deal, for example, lists the following parties:

| Illinois Receivables Trust, Series 2015-1 (HCSC) | |
| --- | --- |
| Closing Date:  December 30, 2015 | |
| **PARTIES** | |
| Assignor: | Health Care Services Corporation d/b/a Blue Cross Blue Shield of Illinois |
| Assignee/Trust: | Illinois Receivables Trust, Series 2015-1 (HCSC) |
| State: | State of Illinois, acting through the Illinois Department of Healthcare and Family Services |
| Manager: | Vendor Assistance Program, LLC |
| Trustee/Registrar: | U.S. Bank Trust National Association |
| Certificateholder Representative: | Bank of America, N.A. |
| Counsel to Manager: | Howard & Howard Attorneys PLLC ("HH") |
| Account Bank: | U.S. Bank Trust National Association |
| Counsel to Certificateholder Representative: | Chapman and Cutler LLP ("Chapman") |
| Counsel to Trustee: | Richards, Layton & Finger, P.A. ("RLF") |
| Note Depository: | The Depository Trust Company ("DTC") |
| Counsel for True Sale Opinion: | Kirkland & Ellis LLP ("K&E") |
| Counsel for True Sale Opinion: | Faegre Baker Daniesl LLP ("Faegre") |

(Ex. 9, at 1 (first 4 pages of more than 900-page deal binder).)  Indeed, when VAP's Board of

Managers votes to approve new deals, they explicitly refer to the deals as "financing

arrangements" with the relevant lender.  (*See* Exs. 10-11 (approving "financing arrangements

with Bank of America").)   Further, all of these financing arrangements "have a certificate

holder" because "every trust at the bottom has a certificate."  (Ex. 3, Reape Dep., at 134:5-7,

304:5-6.)  Thus, the financing arrangements among VAP and its lenders are structured around trusts, which necessarily require financial instruments known as trust certificates.

Because the trust certificates are financial instruments that are held pursuant to financing arrangements among VAP and its lenders, the Section 1.2(e)(iii) requirements are satisfied.  As a result, Warren Hill is entitled, under Count II of its Amended Complaint to a declaration that SFR is required to include all trust certificate income as part of its future Section 1.2(e) payments.  Moreover, the undisputed evidence has revealed that trust certificate income has been released in 2018 and 2019, but SFR did not pay Warren Hill its share within five days, in breach of Section 1.2(e).[4]  Accordingly, in addition to SFR's breach of Section 1.2(d), this Court should grant judgment in favor of Warren Hill on Count I because SFR also breached Section 1.2(e).

**C.     The Transfer of the Trust Certificates to BCM Is Irrelevant for the Purposes of 1.2(e).**

SFR contends that, because VAP transferred—for no consideration—the trust certificates to BCM in 2017, the funds captured by the trust certificates no longer constitute "Reserve Amounts" under Section 1.2(e).  SFR's interpretation of Section 1.2(e) is unreasonable as a matter of law for numerous reasons.

*First*, SFR's interpretation "add[s] new terms or conditions to which the parties do not appear to have assented."  *Thompson*, 241 Ill. 2d at 450, 948 N.E.2d at 51.  Section 1.2(e)(iii) does not require that VAP hold the trust certificates for the trust certificate income to constitute a

---

[4]  (Ex. 3, Reape Dep., at 398:10-19 ("Q. Mr. Reape, I know we touched on it earlier. But do you know whether any amounts associated with the Citi deal were paid in January of 2019? A. I believe some were, yes. Q. Would any of those amounts be related to a trust certificate for the Citi deal? A. That's all it could be. That's all that's left with the Citi deal is a trust certificate."); *id.* at 429:12-20 ("Q. Again going to the trust certificate income receivable row, there is a drop in the outstanding receivable from 27.4 million at the end of August of '18 to 19 million at the end of September of '18; correct? A. Correct. Q. And you believe that this drop is the result of payments made by the state? A. I'm certain of this.")).  *See also id.* at 430:15-431:2 ("Q. Again, the trust certificate income receivable line lists, as of the end of October of 2018, a total of 14.1 million; correct? A. Correct. Q. And that is a drop of approximately 5 million from the close of September of 2018; right? A. It is. Q. Is your testimony, again, that that drop relates solely to payments made by the state of Illinois? A. Yes.").)

