# EXHIBIT 3

Page 1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA DIVISION


WARREN HILL, LLC,                    )
                                     )
              Plaintiff,             )
                                     )
         vs.                         )  No. 2:17-01228-HB
                                     )
SFR EQUITIES, LLC,                   )
                                     )
              Defendant.             )



         The deposition of DAVID REAPE, called by
the Plaintiff for examination, pursuant to notice and
pursuant to the Rules of Civil Procedure for the
United States District Courts pertaining to the taking
of depositions, taken before Erin McLaughlin, CSR, at
200 S. Michigan Avenue, Suite 1000, Chicago, Illinois,
on Monday, October 15, 2018, commencing at the hour of
9:00 o'clock a.m.



Page 2

```
1    APPEARANCES:
2
3       ELLIOTT GREENLEAF, P.C.
        925 Harvest Drive, Suite 300
4       Blue Bell, PA 19422
        gsv@elliotgreenleaf.com, by:
5       MR. GREGORY VOSHELL,
6          appeared on behalf of the Plaintiff;
7
        WHITE & WILLIAMS LLP
8       One Liberty Place, Suite 1800
        Philadelphia, PA 19103-7395
9       onufrakm@whiteandwilliams.com, 215.864.7174, by:
        MR. MICHAEL N. ONUFRAK,
10
           appeared on behalf of the Defendant;
11
12      HOWARD & HOWARD
        200 S. Michigan Avenue, Suite 100
13      Chicago, Illinois 60604
        SML@h2law.com, 312.456.3418, by:
14      MR. SCOTT M. LEVIN,
15         appeared on behalf of the VAP;
16
17      ALSO PRESENT:
18      MR. LOUIS A. BALLEZZI
        Corporate Counsel, Warren Hill, LLC;
19
        MR. JASON CANNON;
20
        MR. JEFF MAIER, Videographer.
21
22
23             * * * * *
24
```

Page 3

```
1              I N D E X
2
3    THE WITNESS: DAVID REAPE
                           PAGE
4    EXAMINATION BY:
        MR. VOSHELL              8
5
6    EXHIBITS MARKED:
        Nos. 1-3            5
7       No. 4             35
        No. 5             50
8       No. 6             55
        No. 7             73
9       No. 8             93
        Nos. 9-12        113
10      Nos. 13-14       132
        No. 15           139
11      Nos. 16-20       144
        No. 21           151
12      No. 22           162
        No. 23           166
13      No. 24           175
        No. 25           180
14      No. 26           183
        Nos. 27-29       189
15      No. 30           213
        No. 31           219
16      Nos. 32-33       234
        No. 34           236
17      No. 35           238
        No. 36           244
18      No. 37           247
        No. 38           249
19      No. 39           263
        No. 40           265
20      No. 41           268
        No. 42           270
21      No. 43           281
        No. 44           285
22      No. 45           294
        No. 46           301
23      No. 47           306
        No. 48           311
24      No. 49           317
```

Page 4

```
1              (Reape Deposition Exhibit
2           Nos. 1-3 was marked for
3           identification.)
4           (Witness sworn.)
5        THE VIDEOGRAPHER:  We are now on the record.
6    This begins Video Number in the deposition of David
7    Reape in the matter of Warren Hill LLC versus SFR
8    Equities LLC in the Eastern District of Pennsylvania
9    Court.
10          Today is Monday, October 15, and the
11   time is 9:10.  This deposition is being taken at
12   Howard and Howard at the request of Elliott Greenleaf
13   PC.  The videographer is Jeff Maier of Magna Legal
14   Services, and the court reporter is Erin McLaughlin of
15   Magna Legal Services.
16          Will counsel and all parties present
17   state their appearances and who they present.
18       MR. VOSHELL:  Greg Voshell from Elliott
19   Greenleaf representing the plaintiff, Warren Hill LLC.
20       MR. ONUFRAK:  Michael Onufrak, O-n-u-f-r-a-k
21   with White and Williams on behalf of SFR Equities LLC.
22       MR. LEVIN:  Scott M. Levin on behalf of the
23   witness and VAP, V-A-P.
24       THE VIDEOGRAPHER:  Will the court reporter
```

Page 5

```
1    please swear in the witness.
2           (Whereupon the Witness was sworn.)
3        MR. VOSHELL:  Good morning, Mr. Reape.  We've
4    met before.  My name is Greg Voshell.  I represent
5    plaintiff, Warren Hill LLC in litigation that's been
6    filed against defendant, SFR Equities LLC in the
7    United States District Court for the Eastern District
8    of Pennsylvania.
9           Could you please state your name for
10   the record.
11       THE WITNESS: David Reape.
12       MR. ONUFRAK:  May I say just something?  On
13   behalf of SFR Equities LLC, I would like to designate
14   the entire transcript as confidential under the
15   stipulation as approved by the Court on June 26, 2018,
16   which I have a copy of and we can attach it to the
17   transcript.
18          Second, I want to just repeat my
19   understanding reached last week with Mr. Voshell that
20   these are discovery depositions that are taking place
21   today and the next two days, not depositions to
22   preserve testimony.  Therefore, all objections will be
23   reserved until later except as to privilege and the
24   form of the question.
```



Page 134

1 Markets, LLC as the certificate holder representative;
2 correct?
3     A   Correct.
4     Q   And what does that mean?
5     A   So you would note all of the trusts have a
6 certificate holder, certificate holders or certificate
7 holder representatives.
8         So all trusts have to have, if nothing
9 else, a beneficial owner. So at the bottom of a trust
10 there is a beneficial owner that has a certificate in
11 that trust. That may be of nominal benefit. There
12 may be no benefit to having that certificate. It all
13 depends on the structure of the financing above it.
14    Q   So if you again can flip to Page 1 of the
15 agreement which again follows the Table of Contents,
16 this June, 2017 management agreement again in the
17 preamble lists VAP as the manager; correct?
18    A   Correct.
19    Q   And again it's the defined term Manager
20 with a capital M; correct?
21    A   Yes.
22    Q   And in the third whereas clause which is
23 the fourth paragraph of the entire document, it states
24 that the manager shall -- Strike that. It states that

Page 135

1 the manager which is VAP shall perform the services
2 set forth herein on behalf of the trust; correct?
3     A   I'm sorry. Which paragraph are you on?
4     Q   Sure. It's still on Page 1, Mr. Reape.
5 It's the third whereas clause.
6     MR. ONUFRAK: 15831, correct?
7     MR. VOSHELL: That's correct.
8     MR. ONUFRAK: Second line from the bottom of
9 the paragraph.
10    MR. VOSHELL: Q It begins whereas on the terms
11 and subject to the conditions hereinafter set forth.
12    A   Okay.
13    Q   Do you see it?
14    A   Yes. Got it.
15    Q   The manager which is VAP shall perform the
16 services set forth herein on behalf of the trust;
17 correct?
18    A   Correct.
19    Q   And again if we move to Page 2 which is
20 the definitional portion of this contract, it lists a
21 Manager fee and a Manager incentive fee; correct?
22    A   Correct.
23    Q   And both of those defined terms have a
24 capital M before the word manager; correct?

Page 136

1     A   Correct.
2     Q   And these just set forth the fees that the
3 manager is going to earn in its capacity as manager;
4 correct?
5     A   They set forth how it will be calculated.
6 The Manager fee rate obviously we have seen previously
7 is set to define what the given series will actually
8 pay.
9     Q   But pay to the manager; correct?
10    A   Pay to the manager or certificate holder.
11    Q   If, in fact -- Well, we will get to that
12 later?
13    A   If we look at all of the series, we will
14 see there are different variants.
15    Q   In fact, some of the more recent series
16 don't structure the transactions in a way that allow
17 for a senior or junior fees but instead put the value
18 of the management services into a trust certificate;
19 correct?
20    A   Sure.
21    Q   But not this one in particular; right?
22    A   Not the master trust; but, again, there is
23 an ability on the individual series issued under it to
24 define -- So, for example, a Manager Incentive Fee

Page 137

1 might be 0 in a given series because it's defined.
2     Q   In Section 2.01 which appears on Page 4,
3 this states again that VAP will be appointed as the
4 manager; correct?
5     A   Correct.
6     Q   Then about halfway through that paragraph
7 in a sentence that begins with the word in, it says:
8 In consideration of the performance of its duties
9 hereunder, the manager which is VAP shall be paid the
10 Manager fee and the Manager incentive fee with respect
11 to any series in accordance with the terms of the
12 related series trust agreement and subject at all
13 times to the availability of amounts in the collection
14 account for such series; correct?
15    A   Correct.
16    Q   If you turn to Page 5, Article 3 and
17 Section 3.01, this sets forth the duties of the
18 manager; correct?
19    A   Yes.
20    Q   And so these are the duties that VAP was
21 undertaking as manager of this particular trust;
22 correct?
23    A   Correct.
24    Q   If you can flip to what's been marked now



Page 206

1    A   Yes.
2    Q   If you could now flip to the Bluestone
3  Capital Markets agreement which is Exhibit 29?
4    A   Okay.
5    Q   You alluded to it.  But why was Bluestone
6  Capital Markets created?
7    A   So in December of 2016 the risk retention
8  requirements under Dodd Frank, Section 15G which
9  amends the Securities and Exchange Act of I think 1934
10  changed requirements with regard to risk that has to
11  be held by entities that are doing securitization for
12  non-residential backed securitization.
13        Basically the requirement says that if
14  you've acquired receivables and you are selling them
15  off in a transaction, a series, a note, whatever that
16  you have to retain 5 percent of the interest of
17  whatever you're selling off.
18        It's an outshoot from the asset backed
19  mortgage market meltdown of 2008 where there were a
20  lot of really bad loans originally that were
21  securitized and the entities selling them off didn't
22  have any interest in what was being sold.  The thought
23  was requiring retention would make an entity a lot
24  more careful about what they were doing.  So those

