## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WARREN HILL, LLC, | CIVIL ACTION |
| Plaintiff, | 2:18-01228-HB |
| v. | |
| SFR EQUITIES, LLC, | |
| Defendant. | |

## ORDER

**AND NOW**, this _____ day of _____, 2019, upon consideration of SFR Equities, LLC's Motion for Partial Summary Judgment, and any response thereto, it is hereby **ORDERED** that the Motion is **GRANTED**.  It is therefore **ORDERED** that:

Cash receipts paid to Bluestone Capital Markets, LLC due to its role as the trust Certificate Holder and future receivables due to its role as trust Certificate Holder are excluded from the definition of "Net Income" under Section 1.2(d) and from the definition of "Included Reserve Amounts" under Section 1.2(e) of the Membership Interest Purchase Agreement.

**IT IS SO ORDERED**.

**BY THE COURT:**

_____
                                   **Bartle,      J.**

22717011v.1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| WARREN HILL, LLC, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | 2:18-01228-HB |
| | : | |
| v. | : | |
| | : | |
| SFR EQUITIES, LLC, | : | |
| | : | |
| Defendant. | : | |

**DEFENDANT SFR EQUITIES, LLC'S MOTION FOR PARTIAL SUMMARY
JUDGMENT REGARDING ALL DIRECT PAYMENTS, PAST AND FUTURE,
TO BCM AS TRUST CERTIFICATE HOLDER**

WHITE AND WILLIAMS LLP
Michael N. Onufrak
Thomas M. Pinney
1650 Market Street | One Liberty Place, Suite 1800 |
Philadelphia, PA 19103-7395
Phone: 215.864.7174
Attorneys for Defendant,
SFR Equities, LLC

Dated:  April 25, 2019

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WARREN HILL, LLC, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | 2:18-01228-HB |
| | : | |
| v. | : | |
| | : | |
| SFR EQUITIES, LLC, | : | |
| | : | |
| Defendant. | : | |

### DEFENDANT SFR EQUITIES, LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING ALL DIRECT PAYMENTS, PAST AND FUTURE, TO BCM AS TRUST CERTIFICATE HOLDER

Defendant SFR Equities, LLC ("SFR") hereby moves this Court, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for entry of an order granting partial summary judgment in favor of SFR determining that the plain language of the Membership Interest Purchase Agreement ("MIPA") excludes past and future payments from the trusts directly to Bluestone Capital Markets, LLC ("BCM") as trust Certificate Holder from the definition of "Net Income" under Section 1.2(d) and the definition of "Included Reserve Amounts" under Section 1.2(e) of the MIPA.

In support of this Motion for Summary Judgment, SFR relies upon and respectfully refers the Court to the accompanying Memorandum of Law, Statement of Undisputed Facts, Declaration of Gene Harris, and Exhibits attached thereto which are incorporated herein as though fully set forth at length.

**WHITE AND WILLIAMS LLP**

By: /s/ Michael N. Onufrak
      Michael N. Onufrak
      Thomas M. Pinney
      1650 Market Street, Suite 1800
      Philadelphia, PA 19103
      (215) 864-7174
      Attorneys for Defendant
      SFR Equities, Inc.

Dated: April 25, 2019

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| WARREN HILL, LLC, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | 2:18-01228-HB |
| | : | |
| v. | : | |
| | : | |
| SFR EQUITIES, LLC, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**DEFENDANT SFR EQUITIES, LLC'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT
REGARDING ALL DIRECT PAYMENTS, PAST AND FUTURE,
TO BCM AS TRUST CERTIFICATE HOLDER**

SFR Equities, LLC ("SFR") respectfully submits this Memorandum of Law in Support of its Motion for Partial Summary Judgment.

**I.     SUMMARY OF ARGUMENT**

SFR seeks an Order granting partial summary judgment in favor of SFR determining the following:

That trust certificate payments made to Bluestone Capital Markets, LLC ("BCM") directly from the related trusts on account of BCM's status as a trust Certificate Holder, as well as BCM's receivables on account of its status as trust Certificate Holder, are excluded from the definition of "Net Income" under Section 1.2(d) of the Membership Interest Purchase Agreement and from the definition of "Included Reserve Amounts" under Section 1.2(e) of the Membership Interest Purchase Agreement.

