**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

WARREN HILL, LLC,

                        Plaintiff,

v.

SFR EQUITIES, LLC,

                        Defendant.

No. 2:18-01228-HB

---

**PLAINTIFF WARREN HILL, LLC'S RESPONSE TO
DEFENDANT SFR EQUITIES, LLC'S STATEMENT OF UNDISPUTED FACTS**

---

ELLIOTT GREENLEAF, P.C.
925 Harvest Drive, Suite 300
Blue Bell, PA 19422
(215) 977-1000

Dated: May 9, 2019

*Counsel for Plaintiff Warren Hill, LLC*

Plaintiff Warren Hill, LLC ("Warren Hill"), through its undersigned counsel, hereby responds to the Statement of alleged Undisputed Facts that Defendant SFR Equities, LLC ("SFR") filed in support of its Motion for Partial Summary Judgment.  The Court's policies do not expressly call for a separate Statement of Facts, which SFR nevertheless filed in connection with its Motion.  In an effort to preserve its rights, and to avoid any impression that SFR's Statement of Facts is "undisputed" for purposes of Rule 56, Warren Hill has prepared the following responses with specific citation to the record.[1]

Warren Hill is mindful of the length of its responses to SFR's Statement, but SFR has made numerous incorrect and misleading statements that require correction.  Many of SFR's statements are not supported by any record citation.  Others are supported only by the self-serving affidavit of Gene Harris, who is one of the managers of SFR.  The overwhelming majority of SFR's statements are immaterial to the issues in dispute, but Warren Hill nevertheless corrects the misstatements for the Court (with appropriate record citations).

### RESPONSE TO SFR'S STATEMENT OF ALLEGED FACTS

1.      AHG Group ("AHG") is a company based in Winter Park, Florida. AHG, among other things, invests in real estate and other businesses. Gene Harris is one of three managers of  AHG and the companies it owns. Declaration of Gene Harris, at ¶ 1 (hereinafter "Harris Dec.").

**RESPONSE:** Admitted.

---

[1] Warren Hill reviewed the Court's published decisions in connection with responding to SFR's separately filed Statement of Facts.  Warren Hill located only a few such decisions where the Court appeared to consider a separate factual statement and a corresponding response. *See A.G. v. Lower Merion Sch. Dist.*, 2012 U.S. Dist. LEXIS 140250, at *26 n.10 (E.D. Pa. Sep. 28, 2012); *Hlywiak v. AMTRAK*, 223 F. Supp. 3d 395, 396 n.2 (E.D. Pa. 2016); *Blunt v. Lower Merion Sch. Dist.*, 826 F. Supp. 2d 749, 752 n.1 (E.D. Pa. 2011). While these cases appear to represent the minority of the Court's summary judgment opinions, Warren Hill makes this submission to provide an appropriate response to SFR's statement for the Court's consideration.

1

2.      Over the years, AHG created numerous other companies that own and manage  AHG's investments.  <u>Harris Dec.</u> at ¶ 2.

**RESPONSE:**  Admitted in part; disputed in part.  Warren Hill admits that AHG created SFR to serve as the entity that purchased Warren Hill's interest in Vendor Assistance Program, LLC.  Warren Hill lacks knowledge concerning, and therefore disputes, whether "numerous other companies" have been created to manage investments that are not part of this case.

3.      One such company is SFR Equities, LLC ("SFR").  Harris is the lead Manager of  SFR. As the lead Manager, he is responsible for SFR's day-to-day operations.  <u>Harris Dec.</u> at ¶ 3.

**RESPONSE:**  Admitted in part; disputed in part.  SFR is managed by Mr. Harris together with Mr. Alan Ginsburg, a billionaire real estate investor in Florida.  Mr. Harris testified that he is the lead manager, but evidence adduced in discovery tends to show that Mr. Ginsburg provides the financial backing to SFR.  (*See* Ex. 1, Member Interest Purchase Agreement ("MIPA") at C-1 (guaranty of payment to Warren Hill of $1 million signed by Mr. Ginsburg, not Mr. Harris).)  Warren Hill thus disputes Mr. Harris' characterization of himself as the "lead" manager.

4.      In an earlier Declaration filed on or about November 20, 2018, Harris explained  that Warren Hill sold its 33.246% of the membership interests in VAP (collectively the  "Interests")" to SFR effective January 1, 2016.  <u>Harris Dec.</u>, ¶4 at Exh. "A"; "<u>MIPA</u>", at 1.

**RESPONSE:**  Admitted.  By way of further response, Warren Hill admits that Mr. Harris authored a prior declaration.  Warren Hill further admits that Warren Hill sold its

interest in VAP to SFR effective January 1, 2016.  (*See* Ex. 1, MIPA at 1.)

5.       As part of the consideration for the purchase of the Interests, SFR agreed

pursuant  to Section 1.2(d) of the MIPA to pay a certain percentage of  VAP's "Net Income" for

the years  2016, 2017 and 2018 [block quotation from MIPA omitted].

**RESPONSE:**  Admitted in part; disputed in part.  Warren Hill admits that the MIPA

contains Section 1.2(d), which speaks for itself and which has already been interpreted, in

part, by the Court.  (*See* Ex. 1, MIPA, § 1.2(d)); *see generally Warren Hill, LLC v. SFR*

*Equities, LLC*, 2019 U.S. Dist. LEXIS 23265 (E.D. Pa. Feb. 8, 2019). Warren Hill disputes

SFR's proffered interpretation of Section 1.2(d).

6.       As part of the consideration for the purchase of the Interests, SFR agreed

pursuant  to Section 1.2(e) of the MIPA to pay a certain percentage of  VAP's "Included

Reserve  Amounts" for the years 2016, 2017 and 2018 [block quotation from MIPA omitted]:

**RESPONSE:**  Admitted in part; disputed in part.  Warren Hill admits that the MIPA

contains Section 1.2(e), which speaks for itself.  (*See* Ex. 1, MIPA, § 1.2(e).)  Warren Hill

disputes SFR's legal interpretation and construction of Section 1.2(e), as set forth in Warren

Hill's Motion for Summary Judgment and in its Response opposing SFR's Motion for Partial

Summary Judgment.

