## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WARREN HILL, LLC, | : | CIVIL ACTION |
| Plaintiff, | : | 2:18-01228-HB |
| v. | : | |
| SFR EQUITIES, LLC, | : | |
| Defendant. | : | |

### ORDER

**AND NOW**, this _____ day of _____, 2019, upon consideration of Warren Hill, LLC's Motion for Summary Judgment, and SFR Equities, LLC's response thereto, it is hereby **ORDERED** that the Motion is **DENIED**.

**IT IS SO ORDERED**.

**BY THE COURT:**

_____
                                                                        **Bartle,       J.**

22793810v.1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WARREN HILL, LLC, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | 2:18-01228-HB |
| | : | |
| v. | : | |
| | : | |
| SFR EQUITIES, LLC, | : | |
| | : | |
| Defendant. | : | |

## DEFENDANT SFR EQUITIES, LLC'S RESPONSE TO
## WARREN HILL, LLC'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Warren Hill, LLC ("Warren Hill") has not provided a statement of undisputed material facts, instead intermingling various facts with legal citation and argument. Given the absence of a statement of undisputed facts, SFR Equities, LLC ("SFR") must contest Warren Hill's entire statement of material facts, except as expressly admitted below.

SFR admits that, in 2016, Warren Hill sold its equity interest in Vendor Assistance Program, LLC ("VAP") to SFR. Warren Hill also admits that the sale document, referred to as the Membership Interest Purchase Agreement ("MIPA"), provided for certain payments from SFR to Warren Hill following the sale if certain conditions were met, as provided for in the MIPA. SFR admits the statements cited by Warren Hill from this Court's prior opinion, *Warren Hill, LLC v. SFR Equities, LLC*, 2019 U.S. Dist. LEXIS 23265 (E.D. Pa. Feb 8, 2019), are quotations from that opinion; however, SFR states that those quotations are legal statements of this Court which speak for themselves.

SFR admits that certain excess income received by the trusts is paid to trust certificate holders. SFR also admits that no money is paid to certificate holders until other trust expenses

are paid.  SFR disputes that the trust certificates are "financial instruments . . . pursuant to the financing arrangements among VAP and its lenders."

SFR disputes Warren Hill's characterization of the financial statement on Page 6 of Warren Hill's motion.  SFR notes that this document is a Bluestone Capital Management ("BCM") financial statement.  SFR disputes that the financial statement reflects that VAP is entitled to any income, whether through management fees or trust certificate income.

SFR admits that the MIPA governs SFR's purchase of VAP from Warren Hill, but disputes any characterization of the MIPA, and notes that the MIPA is a contract, which is a legal document, and any conclusions about the MIPA are conclusions of law.  SFR expressly rejects Warren Hill's assertion that the MIPA entitles it to 16.623% of any trust certificate income.

SFR rejects Warren Hill's characterization that, because the Bluestone entities have ownership identical to or substantially in common with VAP, SFR is "still receiving its portion of trust certificate income" belonging to VAP.  SFR notes that it does not control VAP or the Bluestone entities, and only receives distributions when approved by those companies.  SFR disputes that Warren Hill is entitled to payment on trust certificate income beyond any payment already made, and further disputes that any lack of payment is contrary to the terms of the MIPA or due to bad faith.  SFR notes that the MIPA does not utilize the term "trust certificate" anywhere in Section 1.2(d) or 1.2(e).

SFR admits that VAP identified Blue Cross/Blue Shield ("BCBS") and United Health as potential clients prior to Brian Hynes's involvement in successfully negotiating the purchase of their receivables.  However, SFR disputes Warren Hill's characterization that Brian Hynes's obtaining business from those firms was not a new opportunity for VAP, and that the business

-2-

landed by Hynes was previously "investigated."    SFR disputes Warren Hill's assertion that this bonus was not deductible.

In support of this Opposition, SFR incorporates its Statement of Undisputed Material Facts in Support of its Motion for Partial Summary Judgment, which involves identical factual issues regarding trust certificate payments. *See* (ECF No.73, SFR's Motion for Partial Summary Judgment Regarding Trust Certificate Income, Statement of Material Facts), a true and accurate copy of which is attached hereto as Exhibit "1". SFR also submits a declaration of David Reape, CEO of VAP, in support of its position. *See* Declaration of David Reape, a true and accurate copy of which is attached hereto as Exhibit "2".

<strong>WHITE AND WILLIAMS LLP</strong>

BY:    /s/ Michael N. Onufrak
Michael N. Onufrak
Thomas M. Pinney
1650 Market Street | One Liberty Place,
Suite 1800 |
Philadelphia, PA 19103-7395
Phone: 215.864.7174
Attorneys for Defendant
SFR Equities, LLC

Dated:  May 9, 2019

-3-

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WARREN HILL, LLC, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | 2:18-01228-HB |
| | : | |
| v. | : | |
| | : | |
| SFR EQUITIES, LLC, | : | |
| | : | |
| Defendant. | : | |

## DEFENDANT SFR EQUITIES, LLC'S MEMORANDUM OF LAW IN OPPOSITION TO WARREN HILL'S MOTION FOR SUMMARY JUDGMENT

WHITE AND WILLIAMS LLP
Michael N. Onufrak
Thomas M. Pinney
1650 Market Street | One Liberty Place, Suite 1800 |
Philadelphia, PA 19103-7395
Phone: 215.864.7174
Attorneys for Defendant,
SFR Equities, LLC

Dated: May 9, 2019

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

SUMMARY OF UNDISPUTED MATERIAL FACTS ...................................................... 2

A.   BCM's Trust Certificate Income Is Not Subject to MIPA Section 1.2(e), As Detailed In SFR's Motion for Partial Summary Judgment (ECF No. 73) .................................................... 2

B.   The Court Issued A Prior Opinion on The Issue of Fees Earned by BCM and BSF, Which Identified Multiple Issues of Fact ............................................................................................. 2

C.   The Hynes Bonus Was Awarded Because His Work Secured A New Business Opportunity for VAP ............................................................................................................... 3

D.   SFR's Counterclaim Is Now Moot ...................................................................................... 4

LEGAL ARGUMENT ........................................................................................................... 5

I. WARREN HILL IS NOT ENTITLED TO PAYMENT UNDER MIPA SECTION 1.2(e) BECAUSE THE TRUST DEPOSITORS ARE LENDERS TO THE TRUSTS, NOT TO VAP ........................................................................................................................... 5

A.   The Trusts' Lenders under the Trust Agreements are Not VAP's Lenders as Required by the MIPA ............................................................................................................................... 5

B.   The Transfer of The Trust Certificates Is Not Relevant for Purposes of the MIPA 1.2(e)(iii) Analysis ................................................................................................................... 8

C.   Warren Hill's 1.2(e) Interpretation Runs Contrary to the Plain Language of the MIPA.... 9

D.   The Creation of BCM was a Business Decision Made by VAP's Board of Managers and the Transfer of the Trust Certificates Was Supported by Consideration .................................. 11

1.   *The Transfer of Trust Certificates Was Supported by Consideration* .......................... 12

2.   *The Creation of BCM to Comply with Federal Risk Retention Requirements is Supported by the Factual Record* ...................................................................................... 13

E.   Warren Hill Does Not Argue that Trust Certificate Payments Fall under Any Other Provision of 1.2(e) or 1.2(d) .................................................................................................. 14

II. THIS COURT SHOULD DENY WARREN HILL'S MOTION FOR SUMMARY JUDGMENT ON BLUESTONE REVENUE PURSUANT TO MIPA SECTION 1.2(d) ............................................................................................................................................. 15

III. THE HYNES BONUS WAS PROPERLY DEDUCTED AS A NEW BUSINESS OPPORTUNITY UNDER MIPA SECTION 1.2(d)(ii)(D) ................................................ 16

CONCLUSION ..................................................................................................................... 19

ii

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Benedict v. Fed. Kemper Life Assurance Co.,
   325 Ill. App. 3d 820 (2001) ............................................................................5, 9, 14

Cristoph v. BCA, LLC,
   2008 U.S. Dist. LEXIS 94256 (N.D. Ill 2008) ..................................................16

Eichengreen v. Rollins, Inc.,
   89 Ill. App. 3d 517, 757 N.E.2d 952 (2001) .......................................................9

Epmeier v. United States,
   199 F.2d 508 (7th Cir. 1952) .............................................................................12

First Ins. Funding Corp. v. Fed. Ins. Co.,
   284 F.3d 799 (7th Cir. 2002) .............................................................................16

Gordon v. Bauer,
   177 Ill. App. 3d 1073, 532 N.E.2d 855 (1988) ..................................................12

Hufford v. Balk,
   113 Ill. 2d 168 (1986) ..........................................................................................5

Newman v. Metro. Life Ins. Co.,
   885 F.3d 992 (7th Cir. 2018) .............................................................................16

Praxair, Inc. v. Hinshaw & Culbertson,
   2000 U.S. Dist. LEXIS 3236 (N.D. Ill. March 9, 2000) ....................................14

Quality Oil, Inc. v. Kelley Partners, Inc.,
   657 F.3d 609 (7th Cir. 2011) ...............................................................................9

Russell v. Jim Russell Supply, Inc.,
   2000 Ill. App. 3d 855 (1990) ..............................................................................11

TAS Distrib. Co. v. Cummins Engine Co.,
   491 F.3d 625 (7th Cir. 2007) ......................................................................5, 9, 14

United Airlines, Inc. v. Chicago,
   116 Ill. 2d 311 (1987) ..........................................................................................5

W.W. Vincent & Co. v. First Colony Life Ins. Co.,
   814 N.E.2d 960 (Ill. App. 2004) ..........................................................................9

iii

*Warren Hill, LLC v. SFR Equities, LLC*,
    2019 U.S. Dist. LEXIS 23265 (E.D. Pa. Feb 8, 2019) .....................................................1, 3, 15

**STATUTES**

12 Del. C. § 3801(a), 3805(a) ............................................................................................................7

**OTHER AUTHORITIES**

*Black's Law Dictionary* (10th ed. 2014)............................................................................................7

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WARREN HILL, LLC, | : | CIVIL ACTION |
| Plaintiff, | : | 2:18-01228-HB |
| v. | : | |
| SFR EQUITIES, LLC, | : | |
| Defendant. | : | |

## DEFENDANT SFR EQUITIES, LLC'S MEMORANDUM OF LAW
## IN OPPOSITION TO WARREN HILL, LLC'S MOTION FOR SUMMARY JUDGMENT

SFR Equities, LLC ("SFR") respectfully submits this Memorandum of Law in Opposition to Warren Hill, LLC's ("Warren Hill") Motion for Summary Judgment.

## PRELIMINARY STATEMENT

In 2015, Vendor Assistance Program, LLC ("VAP") was a small, unsophisticated company with little business and small clients. Because of Warren Hill's inability to turn this company into a profitable enterprise, Warren Hill elected to sell its interest in VAP to SFR. The purchase document executed for the sale of VAP is titled the "Membership Interest Purchase Agreement" ("MIPA"). Since the execution of the MIPA, VAP turned into a sophisticated and profitable company, and also spun off certain affiliate companies which serve to promote VAP as a going concern. *See generally* Declaration of David Reape, a true and accurate copy of which is attached as Exhibit "2".

At the time of the execution of the MIPA, VAP did not generate enough revenue to justify the existence of multiple entities. VAP did not receive any certificate income because the trust certificates Warren Hill now seeks payment under were the "last money out" from any trust. Any trust that existed at the time of the MIPA's execution did not make any payments on any

1

trust certificate.  *See* Exh. "2", Reape Decl., ¶12.  Now that VAP has become a profitable company, Warren Hill seeks to extract as much money through the MIPA as possible, and seeks to use the MIPA to claw payments from funding sources not contemplated by the MIPA. Warren Hill's arguments are unsupported by the terms of the MIPA, and consequently, its Motion for Summary Judgment must be denied.

