**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| WARREN HILL, LLC, | |
| Plaintiff, | No. 2:18-01228-HB |
| v. | |
| SFR EQUITIES, LLC, | |
| Defendant. | |

**PLAINTIFF WARREN HILL, LLC'S MEMORANDUM
OF LAW IN OPPOSITION TO DEFENDANT SFR EQUITIES, LLC'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

**ELLIOTT GREENLEAF, P.C.**

Gregory S. Voshell
Thomas B. Helbig, Jr.
925 Harvest Drive, Suite 300
Blue Bell, PA 19422
(215) 977-1000 (p) / (215) 977-1099 (f)
gsv@elliottgreenleaf.com
tbh@elliottgreenleaf.com

*Counsel for Plaintiff Warren Hill, LLC*

Dated: May 9, 2019

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................. 1

ARGUMENT ...................................................................................................... 2

I.     THE COURT SHOULD GRANT JUDGMENT IN FAVOR OF WARREN HILL ON THE SECTION 1.2(E) TRUST CERTIFICATE INCOME. ................................................................ 2

     A.     Warren Hill's Interpretation of Section 1.2(e) Is the Only Reasonable One. .......................................................... 3

     B.     SFR's Interpretation of Section 1.2(e) is Unreasonable as a Matter of Law. ......................................................... 6

          1.     SFR Disregards the Plain Language in Section 1.2(e). ...................................................................... 6

          2.     SFR's Interpretation Would Lead to an Absurd Result. .................................................................... 8

          3.     SFR Fails to Account for the Applicable Commercial Context. .......................................................... 10

          4.     SFR's Interpretation Overlooks the Structure of Section 1.2(e). ...................................................... 11

     C.     Even Assuming, *Arguendo*, that SFR's Interpretation is Also Reasonable, Which It Is Not, the Undisputed Extrinsic Evidence Confirms Warren Hill's Interpretation and Requires Judgment in Warren Hill's Favor. ............................................. 13

II.     THERE ARE DISPUTED ISSUES OF MATERIAL FACT WITH RESPECT TO SFR'S SECTION 1.2(D) ARGUMENT. ...................................... 16

     A.     BCM And VAP Should Be Treated As A Single Entity. ......................... 17

     B.     There Are Material Disputes About the Motives for Creating the Bluestone Entities and Whether It Violates the Duty of Good Faith and Fair Dealing. ....................................... 20

     C.     SFR Falsely Claims the Trust Certificate Income is Outside the Program. ............................................................. 22

     D.  Section 1.2(d) "Allocable to the Interests" ..................................... 24

CONCLUSION ................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Altieri v. Bethlehem Developers*,
 2005 U.S. Dist. LEXIS 646 (E.D. Pa. Jan. 14, 2005) ...................................................... 23-24

*Am. States Ins. Co. v. A.J. Maggio Co.*,
 593 N.E.2d 1083 (Ill. App. Ct. 1992) ...................................................................................... 6

*Asta, L.L.C. v. Telezygology, Inc.*,
 629 F. Supp. 2d 837 (N.D. Ill. 2009) ............................................................................... 10, 11

*Baldwin Piano, Inc. v. Deutsche Wurlitzer GmbH*,
 392 F.3d 881 (7th Cir. 2004) .................................................................................................... 9

*Chi. Dist Council Of Carpenters Pension Fund v. P.M.Q.T., Inc.*,
 169 F.R.D. 336 (N.D. Ill. 1996) ............................................................................................. 17

*Chilmark Ptnrs v. Mts, Inc.*,
 2003 U.S. Dist. LEXIS 7077 (N.D. Ill. Apr. 23, 2003) ........................................................... 2

*Christoph v. BCA, L.L.C.*,
 2008 U.S. Dist. LEXIS 94256 (N.D. Ill. Nov. 17, 2008) ........................................................ 7

*Cont'l Cas. Co. v. Nw. Nat'l Ins. Co.*,
 427 F.3d 1038 (7th Cir. 2005) .................................................................................... 2-3, 3, 14

*Czapski v. Maher*,
 954 N.E.2d 237 (Ill. App. Ct. 2011) ................................................................................. 11, 12

*EBS Dealing Res., Inc. v. Intercontinental Exch., Inc.*,
 379 F. Supp. 2d 521 (S.D.N.Y. 2005) ..................................................................................... 4

*Fleet Bus. Credit, L.L.C. v. Enterasys Networks, Inc.*,
 816 N.E.2d 619 (Ill. App. Ct. 2004) ................................................................................. 10, 11

*Gerow v. Rohm & Haas Co.* ,
 308 F.3d 721 (7th Cir. 2002) ............................................................................................ 10, 11

*Gomez v. Bovis Lend Lease, Inc.*,
 22 N.E.3d 1 (Ill. App. Ct. 2013) .......................................................................................... 2, 3

*Harmon v. Gordon*,
 712 F.3d 1044 (7th Cir. 2013) ............................................................................... 2, 3, 13-14

*Hentze v. Unverfehrt*,
 604 N.E.2d 536 (Ill. App. Ct. 1992) .................................................................................. 20, 21

*Int'l Fin. Servs. Corp. v. Chromas Techs. Can., Inc.*,
 2005 U.S. Dist. LEXIS 20822 (N.D. Ill. Sept. 19, 2005) ................................................ 17, 18

*Jordan v. Duff & Phelps, Inc.* ,
   815 F.2d 429 (7th Cir. 1987) ........................................................ 20

*Kellers Sys. v. Transp. Int'l Pool, Inc.*,
   172 F. Supp. 2d 992 (N.D. Ill. 2001) ............................................ 17-18

*Kenall Mfg. Co. v. Cooper Lighting, L.L.C.*,
   2019 U.S. Dist. LEXIS 64731 (N.D. Ill. Apr. 16, 2019) ......................... 7

*Matavulj v. Supreme Equip. & Sys. Corp.* ,
   1985 U.S. Dist. LEXIS 20760 (Apr. 12, 1985) ................................... 20

*Museum Pointe Condo. Ass'n v. Tower Residences Condo. Ass'n*,
   2017 IL App (1st) 152929-U ..................................................... 11, 12

*N. Tr. Co. v. MS Sec. Servs.*,
   2006 U.S. Dist. LEXIS 11037 (N.D. Ill. Mar. 15, 2006) ...................... 10

*Right Field Rooftops, L.L.C. v. Chi. Cubs Baseball Club, L.L.C.*,
   870 F.3d 682 (7th Cir. 2017) ........................................................ 7

*Rush Presbyterian-St. Lukes Med. Ctr. v. Prudential Ins. Co. of Am.*,
   2004 U.S. Dist. LEXIS 5187 (N.D. Ill. Mar. 30, 2004) ...................... 6-7

*Sandusky v. County of Adams*,
   2015 U.S. Dist. LEXIS 100088 (M.D. Pa. July 31, 2015) ................... 24

*SWPlaza III, L.L.C. v. TSA Stores, Inc.*,
   2008 U.S. Dist. LEXIS 35724 (C.D. Ill. May 1, 2008) .................... 21, 22

*Thompson v. Gordon*,
   948 N.E.2d 39 (Ill. 2011) ..................................................... *passim*

*Trustmark Ins. Co. v. Transamerica Occidental Life Ins. Co.*,
   484 F. Supp. 2d 850 (N.D. Ill. 2007) ............................................. 6

*Union Pac. R.R. Co. v. Kan. City S. Ry. Co.*,
   2009 U.S. Dist. LEXIS 70817 (S.D. Ill. Aug. 12, 2009) ....................... 7

*United States v. Shaw*,
   2017 U.S. Dist. LEXIS 59450 (C.D. Ill. Apr. 19, 2017) .................... 4, 5

*Utica Mut. Ins. Co. v. Vigo Coal Co.*,
   393 F.3d 707 (7th Cir. 2004) ........................................................ 9

*Van Dorn Co. v. Future Chem. & Oil Corp.* ,
   753 F.2d 565 (7th Cir. 1985) ....................................................... 18

*Walgreen Co. v. Panasonic Healthcare Corp.*,
   2017 U.S. Dist. LEXIS 213090 (N.D. Ill. Dec. 29, 2017) ...................... 7

*Warren Hill, L.L.C. v. SFR Equities, L.L.C.*,
    2019 U.S. Dist. LEXIS 23265 (E.D. Pa. Feb. 8, 2019)  ................................................ *passim*

*Woods v. Elgin, Joliet & E. Ry.* ,
    2000 U.S. Dist. LEXIS 226 (N.D. Ill. Jan. 10, 2000) ............................................................ 7

Plaintiff Warren Hill, LLC ("Warren Hill"), through counsel, submits this Memorandum in Opposition to Defendant SFR Equities, LLC's ("SFR") Motion for Partial Summary Judgment.  Warren Hill respectfully requests that the Court deny SFR's Motion.