"Reserve Amount."  Section 1.2(e)(iii) captures funds associated with financial instruments that are held under the terms of "financing arrangement[s]" among VAP and its lenders.  As set forth above, trust certificates are financial instruments and they exist due to VAP's "financing arrangements" with its lenders.  Under SFR's interpretation, however, "Reserve Amounts" would mean "any and all amounts ... held in the form of any financial instrument [*of which VAP is the exclusive holder*]" where such funds are required to be so held "pursuant to the terms of any financing arrangement among VAP and any of its lenders."  The MIPA does not contain the bracketed language, and thus, SFR is asking this Court to re-write the MIPA to include it.  Therefore, SFR's interpretation is unreasonable under *Thompson*; *see also Am. States Ins. Co. v. A.J. Maggio Co.*, 229 Ill. App. 3d 422, 427, 593 N.E.2d 1083, 1086 (1992) ("A court will not add another term about which an agreement is silent; no word can be added to or taken from the agreement to change the plain meaning of the parties as expressed therein."); *Trustmark Ins. Co. v. Transamerica Occidental Life Ins. Co.*, 484 F. Supp. 2d 850, 853 (N.D. Ill. 2007) (same); *Rush Presbyterian-St. Lukes Med. Ctr. v. Prudential Ins. Co. of Am.*, 2004 U.S. Dist. LEXIS 5187, at *8 (N.D. Ill. Mar. 30, 2004) (same).

*Second*, it is well-established that "[a] court will not interpret a contract . . . in a way that is contrary to the plain and obvious meaning of the language used."  *Thompson*, 241 Ill. 2d at 442, 948 N.E.2d at 47.  Here, Section 1.2(e) provides that "Reserve Amounts" includes "*any and all* amounts" held in "*any* financial instrument" that are so held "pursuant to the terms of any financing arrangement among VAP and any of its lenders."  It is undisputed that the trust certificate income at issue is held in form of trust certificates (a financial instrument) that exist due to financing arrangements with the banks who finance VAP's purchase of receivables.  *See* Argument Section I.B. *supra*.  It would distort the plain language of Section 1.2(e) to permit SFR

to withhold and retain any or all of these funds for itself simply because VAP transferred those trust certificates to BCM, which has identical beneficial ownership to VAP, *without VAP receiving any consideration* in return.

       ***Third***, SFR's interpretation would lead to an absurd result.  Under SFR's interpretation, Warren Hill is entitled to nothing at all under Section 1.2(e) when the funds in the trust certificates are released to BCM and BCM's members, ***who are identical to the members of VAP***.  Thus, under SFR's interpretation, SFR gets 100% of its proportionate share of the money derived from the trust certificates and Warren Hill get 0%, simply because VAP transferred the trust certificates into BCM's name *without receiving any consideration in return*.  This is not what the parties intended when drafting Section 1.2(e); rather, as the plain language makes clear, the parties intended for SFR and Warren Hill to each receive half of SFR's proportionate share of the Reserve Amounts.  (*See* Ex. 1, MIPA at § 1.2(e) (providing that Warren Hill would receive 16.623% of the Reserve Amounts, which equates to 50% of SFR's proportionate share).)

       As this Court previously explained, when there are two competing interpretations, "one of which is 'fair, customary, and such as prudent persons would naturally execute, while the other makes it inequitable, unusual, or such as reasonable persons would not be likely to enter into,' the court must construe the contract reasonably to avoid absurd results and adopt the rational and probable interpretation."  *Warren Hill, LLC*, 2019 U.S. Dist. LEXIS 23265, at *8-9 (quoting *Foxfield Realty, Inc. v. Kubala*, 287 Ill. App. 3d 519, 678 N.E.2d 1060, 1063 (Ill. App. Ct. 1997)).  Accordingly, an interpretation that results in one party getting 100% and the other party getting 0% would be unreasonable and absurd when the plain language clearly evidences an intent for each party to receive 50% of SFR's share of the trust certificate income.  This is akin to interpreting the contract to mean that Warren Hill is entitled to its share of the money if it

is held in SFR's left hand, but it is not entitled to anything if SFR moves the money to its right hand.