Page 207

1  requirements came into place the end of December,
2  2016.
3        When we started working with Barclays
4  on putting a note transaction together which was
5  January of 2017, I was aware of the requirements
6  because of some discussions I had had with BAML.  But
7  the way we were structuring the Barclays transactions,
8  we were going to be the certificate holder; and that's
9  the entity that has to meet the risk retention
10  requirements, the structure we were putting together.
11        So talking with Barclays at the time, I
12  had to get up to speed with risk retention.  So I
13  contacted Foley and Lardner, an attorney that had put
14  together a transaction for us previously that I knew
15  had a lot of structured finance experience just to
16  have him kind of teach me up on risk retention
17  requirements and ways that we could potentially
18  address it.
19        One of the things that came out with
20  the initial suggestion was that we create a special
21  purpose entity to hold the risk.  And our initial
22  thought was that maybe Barclays could loan us the
23  money for us to purchase 5 percent of each one of the
24  notes being issued and have the terms of that so that

Page 208

1  it would be neutral, so that if the note was paying 9
2  percent, we'd just have to pay 9 percent.
3        In ongoing discussions with Foley and
4  Barclays, Foley came up with a way that we could
5  address this.  We would still set up an entity to hold
6  the risk, but we would enter into a risk retention
7  agreement where basically Barclays would agree to, for
8  want of a better word, insure our risk, assume our
9  risk.  So it was quite a bit of negotiation on form.
10        There is a couple of different types of
11  risk retention, vertical, horizontal, whatever.  So we
12  went through a couple of iterations with Foley and
13  Barclays before we settled on the way we were going to
14  address these.
15        So Bluestone Capital Markets was formed
16  for the purpose of holding that risk.  One of the
17  reasons why we obviously had to expedite creating an
18  operating agreement was we were, Bluestone Capital
19  Markets had to be KYC.  They were going to be part of
20  all of these note transactions, so we had to have
21  everything in place for this entity to transact
22  business.
23    Q   Two quick points of clarification.  Then
24  we may need to switch the tape.  You said BAML during

Page 209

1  your answer.  That refers to Bank of America?
2    A   Yes.
3    Q   And you just said KYC, Know Your Customer
4  regulations which respect to doing business in Puerto
5  Rico and elsewhere?
6    A   Well, principally here.  Well, Puerto Rico
7  and the United States are --
8    MR. VOSHELL:  We have to switch the tape.
9  Okay.
10    THE VIDEOGRAPHER:  The time is 1:58.  We're off
11  the record.
12        (Whereupon a brief recess was had,
13        after which the deposition of
14        Mr. Reape continued as follows:)
15    The time is 2:06.  We're back on the
16  record, beginning Disk 3
17    MR. VOSHELL:  Q  Mr. Reape, I'll remind you you
18  are still under oath, and we're back on the record.
19    A   Okay.  Understood.
20    Q   We left off with Exhibit 29 which was a
21  services agreement between Vendor Assistance Program
22  and Bluestone Capital Markets; correct?
23    A   Correct.
24    Q   I think I asked you this with respect to



Page 242

1    Q   A few lines down from the senior fee, you
2  get to junior management fee, do you see that, 134,000
3  every month?
4    MR. LEVIN:  Three lines down.
5    A   It actually looks like these may be
6  calculations of some numbers.  Unfortunately this
7  document is practically unreadable.
8        I think all of the numbers you're
9  showing us here are actually calculations off of
10 numbers that are listed in the top left.  I can't read
11 what those headings are.
12   MR. VOSHELL:  Q   I think it's an outstanding
13 monthly average of more than a $120 million, and that
14 wouldn't be payments certainly; right?
15   A   No.  That would be an outstanding
16 receivable balance or in the case of Citi where we
17 were paid off loan balance.
18   Q   Then under the junior fee you can see it
19 reads excess cash, and it says depends on timing of
20 state payments; correct?
21   A   Correct.
22   Q   So there is a cash line in this waterfall
23 schedule; right?
24   A   Just to be clear on that excess cash,

Page 243

1  under this particular facility, there is a senior fee,
2  there is a junior fee and potentially depending on the
3  mechanics and performance there can be cash above
4  that.  That would be a certificate fee.
5        So I'm guessing that's what -- Again,
6  unfortunately this is barely legible, so it's hard for
7  me to figure out what all of the calculations are
8  here.
9    Q   You can put both of those aside.
10       (W.H. Deposition Exhibit No. 36
11       was marked for identification.)
12       Mr. Reape, we placed in front of you a
13 document marked as Warren Hill 36.  Have you had a
14 chance to review the document
15   A   I have.
16   Q   Are you familiar with the document that's
17 in front of you as Exhibit 36?
18   A   It appears to be a printout of our CRM
19 system.
20   Q   What's the CRM stand for?
21   A   Client and Management is the CM.  Somebody
22 help me.  Client Resource Management.
23   Q   Maybe customer?
24   A   Customer, yeah.  Client, Customer, it's

Page 244

1  the same thing.
2    Q   And this is a system that VAP maintained
3  at one time point during its on operation?
4    A   It's the CRM.  It's Microsoft CRM
5  Dynamics.  So it's a platform we put up with some
6  thoughts that we would track leads and maybe at some
7  point integrate it into our porthole hold and even
8  potentially integrate it into an accounting system.
9    Q   When you say track leads, like to track
10 kind of your investigation into potential vendors?
11   A   Sure.
12   Q   And this particular document at the top
13 lists Health Care Services Corp.  Do you see that?
14   A   Yes.
15   Q   And that's as we talked about earlier Blue
16 Cross/Blue Shield of Illinois?
17   A   Correct.
18   Q   In the bottom right-hand corner there is a
19 category for recent interactions.  Do you see that?
20   A   Yes.
21   Q   And it looks like there are a number of
22 calls and follow-up calls that were owed by Drew
23 Delaney?
24   A   Yes.

Page 245

1    Q   Was Mr. Delaney involved in investigating
2  Blue Cross/Blue Shield of Illinois as a potential
3  vendor to VAP for do business with?
4    A   He was among others.
5    Q   Who else was involved in that
6  investigation?
7    A   Brian has been talking to Blue Cross
8  probably since 2012.
9        We had a number of meetings with Blue
10 Cross that I was at.  Brian and I had some separate
11 meetings with them regarding a Medicaid opportunity.
12 So they certainly were an entity we had talked to.
13   Q   When was the meeting with respect to the
14 Medicaid opportunity?
15   A   We have had meetings throughout with that,
16 throughout the year.  So one of the opportunities
17 could have been in 2013.
18       Specifically you could see the meetings
19 that I know I attended are listed here.  I actually
20 think there was -- I'm fairly certain there was a
21 meeting in June of 2014 that's not listed here, but I
22 never put any of my meetings in here.  This was a
23 system that I barely knew how to use.
24   Q   So there could be additional contacts



Page 246

1  between VAP and Blue Cross/Blue Shield of Illinois
2  that are not even listed here?
3      A   Sure.
4      Q   And you just identified one from June of
5  2014; right?
6      A   That's my recollection, yeah, an actual
7  meeting,
8      Q   And there is a section in here for primary
9  contact and additional contacts; correct?
10     A   Correct.
11     Q   The primary contact listed is Eric Nilles;
12 right?
13     A   Correct.
14     Q   And he is a senior executive of Blue
15 Cross/Blue Shield of Illinois?
16     A   Based on this, it would appear he is.
17     Q   Do you interact with Mr. Nilles at all
18 anymore?
19     A   We have extensive dealings now with Blue
20 Cross.  I've never talked to any of these people.
21 None of these people are involved in any of the note
22 transactions.
23              (W.H. Deposition Exhibit No. 37
24              was marked for identification.)

Page 248

1      Q   Do you know who Mr. Doloughty is?
2      A   He's one of our employees.
3      Q   Is he currently an employee?
4      A   He's an employee of VAP.
5      Q   Does he have an employment agreement with
6  VAP?
7      A   He does.
8      Q   Is he eligible for the VAP or vendor
9  system bonus program?
10     A   The employee bonus program.
11     Q   The employee bonus program.
12     A   Yes.
13     Q   Is there another bonus program that VAP
14 funds other than the employee bonus program?
15     A   So there is a member bonus program that's
16 paid to members for bringing new business into the
17 company, and then there is an employee, for want of a
18 better word, profit participation program, net income
19 participation.
20     Q   And what we have just looked as Exhibits
21 36 and 37, those are VAP business records; correct?
22     A   Correct.
23              (W.H. Deposition Exhibit No. 38
24              was marked for identification.)

Page 247

1      Q   We just placed in front of you what we
2  have marked as Warren Hill 37.  When you've had a
3  chance to review it, if you would, let me know.
4      A   Okay.
5      Q   Do you recognize this printout or at least
6  the format of it?
7      A   Yeah.  Again, based on the labeling here,
8  it's coming out of our CRM system.
9      Q   If you start at the first entry at least
10 for this particular printout, the date is 3/19/2013;
11 correct?
12     A   Right.
13     Q   Then as it flows through the next several
14 pages, it references follow up phone calls, voice
15 mails, meetings, emails, and other contacts between
16 VAP representatives and Blue Cross/Blue Shield of
17 Illinois; correct?
18     A   Correct.
19     Q   The name under the column header owner for
20 a lot of these entries is Drew Delaney; correct?
21     A   Correct.
22     Q   There is a Patrick Doloughty.  Do you see
23 that?
24     A   Yes.