II.     **SUMMARY OF UNDISPUTED FACTS**

    A.     **MIPA SECTION 1.2(D) ONLY INCLUDES FEES AND OTHER REVENUE RECEIVED BY VAP**

This Court is aware that SFR purchased Warren Hill's interest in Vendor Assistance Program LLC ("VAP") pursuant to a Membership Interest Purchase Agreement ("MIPA") effective January 1, 2016.

As part of the consideration for the purchase of Warren Hill's interest in VAP, SFR agreed to pay a percentage of the net income received by VAP, as follows:

> (d)     Further, for each of the three years following the Closing Date, Purchaser shall . . . pay Seller an amount equal to 50% of VAP's Net Income (as defined below) allocable to the Interests for such year.  "**Net Income**" is defined to mean (i) the sum of (A) any and all fees earned by VAP in its capacity as a manager or administrator of (1) the Vendor Assistance Trust and/or (2) any other trust or account maintained in the course of VAP's business, (B) any and all interest income, (C) any and all fees earned from providing services to affiliates or third parties, and (D) any and all revenues received by VAP other than the Reserve Amounts (as defined below [in section 1.2(e)] . . . .

> Statement of Undisputed Facts, at ¶6 (citing "MIPA", at 3).

    B.     **MIPA SECTION 1.2(E) GOVERNS PAYMENT FOR "INCLUDED RESERVE AMOUNTS"**

Additionally, as part of the consideration for purchase of the membership interests in VAP from Warren Hill, SFR agreed to pay a certain percentage of  VAP's "Included Reserve Amounts" for the years 2016, 2017 and 2018, as follows:

> (e) For purposes of this Agreement, "**Reserve Amounts**" are defined to mean any and all amounts (i) deposited in VAP's series 2012-1 Reserve Account, (ii) deposited in any other reserve account held by, on behalf of, or for the benefit of, VAP, and/or (iii) held in the form of any financing instrument, in each case as may be required pursuant to the terms of any financing arrangement among VAP and any of its lender(s).  The accounts and financial instruments described in clauses (i), (ii), and (iii) of

-2-

the preceding sentence are herein defined as the "**Reserve Accounts**".  The balance of the 2012-1 Reserve Account as of the Closing Date is herein defined as the "**Excluded Reserve Amount**", and all other Reserve Amounts that are or become Reserve Amounts (other than any amounts that are re-deposited into an Reserve Account in satisfaction of an advance made previously from such Reserve Account) during the three year period following the Closing Date are herein defined as the "**Included Reserve Amounts**".  In addition to the Purchase Price, within five days of the release of any Included Reserve Amount from any Reserve Account, Purchaser shall pay Seller an amount equal to 16.623% of such released Included Reserve Amount (each such amount, a "**Seller Included Reserve Amount**").

Statement of Undisputed Material Facts, at ¶5 (citing MIPA, at 2).

C.    **BCM IS THE HOLDER OF TRUST CERTIFICATES FOR TRUSTS HOLDING STATE OF ILLINOIS VENDOR RECEIVABLES**

1.    The Creation of the Trusts

Prior to 2017, VAP facilitated the creation of trusts for the purchase of State of Illinois receivables from numerous vendors through the State of Illinois Vendor Payment Program ("VPP").  See Statement of Undisputed Material Facts, ¶ 7 (citing Exh. "K", IRT Funding Trust 2017-4 and 2017-4B, at SFR 17015, 17029, 17039, 17768, 17779; Exh. "L", VAP Funding Amended and Restated Master Trust II Agreement, at SFR 12573).    The function of these trusts in relation to the VPP is straightforward.  The trusts were initially funded through agreements with a depositor (a bank, such as Barclays Capital), which was issued promissory notes in exchange for funding the trusts.  See Statement of Undisputed Material Facts, ¶¶ 8-9 (citing Exh. "K", IRT Funding Trust 2017-4 and 2017-4B, at SFR 17015, 17029, 17039, 17768, 17779; Exh. "L", VAP Funding Amended and Restated Master Trust II Agreement, at 12573).  Using the funds from the bank, the trusts would then purchase receivables from vendors to the State of Illinois, and the trusts would later be paid back by the State of Illinois at a premium (referred to as a "penalty") under the terms of the VPP.  See Statement of Undisputed Material Facts, ¶ 10