7.       Prior to 2017, VAP facilitated the creation of trusts for the purchase of State

of  Illinois receivables from numerous vendors through the State of Illinois Vendor Payment

Program ("VPP").  *See* Harris Dec. at ¶6; *see also* Warren Hill Resp. to ¶¶ 18-19, *supra*.

**RESPONSE:**  Admitted in part; disputed in part.  Warren Hill admits that VAP—as

a Qualified Purchaser and only manager of the trusts—caused the creation of the trusts at

issue.  Indeed, as the manager of the trusts, VAP does "anything and everything from

finding the financing to begin with, finding the receivables, getting the receivables in order to qualify . . . and so forth."  (Ex. 4, Jan. 24, 2019 Transcript ("Tr.") at 13; *see also id.* at 10 (SFR counsel agreeing that "[h]istorically, VAP found the financing" which was an "important thing"); *id.* at 16 (SFR counsel noting that "VAP puts this entire deal together for the . . . the benefit of everyone, the bank, the State of Illinois, the vendors").  Warren Hill disputes SFR's suggestion that VAP's role changed in this regard in 2017.  As the Court has already held, VAP is the only manager of the trusts and VAP is the only entity qualified to participate under Illinois' Vendor Payment Program and Vendor Support Initiative (together, the "Program).  *See Warren Hill, LLC,* 2019 U.S. Dist. LEXIS 23265, at **3-7.  Moreover, to the extent SFR may assert that Bluestone Capital Markets, LLC ("BCM") may have partially supplanted VAP's role in "facilitate[ing] the creation of trusts for the purchase of State of Illinois receivables," Warren Hill disagrees that the existence of BCM has any material impact on the facts underlying this litigation. The beneficial ownership of VAP and BCM are identical, VAP remains the manager of all trusts at issue, BCM is not a Qualified Purchaser under the Program, and BCM is an alter ego of VAP.  *Id.*



8.	Trusts, such as ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ sometimes referred to as a ▮▮▮▮▮ *See,* ▮▮▮▮▮▮▮ ▮▮▮▮▮ agreements and certificates, attached to the Declaration of Gene Harris as Exh. "K".  <u>See also,</u> ▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮▮▮, attached to the declaration of Gene Harris as Exhibit "L".

**RESPONSE:**  Admitted.  By way of further response, as the Court has recognized, "VAP purchases accounts receivable from the state's vendors and borrows money from a bank to do so."  *Warren Hill*, 2019 U.S. Dist. LEXIS 23265, at **3-7.  Indeed, the record

confirms that VAP's lenders supply the financing needed to purchase billions of dollars in

receivables, which are held in trusts that VAP manages until Illinois pays its bills.   (Ex. 4, Tr.

at 11, 16; Ex. 5 (VAP's own website states that "*VAP*," not a trust, "has financed over $3.5

billion in accounts receivable"); Ex. 10 (summary deposition exhibit); Ex. 17 (referencing

VAP's ███████████  Ex. 15 (referring to VAP's lenders as "██████"); Ex. 18 (referring

to VAP's lenders as "████████"); Exs. 13-14 (asking board of managers for approval of

████████████████" with one particular lender); *See*

http://cgfa.ilga.gov/upload/04232018meetingAudio.mp3 at Minute 21-22, 37-39 (VAP

founder Brian Hynes referring to VAP's lenders and VAP's role in purchasing receivables).

9.      The trusts would issue promissory notes to the bank in exchange for loans.  *See*

Exhs. "K – L".

**RESPONSE:**  Disputed. The trusts may have issued promissory notes to banks, but the

documents cited by SFR in support of its assertion do not appear to provide for such notes. Two

trust agreements within SFR's Exhibit K refer to ████████████████████████

██████d (*i.e.,* the "████████████████████████-4" (*see* SFR Mtn., Ex. K, at

p.33, SFR 17048) and the "████████████████████████████" (*id.*, at p. 84

SFR 17788)), but such asset-backed notes are not "████████████████████████

████████Warren Hill lacks knowledge concerning, and therefore disputes, the matter to which

SFR is referring.

10.     The trusts would use these funds to purchase receivables from vendors to

the  State of Illinois, and would subsequently be paid back by the State of Illinois at a

premium,  referred to as a "penalty" under the VPP.  *See, e.g., id.*

**RESPONSE:**  Admitted in part; disputed in part.  Warren Hill admits that the

trusts are used as a financial intermediary between VAP and its lenders (████████████ ████████████████████████ in the operation of VAP's business within the Program. As SFR has conceded, and as the Court has already found, VAP finds the lenders, arranges the financing, and facilitates all aspects of the financial arrangements between VAP, its lenders, Illinois, and the state's vendors.  *Warren Hill*, 2019 U.S. Dist. LEXIS 23265, at **3-7; *see also* Ex. 4, Tr. at 10, 13, 16; Ex. 5 (VAP's own website states that "***VAP***," not a trust, "has financed over $3.5 billion in accounts receivable"); Ex. 10 (summary deposition exhibit); Ex. 17 (referencing VAP's "████████ Ex. 15 (referring to VAP's lenders as "████████"); Ex. 18 (referring to VAP's lenders as "████████"); Exs. 13-14 (asking board of managers for approval of "████████████" with one particular lender); *See* http://cgfa.ilga.gov/upload/04232018meetingAudio.mp3 at Minute 21-22, 37-39 (VAP founder Brian Hynes referring to VAP's lenders and VAP's role in purchasing receivables).

11.      The trusts also issued certificates, which entitled the certificate holder to certain  rights to trust assets, including the right to payment directly from the trust as the certificate  holder.  *See* Exhs. "K – L".