## SUMMARY OF UNDISPUTED MATERIAL FACTS

### A. BCM'S TRUST CERTIFICATE INCOME IS NOT SUBJECT TO MIPA SECTION 1.2(e), AS DETAILED IN SFR'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Much of the substance of this motion deals with the issue of trust certificate income, which Warren Hill argues is covered by MIPA Section 1.2(e).  This same subject is already addressed by SFR's Motion for Partial Summary Judgment, and the facts relevant to that motion are the same facts relevant to Warren Hill's instant argument regarding MIPA Section 1.2(e). *See* (ECF No. 73, SFR's Motion for Partial Summary Judgment Regarding Trust Certificate Income, Statement of Undisputed Material Facts).  Therefore, rather than restate these facts, SFR incorporates by reference its own Statement of Undisputed Material Facts as if set forth fully at length, and attaches a copy hereto as Exhibit "1".  These undisputed material facts entitle SFR, not Warren Hill, to summary judgment on the issue of trust certificate income.  However, if the Court finds that any of these facts are disputed, any factual dispute must be resolved at trial.

### B. THE COURT ISSUED A PRIOR OPINION ON THE ISSUE OF FEES EARNED BY BCM AND BSF, WHICH IDENTIFIED MULTIPLE ISSUES OF FACT

Warren Hill also seeks summary judgment on the issues addressed by this Court's February 8, 2019 opinion, denying SFR's Motion for Partial Summary Judgment regarding MIPA Section 1.2(d).  In that opinion, the Court considered substantial evidence extrinsic to the

2

MIPA in support of its analysis of the motion. Of importance to the Court were (1) the flow of funds through VAP and to the Bluestone entities, (2) the Illinois Vendor Payment Program terms, and (3) VAP's status as trust manager. The Court analyzed each of these issues in support of its construction of the term "Revenue". *See Warren Hill, LLC v. SFR Equities, LLC*, 2019 U.S. Dist. LEXIS 23265, at *10-11 (February 8, 2019). SFR objected to the consideration of this extrinsic evidence via Motion for Reconsideration. *See* (ECF No. 66, SFR's Motion for Reconsideration). This Court denied SFR's motion on March 15, 2019. *See* (ECF No. 68, March 15, 2019 Memorandum Regarding Motion for Reconsideration); (ECF No. 69, March 15, 2019 Order Denying SFR's Motion for Reconsideration). As part of the Court's opinion, the Court did not consider whether VAP itself considers the "Revenue" at issue its own revenue, even though VAP itself does not view management fees earned by BCM and Bluestone Finance, LLC as VAP's own revenue. This construction of the term "Revenue" contains significant factual components that must be resolved at trial. SFR is now entitled to a trial on those issues.

Since the Court's decision, SFR produced an expert report of its forensic accountant. This report concludes that VAP, BCM and Bluestone Finance, LLC are all separate and distinct business entities each established for valid business reasons. *See* Report of Edward M. Waddington, CPA, a true and accurate copy of which is attached hereto as Exhibit "3".

## C.   THE HYNES BONUS WAS AWARDED BECAUSE HIS WORK SECURED A NEW BUSINESS OPPORTUNITY FOR VAP

In 2015, VAP was struggling financially and in the process of winding down. *See* Exhibit "2", Reape Declaration, ¶18. Staff was laid off, and the company identified few new business opportunities. *Id.* at ¶19. Although certain individuals at VAP identified BCBS as a potential business opportunity (along with every other vendor to the State of Illinois), efforts to

3

develop that business were unsuccessful, and no meetings occurred with anyone at BCBS

beyond low-level staff who did not have the authority to send significant business to VAP, if at

all. *Id.* at ¶20. The highest level meeting that occurred during the initial effort was with BCBS's

Vice President of Treasury, who did not have any decision-making authority with respect to

BCBS. *Id.* at ¶21. All conversations with BCBS prior to the execution of the MIPA had been

regarding the purchase of small amounts of Illinois receivables. *Id.* at ¶22.

Following these initial failures, Brian Hynes was able to utilize his own business contacts

to obtain meetings with senior officers at BCBS, including with the company's President and

Chief Financial Officer. *Id.* at ¶24. In preparation for these meetings, Hynes also was able to

work with new financial institutions to engage different financing vehicles to meet the specific

needs of an account as large as BCBS. *Id.* at ¶25. In accordance with these meetings, Hynes

was able to pitch a deal whereby VAP could purchase 100% of BCBS' State of Illinois

receivables. *Id.* at ¶26. Hynes's ability to land this business was critical in the success of VAP

as an ongoing business enterprise. *Id.* at ¶27. Because of the prior failure to secure BCBS as a

VAP client, and because enlisting new financing sources allowed VAP to acquire new business

from BCBS that it never before sought, the VAP board determined that Hynes developed and

secured a new business opportunity, and awarded him a bonus accordingly. *Id.* at ¶28.

## D.   SFR'S COUNTERCLAIM IS NOW MOOT

SFR's counterclaim pled a miscalculation of the earnout paid to Warren Hill by SFR

under Section 1.2(d). In light of this Court's prior ruling and payments made throughout the

course of this litigation, that issue is now moot. SFR hereby reserves all its remaining legal

rights with respect to this counterclaim.

4

## LEGAL ARGUMENT

**I.   WARREN HILL IS NOT ENTITLED TO PAYMENT UNDER MIPA SECTION 1.2(E) BECAUSE THE TRUST DEPOSITORS ARE LENDERS TO THE TRUSTS, NOT TO VAP**

### A.   THE TRUSTS' LENDERS UNDER THE TRUST AGREEMENTS ARE NOT VAP'S LENDERS AS REQUIRED BY THE MIPA

Warren Hill's argument that it is entitled to payment on BCM's trust certificate income fails because it erroneously construes the financing arrangements between the trusts and their depositors as financing arrangements "among VAP and its lenders." However, none of the current trust depositors have ever had any lending relationship with VAP.

Illinois law provides that the meaning of a written contract is ordinarily a question of law and not one of fact. *Hufford v. Balk*, 113 Ill. 2d 168, 172 (1986). A court's "primary objective in construing a contract is to ascertain the intent of the parties and to give effect to that intent." *United Airlines, Inc. v. Chicago*, 116 Ill. 2d 311, 318, (1987).

It is well established under Illinois law that, "where parties formally include an integration clause in their contract (such as the one found at Section 6.1 of the MIPA), they are explicitly manifesting their intention to protect themselves against misinterpretations which might arise from extrinsic evidence." *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 636 (7th Cir. 2007) (*quoting Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882 (Ill. 1999)). Furthermore, if a "contract is facially unambiguous and contains an integration clause, the 'four corners rule' applies, barring the consideration of extrinsic evidence." *Id.* (*citing Air Safety*, 185 Ill. 2d at 462). *See also Benedict v. Fed. Kemper Life Assurance Co.*, 325 Ill. App. 3d 820, 823 (2001) ("In Illinois, contract interpretation follows the four corners doctrine so that we look only to the language of the contract to determine if it is susceptible to more than one meaning.").

5

Under Section 1.2(e) of the MIPA, "Reserve Amounts" include only the following funds:

(i)     [amounts] deposited in VAP's series 2012-1 Reserve Account,

(ii)    [amounts] deposited in any other reserve account held by, on behalf of, or for the benefit of, VAP, and/or

(iii)   held in the form of any financial instrument, in each case as may be required pursuant to the terms of any financing     arrangement among VAP and any of its lender(s).

Warren Hill argues only that it is entitled to payment on BCM's trust certificate income because, *inter alia*, it is an included reserve amount as funds "held in the form of [a] financial instrument in accordance with the terms of financing arrangements among VAP and its lenders." (Pl. Motion for Summary Judgment, ECF No. 74, Br. p. 7). This argument tracks MIPA section 1.2(e)(iii), covering "Reserve Amounts" that are "held in the form of any financial instrument, in each case as may be required pursuant to the terms of any financing arrangement among VAP and any of its lenders(s)."

As identified in SFR's Motion for Partial Summary Judgment (ECF No. 73), Warren Hill's argument fails because the trusts' financing arrangements are lending arrangements between the trusts and their banks/depositors. These arrangements involve no lending by any bank to VAP, and in fact none of the current trust depositors have had a lending relationship with VAP. Reape Declaration, ¶7.   A plain reading of this clause requires payment only regarding funds held in a financial instrument pursuant to a financing relationship between VAP and entities lending money *to VAP*.

This is not the relationship existing among VAP, BCM and the trusts.  A review of the trust documents reveals that the trusts themselves receive loans directly from a bank.  These funds are not routed through VAP, and once deposited in the trusts, are never held on VAP's behalf.  Any accounts established exist between a lender and the trusts, and the notes issued as

6

evidence of the loans are issued by the trusts and serve to obligate the trusts themselves to repay the amounts borrowed.  The certificates held by BCM are not financial instruments issued by VAP's lenders relating to VAP's borrowing money.  Instead, pursuant to Delaware trust law, the certificates confer a right to payment from the Trusts and an ownership right in the trust.  *See* 12 Del. C. § 3801(a), 3805(a).  Following the reorganization of VAP, the *only* relationship that VAP has with the trusts is as an indemnitor to, or manager of, the trusts.

There are no cases construing the term "indemnitor" interchangeably with the term "borrower", nor does a review of the definition of each term support a natural reading that the two terms are interchangeable in any way.  Black's Law Dictionary defines "borrower" as "[a] person or entity to whom money or something is lent."  *Borrower, Black's Law Dictionary*, (10th ed. 2014).  Conversely, Black's Law Dictionary defines "indemnitor" as "Someone who indemnifies another. – Also termed *indemnifier*."  *Indemnitor, Black's Law Dictionary*, (10th ed. 2014).  These terms are plainly not interchangeable.

In an attempt to place VAP in as close a proximity as possible to any lending done between the trusts and their banks, Warren Hill points the Court to a party list for the Illinois Receivables Trust, Series 2015-1, which closed on December 30, 2015, before BCM's creation. This party list, however, only identifies VAP as the trust "manager."  Nowhere does it identify VAP as the recipient of any lending by way of this agreement; Warren Hill did not included any terms of the trust agreement as part of the exhibit.

Being listed on this page alone does not make VAP a borrower under the trust agreement, nor a "borrower" of a "lender's" funds for purposes of the MIPA. The "borrower" for the purpose of this trust is the trust, itself.  Similarly, the State of Illinois, acting through the Illinois Department of Healthcare and Family Services is identified as a party to this agreement.

7

However, no money was loaned directly to the State of Illinois from any of the banks involved by virtue of the State's inclusion as a party on this agreement.  Indeed, the responsibility of VAP by virtue of this agreement is merely to manage the trust, *for which it receives a fee* totally unrelated to the funds paid to the holder of trust certificates.  VAP's role as manager is outlined in the document identified in Warren Hill's Exhibit 9 as the Management Agreement.  The management agreement does not identify VAP as a borrower.

Under these circumstances, Warren Hill presented no evidence that any of the lenders to the trusts are lenders to VAP, rendering the certificates a "financial instrument" that exists pursuant to an agreement between VAP and "its lenders".  Therefore, the trust certificate payments do not fall under MIPA Section 1.2(e), and Warren Hill's motion for summary judgment must be denied on this issue.

### B.  THE TRANSFER OF THE TRUST CERTIFICATES IS NOT RELEVANT FOR PURPOSES OF THE MIPA 1.2(E)(III) ANALYSIS

Warren Hill's motion is correct in its assertion that 1.2(e)(iii) does not speak at all to the holder of the trust certificates.  Instead, it only covers any amounts "held in the form of any financial instrument . . . pursuant to the terms of any financing arrangement among VAP and any of its lender(s)."  As previously discussed, the lenders to the trusts are not lenders to VAP, which is why trust certificate payments are not covered by Section 1.2(e) of the MIPA.  SFR does not argue that this clause only applies to financial instruments of which VAP is the exclusive holder, and Warren Hill's statement to the contrary is a misrepresentation of SFR's position.  *Compare* (ECF No. 74, Br. p. 12) (brief of Warren Hill misstating SFR's interpretation of 1.2(e)(iii) only encompasses "financial instruments [*of which VAP is the exclusive holder*]" with (ECF No. 75, Br. p. 8) (arguing that the trusts' lenders are not VAP's lenders' merely by virtue of VAP's status

8

as indemnitor to the trusts).  Instead, the banks act as depositors, loaning money *to the trusts* in

exchange for notes.  The trusts then utilize these funds to purchase State of Illinois receivables.