## PRELIMINARY STATEMENT

The primary issue remaining in this case is straight-forward.  Each trust that Vendor Assistance Program, LLC ("VAP") manages must have a trust certificate, each trust certificate has significant financial value, and the parties did not know when that value would be released from the trusts.  So, the parties included Section 1.2(e) in the Membership Interest Purchase Agreement ("MIPA"), which requires SFR to pay Warren Hill its share of the certificate income when it is released.  SFR breached Section 1.2(e) by not paying Warren Hill its share, and SFR is asking this Court to re-write the MIPA in a manner that is contrary to the MIPA's plain terms.

As the Court has recognized, VAP makes money on the spread between the penalty payments Illinois makes when it pay its bills late and the interest rate that VAP secures from its lenders to purchase receivables. A significant portion of this "spread" is held in financial instruments known as trust certificates. This trust certificate income falls within the scope of Section 1.2(e)(iii) because the trust certificates are "financial instruments" that are required as a part of the "financing arrangements among VAP and its lenders."

SFR, however, wants to keep all of the trust certificate income for itself.  After inexplicably focusing its moving papers on Section 1.2(d), however, SFR makes only a single, Section 1.2(e) argument: SFR claims that because VAP's lenders loan money to trusts, which VAP uses to facilitate the purchase of receivables, and not to VAP directly, the trust certificate income does not fall within Section 1.2(e).  SFR's interpretation is unreasonable. Section 1.2(e)(iii) is not limited to situations where VAP is a direct debtor; rather, it applies to the "financing arrangements" that VAP organizes with its lenders to purchase receivables.  In fact,

1

the parties addressed direct loans to VAP in other provisions of the MIPA, *see* Sections 1.2(c), 1.2(d), and used materially different language than they used in Section 1.2(e).  At its core, SFR's position would lead to the absurd result of SFR keeping the *entire* share of the trust certificate income, even though the parties agreed to split it.  SFR's latest attempt to deprive Warren Hill of the benefit of its bargain is meritless and should be rejected.

## ARGUMENT

## I.  THE COURT SHOULD GRANT JUDGMENT IN FAVOR OF WARREN HILL ON THE SECTION 1.2(E) TRUST CERTIFICATE INCOME.

"In construing a contract, the primary objective is to give effect to the intention of the parties." *Thompson v. Gordon*, 948 N.E.2d 39, 47 (Ill. 2011). "Illinois subscribes to the 'four corners' theory of contract interpretation" to determine the intent of the parties. *Chilmark Ptnrs v. Mts, Inc*., 2003 U.S. Dist. LEXIS 7077, at *10-11 (N.D. Ill. Apr. 23, 2003). "A court will first look to the language of the contract itself to determine the parties' intent" and "[i]f the words in the contract are clear and unambiguous, they must be given their plain, ordinary and popular meaning." *Thompson*, 948 N.E.2d at 47.

"A contract is ambiguous if it is subject to more than one reasonable interpretation." *Gomez v. Bovis Lend Lease, Inc*., 22 N.E.3d 1, 4 (Ill. App. Ct. 2013).  However, "[t]he mere fact that the parties disagree over the contract's interpretation does not suffice to establish ambiguity."  *Id*.  Rather, "[a]mbiguity exists when the contract provisions can reasonably be read in more than one way."  *Id*. at 5.  "[W]hether a contract is ambiguous is a question of law for the court."  *Harmon v. Gordon*, 712 F.3d 1044, 1051 (7th Cir. 2013).

Generally, the interpretation of an ambiguous phrase is a question of fact for the jury. "If, however, 'the extrinsic evidence bearing on the interpretation is undisputed,' the construction of the ambiguous contract is a question of law for the court." *Id*. at 1050; *Cont'l Cas. Co. v. Nw.*

*Nat'l Ins. Co*., 427 F.3d 1038, 1041 (7th Cir. 2005) (same); *Gomez*, 22 N.E.3d at 6.  In other words, "[s]ummary judgment is appropriate when no reasonable jury could find for the [non-moving party] even when all reasonable inferences are drawn from the undisputed extrinsic evidence."  *Harmon*, 712 F.3d at 1050; *Cont'l Cas. Co*., 427 F.3d at 1043 (same).

### A.      Warren Hill's Interpretation of Section 1.2(e) Is the Only Reasonable One.

"VAP purchases accounts receivable from the state's vendors and borrows money from a bank to do so. The accounts receivable are placed in one of a number of trusts established by the U.S. National Bank, a bank different from the lending bank."  *Warren Hill, LLC v. SFR Equities, LLC*, 2019 U.S. Dist. LEXIS 23265, at *4 (E.D. Pa. Feb. 8, 2019).  As the Court noted, VAP makes money on the spread between the state's late payment penalties and the interest rates VAP is able to secure from its lenders.  (*Id*.)  The value of this "spread" is captured by two principal income streams.  First, VAP earns management fees for managing the trusts, which VAP refers to as "**Trust Fee Income**" and which can be viewed economically as an advance on the spread.  Second, the remainder resides in financial instruments known as trust certificates, which VAP refers to as "**Trust Certificate Income**."  Trust certificate income is all residual cash remaining in the trust after "all related fees and payments are made."  (Ex. 11, Consol. Fin. at 7.)

Section 1.2(d) and Section 1.2(e) of the MIPA—the two earnout provisions—track VAP's two income streams and were designed by the parties to capture the entire "spread" for purposes of calculating what SFR owes to Warren Hill under the MIPA.  The Court has already construed Section 1.2(d), which captures the management fees or "Trust Fee Income" and requires that SFR make payments to Warren Hill at set times for each of three years.  (Ex. 1, MIPA at § 1.2(d)).  Before the Court now is the application of Section 1.2(e) to the "Trust Certificate Income."  The only reasonable interpretation of Section 1.2(e) is that the "Trust Certificate Income" constitutes a "Reserve Amount" under Section 1.2(e)(iii).