    **Fourth**, according to VAP's audited financial statements, trust certificate income, like the management fees, are earned in VAP's capacity "as the manager and administrator of certain trusts."[5]  (Ex. 5, Consol. Financials at 7.). However, this Court has already found that under Illinois law, "it is undisputed that the Bluestone entities are not and cannot be managers of any trusts." (Op. at 10; *see also id.* at 9 ("The record is undisputed that VAP is the only manager of trusts holding the accounts receivable.")).  Therefore, SFR's contention that BCM, not VAP, earns the trust certificate income simply because VAP transferred the trust certificates into BCM's name *for no consideration*, would violate Illinois law.  The Court should reject this argument as it must "interpret the contract to be in compliance with the law." *Warren Hill, LLC*, 2019 U.S. Dist. LEXIS 23265, at *9 (citing *Illinois State Police v. Fraternal Order of Police Troopers Lodge No. 41*, 323 Ill. App. 3d 322, 751 N.E.2d 1261, 1266 (Ill. App. Ct. 2001)).

    In sum, SFR's contention that Section 1.2(e) does not apply to the funds held in trust certificates because VAP transferred them into the name of BCM *without consideration* is unreasonable.  It is contrary to the plain language of Section 1.2(e), it adds non-existent clauses that would fundamentally change the plain meaning of Section 1.2(e), it leads to an absurd result, and it would violate Illinois law.

    **D.**     **SFR's Reliance on Risk Retention Regulations Is a Red Herring.**

    SFR has attempted to justify the transfer of the trust certificates to BCM based on new risk retention regulations that were promulgated in response to the 2008 mortgage meltdown and financial crisis.  To be sure, the motives behind the transfers are irrelevant to this Motion because

---

[5] The audited financials lump together VAP and the Bluestone entities as a single "Company," but refer to the trust certificate income being earned by the manager of the trusts.  (*See* Ex. 5, Consol. Fin. at 1.) As the Court has already concluded, VAP is the only manager of the relevant trusts.

the plain language of the MIPA does not require VAP to hold the trust certificates for Warren Hill to be entitled to its share of the trust certificate income. Still, to clarify the matter for the Court, SFR's interpretation of how the regulations affect its obligations under the MIPA is plainly wrong, and the Court should reject SFR's alleged "justification."

At various points in this case, SFR has offered the following refrain:

| Document | Statement |
|---|---|
| SFR's Memorandum of Law in Support of its Motion for Partial Summary Judgement at 3 | "BCM, was created to hold trust certificates to foster compliance with the new risk retention regulations." |
| SFR's Statement of Undisputed Facts in Support of its Motion for Partial Summary Judgement at ¶ 24 | "As a result of entering into the risk retention agreements, VAP complied with the new federal risk retention regulations." |
| Statement of SFR's counsel to this Court during Oral Argument on January 24, 2019 at 26 | "And I think the record is clear that there are sound business reasons for creating those companies, to save on taxes and to comply with federal risk retention laws." |

SFR suggests that these regulations *required* the creation of BCM and the transfer of the trust certificates from VAP to BCM.  In fact, the risk retention regulations did no such thing. The risk retention regulations in question are promulgated as a Rule at 12 C.F.R. §§ 244.1 *et seq.* Sections 244.3 and 244.4 of the Rule set forth the "Base" and "Standard" risk retention requirements, respectively.  VAP's CEO, David Reape, summarized the history and purpose of the Rule during his deposition.  (*See* Ex. 3, Reape Dep. at 206-207 (explaining that the Rule applies to certain entities engaged in certain securitization transactions, that such entities are required to retain a 5% economic interest in the credit risk of the securitized assets, and that the Rule was a response to the "asset backed mortgage meltdown of 2008" and was premised on the theory that market participants would act with greater care in selling asset backed securities if they were required to retain a portion of the risk.)