Page 249

1      Q   Mr. Reape, I've just put in front of you a
2  document that we have marked as Exhibit Number 38,
3  Warren Hill 38.  There is a cover email on April 11,
4  2017 from Jim Delaney to Gene Harris.  Do you see
5  that?
6      A   I do.
7      Q   Then it attaches a series of documents
8  after that.  I'd like to focus on the series of
9  documents it attaches.  Okay?
10     A   Okay.
11     Q   The first one is a December 13, 2012
12 email.  Do you see that?
13     A   I do.
14     Q   And it's from you to a number of people;
15 right?
16     A   Yes.
17     Q   About halfway through you reference a
18 "upcoming BCBS meeting."  Do you see that?
19     A   Yes.
20     Q   Does BCBS refer to Blue Cross/Blue Shield
21 of Illinois?
22     A   It does.
23     Q   I guess you're referring to a meeting that
24 had been scheduled between VAP and Blue Cross/Blue



Page 250

1  Shield of Illinois?
2      A  Yes.
3      Q  And was that part of your investigation of
4  Blue Cross/Blue Shield of Illinois as a potential
5  vendor to do business with?
6      A  I'm sure it was although I don't remember
7  the 2012 meeting.
8      Q  It would make sense you would be meeting
9  with Blue Cross/Blue Shield for that purpose; right?
10     A  It could have been for participation in
11  vendor payment or it could have been exploring
12  Medicaid opportunities, a different program.
13     Q  Right.  The Medicaid opportunities are
14  carved out of the VPP; correct?
15     A  They're excluded by VPP.
16     Q  Excluded by VPP, yeah.
17     A  Medicaid receivables are not assignable.
18     Q  Right, in light of the federal oversight.
19     A  Yeah.
20     Q  If you flip to the next email, it's an
21  email from you again to a number of people attaching a
22  marketing update.
23     A  Okay.
24     Q  And just very quickly, do you know --

Page 251

1  There is a Yahoo address as the first two.  Do you
2  know who that is?
3      A  Dick Blewlitt.
4      Q  That's the Mr. Blewlitt that we talked
5  about at the beginning of the deposition?
6      A  That's correct.
7      Q  The next is -- Is that Mr. Neumann?
8      A  That's Mr. Neumann.
9      Q  The same Mr. Neumann we talked about
10  earlier?
11     A  It is.
12     Q  The next is Jim Delaney?
13     A  Yes.
14     Q  Then Brian Hynes at his Howard &
15  Howard.com address?
16     A  Yes.
17     Q  Drew Delaney and Mr. Cannon; right?
18     A  Correct.
19     Q  If you turn to the marketing update
20  itself, it's dated January 10th, 2013; right?
21     A  Yes.
22     Q  Do you recall whether you drafted this
23  marketing update?
24     A  So this was kind of a collective.  Drew

Page 252

1  did a lot of the work.  I had some input.  We had some
2  issues because we had a $320 million line.  We were a
3  month in, and we used $5 million.  As you can imagine,
4  the lenders were a little uncomfortable in the lack of
5  business.
6      Q  Is one of the purposes of this marketing
7  update to identify vendors that VAP was investigating
8  for potential business deals?
9      A  That and to encourage our lenders not to
10  give up a month in.
11     Q  If you turn to the next page, it's marked
12  Warren Hill 96 at the bottom, you'll see that there's
13  a co-marketing header on this particular slide; right?
14     A  Yes.
15     Q  It says large vendor outreach; right?
16     A  Yes.
17     Q  And there is a chart that follows the
18  large vendor outreach heading that states status.  Do
19  you see that?
20     A  Yes.
21     Q  In discussion is the first row under the
22  word status; right?
23     A  Yes.
24     Q  And it specifically references vendors in

Page 253

1  the next column; right?
2      A  It does.
3      Q  And one of the vendors -- Strike that.
4         One of the vendors is Blue Cross/Blue
5  Shield of Illinois; right?
6      A  Yes.
7      Q  And the status for Blue Cross/Blue Shield
8  of Illinois is "in discussion"; right?
9      A  Yes.
10     Q  So this is early 2013, and there are
11  discussions between Blue Cross/Blue Shield of Illinois
12  and VAP about potential transactions; right?
13     A  True.  And, in fact, this indicates they
14  would be registering which they finally did last week.
15     Q  And you're referring to the bottom portion
16  of this particular marketing update where Blue
17  Cross/Blue Shield of Illinois is not only specifically
18  referenced but also referenced in boldface; right?
19     A  Yes.
20     Q  If you flip to the next page, please, it
21  has the Bates stamp Warren Hill 98.  This is an email
22  from Drew Delaney to yourself and Brian Hynes at his
23  Howard & Howard.com address; right?
24     A  Uh-huh.



Page 254

```
1        Q    Subject line is BCBS; right?
2        A    It is.
3        Q    Do you understand that to refer to Blue
4  Cross/Blue Shield of Illinois?
5        A    I do.
6        Q    He said he spoke to Jo Ann Wetzel;
7  correct?
8        A    Yes.
9        Q    Have you ever spoken to Miss Wetzel?
10       A    We had some meetings and discussions.
11 it would have been at that time period, but probably
12 nothing since 2013, 2014.
13       Q    At this time she was with Blue Cross/Blue
14 Shield of Illinois?
15       A    That's correct.
16       Q    She is now an at United; right?
17       A    Oh, I have no idea where she is.
18       Q    Then Mr. Delaney lists a number of
19 take-aways from his conversation with Miss Wetzel;
20 correct?
21       A    Yes.
22       Q    Do you view this as Mr. Delaney updating
23 you on his investigation of Blue Cross/Blue Shield as
24 a potential vendor for VAP to do business with?
```

Page 255

```
1        A    Yes.
2        Q    Next page, this is an email dated --
3             And just to be clear, that last email
4  we looked at was dated October 28 of 2013; right?
5        A    Yes.
6        Q    Next one, Brian Hynes to Drew Delaney
7  copying Jim Delaney, David Reape, and Patty Solis
8  Doyle; right?
9        A    Yes.
10       Q    Again this seems to be -- and take your
11 time and read it, please, just a number of emails back
12 and forth about the status of the ongoing
13 investigation Blue Cross/Blue Shield of Illinois;
14 right?
15       A    Sure, including the meeting that I
16 referenced.
17       Q    That's the June, 2014 email you
18 represented earlier?
19       A    Yeah.  I said I thought that contact
20 record was incorrect because it was missing a meeting.
21       Q    Just to clarify, incomplete because it was
22 incomplete, not that it was incorrect?
23       A    Incomplete.  Thank you.
24       Q    And just to speed things up, Mr. Reape, if
```

Page 256

```
1  you can look at the next several pages, one's got a D
2  circled at the bottom of it, an E circled at the
3  bottom of it, then an F circled at the bottom of it,
4  then a G circled at the bottom of it, then an H
5  circled at the bottom of it.  Would you agree these
6  are all emails that were exchanged within VAP in the
7  2014 to 2015 time frame?
8        A    Yes.
9             Is there an 2015 email in here?
10       Q    I think in the last one, Mr. Reape,
11 Wednesday, December 30, 2015.
12       A    We seem to have big time jump.
13       Q    Sure.  Well, let's go through them.  I was
14 trying to make things a little bit faster.
15       A    We went from September, 2014 to
16 December 30, 2015.  I'm assuming something happened in
17 between.
18       Q    That's fine.  Why don't you turn to the
19 page marked Warren Hill 101.  This is an email dated
20 June 27, 2014 from Drew Delaney to a number of people
21 including yourself; correct?
22       A    Correct.
23       Q    And he's again, Mr. Delaney updating this
24 group of individuals as to the status of his
```

Page 257

```
1  investigation Blue Cross/Blue Shield of Illinois;
2  right?
3        A    Correct.
4        Q    Let's jump to the page with the F circled
5  at the bottom of it which is Warren Hill 103.  Okay.
6  And this is --
7        A    I'm sorry.  103, two pages.  Got it.
8        Q    Yes.  It starts on 103 and it runs to 104.
9  Okay.
10            I guess we will look at the first email
11 which begins on the bottom of Page 103.  It's from
12 you, Mr. Reape, to a number of individuals.  I'm
13 sorry.  It's to a Paul Bloshuk and Edward Curland, a
14 James Nacos and Thomas Viscone?
15       A    Yes.
16       Q    Then it's copying Mr. Delaney, Miss Solis
17 Doyle, Mr. Hynes at his Howard & Howard address, and
18 that's it; right?
19       A    Yes.
20       Q    Who is Mr. Bloshuk?
21       A    He is managing director of Global
22 Municipal Transitions at Bank of America Merrill
23 Lynch.  I'm not sure if I have his title exactly.
24       Q    Who is Mr. Curland?
```

Page 258

1    A   He's a very senior municipal managing
2  director at BAML, Blue Cross. I'll use BAML for Bank
3  of America Merrill Lynch.
4    Q   Who is Mr. Nacos?
5    A   At the time he was an analyst there. I
6  know he's no longer employed by BAML.
7    Q   Mr. Viscone?
8    A   Probably the same. I've had a lot of
9  contact with the first two individuals over the years,
10  and I don't think after June 14 I ever had any contact
11  with the other two guys.
12    Q   And this email is dated June 4, 2014;
13  correct?
14    A   Correct.
15    Q   And you're reaching out to a number of
16  individuals affiliated in one capacity or another with
17  Bank of America Merrill Lynch; right?
18    A   Yes.
19    Q   Is the purpose here to investigate funding
20  for additional work that VAP was intending to pursue?
21    A   Yes.
22    Q   So I think we saw earlier today that the
23  first of the Blue Cross transactions closed I believe
24  in December of 2015; is that right?