-3-

(Exh. "K", IRT Funding Trust 2017-4 and 2017-4B, at SFR 17039, 17779, Exh "L", VAP

Funding Amended and Restated Master Trust II Agreement, at SFR 17263).  The trusts

themselves issued certificates, which entitled the Certificate Holder to certain rights to trust

assets, including the right to payment directly from the trust as the Certificate Holder.  *See, e.g.,*

Statement of Undisputed Material Facts, ¶ 11 (citing Exh. "K", IRT Funding Trust 2017-4 and

2017-4B, at SFR 17035, 17066, 17774, 17803; Exh. "L", VAP Funding Amended and Restated

Master Trust II Agreement, at SFR 12556-12560).[1]

These trusts were created under and are governed by Delaware law in order to facilitate

funding to purchase receivables.  *See* Statement of Undisputed Material Facts, ¶¶ 13-14 (citing

Exh. "K", IRT Funding Trust 2017-4 and 2017-4B, at SFR 17015, Exh. "L", VAP Funding

Amended and Restated Master Trust II Agreement, at SFR 12563).  The rights and

responsibilities of the parties to the trust agreement are therefore controlled by Delaware

statutory trust law, rather than the VPP terms.  *See id.*  In addition to VAP, the creation and

administration of the trusts necessitated the involvement of numerous other parties, acting in

roles such as a "Trustee", "Collateral Agent," "Depositor," "Certificate Holder Representative,"

and "Indemnitor."  *See* Statement of Undisputed Material Facts, ¶ 15 (citing Exh. "K", IRT

Funding Trust 2017-4 and 2017-4B, at SFR 17029, 17768; Exh. "L", VAP Funding Amended

and Restated Master Trust II Agreement, at SFR 12560).  These roles are all beyond the VPP

terms, and thus the trusts' administration is completely separate from and not specific to the VPP

program. *See* Statement of Undisputed Material Facts, ¶ 16.  Indeed, the VPP terms do not

---

[1] ("Pursuant to the Trust Agreement, there may be distributed on Each Distribution Date to the Person in whose name this Certificate is registered at the close of business on the Record Date preceding such Distribution Date such Certificateholder's Percentage Interest in the amount to be distributed to Certificateholders on such Distribution Date.")  *See* IRT Funding Trust Series 2017-4B Trust Agreements, Bates No. SFR 17886, attached to the Declaration of Gene Harris as Exhibit "K".

-4-

require trust Certificate Holders to be "qualified purchasers."  *See* <u>Statement of Undisputed</u> <u>Material Facts</u>, ¶ 17.

2.      BCM Becomes the Trust Certificate Holder

In 2017, based in part on changes to the risk retention regulations applicable to asset securitizations and also to take advantage of favorable tax laws in Puerto Rico, the management of VAP decided to create two new affiliated entities to assist VAP in its business operations.  *See* <u>Statement of Undisputed Material Facts</u>, ¶¶ 18-19.  One of these two entities, Bluestone Capital Markets, LLC ("BCM"), was created to hold trust certificates to foster compliance with the new federal risk retention regulations.  *See id.*  In 2017, after the creation of BCM, VAP assigned its certificate rights to BCM in exchange for BCM assuming responsibility to hold the certificates and to comply with risk retention regulations.  *See* <u>Statement of Undisputed Material Facts</u>, ¶ 19. Trusts created in 2017 and thereafter were created with BCM as the Certificate Holder.  *See id.* VAP's role in the newly created trusts after 2017 was as the Indemnitor to the extent of unpaid fees and expenses.  *See* <u>Statement of Undisputed Material Facts</u>, ¶ 19.