**RESPONSE:**  Admitted in part; disputed in part.  Warren Hill admits that each trust has a trust certificate.   The trust certificates are one of the vehicles through which value is captured in the operation of VAP's business.  As VAP explains in its financial statements,



██████████████████████████████████████████████████████████

████ . (*See* Ex. 11 at 7 (██████████████████████████████████

████████████.)  It is paid this amount through two income streams: (1) management fees, which VAP refers to as ████████ and (2) ████████████, which is the residual

amount left after VAP—as manager—pays all fees and expenses, including interest payments to VAP's lenders.  *Id.*  Warren Hill disputes SFR's statement to the extent that SFR implies, incorrectly, that its obligations to Warren Hill under the MIPA are somehow reduced or extinguished by the identity of an entity, such as BCM, that may receive a direct payment from a trust or that may have obtained title to a trust certificate without consideration.

12.     Entities that did not rightfully hold title to the certificates were not entitled to  certificate holder payments.  *See id.*

**RESPONSE:**  Admitted in part; disputed in part.  Warren Hill admits that each trust has a trust certificate.  Warren Hill disputes SFR's statement to the extent that SFR implies, incorrectly, that its obligations to Warren Hill under the MIPA are somehow reduced or extinguished by the identity of an entity, such as BCM, that may receive a direct payment from a trust or that may have obtained title to a trust certificate without consideration. Warren Hill further disputes the legal conclusions set forth in this Paragraph.

13.     These trusts were created under Delaware law and are governed by Delaware law.  *See id.*

**RESPONSE:**  Admitted in part; disputed in part.  Warren Hill admits that the trusts were created under Delaware law and, while not a statement of fact, Warren Hill believes that the trusts must comply with Delaware law.  Warren Hill disputes any suggestion that the trusts are not also subject to the laws and regulations governing the Program.  To the contrary, as Illinois has recognized, the trusts are subject to the Program Terms, and ███████████████

████████████████████████████████████████████████

       ███████ (*See* Ex. 25 ███████████████████████████

█████████████████████████ at 1 (███████████████████████



to"); *see* Ex. 26,

.)  VAP is required by Illinois to make detailed disclosures each month

concerning the receivables that are held in each trust, which further confirms that the trusts—

which are financial vehicles used by VAP to conduct its business under the Program—are

subject to Illinois laws and regulations.  *See* VAP's December 2018 Disclosures, *available at*

https://illinoiscomptroller.gov/comptroller/assets/File/QualifiedPurchaserMonthlyReports/2018/

December/VendorAssistanceProgramLLC_December%202018.pdf.

14.     These trusts were created to facilitate borrowing under a credit facility under

the  VPP.  *See* Certification of Gene Harris, ¶ 6.

**RESPONSE:**  Admitted in part; disputed in part.  Warren Hill admits that VAP elected

to use trusts to facilitate its business under the Vendor Payment Program, after VAP was

qualified by Illinois as eligible to participate in the Program.  Warren Hill disputes that the trusts

are used solely for the Vendor Payment Program, as VAP also uses trusts as part of its

participation in the Vendor Support Initiative, which is governed by the same terms that govern

the Vendor Payment Program.  (*See* Ex. 6, Reape Dep. at 32:19-33:4; Ex. 3 (Program Terms

apply to Vendor Support Initiative).)

15.     The trusts refer to numerous parties filling different roles other than the

trust  manager VAP, such as the "

."  *See* Exhs. "K – L".

**RESPONSE:**  Admitted.  By way of further response, the trusts also reference the

8

manager, VAP, and refer to management agreements that will govern the operation of the trusts.  (*See, e.g.*, SFR Ex. K (SFR 17030, 17084); SFR Ex. L (SFR 12633).)

16.     The roles of the various parties to the trusts are not governed by the VPP program  terms, and the trusts' administration is not specific to the VPP program.  *See* Declaration of Gene  Harris, ¶ 7.

**RESPONSE:**  Disputed.  For one, this statement is not factual in nature.  Rather, SFR is making a conclusion of law—that the trusts are not governed by the Program—and basing that conclusion of law on a self-serving statement by one of SFR's managers.  Notably, SFR fails to cite any law that would support its conclusion.  By way of further response, the trusts are qualified purchasers under the Program, and are subject to its terms.  (*See* Exs. 25-26 ███████ ████████████████████████████████.)  Indeed, █████████████████████████████████ ████████████████████████████████████. (*Id.*)  In approving the trusts, the agency—████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████m. (*Id.*)  In fact, the trust agreements explicitly refer to ██████████████████ ████████████████████████ (*See, e.g.*, SFR Ex. L (SFR 12560 (████████████ █████████████████████████, SFR 12630 (████████████████████████ █████████████); Ex. 35, Mgt. Agreement at 2, § 2.01(b) ██████████████████ █████████████████████████████████ *id.* at §2.03(h) (██████████████████████████████).)

17.     The VPP terms do not require trust certificate holders to be "qualified purchasers."  *Id.*

**RESPONSE:**  Disputed.  For one, this statement is not factual in nature.  Rather, SFR is

making a conclusion of law, and basing that conclusion of law—regarding how the Program

terms apply to certificate holders—on a self-serving statement by its manager.  Notably, SFR fails

to cite any law that would support its conclusion.  By way of further response, only Qualified

Purchasers are permitted to participate in the Program.  (Ex. 2, Program Terms at 1.)

Specifically, the Program terms state that in "consideration" for paying vendors based on the face

value of the invoice, "Qualified Purchasers" will be entitled to "all of [a vendor's] rights to

payment of such Qualified Account Receivable, including all current and future prompt payment

penalties due relating to such Qualified Account Receivable in accordance with the Prompt

Payment Act." (*Id.* at 2, § I.)  VAP and its affiliates have chosen to structure VAP's business

such that a portion of the value of the prompt payment penalty is captured as the ███████████

███████. (*See* Ex. 11, at 7.)