No money is loaned to VAP, and VAP incurs no obligation to the banks as a result of these

transactions.  Pursuant to the terms of the earlier trusts, VAP received fees as manager of the

trusts, which was its compensation for that role.

### C.    WARREN HILL'S 1.2(E) INTERPRETATION RUNS CONTRARY TO THE PLAIN LANGUAGE OF THE MIPA

Warren Hill's strained, outcome-oriented interpretation of MIPA Section 1.2(e) should be

rejected by the court because it runs contrary to basic Illinois principles of contract

interpretation.  "It is a basic principle of contract interpretation that contractual provisions are not

to be read in isolation." *Quality Oil, Inc. v. Kelley Partners, Inc.*, 657 F.3d 609, 613 (7th Cir.

2011).  "A written contract is presumed to speak to the intention of the parties who signed it and

their intentions must be determined from the language used." *W.W. Vincent & Co. v. First

Colony Life Ins. Co.*, 814 N.E.2d 960, 966 (Ill. App. 2004) (citing *Air Safety, Inc. v. Teachers

Realty Corp.*, 185 Ill. 2d 457, 462, 706 N.E.2d 882 (1999)).  The parole evidence rule generally

precludes evidence of understandings not reflected in the contract, reached before or at the time

of its execution, which would vary or modify its terms. *Eichengreen v. Rollins, Inc.*, 89 Ill. App.

3d 517, 521, 757 N.E.2d 952 (2001).  If a "contract is facially unambiguous and contains an

integration clause, the 'four corners rule' applies, barring the consideration of extrinsic

evidence." *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 636 (7th Cir. 2007) (*citing

Air Safety*, 185 Ill. 2d at 462). *See also Benedict v. Fed. Kemper Life Assurance Co.*, 325 Ill.

App. 3d 820, 823 (2001) ("In Illinois, contract interpretation follows the four corners doctrine so

9

that we look only to the language of the contract to determine if it is susceptible to more than one meaning.").

Warren Hill argues that the Court must accept its interpretation of the MIPA because, under a contrary interpretation, "SFR gets 100% of its proportionate share of the money derived from the trust certificates and Warren Hill gets 0% simply because VAP transferred the trust certificates into BCM's name . . . ." (ECF No. 74, Br. p. 13). As an initial matter, this suggested outcome runs directly against how 1.2(e) has been applied by the parties. Warren Hill already received its proportionate share of the $5 million released from the Citi Reserve Account under Section 1.2(e)(i), and any argument that SFR is attempting to pay Warren Hill nothing is belied by the facts. *See* (ECF No. 73, Br. p. 9) (discussing payment of 16.623% of $5 million to Warren Hill pursuant to MIPA Section 1.2(e)). This payment is in addition to the over $2.4 million already paid by SFR to Warren Hill under Section 1.2(d) of the MIPA. Warren Hill's argument that it is somehow not getting paid at all under the terms of the MIPA is unsupported by the facts of record.

Furthermore, engaging in this outcome-oriented interpretation runs contrary to basic principles of contract interpretation. Warren Hill itself argues that a contract may not be interpreted "in a way that is contrary to its plain and obvious meaning." (ECF No. 74, Br. p. 12) (citing *Thomson v. Gordon*, 241 Ill. 2d 428 442 (2011)). Instead of conforming to this principle, Warren Hill's suggested method of interpretation would first require the Court to take each contractual provision, then examine the books and records of VAP, BCM, BSF, and SFR, and finally, to construe each provision in a manner where Warren Hill gets paid under that specific clause, regardless of the actual language of the clause. This method of interpretation ignores Illinois law on the impact of an integration clause and the parole evidence rule, requiring the

10

Court to review substantial amounts of extrinsic evidence before interpreting the contract. There is no support for this interpretive method in the law.

Finally, Warren Hill's argument ignores the fact that, at the time the MIPA was signed, the value of any trust certificates was unknown. It was unclear that VAP would even remain a going concern. At the time the MIPA was executed, VAP was in a difficult financial condition, and was in the process of laying off employees. It did not have the funding sources to service major accounts such as BCBS, nor were such large potential accounts selling receivables like they are today. Warren Hill was certainly aware of the possibility that it could receive nothing under 1.2(e), or indeed, under any of the terms of the MIPA. Warren Hill's attempt now to pigeonhole trust certificate payments received by BCM as the trust certificate holder under 1.2(e) of the MIPA is an attempt to squeeze as much money out of the MIPA as possible; however, this attempt is not supported by the MIPA's plain language.

The MIPA earnout (of which Section 1.2(e) is a part) is a provision with intentionally limiting scope. It provides limited categories of compensation that form the basis of the earnout, which are specifically enumerated in the document. Because no provision of the MIPA requires payment to Warren Hill for trust certificate income received by BCM, there is no basis for finding that such income may be included in the earnout calculation. Because BCM trust certificate income is not included in the earnout calculation, Warren Hill's Motion for Summary Judgment must be denied.

### D.   THE CREATION OF BCM WAS A BUSINESS DECISION MADE BY VAP'S BOARD OF MANAGERS AND THE TRANSFER OF THE TRUST CERTIFICATES WAS SUPPORTED BY CONSIDERATION

As previously discussed, the creation of BCM and the transfer of trust certificates to it by VAP is not essential to Warren Hill's argument, as Warren Hill argues that it is entitled to

11

payment on trust certificates regardless of whether or not VAP or BCM is the certificate holder. Nevertheless, Warren Hill devotes considerable space to the argument that the transfer of certificates was not supported by consideration and questions whether the creation of BCM was "required" by new risk retention regulations. While the relevance to Warren Hill's position is not immediately clear, both transactions were legitimate transactions completed to accomplish stated business purposes, and there is no basis to question the legitimacy of either business decision.

1.    *The Transfer of Trust Certificates Was Supported by Consideration*

The transfer of the trust certificates was supported by valuable consideration because BCM accepted the risk of loss on the certificates in exchange for potentially receiving payments which might be made on the trust certificates. "Valuable consideration for a contract consists of some right, interest, profit or benefit accruing to one party, *or some forbearance, detriment, loss or responsibility given, suffered or undertaken* by the other." *Russell v. Jim Russell Supply, Inc.*, 2000 Ill. App. 3d 855, 860 (1990). Indeed, transfer of risk is a common subject of a contract, as the transfer of risk of loss is itself the fundamental consideration provided by an insurance company in an insurance contract. *See Epmeier v. United States*, 199 F.2d 508, 509-10 (7th Cir. 1952). "A contract does not lack mutuality because its obligations appear unequal . . . ." *Gordon v. Bauer*, 177 Ill. App. 3d 1073, 1088, 532 N.E.2d 855, 864 (1988).

In the present matter, David Reape, CEO of VAP, describes how VAP sought to involve a separate entity as the risk-bearing entity for the purchase of State of Illinois receivables. BCM was created to effectuate that purpose. The simplest way to transfer the risk of loss from VAP to BCM was through the transfer of the trust certificates. As explained by Reape and supported by the certificates themselves, the residual risk of loss to the trust was held by the certificateholders.

12

*See* Exhibit "2", Reape Decl., ¶13. The incentive for the certificateholders to take on this risk is through the potential payment on trust certificates when money flows into the trust from payments on the State of Illinois receivables. *See id,* ¶12. When the money flows in, the certificateholder payments are the "last money out," paid only after all other interest and fees to the trustee and trust manager are paid. *See id.* In consideration for this potential "last money out" of the trusts, BCM took on the risk of any losses to the trust. This acceptance of the risk was adequate consideration for the prospect of any certificateholder payments as a matter of law.

> 2.   *The Creation of BCM to Comply with Federal Risk Retention Requirements is Supported by the Factual Record*

Warren Hill's argument about the creation of BCM (made without clear purpose in their motion) misstates the purpose for its creation, which was a legitimate business decision. Warren Hill's own motion quotes SFR's prior moving papers, which stated that "BCM was created to hold trust certificates to foster compliance with the new risk retention regulations." (ECF No. 74, Br. p. 15).

Rather than adhering to this position, Warren Hill then creates a straw man argument for itself to argue against, stating that "SFR suggests that these regulations *required* the creation of BCM and the transfer of the trust certificates from VAP to BCM." (ECF No. 74, Br. p. 15). SFR has argued no such thing. SFR has repeatedly argued that (1) the creation of BCM would enable compliance with risk retention regulations, and (2) its creation provided a financial benefit to the companies involved, including VAP.

David Reape, CEO of VAP, previously explained his understanding of the risk retention regulations and the justification for the creation of BCM, and he summarizes this rationale in the Declaration attached to this motion. Specifically, Reape explained that, following the 2008

13

financial meltdown, the new regulations (promulgated pursuant to the Dodd-Frank Act, and

which went into effect in December of 2016) "required sponsors of asset backed securities to

retain a 5% economic interest in the credit risk of the securitized assets." (ECF No. 74, Br. p.

15) (quoting Reape Dep. at 206-07). Because of these regulations, Reape learned that, if VAP

were to continue to hold the trust certificates, it would have to issue an additional $5 million in

subordinated notes to put up the additional cash associated with the purchase of State of Illinois

receivables. *See* Reape Decl., ¶7. Through further conversations with counsel and the trusts'

lenders, it was determined that VAP would not need to borrow the additional funds if, instead of

holding the risk directly, the trust certificates were transferred to another entity, which was the

basis of the decision to transfer the trust certificates to BCM. *See* Reape Decl., ¶7.   After this

transfer, VAP would continue to earn additional, greater fee income from the various trusts due

to the additional receivables that could be purchased, while BCM would hold the required

economic risk through its ownership of the trust certificates, and more importantly, VAP would

not need to borrow.

     Warren Hill admits itself that this transfer of certificates has no impact on the

interpretation of MIPA Section 1.2(e), and its attempt to unjustifiably question the creation of

BCM should be rejected by this Court.

### E.   WARREN HILL DOES NOT ARGUE THAT TRUST CERTIFICATE PAYMENTS FALL UNDER ANY OTHER PROVISION OF 1.2(E) OR 1.2(D)

     Warren Hill does not argue that trust certificate payments fall within any other provision

of 1.2(e) or 1.2(d). Therefore, because a plain construction of the MIPA cannot support the

conclusion that the lenders to the trusts are *actually* lenders to VAP, payments on trust

certificates cannot be construed as "amounts . . . held in the form of any financial instrument . . .

14

as may be required pursuant to the terms of a financing arrangement among VAP and any of its lender(s)." Because Warren Hill has no other arguments that it is entitled to payment on trust certificateholder payments, its motion for Summary Judgment must be denied.

**II.    THIS COURT SHOULD DENY WARREN HILL'S MOTION FOR SUMMARY JUDGMENT ON BLUESTONE REVENUE PURSUANT TO MIPA SECTION 1.2(D)**

This Court should deny Warren Hill's motion for summary judgment on Bluestone entity revenues under MIPA Section 1.2(d) because this Court's prior opinion relied on issues of fact in coming to its conclusion, and therefore, that issue is appropriately reserved for trial. If a "contract is facially unambiguous and contains an integration clause, the 'four corners rule' applies, barring the consideration of extrinsic evidence." *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 636 (7th Cir. 2007) (*citing Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882 (Ill. 1999)). *See also Benedict v. Fed. Kemper Life Assurance Co.*, 325 Ill. App. 3d 820, 823 (2001). Conversely a dispute over an ambiguous contract is an issue for the finder of fact at trial. *See Praxair, Inc. v. Hinshaw & Culbertson*, 2000 U.S. Dist. LEXIS 3236, at *8-9 (N.D. Ill. March 9, 2000).