"Reserve Amounts" are defined as follows in Section 1.2(e):

> (e)    For purposes of this Agreement, "**Reserve Amounts**" are defined to mean any and all amounts (i) deposited in VAP's series 2012-1 Reserve Account, (ii) deposited in any other reserve account held by, on behalf of, or for the benefit of, VAP, and/or (iii) held in the form of any financial instrument, in each case as may be required pursuant to the terms of any financing arrangement among VAP and any of its lender(s). The accounts and financial instruments described in clauses (i), (ii), and (iii) of the preceding sentence are herein defined as the "**Reserve Accounts**". The balance of the 2012-1 Reserve Account as of the Closing Date is

Thus, clauses (i), (ii), and (iii) of Section 1.2(e) set out three categories of "Reserve Amounts," each of which is subject to the condition that the applicable amounts be deposited or held, as the case may be, "pursuant to the terms of any financing arrangement among VAP and any of its lenders." According to the plain and unambiguous language of Section 1.2(e)(iii), Warren Hill is entitled to its share of the trust certificate amounts because those amounts (1) are "held in the form of any financial instrument" and (2) are required to be so held pursuant to the "financing arrangements" with the banks who finance VAP's purchase of receivables. Here, it is undisputed that these two plain and unambiguous requirements are satisfied:

*First*, trust certificates are "financial instruments." *See United States v. Shaw*, 2017 U.S. Dist. LEXIS 59450, at *5 n.2 (C.D. Ill. Apr. 19, 2017) (defining a "financial instrument as "[a] document such as a check, draft, bond, share, bill of exchange, futures or options contract, that has a monetary value or represents a legally enforceable (binding) agreement between two or more parties regarding a right to payment of money."); *EBS Dealing Res., Inc. v. Intercontinental Exch., Inc*., 379 F. Supp. 2d 521, 526 (S.D.N.Y. 2005) (defining "financial instrument as "[a]ny enforceable instrument having a monetary value"); BLACK'S LAW DICTIONARY (defining a "financial instrument" as "[a] document with monetary value and is legally enforceable."). Here, VAP CEO David Reape testified that each trust certificate has a monetary value and that "at any point . . . you can calculate a value for that certificate" based

upon a number of factors such as loan outstanding, trust expenses, etc.  (Ex. 6, Reape Dep., at 394:6-14.)  SFR, in fact, concedes that the trust certificates are "financial instruments" by admitting they are "securities entitling the holder to direct payment." (SFR Br. at 12.)  Thus, the undisputed evidence shows that a trust certificate is a "document ... that has a monetary value," and thus constitutes a "financial instrument."  *Shaw*, 2017 U.S. Dist. LEXIS 59450, at *5 n.2.

 **Second**, the trust certificates are required pursuant to the financing arrangements among VAP and its lenders, which finance the purchase of the receivables.  These voluminous financing arrangements (which span hundreds of pages) contain cover sheets that list exactly which entities are "Parties" to the applicable financing deal.  (Ex. 12 at 1 (first 4 pages of more than 900-page deal binder).)  Indeed, when VAP's Board of Managers votes to approve new deals, they explicitly refer to the deals as "financing arrangements" with the relevant lender, whom VAP personnel refer to as "our banks."  (*See* Exs. 13-14 (approving "financing arrangements with Bank of America"). Ex.15 (informing potential vendor that VAP had "secured a commitment with ***our banks*** for exactly what you proposed" (emphasis added).)  Further, all of these financing arrangements "have a certificate holder" because "every trust at the bottom has a certificate."  (Ex. 6, Reape Dep., at 134:5-7, 304:5-6.)  In summary, the undisputed evidence shows that the financing arrangements among VAP and its lenders are structured around trusts, which necessarily require financial instruments known as trust certificates.

 Because the trust certificates are financial instruments that are held pursuant to financing arrangements among VAP and its lenders, the Section 1.2(e)(iii) requirements are satisfied. Warren Hill is entitled, under Count II of its Amended Complaint, to a declaration that SFR is required to include all trust certificate income as part of its future Section 1.2(e) payments. Moreover, SFR admits that trust certificate income has been released in 2018 and 2019, but SFR

did not pay Warren Hill its share within five days, in breach of Section 1.2(e).  (SFR Br. at 5-6.)

**B.      SFR's Interpretation of Section 1.2(e) is Unreasonable as a Matter of Law.**

SFR argues only that the trust certificate income does not fall within the ambit of Section 1.2(e)(iii) because it interprets the phrase "financing arrangement among VAP and any of its lenders" to apply only in a scenario where a bank is lending money directly to VAP, in a direct creditor/debtor relationship.  (SFR Br. at 14.) Therefore, SFR argues that because VAP uses trusts as an intermediary through which VAP finances the purchase of receivables, the banks "are not VAP's lenders, but rather are the lenders to the trust themselves."  (*Id*. at 15.)  SFR's interpretation is unreasonable as a matter of law.

**1.      SFR Disregards the Plain Language in Section 1.2(e).**

SFR asks this Court to re-write the parties' contract and "add new terms or conditions to which the parties do not appear to have assented."  *Thompson*, 948 N.E.2d at 51.  In particular, SFR asks the Court to re-write Section 1.2(e) to apply only in situations where VAP takes on a direct loan from a bank.  Section 1.2(e) reads "any financing arrangement among VAP and any of its lender(s)," but SFR asks this Court to re-write the phrase to read:

> "~~any financing arrangement~~ **[a loan]** ~~among~~ **[by and between]** VAP and any of its lender(s) **[for which VAP is the debtor]**"

The MIPA ***does not*** contain the bracketed language, but ***does*** contain the language that SFR is attempting to strike.  Thus, SFR is asking this Court to re-write the MIPA, which renders its interpretation unreasonable under *Thompson*; *see Am. States Ins. Co. v. A.J. Maggio Co* 593 N.E.2d 1083, 1086 (Ill. App. Ct. 1992) ("A court will not add another term about which an agreement is silent; no word can be added to or taken from the agreement to change the plain meaning of the parties as expressed therein."); *Trustmark Ins. Co. v. Transamerica Occidental Life Ins. Co*., 484 F. Supp. 2d 850, 853 (N.D. Ill. 2007) (same); *Rush Pres.-St. Lukes Med. Ctr. v.*

*Prudential Ins. Co. of Am.*, 2004 U.S. Dist. LEXIS 5187, at *8 (N.D. Ill. Mar. 30, 2004) (same).[1]

If the parties intended Section 1.2(e) to apply only to situations where VAP (rather than a trust) was the direct debtor, the parties could have written the provision in the manner SFR now advances.  In fact, the parties elected to use different and distinct terms elsewhere in the MIPA when referring to loan agreements between VAP and a bank.  When referring specifically to a loan agreement, Section 1.2(c) uses the phrase "loan to VAP" and when referring to a financial transaction for which VAP is a direct borrower, Section 1.2(d) uses the phrase "debt for which VAP is the debtor."  In contrast, Section 1.2(e) uses the phrase "any financing arrangement among VAP and any of its lender(s)," indicating that the parties did not intend to limit the section to embrace only a "loan to VAP" where "VAP is the direct debtor."  *Thompson*, 948 N.E.2d at 47.  Moreover, Section 1.2(c) uses the phrase "by and between" because it refers to financial transactions involving only two entities.  *See* CHICAGO MANUAL OF STYLE, § 5.220 (explaining that the word "between" indicates "one-to-one relationships").  In contrast, Section 1.2(e) uses the phrase "**among** VAP and any of its lenders," which indicates "collective relationships" involving more than two parties.  *Id.* § 5.220.  The use of the word "among" in Section 1.2(e) evidences the parties' intent that it applies to transactions involving more than two parties, such as the financing arrangements that fund the purchase of receivables (Ex. 12, at 1).

"When parties to the same contract use such different language to address parallel issues ... it is reasonable to infer that they intend this language to mean different things."  *Right Field Rooftops, LLC v. Chi. Cubs Baseball Club, LLC*, 870 F.3d 682, 690 (7th Cir. 2017).[2]  In

---

[1] To appreciate the extent to which SFR asks the Court to re-write the parties' contract, the Court need look no further than SFR's comparison of the words "Indemnitor" and "Borrower". (SFR Br. at 14-15.)  SFR professes to rely upon the plain language of the MIPA, but SFR is comparing the definitions of two words that ***do not appear in the text of Section 1.2(e)***. The MIPA simply does not state what SFR now argues it states.