Under the Rule, the risk retention requirements apply to the sponsors of securitization transactions. The Rule defines "sponsor" to mean "a person who organizes and initiates a securitization transaction by selling or transferring assets, either directly or indirectly, including through an affiliate, to the issuing entity." 12 C.F.R. § 244.2. The Rule also defines the terms "majority-owned affiliate" (*id.*) and "wholly-owned affiliate" (*id.*) and provides that, under various circumstances, a sponsor may satisfy its risk retention obligations by having the risk held by a majority-owned affiliate (or a wholly-owned affiliate) rather than by the sponsor itself. *See, e.g.*, 12 C.F.R. §§ 244.3, 244.4.

As stated in various risk retention agreements produced by SFR in this case, VAP and its lender, Barclay's, determined that both VAP and Barclay Capital Inc. fell within the Rule's definition of a "sponsor."  (*See* Ex. 12, Risk Retention Agreement at 1 (Recitals)). Therefore, each of VAP and Barclay Capital Inc. were subject to the risk retention obligations of a sponsor under the Rule. As explained *supra*, the Rule *permitted* VAP, as a sponsor, to satisfy its risk retention obligations by having its affiliate, BCM, hold the subject risk. However, the Rule did not *require* VAP to transfer the trust certificates to BCM.  At various times, SFR has tacitly acknowledged that the Rule did not require the creation of BCM or transfer of the trust certificates.  (*See, e.g.*, SFR's Statement of Undisputed Facts in Support of its Motion for Partial Summary Judgement at ¶ 20 (stating "As a result of the passage of those regulations, *VAP* would have to retain a 5% interest in all future securitization transactions in which VAP was the certificate holder." (emphasis added)); Def.'s Mot. Partial. Summ. J., Declaration of Brian Hynes at 2 (stating same); Ex. 3, Reape Dep. at 207-208 (discussing alternative structures); *id.* at 349 (discussing same).)

16

The Rule was promulgated to ensure that risk is *retained* by a sponsor (or the sponsor's permitted affiliate). The Rule did not require that the trust certificates be transferred from VAP, as SFR has seemed to imply while attempting to justify the transfer of the trust certificates from VAP to BCM without consideration. In any event, that the Rule permitted the transfer of the trust certificates in no way alters the fact that the trust certificates fall squarely within the terms of Section 1.2(e). Warren Hill's entitlement to payment under Section 1.2(e) is in no way diminished by the secretive creation of BCM or the transfer of trust certificates.

II.    **MIPA SECTION 1.2(D):  THE COURT SHOULD ENTER JUDGMENT FOR WARREN HILL BECAUSE SFR EXCLUDED MONEY ALLOCATED TO THE BLUESTONE ENTITIES FROM THE SECTION 1.2(D) EARNOUT.**

Warren Hill is entitled to summary judgment because SFR improperly excluded fees that were earned by VAP from "Net Income" when calculating the amount it owed Warren Hill under Section 1.2(d).  It is undisputed that SFR did not include fees that were earned by VAP, and later funneled to the Bluestone entities, in the calculation of "Net Income" when paying Warren Hill's earn-out payments under Section 1.2(d).  *See Warren Hill, LLC*, 2019 U.S. Dist. LEXIS 23265, at *1.  This Court has already held that "§ 1.2(d) of the MIPA does not allow defendant to exclude the fees VAP pays to the Bluestone entities from the Net Income due to plaintiff."  *Id*. at *12-13.  The Court concluded that SFR's argument that "the Bluestone entities, rather than VAP, 'earned' the management fees at issue" was "without merit."  *Id*. at *11.  Accordingly, to the extent the Court has not already done so, Warren Hill respectfully requests that this Court enter judgment in its favor on Count I because it is undisputed that SFR breached Section 1.2(d).