Page 259

1    A   December 30 of 2015.
2    Q   So here we are a year and a half earlier
3  and you along with several other VAP-affiliated
4  individuals who are copied are investigating potential
5  funding sources with Bank of America; right?
6    A   Sure. We've gone through an exercise with
7  them to see if they could create a revolving facility
8  to give us a hundred percent financing for potentially
9  Blue Cross and potentially Health Alliance.
10       It never got anywhere. We couldn't get
11  the right things put together with BAML on the
12  structure they proposed. At the end of the day, Blue
13  Cross didn't want to pull the trigger either.
14    Q   On this particular iteration of the deal;
15  right?
16    A   Correct.
17       We also at the same time met with Citi
18  and tried to get them to put a revolving facility
19  together because they did make a proposal; but, again,
20  neither of the vendors was interested.
21    Q   And again you said something there that
22  was interesting to me. You said an a hundred percent
23  deal. Can you explain that?
24    A   Sure. These are very large insurers.

Page 260

1  They weren't in a position from the way they do their
2  accounting to just do a 90 percent advance and have
3  the deferral. That didn't work for them.
4       It was clear from an admitted capital
5  standpoint that they needed to move the entire
6  receivable off. So they wouldn't have to take any
7  reserve against the 10 percent. So really the only
8  way it was going to make any sense to try to do
9  anything with these large vendors was to try to put
10  some type of revolving facility together.
11       The problem was a hundred percent
12  financing. The financing looked very difficult. It
13  wasn't -- The way we had done financing, this program
14  clearly wasn't going to work.
15    Q   But the concept of a 100 percent financing
16  was being discussed as early as June of 2014?
17    A   It was. It was being discussed in a very,
18  very different structure than when it ended up
19  happening.
20    Q   Sure. But to be clear, the concept of
21  Blue Cross/Blue Shield of Illinois needing to transfer
22  or assign 100 percent was in the works long before any
23  deal with Blue Cross/Blue Shield of Illinois was
24  completed; correct?

Page 261

1    A   It was.
2    Q   Just to close the loop here, there is an
3  email from Mr. Bloshuk to you at the top of the chain
4  stating it was great to meet with you; is that right?
5    A   I'm sorry. Which page are you on?
6    Q   Sure. Warren Hill 103. It's the top of
7  the email chain where Mr. Bloshuk is responding to
8  you, Mr. Reape, thanking you for the meeting with the
9  VAP team?
10    A   Yes.
11    Q   Who was the primary individual at VAP who
12  was I guess investigating this sort of 100 percent
13  lending structure with Bank of America Merrill Lynch?
14    A   It was Brian and I.
15    Q   Does Mr. Hynes have a finance background,
16  or was he more of a -- Did he serve more of a role in
17  kind of connecting you with individuals at Bank of
18  America?
19    A   So kind of a -- He doesn't have a formal
20  finance background; but anybody that grows up in a
21  business like this, you end up learning a lot about
22  finance.
23    Q   But you and he were investigating this 100
24  percent kind of --



66 (Pages 258 to 261)

Page 262

1   A   Yeah.  Again, the team, everyone is
2   assisting in the company in developing models and
3   figuring out if we could make this work.
4            BAML obviously did a lot of work on
5   their end to try to model this.  We could never get
6   there.
7       Q   Before we move on, Mr. Reape, Mr. Curland
8   and Mr. Nacos, were they ultimately involved in the
9   Bank of America deal that was completed in December
10  of 2015?
11      A   Mr. Bloshuk and Mr. Curland.
12      Q   Not Mr. Nacos?
13      A   No.  I think, my recollection was he was
14  just the guy that put the spread sheets put together.
15      Q   The same people that the VAP team is
16  meeting with in June of 2014 were involved in the
17  ultimate deal?
18      A   Yeah, Paul and Ed.
19           (W.H. Deposition Exhibit No. 39
20               was marked for identification.)
21      Q   We have placed in front of you Exhibit 39,
22  Warren Hill 39.  Have you had a chance to review the
23  document, Mr. Reape?
24      A   Yes.

Page 263

1       Q   And this is an email from Mark Ryerson at
2   Howard & Howard to a number of individuals on
3   December 30, 2015, correct?
4       A   Correct.
5       Q   And Mr. Ryerson is asking for majority
6   board approval to enter into the financing arrangement
7   with Bank of America regarding the purchase of certain
8   Blue Cross Blue Shield receivables; right?
9       A   Uh-huh.
10      Q   What does this document represent to you?
11      A   So in every one of our transactions you'll
12  find that there is a consent of the managers to enter
13  into the role that VAP is playing in this these trust
14  documents.
15           So every series you have seen has a
16  consent, a fairly similar to this one.
17      Q   So this is Mr. Ryerson asking for the
18  board of managers' consent, VAP's board of managers;
19  consent to a transaction involving Blue Cross and Bank
20  of America in December of 2015; correct?
21      A   Yeah, and it also gives Brian and I the
22  ability to enter into certain documents.
23           And, again, Mark sent this document on
24  this transaction; but I believe every other one came

Page 264

1   out.  For me, I was the actual sender of consents.
2       Q   Understood.  And Mr. Ryerson just to close
3   the loop sent this to yourself, Brian Hynes of
4   Howard & Howard, Patty Solis Doyle and Jason Cannon;
5   correct?
6       A   The board of managers of VAP at the time.
7       Q   Yep.
8            And attached to this is a resolution;
9   correct?
10      A   Yes.
11      Q   Or at least part of the resolution?
12      A   Uh-huh.
13      Q   And that's consistent with how other
14  transactions were approved by the board of managers?
15      A   Every one is approved this way.
16           (W.H. Deposition Exhibit No. 40
17               was marked for identification.)
18      Q   Mr. Reape, we have placed in front of you
19  a document marked Warren Hill 40.  It's another email
20  with attachments.  When you have had a chance to look
21  at it, please let me know.
22      A   Okay.
23      Q   Are you familiar with this document,
24  Mr. Reape?

Page 265

1       A   I am.
2       Q   What is it?
3       A   It's a consent for entry into the next
4   transaction we were doing.
5       Q   And that transaction was with Bank of
6   America and Blue Cross/Blue Shield of Illinois?
7       A   It was.  It was Illinois Receivable Trust
8   2, Series 16-1 A and B.
9       Q   And this is dated February 12, 2016;
10  right?
11      A   Yes.
12      Q   That's the same date as the management
13  agreement we looked at earlier that addressed the Blue
14  Cross deal; right?
15      A   Sure.  The management agreement was for
16  the master trust that we were going to be doing all of
17  these series underneath.
18      Q   But the two documents are related;
19  correct?
20      A   They are.
21      Q   And, again, you sent it out this time, the
22  request for a vote; and again it went to Mr. Ryerson,
23  Mr. Hynes, Miss Doyle and Mr. Delaney; right?
24      A   Correct.

**MAGNA** ›
**LEGAL SERVICES**

Page 266

1  Q   And then if you could flip to Bates Number
2  160, so about I would say 90 percent of the way
3  through that document.
4  A   Okay.
5  Q   In the note there is a provision for
6  notices.  Do you see that --
7  A   Yes.
8  Q   -- Section 8.04?  And the notice to the
9  certificate holder representative goes to Edward
10 Curland; right?
11 A   Yes.
12 Q   That's the same Mr. Curland we were
13 talking about?
14 A   Same one, yes.
15 Q   Just to put a time frame on it, that was
16 the Mr. Curland we were talking about in connection
17 with meetings occurring in June of 2014; right?
18 A   That's correct.
19 Q   Next page there is another notice
20 provision with a copy going to James Nacos; correct?
21 A   Okay.
22 Q   That's the same Mr. Nacos referred to in
23 the June, 2014 email we looked at earlier; right?
24 A   Yes.

Page 267

1        (W.H. Deposition Exhibit No. 41
2              was marked for identification.)
3  Q   Mr. Reape, we have put in front of you
4  what's been marked as Warren Hill 41.  Are you
5  familiar with the document?
6  A   I am.
7  Q   Could you please describe for the record
8  what it is?
9  A   It's a consulting agreement between Brian
10 Hynes and the company.
11 Q   When you say the company, you're referring
12 to Vendor Assistance Program, LLC; right?
13 A   Yes.
14 Q   And it's dated August 24, 2012; right?
15 A   Yes.
16 Q   And if you look at Section 2 which is the
17 compensation section, it lists Mr. Hynes would be
18 paid $20,000 per month for a period of three years;
19 right?
20 A   Yes.
21 Q   What was that consulting or what was that
22 compensation under the terms of this consulting
23 agreement for?
24 A   For services performed for the company.