Thus, BCM acquired trust certificates that were previously owned by VAP, and BCM received newly issued trust certificates in 2017 and 2018.  As the Certificate Holder, BCM received payment from the trusts directly in accordance with the rights of the Certificate Holder during 2018.  <u>Statement of Undisputed Material Facts</u>, at ¶¶11-12, 18.  A review of the examples of the Noteholder Reports, Cash Receipts Schedule and the Bank Statements of BCM reveals that cash receipts on the certificates of approximately $9.5 million in 2018 were received directly by BCM from the trusts, as required by the Trust Certificates, and did not go through VAP's accounts.  <u>Statement of Undisputed Material Facts</u>, ¶¶23-27.

-5-

The following table reflects the trusts for which BCM was the Certificate Holder, the date when cash receipts were received by BCM as the Certificate Holder from each trust, and the amount received by BCM on the certificate:

| TRUST | RECIPIENT | RECEIVED | AMOUNT |
|---|---|---|---|
| | | | |
| IRT Funding Trust – 2017 -4B | BCM | 6/18 | $1,729,839.83 |
| IRT Funding Trust – 2017-4B | BCM | 7/18 | $583,969.43 |
| IRT Funding Trust – 2017-4B | BCM | 9/18 | $1,293,748.96 |
| Citi Trust | BCM | 9/18 | $488,245.18 |
| VAP Master Trust II Trust | BCM | 10/18 | $3,820,300.77 |
| VAP Master Trust II Trust | BCM | 11/18 | $256,003.45 |
| IRT Funding Trust – 2017-4B | BCM | 12/18 | $446,088.18 |
| IRT Funding – 2017 – 4 | BCM | 12/18 | $319,247.83 |
| VAP RRT Master Trust | BCM | 12/18 | $51,172.87 |
| Citi Trust | BCM | 12/18 | $440,814.00 |
| TOTAL | | | $9,479,397.32 |

*See* Statement of Undisputed Material Facts, ¶ 24.

Because VAP was not the Certificate Holder for these trust certificates, and had no other rights to the trust funds, VAP was not entitled to payment for purposes of 1.2(d) as part of these trust disbursements.

22717011v.1

### D. THE TRUSTS' NOTEHOLDER REPORTS REVEAL THAT THE CERTIFICATE HOLDER PAYMENTS ARE NOT RELATED TO ANY TRUST RESERVE ACCOUNT

A review of the Noteholder Reports[2] reveals that these Certificate Holder payments have no relationship to the deposit or release of funds from any trust reserve account addressed by MIPA Section 1.2(e)(ii). *See* Statement of Undisputed Material Facts, ¶ 29. Each of these Noteholder Reports reveals that Certificate Holder payments were separate payments from any deposits of funds into a reserve account or release of funds from any trust reserve account. *See* Statement of Undisputed Material Facts, ¶ 30.

For example, the October 31, 2018 Noteholder Report for the VAP Funding Master Trust II reveals a $2,168,580.62 payment was made to the Manager/Certificate Holder. *See* Statement of Undisputed Material Facts, ¶31. The report does not reflect that this amount came from a reserve account or that the reserve account was "held by, on behalf of, or for the benefit of VAP." *See* Statement of Undisputed Material Facts, ¶35. Similarly, the September 7, 2018 IRT Funding Trust Series 2017-4B Noteholder Report reflects a payment of $1,293,748.96 to the Certificate Holder Representative, but does not even reflect the presence of a reserve account within that trust. *See* Statement of Undisputed Material Facts, ¶33. None of the Noteholder Reports reflect any relationship between any reserve account and any Certificate Holder payment. *See* Statement of Undisputed Material Facts, ¶34. Furthermore, these reserve accounts are not identified as being held by, on behalf of, or for the benefit of VAP. *See* Statement of Undisputed Material Facts, ¶35.

### E. THE TRUSTS' DEPOSITORS ARE LENDERS TO THE TRUSTS THEMSELVES, AND ARE NOT LENDERS TO VAP

---

[2] Each of the trust generated "Noteholder Reports," which report on various trust financials.