18.     In his Declaration of November 20, 2018, Harris explained ████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████. All

new trust certificates created after BCM's formation in 2017 were created in the name of BCM

in 2017 and 2018.  The trust Certificate Holder owns the equity or residual interest in each

trust.  Harris Dec., at ¶¶ 8-9.

**RESPONSE:**  Disputed.  Warren Hill disputes "why and how" VAP's board of

managers (which is identical to BCM's board of managers) agreed to create BCM, and even

SFR acknowledges that there are "***all sorts of disputes*** about . . . what was happening behind

the scenes."  (Ex. 4, Tr. at 33 (emphasis added).)  Thus, Warren Hill (1) disputes that VAP

needed to create BCM, or any affiliate, to "comply" with new risk retention regulations; and (2)

disputes that the alleged need to "comply" with new regulations was the true motivation for creating BCM.

As to the first point, the new risk retention requirements did not, as a matter of law, require VAP to create a new entity for purposes of compliance. Warren Hill briefed this issue in its pending Motion for Summary Judgment.  (*See* D.E.74 at 14-17.)  SFR has never been able to point to applicable law that required the creation of BCM.

As to the second point, Warren Hill has adduced substantial evidence, including through its expert, to show that BCM was created for the purpose of funneling money out of VAP to support SFR's effort to depress the amount of money it owed to Warren Hill under the terms of the MIPA.  Specifically:

(1) ███████████████████████████████████████

███████ (*See* Ex. 9, Harris Dep. at 197:10-17, 199:23-200:1; Ex. 6, Reape Dep. at 210:16-211:16);

(2) ████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████ (Ex. 9, Harris Dep. at 197:10-25; *see also* Ex. 28, BCM Ownership Chart);

(3) ████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████ (Ex. 29 (███████████████████

███████████████████████████████; Ex. 30 (same)) ;

(4) ultimately, at SFR's insistence, approximately 80% of VAP's earned fees were

"allocated" to BCM and BSF (Ex. 20 (reallocating—without any analysis—more than ███

██████ of VAP's earned fees to BCM and BSF));

(5) indeed, despite the fact that BCM had just been created in March 2017, Mr. Harris—

SFR's alleged "lead manager"—allocated to BCM more than ████████ of fees that VAP had

already earned over the course of several years, (*id.*);

(6) ████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

███████████████S (Ex. 6, Reape Dep. at 287:18-288:14; Ex. 7, Wilson Dep. at 175:4-

177:21; Ex 30 (████████████████████████████

████████████); Ex. 31 (███████████████████████

███████w).)

(7) BCM received significant monetary allocations despite there not having been much

████████ in the entity and even though Mr. Hynes, who was supposed to be dedicating the

majority of his time to BCM, ██████████████████████████████████

(Ex. 32 (████████████████████████); Ex. 8, Hynes Dep. at 77:9-13);

(8) ████████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████ (Ex. 6, Reape Dep. at 202:15-

23; Ex. 7, Wilson Dep. at 65:15-66:10, 71:23;  Ex. 8, Harris Dep. at 231:18-233:8.)

(9) VAP received nothing of value in connection with transferring the trust certificates to

BCM— ███████████████████████████████████████████

████████████████████████████████████████████████-

████████████████████████████████████████ (*see* Warren Hill

Resp. to ¶ 19, *infra*);

(10) ██████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████,

████████████████████████████████████████████

████████████████████████ (Ex. 6, Reape Dep. at 136:15-20); and

(11) the "Services Agreement" between VAP and BCM was set to expire ███████████

███████████████████ (Ex. 33, VAP-BCM Services Agreement at 1).

19.    In September and October, 2017 ████████████████████████████

██████████████s attached to Harris's Declaration as Exhs. "B – G," respectively,

transferring   all VAP's ownership interest in the trust certificates created prior to 2017 in which

VAP at one  time maintained a residual interest to BCM.  During 2017 and thereafter, ████████

███████████████████████████████████. As a result of these transactions, BCM,

holds the  trust certificates which produced income for BCM in 2018 and which also will

produce income  for BCM in the future through receivables.  Consequently, VAP no longer

holds any interest in  the trust certificates and does not derive any revenue from them.  Harris

Dec., at ¶ 9.

**RESPONSE:**  Admitted in part; disputed in part.  Warren Hill admits that ██████████

████████████████████████████████████████████████████

13

███████████████████████████████████████████████, and that new trust

certificates created in the course of VAP's business were issued with BCM named as the

certificate holder.  Further, Warren Hill admits that SFR, using its counsel in Florida, created

BCM in March 2017, just days after Warren Hill inquired about the first earnout payment owed

by SFR to Warren Hill.  (Ex. 34, Delaney Decl. ¶¶ 41-42.)  Warren Hill disputes that "VAP no

longer holds any interest in the trust certificates and does not derive any revenue from them"

because:

(1)     as detailed in VAP's financial statements, including those covering the period

following the creation of BCM, the "████████████████████████████████████

████████████████████████████████ VAP is, undisputedly, the only manager

of the trusts, and thus it is VAP's work as manager that "████████████████████;"

(2)     the circumstances by which VAP gave away possession of the trust certificates

without consideration were a sham, in furtherance of SFR's attempts to wrongfully depress its

earnout obligations; and

(3)     Warren Hill disputes that VAP and BCM are legally separate—they, together with

BSF, are mere alter egos.  For instance:

- ████████████████████████████ (Ex. 6 Reape Dep. at 10-14), the
████████████████████████████████ (Ex. 19, SFR RFA Resp. ¶ 28; Doc. 38,
Hynes Decl. Exs. E, H, Q, R, S; Ex. 9 Harris Dep. at 41), █████████████████████
████████████l (Ex. 19 SFR RFA Resp. ¶ 28; Ex. 9, Harris Dep. at 97-99; Ex. 7,
Wilson Dep. at 57), ████████████████ (Doc. 38, Hynes Decl. Exs. E, F, H; Ex. 7, Wilson Dep. at 57).