In its prior opinion denying SFR's initial motion for partial summary judgment, the Court considered substantial evidence extrinsic to the MIPA in support of its analysis of the motion. Included among this evidence was the (a) flow of funds between VAP and the Bluestone entities, (b) the Illinois Vendor Payment Program terms, and (c) VAP's status as trust manager, all in support of its construction of the term "Revenue". *See Warren Hill, LLC v. SFR Equities, LLC*, 2019 U.S. Dist. LEXIS 23265, at *10-11 (February 8, 2019). Because the Court relied on this extrinsic evidence to define "revenue" under the MIPA, the Court must have concluded that ambiguity existed in the contract. Because ambiguity in a contract is an issue for trial, this Court

15

should deny Warren Hill's Motion for Summary Judgment on the issue of revenue earned by the Bluestone Entities under MIPA Section 1.2(d), and reserve this issue for trial.

SFR's expert report further demonstrates that this issue is properly reserved for trial. This report of forensic accountant Edward M. Waddington, CPA, concludes that VAP, BCM and Bluestone Finance, LLC are all separate and distinct business entities each established for valid business reasons. *See* Exhibit "3," Report of Edward M. Waddington, CPA. Due to these conflicting factual issues regarding whether revenue was "earned" by VAP or BCM under MIPA Section 1.2(d), this issue should be determined at trial.

## III. THE HYNES BONUS WAS PROPERLY DEDUCTED AS A NEW BUSINESS OPPORTUNITY UNDER MIPA SECTION 1.2(d)(ii)(D)

The $3 million bonus paid to Brian Hynes was properly deducted as an expense under Section 1.2(d)(ii)(D) because the accounts landed by Hynes were new business opportunities for VAP. *See* Exhibit "2", Reape Decl., ¶28.

MIPA Section 1.2(d)(ii)(D) allows deduction of expenses from the earnout payment to the extent that they fall within the following clause:

> (D) any consulting fees paid to any member of VAP or any third party in exchange for introducing any new business opportunity to VAP, provided that such new business opportunities exclude any business involving any vendor, payee, program or party which VAP had previously investigated, transacted with or paid any consulting fee with respect to.

"A contract must be read as a whole to determine the meaning of specific phrases." *Cristoph v. BCA, LLC*, 2008 U.S. Dist. LEXIS 94256, at *13 (N.D. Ill 2008); *see also Newman v. Metro. Life Ins. Co.*, 885 F.3d 992, 998 (7th Cir. 2018) (portions of a contract may not be read in isolation, instead a contract "must be read as a whole"). A contract is read as a whole to give

16

effect to the "true intentions of the contracting parties". *First Ins. Funding Corp. v. Fed. Ins. Co.*, 284 F.3d 799, 804 (7th Cir. 2002).

Contrary to the assertion of Warren Hill, the plain intent of this clause is to specifically allow for deduction of consulting fees for introducing new business opportunities to VAP. Any reading to the contrary would significantly dis-incentivize the development of business at large, hard to land clients, such as BCBS, which runs contrary to the plain intent of this clause. The reading of this clause suggested by Warren Hill could effectively result in the prevention of *any* bonus being deducted under this clause if a list of State of Illinois vendors was compiled and cold called.

The facts of this case instead reflect that the business opportunities developed and landed by Hynes were exactly the types of business development work envisioned by this clause. VAP employees previously identified BCBS as a potential business opportunity. *See* Exhibit "2", Reape Decl., ¶20. However, this "opportunity" was with relatively low level employees, and would have involved the purchase of a relatively trivial amount of receivables. *See id.* Much later, Hynes utilized his connections in Illinois, and ultimately secured meetings with BCBS's President and Chief Financial Officer, who agreed to allow the purchase of nearly all of that company's receivables. *See id.* at ¶24. Furthermore, Hynes was able to use his contacts and connections to facilitate additional funding sources so that VAP could service large accounts. *See id.* at ¶25. Without Hynes's work, it would have been impossible for VAP to obtain business opportunities, and that business would never have been developed. *See id.* at ¶23-28. Hynes's contribution was worth far more than $3 million to VAP, because without his contributions, the company would likely have folded. This is precisely the type of bonus or consulting expense contemplated by 1.2(d)(ii)(D), and its deduction from the MIPA earnout payment was therefore

17

proper.  Under these circumstances, Warren Hill's Motion for Summary Judgment with regard to

MIPA section 1.2(d)(ii)(D) must be denied.

18

## CONCLUSION

For the reasons stated, Warren Hill fails to present any grounds for summary judgment in its favor.  Therefore, SFR respectfully requests that this Court deny Warren Hill's Motion for Summary Judgment in its entirety.

**WHITE AND WILLIAMS LLP**

BY:    /s/ Michael N. Onufrak
Michael N. Onufrak
Thomas M. Pinney
1650 Market Street | One Liberty Place,
Suite 1800 |
Philadelphia, PA 19103-7395
Phone: 215.864.7174
Attorneys for Defendant
SFR Equities, LLC

Dated:  May 9, 2019

19

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing Defendant

SFR Equities, LLC's Response in Opposition to Warren Hill's Motion for Summary Judgment

was filed under seal with the Court and served on the following counsel of record by email:

> Gregory S. Voshell, Esquire
> Elliott Greenleaf
> 925 Harvest Drive
> P.O. Box 3010
> Blue Bell, PA  19422

### WHITE AND WILLIAMS LLP


BY:   /s/ Michael N. Onufrak
> Michael N. Onufrak
> 1650 Market Street
> One Liberty Place, Suite 1800
> Philadelphia, PA 19103-7395
> Phone: 215.864.7174
> Attorney for Defendant,
> SFR Equities, LLC

Dated:  May 9, 2019

20

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| WARREN HILL, LLC, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | 2:18-01228-HB |
| | : | |
| v. | : | |
| | : | |
| SFR EQUITIES, LLC, | : | |
| | : | |
| Defendant. | : | |

**DEFENDANT SFR EQUITIES, LLC'S STATEMENT OF
UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR PARTIAL
SUMMARY JUDGMENT REGARDING ALL DIRECT PAYMENTS, PAST AND
FUTURE, TO BCM AS TRUST CERTIFICATE HOLDER**

1.    AHG Group ("AHG") is a company based in Winter Park, Florida. AHG, among other things, invests in real estate and other businesses. Gene Harris is one of three managers of AHG and the companies it owns. Declaration of Gene Harris, at ¶ 1 (hereinafter "Harris Dec.").

2.    Over the years, AHG created numerous other companies that own and manage AHG's investments. Harris Dec. at ¶ 2.

3.    One such company is SFR Equities, LLC ("SFR"). Harris is the lead Manager of SFR. As the lead Manager, he is responsible for SFR's day-to-day operations. Harris Dec. at ¶ 3.

4.    In an earlier Declaration filed on or about November 20, 2018, Harris explained that Warren Hill sold its 33.246% of the membership interests in VAP (collectively the "Interests")" to SFR effective January 1, 2016. Harris Dec., ¶4 at Exh. "A"; "MIPA", at 1.

5.    As part of the consideration for the purchase of the Interests, SFR agreed pursuant to Section 1.2(d) of the MIPA to pay a certain percentage of VAP's "Net Income" for the years 2016, 2017 and 2018, as follows:

> (d)    Further, for each of the three years following the Closing Date, Purchaser shall . . . pay Seller an amount equal to 50% of

VAP's Net Income (as defined below) allocable to the Interests for such year. "**Net Income**" is defined to mean (i) the sum of (A) any and all fees earned by VAP in its capacity as a manager or administrator of (1) the Vendor Assistance Trust and/or (2) any other trust or account maintained in the course of VAP's business, (B) any and all interest income, (C) any and all fees earned from providing services to affiliates or third parties, and (D) any and all revenues received by VAP other than the Reserve Amounts (as defined below [in section 1.2(e)] . . . .

Harris Dec. at ¶5 at Exh. "A" ("MIPA"), at 2.

6.     As part of the consideration for the purchase of the Interests, SFR agreed pursuant

to Section 1.2(e) of the MIPA to pay a certain percentage of VAP's "Included Reserve

Amounts" for the years 2016, 2017 and 2018, as follows:

(e) For purposes of this Agreement, "**Reserve Amounts**" are defined to mean any and all amounts (i) deposited in VAP's series 2012-1 Reserve Account, (ii) deposited in any other reserve account held by, on behalf of, or for the benefit of, VAP, and/or (iii) held in the form of any financing instrument, in each case as may be required pursuant to the terms of any financing arrangement among VAP and any of its lender(s). The accounts and financial instruments described in clauses (i), (ii), and (iii) of the preceding sentence are herein defined as the "**Reserve Accounts**". The balance of the 2012-1 Reserve Account as of the Closing Date is herein defined as the "**Excluded Reserve Amount**", and all other Reserve Amounts that are or become Reserve Amounts (other than any amounts that are re-deposited into an Reserve Account in satisfaction of an advance made previously from such Reserve Account) during the three year period following the Closing Date are herein defined as the "**Included Reserve Amounts**". In addition to the Purchase Price, within five days of the release of any Included Reserve Amount from any Reserve Account, Purchaser shall pay Seller an amount equal to 16.623% of such released Included Reserve Amount (each such amount, a "**Seller Included Reserve Amount**").

Harris Dec. at ¶5 at Exh. "A" ("MIPA"), at 3.

7.      Prior to 2017, VAP facilitated the creation of trusts for the purchase of State of Illinois receivables from numerous vendors through the State of Illinois Vendor Payment Program ("VPP"). *See* Harris Dec. at ¶6.

8.      Trusts, such as IRT Funding Trust 2017-4 and 201-4B were initially funded through a bank, sometimes referred to as a "Depositor." *See*, IRT Funding Trust 2017-4 and 2017-4B agreements and certificates, attached to the Declaration of Gene Harris as Exh. "K". See also, VAP Funding Amended and Restated Master Trust II Agreement, attached to the declaration of Gene Harris as Exhibit "L".

9.      The trusts would issue promissory notes to the bank in exchange for loans. *See* Exhs. "K – L".

10.     The trusts would use these funds to purchase receivables from vendors to the State of Illinois, and would subsequently be paid back by the State of Illinois at a premium, referred to as a "penalty" under the VPP. *See, e.g., id.*

11.     The trusts also issued certificates, which entitled the certificate holder to certain rights to trust assets, including the right to payment directly from the trust as the certificate holder. *See* Exhs. "K – L".

12.     Entities that did not rightfully hold title to the certificates were not entitled to certificate holder payments. *See id.*

13.     These trusts were created under Delaware law and are governed by Delaware law. *See id.*

14.     These trusts were created to facilitate borrowing under a credit facility under the VPP. *See* Certification of Gene Harris, ¶6.

15.     The trusts refer to numerous parties filling different roles other than the trust manager VAP, such as the "Trustee," "Collateral Agent," "Depositor," "Certificate Holder Representative," and "Indemnitor." *See* Exhs. "K – L".

16.     The roles of the various parties to the trusts are not governed by the VPP program terms, and the trusts' administration is not specific to the VPP program. *See* Declaration of Gene Harris, ¶ 7.

17.     The VPP terms do not require trust certificate holders to be "qualified purchasers." *Id.*

18.     In his Declaration of November 20, 2018, Harris explained why and how, after consulting with legal counsel, VAP's members decided to create a new affiliate, Bluestone Capital Markets, LLC ("BCM") as a vehicle to comply with new federal risk retention regulations and that VAP transferred all its ownership in existing trust certificates to BCM. All new trust certificates created after BCM's formation in 2017 were created in the name of BCM in 2017 and 2018. The trust Certificate Holder owns the equity or residual interest in each trust. Harris Dec., at ¶¶ 8-9.