[2] *See also Woods v. Elgin, Joliet & E. Ry.*, 2000 U.S. Dist. LEXIS 226, at *14 (N.D. Ill. Jan. 10, 2000) ("When parties to a contract use different terms to address similar issues, it is reasonable to infer that they intend

*Thompson v. Gordon*, for instance, the Illinois Supreme Court explained: "Because the parties used the term 'improvements' in section 2A of the contract, and used the term 'replacement' in section 2B of the contract, we presume that the parties chose the word purposefully, and will give effect to that language." *Thompson*, 948 N.E.2d at 47.  In light of this, the Court held that "[i]t is clear the parties did not intend for the term 'replacement' to mean 'improvement.'"  *Id.* The same rationale applies here, where the parties used specific language in Section 1.2(c) and 1.2(d) when describing VAP as a direct debtor, and different language in Section 1.2(e) to describe the financing arrangements that generate trust certificate income.  As in *Thompson*, this Court should "presume that the parties chose the word[s] purposefully" and therefore did not intend for the phrase "any financing arrangement among VAP and any of its lender(s)," to mean "[**a loan by and between**] VAP and any of its lender(s) [**for which VAP is the debtor**]."  *Id.*

### 2.      SFR's Interpretation Would Lead to an Absurd Result.

SFR's interpretation would lead to an absurd result.  Under SFR's interpretation, Warren Hill would be entitled to nothing at all under Section 1.2(e) when the funds in the trust certificates are released to BCM and BCM's beneficial owners, ***who are identical to the beneficial owners of VAP (including SFR)***.  Thus, under SFR's interpretation, SFR would get 100% of its proportionate share of the money derived from the trust certificates and Warren Hill would get 0%. This is not what the parties intended when drafting the MIPA; rather, as the plain language makes clear, Section 1.2(d) and Section 1.2(e) of the MIPA—the two earnout provisions—track VAP's two income streams and were designed by the parties to capture the

---

these terms to have different meanings"); *Union Pac. R.R. Co. v. Kan. City S. Ry. Co.,* 2009 U.S. Dist. LEXIS 70817, at *46 (S.D. Ill. Aug. 12, 2009) ("If the parties had intended for Paragraph 7 to create new, independent trackage rights, they would have used the term "grant" as they did in Paragraphs 3 and 9. Their failure to do so supports the conclusion that "continued use" referred back to SP's prior actual use."); *Walgreen Co. v. Panasonic Healthcare Corp.*, 2017 U.S. Dist. LEXIS 213090, at *15 (N.D. Ill. Dec. 29, 2017) ("the differences in language between Section 14.1 and Section 14.2 must be given effect."); *Kenall Mfg. Co. v. Cooper Lighting, LLC*, 2019 U.S. Dist. LEXIS 64731, at *13 (N.D. Ill. Apr. 16, 2019); *Christoph v. BCA, LLC*, 2008 U.S. Dist. LEXIS 94256, at *11-12 (N.D. Ill. Nov. 17, 2008).

entire "spread" (the difference in the interest rates VAP secures from the banks who finance the purchase of receivables and the penalty interest rate paid by the State) that is the core of VAP's business.  The MIPA's plain language makes clear that the parties intended for SFR and Warren Hill to each receive half of SFR's proportionate share of the spread.  (*See* Ex. 1, MIPA at § 1.2(d) (providing that Warren Hill would receive "50% of VAP's Net Income…allocable to the Interests," with the "Interests" being defined as "33.246% of the membership interests in VAP") and §1.2(e) (providing that Warren Hill would receive 16.623% (which, again, is 50% of 33.246%) of the "Included Reserve Amounts," on a rolling basis as they are released.)

This Court previously explained that when there are two competing interpretations, "one of which is 'fair, customary, and such as prudent persons would naturally execute, while the other makes it inequitable, unusual, or such as reasonable persons would not be likely to enter into,' the court must construe the contract reasonably to avoid absurd results and adopt the rational and probable interpretation."  *Warren Hill, LLC*, 2019 U.S. Dist. LEXIS 23265, at *8-9 (quoting *Foxfield Realty, Inc. v. Kubala*, 678 N.E.2d 1060, 1063 (Ill. App. Ct. 1997)). "If one reading produces a plausible result for which parties might be expected to bargain, that reading has a strong presumption in its favor as against another reading producing an unlikely result (*e.g.*, windfall gains, conditions that cannot be satisfied, dubious incentives)."  *Utica Mut. Ins. Co. v. Vigo Coal Co.*, 393 F.3d 707, 711 (7th Cir. 2004).  Accordingly, an interpretation that results in one party getting 100% and the other party getting 0% would be unreasonable and absurd when the plain language clearly evidences an intent for each party to receive 50% of SFR's share.  *See Baldwin Piano, Inc. v. Deutsche Wurlitzer GmbH,* 392 F.3d 881, 883 (7th Cir. 2004) ("When there is a choice among plausible interpretations, it is best to choose a reading that makes commercial sense, rather than a reading that makes the deal onesided.").

### 3.    SFR Fails to Account for the Applicable Commercial Context.

SFR's interpretation improperly divorces the language of Section 1.2(e) from the

commercial context of the MIPA. "A contract does not exist in a vacuum; its terms must be

understood in light of the commercial context within which it was drawn." *Fleet Bus. Credit,*

*LLC v. Enterasys Networks, Inc*., 816 N.E.2d 619, 629 (2004); *Gerow v. Rohm & Haas Co*., 308

F.3d 721, 725 (7th Cir. 2002) ("it is a fundamental principle of contract interpretation that courts

read language to make business sense whenever possible."); *Asta, L.L.C. v. Telezygology, Inc*.,

629 F. Supp. 2d 837, 844 (N.D. Ill. 2009) ("in order to properly understand the meaning of

language there must be a discerning assessment of the context in which the words are used."); *N.*

*Trust Co. v. MS Sec. Servs*., 2006 U.S. Dist. LEXIS 11037, *15, 24 (N.D. Ill. Mar. 15, 2006)

(stating that "courts should remain sensitive to the contract's commercial context" and "courts

should not endorse an interpretation of a contract that is absurd in light of that context").

SFR argues that the parties did not intend for the phrase "VAP and any of its lenders" to

include the banks that finance VAP's purchase of receivables because it contends that these

banks "are not VAP's lenders, but rather are the lenders to the trust themselves."  But, as SFR

admits, the trusts are merely a financial intermediary that VAP uses to facilitate the financing,

through these banks, of VAP's purchase of receivables.  (*See* SFR Smt of Facts, ¶ 7 ("Prior to

2017, VAP facilitated the creation of trusts for the purchase of State of Illinois receivables from

numerous vendors through the State of Illinois Vendor Payment Program."); Decl. of Gene

Harris ¶ 6 ("These trusts were created to obtain funding to acquire the receivables.")).[3]

Interpreting Section 1.2(e) to not apply to the banks that finance VAP's purchase of receivables

because "the trusts' lenders are not VAP's lenders," divorces the language of the MIPA from the

---

[3] The Court recognized this during oral argument, when asking SFR's counsel "in other words, this is a
vehicle for financing the payment; is that it?"  SFR's counsel responded "Yes."  (Ex. 4, Tr. at 11:5-7.)

commercial context in which it was agreed to—the parties knew that the trusts had trust

certificates that were extremely valuable, the parties intended Warren Hill to get half of SFR's

share of the certificate income, and the parties knew how VAP's financial arrangements with its

lenders worked, which is why Section 1.2(e) exists.  SFR's interpretation ignores this context,

and is therefore unreasonable on that basis as well.  *See Fleet Bus. Credit, LLC*, 816 N.E.2d at

629; *Gerow*, 308 F.3d at 725; *Asta, L.L.C.*, 629 F. Supp. 2d at 844.

      Moreover, according to SFR, VAP does not borrow money directly from any lenders.

(Doc. 60, ¶ 36 ("SFR denies that VAP borrows money from lenders.")).  Yet, SFR is asking the

Court to interpret Section 1.2(e) to apply only where VAP borrows money directly.  SFR's

interpretation that Section 1.2(e) is implicated only where VAP is directly borrowing money

(SFR Br. at 14), when applied to SFR's factual denial (assuming it is true), renders the phrase

"financing arrangement among VAP and any of its lenders" meaningless and superfluous (and

further highlights how SFR's interpretation is devoid of any commercial context).  This is

unreasonable as a matter of law. *Czapski v. Maher*, 954 N.E.2d 237, 244 (Ill. App. Ct. 2011)

("[a]n interpretation that renders a provision meaningless is not reasonable."); *Museum Pointe*

*Condo. Ass'n v. Tower Residences Condo. Ass'n*, 2017 IL App (1st) 152929-U, ¶ 35 ("We find

that Tower has not offered a reasonable interpretation of the easement agreement, because

Tower's interpretation renders much of the language meaningless."); *Thompson*, 948 N.E.2d at

47 ("[a] court will not interpret a contract" to "nullify or render provisions meaningless.").