III.    **SECTION 1.2(D)(ii):  THE COURT SHOULD ENTER JUDGMENT FOR WARREN HILL BECAUSE SFR TOOK INELGIBLE EXPENSE DEDUCTIONS WHEN CALCULATING THE SECTION 1.2(D) EARNOUT IN 2017 AND 2018.**

Warren Hill next seeks summary judgment under Section 1.2(d)(ii)(D), a provision that permits SFR to deduct certain "consulting fees" as an allowable "Expense."  SFR took

deductions under Section 1.2(d)(ii)(D) in both 2017 and 2018, claiming that bonuses paid to

Brian Hynes fell within the provision.  Section 1.2(d)(ii)(D) applies only to "consulting fees"

paid for *new* business leads, subject to conditions specified in the provision, but, SFR itself

admits that the bonuses paid to Mr. Hynes related to vendors and entities that VAP was already

investigating or doing business with long before Warren Hill sold its interest in VAP to SFR.

The bonuses are therefore not eligible to be deducted as "Expenses."  By deducting the bonuses

as expenses in 2017 and 2018, SFR breached Section 1.2(d).

      The plain language of the MIPA "specifies that the only sums defendant may subtract

[from Revenue] are what the MIPA defines as VAP's 'Expenses'." *Warren Hill, LLC*, 2019 U.S.

Dist. LEXIS 23265, at *11.  The MIPA lists four categories of "Expenses," only one of which is

material here, Section 1.2(d)(ii)(D).

      Section 1.2(d)(ii)(D) provides that SFR can deduct from the earn-out payments, "any

consulting fees paid to any member of VAP or any third party in exchange for introducing any

new business opportunity to VAP," provided that such new business opportunities *exclude* any

business opportunity "involving any vendor, payee, program, or party which VAP had

***previously investigated, transacted with or paid any consultant*** with respect to" (emphasis

added).   In other words, the plain language of this provision permits a deduction for consulting

fees paid for introducing new business to VAP, except where that allegedly new business

involved an entity that VAP previously had sought to do, or did do, business with.

      In calculating the earnout payment for 2017 and 2018, SFR deducted close to $3 million

in bonus payments made to Brian Hynes.  (Exs. 13-14 (SFR's earnout calculations).)  SFR

contends that the bonuses were properly deducted pursuant to Section 1.2(d)(ii)(D) because it

was a "bonus that was paid or payable to Brian Hynes under the bonus plan" as a "result of a

new business opportunity." (Doc. 60, at 8.) The plain unambiguous language of Section 1.2(d)(ii)(D), however, prohibits SFR from deducting this "bonus" because the vendors and parties that Mr. Hynes allegedly investigated/worked with in 2017 and 2018 had been investigated and transacted with long before the MIPA was signed.[6]

SFR contends that the alleged "new business opportunities" justifying the Hynes bonuses involve Blue Cross Blue Shield ("BCBS"),[7] United Health, and Bank of America ("BoA"). (Doc. 60, at 8.) Yet, the record evidence is undisputed that all of these entities constitute a "vendor" or "party" that VAP had "previously investigated, transacted with or paid any consultant with respect to." Therefore, when SFR took a deduction for the Hynes bonuses, it breached Section 1.2(d)(ii)(D).

Indeed, David Reape testified that VAP personnel, Drew Delaney and Brian Hynes, were "involved in *investigating BCBS* as a potential vendor [for] VAP to do business with" and that "Brian has been talking to Blue Cross *probably since 2012*." (Ex. 3, Reape Dep., at 245:1-8 (emphasis added).) Mr. Reape repeatedly testified that VAP had engaged in an "investigation" of BCBS as a potential vendor since 2012. (*See, e.g.*, *id.* at 254:22-255:5 ("Q: Do you view this as Mr. Delaney updating you on his investigation of Blue Cross/Blue Shield as a potential vendor for VAP to do business with? A: Yes. Q: Next page, this is an email dated -- And just to be clear,

---

[6] To be clear, Warren Hill does not take issue with Mr. Hynes receiving the bonuses—even though the bonuses are suspicious given Mr. Hynes' inability to articulate what he does on a daily basis for BCM (Ex. 4, Hynes Dep. at 77). That is an issue for VAP and its board of managers to address. The issue here is that such bonuses are not eligible to be deducted by SFR as "Expenses" under the express terms of the MIPA. VAP may, at its discretion, pay bonuses. But, SFR cannot skirt the plain and unambiguous terms of the MIPA by deducting such bonuses as alleged "Expenses" under Section 1.2(d) to reduce the amount of money it must pay to Warren Hill.