Page 268

1  Q   And what would those services include?
2  A   I mean pretty expansive.
3  Q   Would it include, for example,
4  investigating a potential deal with Blue Cross/Blue
5  Shield of Illinois?
6  A   It certainly would be talking to vendors.
7  It would certainly be potentially assisting in state
8  relations, monitoring of any changes in legislation.
9  You know, it could even be certain operating
10 activities.
11 Q   But specifically with respect to the
12 vendor Blue Cross/Blue Shield of Illinois, would his
13 compensation have covered his work with respect to
14 Blue Cross?
15 A   It certainly would have in the 2014 time
16 frame.
17 Q   What about his -- You mentioned that you
18 and Mr. Hynes had investigated potential financing
19 deals with Bank of America; right?
20 A   Correct.
21 Q   Would this consulting agreement have
22 covered his investigation of those financing deals?
23 A   It depends on the time period.
24 Q   We just looked at the 2014 email from the

Page 269

1  Bank of America team to the VAP team.  So for that
2  time period, would that consulting agreement have
3  covered his services with respect to Bank of America?
4  A   Yes.
5        (W.H. Deposition Exhibit No. 42
6              was marked for identification.)
7  Q   Mr. Reape, we have placed in front of you
8  a copy I have a document numbered 42.  I'll represent
9  this is a document that was produced by SFR to Warren
10 Hill on Friday of last week.  Have you had a chance to
11 review it?
12 A   Yes.
13 Q   Are you familiar with it?
14 A   I am.
15 Q   Could you describe for the record what it
16 is?
17 A   It's an employment agreement between Alan
18 Wilson and Blue Stone Finance.
19 Q   If you could turn to the back, there is an
20 Exhibit A which defines compensation.  It's the last
21 page, Mr. Reape.  Are you there?
22 A   Yes.
23 Q   And Subsection 3 is labeled Bonus; right?
24 A   Yes.



68  (Pages 266 to 269)

Page 302

1  Markets to serve as the risk retention entity -- we
2  were transferring VAP-held certificates to Bluestone
3  Capital Markets. At the time that we created the
4  Barclays revolving facility, VAP had been the
5  certificate holder.
6        One of the things -- So there were a
7  series of reasons why we decided we were going to
8  transfer the VAP-held certificates to Bluestone
9  Capital Markets. One was that we already had the IRT
10 funding trust that was holding those certificates. We
11 were kind of viewing Bluestone Capital as our equity
12 entity; so for an organizational standpoint, it made
13 sense to hold all of those.
14       With regards to the Barclays revolving
15 facility, we had been extremely successful; and we
16 were at capacity. I had had some discussions with
17 Barclays about upping the commitment which they had
18 from an on balance sheet perspective an issue with.
19 But they said we could actually create notes series
20 under the trust that was holding the revolving
21 commitment.
22       So anticipating like we have with all
23 of the note series that we would need a risk retention
24 entity, I thought it made sense on the Barclays

Page 303

1  revolving note or the Barclays revolving trust to
2  transfer that certificate.
3        Citi certificate and the RRT
4  certificate, again it was just part of the
5  restructuring to put all of those kind of activities
6  in there.
7        So the reason we were communicating
8  with Josh Wrightsman who is our principal contact at
9  Bridgeview Bank was we wanted to get his consent
10 because the loan was directly with VAP. We didn't
11 want to make it look like we were taking collateral
12 out of that loan. So that's why we did those
13 certificate transfers.
14       So Board consents, there is a whole set
15 of procedures that have to happen for a certificate to
16 be transferred and reissued with U.S. Bank.
17       So this was to get -- this email refers
18 to the consent we had to obtain from Bridgeview under
19 our loan agreement with them.
20    Q   And the loan agreement you're referring
21 to, is that the one that was obtained from Bridgeview
22 to pay down the member debts?
23    A   And for working capital purposes.
24    Q   But that is the $5 million one?

Page 304

1     A   Yes. It is.
2     Q   When you talk about certificates, you're
3  referring to I think the residual value of those some
4  of these trusts?
5     A   So every trust at the bottom has a
6  certificate; and depending on the economics of the
7  trust, that certificate could never have any value; or
8  depending on how the deal was structured, for example,
9  the RRT trust, the only value any of the companies
10 would ever derive would be from that certificate. No
11 senior or junior fees were paid.
12       So depending on the trust, it kind of
13 defines how that certificate works. But basically
14 under most trusts, when money actually hits that
15 certificate, it just gets kicked out of that to
16 whoever holds the certificate.
17    Q   At the top of this email chain on Page 1,
18 Mr. Wrightsman writes back and says the likely need to
19 amend the loan docs. Do you see that?
20    A   Right.
21    Q   Is he referring to the $5 million loan
22 there?
23    A   Yes.
24    Q   Is he referring to the $5 million loan

Page 305

1  there?
2     A   Yes. I don't believe they were amended.
3  I believe the consent was sufficient.
4     Q   So even though Mr. Wrightsman raises the
5  concept of an amendment --
6     A   Penned and signed a consent.
7     Q   -- you don't think that happened?
8        All right. Was that consistent with
9  the loan documents to the best of your recollection?
10    A   The consent was consistent, yeah.
11    Q   Were there any guarantees exchanged in
12 connection with this transfer?
13    A   So the initial -- So I believe. I have to
14 look at the consent, but I believe Bluestone Capital
15 Markets probably gave a guarantee as part of this
16 consent.
17    Q   Not VAP?
18    A   Well, VAP was already on the loan.
19          (W.H. Deposition Exhibit No. 47
20          was marked for identification.)
21    Q   Mr. Reape, I've handed you a two-page
22 exhibit marked Number 47. It's another email chain.
23 When you have had a chance to review it, please let me
24 know?



David Reape
DAVID REAPE - CONFIDENTIAL

Page 347

1    that and respond appropriately.
2 BY MR. VOSHELL:
3    Q.    Mr. Reape -- and I apologize if we
4 talked about this during your prior deposition --
5 do you recall who had the idea initially to create
6 the Blue Stone entities?
7    A.    It was a collection of members of
8 VAP that saw certain benefits from creating the
9 two entities.
10   Q.    But do you recall the specific
11 individual who raised it for the first time?
12   A.    Brian Hynes initially raised the --
13 Brian was living in Puerto Rico. He raised the
14 benefits to creating an Act 20 company in Puerto
15 Rico probably in 2014.
16   Q.    When did the discussions concerning
17 the creation of the Blue Stone entities really, I
18 guess, gain some steam or pick up momentum?
19   A.    2016.
20   Q.    That would have been after Warren
21 Hill sold its interest in VAP to SFR?
22   A.    I'm not sure on the time frame.
23   Q.    Do you recall whether the prospect
24 of creating the Blue Stone entities was ever

Page 348

1 discussed with individuals associated with Warren
2 Hill in 2016?
3    A.    Not by me.
4    Q.    So when the discussions concerning
5 the Blue Stone entities began to gain momentum in
6 2016, who kind of took lead in the creation of
7 them?
8    A.    Brian took lead on the Puerto Rico
9 initiative. The Bluestone Capital Markets
10 creation didn't occur until 2017. And discussions
11 regarding that didn't really kind of congeal until
12 the risk retention rules went into effect in 2017.
13   Q.    Blue Stone Finance was created in
14 2017 as well; right, Mr. Reape?
15   A.    It was, yes.
16   Q.    Blue Stone Finance didn't begin
17 operating until, the earliest, November of 2017;
18 correct?
19   A.    That's correct.
20   Q.    Now you mentioned risk retention
21 issues in 2017. Who first brought those issues to
22 your personal attention, Mr. Reape?
23   A.    Both Barclays and Bank of America,
24 Merrill Lynch.

Page 349

1    Q.    Whose idea was it to create
2 Bluestone Capital Markets?
3    A.    It was kind of a board decision
4 that that would be -- we knew we had to create a
5 new entity in our initial discussions on how we
6 could address risk retention.
7    Q.    Now, why did you have to create a
8 new entity, Mr. Reape?
9    A.    As it was presented to us
10 initially, we would actually need to borrow the
11 money in our transactions. So we had discussions
12 with both banks regarding them actually having us
13 -- as part of every transaction, lend us the five
14 percent requirement, since our transactions are
15 very large. So we set up a Bluestone Capital
16 really to be a special purpose entity to take on
17 that -- what we thought was going to be a loan
18 requirement.
19         Obviously, subsequent to that we
20 were able to figure out a way around actually
21 doing that five percent lending.
22   Q.    Do you recall whose idea it was
23 specifically to create Bluestone Capital Markets?
24   A.    To create an entity for that

Page 350

1 purpose?
2    Q.    Right.
3    A.    I certainly was on the forefront of
4 it. It may have been my idea.
5    Q.    Was Mr. Gene Harris involved in
6 those discussions as well?
7    A.    He was.
8    Q.    In fact, Bluestone Capital Markets
9 was created as a Florida company; correct?
10   A.    It was.
11   Q.    Why, if you know, was Bluestone
12 Capital Markets created as a Florida entity?
13   A.    We thought there could be some tax
14 benefit. We needed to create an entity quickly
15 and Mr. Harris actually had the resources to do
16 that.
17   Q.    What type of tax benefits did you
18 see as, I guess, potentially available by creating
19 Bluestone Capital Markets in Florida?
20   A.    Again, a different tax base than
21 Illinois.
22   Q.    A different tax base for whom, Mr.
23 Reape?
24   A.    Potentially for the members. It

5 (Pages 347 - 350)

David Reape
DAVID REAPE - CONFIDENTIAL

Page 391

1    A.    I would guess this is probably a
2  document that Mr. Wilson distributed to members.
3    Q.    If you look at the bottom left-hand
4  corner, it's dated January 29th, 2019; right?
5    A.    Correct.
6    Q.    And so your testimony is that you
7  believe Mr. Wilson distributed this to members,
8  including SFR, on or around that date?
9    A.    I can't say when he distributed it,
10 but it looks like that would have been the
11 preparation date. So I would assume on or after
12 that date.
13   Q.    And to the best of your knowledge,
14 it would be inaccurate to characterize this
15 document as coming from the company's QuickBooks?
16   A.    I think you need to clarify that
17 question.
18   Q.    To the best of your knowledge, it
19 would be inaccurate for someone to characterize
20 this document as coming from the company's
21 QuickBooks?
22   A.    This certainly is not a
23 QuickBooks-produced report. Is that your
24 question?