A review of the subject trusts' trust agreements proves that the trusts' depositors loaned money directly to the trusts, and not to VAP. Specifically, each trust agreement contains terms identifying the banks as lenders to the trust (as opposed to lenders to VAP). *See* Statement of Undisputed Material Facts, ¶8. The VAP Funding Master Trust II Amended and Restated Trust Agreement describes the initial funding of the trust in Article IV. That provision states, "[o]n each Funding Date, upon receipt of funds deposited by the Bank in the Funding Account in accordance with a related Notice of Loan and Funding Request, the Trustee shall withdraw from the Funding Account and transfer to the Vendor Payment Account, at the direction of the Manager on behalf of the Trust . . . for distribution to the related Vendors . . . ." *See* Statement of Undisputed Material Facts, ¶36 (citing Exh. "L", VAP Funding Amended and Restated Master Trust II Agreement, at SFR 12573). "Funding Account" is defined as "the segregated account or accounts created and maintained pursuant to Section 5.04 of the Trust Agreement . . . ." *See* Statement of Undisputed Material Facts, ¶37 (citing Exh. "L", VAP Funding Amended and Restated Master Trust II Agreement, at SFR 12573).

Similarly, the VAP Funding Amended and Restated Master Trust Agreement describes in various places the establishment of a "Revolving Credit Agreement", which is defined in the definitions appendix as "the Revolving Credit Agreement . . . by and between the Trust and the Bank." *See* Statement of Undisputed Material Facts, ¶39 (citing Exh. L, at SFR 12635). This is similar to the obligations described within the latter trusts established after the formation of BCM, which describe Barclays as the "Depositor," BCM as the "Certificate Holder Representative", and VAP merely as the "Indemnitor." *See* Statement of Undisputed Material Facts, ¶40 (citing Exh. "K", IRT Funding Trust 2017-4 and 2017-4B, at SFR 17026, 17765).

Further, there is nothing in any of these trust agreements that reflects that the lenders providing funding to the trusts were lenders to anyone other than the trusts.

### F.   SFR ALREADY MADE PAYMENT TO WARREN HILL ON $5 MILLION OF CASH RECEIPTS UNDER SECTION 1.2(e)

Finally, $5 million was released from the VAP Funding Master Trust Series 2012-1 reserve account.  The reserve account was specifically mentioned in Section 1.2(e)(i), in September of 2018.  *See* Statement of Undisputed Material Facts, ¶21.  SFR made payment to Warren Hill pursuant to Section 1.2(e)(i) of the MIPA on this amount, and consequently, payments on the series 2012-1 Reserve Account are not in controversy for purposes of this motion.  *See* Statement of Undisputed Material Facts, ¶22.

SFR incorporates by reference as though fully set forth at length its Statement of Undisputed Material Facts filed concurrently with this Memorandum of Law.

## III.   LEGAL ARGUMENT

### A.   BCM CASH RECEIPTS TO BCM AS CERTIFICATE HOLDER ARE NOT "NET INCOME" OF VAP SUBJECT TO MIPA SECTION 1.2(d)

As discussed above, BCM's cash receipts from trust Certificate Holder payments are not subject to Section 1.2(e) of the MIPA.  To the extent that Warren Hill may argue that such past or future cash receipts are subject to Section 1.2(d) of the MIPA, it is plain from the MIPA terms that such receipts are not subject to Section 1.2(d).[3]

MIPA Section 1.2(d) provides for payment by SFR to Warren Hill based upon the net income *of VAP*.  Specifically, Section 1.2(d) defines VAP's net income, in part, as encompassing the following components of "revenue":

---

[3] Warren Hill has previously argued that past cash receipts by BCM from the trusts as the trusts' certificateholder representative are not subject to MIPA Section 1.2(d), and instead are properly only subject to Section 1.2(e).  *See* (ECF No. 57, p. 5).

22717011v.1

> (A) any and all fees earned by VAP in its capacity as a manager or administrator of (1) the Vendor Assistance Trust and/or (2) any other trust or account maintained in the course of VAP's business;
>
> (B) any and all interest income;
>
> (C) any and all fees earned from providing services to affiliates or third parties; and
>
> (D) any and all revenues received by VAP other than the Reserve Amounts (as defined below [in section 1.2(e)]) . . . .