- ██████████████████████████████ (Ex. 6, Reape Dep. at 19, 270-77);
████████████████████

- ███████████████████████████████████████
██████████████████████████████████ (Ex. 7, Wilson Dep. at 234-37, 257-58);

14



- ████████████████████████████████████████████ " (Ex. 7, Wilson Dep. at 35, 126, 222, 258-59; Ex. 20.);

- ████████████████████████████████████████ ████████████████████████████████ ███ h (Ex. 9, Harris Dep. at 204-12);

- ████████████████████████████████████████ ████████████████████████████████████ (Ex. 9, Harris Dep. at 232-34; Ex. 6, Reape Dep. at 202; Ex. 7, Wilson Dep. at 76);

- ████████████████████████████████████ ████████████ (Ex. 9, Harris Dep. at 200; Ex. 21 (ownership chart));

- Mr. Hynes did not mention the Bluestone entities and held out the combined operation of VAP and the Bluestone entities as a single entity (VAP) when testifying to Illinois's Commission on Government Forecasting and Accountability; testifying in 2018 that VAP (not BCM or BSF) purchased receivables (21:48), was repaid by the state and was owed outstanding payment (22:11), and received and continued to be owed Prompt Payment Penalties (22:19) (a portion of the value of which resides in the Trust Certificate Income for trust certificates nominally held by BCM);

- ████████████████████████████████████████ ████████████████████████████ (see Exs. 22-23, VAP's Confirmation Requests); and

- Warren Hill's expert has opined that: (a) "BSF and BCM did not appear to have the ability to operate as stand-alone entities"; (b) "Numerous transactions in excess of ████ ██████ between VAP and BSF and VAP and BCM did not appear to be conducted on an arm's length basis"; (c) "VAP, BSF, and BCM appeared to commingle assets through the sharing of revenues earned by VAP, sharing various expenses including payroll, undocumented loans, and undocumented transfers of funds, among others"; and (d) "VAP, BSF, and BCM shared common members/owners, Board of Managers, officers, accounting personnel, accounting software, and auditors." (Ex. 24, Expert Report at 6.)

20.     In order to calculate the earnout for 2018 under the MIPA and to comply with

Warren Hill's discovery demands in this case, Harris calculated the total amount of cash receipts

earned by VAP/BCM/BSF as of December 31, 2018.  Attach to Harris's Declaration as Exh.

"H"  is a true and correct copy of the 2018 Cash Receipts Schedule that was created by Harris or

under his supervision in which he broke down ████████████ in cash receipts of

15

VAP/BCM/BSF in 2018.  This document was produced to Warren Hill as SFR bates stamped document 37675-37674 and was marked by plaintiff's counsel and used at the second deposition of David Reape as Warren Hill Exhibit 117.

**RESPONSE:**  Admitted in part; disputed in part.  Warren Hill admits that it received the document referenced in this Paragraph as part of discovery.  Warren Hill admits that the document was marked as a deposition exhibit.  Warren Hill lacks knowledge concerning, and therefore disputes, the identity of the individual who created the document at issue in this paragraph.  Notably, SFR does not cite any record evidence to support its assertion.

21.    $ ███████████████████████████████ ███████████████████████████████ .

**RESPONSE:**  Admitted.

22.    SFR made payment to Warren Hill pursuant to Section 1.2(e)(i) of the MIPA on  this  ████████  amount released from the  ████████████████████ -1 reserve  account, and consequently, payments on the series  ███████████████  are not in controversy for purposes of this motion.

**RESPONSE:**  Admitted.

23.    Harris created this Schedule from the books and records of VAP/BSF/BCM. The  document lists the cash receipts paid by the trusts managed by VAP to VAP/BSF/BCM on a  monthly basis.

**RESPONSE:**  Disputed.  There is no citation to any fact of record to support this statement, in violation of the Court's stated requirement that all factual assertions be accompanied by corresponding record citation.  In any event, Warren Hill did not prepare the schedule referenced herein and does not know how the Schedule was created.

16

24.    The following cash payments were set forth on the Exhibit "H" Schedule and constitute cash payments paid directly to Bluestone Capital Management by the trusts:

| | | | |
|---|---|---|---|
| ▬▬ | ▬▬ | ▬▬ | ▬▬ |
| | | | |
| ▬▬▬▬ | ▬ | ▬ | ▬▬▬ |
| ▬▬ | | | |
| ▬▬ | ▬ | ▬ | ▬▬ |
| ▬▬ | ▬ | ▬ | ▬▬▬ |
| ▬▬▬▬▬ | ▬ | ▬ | ▬▬ |
| ▬▬▬ | | | |
| ▬▬▬▬▬ | ▬▬ | ▬▬ | ▬▬▬ |
| ▬▬▬▬▬ | ▬▬ | ▬▬ | ▬▬▬ |
| ▬▬▬▬ | ▬▬ | ▬▬ | ▬▬ |
| ▬ | | | ▬▬▬ |

**RESPONSE:**  Disputed. Warren Hill did not prepare the summary chart presented by SFR, nor did Warren Hill prepare the two pages of SFR's Exhibit H. In preparing its response to SFR's motion for partial summary judgment, Warren Hill attempted to confirm the entries in SFR's summary chart based upon the information in Exhibit H cited by SFR as the basis for its summary (assuming, *arguendo*, that the information in Exhibit H is accurate). SFR's summary chart cannot be validated by the information proffered by SFR in Exhibit H for a number of reasons, including *inter alia*:

(1) ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ (with a few negligible discrepancies) ▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬;

(2) the second page of SFR's Exhibit H purports to show ▬▬▬▬▬▬▬

17

███████████████████████, but Exhibit H does not demonstrate how SFR arrived

at the numbers it included in its summary chart;

(3) there is a substantial discrepancy between (A) the total of all amounts that SFR

allocated to BCM relating to the various certificates listed on the second page of SFR's

Exhibit H and (B) the total listed in SFR's proffered summary chart;

(4) there is a discrepancy between SFR's summary chart and the first page of SFR's

Exhibit H regarding the identity of the trust certificate corresponding to ████████████

███████ listed in SFR's summary chart; and

(5) even within SFR's summary chart, there is a discrepancy of nearly ██████

between the amounts listed and the sum total shown.