19.     In September and October, 2017 the Boards of VAP and BCM entered into the Consent Resolutions attached to Harris's Declaration as Exhs. "B – G," respectively, transferring all VAP's ownership interest in the trust certificates created prior to 2017 in which VAP at one time maintained a residual interest to BCM. During 2017 and thereafter, all new trusts were created with BCM as the certificate holder. As a result of these transactions, BCM, holds the trust certificates which produced income for BCM in 2018 and which also will produce income for BCM in the future through receivables. Consequently, VAP no longer holds any interest in the trust certificates and does not derive any revenue from them. Harris Dec., at ¶ 9.

20.     In order to calculate the earnout for 2018 under the MIPA and to comply with Warren Hill's discovery demands in this case, Harris calculated the total amount of cash receipts earned by VAP/BCM/BSF as of December 31, 2018.  Attach to Harris's Declaration as Exh. "H" is a true and correct copy of the 2018 Cash Receipts Schedule that was created by Harris or under his supervision in which he broke down $36,420,833.26 in cash receipts of VAP/BCM/BSF in 2018.  This document was produced to Warren Hill as SFR bates stamped document 37675-37674 and was marked by plaintiff's counsel and used at the second deposition of David Reape as Warren Hill Exhibit 117.

21.     $5 million was released from the VAP Funding Master Trust Series 2012-1 reserve account in September of 2018.

22.     SFR made payment to Warren Hill pursuant to Section 1.2(e)(i) of the MIPA on this $5 million amount released from the VAP Funding Master Trust Series 2012-1 reserve account, and consequently, payments on the series 2012-1 Reserve Account are not in controversy for purposes of this motion.

23.     Harris created this Schedule from the books and records of VAP/BSF/BCM.  The document lists the cash receipts paid by the trusts managed by VAP to VAP/BSF/BCM on a monthly basis.

24.     The following cash payments were set forth on the Exhibit "H" Schedule and

constitute cash payments paid directly to Bluestone Capital Management by the trusts:

| TRUST | RECIPIENT | RECEIVED | AMOUNT |
|---|---|---|---|
| | | | |
| IRT Funding Trust – 2017 -4 Certificate | BCM | 6/18 | $1,729,839.83 |
| IRT Funding Trust – 2017-4 Certificate | BCM | 7/18 | $583,969.43 |
| IRT Funding Trust – 2017-4 Certificate | BCM | 9/18 | $1,293,748.96 |
| Citi Trust - 2012-1 VAP Master Note Trust[1] | BCM | 9/18 | $488,245.18 |
| IRT Funding Trust – 2017-4B Certificate | BCM | 12/18 | $446,088.18 |
| VAP Master Trust II Trust Certificate | BCM | 10/18 | $3,820,300.77 |
| VAP Master Trust II Trust Certificate | BCM | 11/18 | $256,003.45 |
| IRT Funding – 2017 – 4 Certificate | BCM | 12/18 | $319,247.83 |
| VAP RRT Master Trust Certificate | BCM | 12/18 | $51,172.87 |
| Citi Trust – 2012-1 VAP Master Note Trust | BCM | 12/18 | $440,814.00 |
| TOTAL | | | $9,479,397.32 |

25.     Each of the amounts set forth above were cash receipts paid directly to BCM and

were paid by wire transfer from a Trust (either Citi Trust, IRT Funding Trust 2017-4, IRT

Funding Trust 2017-4B, VAP Master Trust II or the VAP RRT Master Trust) and not through

VAP or its accounts. Harris Dec., at ¶ 13.

26.     Harris attached to his Declaration as Exh. "I" true and correct copies of the

applicable Bank of America Merrill Lynch or Bridgeview Bank statements showing the wire

transfers directly from each of the trusts mentioned above to BCM's bank account with respect

to each of the payments set forth above.  He circled each of the payments referred to in

paragraph 24 above to illustrate that the transfers were made by the Trustee, US Bank, on behalf

of the trusts to BCM. Harris Dec., at ¶ 14

---

[1] The Trustee wired three payments to BCM on September 5, 7 and 12 totaling $7,798,245.18 of this amount, $2,310,000 was money returned to BCM by the trustee since BCM pre-paid interest to the trust earlier in the year on March 19, 2018.  The balance of $5,488,245.18 constituted $5,000,000 released from the Reserve Account for Citi Trust 2012-1 and the final balance of $488,245.18 was cash receipts paid to BCM.  SFR Paid Warren Hill its share of the $5 million Reserve Account after it was released.

27.     Harris also attached to his Declaration as Exh. "J" true and correct copies of examples of Noteholder Reports documenting most of the payments to BCM. The Noteholder Reports are sent on a monthly or weekly basis by a trustee to VAP. These Noteholder Reports reflect that each of the payments above were cash receipts paid to BCM. A comparison of examples of the Noteholder Reports to the BCM Bank Statements and the Cash Receipts Schedule, shows that the examples of the payments tie together and were made during the month set forth on the Cash Receipts Schedule in 2018 via wire transfers by the trustee directly to BCM (and were not paid to VAP first). Harris Dec., at ¶ 15.

28.     The reason these payments were made directly to BCM is because, as previously disclosed to the Court in SFR's Motion for Partial Summary Judgment all trust certificates originally issued in the name of VAP prior to 2017 were assigned by VAP to BCM in exchange for BCM assuming the responsibility for holding the certificates. See, Exhs. "B" – "G" above. Also, all new trust certificates created in 2017 or later, like those issued under IRT Funding Trust – 2017-4 and 4B, were issued in the name of BCM. Harris Dec., at ¶ 16.

29.     The examples of the Noteholder Reports reveal that the certificate holder payments had no relationship to the deposit or release of funds from any reserve account addressed by the MIPA. *See* Exhibit "J".

30.     Each of these examples of Noteholder Reports reveals that certificate holder payments were separate payments from any deposits of funds into a reserve account or release of funds from any trust reserve account. *Id.*

31.     The October 31, 2018 Noteholder Report for the VAP Funding Master Trust II reveals a $2,168,580.62 payment was made to the Manager/Certificate Holder. *Id.*

32.     That report reflects a release of only $429,406.58 from the reserve account. *Id.*

33.    The September 7, 2018 IRT Funding Trust Series 2017-4B Noteholder Report reflects a payment of $1,293,748.96 to the Certificate Holder Representative, but does not reflect the existence of a reserve account within that trust. *Id.*

34.    None of the Noteholder Reports reflect a relationship between any reserve account and any certificate holder payment. *Id.*

35.    None of the examples of Reserve Accounts, to the extent they are contained within any trust, are identified as being held by, on behalf of, or for the benefit of VAP. *Id.*

36.    Article IV of the VAP Funding Master Trust II Amended and Restated Trust Agreement describes the initial funding of the trust in Article IV, stating, "[o]n each Funding Date, upon receipt of funds deposited by the Bank in the Funding Account in accordance with a related Notice of Loan and Funding Request, the Trustee shall withdraw from the Funding Account and transfer to the Vendor Payment Account, at the direction of the Manager on behalf of the Trust . . . for distribution to the related Vendors . . . ." *See* Exhibit "L."

37.    "Funding Account" is defined as "the segregated account or accounts created and maintained pursuant to Section 5.04 of the Trust Agreement . . . ." *Id.*

38.    The Amended and Restated Trust Agreement describes in various locations the establishment of a "Revolving Credit Agreement", which is defined in the definitions appendix as "the Revolving Credit Agreement . . . by and between the Trust and the Bank." *Id.*

39.    The Notes issued pursuant to this agreement similarly identify the Trust as the issuer of Notes to facilitate trust funding. *See, id.,* Class "A" Note Purchase Agreement, excerpted from VAP Funding Master Trust II Amended and Restated Trust Agreement.

40.     This is similar to the obligations described within the latter trusts established after the formation of BCM, which describe Barclays as the "Depositor," BCM as the Certificate Holder Representative, and VAP merely as the "Indemnitor." *See* Exhibit "L".

41.     Furthermore, under these circumstances, all cash receipts and future receivable payments made or to be made to BCM as trust certificate holder do not constitute "Net Income" for purposes of Section 1.2(d) of the MIPA, and should not be included in any present or future payment to Warren Hill under the MIPA.

42.     Under the circumstances, the 2018 cash payments from the trusts to BCM set forth in Paragraph 24 above, as well as any future receivable payments on trust certificates, do not constitute revenue from "Included Reserve Amounts" for purposes of Section 1.2(e) of the MIPA and should not be included in the calculation of the 2018 earnout or any future payment. The cash payments described above were not (i) "deposited in VAP's series 2012-1 Reserve Account"; (ii) "deposited in any other reserve account held by, on behalf of, or the benefit of VAP"; and/or (iii) held in the form of any financing instrument, in each case as may be required pursuant to the terms of any financially arrangement among VAP and any of its leaders."

                                                        WHITE AND WILLIAMS LLP

                                                        By:   /s/ Michael N. Onufrak
                                                            Michael N. Onufrak
                                                            Thomas M. Pinney
                                                            1650 Market Street, Suite 1800
                                                            Philadelphia, PA 19103
                                                            (215) 864-7174
                                                            Attorney for Defendant
                                                            SFR Equities, LLC

Dated: April 25, 2019

-9-

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WARREN HILL, LLC | CIVIL ACTION |
| Plaintiff, | |
| | 2:18-cv-01228 - HB |
| v. | |
| | JURY TRIAL DEMANDED |
| SFR EQUITIES, LLC | |
| Defendant. | |

## DECLARATION OF GENE HARRIS IN SUPPORT OF THE MOTION FOR PARTIAL SUMMARY JUDGMENT OF SFR EQUITIES, LLC REGARDING ALL DIRECT PAYMENTS, PAST AND FUTURE, TO BCM AS TRUST CERTIFICATE HOLDER

I, Gene Harris, pursuant to 28 U.S.C. §1746, under penalty of perjury, hereby declare as follows:

1.     I am one of three managers of the AHG Group ("AHG") and the companies it owns. AHG is a company based in Winter Park, Florida. AHG, among other things, invests in real estate and other businesses.

2.     Over the years, AHG created numerous other companies that own and manage AHG's investments.

3.     One such company is SFR Equities, LLC ("SFR"). I am one of three Managers and the lead Manager of SFR. As the lead Manager, I am responsible for SFR's day-to-day operations.

4.      In my Declaration dated November 20, 2018, I explained the history of how SFR became interested in purchasing Warren Hill's ownership interest in VAP pursuant to the Membership Interest Purchase Agreement ("MIPA") attached hereto as Exhibit "A".

5.      Prior to 2017, VAP facilitated the creation of trusts for the purchase of State of Illinois receivables from numerous vendors utilizing the State of Illinois Vendor Payment Program ("VPP").

6.      These trusts were created to obtain funding to acquire the receivables.

7.      The roles of the various parties to the trusts are beyond the VPP program terms, and the trusts' administration is not specific to the VPP program.

8.      In my Declaration of November 20, 2018, I also explained why and how after consulting with legal counsel, VAP's members decided to create a new affiliate, Bluestone Capital Markets, LLC ("BCM"), as a vehicle to comply with new federal risk retention regulations and that VAP then transferred the ownership of all its trust certificates to BCM. All new trust certificates created in 2017 and 2018 after BCM's formation in 2017 were created in the name of BCM. The trust certificate holder represents the equity or residual interest in each trust.

9.      I attach to this Declaration as Exhibits "B" – "G" copies of Consent Board Resolutions entered into between the Boards of VAP and BCM in September and October 2017, transferring to BCM all the trust certificates in which VAP at one time maintained an interest. As a result of these transactions, BCM holds the trust certificates which produced income for BCM in 2018 and which also will produce residual income for BCM in the future. As a result of these transactions, VAP no longer holds any interest in any trust certificates, and does not derive any revenue from them.