      **4.**      **SFR's Interpretation Overlooks the Structure of Section 1.2(e).**

      Finally, it is well-established that "[a] court will not interpret a contract . . . in a way that

is contrary to the plain and obvious meaning of the language used."  *Thompson*, 948 N.E.2d at

47.  Here, Section 1.2(e) expressly states it applies with respect to "***any*** financing arrangement

among VAP and ***any*** of its lenders."  However, under SFR's interpretation, this phrase would

11

apply to only *one* type of "financing arrangement"—a loan—and only *one* type of "lender"—a direct creditor.  Accordingly, it would distort the plain language of Section 1.2(e) to interpret this phrase to only apply in the scenario where a bank is lending money directly to VAP.

Likewise, SFR's interpretation distorts the plain and obvious structure of Section 1.2(e) by interpreting the clause "in each case as may be required pursuant to the terms of any financing arrangement among VAP and any of its lender(s)" to only apply to clause (iii), rather than clauses (i), (ii), *and* (iii).  As explained *supra*, the plain language of Section 1.2(e) lists three categories of funds that may constitute a "Reserve Amount," and then narrows the definition of "Reserve Amount" by setting a condition that "in *each* case," *i.e.*, for *each* of these three categories of funds, the applicable funds only constitute a "Reserve Amount" if they are required to be deposited or held "pursuant to the terms of any financing arrangement among VAP and any of its lender(s)."  Thus, SFR's interpretation improperly distorts the plain language of Section 1.2(e) by construing this condition to apply *only* to Section 1.2(e)(iii), rather than "each case" of clauses (i), (ii), and (iii).  *Thompson*, 948 N.E.2d at 47.  Furthermore, under this interpretation, the phrase "in each case" would be utterly meaningless and superfluous, which is unreasonable as a matter of law.[4]  *Czapski*, 954 N.E.2d at 244; *Museum Pointe Condo. Ass'n*, 2017 IL App (1st) 152929-U, ¶ 35; *Thompson*, 948 N.E.2d at 47.

The reason SFR distorts the express language of Section 1.2(e) is obvious.  As SFR admits, it "made payment to Warren Hill pursuant to Section 1.2(e)(i)" concerning funds held in the 2012-1 Reserve Account.  (SFR Br. at 9.)  The 2012-1 Reserve Account was required

---

[4] If the parties had intended the condition to apply solely to clause (iii), the natural construction would have been to omit the comma and the phrase "in each case," such that clause (iii) would have read: "*held in the form of any financial instrument as may be required pursuant to the terms of any financing arrangement among VAP and any of its lenders(s).*"  The parties expressly included the phrase "in each case" to refer back to clauses (i), (ii), and (iii).  This is consistent with the immediately following sentence of Section 1.2(e), which also explicitly refers to the "accounts and financial instruments described in clauses (i), (ii), and (iii)" as a group.

pursuant to VAP's financing arrangement with Citi (Ex. 16 at §§ 3.02, 4.05(c)), consistent with the plain language of Section 1.2(e).  If SFR were to concede that the "in each case" condition applied to the 2012-1 Reserve Account, SFR (which does not dispute that it owed Warren Hill payment under Section 1.2(e)(i)) would also be forced to make several self-defeating admissions:

*First*, SFR would be forced to concede the Citi financing arrangement is one that is "among VAP and any of its lender(s)" and that the use of a trust as a financing intermediary does not render the financing arrangement otherwise.  *Second*, given that the Citi financing arrangement satisfies the financing arrangement condition, SFR would be forced to concede that the financing arrangements with Bank of America and Barclays, which also utilize trusts, likewise satisfy the condition. *Consequently*, SFR could not attempt to assert that the trust certificate income is somehow shielded from Section 1.2(e).

Because the phrase "in each case as may be required pursuant to the terms of any financing arrangement among VAP and any of its lender(s)" applies to Section 1.2(e)(i), the unreasonable interpretation SFR now advances is inconsistent with its prior Section 1.2(e)(i) payment.  Yet, SFR now argues that these banks "are not VAP's lenders," and thus no payment would have been required.  (SFR Br. at 15.)  Nevertheless, these banks are VAP's lenders, which is why SFR made payment consistent with the plain, unambiguous language of Section 1.2(e).

For all these reasons, SFR's interpretation is unreasonable as a matter of law. Accordingly, the Court should deny SFR's Motion grant judgment in Warren Hill's favor.

### C. Even Assuming, *Arguendo*, that SFR's Interpretation is Also Reasonable, Which It Is Not, the Undisputed Extrinsic Evidence Confirms Warren Hill's Interpretation and Requires Judgment in Warren Hill's Favor.

As set forth above, even where a court finds that a contract is ambiguous, "[s]ummary judgment is appropriate when no reasonable jury could find for the [non-moving party] even when all reasonable inferences are drawn from the undisputed extrinsic evidence."  *Harmon*, 712

F.3d at 1050; *see also Cont'l Cas. Co*., 427 F.3d at 1043.  Thus, even if the Court were to find

that SFR's interpretation of Section 1.2(e) is also reasonable, which it is not, the Court should

still grant summary judgment in favor of Warren Hill because the extrinsic evidence is

undisputed that all parties considered the banks who finance VAP's purchase of receivables to be

***VAP's*** lenders, and thus intended these deals to fall within Section 1.2(e).

Significantly, this Court has already noted that "[a]s a Qualified Purchaser, ***VAP***

purchases accounts receivable from the state's vendors and ***borrows money from a bank to do***

***so***." *Warren Hill, LLC*, 2019 U.S. Dist. LEXIS 23265, at *4 (emphasis added). At oral argument

on SFR's prior Motion for Partial Summary Judgment, SFR's counsel admitted that "VAP puts

this entire deal together for the ... benefit of everyone, the bank, the State of Illinois, the

vendors."  (Ex. 4, Tr., at 16:3-7.)  SFR's counsel further admitted that VAP is the entity that

"picks the bank" and that "VAP found the financing and that's ... an important thing" (*Id*. at

11:23-12:11.).  VAP's own website states that "***VAP***," not a trust, "has financed over $3.5 billion

in accounts receivable." (*See* Ex. 5.)

This is consistent with the testimony of VAP CEO David Reape, Brian Hynes, and SFR

principal Gene Harris, all of whom testified that VAP has a significant and direct relationship

with the banks that finance the purchase of receivables and thus would be considered VAP's

lenders. (*See* Ex. 10 (Summary Exhibit).).  Likewise, business records–both before and after the

parties agreed to the MIPA–exchanged through discovery show that the parties considered the

banks that finance VAP's purchase of receivables to be VAP's lenders, and thus intended them

to fall within the definition of "any financing arrangement among VAP and its lender(s)."

For example, a December 2012 email from David Reape to VAP personnel notes that a

potential vendor expressed "a desire to talk to ***our senior lender***."  (Ex. 17 (emphasis added).)

14

Likewise, a June 2014 email from VAP personnel to executives at BCBS states that VAP had

"secured a commitment with ***our banks*** for exactly what you proposed."  (Ex. 15 (emphasis

added).)  And in December of 2017, SFR's principal Gene Harris stated in an email that VAP

had to get documents "to ***our lenders***."  (Ex. 18 (emphasis added).)  Moreover, in internal

emails, VAP executives and personnel use the exact phrase contained in Section 1.2(e),

"financing arrangement," when discussing the financing of the purchase of receivables.