[7] The legal name for Blue Cross Blue Shield of Illinois is "Health Care Services Corporation." The parties regularly refer to this entity as BCBS, and for consistency and clarity, Warren Hill likewise does so herein.

that last email we looked at was dated October 28 of 2013; right? A: Yes.")).[8]  In fact, a VAP

PowerPoint presentation from **January 2013** lists BCBS as part of its "Large Vendor Outreach,"

and states that it was "In Discussion" with BCBS.[9]  (Ex.15 (Deposition Exhibit 38) at 5-7.)  The

same holds true for United Healthcare, which was investigated as a potential business lead along

with all health insurance carriers as far back as 2013.  (*See* Ex. 17 (VAP's internal customer

tracking system, showing contacts with United dating long before MIPA).)  The undisputed

records, including from VAP's Customer Resource Management ("CRM") software program,

show prior investigation of each of BCBS and United Health. (Ex. 17 (BCBS CRM showing

contacts back to 2013); Ex. 16 (United CRM showing contacts back to 2013).)

Likewise, the record is undisputed that VAP had "investigated" partnering with BoA to

purchase receivables since at least June of 2014 when Mr. Reape and Brian Hynes met with a

number of individuals associated with BoA.  (*See* Ex. 3, Reape Dep., at 258:12-21 ("Q And this

email is dated June 4, 2014; correct? A Correct. Q And you're reaching out to a number of

individuals affiliated in one capacity or another with Bank of America Merrill Lynch; right? A

Yes. Q Is the purpose here to investigate funding for additional work that VAP was intending to

pursue? A Yes."); *id.* at 261:11-14 ("Q Who was the primary individual at VAP who was I guess

---

[8] *See also id.* at 249:24-250:7 ("Q: I guess you're referring to a meeting that had been scheduled between VAP and Blue Cross/Blue Shield of Illinois? A Yes. Q And was that part of your investigation of Blue Cross/Blue Shield of Illinois as a potential vendor to do business with? A I'm sure it was although I don't remember the 2012 meeting."); *id.* at 252:6-10 ("Q Is one of the purposes of this [January 2013] marketing update to identify vendors that VAP was investigating for potential business deals? A That and to encourage our lenders not to give up a month in."); *id.* at 255:10-16 ("Q Again this seems to be -- and take your time and read it, please, just a number of emails back and forth about the status of the ongoing investigation Blue Cross/Blue Shield of Illinois; right? A Sure, including the meeting that I referenced."); *id.* at 256:19-257:3 ("This is an email dated June 27, 2014 from Drew Delaney to a number of people including yourself; correct? A Correct. Q And he's again, Mr. Delaney updating this group of individuals as to the status of his investigation Blue Cross/Blue Shield of Illinois; right? A Correct.").

[9] Information from VAP's Customer Resource Management software program further indicates that from March of 2013 through January of 2015, VAP employee Drew Delaney had over forty communications to and from BCBS; held meetings with the BCBS "finance team", with BCBS Senior Director of Corporate Investments, Eric Nilles, and with the CFO of BCBS.  (*See* Ex. 16.)

investigating this sort of 100 percent lending structure with Bank of America Merrill Lynch? A It was Brian and I."); *id*. at 268:17-20 ("Q What about his -- You mentioned that you and Mr. Hynes had investigated potential financing deals with Bank of America; right? A Correct."); *see also* Ex. 18, WH103-104 (detailing communications with BoA executives).)