Page 392

1    Q.    That's right.
2          And if someone had represented to
3  Warren Hill that this was indeed from QuickBooks,
4  that would be an inaccurate representation?
5    A.    I think so. Again, based on my
6  knowledge of QuickBooks.
7    Q.    This is dated December 31st, 2018;
8  correct?
9    A.    Correct.
10   Q.    So these are year-end numbers; is
11 that right?
12   A.    I would assume, yes.
13   Q.    Well, do you know or are you
14 assuming, Mr. Reape?
15   A.    Based on the dating, it would have
16 to be; yeah.
17   Q.    There's a heading called "Assets."
18 Right?
19   A.    Yes.
20   Q.    And the first line under that reads
21 "cash and due from banks." Correct?
22   A.    Yes.
23   Q.    What does that line or row
24 represent?

Page 393

1    A.    That's cash.
2    Q.    That is cash that's actually in the
3  accounts or cash that was received for the month,
4  Mr. Reape?
5    A.    It's a balance sheet. It's cash in
6  the accounts.
7    Q.    And then it also says "due from
8  banks." Do you see that?
9    A.    Yes.
10   Q.    What does that relate to?
11   A.    I don't think that has any meaning.
12   Q.    Could it be like a money market
13 account or something like that?
14   A.    No.
15   Q.    So the total cash on hand for the
16 three entities at the end of December 31st, at
17 least according to this sheet, is approximately
18 12.3 million; correct?
19   A.    Correct.
20   Q.    The next row has the notation that
21 reads "trust certificate income receivable." Do
22 you see that?
23   A.    Yes.
24   Q.    What does that represent?

Page 394

1    A.    That's the value of our trust
2  certificates. That's an internally calculated
3  value.
4    Q.    Let's pause there. What do you
5  mean, internally calculated?
6    A.    The various companies hold trust
7  certificates and you can calculate -- at any
8  point, based on a loan outstanding, senior fees
9  receivable, trustee expenses, whatever, to the
10 extent that a company was holding the certificate,
11 you can calculate a value for that certificate.
12 So it's a way of listing an asset calculation that
13 wouldn't appear anywhere else, any reports,
14 anything like that.
15   Q.    So is this the company's estimation
16 of the value of those certificates --
17   A.    It's an estimation.
18   Q.    -- as of December 31st, 2018?
19   A.    Yes.
20   Q.    When you say trust certificate
21 income receivable, does that also include any
22 reserve amounts?
23   A.    You would include that in the trust
24 certificate because it's a liquidating value of

16 (Pages 391 - 394)

David Reape
DAVID REAPE - CONFIDENTIAL

Page 395

1 reserves.
2   Q.   So those concepts, trust
3 certificate and reserve amounts, are synonymous to
4 you, Mr. Reape?
5   A.   No.
6   Q.   What's the distinguishing feature,
7 if any?
8   A.   So a reserve is a specific account
9 within a trust that is there to hold an expense or
10 over collateralization amount of money. Some of
11 our trusts don't have reserves. So to the extent
12 money flows down to the level of the trust
13 certificate it just goes out to whoever holds the
14 certificate.
15   Q.   We'll talk more about this later.
16 But with the money that flows down to the
17 certificate, when is that money released to the
18 certificate holder?
19   A.   So when it flows to the
20 certificate, it flows out.
21   Q.   Is that essentially when the
22 receivables have been paid off?
23   A.   It would have to be a very large
24 paydown of receivables.

Page 396

1   Q.   And with reserve amounts that are
2 released, are those released at a similar time
3 when there's been largely a payoff of the
4 underlying receivables?
5   A.   It depends on the mechanics of the
6 trust. There really aren't reserves, per se, that
7 are of any significance for any of our trusts.
8   Q.   As of today; right?
9   A.   As of today.
10   Q.   There were reserves that were of
11 significance to the trust previously; correct?
12   A.   At one time under the Citi trust
13 only.
14   Q.   Was that the five-million-dollar
15 reserve that came in this year?
16   A.   There was a reserve requirement
17 under the Citi trust which had been amended.
18   Q.   What do you mean, it's been
19 amended?
20   A.   It was originally five million
21 dollars. The note's paid off, so there was no
22 reason to have the trust have a five million --
23 there's no noteholders to benefit from that.
24   Q.   And that's when the five million

Page 397

1 dollars was released to VAP?
2   A.   I actually had to go back with the
3 trustee and have the reserve reduced from five
4 million to 100,000. Now it's purely an expense
5 reserve since there are no noteholders.
6   Q.   Are there trust certificates
7 related to the Barclays trust that are contained
8 in this 12.5 million dollar estimate?
9   A.   Yes.
10   Q.   What about trust certificates
11 related to the Citi deals in that 12.5?
12       MR. ONUFRAK: Citi deals?
13       MR. VOSHELL: Yes.
14       THE WITNESS: Citibank, yes.
15 BY MR. VOSHELL:
16   Q.   Any other lenders who have trust
17 certificates associated with that 12.5 million
18 dollars that's listed here under trust certificate
19 income receivable?
20   A.   Just Barclays and Citi, although
21 there are two different Barclays trusts. So
22 they're two different certificates.
23   Q.   If you can, Mr. Reape,
24 approximately what portion of the 12.5 million

Page 398

1 dollar estimate here is associated with the two
2 Barclays trusts?
3   A.   As of 12-31, at least 10 million;
4 maybe substantially more.
5   Q.   Is it fair to say that the
6 overwhelming majority of that 12.5 million dollar
7 estimate is associated with the Barclays trust
8 certificates?
9   A.   Yes.
10   Q.   Mr. Reape, I know we touched on it
11 earlier. But do you know whether any amounts
12 associated with the Citi deal were paid in January
13 of 2019?
14   A.   I believe some were, yes.
15   Q.   Would any of those amounts be
16 related to a trust certificate for the Citi deal?
17   A.   That's all it could be. That's all
18 that's left with the Citi deal is a trust
19 certificate.
20   Q.   Did the entire certificate pay out
21 in January of 2019 for the Citi deal?
22   A.   No.
23   Q.   There's still some amount of the
24 Citi deal trust certificate outstanding?

17 (Pages 395 - 398)

Page 419

1    marked, for identification purposes, as
2    Warren Hill Exhibit 121.)
3 BY MR. VOSHELL:
4       Q.    Mr. Reape, we're back on the
5 record. You remain under oath.
6             I've placed in front of you a
7 document that's been marked Warren Hill Exhibit
8 121. Just take a moment to look at it. I have a
9 few questions.
10      A.    (Reviewing document.)
11            Okay.
12      Q.    This is another document labeled
13 Balance Sheet dated February 28, 2018; right?
14      A.    Correct.
15      Q.    This looks similar to the document
16 we just reviewed as Exhibit 120; right?
17      A.    It looks similar, yes.
18      Q.    Do you believe this document was
19 also prepared by Mr. Wilson?
20      A.    I do.
21      Q.    Again, it has the trust certificate
22 income receivable row under Assets. Do you see
23 that?
24      A.    Yes.

Page 420

1       Q.    The value of that receivable, as of
2 at least February 28th, 2018, was 21.7 million
3 dollars; right?
4       A.    Yes.
5       Q.    That's eight or nine million
6 dollars higher than what we looked at in the
7 December 2018 exhibit; correct?
8       A.    Correct.
9       Q.    Can you explain why there is that
10 difference in the two receivable values?
11      A.    Sure. It's most likely a cash
12 paydown.
13      Q.    Do you recall when that cash
14 paydown occurred?
15      A.    Over the course of the year, there
16 were a number of significant state paydowns as
17 well as state payments of prompt payment penalty.
18      Q.    So there are payments made by the
19 state that, I guess, flowed through to the
20 certificates in 2018?
21      A.    Yes.
22      Q.    Do you recall which bank
23 certificates those paydowns impacted?
24      A.    Well, absolutely impacted the Citi

Page 421

1 certificate. And there was -- because the paydown
2 in 2018 was so significant, there was some outflow
3 from the Barclay certificate, also.
4       Q.    If you turn to the third page, Mr.
5 Reape, under the heading Liabilities and Member's
6 Equity, there are the NAI loan and the SFR
7 Equities loan referenced; right?
8       A.    Correct.
9       Q.    For the NAI loan it shows an
10 outstanding value of $275,000; right?
11      A.    Yes.
12      Q.    And for the SFR loan it shows an
13 outstanding value of 1.725 million dollars;
14 correct?
15      A.    Correct.
16      Q.    You testified earlier that the NAI
17 loan was a total of 1 million dollars, correct,
18 Mr. Reape?
19      A.    Yes.
20      Q.    When, if you know, was that paid
21 down to $275,000?
22      A.    I believe over the course of 2017,
23 possibly into 2018.
24      Q.    Well, this is February 28th of '18;

Page 422

1 correct?
2       A.    Correct.
3       Q.    So if it leaked into 2018, would
4 that be reflected in the January sheet?
5       A.    I have to see the January sheet for
6 comparison to see what number is listed there.
7       Q.    I, too, would like to see the
8 January sheet. It has not been produced.
9             The SFR Equities loan here, this
10 is down from 3 million dollars to 1.725; correct?
11      A.    Actually, there are other SFR
12 loans. So at one point their balance was much
13 higher than 3 million. I can't tell whether this
14 is a balance from the loans they assumed or
15 whether this is a balance from other loans they
16 made to the company.
17      Q.    What documents would you need to
18 look at to know whether this is a balance from the
19 loan that SFR assumed from Warren Hill?
20      A.    Just the timing of payments would
21 probably tell me which was paid down.
22      Q.    What documents would you look at,
23 Mr. Reape, to ascertain the timing of the
24 payments?