The Court held previously that payment <u>through</u> VAP's bank account that were ultimately allocated to BCM, nevertheless constituted new revenue of VAP from purposes ot the MIPA.  However, the payments that are the subject of this motion are wire transfers made from the Trustee to BCM as Certificate Holder.

BCM's cash receipts and future receivables as the trusts Certificate Holder do not fall within any of the available definitions of VAP revenue.  First and foremost, the receipts and receivables are not fees "earned" by VAP.  In contrast to the VAP management fees at issue in SFR's prior motion for partial summary judgment (which were routed to BCM or Bluestone Finance through VAP), the Certificate Holder payments are paid *directly* to the holder of the trust's certificates by the respective trust.  Furthermore, nothing in the VPP program terms requires that certificates of a financing vehicle must be held by a qualified purchaser.  Therefore, there is no basis for BCM's cash receipts or future receivables as the trust Certificate Holder to fall under Section 1.2(d) of the MIPA' s definition of VAP "Net Revenue."

BCM's cash receipts and future receivables from trust Certificate Holder payments are neither "interest income", "fees earned from providing services to affiliates or third parties", nor another type of "revenues received by VAP".  As previously discussed, these payments are made by the trusts to BCM due to its status as the legal holder of the certificates, and VAP has no interest in these payments whatsoever.   The receipts are not "interest income" of VAP.  The receipts are not "fees," received by VAP which are a separate category of payments made by the

-10-

trusts.  Finally, these payments are not any other type of revenue "received" by VAP, as the funds did not go through VAP's bank accounts.

VAP was not a Certificate Holder at the time these payments were made and is not currently a trust Certificate Holder.  Certificate Holder revenue was not received by VAP and Certificate Holder receivables do not belong to VAP; therefore, these receipts and receivables do not properly fall within MIPA Section 1.2(d).  Consequently, neither BCM's past cash receipts in 2018 nor future receivables regarding trust Certificate Holder payments are subject to MIPA Section 1.2(d).  Because these payments do not properly fall within MIPA Section 1.2(d), this court should grant SFR's motion for partial summary judgment.

The cash receipts of about $9.5 million received directly by BCM in 2018 must be excluded from the amount owed under the MIPA for the 2018 earnout pursuant to this Court's prior interpretation of the MIPA.  A contract must be "read as a whole." *Dowling v. Chicago Options Associates, Inc.*, 2226 Ill. 2d 277, 296, 875 N.E.2d 1012, 314 Ill. Dec. 725 (2007).  Furthermore, "contract terms should not be read in isolation." *Brown v. Delfre*, 968 N.E.2d 696, 703 (Ill. App. 2012).  Each sentence in a contract "takes meaning from others in the same document." *Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1038 (7th Cir. 1998).

This Court previously undertook a construction of the MIPA.  Pursuant to that interpretation, the Court held that, because *management fees* earned by BCM and Blue Stone Finance, LLC ("BSF") were first routed through VAP pursuant to the VPP program terms, VAP "earned" those revenues, and as such, SFR was required to include management fees earned by BCM and BSF in the MIPA's Section 1.2(d) earnout payment to Warren Hill.  *See, e.g.* (ECF No. 62, p. 9).

Pursuant to this contractual construction, trust certificate payments that are not paid to VAP, and are never received by VAP, should therefore be excluded from the MIPA.  Amounts paid directly to BCM in its capacity as a trust Certificate Holder are not first received by VAP, nor do the VPP program terms require that payment on trust certificates be made to VAP.  BCM is the holder of trust certificates, which are securities entitling the holder to direct payment.  A review of the relevant BCM bank records reveals that the trusts pay BCM directly as the holder of these certificates.  Therefore, pursuant this Court's prior interpretation of the MIPA, because VAP has no interest in the payments made by the trusts to BCM, it should not be included in the calculation of "Net Income" under Section 1.2(d) of the MIPA or "Included Reserve Amounts" under Section 1.2(e) of the MIPA.