The accuracy or inaccuracy of the information proffered by SFR in its summary chart

is not material to the dispute before the court (*i.e.*, Warren Hill's entitlement to a portion of

the ███████████████). Nevertheless, Warren Hill undertook in good faith to reconcile

SFR's summary chart with Exhibit H. Warren Hill would likely have been more fully able to

evaluate SFR's summary chart if SFR had produced the ████████████████ relating to

VAP/BCM/BSF, which SFR has failed to do despite █████████████████████████

████████████████████t. Information contained in the ███████████ could corroborate

or conflict with SFR's proffered summary.

Finally, for clarity, Warren Hill notes that BCM's full name is Bluestone Capital

Markets, LLC (not Bluestone Capital Management).

25.      Each of the amounts set forth above were cash receipts paid directly to BCM

and  were paid by wire transfer from a Trust (█████████████████████████████

████████████████████████████████████████████████████) and not

through  VAP or its accounts.  <u>Harris Dec.</u>, at ¶ 13.

  **RESPONSE:**  Admitted in part; disputed in part.  Warren Hill admits that the

amounts identified were paid directly to BCM, but such payments were made through the

directions of VAP.  (*See generally* Ex. 35 (███████████████████████████

███████); *see also* Warren Hill Resp. to Para. 19 *supra* (setting forth fact that VAP and

BCM are alter egos and should be treated as a single entity).)   Warren Hill therefore

disputes that these amounts were "not [paid] through VAP" because VAP, as the manager of

each trust, directs the trusts as to where they should wire funds.

  26.  Harris attached to his Declaration as Exh. "I" true and correct copies of the

applicable ███████████████ or ███████████ statements showing the wire

transfers directly from each of the trusts mentioned above to BCM's bank account with

respect  to each of the payments set forth above.  He circled each of the payments referred to

in  paragraph 24 above to illustrate that the transfers were made by the Trustee, ████████, on

behalf  of the trusts to BCM.  <u>Harris Dec.</u>, at ¶ 14

  **RESPONSE:**  Admitted in part; disputed in part.  Warren Hill admits that Mr.

Harris attached documents to his declaration and Warren Hill admits that he circled various

amounts.  However, SFR's proffered summary chart includes entries that are not circled in

SFR's Exhibit I.  For example, SFR's summary chart shows an amount of █████████ that

SFR apparently claims was wired to BCM in ████████████. There is no corresponding

entry circled in SFR's Exhibit I. There is, however, a substantially similar amount of

██████████ shown as wired *out of BCM's bank account* on ████████████████ (*See* SFR

Mtn., Ex. "I", at p.31, SFR 041264.)

  Warren Hill further admits that certain payments were directed to BCM after this

19

lawsuit was initiated, pursuant to instructions from VAP, which, as the manager of each

trust, directs the Trustee as to where it should send funds. (*See generally* Ex. 35 (███████

██████████████████████████████████████ *see also* Warren Hill Resp. to Para. 19

*supra* (setting forth fact that VAP and BCM are alter egos and should be treated as a single

entity).)

27.     Harris also attached to his Declaration as Exh. "J" true and correct copies of

examples of Noteholder Reports documenting most of the payments to BCM.  The Noteholder

Reports are sent on a monthly or weekly basis by a trustee to VAP.  These Noteholder Reports

reflect that each of the payments above were cash receipts paid to BCM.  A comparison of

examples of the Noteholder Reports to the BCM Bank Statements and the Cash Receipts

Schedule, shows that the examples of the payments tie together and were made during the

month  set forth on the Cash Receipts Schedule in 2018 via wire transfers by the trustee directly

to BCM  (and were not paid to VAP first).  <u>Harris Dec.</u>, at ¶ 15.

      **RESPONSE:**  Admitted in part; disputed in part.  Warren Hill admits that Mr. Harris

attached to his declaration various documents appearing to be a subset of Noteholder Reports.

Warren Hill disputes that the "Noteholder Reports  reflect that each of the payments above

were cash receipts paid to BCM". To the contrary, at numerous places, the documents appear

to refer to the combined entity of VAP and BCM. (*See*, *e.g.*, SFR Mtn., Ex. "J", at pp. 9, 11,

15, 20, 24  (SFR 26795, 26799, 26791, 26787, 26803) (████████████████████████

██████████████████████████) and pp. 10, 12, 16, 19, 23 (SFR 26796,

26800, 26792, 26788, 26804) (█████████████████████████████████████

██████████████████████") ). VAP is the undisputed manager of all trusts at

issue. The record demonstrates that SFR engaged in self-interested transactions to gift existing

trust certificates from VAP to BCM without consideration and to create new trust certificates in the name of BCM while placing indemnification obligations (again without consideration) on VAP.  (*See* Warren Hill Resp. to ¶¶ 18-19, *supra*.)  The fact that the noteholder reports refer to ███████████████████████ in a single line item in no way substantiates SFR's claims regarding BCM. Rather, such Noteholder reports are further evidence that VAP and BCM (together with BSF) are alter egos, as detailed in Warren Hill's submissions on that issue to the Court. Thus, SFR's statements in Paragraph 27 diverge materially from the actual facts.