2

10.     In order to calculate the amounts owed for 2018 under the MIPA and to comply with Warren Hill's discovery demands in this case, I calculated the total amount of cash receipts earned by VAP/BCM/BSF as of December 31, 2018. Attach hereto as Exhibit "H" is a true and correct copy of the 2018 Cash Receipts Schedule that was created by me or under my supervision in which I broke down $36,420,833.26 in cash receipts of VAP/BCM/BSF in 2018. This document was produced to Warren Hill as SFR bates stamped document 37675-37674 and was marked by plaintiff's counsel and used at the second deposition of David Reape as Warren Hill Exhibit 117.

11.     I created this Schedule from the books and records of VAP/BSF/BCM. The document lists the cash receipts paid by the trusts managed by VAP to VAP/BSF/BCM on a monthly basis. The Schedule also sets forth the name of the trust, the amount of the cash receipt, and the month in which it was paid.

12.     The following cash receipts are set forth on the Schedule and constitute cash receipts paid directly to Bluestone Capital Management by the trusts in 2018:

| TRUST | RECIPIENT | RECEIVED | AMOUNT |
|---|---|---|---|
| IRT Funding Trust – 2017 -4B Certificate | BCM | 6/18 | $1,729,839.83 |
| IRT Funding Trust – 2017-4B Certificate | BCM | 7/18 | $583,969.43 |
| IRT Funding Trust – 2017-4B Certificate | BCM | 9/18 | $1,293,748.96 |
| Citi Trust[1] | BCM | 9/18 | $488,245.18 |
| VAP Master Trust II Trust Certificate | BCM | 10/18 | $3,820,300.77 |
| VAP Master Trust II Trust Certificate | BCM | 11/18 | $256,003.45 |

[1] The Trustee wired three payments to BCM on September 5, 7 and 12 totaling $7,798,245.18 of this amount, $2,310,000 was money returned to BCM by the trustee since BCM pre-paid interest to the trust earlier in the year on March 19, 2018. The balance of $5,488,245.18 constituted $5,000,000 released from the Reserve Account for Citi Trust 2012-1 and the final balance of $488,245.18 was cash receipts paid to BCM. SFR Paid Warren Hill its share of the $5 million Reserve Account after it was released.

| IRT Funding Trust – 2017-4B Certificate | BCM | 12/18 | $446,088.18 |
|---|---|---|---|
| IRT Funding – 2017 – 4 Certificate | BCM | 12/18 | $319,247.83 |
| VAP RRT Master Trust Certificate | BCM | 12/18 | $51,172.87 |
| Citi Trust | BCM | 12/18 | $440,814.00 |
| TOTAL | | | $9,479,397.32 |

13.     Each of the amounts set forth above were cash receipts received directly by BCM and were paid by wire transfer from a Trust (either Citi Trust, IRT Funding Trust 2017-4, IRT Funding Trust 2017-4B, VAP Master Trust II or the VAP RRT Master Trust) and not through VAP's accounts.

14.     I attach to this Declaration as Exhibit "I" true and correct copies of the applicable Bank of America Merrill Lynch or Bridgeview Bank statements showing the wire transfers directly from the trusts mentioned above to BCM's bank account with respect to each of the cash receipts set forth above.  I circled each of the cash receipts referred to in paragraph 12 above which proves that the transfers were made by the Trustee, US Bank, on behalf of a trust to BCM.

15.     I also attach hereto as Exhibit "J" true and correct copies of examples of Noteholder Reports issued by the Trustee for each of the trusts, US Bank.  The Noteholder Reports are sent on a monthly or weekly basis by the Trustee.  If the Court will review the examples of the Noteholder Reports and compare them to the BCM bank statements and the Cash Receipts Schedule, the Court will see that the payments tie together and that the payments were made during the month set forth on the Cash Receipts Schedule in 2018 by the trusts via wire transfers by the Trustee directly to BCM (and were not paid to VAP first).

16.     These payments were made directly to BCM because, as previously disclosed to the Court in SFR's prior Motion for Partial Summary Judgment, all trust certificates originally issued in the name of VAP before 2017 were assigned by VAP to BCM in exchange for BCM

4

assuming the responsibility for holding the certificates.  Also, all new trust certificates created in 2017 or later, like those issued under IRT Funding Trust – 2017-4 and 4B, were issued in the name of BCM.  Trust certificate holders, like BCM, are not required to be qualified purchasers under the VPP.

17.     I also attach to this Declaration as Exhibit "K" copies of the trust agreements for IRT Funding Trust 2017-4 and 2017-4B which prove that VAP is the Trust Manager and BCM is the Certificate Holder for these trusts.  Also attached as Exhibit "L" is a copy of the Trust Agreement for VAP Funding Amended and Restated Master Trust II Agreement.  BCM was assigned all VAP's ownership rights in this trust as well as the Citi Trust and RRT Trusts.

18.     Under the circumstances, the cash receipts from the trusts to BCM did not constitute revenue "earned" by VAP for purposes of the MIPA and should not be included in the calculation of the 2018 earnout.  The cash receipts described above were "earned" exclusively by BCM.

19.     As part of the consideration for purchase of Warren Hill's membership interests in VAP from Warren Hill, SFR agreed to pay a certain percentage of VAP's "Included Reserve Amounts" for the years 2016, 2017 and 2018, as follows:

> (e) For purposes of this Agreement, **"Reserve Amounts"** are defined to mean any and all amounts (i) deposited in VAP's series 2012-1 Reserve Account, (ii) deposited in any other reserve account held by, on behalf of, or for the benefit of, VAP, and/or (iii) held in the form of any financing instrument, in each case as may be required pursuant to the terms of any financing arrangement among VAP and any of its lender(s).  The accounts and financial instruments described in clauses (i), (ii), and (iii) of the preceding sentence are herein defined as the **"Reserve Accounts"**.  The balance of the 2012-1 Reserve Account as of the Closing Date is herein defined as the **"Excluded Reserve Amount"**, and all other Reserve Amounts that are or become Reserve Amounts (other than any amounts that are re-deposited into an Reserve Account in satisfaction of an advance made

5

previously from such Reserve Account) during the three year period following the Closing Date are herein defined as the **"Included Reserve Amounts"**. In addition to the Purchase Price, within five days of the release of any Included Reserve Amount from any Reserve Account, Purchaser shall pay Seller an amount equal to 16.623% of such released Included Reserve Amount (each such amount, a **"Seller Included Reserve Amount"**).

See, Exhibit "A" attached hereto ("MIPA"), at 3.

20.     As of December 31, 2018, BCM as certificate holder for the trusts described above held trust certificate receivables in the approximate amount of $13 million. These receivables eventually will be paid to BCM, not VAP.

21.     These receivables, when paid to BCM, will not constitute "an amount deposited into and released from VAP's 2012-1 Reserve Account" under Section 1.2(e)(i). SFR already made payment to Warren Hill based on amounts released from VAP's 2012-1 Reserve Account pursuant to Section 1.2(e)(i) in September, 2018 in the amount of $633,670.00.

22.     These receivables are also not amounts that were ever "deposited into any other reserve account held by, on behalf of, or for the benefit of, VAP" for purposes of Section 1.2(e)(ii).

23.     These receivables are not amounts "held in the form of any financing instrument pursuant to the terms of any financing arrangement among VAP and any of its lenders" for purposes of Section 1.2(e)(iii). All of the financing arrangements undertaken by VAP and BCM are based upon loans from banks to the individual trusts, not loans to VAP.

24.     These receivables of BCM are not "Net Income" of VAP, because these receivables, when paid, will go directly to BCM. VAP has no rights in these receivables, and these receivables will not be routed through any of VAP's accounts.

6

25.     No other cash receipt payments made to BCM, or BCM receivables relating to the trust certificates, received to date or in the future, fall within MIPA Section 1.2(d) or (e) since all such payments have been, or will be made, directly to BCM, and not through VAP.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed this 25 day of    April    , 2019.


BY: _____
    Gene Harris


DATE: April 25, 2019

7

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WARREN HILL, LLC | CIVIL ACTION |
| Plaintiff, | 2:18-cv-01228 - HB |
| v. | JURY TRIAL DEMANDED |
| SFR EQUITIES, LLC | |
| Defendant. | |

### DECLARATION OF DAVID REAPE IN SUPPORT OF SFR EQUITIES, LLC'S OPPOSITION TO WARREN HILL, LLC'S MOTION FOR SUMMARY JUDGMENT

I, David Reape, pursuant to 28 U.S.C. §1746, under penalty of perjury, hereby declare as follows:

1.      I am the Chief Executive Officer of Vendor Assistance Program ("VAP"), Blue Stone Finance ("BSF") and Bluestone Capital Markets ("BCM"). In this role, I am familiar with certain facts underlying this lawsuit.

2.      I am familiar with the formation of each company and each company's business operations. I am also familiar with the structure and operation of the various trusts with which VAP and BCM are involved.

3.      BCM was formed in March of 2017. The board of VAP determined that the formation of BCM would be advantageous from both a business and legal perspective.

4.      Specifically, it was determined that forming BCM and utilizing it as a separate company responsible for holding trust certificates would help foster compliance with new federal risk retention rules.

    5.     These risk retention rules were promulgated in October 2014 by various regulatory agencies and governed risk retention requirements for asset-backed securities. The rules were promulgated pursuant to the Dodd-Frank Act, and went into effect in December of 2016.

    6.     I developed an understanding of the requirements of these rules through reading client alerts from various lawyers I had professional relationships with and through discussions with VAP lawyers. I came to understand that the new rules would generally require the sponsor of an asset backed security transaction to retain an economic interest equal to at least five percent of the aggregate credit risk of the assets collateralizing an issuance. Although not the specific alerts I relied upon, the style and substance of the information we reviewed is similar to publicly available alerts issued from various law firms that I identify in footnote 1 below.[1]

    7.     Based upon my discussion with VAP's legal counsel and the lenders to the trust pools, I concluded that, if VAP was to continue to hold the trust certificates, it would have to issue an additional $5 million in subordinated notes to put up additional cash associated with the transactions to purchase State of Illinois receivables. These lenders to the trust pools (specifically, Barclays, Bank of America, Citibank, and Rosemawr) are lenders to the trusts only, and are not lenders to VAP.

    8.     Ultimately, I determined with the advice of counsel and instructions of the trusts' lenders that the involvement of an affiliated company as certificateholder would not require VAP to take on additional debt or front additional cash.

---

[1] *See, e.g.,* Andrew M. Faulkner, *Regulators Adopt Financial Risk Retention Rules for Asset-Backed Securities,* (Jan. 2015), *available at*
https://www.skadden.com/insights/publications/2015/01/regulators-adopt-final-risk-retention-rules-for-as; Charles A. Sweet, *Guide to the Credit Risk Retention Rules for Securitizations, available at*
https://www.morganlewis.com/~/media/files/handouts/final_risk_retention_guide_handout.ashx

9.     VAP's board of managers determined that BCM should be created to serve this function, and to exist as the company that would hold various risks separate and apart from VAP.

10.     In the discussions surrounding the creation of BCM, summarized above, the Warren Hill, LLC earnout payment was never raised, nor was it ever identified as a factor in favor of or against the creation of BCM.

11.     The trust certificates are functionally subordinated financial instruments within the trust's legal framework.

12.     The certificateholders are not entitled to payment unless and until a certain amount of money flows into the trust and the trust's other obligations are met, such as management and administration fees. As such, they are, in effect, the proverbial "last money out" of these trusts.

13.     In addition, the certificateholders are the parties that hold the primary risk of losses if the trusts are not to be paid.

14.     The certificates themselves are ultimately securities that entitle the holder to residual payments. When a certain amount of cash flows into a certain trust so that all of the trust's other obligations and fees are satisfied, payment is automatically made directly from the trust's bank account to the certificateholder.

15.     When BCM was formed, it was recognized that, as the entity to be responsible for holding and managing the risk related to the purchased receivables, it would be the entity that would hold the trust certificates.

16.     As such, all certificates held by VAP in 2017 were transferred to BCM, and all new certificates created later in 2017 and in 2018 were issued directly to BCM.