(Ex. 13; Ex. 14 (same).)  Similarly, on April 23, 2018, Brian Hynes, a beneficial owner of VAP,

testified before Illinois's Commission on Government Forecasting and Accountability.[5]  Mr.

Hynes's testimony on behalf of VAP is consistent with Warren Hill's interpretation of the MIPA

and contradicts SFR's proffered interpretation.  For example, Mr. Hynes introduced himself as

the founder of VAP, and proceeded to refer to VAP using the pronoun "we," testifying:

- "we've purchased slightly over $4 billion of Illinois receivables" (21:48);
- "we've been paid a little over $2.2 billion back, so today we currently have outstanding $376 million" (22:11);
- "total PPP or penalties paid to us since 2010 is a little over $65 million" (22:19);
- "total penalty owed to us today is a little over $250 million" (22:28); and
- in response to a Commission member's question about changes VAP would like to see to the Program, "any kind of relief of even making the next month instead of making a

---

[5] An audio recording is publicly available at http://cgfa.ilga.gov/upload/04232018meetingAudio.mp3.

normal month payment, paydown some of the interest, would go a long way with, um, with us and with our, with our lenders" (38:39).

Significantly, Mr. Hynes testified that ***VAP*** ("we") purchased receivables, was paid back by the State, had been paid Prompt Payment Penalties ("to us"), and was owed outstanding penalties ("to us").  Consistent with the parties' intent in drafting Section 1.2(e) and contrary to SFR's proffered interpretation, Mr. Hynes did not differentiate among VAP or any of the trusts that VAP uses as financing vehicles.  Most tellingly, Mr. Hynes explicitly referred to the banks that finance the purchase of receivables as "***our*** lenders" (38:39).  Mr. Hynes testified in 2018— long after SFR purchased its stake in VAP (and also after the nominal "transfer" of trust certificates to BCM).  For SFR to take a position in this litigation that is contrary to the plain language of the MIPA, the commercial context of VAP's business, and the explicit testimony of VAP's representative to an Illinois oversight Commission evidences its bad faith.

In sum, the record evidence is undisputed that all parties considered the banks that finance VAP's purchase of receivables to be VAP's lenders, and thus intended these deals to fall within the definition of "any financing arrangement among VAP and its lender(s)."  Thus, even assuming *arguendo* that the Court finds that SFR offered a competing, reasonable interpretation, the Court should still grant judgment in favor of Warren Hill.

## II.   THERE ARE DISPUTED ISSUES OF MATERIAL FACT WITH RESPECT TO SFR'S SECTION 1.2(D) ARGUMENT.

SFR focuses its moving papers on arguing that the trust certificate income does not fall within Section 1.2(d). Warren Hill agrees that the trust certificate income does not fall within Section 1.2(d) because it falls within the definition of a "Reserve Amount" under Section 1.2(e). If the Court, however, disagrees with Warren Hill, SFR is still not entitled to judgment.[6]

---

[6] If the Court agrees with Warren Hill as to the scope of Section 1.2(e), the Court need not reach the Section 1.2(d) arguments articulated by SFR.

Specifically, "Reserve Amounts" are excluded from Section 1.2(d)(i)(D), but if the trust

certificate income is not considered by the Court to be a "Reserve Amount," then revenue

received by VAP would be included within Section 1.2(d)(i)(D).   SFR admits that

approximately $9.5 million of the trust certificate income was released by the trusts to BCM and

its members in 2018.[7]   (SFR Br. at 5-6.)   If not considered a "Reserve Amount," these funds

should be included in the Section 1.2(d) earnout.   SFR contends that these funds could not

constitute "revenues received by VAP" under Section 1.2(d)(i)(D) because this trust certificate

income was paid directly from the trust to BCM and "did not go through VAP's bank accounts."[8]

(*Id.* at 10-12). However, as set forth below, there are disputed issues of material fact on this point

that prevent the Court from entering judgment in favor of SFR.

### A.    BCM And VAP Should Be Treated As A Single Entity.

BCM and BSF are alter egos of VAP, such that the three entities should be treated as a

single entity.  (*See* Doc. 43, at 14-16.)  Illinois' alter ego doctrine treats "nominally separate

business entities as if they were a single, continuous employer." *Chi. Dist. Council Of

Carpenters Pension Fund v. P.M.Q.T., Inc*., 169 F.R.D. 336, 341-42 (N.D. Ill. 1996); *Int'l Fin.

Servs. Corp. v. Chromas Techs. Can., Inc*., 2005 U.S. Dist. LEXIS 20822, at *13 (N.D. Ill. Sep.

19, 2005) ("Where one corporation is merely the alter ego of another, courts will disregard the

corporate form."); *Kellers Sys. v. Transp. Int'l Pool, Inc*., 172 F. Supp. 2d 992, 1000 (N.D. Ill.

---

[7] The actual figure is in dispute.  *See* Warren Hill Resp. Stat. of Facts ¶ 24.

[8] In making this argument, SFR also blatantly misrepresents this Court's prior holding.  (SFR Br. at 11-12.)
SFR erroneously contends that this Court held that "because management fees ***earned by BCM and Blue Stone
Finance, LLC*** ("BSF") were first routed through VAP pursuant to the VPP program terms, VAP 'earned' those
revenues." (SFR Br. at 11; emphasis added). This is incorrect as the Court plainly held that BCM and BSF ***did not***
earn any management fees.  Rather, this Court held the exact opposite, concluding that "[t]o the extent that
defendant argues that the Bluestone entities, rather than VAP, 'earned' the management fees at issue, ***this argument
is without merit***." *Warren Hill, LLC*, 2019 U.S. Dist. LEXIS 23265, at *11 (emphasis added).   This Court explained
that it would violate Illinois law to conclude that BCM or BSF earned the fees at issue because "under Illinois law,
the Bluestone entities were neither Qualified Purchasers nor Sub-Participants in the VPP."  (*Id.*)  This is just the
latest example of SFR playing fast and loose with this Court.

2001) ("Illinois recognizes the 'single-entity' theory of piercing the corporate veil.")

The entities in question must be a "mere instrumentality of [one] another." *Van Dorn Co. v. Future Chem. & Oil Corp.*, 753 F.2d 565, 570 (7th Cir. 1985) (applying Illinois law); *Int'l Fin. Servs. Corp.,* 2005 U.S. Dist. LEXIS 20822, at *13-14 ("there must be such unity of interest and ownership that the separate personalities of the corporation and the individual [or other corporation] no longer exist."). Also, it must appear that the observance of a separate existence for each entity "would, under the circumstances, sanction a fraud or promote injustice." *Van Dorn Co.* 753 F.2d at 570; *Int'l Fin. Servs. Corp.,* 2005 U.S. Dist. LEXIS 20822, at *14.

To determine whether an entity is a "mere instrumentality" of another, courts consider the following factors: "(1) the failure to maintain adequate corporate records or to comply with corporate formalities, (2) the commingling of funds or assets, (3) undercapitalization, and (4) one corporation treating the assets of another corporation as its own." *Van Dorn Co.* 753 F.2d at 570. Some courts have also considered whether the entities are "holding one's self out as being a unified entity" and the "failure to operate at arm's length." *Int'l Fin. Servs. Corp.,* 2005 U.S. Dist. LEXIS 20822, at *15. "Once the first element of the test is established, either the sanctioning of a fraud (intentional wrongdoing) or the promotion of injustice, will satisfy the second element." *Van Dorn Co.* 753 F.2d at 570. Such "injustice" has been found where the failure to treat the entities as a single entity would mean that "former partners would be permitted to skirt the legal rules concerning monetary obligations" or "a party would be unjustly enriched." *Int'l Fin. Servs. Corp.,* 2005 U.S. Dist. LEXIS 20822, at *15.