In addition to previously "investigating" BCBS and BoA, it is undisputed that VAP had previously "transacted with" both BCBS and BoA. Mr. Reape testified, and internal documents confirm, that VAP engaged in a transaction involving both BCBS and BoA in December of 2015. (*See* Ex. 3, Reape Dep., at 258:22-259:1 ("Q So I think we saw earlier today that the first of the Blue Cross transactions closed I believe in December of 2015; is that right? A December 30 of 2015."); *id*. at 263:17-22 ("Q So this is Mr. Ryerson asking for the board of managers' consent, VAP's board of managers; consent to a transaction involving Blue Cross and Bank of America in December of 2015; correct? A Yeah, and it also gives Brian and I the ability to enter into certain documents."); *see* Ex. 10-11.)  VAP and BoA entered another financing arrangement in February 2016, just prior to the parties executing the MIPA. (*See* Ex. 11.)

Finally, this "bonus" is not deductible from the earnout payment under Section 1.2(d)(ii)(D) because the record is also undisputed that VAP had previously "paid a[] consultant with respect to" BCBS and BoA.  Mr. Reape testified that Brian Hynes has a consulting agreement with VAP under which VAP paid Brian Hynes a consulting fee for services performed for VAP.  (Ex. 3, Reape Dep., at 267:7-24.)  Mr. Reape further testified that VAP paid Brian Hynes under this "consulting agreement" with respect to services regarding BCBS and BoA in 2014.  (*See id.* at 268:11-16 ("Q But specifically with respect to the vendor Blue Cross/Blue Shield of Illinois, would his compensation have covered his work with respect to Blue Cross? A. It certainly would have in the 2014 time frame."); *id*. at 268:24-269:4 ("Q We

just looked at the 2014 email from the Bank of America team to the VAP team. So for that time period, would that consulting agreement have covered his services with respect to Bank of America? A Yes.")).

In sum, the bonuses paid to Brian Hynes in 2017 and 2018 are not deductible under the plain and unambiguous meaning of Section 1.2(d)(ii)(D) because the undisputed record evidence shows that VAP had previously "investigated," "transacted with," **and** "paid a[] consultant with respect to" the vendors and parties associated with the Hynes bonus payments that SFR improperly deducted for 2017 and 2018.  Accordingly, this Court must enter judgment in favor of Warren Hill on Count I because the undisputed evidence shows SFR breached Section 1.2(d)(ii)(D).

## IV.    SFR'S COUNTERCLAIM:  THIS COURT SHOULD GRANT JUDGMENT IN FAVOR OF WARREN HILL ON SFR'S COUNTERCLAIM.

SFR asserts a counterclaim against Warren Hill, alleging that it overpaid Warren Hill $83,115 in the 2017 earn-out payment because it included $500,000 in "VAP's revenues that were not earned and received by VAP," but rather were "earned" by the Bluestone entities. (Doc. 60, p.9.)  In other words, SFR contends that it inadvertently included VAP fees that were funneled to Bluestone when calculating "Revenue" in Section 1.2(d).  This theory fails as a matter of law because this Court has already rejected SFR's argument "that the Bluestone entities, rather than VAP, 'earned' the management fees at issue."  *Warren Hill, LLC*, 2019 U.S. Dist. LEXIS 23265, at *11.  Accordingly, SFR's counterclaim fails as a matter of law and this Court should grant judgment in favor of Warren Hill.

## **CONCLUSION**

For these reasons, Warren Hill respectfully requests that this Court grant its Motion.

Respectfully submitted,

*/s/ Gregory S. Voshell*
Gregory S. Voshell
Thomas B. Helbig, Jr.
ELLIOTT GREENLEAF, P.C.
925 Harvest Drive, Suite 300
Blue Bell, PA 19422
(215) 977-1000

Dated: April 25, 2019                    *Counsel for Plaintiff Warren Hill, LLC*

23

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on this date, I have caused a true and correct copy of the forgoing to be served upon each attorney of record via electronic mail, the Court's ECF system, and U.S. mail.


*/s/ Gregory S. Voshell*
GREGORY S. VOSHELL

Dated: April 25, 2019