23 (Pages 419 - 422)

Page 423

1   A.   The accounting records.
2   Q.   Again, that's QuickBooks?
3   A.   Yes.
4   Q.   You testified that SFR loaned money
5   over and above the 3 million that it assumed from
6   Warren Hill; correct?
7   A.   Correct.
8   Q.   Do you have a recollection as to
9   how much more?
10   A.   I think approximately 2 million.
11   Q.   You can put that aside.
12       MR. VOSHELL:  We'll mark this as
13   Exhibit 122.
14       (Whereupon, the document was
15   marked, for identification purposes, as
16   Warren Hill Exhibit 122.)
17  BY MR. VOSHELL:
18   Q.   Mr. Reape, we placed in front of
19  you what's been marked as Warren Hill 122.  When
20  you've had a chance to review it, please let me
21  know.
22   A.   Okay.
23   Q.   I just want to go back to the trust
24  certificate income receivable row.  There's an

Page 424

1  increase from the end of February to the end of
2  March of about 3 million dollars.  Do you see
3  that?
4   A.   I do.
5   Q.   It jumps from 21.75 million to
6  24.85 million; right?
7   A.   Yes.
8   Q.   Do you know why it increased from
9  the end of February of '18 to the end of March of
10  '18?
11   A.   I would assume quite a bit of new
12  origination, plus the existing assets continued to
13  generate additional value in the certificates.
14   Q.   What do you mean by new
15  origination?
16   A.   We buy new receivables.  To the
17  extent those receivables have accruals associated
18  with them at the time we buy them, that accrual
19  would all be picked up as certificate value.
20   Q.   And were there, in fact, new deals
21  that you did to purchase receivables in 2018?
22   A.   Every month there are new deals.
23   Q.   Did the new deals take advantage of
24  the Barclays line or another lender?

Page 425

1   A.   So for certificate income?  Is the
2  question for certificate income?
3   Q.   Yeah.  You mentioned new
4  origination might explain the jump in the
5  certificate income receivable here and so I'm --
6   A.   It's the only thing that could
7  explain the jump, to be clear.  And in 2018 the
8  only active facility that we held a trust
9  certificate for was Barclays.
10   Q.   You can put that aside.
11       MR. VOSHELL:  Mark this 123.
12       (Whereupon, the document was
13  marked, for identification purposes, as
14  Warren Hill Exhibit 123.)
15  BY MR. VOSHELL:
16   Q.   Mr. Reape, I've placed in front of
17  you what has been marked as Warren Hill 123.  Are
18  you familiar with this document?
19   A.   Yes.
20   Q.   It looks like this is essentially
21  the same type of spreadsheet we've been looking
22  at, but for the month ending May 31st, 2018;
23  right?
24   A.   Right.

Page 426

1   Q.   I just want to note, on page three,
2  it still lists the NAI loan and SFR Equities loan
3  as existing and totaling together 2 million
4  dollars; right?
5   A.   It does.
6   Q.   You can put that aside.
7       MR. VOSHELL:  Mark this as 124.
8       (Whereupon, the document was
9  marked, for identification purposes, as
10  Warren Hill Exhibit 124.)
11  BY MR. VOSHELL:
12   Q.   Mr. Reape, we've placed in front of
13  you what has been marked as Warren Hill 124.  This
14  is, again, a comparable spreadsheet to what we've
15  been looking at, but with the date ending June
16  30th, 2018; right?
17   A.   Correct.
18   Q.   If you leaf through the document,
19  it does not appear to contain the itemized
20  breakdown that we've looked at on the prior
21  comparable exhibits; correct?
22   A.   Well, there are less pages.  So I
23  would assume yes.
24   Q.   To the best of your knowledge,

Page 427

1 would there be the more detailed itemization for
2 June of 2018?
3     A.    I'd have to kind of compare
4 document by document, but I would -- absolutely,
5 yeah.
6     Q.    You can put that aside.
7         MR. VOSHELL: Mark this as 125.
8         (Whereupon, the document was
9     marked, for identification purposes, as
10    Warren Hill Exhibit 125.)
11 BY MR. VOSHELL:
12    Q.    Mr. Reape, we've placed in front of
13 you what's been marked as Warren Hill 125.
14    A.    Okay.
15    Q.    Again, this is the next in a series
16 of spreadsheets similar to the ones we just looked
17 at, this one ending July 31st, 2018; correct?
18    A.    Correct.
19    Q.    This particular exhibit does have
20 the itemization following the first two pages;
21 correct?
22    A.    It does.
23    Q.    There is a line item for the NAI
24 loan and the SFR Equities loan; correct?

Page 428

1     A.    Correct.
2     Q.    But here there's no value
3 associated with those loans; right?
4     A.    Correct.
5     Q.    Is that because the loans were paid
6 off as of the end of July, 2018?
7     A.    Yes.
8     Q.    Now, we looked two exhibits ago at
9 the end of May of '18 and the loans were still in
10 existence; correct?
11    A.    Correct.
12    Q.    There was not the itemization in
13 the June balance sheet; right?
14    A.    Not in your printout. I certainly
15 would have guessed that it would've been there.
16 But, again, that could be an issue with just what
17 was printed.
18    Q.    Sure. But it's fair to say that
19 sometime between the end of May 2018 and the end
20 of July 2018 the NAI loan and the SFR Equities
21 loan were paid off?
22    A.    As well as another short-term loan,
23 it appears.
24    Q.    But yes as to --

Page 429

1     A.    Yes. Um-hum. Absolutely.
2     Q.    You can put that aside.
3         MR. VOSHELL: Mark this as 126.
4         (Whereupon, the document was
5     marked, for identification purposes, as
6     Warren Hill Exhibit 126.)
7 BY MR. VOSHELL:
8     Q.    Mr. Reape, in front of you is
9 Exhibit Warren Hill 126. This is the September
10 30th, 2018 balance sheet; right?
11    A.    Yes.
12    Q.    Again going to the trust
13 certificate income receivable row, there is a drop
14 in the outstanding receivable from 27.4 million at
15 the end of August of '18 to 19 million at the end
16 of September of '18; correct?
17    A.    Correct.
18    Q.    And you believe that this drop is
19 the result of payments made by the state?
20    A.    I'm certain of this.
21    Q.    You said earlier that the
22 certificate income receivable was an estimate by
23 VAP; correct?
24    A.    Correct.

Page 430

1     Q.    Just so the record is clear, the
2 drop here relates to payments made by the state,
3 not to a downward deviation in VAP's estimate?
4     A.    Yes.
5     Q.    You can put that aside.
6         MR. VOSHELL: Mark this as 127.
7         (Whereupon, the document was
8     marked, for identification purposes, as
9     Warren Hill Exhibit 127.)
10 BY MR. VOSHELL:
11    Q.    Mr. Reape, in front of you is
12 Exhibit 127. This is the October 31st, 2018
13 balance sheet; right, Mr. Reape?
14    A.    Correct.
15    Q.    Again, the trust certificate income
16 receivable line lists, as of the end of October of
17 2018, a total of 14.1 million; correct?
18    A.    Correct.
19    Q.    And that is a drop of approximately
20 5 million from the close of September of 2018;
21 right?
22    A.    It is.
23    Q.    Is your testimony, again, that that
24 drop relates solely to payments made by the state

25 (Pages 427 - 430)

David Reape
DAVID REAPE - CONFIDENTIAL

Page 431

1 of Illinois?
2    A.    Yes.
3    Q.    You can put that aside.
4         MR. VOSHELL: Mark that as 128.
5         (Whereupon, the document was
6    marked, for identification purposes, as
7    Warren Hill Exhibit 128.)
8         MR. ONUFRAK: Is this the new one?
9         MR. VOSHELL: It is.
10 BY MR. VOSHELL:
11   Q.    Mr. Reape, I've placed in front of
12 you a document that's been marked as Exhibit 128.
13 Take a moment to review it and let me know when
14 you've completed that review.
15   A.    (Reviewing document.)
16        Okay.
17   Q.    Before we get into the document, I
18 believe your testimony is that Bluestone Capital
19 Markets and Blue Stone Finance do not have the
20 same owners; correct?
21   A.    Correct.
22   Q.    That's because those two Elliott
23 groups own part of Bluestone Capital Markets, but
24 not part of Blue Stone Finance; correct?

Page 432

1    A.    They haven't been admitted yet.
2 We've had discussions with them, but they're not
3 members yet.
4    Q.    Can you please describe for the
5 record what this document is, Mr. Reape?
6    A.    This is a risk retention agreement
7 that was in connection with a Medicaid loan
8 financing transaction.
9    Q.    And that Medicaid loan transaction
10 occurred in 2018; correct?
11   A.    Correct.
12   Q.    This lists Blue Stone Finance, LLC
13 as the manager of the trust; correct?
14   A.    Correct.
15   Q.    And then Blue Stone Finance, LLC is
16 defined as the "VAP Sponsor." Right?
17   A.    Correct.
18   Q.    Just to be clear, the Medicaid deal
19 occurred outside of the Vendor Payment Program and
20 Vendor Support Initiative; right?
21   A.    Yeah. It's not an assignment.
22 It's a loan transaction. Correct.
23   Q.    It's part of, I think, a timely pay
24 program?