The MIPA provides, at Section 6.4, that its terms are governed by Illinois law.  Illinois law provides that the meaning of a written contract is ordinarily a question of law and not one of fact. *Hufford v. Balk*, 113 Ill. 2d 168, 172 (1986).  The court's "primary objective in construing a contract is to ascertain the intent of the parties and to give effect to that intent."  *United Airlines, Inc. v. Chicago*, 116 Ill. 2d 311, 318, (1987).

It is well established under Illinois law that, "where parties formally include an integration clause in their contract (such as the one found at Section 6.1 of the MIPA), they are explicitly manifesting their intention to protect themselves against misinterpretations which might arise from extrinsic evidence." *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 636 (7th Cir. 2007) (*quoting Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882 (Ill. 1999)).  Furthermore, if a "contract is facially unambiguous and contains an integration clause, the 'four corners rule' applies, barring the consideration of extrinsic evidence." *Id.* (*citing Air Safety*, 185 Ill. 2d at 462).  *See also Benedict v. Fed. Kemper Life Assurance Co.*, 325 Ill. App.

3d 820, 823 (2001) ("In Illinois, contract interpretation follows the four corners doctrine so that we look only to the language of the contract to determine if it is susceptible to more than one meaning."). Because the MIPA contains an integration clause, the four-corners rule of Illinois applies to this contract dispute.

### B.   THE STRUCTURE OF THE TRUSTS DO NOT SUBJECT CERTIFICATE HOLDER PAYMENTS TO SECTION 1.2(e)

A review of the trust documents and trust certificate holder payment transactions described above reveals that Certificate Holder receivables of approximately $13 million held by BCM are not subject to the definition of "Included Reserve Amounts" under the MIPA's Section 1.2(e).

Under Section 1.2(e) of the MIPA, "Reserve Amounts" include only the following funds:

(i)      [amounts] deposited in VAP's series 2012-1 Reserve Account,

(ii)     [amounts] deposited in any other reserve account held by, on behalf of, or for the benefit of, VAP, and/or

(iii)    held in the form of any financial instrument, in each case as may be required pursuant to the terms of any financing    arrangement among VAP and any of its lender(s).

As stated above, SFR made payment in 2018 to Warren Hill on the $5,000,000 released from the 2012-1 Reserve Account in accordance with Section 1.2(e)(i) of the MIPA. These are the only funds subject to Section 1.2(e)(i), and the required payment was made to Warren Hill.

With respect to 1.2(e)(ii), all 2018 cash receipts paid to BCM were not paid from any "reserve account held by, on behalf of, or for the benefit of VAP,". The certificate payments were paid directly by the trustee from the trust's bank accounts to BCM's bank accounts, neither of which exist for VAP's behalf. A review of the IRT Funding Trusts Noteholder Reports reveals that these trusts do not even possess reserve accounts, and consequently, payment on these certificates could not fall under 1.2(e)(ii). Similarly, a review of the VAP Master Trust II

-13-

Noteholder Reports reveals no relationship between funds released from any reserve account and payments made to the Certificate Holders.  Furthermore, a review of the VAP Master Trust II Amended Trust Agreement reflects that each of the related trust accounts is established for the benefit of the trust alone, and is not established for the benefit of or on behalf of VAP. Therefore, these payments also are not subject to Section 1.2(e)(ii).

Finally, the trust certificate payments also cannot be subject to clause (iii) because the trusts' lenders are not VAP's lenders.  Clause (iii) only makes funds subject to "Included Reserve Amounts" if "required pursuant to the terms of any financing arrangement among VAP and . . . *its* lender(s)." (emphasis added)  Thus, a plain reading of this clause requires payment only regarding funds held in a financial instrument pursuant to a financing relationship between VAP and entities lending money *to VAP*.