28.     The reason these payments were made directly to BCM is because, as previously disclosed to the Court in SFR's Motion for Partial Summary Judgment all trust certificates originally issued in the name of VAP prior to 2017 were assigned by VAP to BCM in exchange for BCM assuming the responsibility for holding the certificates. See, Exhs. "B" – "G" above.  Also, all new trust certificates created in 2017 or later, like those issued under ███████████████████, were issued in the name of BCM.  Harris Dec., at ¶ 16.

**RESPONSE:**  Admitted in part; disputed in part.  Warren Hill admits that payments of trust certificate income were made to BCM directly.  Warren Hill disputes the assertion that BCM assumed any responsibilities.  VAP remained the manager of all of the trusts and VAP was the obligor for all services provided to the trusts. *See Warren Hill, supra* at *3-7.  SFR's claim that BCM "assum[ed]" an obligation to hold onto a piece of paper is disingenuous.

29.     The examples of the Noteholder Reports reveal that the certificate holder payments had no relationship to the deposit or release of funds from any reserve account addressed by the MIPA. *See* Exhibit "J".

**RESPONSE:**   Disputed.  VAP and BCM CEO David Reape testified that ████████

████████████████████████████████████████████████████

███████████████. (*See* Ex. 6, Reape Dep. at 507:2-511:20.)  Moreover, SFR's reference to "any

reserve account addressed by the MIPA" is materially misleading, in that it ignores the express

language of the MIPA. Each trust certificate constitutes a "financial instrument" as described

Section 1.2(e)(iii) of the MIPA, and the second sentence of Section 1.2(e) plainly states that the

"accounts and financial instruments described in clauses (i), (ii), and (iii) of the preceding

sentence are herein defined as the "Reserve Accounts".  Thus, the trust certificates are defined to

be "Reserve Accounts."  SFR's use of the phase "reserve account" (with lower case letters) is

grossly misleading because it ignores, and is directly contrary to, the term "Reserve Accounts"

defined by the parties in the MIPA.

30.     Each of these examples of Noteholder Reports reveals that certificate holder

payments were separate payments from any deposits of funds into a reserve account or release

of  funds from any trust reserve account.  *Id.*

**RESPONSE**:   Disputed.  *See* Warren Hill's response to Paragraph 29.

31.     The October 31, 2018 Noteholder Report for the ████████████████████

reveals a ██████████2 payment was made to the █████████████████.  *Id.*

**RESPONSE:**  Admitted in part; disputed in part.  Warren Hill admits that the Noteholder

Reports exist and that they are documents that speak for themselves.  To the extent that SFR is

asserting that BCM received payments in the capacity as "manager" of any of the trusts, that

assertion is knowingly false, because only VAP is a manager of the trusts at issue.  *See Warren*

*Hill, supra* at *3-7; *see also* Warren Hill's response to ¶ 27, *supra*.

32.     That report reflects a release of only ███████8 from the reserve account.  *Id.*

**RESPONSE**:  Admitted in part; disputed in part.  Warren Hill admits that the Noteholder

Reports exist and that they are documents that speak for themselves.  SFR's use of the phrase "reserve account" (with lower case letters) is grossly misleading because it ignores, and is directly contrary to, the term "Reserve Accounts" defined by the parties in the MIPA. *See* Warren Hill's response to ¶ 29.

33.     The ███████████  ██████████████████████████████████ reflects a payment of ██████████████ to the Certificate Holder Representative, but does not reflect  the existence of a reserve account within that trust.  *Id.*

**RESPONSE**: Admitted in part; disputed in part.  Warren Hill admits that the Noteholder Reports exist and that they are documents that speak for themselves.  SFR's use of the phrase "reserve account" (with lower case letters) is grossly misleading because it ignores, and is directly contrary to, the term "Reserve Accounts" defined by the parties in the MIPA. See Warren Hill's response to Paragraph 29.

34.     None of the Noteholder Reports reflect a relationship between any reserve account and any certificate holder payment.  *Id.*

**RESPONSE**:   Disputed.  SFR's use of the phrase "reserve account" (with lower case letters) is grossly misleading because it ignores, and is directly contrary to, the term "Reserve Accounts" defined by the parties in the MIPA. *See* Warren Hill's response to Paragraph 29.  In addition, VAP and BCM CEO David Reape testified that ████████████████████████ ██████████████████████████████████████████████████████████████.  (See Ex. 6, Reape Dep. at 507:2-511:20.)

35.     None of the examples of Reserve Accounts, to the extent they are contained within any trust, are identified as being held by, on behalf of, or for the benefit of VAP.  *Id.*

**RESPONSE:**  Disputed.  As detailed above, the trust certificates constitute

financial instruments that are expressly defined as "Reserve Accounts" in Section 1.2(e) of the MIPA. Warren Hill admits that, prior to the gifting of the trust certificates from VAP to BCM, that the trust certificates were "held by" VAP.  Following the gifting of the trust certificates to BCM and the creation of new trust certificates with BCM as the nominal certificate holder, such certificates were plainly held "on behalf of" or "for the benefit of VAP" because the trust certificates were required for the operation of VAP's business, as VAP's board chose to structure it through the use of trusts to hold assets.

Moreover, BCM's operations are inextricably tied to the operation of VAP's business, such that the holdings of BCM are plainly "for the benefit of VAP."  This is evidenced by the coordinated ████████████████████████████████ (which boards are comprised of the exact same members) cited by SFR in its motion.  (*See* Doc. 38, Hynes Decl. at Exs. I-J.)  Indeed, even the farcical attempt at papering up the appearance of consideration in the transactions that gifted the trust certificates to BCM demonstrates that BCM holds the certificates "for the benefit of VAP."  In paragraph 16 of his declaration submitted with SFR's pending motion, Mr. Harris asserts the trust certificates "████████████████████████████████████████████████ ████████████████████████████████."  (*See* Harris Decl. ¶ 16.)  Such an "exchange" is hardly an assumption of any responsibility at all under the applicable circumstances. However, to the extent that BCM's "█████████████████████████" could be deemed to be any sort of "exchange," BCM unquestionably would be holding the certificates "on behalf of" or "for the benefit of VAP" because VAP was (and remains) the manager of all trusts to which the trust certificates relate, and the existence of the trusts requires the trust certificates.