3

17.     In exchange for the benefit of payment on the certificates taken on by BCM, BCM also took on the risk of losses to the trusts.

18.     In 2015, VAP was struggling financially, and was in the process of effectively winding down.

19.     Staff was laid off, and the company identified few new business opportunities.

20.     Although certain individuals at VAP identified Blue Cross/Blue Shield of Illinois as a potential business opportunity, any efforts to actually develop that business were completely unsuccessful, and VAP was unable to get meetings with anyone at the company beyond treasury management staff who did not have the authority to send significant business to VAP, if at all.

21.     The highest-level meeting obtained during this initial effort was with the Vice President of Treasury who did not have any decision-making authority with respect to the Blue Cross/Blue Shield of Illinois State of Illinois Receivables.

22.     Any discussions during these meetings surrounded the purchase of a small percentage of Blue Cross/Blue Shield of Illinois's State of Illinois Receivables.

23.     Ultimately, these efforts to enlist Blue Cross/Blue Shield of Illinois were unsuccessful.

24.     Following the failure of these efforts, and based on his own initiative, Brian Hynes was able to utilize his own business contacts to obtain meetings with senior officers at Blue Cross/Blue Shield of Illinois, including meetings with the company's President and Chief Financial Officer.

25.     In preparation for these meetings, Mr. Hynes also was able to work with new financial institutions to engage different financing vehicles to meet the specific needs of an account as large as Blue Cross/Blue Shield of Illinois.

4

26.     As a result of these meetings, Mr. Hynes was able to create an ongoing program to purchase 100% of Blue Cross/Blue Shield of Illinois's State of Illinois Receivables.

27.     Mr. Hynes's ability to land Blue Cross/Blue Shield of Illinois as a VAP client was critical in the success of VAP as an ongoing business enterprise.

28.     Because of the prior failure to secure Blue Cross/Blue Shield of Illinois as a VAP client, and because of the completely new financing sources arranged in order to land this business, the VAP board determined that Mr. Hynes developed and secured a new business opportunity, and awarded him a bonus accordingly.

I declare under the penalty of perjury that the foregoing is true and correct. Executed this 8th day of _____MAY_____, 2019.

BY: _____
        David Reape

DATE:____5/8/19_____

EXHIBIT 3



ADVISORY ▲ CONSULTING

March 14, 2018

Michael Onufrak, Esquire
White and Williams LLP
One Liberty Place
1650 Market Street, Suite 1800
Philadelphia, PA 19103-7395

**Re:     Warren Hill, LLC v. SFR Equities, LLC**
**USDC for Ed. PA 2:18-cv-01228HB**
**CONFIDENTIAL**

Dear Mr. Onufrak:

Marcum LLP has been engaged by White and Williams LLP on behalf of SFR Equites, LLC ("SFR") in connection with the above captioned matter involving claims arising out of SFR's purchase of Warren Hill, LLC's ("Warren Hill") interest in Vendor Assistance Program, LLC ("VAP").

In forming my opinions in this matter, I have considered the documents identified within this report and deposition testimony. The findings and opinions expressed in this report are solely intended for use by Counsel in this matter. The procedures and analyses performed in connection with this engagement do not constitute an audit, review or other attestation engagement as described in authoritative literature promulgated by the American Institute of Certified Public Accountants (AICPA). This engagement is for litigation services and was conducted in accordance with Statements on Standards for Consulting Services issued by the AICPA.

I am a Certified Public Accountant and a Partner of the accounting firm Marcum LLP with 35 years of professional experience providing accountant, tax and valuation services for closely held entrepreneurial companies and the analysis and measurement of damage calculations in commercial disputes. My curriculum vitae is included as **Attachment 1**.

Marcum LLP is being compensated at our standard hourly rates on this engagement. The firm's fees are not contingent upon the outcome of this matter or the opinions expressed herein. We reserve the right to supplement or amend our report based upon the receipt and analysis of any additional information

We have been asked to review and inspect relevant corporate and financial records to ascertain whether VAP and affiliated entities, Bluestone Capital Markets, LLC ("BCM"), and Blue Stone Finance, LLC ("BSF") maintained organizational, operational and financial records as separate and distinct entities. We have been asked by Counsel to consider the following relevant factors:



**Marcum LLP** ▪ 1601 Market Street ▪ 4th Floor ▪ Philadelphia, PA 19103 ▪ **Phone** 215.297.2100 ▪ **Fax** 215.297.2101 ▪ **www.marcumllp.com**

Michael Onufrak, Esquire
March 14, 2019
Page 2

- Ownership of the entities;

- Identity of the Board of Managers; and

- Observation of corporate formalities, including the maintenance of separate corporate and financial records, such as operating agreements, tax returns, financial statements, general ledgers, Board of Managers meetings and minutes, consent resolutions, and Services Agreements.

## 1.   **Entity Creation and Background**

VAP was formed on September 23, 2010 by Brian Hynes as a limited liability company and filed its Articles of Organization with the State of Illinois.[1,2]  VAP is a specialty finance company that is paid fees for managing trusts that purchase receivables owed by the State of Illinois to its vendors.[3]  The business and affairs of VAP are managed by its Board of Managers, who direct, manage and control the business and all decisions shall be made by a majority vote of the Board of Managers.[4]

Warren Hill, LLC was a Member of VAP and wished to sell its ownership interest.[5]  Effective January 1, 2016, SFR Equities, LLC ("SFR") as Purchaser, Warren Hill as Seller, and others[6] executed a Membership Interest Purchase Agreement ("MIPA"), whereby SFR acquired Warren Hill's 33.246% interest in VAP.[7,8]

In late 2016, new Federal regulations were enacted[9] that required VAP to separate ownership of trust certificates from core qualified purchaser services that VAP provided.  Pursuant to this new requirement, VAP's Board of Managers created a new entity, BCM, to comply with the regulations.[10]  BCM was formed on March 15, 2017 and filed its Articles of Organization with the State of Florida.[11]

---

[1] Declaration of Brian F. Hynes dated November 20, 2018, paragraph 1.
[2] Office of the Illinois Secretary of State LLC File Detail Report
[3] Declaration of Brian F. Hynes dated November 20, 2018, paragraph 1.
[4] Second Amended and Restated Operating Agreement of Vendor Assistance Program, LLC dated September 21, 2012 (SFR 23246).
[5] Declaration of Gene Harris dated November 20, 2018, paragraph 5.
[6] Jacqueline Delaney, Jason Cannon, (with Warren collectively "Seller Parties"), James Delaney, VAP, Healthcare Finance, LLC, and Brian Hynes.
[7] Member Interest Purchase Agreement dated January 1, 2016 (SFR 23492).
[8] As part of the MIPA, SFR agreed to pay Warren Hill an earn out based on VAP's net income (as defined in the MIPA), for the three years following the closing date (December 31, 2016, 2017 and 2018).
[9] Credit risk retention requirements under Section 150 of the Exchange Act, as added by Section 941 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (Series 2017-1 Risk Retention Agreement dated June 21, 2017 SFR 23673).
[10] Declaration of Brian F. Hynes dated November 20, 2018, paragraph 5.
[11] Florida Department of State Division of Corporations.

**CONFIDENTIAL**

Michael Onufrak, Esquire
March 14, 2019
Page 3

BSF was formed March 13, 2017 as a limited liability company, and filed its Articles of Organization with the Department of State of the Commonwealth of Puerto Rico.[12]

## 2. **Corporate and Financial Records**

    *a. Formation and Operating Agreements*

We have reviewed the formation documentation for each of the entities, VAP, BCM and BSF, and found that they were separate limited liability companies, filing their own Articles of Organization with their respective states, and had their own operating agreements governing their operations.

VAP was formed on September 23, 2010 as a limited liability company and filed its Articles of Organization with the State of Illinois. VAP has its own Operating Agreement, governing its business operations and its Members' financial and managerial rights and duties. VAP executed its Second Amended and Restated Operating Agreement effective September 21, 2012.[13,14] Section 6.1 of this Agreement lists the following officers of VAP:

| | |
|---|---|
| David Reape | Chief Executive Officer |
| Pattis Solis Doyle | President |
| Mitch Johnson | Chief Financial Officer |
| Jeff Balvanz | Chief Information Officer |
| Drew Delaney | Vice President and Secretary |

BCM was formed on March 15, 2017 as a limited liability company and filed its Articles of Organization with the State of Florida. BCM has its own Operating Agreement governing its business operations and its Members' financial and managerial rights and duties. BCM executed its Operating Agreement effective March 15, 2017. Exhibit A to the Operating Agreement lists BCM's Members and their percentage interests as follows:[15]

---

[12] Operating Agreement of Blue Stone Finance LLC (SFR 23174).

[13] Second Amended and Restated Operating Agreement of Vendor Assistance Program, LLC dated September 21, 2012 (SFR 23246).

[14] There has not been a subsequent or amended Operating Agreement of VAP since the Second Amended and Restated Operating Agreement of Vendor Assistance Program, LLC dated September 21, 2012. The Second Amended and Restated Operating Agreement requires that all members consent to any amendments or any replacement agreements, and Manchester Securities does not want to spend time reviewing new agreements. (Deposition of David Reape dated October 15, 2018, p.36-37)

[15] These percentage interests are as of March 15, 2017. Subsequent changes may have occurred.

**CONFIDENTIAL**

Michael Onufrak, Esquire
March 14, 2019
Page 4

| | |
|---|---|
| SFR Equities, LLC | 43.17% |
| CHGO Real Estate Consulting Group, LLC | 33.56% |
| Nai Ark Funding, LLC | 13.53% |
| Howard & Howard Attorneys, PLLC | 5.00% |
| Manchester Securities Corp | 1.36% |
| Beresford Energy Corp | 2.88% |
| The Eleven Corp | 0.50% |
| **Total** | **100.00%** |

Exhibit B to the Operating Agreement list BCM's Managers as follows:

- Brian Hynes (CHGO Real Estate Consulting Group, LLC representative)
- Gene Harris (SFR Equities, LLC representative)
- Malcom Weems (CHGO Real Estate Consulting Group, LLC representative)
- David Reape (NAI Ark Funding, LLC representative)
- Mark Ryerson (Howard & Howard Attorneys PLLC representative)
- Marty Martin (representative elected by majority of the other Managers)

BSF was formed March 13, 2017 as a limited liability company and filed its Articles of Organization with the Department of State of the Commonwealth of Puerto Rico. BSF also has its own Operating Agreement governing its business operations and its Members' financial and managerial rights and duties. BSF executed its Operating Agreement effective September 5, 2017. Exhibit A to the Operating Agreement lists BSF's Members and their percentage interests as follows:[16]

| | |
|---|---|
| SFR Equities, LLC | 45.08% |
| CHGO Real Estate Consulting Group, LLC | 35.04% |
| Nai Ark Funding, LLC | 14.13% |
| Howard & Howard Attorneys, PLLC | 5.23% |
| The Eleven Corp | 0.52% |
| **Total** | **100.00%** |

Exhibit B to the Operating Agreement list BSF's Managers as follows:

- Brian Hynes (CHGO Real Estate Consulting Group, LLC representative)
- Gene Harris (SFR Equities, LLC representative)
- Malcom Weems (CHGO Real Estate Consulting Group, LLC representative)

---

[16] These percentage interests are as of September 5, 2017. Subsequent changes may have occurred.

**CONFIDENTIAL**

Michael Onufrak, Esquire
March 14, 2019
Page 5

- David Reape (NAI Ark Funding, LLC representative)
- Mark Ryerson (Howard & Howard Attorneys PLLC representative)
- Marty Martin (representative elected by majority of the other Managers)

*b.  Tax Returns*

We have reviewed the income tax returns for each of the entities, VAP, BCM and BSF, and have found that each has its own Employer Identification Number and each entity filed its own separate income tax returns.