Here, the undisputed record evidence shows that there is no distinction between VAP, BSF, and BCM, and that the companies were created, at least in large part, to sanction a fraud or promote injustice—namely, avoiding SFR's obligations under the MIPA. For example:

18

- Mr. Reape is CEO of all of three companies (Ex. 6 Reape Dep. at 10-14), the boards of managers for all three companies are identical (Ex. 19, SFR RFA Resp. ¶ 28; Doc.38, Hynes Decl. Exs. E, H, Q, R, S; Ex. 9 Harris Dep. at 41), the beneficial owners of the companies are identical or nearly identical (Ex. 19 SFR RFA Resp. ¶ 28; Ex. 9, Harris Dep. at 97-99; Ex. 7, Wilson Dep. at 57), and the relative proportions of the companies held by each beneficial owner are identical or nearly identical (Doc.38, Hynes Decl. Exs. E, F, H; Ex. 7, Wilson Dep. at 57).

- The companies share personnel, both employees and consultants, and also share a single employee bonus pool (Ex. 6, Reape Dep. at 19, 270-77);

- The companies have transacted with each other, including the purported provision of services and one or more purported loans, under circumstances where governing agreements may not be "papered-up" until months after applicable transactions (Ex. 7, Wilson Dep. at 234-37, 257-58);

- Funds or assets are regularly commingled and subsequently "reallocated" (Ex. 7, Wilson Dep. at 35, 126, 222, 258-59; Ex. 20.);

- VAP transferred—fraudulently, Warren Hill contends—valuable trust certificates to BCM without receiving any consideration in return, demonstrating a failure to deal at arms-length (Ex. 9, Harris Dep. at 204-12);

- The companies internally reallocated revenues among themselves under the guise of purported "services agreements", which services agreements feature subjective valuations dreamed up without competitive bidding or transfer pricing studies (Ex. 9, Harris Dep. at 232-34; Ex. 6, Reape Dep. at 202; Ex. 7, Wilson Dep. at 76);

- In filings to the State of Illinois, the companies held themselves out as a single entity (VAP) (Ex. 9, Harris Dep. at 200; Ex. 21 (ownership chart));

- Mr. Hynes did not mention the Bluestone entities and held out the combined operation of VAP and the Bluestone entities as a single entity (VAP) when testifying to Illinois's Commission on Government Forecasting and Accountability; testifying in 2018 that *VAP* (not BCM or BSF) purchased receivables (21:48), was repaid by the state and was owed outstanding payment (22:11), and received and continued to be owed Prompt Payment Penalties (22:19) (a portion of the value of which resides in the Trust Certificate Income for trust certificates nominally held by BCM); and

- Submissions to the trustee of all of the trusts at issue refer to fees as being earned solely by VAP (despite SFR's contention that some of those fees are later "reallocated" to the Bluestone entities) (*see* Exs. 22-23, VAP's Confirmation Requests).

Moreover, Warren Hill's expert has opined, *inter alia* that: (a) "BSF and BCM did not appear to have the ability to operate as stand-alone entities"; (b) "Numerous transactions in

excess of $30 million between VAP and BSF and VAP and BCM did not appear to be conducted

on an arm's length basis"; (c) "VAP, BSF, and BCM appeared to commingle assets through the

sharing of revenues earned by VAP, sharing various expenses including payroll, undocumented

loans, and undocumented transfers of funds, among others"; and (d) "VAP, BSF, and BCM

shared common members/owners, Board of Managers, officers, accounting personnel,

accounting software, and auditors."  (Ex. 24, Expert Report at 6.)

Accordingly, while Warren Hill contends these alter ego facts are undisputed, at the very

least, there is a dispute of fact on this material issue.

**B.      There Are Material Disputes About the Motives for Creating the Bluestone
        Entities and Whether It Violates the Duty of Good Faith and Fair Dealing.**

"A covenant of fair dealing and good faith is implied in every contract absent express

disavowal."  *Hentze v. Unverfehrt*, 604 N.E.2d 536, 539 (Ill. App. Ct. 1992). "While it is true

contract terms implied in law cannot supplant express terms of a contract, implied terms can

supplement express terms."  *Id*.  Thus, the implied covenant of good faith and fair dealing

"imposes liability for 'bad faith', 'opportunistic advantage-taking' or 'lack of cooperation' which

'depriv[es] the other contracting party of his reasonable expectations.'"  *Id*.; *see also Matavulj v.

Supreme Equip. & Sys. CORP.,* 1985 U.S. Dist. LEXIS 20760, at *4-5 (N.D. Ill. Apr. 12, 1985)

("In every contract there is an implied covenant of good faith and fair dealing which precludes

each party from engaging in conduct that will deprive the other party of the benefits of the

agreement."); *Jordan v. Duff & Phelps, Inc*., 815 F.2d 429, 438 (7th Cir. 1987) (explaining that

implied covenant of good faith prohibits "[a]vowedly opportunistic conduct").

The Court cannot grant summary judgment in favor of SFR based upon SFR's argument

that the trust certificate income flows directly from the trust to BCM and "did not go through

VAP's bank accounts" because there is a material dispute of fact as to whether the transfer of the

trust certificates from VAP to BCM violates the duty of good faith and fair dealing.  SFR notes

that the trust certificates were transferred to BCM in late 2017 (Harris Decl. ¶ 9), when the trust

certificates **were valued at over $22 million**, (Ex. 25).  But, as the Consent Resolutions attached

to Gene Harris' Declaration make clear, VAP did not receive anything in return for transferring

$22 million of assets to BCM. The Consent Resolutions note that in exchange for transferring

$22 million of assets to BCM, VAP was "**retaining** responsibility as manager of the Trust in

exchange for the Fees."  (Harris Decl., at p. 1 of Exs. B through G.)

In other words, VAP gave BCM at least $22 million of assets and in return VAP would

continue to have all the responsibility and financial risk associated with managing the trust, and

continue to receive the same manager fees that it was receiving prior to the transfer.  (*Id.*)  The

reason VAP did not receive anything in return is because if VAP had actually received fair

market value for the trust certificates at the time they were given to BCM, that $ 22 million

would have constituted "other revenues received by VAP", and would be plainly subject to

Section 1.2(d)'s earnout provisions.  Transferring $22 million of assets for free to avoid an

obligation to pay Warren Hill is a quintessential example of "bad faith" conduct or

"opportunistic advantage-taking" that "depriv[es] [Warren Hill] of [its] reasonable expectations"

under the MIPA.  *See Hentze*, 604 N.E.2d at 539; *SWPlaza III, LLC v. TSA Stores, Inc*., 2008

U.S. Dist. LEXIS 35724, at *24 (C.D. Ill. May 1, 2008) ("In manipulating the cost estimates,

TSA violated its duty to exercise discretion under the Lease fairly and in good faith.")

Significantly, at oral argument on SFR's first Motion for Partial Summary Judgment, this

Court commented that the creation of the Bluestone entities and the attempt to shift revenue

away from VAP and to the Bluestone entities was "playing fast and loose with . . . good faith and

fair dealing, if nothing else, under a contract."  (Ex. 4, Tr. at 30:24-31:1.) During this discussion,

counsel for SFR admitted that there are material disputes of fact regarding the creation, and transfer of funds to, the Bluestone entities, stating "[t]here are all sorts of disputes about, you know, what was happening behind the scenes." (*Id*. at 33:6-7.) Thus, by SFR's own admission there are material disputes of fact as to whether the creation of the Bluestone entities and transfer of trust certificates, valued at more than $22 million at the time of transfer, for nothing in return violated the duty of good faith and fair dealing, depriving Warren Hill "of [its] reasonable expectations" under the MIPA.

### C.    SFR Falsely Claims the Trust Certificate Income is Outside the Program.

Next, SFR concludes (without any citation) that the "trusts' administration is completely separate from and not specific to the VPP program." (SFR Br. at 4, 12; Stmt of Facts, ¶ 16.) SFR only makes these statements in passing and does not explain its argument. The only "evidence" that SFR cites is the unsupported, self-serving statement of SFR's principal, Gene Harris.[9] Regardless, there is an abundance of undisputed evidence in the record demonstrating that the administration of the trusts, and trust certificate income, is not separate from the VPP.