Page 433

1    A.    No.
2    Q.    Is it part of any program?
3    A.    The receivables do accrue prompt
4 payment penalty, but they're not assignable. So
5 it's a -- this transaction was structured as a
6 loan.
7    Q.    If you turn to page four of this
8 risk retention agreement -- actually, let's start
9 on page three. Do you see Section 2 lists
10 "Representations and Warranties"?
11   A.    Yes.
12   Q.    Now if you turn to page four,
13 subsection (b), it reads: "The VAP sponsor" --
14 and that's Blue Stone Finance; right?
15   A.    Yes.
16   Q.    -- "represents and warrants that
17 Bluestone Capital Markets, LLC is owned by the
18 same persons who have the same proportionate
19 interests therein as the VAP sponsor." Right?
20   A.    Yes.
21   Q.    That is not the case, though,
22 right, Mr. Reape, because Blue Stone Finance is
23 not owned by the same individuals or entities that
24 own Bluestone Capital Markets?

Page 434

1    A.    Well, they have substantially
2 identical ownership. This is a legal document, so
3 I don't -- I would have to kinda defer to our
4 attorneys who prepared it.
5    Q.    Sure. But it says "owned by the
6 same persons," right, not owned by substantially
7 the same persons?
8    A.    It says that, yes.
9    Q.    And so the VAP sponsor, which is
10 Blue Stone Finance, is in violation of this
11 representation; correct, Mr. Reape?
12        MR. RUBIN: Objection. Calls for
13    a legal conclusion.
14 BY MR. VOSHELL:
15   Q.    You can answer.
16   A.    I don't know. I'm not a lawyer.
17   Q.    You can put that aside.
18        MR. VOSHELL: 129.
19        (Whereupon, the document was
20    marked, for identification purposes, as
21    Warren Hill Exhibit 129.)
22 BY MR. VOSHELL:
23   Q.    Mr. Reape, I've placed in front of
24 you what's been marked as Warren Hill 129. When

26 (Pages 431 - 434)

David Reape
DAVID REAPE - CONFIDENTIAL

Page 507

1    A.    Yes.
2    Q.    Now, we've talked a number of times
3  about the waterfall when a state makes a payment.
4         Could you, I guess, as
5  simplistically as possible, just kind of walk
6  through what happens when the state of Illinois
7  makes a payment that relates to the Barclays line?
8    A.    Sure.  And the priority of payments
9  is specifically outlined in this document.  But to
10 follow that waterfall specifically, when payments
11 come in there's frequently a portion that goes
12 back to the vendor.  So at the highest priority
13 level, the portion being returned to the vendor is
14 kind of immediately segregated from the rest of
15 the flow of funds.
16   Q.    Let me pause you right there.
17        When you say "immediately
18 segregated," is there a certain account that that
19 money flows into?
20   A.    So the trust has multiple accounts
21 for multiple different reasons.  But in the
22 initial allocation, which is when money that's
23 come in is applied, which happens once a week, the
24 first segregation is these are none-trust monies

Page 508

1  that go back to vendors.
2    Q.    So you have the segregation of
3  funds that go back to the vendors.
4    A.    Right.
5    Q.    What happens next?
6    A.    So then the money coming over to
7  the trust moves through the trust waterfall, which
8  in order of priority of payments is trustees'
9  expenses -- I may miss a minor priority or two
10 here, but I'm going to put the main ones out.
11 Lender interest, lender-accrued interest, senior
12 fees to go to VAP.
13        To the extent there's unpaid
14 principal -- which would be principal that had
15 been applied to somewhere else in the waterfall
16 prior, so that there's what they call an accrued
17 unpaid principal, that then money would go to
18 that.  And then once that was paid everything goes
19 through a couple of more minor priorities for
20 potentially unpaid trust expenses.
21        There is a reserve under this
22 trust, which is one and a half percent of the
23 drawn amount.  So the reserve requirement changes
24 as the drawn amount changes.

Page 509

1    Q.    When you say drawn amount, just so
2  the record's clear, it's essentially how much is
3  outstanding on the line?
4    A.    The outstanding loan balance.  And
5  then below that level, to the extent that that
6  reserve is full, money flows out to the trust
7  certificate.
8    Q.    So the senior fees, you say that
9  they went to VAP; right?
10   A.    Yes.
11   Q.    In the Barclays deal has the senior
12 fee been set to a value of zero?
13   A.    No.
14   Q.    What is the senior fee value under
15 the terms of the Barclays deal?
16   A.    It's one percent -- it accrues one
17 percent of the outstanding receivable balance.
18 I'm sorry.  One percent of the outstanding loan
19 balance.  Not receivable balance, loan balance.
20 Oh, I missed -- one of the priorities is that
21 there's a $75,000 expense account that gets
22 replenished.
23   Q.    Let's just take a $100 payment from
24 the state.  That comes in, and say only 20 of it

Page 510

1  is segregated out to the vendor.  So you have $80
2  coming in.
3         What account does that $80 hit
4  first?  Think actual trust account.
5    A.    So there's actually a trust --
6  without looking at the list because there are,
7  again, I think, about seven or eight accounts.  So
8  I'm not sure of the precise name.  For want of a
9  better -- that would be a trust disbursement
10 account.
11   Q.    And then a certain portion of that
12 money is deposited into the Barclays reserve
13 account?
14   A.    No.  So it goes through the
15 waterfall.  A better example would be -- there
16 probably would be no example where $20 would be
17 segregated and 80 would stay in.  It's more likely
18 that 5 gets segregated for vendors and 95 is going
19 in.  So that 95 would come in, pay trust expenses.
20 To the extent that the trust reserve was under
21 $75,000 --
22   Q.    You mean the trust expense account?
23 You said trust reserve.
24   A.    Oh, trust expense account.  Yeah.

45 (Pages 507 - 510)

David Reape
DAVID REAPE - CONFIDENTIAL

Page 511

1 I'm sorry.  Wrong word.  Trust expense account.
2 And then it would flow to lender interest until
3 all lender interest was paid in full.  Then it
4 would flow to senior management fees until all of
5 that was paid in full.  Then it would go to what's
6 termed accrued principal -- accrued unpaid
7 principal, which would be principal payments that
8 have come in, but have been paid to something else
9 above it in the waterfall.
10            And then to the extent all of the
11 accrued unpaid principal is paid, then it goes
12 down to the certificate.
13     Q.     You didn't mention the reserve.
14     A.     Oh, I'm sorry.  Yes.
15     Q.     So after the unpaid principal -- if
16 that's paid off and the reserve is not at the
17 appropriate level, money would be deposited into
18 the reserve account?
19     A.     Yes.  And, again, that reserve --
20 the amount that has to be in that reserve changes.
21     Q.     One and a half percent of whatever
22 is outstanding; right?
23     A.     Yes.
24     Q.     Whose name is the reserve account

Page 512

1 in?
2     A.     The reserve account is a trust
3 account.
4     Q.     VAP is the manager of the Barclays
5 trust; right?
6     A.     Of this specific trust, yes.
7     Q.     The manager of all the trusts, with
8 the exception of, I guess, the Medicaid ones we
9 looked at earlier?
10     A.     That's correct.
11     Q.     If you could, Mr. Reape, flip to
12 Section 5.06 of the trust agreement.  I believe
13 it's titled "Reserve Account."  Do you see that?
14     A.     Okay.
15     Q.     Is that the reserve account you
16 were referring to as second-to-last in the
17 waterfall?
18     A.     Yes.
19     Q.     This also refers to an eligible
20 deposit account.  Do you know what that is?
21     A.     All of the trust --
22     Q.     Strike that.  That's fine.  You can
23 put the trust agreement aside.
24            You're aware of recent news

Page 513

1 articles relating to donations made by
2 VAP-affiliated entities either to the campaign of
3 Susana Mendoza directly or to Danny Solis' Ward;
4 right?
5     A.     I don't think the donations were
6 made to Danny Solis' Ward.  But, yes, I am aware
7 of the news articles.
8     Q.     You're aware of donations that were
9 made directly by VAP-affiliated entities to Susana
10 Mendoza's campaign; correct?
11     A.     Yes.
12     Q.     Was it your idea to make those
13 donations, Mr. Reape?
14     A.     No.
15     Q.     Who came up with the idea?
16     A.     In discussions with Brian and
17 Malcolm and the board, decisions were -- like all
18 organizations, we make political donations.
19 There's nothing unusual about it.
20     Q.     Well, we'll get to that.
21            But who brought the idea of making
22 donations directly to Susana Mendoza's campaign to
23 your attention?
24     A.     It was probably Brian that made the

Page 514

1 suggestion.
2     Q.     You referred earlier to Malcolm.
3 That's a reference to Malcolm Weems; correct?
4     A.     It is.
5     Q.     Do you recall when Brian Hynes made
6 the suggestion?
7     A.     I don't have a specific date
8 recollection as to when he may have suggested it
9 or -- obviously, if I saw the checks I would know
10 when we sent the checks.
11     Q.     Was it in 2018 that Mr. Hynes
12 brought this to your attention?
13     A.     I think we've made political
14 contributions throughout the life of that.  So
15 there could have been other contributions.
16 Specific to the Mendoza campaign, that's 2018.
17     Q.     Are you sure, Mr. Reape, that VAP
18 has made contributions to political campaigns
19 throughout its existence?
20     A.     I think so, yes.  To clarify,
21 members of VAP maybe made contributions.  Maybe
22 they weren't specific to VAP.  I would have to
23 check to see what we did early on, you know, 2012,
24 '13.

46 (Pages 511 - 514)