This is not the relationship existing among VAP, BCM and the trusts.  A review of the trust documents reveals that the trusts themselves receive loans directly from a bank.  These funds are not routed through VAP, and once deposited in the trusts, are never held on VAP's behalf.  Any accounts established exist between a lender and the trusts, and notes issued are issued by the trusts and serve to obligate the trusts themselves to repay the amounts borrowed. The certificates held by BCM are not financial instruments issued by VAP's lenders relating to VAP's borrowing money.  Instead, pursuant to Delaware trust law, the certificates confer a right to payment from the Trusts and an ownership right in the trust.  *See* 12 Del. C. § 3801(a), 3805(a).  Following the reorganization of VAP, the *only* relationship that VAP has to the trusts is as an indemnitor.

There are no cases construing the term "indemnitor" interchangeably with the term "borrower", nor does a review of the definition of each term support a natural reading that the

-14-

two terms are interchangeable in any way.  Black's Law Dictionary defines "borrower" as "[a] person or entity to whom money or something is lent."  *Borrower, Black's Law Dictionary*, (10th ed. 2014).  Conversely, Black's Law Dictionary defines "indemnitor" as "Someone who indemnifies another. – Also termed *indemnifier*."  *Indemnitor, Black's Law Dictionary*, (10th ed. 2014).

These terms are not interchangeable, and there is no other basis for arguing that the trusts fall within clause (iii) of Section 1.2(e) in any way.  VAP has no demonstrable financial interest in the trust certificates held by BCM.  The Certificate Holder payments made to BCM by the trusts were not paid out of any reserve account, and any remaining reserve accounts that exist are not held by, on behalf of, or for the benefit of VAP.  Furthermore, the banks funding the trusts are not VAP's lenders, but rather are lenders to the trusts themselves.  Therefore, BCM's Certificate Holder payments fall completely outside the scope of Section 1.2(e) of the MIPA.  Because payments to trust Certificate Holders are outside the scope of Section 1.2(e) of the MIPA, SFR does not owe Warren Hill any portion of these payments received directly by BCM.  SFR is therefore entitled to summary judgment excluding these payments and future receivables on Certificate Holder payments from the Section 1.2(e) calculation.

The language of Section 1.2(d) and (e) of the MIPA is clear and unambiguous, and therefore, under Illinois law and the plain reading of the language in the MIPA, SFR is not required to include the Certificate Holder payments made by the trusts directly to BCM in its calculation of "Net Income" or the "Seller Included Reserve Amount".  The trust certificate payments made directly by the trusts to BCM and BCM's future receivables on Certificate Holder payments are not subject to the "Purchase Price" provisions of Section 1.2 of the MIPA.  Therefore, because the MIPA is clear that BCM's cash receipts on trust Certificate Holder

payments and receivables for such payments are funds not received by VAP and not subject to

Section 1.2 of the MIPA, SFR is entitled to partial summary judgment on this issue.

## IV. <u>REQUESTED RELIEF</u>

For the foregoing reasons, SFR respectfully requests that this Court grant partial

summary judgment in its favor determining trust Certificate Holder payments to BCM are

excluded from Section 1.2(e) of the MIPA.


                                    **WHITE AND WILLIAMS LLP**


                            BY:    /s/ Michael N. Onufrak
                                   Michael N. Onufrak
                                   Thomas M. Pinney
                                   1650 Market Street | One Liberty Place,
                                   Suite 1800 |
                                   Philadelphia, PA 19103-7395
                                   Phone: 215.864.7174
                                   Attorneys for Defendant
                                   SFR Equities, LLC


Dated:  April 25, 2019

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing documents

1)      Motion for Partial Summary Judgment;

2)      Statement of Undisputed Material Facts in Support of its Motion for Partial

Summary Judgment; and

3)      Declaration of Gene Harris with Exhibits

were filed under seal with the Court and served on the following counsel of record by

email:

> Gregory S. Voshell, Esquire
> Elliott Greenleaf
> 925 Harvest Drive
> P.O. Box 3010
> Blue Bell, PA  19422

**WHITE AND WILLIAMS LLP**

BY:   /s/ Michael N. Onufrak
          Michael N. Onufrak
          1650 Market Street
          One Liberty Place, Suite 1800
          Philadelphia, PA 19103-7395
          Phone: 215.864.7174
          Attorney for Defendant,
Dated:  April 25, 2019          SFR Equities, LLC

22717011v.1