Finally, VAP and BCM (together with BSF) are alter egos, so any financial instrument (including the trust certificates) held in the name of BCM is also "held by" VAP. (*See also* Warren Hill's Resp. to ¶ 19, *supra* (setting forth record citations supporting finding of alter ego status).)

36.     Article IV of the ██████████████████████████ 
█████████t describes the initial funding of the trust in Article IV, stating, "[████████████
███████████████████████████████████████████████████████████
████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████     *See* Exhibit "L."

**RESPONSE**:   Admitted in part; disputed in part.  Warren Hill admits that the document states, in part, what is reflected here by SFR.  Warren Hill disputes SFR's interpretation of the document, which speaks for itself.

37.     "█████████████████████████████████████████████████
██████████████████████████████████     *Id.*

**RESPONSE**:  Admitted in part; disputed in part.  Warren Hill admits that the document states, in part, what is reflected here by SFR.  Warren Hill disputes SFR's interpretation of the document, which speaks for itself.

38.     The ██████████████████████████t describes in various locations the establishment of a "███████████████████ which is defined in the definitions appendix as "██████████████████████████████████████."
*Id.*

**RESPONSE**:   Admitted in part; disputed in part.  Warren Hill admits that the

document states, in part, what is reflected here by SFR.  Warren Hill disputes SFR's interpretation of the document, which speaks for itself.

39.     The Notes issued pursuant to this agreement similarly identify the Trust as the  issuer of Notes to facilitate trust funding. *See, id.,* ███████████████████████, excerpted from ███████████████████████████████nt.

**RESPONSE:**  Disputed.  Warren Hill cannot locate any portion of SFR's Exhibit L corresponding to the alleged excerpt that SFR described in this paragraph. Warren Hill therefore disputes the purported content of such alleged excerpt.

40.     This is similar to the obligations described within the latter trusts established after  the formation of BCM, which describe ██████ as the "█████████" ██████████ ████████████████████████████████████." *See* Exhibit "L".

**RESPONSE:**  Disputed.  First, SFR appears to have intended to cite to its Exhibit K, not its Exhibit L. SFR's Exhibit L sets forth vastly different definitions and party designations than are referenced by SFR in Paragraph 40.  For example, SFR's Exhibit L explicitly defines VAP ████████████████████████████████████████" (*see* SFR Mtn., Ex. L, at p. 7, SFR 12560) and elsewhere refers to VAP as "████████████ ██████████████████ (*id.* at p.1, SFR 12554).  Second, assuming that SFR intended to refer to the █████████████████████, dated as of September 29, 2017, modifying the ██████████████████████████████, which SFR included in its Exhibit K (starting at SFR 17026), such agreement plainly incorporates by reference "the ██████████████████████████████████████████████ (*see* SFR Mtn., Ex. K, at p. 15, SFR 17030.)  VAP is the undisputed manager of all the trusts at issue.  SFR's reference to VAP as "████████████████" is grossly misleading because

26

VAP is, undisputedly, also the manager.  In any case, the copious ink that SFR has spilled

regarding the particulars of specific trusts is a distraction.  Nothing that SFR has cited

diminishes Warren Hill's entitlement to the ███████████ under the MIPA.

41.     Furthermore, under these circumstances, all cash receipts and future receivable

payments made or to be made to BCM as trust certificate holder do not constitute "Net

Income"  for purposes of Section 1.2(d) of the MIPA, and should not be included in any

present or future  payment to Warren Hill under the MIPA.

   **RESPONSE:**  Disputed.  This statement contains a legal conclusion, not a statement

   of allegedly undisputed fact.  Moreover, the statement does not contain citation to the record

   at all.  The Court should disregard Paragraph 41 entirely.  To the extent the Court considers it,

   Warren Hill disputes Paragraph 41, for the reasons set forth in its Memorandum of Law

   opposing SFR's Motion for Partial Summary Judgment.

42.     Under the circumstances, the 2018 cash payments from the trusts to BCM set

forth in Paragraph 24 above, as well as any future receivable payments on trust certificates, do

not constitute revenue from "Included Reserve Amounts" for purposes of Section 1.2(e) of the

MIPA and should not be included in the calculation of the 2018 earnout or any future

payment.  The cash payments described above were not (i) "deposited in VAP's series 2012-1

Reserve  Account"; (ii) "deposited in any other reserve account held by, on behalf of, or the

benefit of  VAP"; and/or (iii) held in the form of any financing instrument, in each case as

may be required  pursuant to the terms of any financially arrangement among VAP and any of

its leaders."

   **RESPONSE:**  Disputed.  This statement contains a legal conclusion, not a statement of

   allegedly undisputed fact.  Moreover, the statement does not contain citation to the record at all.

The Court should disregard Paragraph 42 entirely.  To the extent the Court considers it, Warren

Hill disputes Paragraph 42, for the reasons set forth in its Memorandum of Law opposing SFR's

Motion for Partial Summary Judgment.


Respectfully submitted,

*/s/ Gregory S. Voshell*
Gregory S. Voshell
Thomas B. Helbig, Jr.
ELLIOTT GREENLEAF, P.C.
925 Harvest Drive, Suite 300
Blue Bell, PA 19422
(215) 977-1000

Dated: May 9, 2019                          *Counsel for Plaintiff Warren Hill, LLC*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on this date, I have caused a true and correct copy of the forgoing to be served upon each attorney of record via electronic mail, the Court's ECF system, and U.S. mail.


*/s/ Gregory S. Voshell*
GREGORY S. VOSHELL

Dated: May 9, 2019