We were provided with VAP's Federal Form 1065 U.S. Return of Partnership Income for both 2016 and 2017.[17] VAP's address was listed as 1201 N. Clark Street, Suite 201, Chicago, IL 60610-6526. The returns identify VAP's Employer Identification Number as 27-3531523, its principal business activity as Finance and Insurance and its principal products or services as Vendor Financing. As of December 31, 2017, the Form K-1s reported the following profit, loss and capital share percentages:[18]

| | |
|---|---|
| SFR Equities, LLC | 43.17% |
| Chicago Real Estate Consulting Group, LLC | 33.56% |
| Nai Ark Funding, LLC | 13.53% |
| Howard & Howard PLLC | 5.01% |
| Manchester Securities Corp | 4.24% |
| The Eleven Corp, Ltd | 0.50% |
| **Total** | **100.00%** |

We were provided with BCM's Federal Form 1065 U.S. Return of Partnership Income for 2017.[19] BCM's address was listed as 700 West Morse Blvd, Suite 220, Winter Park, FL 32789. The return identifies BCM's Employer Identification Number as 32-0521594, its principal business activity as Finance and Insurance and its principal products or services as Factoring Receivables. As of December 31, 2017, the Form K-1s reported the following profit, loss and capital share percentages:[20]

---

[17] SFR 00429 and SFR 00454
[18] These share percentages are as of December 31, 2017. Subsequent changes may have occurred.
[19] SFR 00512
[20] These share percentages are as of December 31, 2017. Subsequent changes may have occurred.

**CONFIDENTIAL**

Michael Onufrak, Esquire
March 14, 2019
Page 6

| | |
|---|---|
| SFR Equities, LLC | 43.17% |
| Chicago Real Estate Consulting Group, LLC | 33.56% |
| Nai Ark Funding, LLC | 13.53% |
| Howard & Howard PLLC | 5.00% |
| Manchester Securities Corp | 1.36% |
| Beresford Energy Corp | 2.88% |
| The Eleven Corp, Ltd | 0.50% |
| **Total** | **100.00%** |

We were provided with BSF's Income Tax Return for Exempt Businesses under the Puerto Rico Incentives Programs Industrial Development for 2017.[21]  BSF's address was listed as 270 Munoz Rivera Ave, Suite 1130, San Juan, Puerto Rico 00918.  The return identifies BSF's Employer Identification Number as 66-0875921, its principal industry or business activity as Financial Services.

### c.  Financial Statements

We reviewed the audited financial statements for the entities, VAP, BCM and BSF.

We were provided with VAP's audited financial statements for the year ended December 31, 2016.[22]  The financial statements were audited by RSM US LLP and the auditors' issued an unqualified report on September 28, 2017.

We were provided with the audited financial statements of BCM and Affiliates for the year ended December 31, 2017, which included the separate legal entities VAP and BSF.[23]  The financial statements were audited by RSM US LLP and the auditors' issued an unqualified report on June 26, 2018.  Although BCM, VAP and BSF were separate legal entities, in accordance with Generally Accepted Accounting Principles, the financial statements were presented on a consolidated basis.

### d.  Financial Reporting Package

VAP, BCM and BSF each maintained its own financial records in QuickBooks.[24]  QuickBooks is an accounting software package that is used to maintain the daily financial business transactions of an entity.  Additionally, we were provided with the 2018 monthly trial balances for VAP, BCM and BSF.[25]  These files indicate that each entity maintained its own general ledger, providing a separate record of financial transactions.

---

[21] SFR 00544
[22] SFR 00402
[23] SFR 00415
[24] Deposition of Alan Wilson dated October 16, 2018, p. 38-39.
[25] SFR 37652, SFR 37612 and SFR 37631

**CONFIDENTIAL**

Michael Onufrak, Esquire
March 14, 2019
Page 7

Furthermore, the trial balances for VAP, BCM and BSF indicate that each entity had separate bank accounts. The trial balances indicate the following banking relationships:

| VAP | North Shore and Bridgeview Banks |
| BCM | Bank of America and Bridgeview Bank |
| BSF | Banco Popular |

   e.   *Board of Managers Minutes and Corporate Resolutions*

We reviewed documentation provided formalizing the activities of Board of Managers of VAP, BCM and BSF. VAP held Board of Managers Meetings with minutes providing a written record of the proceedings, and executed and approved Consent of Managers resolutions. BCM and BSF executed and approved Consent of Managers resolutions.

   f.   *Services Agreements*

We reviewed documentation provided relating to operational activity between VAP, BCM and BSF. Intercompany services between the entities were formally governed by various Services Agreements that were executed on behalf of each entity. These agreements were as follows:

- Services Agreement between VAP and BCM dated November 1, 2017 and included services related to financing activities;[26]
- Services Agreement between VAP and BSF dated November 1, 2017 and included services related to vendor and receivable due diligence and trust activities;[27] and
- Services Agreement between BCM and BSF dated November 1, 2017 and included services related to financing and trust activities.[28]

## 3.  **Conclusion**

We reviewed the relevant corporate and financial records of VAP, BCM and BSF, including but not limited to, formation documentation, operating agreements, tax returns, financial statements, internal financial reports, Board of Managers meetings and minutes, consent resolutions, and Services Agreements. It is my opinion that VAP, BCM and BSF operated and maintained separate and distinct financial, corporate and tax compliance documentation for each entity.

---

[26] SFR 23294
[27] SFR 23303
[28] SFR 23655

**CONFIDENTIAL**

Michael Onufrak, Esquire
March 14, 2019
Page 8

Opinions and conclusions expressed in this correspondence are based upon analysis of information described herein and are expressed to a reasonable degree of professional certainty.

I reserve the right to supplement or amend this report if additional documents and/or information becomes available that affects findings and conclusions expressed herein.

Sincerely,

Edward M. Waddington, CPA

**CONFIDENTIAL**

# ATTACHMENT 1

# CV 

# Edward M. Waddington, CPA

### Office

1601 Market Street, 4th Floor
Philadelphia, PA 19103
Phone: (215) 297-2100
edward.waddington@marcumllp.com

### Areas of Expertise

- Business Acquisitions and Dispositions
- Business Valuation
- Civil and Criminal Tax Controversies
- Estate Planning
- Financial Accounting and Tax Reporting and Compliance
- Litigation Support
- Qui tam Related Tax Issues
- White Collar Crime

### Certifications

- CPA Licensed in PA

### Professional Affiliations

- American Institute of Certified Public Accountants
- Pennsylvania Institute of Certified Public Accountants
- National Association of Certified Valuators and Analysts

### Educational Background

- B.S. Accounting- LaSalle University

## Partner – Philadelphia Office / Advisory Services

Edward Waddington is a partner in Marcum's Philadelphia office and a member of the Firm's Advisory Services division. He came to Marcum in 2015 via the Firm's merger with Smart Devine, (formerly Nihill & Riedley, PC) a leading full-service accounting firm in Philadelphia.

Mr. Waddington has more than 30 years of experience advising clients on numerous facets of financial and tax reporting in addition to representing a wide range of individuals and businesses in litigated financial disputes and civil and criminal investigations. Mr. Waddington's prior experience managing traditional accounting and tax services with a client base of closely-held entrepreneurial businesses has provided technical expertise and transactional insight to effectively investigate civil and criminal financial disputes involving tax controversies, business valuations, commercial damages and professional malpractice actions.

Since 1986, his testimony as an expert in matters involving accounting and tax issues, commercial damages and business valuations has been accepted on numerous occasions in United States District Courts; Pennsylvania Court of Common Pleas; Superior Court of New Jersey Chancery Division; United States Tax Court; United States Bankruptcy Court; Pennsylvania Department of Health & Human Services; Pennsylvania Board of Revenue and Finance and various arbitration and administrative proceedings.

Mr. Waddington speaks frequently at industry conferences, and throughout his career, he has continuously been involved with numerous civic and charitable organizations in leadership roles. He currently serves as a member of the Board of Trustees for The Library Company of Philadelphia and recently was an officer on the Board of Directors of LaSalle University's Alumni Association.

### Relevant Experience:

- Extensive experience in providing tax, accounting and operational advice to closely-held entrepreneurial businesses including income and estate tax planning, entity structure and ownership changes.

- Responsible for adversarial valuation engagements involving dissenting shareholder actions and ownership disputes, marital dissolution, and business value impairment. Engagements include the forensic analysis of underlying financial records, and business valuation of ownership interest in privately-held companies in numerous industries with valuations exceeding $100 million.

- Frequently responsible for criminal and civil tax investigations involving disputes with various governmental units and administrative agencies involving individual tax, business tax, sales and use tax, estate tax and Internal Revenue Service Offshore Voluntary Disclosure Program.

- Responsible for commercial damages involving contract and business disputes. Also, frequently engaged to defend and/or prosecute professional malpractice actions.



# CV

# Edward M. Waddington, CPA

**Prior Experience:**

- Controller – S.T. Hudson International, Inc.
- Assistant Manager, National Dealer Development – Subaru of America, Inc.
- Senior Tax Accountant – Subaru of America, Inc.
- Accountant – Philadelphia Ship Maintenance Company, Inc.
- Investigative Co-Op – United States Department of Labor, Organized Crime and Racketeering Section

## Testimony as an Expert Witness at Trial(T) or by Deposition(D) (since 2011):

- Stone Harbor Estates, Inc. v. Kennedy Funding, LLC, CB Richard Ellis, Colliers International, et al. – Bergen County, NJ (Superior Court of New Jersey) D-2018

- Veneesa, Inc. et al. v. Thomas Stevenson et al. – Bucks County, PA (Pennsylvania Court of Common Pleas) T-2018

- United States of America v. Dennis Gagliardi – Philadelphia, PA (United States District Court for the Eastern District of Pennsylvania) T-2017

- Keith Silverstein, D.M.D., MD v. Sharon Collins, Philadelphia County, PA (Pennsylvania Court of Common Pleas) T-2016

- Fisher v. Fisher (ROI Holdings), Bucks County, PA (Pennsylvania Court of Common Pleas) T-2016

- Anthony Lawrence Rufo v. Toni M. Varallo Rufo (Rhino Holdings – Planet Fitness), Delaware County, PA (Pennsylvania Court of Common Pleas) T-2016, 2017

- Triad Scientific, Inc. v. Refine Technology, LLC, Jerry Shevitz, Incell, Inc. and Sol Genauer (Superior Court of New Jersey, Monmouth County-Law Division) D-2016

- Lewis vs. Loftus (Re: LinkSource Technologies, LLC) San Francisco, CA (JAMS Arbitration) T-2013

- In re: Croatan Surf Club, LLC, Debtor, Chapter 11 – Raleigh, NC (United States Bankruptcy Court, Eastern District of North Carolina-Wilson Division) T-2011

- Torresdale-Frankford Country Club v. Hilger, Flick & Co. Philadelphia County, PA (Pennsylvania Court of Common Pleas) T-2011



# CV

# Edward M. Waddington, CPA

## Speaking Engagements and Articles

### Presentations:

- *Tax Cuts and Jobs Act – Impact on Business Valuation*
  Pennsylvania Institute of Certified Public Accountants – Valuation
  And Forensic Accounting Conference, November 2018

- *Crypto Currency*
  Marcum's National Valuation and Litigation Support Conference,
  October 2018

- *Interface with Criminal Tax Lawyer*
  Pennsylvania Institute of Certified Public Accountants – Forensics and
  Litigation Conference,  November 2017

- *Valuations in Healthcare*
  Pennsylvania Institute of Certified Public Accountants – Healthcare
  Conference, June 2012

- *Net Operating Loss Carrybacks*
  The Eastern Bond Claims Review – Surety
  Fidelity Seminar, May 2012

### Articles:

- *Financial Damage Measurement: A Refresher*
  The Legal Intelligencer, October 2018

- *Understanding the Criminal Tax Plea Agreement*
  The Legal Intelligencer, October 2017

- *Fair Value in Pennsylvania Shareholder Actions*
  Marcum Forensic Files, July 2016