VAP's own financial statements provide that trust certificate income is earned "as the manager and administrator of certain trusts." (Ex. 11, at 7.) But, which entities can serve as the manager of the trust, and thus earn trust certificate income, is dictated by the Program Terms of the VPP. *See Warren Hill, LLC*, 2019 U.S. Dist. LEXIS 23265, at *2-4, 10-11. Indeed, each time VAP uses a trust to finance and purchase receivables, the trust itself must be approved by the Illinois Department of Central Management Services ("CMS"), which oversees the VPP. For example, in approving a trust, CMS expressly noted that the trust was approved:

> [I]n reliance upon representations and warranties made by Vendor Assistance

---

[9] The reference on Page 4 of SFR's Brief cites ¶ 16 of SFR's Statement of Facts, which cites ¶ 7 of Gene Harris' Declaration. The entirety of ¶ 7 states, *without any citation*, "The roles of the various parties to the trust are beyond the VPP program terms, and the trusts' administration is not specific to the VPP program." This is false.

Program, LLC ("VAP"), that (i) the **_Trust is managed by VAP_**, which is an existing Qualified Purchaser under the Program and (ii) the Trust has been formed **_solely for the purpose of purchasing "Qualified Accounts Receivable"_** and to perform activities **_directly relating thereto_**.

(Exs. 25-26.) Thus, contrary to Gene Harris' self-serving statement, VAP's own financial statements and CMS' approvals show that the trust's existence itself is dependent upon the VPP and the Program Terms, which in turn dictate the administration of the trusts.

Furthermore, VAP's own financial statements show that the actual funds that comprise the Trust Certificate Income are funds that the State of Illinois paid as a Prompt Payment Penalty to the Trust pursuant to the VPP.  (Ex. 11, at 7 (noting that the trust certificate income is based upon "the trusts' collection from the State of Illinois").)  This was confirmed by VAP's CEO, David Reape, who consistently testified that the money held in the trust certificates is the excess cash left over from the State's payment after the payment of all fees and costs.  (*See* Ex. 6, Reape Dep., at 419:21-420:17 (testifying that trust certificate income receivable decreased in 2018 because "there were a number of significant state paydowns as well as state payments of prompt payment penalty.")).[10]  Put simply, when asked whether "there are payments made by the state that...flowed through to the trust certificates in 2018," Mr. Reape testified "Yes."  (*Id*. at 420.)

Thus, the undisputed evidence–VAP's own financial statements, statements from the agency that administers the VPP, and the testimony of VAP's CEO–shows that the administration and management of the trusts, including the trust certificate income, is connected to and part of the VPP.  Gene Harris' self-serving statement concerning Illinois law does not create a genuine dispute of fact, or even constitute material evidence. *See Altieri v. Bethlehem*

---

[10] *See also* Ex.6, Reape Dep., at 429:12-20 ("Q. Again going to the trust certificate income receivable row, there is a drop in the outstanding receivable from 27.4 million at the end of August of '18 to 19 million at the end of September of '18; correct? A. Correct. Q. ***And you believe that this drop is the result of payments made by the state? A. I'm certain of this.***"); *id*. at 430:15-431:2 ("Q. Again, the trust certificate income receivable line lists, as of the end of October of 2018, a total of 14.1 million; correct? A. Correct. Q. And that is a drop of approximately 5 million from the close of September of 2018; right? A. It is. Q. ***Is your testimony, again, that that drop relates solely to payments made by the state of Illinois? A. Yes.***").)

*Developers*, 2005 U.S. Dist. LEXIS 646, at *9 (E.D. Pa. Jan. 14, 2005) (explaining that a dispute of fact "is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party."); *Sandusky v. Cty. of Adams*, 2015 U.S. Dist. LEXIS 100088, at *10-11 (M.D. Pa. July 31, 2015) (same).

Accordingly, to the extent any of SFR's arguments rely upon its incorrect assertion that the administration of the trusts and trust certificate income is outside the scope of the VPP, the Court must reject those arguments as contrary to the undisputed record evidence.

### D.     Section 1.2(d) "Allocable to the Interests"

SFR's Section 1.2(d) argument fails for an additional reason.  (SFR Br. at 12.)  Section 1.2(d) requires SFR to pay Warren Hill "50% of VAP's Net Income . . . ***allocable to the Interests*** for such year."  The phrase "allocable to the Interests" embraces amounts received by the Bluestone entities to the extent SFR's beneficial interest in those amounts relates back to the Interests in VAP that SFR purchased from Warren Hill.  SFR holds membership interests in BSF and BCM ***because of*** its membership interest in VAP.  Moreover, the relative amount of BSF and BCM held by SFR flows directly from the relative amount of VAP held by SFR.  Money that is "allocable to the Interests" that SFR purchased from Warren Hill cannot be rendered otherwise because VAP directed it to be sent to BCM instead of VAP.

This interpretation of the phrase "allocable to the Interests" is consistent with testimony from SFR's principal.  Mr. Harris testified that Manchester Securities Corp. ("Manchester"), which owns a 4.24% stake in VAP but does not own a stake in BSF, Ex. 21 at 5 (ownership chart), is nevertheless entitled to 4.24% of the monies funneled from VAP to BSF because they are "***allocable*** to their interest" in VAP.  (Ex. 5, Harris Dep. at 99:4.)[11]  That is, even though SFR

---

[11] Mr. Harris was testifying regarding VAP's disclosure of its members and their relative ownership percentages to the State. (Ex. 9, Harris Dep. at 96:22-98:10.)  VAP failed to disclose the diversion of monies to the

asserts in this litigation that earnout payments owed to Warren Hill should exclude trust certificate income directed to BCM, Mr. Harris testified that Manchester has a right to money diverted to BSF.  (*Id.*) SFR's own principal, therefore, agrees that all of the money earned through the operation of VAP's business, including those portions that SFR helped restructure into the Bluestone entities, is "allocable" to the applicable interests in VAP from which the subsequent equity stakes in the Bluestone entities are derived.  The contradiction between (1) Mr. Harris's testimony regarding Manchester and BSF and (2) SFR's position regarding Bluestone and Warren Hill's earnout further evidences SFR's bad faith.

In summary, the phrase "allocable to the Interests" requires that all of the fees earned through the operation of VAP's business—regardless of where they are later diverted or funneled—be included within Section 1.2(d).[12]

## CONCLUSION

Warren Hill respectfully requests that this Court deny SFR's Motion and grant Warren Hill's Motion.

Respectfully submitted,

*/s/ Gregory S. Voshell*
Gregory S. Voshell
Thomas B. Helbig, Jr.
Elliott Greenleaf, P.C.
925 Harvest Drive, Suite 300
Blue Bell, PA 19422
(215) 977-1000

Dated: May 9, 2019                          *Counsel for Plaintiff Warren Hill, LLC*

---

Bluestone entities, but instead represented to the State that all of the money coming into VAP was distributed to VAP's members based on their respective ownership interests in VAP. (*Id.* at 98:2-23.) Because Manchester holds no stake in BSF, *id.* at 98:11-99:6, and many VAP fees had been diverted to BSF, Manchester could not possibly receive its full 4.24% share of VAP's fees that VAP disclosed to the State. (*Id.* at 98:24-99:8)

[12] Warren Hill negotiated amendments to Section 1.2(d) regarding the phrase "allocable to the Interests" specifically to "clarify that the earnout payments will be unaffected by any restructuring of VAP that [SFR] may pursue after closing."  (Ex. 27 at 3 (Section 4 of email attachment).)

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this date, I have caused a true and correct copy of the forgoing to be served upon each attorney of record via electronic mail, the Court's ECF system, and U.S. mail.


*/s/ Gregory S. Voshell*
GREGORY S. VOSHELL


Dated: May 9, 2019