# EXHIBIT 6

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA DIVISION


WARREN HILL, LLC,                    )
                                     )
          Plaintiff,                 )
                                     )
     vs.                             ) No. 2:17-01228-HB
                                     )
SFR EQUITIES, LLC,                   )
                                     )
          Defendant.                 )


          The deposition of DAVID REAPE, called by

the Plaintiff for examination, pursuant to notice and

pursuant to the Rules of Civil Procedure for the

United States District Courts pertaining to the taking

of depositions, taken before Erin McLaughlin, CSR, at

200 S. Michigan Avenue, Suite 1000, Chicago, Illinois,

on Monday, October 15, 2018, commencing at the hour of

9:00 o'clock a.m.



Page 2

```
 1    APPEARANCES:
 2
 3       ELLIOTT GREENLEAF, P.C.
         925 Harvest Drive, Suite 300
 4       Blue Bell, PA 19422
         gsv@elliotgreenleaf.com, by:
 5       MR. GREGORY VOSHELL,
 6          appeared on behalf of the Plaintiff;
 7
         WHITE & WILLIAMS LLP
 8       One Liberty Place, Suite 1800
         Philadelphia, PA 19103-7395
 9       onufrakm@whiteandwilliams.com, 215.864.7174, by:
         MR. MICHAEL N. ONUFRAK,
10
            appeared on behalf of the Defendant;
11
12       HOWARD & HOWARD
         200 S. Michigan Avenue, Suite 100
13       Chicago, Illinois 60604
         SML@h2law.com, 312.456.3418, by:
14       MR. SCOTT M. LEVIN,
15          appeared on behalf of the VAP;
16
17    ALSO PRESENT:
18       MR. LOUIS A. BALLEZZI
         Corporate Counsel, Warren Hill, LLC;
19
         MR. JASON CANNON;
20
         MR. JEFF MAIER, Videographer.
21
22
23          * * * * *
24
```

Page 3

```
 1              I N D E X
 2
 3    THE WITNESS:  DAVID REAPE
                                        PAGE
 4    EXAMINATION BY:
         MR. VOSHELL                      8
 5
 6    EXHIBITS MARKED:
 7       Nos. 1-3                          5
         No. 4                            35
         No. 5                            50
 8       No. 6                            55
         No. 7                            73
 9       No. 8                            93
         Nos. 9-12                       113
10       Nos. 13-14                      132
         No. 15                          139
11       Nos. 16-20                      144
         No. 21                          151
12       No. 22                          162
         No. 23                          166
13       No. 24                          175
         No. 25                          180
14       No. 26                          183
         Nos. 27-29                      189
15       No. 30                          213
         No. 31                          219
16       Nos. 32-33                      234
         No. 34                          236
17       No. 35                          238
         No. 36                          244
18       No. 37                          247
         No. 38                          249
19       No. 39                          263
         No. 40                          265
20       No. 41                          268
         No. 42                          270
21       No. 43                          281
         No. 44                          285
22       No. 45                          294
         No. 46                          301
23       No. 47                          306
         No. 48                          311
24       No. 49                          317
```

Page 4

```
 1            (Reape Deposition Exhibit
 2         Nos. 1-3 was marked for
 3         identification.)
 4            (Witness sworn.)
 5         THE VIDEOGRAPHER:  We are now on the record.
 6    This begins Video Number in the deposition of David
 7    Reape in the matter of Warren Hill LLC versus SFR
 8    Equities LLC in the Eastern District of Pennsylvania
 9    Court.
10            Today is Monday, October 15, and the
11    time is 9:10.  This deposition is being taken at
12    Howard and Howard at the request of Elliott Greenleaf
13    PC.  The videographer is Jeff Maier of Magna Legal
14    Services, and the court reporter is Erin McLaughlin of
15    Magna Legal Services.
16            Will counsel and all parties present
17    state their appearances and who they present.
18         MR. VOSHELL:  Greg Voshell from Elliott
19    Greenleaf representing the plaintiff, Warren Hill LLC.
20         MR. ONUFRAK:  Michael Onufrak, O-n-u-f-r-a-k
21    with White and Williams on behalf of SFR Equities LLC.
22         MR. LEVIN:  Scott M. Levin on behalf of the
23    witness and VAP, V-A-P.
24         THE VIDEOGRAPHER:  Will the court reporter
```

Page 5

```
 1    please swear in the witness.
 2            (Whereupon the Witness was sworn.)
 3         MR. VOSHELL:  Good morning, Mr. Reape.  We've
 4    met before.  My name is Greg Voshell.  I represent
 5    plaintiff, Warren Hill LLC in litigation that's been
 6    filed against defendant, SFR Equities LLC in the
 7    United States District Court for the Eastern District
 8    of Pennsylvania.
 9            Could you please state your name for
10    the record.
11         THE WITNESS:  David Reape.
12         MR. ONUFRAK:  May I say just something?  On
13    behalf of SFR Equities LLC, I would like to designate
14    the entire transcript as confidential under the
15    stipulation as approved by the Court on June 26, 2018,
16    which I have a copy of and we can attach it to the
17    transcript.
18            Second, I want to just repeat my
19    understanding reached last week with Mr. Voshell that
20    these are discovery depositions that are taking place
21    today and the next two days, not depositions to
22    preserve testimony.  Therefore, all objections will be
23    reserved until later except as to privilege and the
24    form of the question.
```



Page 10

1 my entire question out before you answer, and I'll try
2 to extend you the same courtesy.
3    A   Fair enough.
4    Q   So let me ask that again.  Are you
5 familiar with an entity known as Vendor Assistance
6 Program LLC?
7    A   Yes.
8    Q   And do you hold a position with that
9 company?
10   A   Yes.
11   Q   What is that position?
12   A   Chief Executive Officer.
13   Q   And for purposes of this deposition, if I
14 refer to Vendor Assistance Program LLC as a VAP,
15 V-A-P, will you understand that to be the same?
16   A   Yes.
17   Q   Do you have any familiarity with a company
18 known, named I should say Warren Hill LLC?
19   A   Yes.
20   Q   What is your familiarity with that entity?
21   A   I know the owners.
22   Q   Who would those owners be?
23   A   I think Jason Cannon, and Jackie Delaney,
24 and I'm not sure whether Jim Delaney has an interest

Page 11

1 or not.
2    Q   You yourself do not have an interest in
3 that entity; correct?
4    A   That's correct.
5    Q   Again for purposes of the deposition
6 today, if I refer to Warren Hill LLC as Warren Hill,
7 would you understand the two to be synonymous?
8    A   Yes.
9    Q   Do you have any familiarity with a company
10 by the name of SFR Equities LLC?
11   A   I know one of the owners, and they are a
12 member of vendor assistance.
13   Q   When you say Vendor Assistance, you're
14 referring to VAP?
15   A   Yes.  Sorry.
16   Q   Are you aware of a dispute between Warren
17 Hill and SFR?
18   A   Yes.
19   Q   Is that the dispute that's brought us here
20 today?
21   A   Yes.
22   Q   And you understand that that dispute is
23 pending in a Federal Court in Philadelphia?
24   A   Yes.

Page 12

1    Q   You just mentioned that SFR is a member of
2 VAP.  Is that currently they're a member?
3    A   They have a membership interest, correct.
4    Q   We will talk about the scope of that
5 membership interest later.
6       But do you know approximately what
7 percentage of an ownership interest they have in VAP?
8    A   I know there has been some transfers.
9 I believe 30 percent.
10   Q   To the best of your recollection, does the
11 interest that SFR currently holds in VAP date back to
12 when Warren Hill sold its interest in VAP to SFR?
13   A   That's correct, yes.
14   Q   And that happened in or around February of
15 2016?
16   A   Yes.
17   Q   Are you familiar with an entity by the
18 name of Blue Stone Finance, LLC?
19   A   Yes.
20   Q   And just for the court reporter's benefit,
21 is there a space between Blue and Stone in the name of
22 that entity?
23   A   That's correct.
24   Q   If I refer to Blue Stone Finance as BSF or

Page 13

1 Blue Stone Finance throughout the deposition, you
2 understand those to be synonymous?
3    A   Yes.
4    Q   Are you familiar with an entity by the
5 name of Bluestone Capital Markets, LLC?
6    A   Yes.
7    Q   And for court reporter's benefit, there is
8 no space between Blue and Stone in the name of that
9 entity; correct?
10   A   Yes.
11   Q   If I refer to Bluestone Capital Markets,
12 LLC as Bluestone Capital or BSC -- I'm sorry, BCM
13 during the deposition, will you understand them to be
14 synonymous?
15   A   Yes.
16   Q   I'll do my best to keep referring to them
17 as one entity, but there are a lot of acronyms in the
18 documents as we will see.
19       You mentioned that you are currently
20 the CEO or Chief Executive Officer of VAP.  Do you
21 also have a position with Blue Stone Finance?
22   A   Yes.
23   Q   What is that position?
24   A   CEO.



Page 14

1    Q    Do you currently hold a position with
2  Bluestone Capital?
3    A    Yes.
4    Q    What is that position?
5    A    CEO.
6    Q    Do you derive a salary from VAP?
7    A    Yes.
8    Q    Do you derive a salary from Blue Stone
9  Finance?
10    A    Not a salary.
11    Q    Can you explain?
12    A    I get a consulting fee from Blue Stone
13  Finance.
14    Q    Is that consulting fee set forth in any
15  type of an agreement?
16    A    No.
17    Q    So how is the consulting fee that you
18  derive from Blue Stone Finance memorialized?
19    A    It's not.
20    Q    Where did it arise from?  Strike that.
21        How did it come to be that you receive
22  a consulting fee from Blue Stone Finance?
23    A    As part of the formation of Blue Stone
24  Finance, I get a fee for the services I'm performing.

Page 15

1    Q    What is that fee?
2    A    It's approximately 3,000 a month.
3    Q    Is that a static number, or is there I
4  guess an upward mobility to that?
5    A    It's a static number.
6    Q    Is that the only fee, salary, or bonus
7  that you derive from your services is as the CEO of
8  Blue Stone Finance?
9    A    As the CEO, yes.
10    Q    Do you derive any fee or bonus or salary
11  from providing services to Blue Stone Finance other
12  than in your capacity as CEO?
13    A    I'm a member of all three entities and as
14  such would get the benefit of distributions from those
15  entities.
16    Q    But outside of your membership interest
17  and the consulting fee with Blue Stone Finance, is
18  there any other financial arrangement that you have
19  with that entity?
20    A    No.
21    Q    Do you hold a position with Bluestone
22  Capital?  You said you were CEO?
23    A    Yes.
24    Q    Do you derive any income other than a

Page 16

1  membership interest from performing services as CEO
2  for Bluestone Capital?
3    A    No.
4    Q    No bonus associated with any services you
5  provide as CEO of Bluestone Capital?
6    A    Just benefit as a member.
7    Q    We have premarked these as Exhibits 1, 2
8  and 3.  I'll hand them to you all at the same time;
9  and counsel can have a copy as well.  If you could
10  take a moment to review those documents, I'll have a
11  few questions on them.
12        MR. ONUFRAK:  Is this Reape 1?
13        MR. VOSHELL:  Yeah.  These are marked as Reape
14  1, 2 and 3.
15    Q    Mr. Reape, have you had a chance to review
16  what's been marked as Reape 1, 2 and 3?
17    A    Quickly, yes.
18    Q    Have you seen these documents before?
19    A    Yes.
20    Q    Can you just provide for the record a
21  brief description of what your understanding of the
22  documents is?
23    A    They're financial audits.
24    Q    The documents themselves are subpoenas for

Page 17

1  the testimony of a corporate representative of Vendor
2  Assistance Program, Bluestone Finance, and Bluestone
3  Capital Markets; correct?
4    A    Correct.
5    Q    And do you understand that you are here
6  today not only testifying in your individual capacity
7  but also as the corporate representative for Vendor
8  Assistance Program, Bluestone Finance, and Bluestone
9  Capital Markets?
10    A    Yes.
11    Q    If you could flip to -- There is a
12  schedule attached to each of the subpoenas which lists
13  an itemization of the topics for your testimony today.
14    A    Is that Exhibit?  A.
15    Q    Yes.  It is Exhibit A to each of the
16  subpoenas.
17        Have you reviewed this before?
18    A    Yes, at the time the subpoena was issued.
19    Q    If you could, take a moment to review
20  those and then let me know if you are prepared to
21  testify on the topics identified in each of the
22  Exhibits A's to the corporate designee subpoenas.
23    A    I am.
24    Q    Going back briefly to your role as CEO for



Page 18

1  VAP, do you derive a salary from that role?
2      A    Yes.
3      Q    What is that salary?
4      A    It's approximately 220,000 a year.
5      Q    And is there any bonus payment that you
6  are eligible for serving as CEO of VAP?
7      A    We have an employee bonus pool.
8      Q    When you say we, what are you referring
9  to?
10     A    Vendor Assistance Program has an employee
11 bonus pool, as does BSF.
12     Q    And are those distinct pools?
13     A    Yes.
14     Q    To the best of your recollection, when was
15 the BSF or Blue Stone Finance pool created?
16     A    At some point during 2017.  If I could
17 clarify, we have had an existing bonus pool for VAP
18 since 2014.  No payments were made under it.
19     Q    So the VAP bonus pool that you're
20 referring to, the one that's been existing since about
21 2014 had a pool of money but no bonuses we're paid out
22 of it, is that what you're saying?
23     A    It existed, but there was never any money
24 to pay under it.

Page 19

1      Q    There was actually no money in the fund
2  for a period of time?
3      A    No.
4      Q    Is there money in that fund now?
5      A    We have made employee bonuses.
6      Q    Just to clarify, when you say we, you're
7  referring to VAP?
8      A    VAP as well as BCM and BSF.
9      Q    The BSF, so if you are labeled as a BSF
10 employee, are you eligible for the a Vendor Assistance
11 bonus pool?
12     A    Yes, all of the employees -- and we have
13 some consultants that are in that pool -- are eligible
14 for the three entities and any bonuses due under the
15 three entities.
16     Q    Can you briefly describe your educational
17 background for the record?
18     A    I have a degree in mechanical engineering
19 from Yale University, and I have a Master's Degree in
20 applied mathematics from the University of Virginia.
21     Q    I'm sorry.  Can you speak up on the latter
22 part of that answer?
23     A    Sure.  Yale was the Bachelor's Degree in
24 mechanical engineering, and I have a Master's Degree

Page 20

1  in applied mathematics from the University of
2  Virginia.
3      Q    Is that the extent of your education, your
4  formal education?
5      A    Some additional graduate courses, but --
6      Q    But no degrees associated with those
7  graduate courses?
8      A    No.
9      Q    Do you hold any certificates or anything
10 along those lines outside of a formal degree?
11     A    No.
12     Q    You are not at CPA?
13     A    No.
14     Q    Could you also briefly describe your
15 professional background for the record?
16     A    I was an options trader in Chicago for
17 four years.  I worked for an industrial distribution
18 company that's based in Chicago for four years.  I was
19 the chief operating officer of J.G. Wentworth for
20 13 years.  I had a Series 7 license and worked for
21 Kildare Capital for three years.  And since 2012 I've
22 been the CEO of Vendor Assistance Program.
23     Q    If we can go back a bit -- let's kind of
24 frame this out from a time standpoint -- when did you

Page 21

1  get your degree from Yale?
2      A    1984.
3      Q    What about the degree from the University
4  of Virginia?
5      A    1986.
6      Q    Then did you become an options trader in
7  Chicago right after that?
8      A    Yes.
9      Q    From a time period standpoint, how long
10 did that last?
11     A    Four years.
12     Q    So that brings us to approximately 1990?
13     A    1990.
14     Q    Who were you an options trader with when
15 you were in Chicago?
16     A    I was an independent.  I worked,
17 self-employed.
18     Q    Then where did you go in 1990 when you
19 made the shift from options trader to another company?
20     A    I worked for McMaster-Carr Supply Company.
21     Q    How long were you with McMaster?
22     A    Four years.
23     Q    That brings us to approximately 1994;
24 fair?



Page 30

1   a receivable.
2       Q   So the State receives an invoice from a
3   vendor and at that point owes the vendor for a service
4   that has been provided?
5       A   Yes.
6       Q   Is that a fair way to say it?
7       A   Uh-huh.
8       Q   Is one of the vendors to the State Blue
9   Cross and Blue Shield of Illinois?
10      A   Yes.  They're an HMO provider to the
11  State.
12      Q   And, again, we will get to this later.
13          In your interacting with Blue
14  Cross/Blue Shield of Illinois, have they also been
15  referred to as Health Care Service Corp.?
16      A   Yes.
17      Q   Do you understand those two entities to
18  the extent they are distinct to be affiliates of each
19  other?
20      A   So Blue Cross/Blue Shield of Illinois is
21  just the d/b/a for Health Care Service Corp.
22      Q   And you referred to a Prompt Payment
23  Penalty.  Does that arise under a particular statute
24  or regulation under Illinois?

Page 31

1       A   It does.
2       Q   Are you aware of what that statute or
3   regulation is?
4       A   When I can remember it, yes.  It's the
5   state Prompt Payment Act.  I don't have -- The
6   statutory reference escapes me.  It's actually been
7   codified under Public Act 1089?
8       Q   What is the Prompt Payment Penalty or
9   interest that accrues?  Could you describe that for
10  the record?
11      A   Sure.  90 days after the State receives
12  and acknowledges and verifies and puts in line for
13  payment an invoice, that invoice starts accruing
14  Prompt Payment Penalty on a daily basis on an amount
15  that amounts to 1 percent per month.
16      Q   How long will that interest or that
17  penalty accrue?
18      A   It accrues until the point at which the
19  State issues a payment against the invoice.
20      Q   When you say issues a payment against the
21  invoice, are you referring to the face value of the
22  invoice or the face value plus the penalty that has
23  accrued up to the point of the payment?
24      A   The face value.  The penalty payments are

Page 32

1   paid separately.
2       Q   If the face value of the invoice is paid
3   off, does a penalty accrue on I guess the balance of
4   the penalty that had been earned at that point?
5       A   No.
6       Q   Now, what enables VAP to purchase
7   receivables, State of Illinois receivables?  Strike
8   that.
9           Is there a program that the State of
10  Illinois runs under which VAP is able to purchase
11  these receivables?
12      A   So there have been in existence one formal
13  program and one not so formal program.
14      Q   Let's start with the formal program.
15  What's the formal program?
16      A   It's the Vendor Payment Program.
17      Q   Is that sometimes referred to as the VPP?
18      A   Yes.
19      Q   What is the Vendor Payment Program or the
20  VPP?
21      A   So it was a bicameral program that was put
22  together in 2011 that allowed for an assignment of
23  base invoices as well as their prompt payment
24  penalties, and it set forth a set of rules for

Page 33

1   purchasing those receivables.
2       Q   And are those rules codified in part in
3   what are referred to as program terms?
4       A   Yes.
5       Q   And what I guess Illinois regulatory body
6   would issue those program terms?
7       A   So, again, the group was called JCAR which
8   is a joint cameral group that issued those terms.
9       Q   Is that a subdivision of any state agency
10  to the best of your knowledge?
11          Let me ask it a bit more specifically.
12  Are you familiar with a regulatory body known as CMS
13  within the State of Illinois?
14      A   Yes.
15      Q   And do you know what the acronym CMS
16  refers to?
17      A   Central Management Services.
18      Q   Is the J --
19          What did you refer to that as?
20      A   JCAR.
21      Q   Is the JCAR subsumed within CMS to the
22  best of your knowledge?
23      A   No.  It's separate from it.
24      Q   So your testimony is you don't believe



9 (Pages 30 to 33)

Page 86

1  Illinois?
2      A   He thought he had a chance to be another
3  Wentworth, a company we had been affiliated with.
4      Q   What do you mean when you say another
5  Wentworth?
6      A   He thought it was a business that had a
7  lot of potential.
8      Q   Ultimately you agreed with him and decided
9  to come out to Illinois; correct?
10     A   You know, he very much wanted me to be a
11 part of what was happening here.  He was taking on an
12 interest in the company.  They didn't have any
13 operations to speak of.  They didn't have any
14 financing, and they didn't have any experience with
15 either of those things, both of which I had a lot of
16 experience in.
17     Q   So when you did come to I guess Illinois
18 to work with VAP in early 2012, what was your primary
19 role?
20     A   Initially it was an operating one.  It was
21 to put the, to formalize the operating activities, to
22 organize them, and then to go help solicit financing.
23     Q   When you say go help solicit financing,
24 are you referring to outreach to lenders on VAP's

Page 87

1  behalf?
2      A   Yes.
3      Q   Did you have a list of lenders that could
4  have been affiliated with VAP that you targeted?  Walk
5  me through how that works.
6      A   So we actually retained a Wall Street firm
7  to help us obtain financing.
8      Q   And what was the name of that?
9      A   Moelis & Company.
10     Q   Can you just spell that?  I don't think I
11 heard you correct.
12     A   Yeah, Moelis.  It's M-o-e-l-i-s.
13     Q   Is that an entity that you were familiar
14 with from your past work?
15     A   Yes.
16     Q   Who was your contact with that company,
17 the Moelis company if you recall?
18     A   I don't recall.
19     Q   Ultimately you were, you as the CEO of VAP
20 were you able to secure a vendor for VAP; correct?
21     A   Not via Moelis.  We ultimately brought in
22 the two individuals which we referenced earlier in the
23 operating agreement, Blewlitt and Neumann; and they
24 gave us some assistance.  And ultimately we were able

Page 88

1  to obtain financing for VAP.
2      Q   What institutional I guess lender was
3  VAP's first?  Let me strike that.
4          Which lender first agreed to kind of
5  come on with VAP?
6      A   So it was a series of lenders that came in
7  on a senior and mezzanine structure.
8      Q   Do you recall the names of those lenders?
9      A   Citibank was senior.  Rosemawr was a
10 junior lender.
11     Q   And that's R-o-s-e-m-a-w-r; correct?
12     A   Yes.
13     Q   Like Bryn Mawr?
14     A   Like Bryn Mawr, yes.
15         Elliott.
16     Q   Is that the same Elliott you referred to
17 earlier?
18     A   Same Elliott via a couple of their
19 entities.
20         And BlackRock.
21     Q   And BlackRock I don't think we have heard
22 about before.  Can you just briefly describe what
23 BlackRock is?
24     A   Sure.  BlackRock is an a multi billion

Page 89

1  dollar alternative asset manager effectively.  You can
2  think of them kind of like a hedge fund.  They were a
3  participant, and they actually also as Elliott did had
4  a warrant to purchase interest in the company.
5      Q   About what time period if you recall did
6  VAP first obtain financing from these lenders?
7      A   We closed on December 19 of 2012.
8      Q   So it took approximately a year of you
9  being here in Illinois to land the financing?
10     A   Yes.
11     Q   Do you recall what the original amount was
12 of the lending that VAP had secured?
13     A   321 million.
14     Q   I had a feeling you would remember that
15 number.
16         After VAP obtains this financing, what
17 does that do for the business in terms of getting it
18 really off the ground?
19     A   Unfortunately it didn't do a lot of it.
20 We obtained the financing, but we didn't have any
21 clients.
22     Q   When you say clients, you're referring to
23 state vendors; correct?
24     A   Yeah.  We had done -- Just to clarify, the



1  Payment Program?
2      Q   Correct.  We will shift to the VSI here
3  shortly.  Don't worry.
4          What happens next in terms of the trust
5  formation?  Are we at the completion stage at this
6  point?
7      A   So we're again talking we're about the
8  transaction, just at the transactional level?
9      Q   That's right.  So the assignment agreement
10 is now signed and executed.  The diligence is
11 complete.
12     A   Okay.
13     Q   What happens next?
14     A   A third of the time there is an issue.
15     Q   What type of issues do you run into?
16     A   Occasionally we see a tax lien which more
17 often than not is what we consider fatal unless that
18 vendor can show that in fact that tax lien has been
19 resolved.  It's not unusual for our vendors to have
20 credit facilities and to have pledged these
21 receivables into that facility as part of a blanket
22 lien.
23          So we would attempt if it was the
24 latter to get some type of resolution with the

1  creditor.  So we would say to the vendor, the bank of
2  the west has a blanket lien all over your receivables,
3  here is a form consent and lien waiver that we use on
4  these types of things.  We're going to need the debt
5  bank to waive their right to any claim on what we're
6  purchasing.
7      Q   And just to back up again, you're
8  referring to all of the receivables.  The entirety of
9  the receivable is actually assigned to these trusts;
10 correct?  A hundred percent of the receivable is
11 assigned to the trust?
12     A   And it's Prompt Payment Penalty.
13     Q   To the extent any has accrued at that
14 point; correct?  I guess it would always accrue at
15 that point.
16     A   The Prompt Payment Penalty is a future
17 event.  So you're going to get the receivable and its
18 Prompt Payment Penalty.
19     Q   The right to receive the Prompt Payment
20 Penalty, that's right.
21     A   Yeah.
22     Q   So once I guess we get to the point where
23 VAP has discovered there are no problems such as liens
24 or has resolved them, what happens next?

1      A   We transmit the agreement to the State.
2      Q   And what happens after the State receives
3  the agreement?
4      A   So it goes to CMS.  Believe it or not,
5  they create a floppy disk or computer tape or a CD
6  depending, and they will create a report; and they
7  will send that down to the actual contracting agency.
8          In some instances CMS is the
9  contracting agency; but in many instances it's another
10 agency.  So, for example, an IBM receivable may have
11 DoIT which is the Department Of Innovation and
12 Technology as the contracting agency.
13         So CMS would send a report and a disc
14 with the data over to DoIT, the contracting agency.
15 DoIT would review everything that's come over and then
16 would sign off on the assignment.  They send it on to
17 Shared Services which is a department.  That's kind of
18 somewhere between CMS and the comptroller.  They would
19 enter it into their system.
20         They would send it up to the
21 comptroller.  The comptroller would formally update
22 the system to indicate the change of payee, and then
23 they would send an acknowledgement down CMS that the
24 receivable has been acknowledged -- it's really just a

1  printout -- at which point CMS would then send back to
2  us an acknowledgment that the receivable had been
3  assigned to us.
4      Q   Back to VAP; correct?
5      A   Back to VAP.
6      Q   Once that acknowledgment is received, what
7  happened happens next?
8      A   So we would update our system to reflect
9  that the assignment had been made; and then
10 periodically, depending upon the number of receivables
11 that have been assigned to us, we would do a funding
12 request.
13         We have funding minimums.  So if you
14 have a thousand dollar receivable and it's the first
15 one that got assigned to us this week, we would wait
16 until we had some more receivables prior to.
17     Q   When you have say funding request, you're
18 referring to the various financial deals that VAP had
19 secured with lenders?
20     A   Yeah.
21     Q   That would include the Citi deal that we
22 talked about earlier in late 2012?
23     A   Yes.  That was one of our financing
24 vehicles.



Page 134

1    Markets, LLC as the certificate holder representative;
2    correct?
3        A    Correct.
4        Q    And what does that mean?
5        A    So you would note all of the trusts have a
6    certificate holder, certificate holders or certificate
7    holder representatives.
8             So all trusts have to have, if nothing
9    else, a beneficial owner.  So at the bottom of a trust
10   there is a beneficial owner that has a certificate in
11   that trust.  That may be of nominal benefit.  There
12   may be no benefit to having that certificate.  It all
13   depends on the structure of the financing above it.
14       Q    So if you again can flip to Page 1 of the
15   agreement which again follows the Table of Contents,
16   this June, 2017 management agreement again in the
17   preamble lists VAP as the manager; correct?
18       A    Correct.
19       Q    And again it's the defined term Manager
20   with a capital M; correct?
21       A    Yes.
22       Q    And in the third whereas clause which is
23   the fourth paragraph of the entire document, it states
24   that the manager shall -- Strike that.  It states the

Page 135

1    the manager which is VAP shall perform the services
2    set forth herein on behalf of the trust; correct?
3        A    I'm sorry.  Which paragraph are you on?
4        Q    Sure.  It's still on Page 1, Mr. Reape.
5    It's the third whereas clause.
6        MR. ONUFRAK:  15831, correct?
7        MR. VOSHELL:  That's correct.
8        MR. ONUFRAK:  Second line from the bottom of
9    the paragraph.
10       MR. VOSHELL:  Q  It begins whereas on the terms
11   and subject to the conditions hereinafter set forth.
12       A    Okay.
13       Q    Do you see it?
14       A    Yes.  Got it.
15       Q    The manager which is VAP shall perform the
16   services set forth herein on behalf of the trust;
17   correct?
18       A    Correct.
19       Q    And again if we move to Page 2 which is
20   the definitional portion of this contract, it lists a
21   Manager fee and a Manager incentive fee; correct?
22       A    Correct.
23       Q    And both of those defined terms have a
24   capital M before the word manager; correct?

Page 136

1        A    Correct.
2        Q    And these just set forth the fees that the
3    manager is going to earn in its capacity as manager;
4    correct?
5        A    They set forth how it will be calculated.
6    The Manager fee rate obviously we have seen previously
7    is set to define what the given series will actually
8    pay.
9        Q    But pay to the manager; correct?
10       A    Pay to the manager or certificate holder.
11       Q    If, in fact -- Well, we will get to that
12   later?
13       A    If we look at all of the series, we will
14   see there are different variants.
15       Q    In fact, some of the more recent series
16   don't structure the transactions in a way that allow
17   for a senior or junior fees but instead put the value
18   of the management services into a trust certificate;
19   correct?
20       A    Sure.
21       Q    But not this one in particular; right?
22       A    Not the master trust; but, again, there is
23   an ability on the individual series issued under it to
24   define -- So, for example, a Manager Incentive Fee

Page 137

1    might be 0 in a given series because it's defined.
2        Q    In Section 2.01 which appears on Page 4,
3    this states again that VAP will be appointed as the
4    manager; correct?
5        A    Correct.
6        Q    Then about halfway through that paragraph
7    in a sentence that begins with the word in, it says:
8    In consideration of the performance of its duties
9    hereunder, the manager which is VAP shall be paid the
10   Manager fee and the Manager incentive fee with respect
11   to any series in accordance with the terms of the
12   related series trust agreement and subject at all
13   times to the availability of amounts in the collection
14   account for such series; correct?
15       A    Correct.
16       Q    If you turn to Page 5, Article 3 and
17   Section 3.01, this sets forth the duties of the
18   manager; correct?
19       A    Yes.
20       Q    And so these are the duties that VAP was
21   undertaking as manager of this particular trust;
22   correct?
23       A    Correct.
24       Q    If you can flip to what's been marked now



Page 202

1  company in Puerto Rico.  Whose idea was it to do that?
2      A   So we, my partner, Brian Hynes moved to
3  Puerto Rico in 2014 and was getting certain tax
4  benefits down there.
5          We became aware that there is an
6  opportunity for companies in the U.S. to move certain
7  services to Puerto Rico and get certain tax benefits.
8  It's under Act 20.  It's a way -- They're trying to
9  stimulate the Puerto Rico economy.  So many businesses
10 in the financial services area, mortgage companies,
11 insurers, banks have moved operations down to Puerto
12 Rico to take advantage of Act 20.
13         So Blue Stone Finance was created to
14 save the members of that a substantial amount in tax.
15     Q   Going back to Exhibit A -- we're
16 delineating services -- are you familiar with what is
17 referred to as a transfer pricing study?
18     A   Only when somebody asks me about it.
19 I did a little Googling on it.  I would say there was
20 no formal study done by an independent auditor here.
21 These were activities that I allocated but that
22 obviously in a subsequent audit our auditors have
23 validated.
24     Q   That's the auditing firm that Mr. Harris

Page 203

1  used to be a partner of?
2      A   Yes.
3      MR. ONUFRAK:  I'm serious.  If he does it
4  again, I'm going to ask him to be excused.  I'm not
5  going to put up with it.  I've agreed --
6      MR. VOSHELL:  He's a corporate representative.
7  He's going to stay here.  I will talk to him, but I
8  doubt he's doing anything that's remotely offensive or
9  inappropriate.
10     MR. ONUFRAK:  He is.  He is.
11     MR. VOSHELL:  Mike you've had your head down
12 for half of the deposition.  I don't understand how
13 you could have even seen it happen, if it did which I
14 don't believe.  So we're going to move on.
15     Q   All of the services that are set forth in
16 Exhibit A, are these services that were performed by
17 VAP exclusively prior to the creation of the Bluestone
18 entities?
19     A   Yes.
20     Q   Could VAP itself complete and perform all
21 of these services today if the Bluestone entities were
22 dissolved?
23     A   Yes.
24     Q   If you could go to the second Blue Stone

Page 204

1  Finance agreement, please.  We're now looking at the
2  second Blue Stone Finance agreement.  This one, Warren
3  Hill 28 addresses the time period prior to
4  November 1st, 2017; correct?
5      A   Correct.
6      Q   And it too has a Section 5 for
7  compensation of service provider; correct?
8      A   Correct.
9      Q   And, again, it defines compensation here
10 by way of an assignment; correct?
11     A   I think the same definition as the
12 previous agreement.
13     Q   Well, on that -- And I do think the
14 calculation is done slightly differently here;
15 correct?
16     A   Okay.  Let me take a look.
17     Q   Yeah.  Take a look.
18     A   Okay.
19     Q   Would you agree that the calculation
20 itself as to what is purporting to be assigned is
21 slightly different than the prior agreement?
22     A   Yes.
23     Q   Do you know why that is?
24     A   I think it's really it's addressing

Page 205

1  activities that have already occurred versus the other
2  agreement is forward looking.
3      Q   If there were discussions I guess in terms
4  of how to structure this compensation provision or the
5  compensation provision in the other Blue Stone Finance
6  agreement that we looked at, would that be done via
7  email?
8      A   I suspect it probably happened when I was
9  in Puerto Rico.  I sat down with Alan Wilson who
10 assisted me with all of this.
11     Q   When were you in Puerto Rico working on
12 this, if you recall?
13     A   I'm in Puerto Rico once a month.
14     Q   Do you recall when you were specifically
15 working on this, this meaning the two Blue Stone
16 Finance service agreements?
17     A   Yeah.  I was in Puerto Rico in November.
18 Prior I was down there I think twice in August.  Some
19 of it may have been under way then.
20     Q   If you flip to Section 9 of Exhibit
21 Number 28, would you agree that it has representations
22 concerning compliance with applicable laws in
23 compliance with management agreements comparable to
24 the other Blue Stone Finance agreement?



Page 210

1    the Blue Stone Finance Services agreements, but do you
2    recall who drafted the Bluestone Capital Markets
3    services agreement?
4         A   So again it was kind of to my recollection
5    a collaborative effort.  I know that there was a
6    version -- and it can be this agreement -- that Howard
7    & Howard drafted.  I believe the firm in Florida
8    probably had what hand in it, but I mean we would have
9    to take a kind of take the whole email chain to figure
10   it out.
11             I think the agreement's actually a
12   fairly standard style agreement.  Obviously the input
13   I strongly provided with the exhibits of all of the
14   activities the company, you know, amongst our internal
15   discussions how we would allocate among consolidated.
16        Q   So in large measure the same cast of
17   characters were involved with the Bluestone Capital
18   Markets servicing agreements as with the Blue Stone
19   Finance ones?
20        A   Correct.  Again I would have to check with
21   PMA.  PMA would not have reviewed the Bluestone
22   Capital Markets.  My recollection certainly is I
23   showed it to them at the physical meeting in Puerto
24   Rico.  We discussed it.

Page 211

1         Q   Quick question on Bluestone Capital
2    Markets.  Whose idea was it to make it a Florida
3    company?
4         A   So we made it a Florida company because we
5    needed to set it up quickly, and I used one of the
6    members that's got a lot of experience setting up
7    entities and had a lot of capacity which is SFR.
8         Q   That's Mr. Harris?
9         A   Resources down there, yeah.  I mean,
10   again, we're a very small company.  So I try to use
11   all of the member resources and whatever external
12   resources I can.
13             They have an attorney down there that
14   I'm told just sets up entities because they have
15   multiple real estate transactions.  It's just an easy
16   way to get things set up quickly.
17        Q   SFR is affiliated with another company as
18   well; correct?
19        A   So there are multiple entities down there,
20   correct.
21        Q   Are you familiar with the name Alan
22   Ginsburg (phonetic)?
23        A   Yes.
24        Q   To the best of your knowledge, is SFR

Page 212

1    affiliated with Mr Ginsburg or one of his affiliate
2    companies?
3         A   There is an entity called AHG, and there
4    is some intercompany affiliation there.
5             You know, from our perspective, what
6    our members do among their entities and allocations,
7    we're really not that very concerned about that.  It
8    doesn't really impact.
9             To the extent their transfers are
10   governed by the operating agreements, obviously we
11   would get consent.  But certainly I would be free with
12   my interest in NAI to do transfers or bring people in
13   or whatever.  It's just if I transferred outside of
14   that entity, there is a consent provision.
15        Q   But when you refer to the resources in
16   Florida, are you referring to both SFR and also its
17   affiliates like AHG?
18        A   Sure.  I guess I think of them all as one
19   kind of combined entity.
20             (W.H. Deposition Exhibit No. 30
21             was marked for identification.)
22        Q   Take a moment and look at what's been
23   marked as Exhibit Number 30, please.
24        A   Yes.

Page 213

1         Q   Are you familiar with that document?
2         A   I prepared it.
3         Q   And who asked you -- Who if anybody asked
4    that you prepare that document?
5         A   So when you served us with
6    interrogatories, depositions, requests for
7    information, we retained Howard & Howard.  Dan Rubin
8    is primarily the attorney I've dealt with in
9    representation for both VAP, Bluestone Capital, and
10   Blue Stone Finance in connection with this litigation
11   that none of our entities are a party to, none of the
12   three entities I've just mentioned.
13             So it became clear in my discussions
14   with Dan that one of the sets of questions that would
15   come out at some point would be what was the genesis
16   to creating these affiliated entities, and it occurred
17   to me to put a time line together of events for a day
18   like today since my memory month by month is not
19   always the best because of the pure level of activity.
20             I talked to Dan.  I hand wrote out my
21   recollections.  I typed them up quickly.  As the IT
22   record will indicate, there is one version of this
23   document.  When I look at it now, there is some typos
24   and some things stylistically I don't like.  But it

Page 250

1  Shield of Illinois?
2      A   Yes.
3      Q   And was that part of your investigation of
4  Blue Cross/Blue Shield of Illinois as a potential
5  vendor to do business with?
6      A   I'm sure it was although I don't remember
7  the 2012 meeting.
8      Q   It would make sense you would be meeting
9  with Blue Cross/Blue Shield for that purpose; right?
10     A   It could have been for participation in
11 vendor payment or it could have been exploring
12 Medicaid opportunities, a different program.
13     Q   Right.  The Medicaid opportunities are
14 carved out of the VPP; correct?
15     A   They're excluded by VPP.
16     Q   Excluded by VPP, yeah.
17     A   Medicaid receivables are not assignable.
18     Q   Right, in light of the federal oversight.
19     A   Yeah.
20     Q   If you flip to the next email, it's an
21 email from you again to a number of people attaching a
22 marketing update.
23     A   Okay.
24     Q   And just very quickly, do you know --

Page 251

1  There is a Yahoo address as the first two.  Do you
2  know who that is?
3      A   Dick Blewlitt.
4      Q   That's the Mr. Blewlitt that we talked
5  about at the beginning of the deposition?
6      A   That's correct.
7      Q   The next is -- Is that Mr. Neumann?
8      A   That's Mr. Neumann.
9      Q   The same Mr. Neumann we talked about
10 earlier?
11     A   It is.
12     Q   The next is Jim Delaney?
13     A   Yes.
14     Q   Then Brian Hynes at his Howard &
15 Howard.com address?
16     A   Yes.
17     Q   Drew Delaney and Mr. Cannon; right?
18     A   Correct.
19     Q   If you turn to the marketing update
20 itself, it's dated January 10th, 2013; right?
21     A   Yes.
22     Q   Do you recall whether you drafted this
23 marketing update?
24     A   So this was kind of a collective.  Drew

Page 252

1  did a lot of the work.  I had some input.  We had some
2  issues because we had a $320 million line.  We were a
3  month in, and we used $5 million.  As you can imagine,
4  the lenders were a little uncomfortable in the lack of
5  business.
6      Q   Is one of the purposes of this marketing
7  update to identify vendors that VAP was investigating
8  for potential business deals?
9      A   That and to encourage our lenders not to
10 give up a month in.
11     Q   If you turn to the next page, it's marked
12 Warren Hill 96 at the bottom, you'll see that there's
13 a co-marketing header on this particular slide; right?
14     A   Yes.
15     Q   It says large vendor outreach; right?
16     A   Yes.
17     Q   And there is a chart that follows the
18 large vendor outreach heading that states status.  Do
19 you see that?
20     A   Yes.
21     Q   In discussion is the first row under the
22 word status; right?
23     A   Yes.
24     Q   And it specifically references vendors in

Page 253

1  the next column; right?
2      A   It does.
3      Q   And one of the vendors -- Strike that.
4          One of the vendors is Blue Cross/Blue
5  Shield of Illinois; right?
6      A   Yes.
7      Q   And the status for Blue Cross/Blue Shield
8  of Illinois is "in discussion"; right?
9      A   Yes.
10     Q   So this is early 2013, and there are
11 discussions between Blue Cross/Blue Shield of Illinois
12 and VAP about potential transactions; right?
13     A   True.  And, in fact, this indicates they
14 would be registering which they finally did last week.
15     Q   And you're referring to the bottom portion
16 of this particular marketing update where Blue
17 Cross/Blue Shield of Illinois is not only specifically
18 referenced but also referenced in boldface; right?
19     A   Yes.
20     Q   If you flip to the next page, please, it
21 has the Bates stamp Warren Hill 98.  This is an email
22 from Drew Delaney to yourself and Brian Hynes at his
23 Howard & Howard.com address; right?
24     A   Uh-huh.

Page 270

1    Q   And it states that during employment with
2  the company --
3         Now, company is defined on Page 1 as
4  Blue Stone Finance, LLC; right?
5    A   It is.
6    Q   -- employee, which is Mr. Wilson, may be
7  eligible to receive payment of an annual bonus as set
8  forth in the Vendor Assistance Program, LLC Employee
9  Bonus Plan.  Did I read that correct?
10   A   Yes.
11   Q   Is this the Employee Bonus Plan you
12 referred to earlier today?
13   A   Yes.
14   Q   So as an employee of Blue Stone Finance,
15 Mr. Wilson is eligible for a bonus payable through
16 Vendor Assistance Program?
17   A   So along with the employee agreement --
18 I'll take the hundred percent blame on this -- I did
19 not produce, there is a separate acknowledgment of the
20 Employee Bonus Plan that are our employees sign.
21        And to make it clear, it could be
22 coming from, the bonus could be coming from any of the
23 entities potentially.
24   Q   And you said that's an acknowledgment?

Page 271

1    A   Yeah.  It's a separate stand-alone.
2         When I decided to clean up all of the
3  employment agreements, we brought Chris Nybo who is an
4  attorney -- I also think a state representative --
5    MR. LEVIN:  Senator.
6    A   Senator.  He's on the wrong side, a
7  Republican which is the right or wrong side, depending
8  on where you sit which means he's in the minority.
9         I think Chris Nybo did a whole bunch of
10 things for us.  We looked at compensation studies to
11 determine how our employees were being compensated,
12 and then I had him put together an employment
13 agreement for the employees of the different entities
14 and, along with that the acknowledgment of the
15 employee, what I would call profit participation bonus
16 agreement which is kind of a one-page agreement that
17 everyone signs.  It's not really part of the
18 employment agreement per se which is why I didn't
19 include it here.
20   MR. VOSHELL:  Q  And that's the acknowledgment
21 you referred to earlier?
22   A   It's kind of -- You have to kind of opt
23 into the plan; and, again, it makes it clear that it's
24 100 percent discretionary as to whether anything will

Page 272

1  be paid.  So nothing is guaranteed, and it doesn't fix
2  percentages.
3         So it's all subject to board of manager
4  approval.  Yes, we're going to pay a bonus; and then
5  we're going to pay Reape a million dollars and
6  everyone else $50,000.
7    Q   You referenced Mr. Nybo?
8    A   Chris Nybo, an Illinois attorney?
9    Q   What firm is he affiliated with?
10   A   Much Shelist I believe is the firm.  He's
11 an employment specialist.
12   Q   You said you brought him in to "clean up
13 the employment agreements"?
14   A   No.  One of my big focuses last year was
15 general governance; so I wanted to get employees under
16 a formal agreement, under confidentiality.
17        In the beginning of VAP we did have new
18 employees sign like a confidentiality agreement but
19 really not much more than that.  So it's a small
20 company with a lot of essential people, so I kind of
21 wanted to get everybody under an agreement.
22   Q   When you say it's a small company, what
23 are you referring to?
24   A   It's a small -- Collectively it's a

Page 273

1  small -- our affiliates.  And, again, we've
2  consolidated the affiliates on a financial statement
3  basis.  It's a small group of people collectively
4  working on this.
5    Q   I guess while we're on that point, who
6  comprises that small group of people?
7    A   So for VAP -- and some of this is counting
8  distinction.  So VAP, we will talk about who has
9  employment agreements first.
10   Q   Okay.
11   A   So for VAP, Patrick Doloughty and Marisol
12 Solis.
13        For Blue Stone Finance --
14   Q   Do you have an employment agreement with
15 VAP?
16   A   I don't have an employment agreement.
17   Q   Do you have an employment agreement with
18 any entity?
19   A   No.
20   Q   For BSF?
21   A   Alan Wilson, Jeff Balvanz, Andrew Reape;
22 and Cody Williams is an employee.  He does not have an
23 employment agreement, but he acknowledged -- We made
24 him like an offer letter that he acknowledged terms



Page 274

1  on.
2      Q   What about Bluestone Capital Markets?
3      A   No employees.
4      Q   No employees.
5      A   I am paid through VAP; but on an
6  accounting basis based on the allocations of
7  activities we have done under this servicing
8  agreement, Bluestone Capital Markets reimburses VAP
9  for my salary and expenses. So I get a W-2 from VAP
10 as a paymaster.
11     Q   You mentioned Mr. Balvanz being a BSF
12 employee; right?
13     A   Yes.
14     Q   Does his company, that Fulcra company do
15 work for BSF?
16     A   They also provide consulting services.
17     Q   Do they provide consulting services to VAP
18 currently?
19     A   You know, I'd almost have to kind of check
20 the accounting records on the way it breaks down, but
21 I think all of our IT is serviced and managed through
22 Blue Stone Finance.
23     Q   And Fulcra is based you said in Colorado
24 somewhere?

Page 275

1      A   Yes.
2      Q   Prior to the creation of Bluestone
3  entities, were all of these individuals considered VAP
4  employees?
5      A   So prior to the creation of the Bluestone
6  entities, Jeff was a consultant.
7      Q   For VAP; correct?
8      A   For VAP.
9      Q   And was his company a consultant, Fulcra a
10 consultant for VAP as well?
11     A   Yeah. It's kind of -- It's evolved. So
12 in the beginning, it was entirely Fulcra. And at one
13 point it got split off between Fulcra and I think one
14 of Jeff's other entities, and now it's strictly Jeff's
15 a W-2 BSF employee and we have used some of Fulcra's
16 resources. Fulcra has its own employees.
17     Q   Why don't we go one by one.
18     A   Sure.
19     Q   Prior to the creation of the Bluestone
20 entities, was Alan Wilson an employee of VAP?
21     A   No.
22     Q   He was at the time an employee of AHG;
23 correct?
24     A   Yes.

Page 276

1      Q   As least to the best of your knowledge?
2      A   Yes.
3      Q   Prior to the creation of the Bluestone
4  entities, was Andrew Reape an employee of VAP?
5      A   He was.
6      Q   Prior to the creation of the Bluestone
7  entities, was Cody Williams an employee of VAP?
8      A   I believe he was paid as a consultant, so
9  not an employee.
10     Q   When Blue Stone Finance was created, was
11 Mr. Williams paid as a consultant for a period of
12 time?
13     A   On the timing he may have been.
14     Q   But he would have been paid by Bluestone
15 Finance for any of that consulting?
16     A   You know, on allocation basis, who's
17 making payments could be different than who's
18 ultimately responsible.
19     Q   What about Mr. Doloughty, prior to the
20 creation of Bluestone Finance and Bluestone Capital
21 Markets, was he an employee of VAP?
22     A   Yes, and he still is.
23     Q   Same question with respect to Miss Solis,
24 Marisol Solis I should say?

Page 277

1      A   So she has always been an employee of VAP.
2      Let me step back from that. She was a
3  consultant to Health Care Finance which is one of the
4  entities that's not subject to these activities. She
5  moved from being an employee of Health Care Finance, a
6  consultant to Health Care Finance to an employee of
7  VAP?
8      Q   Now, you referenced there was I guess
9  internal accounting as to which entity pays for which
10 service or agreement?
11     A   Sure.
12     Q   Is there a spread sheet or a series of
13 spread sheets that would show that flow of money from
14 one company to another?
15     A   Yes.
16     Q   And how was that stored?
17     A   So obviously each entity has its own set
18 of accounting records and books. You know, with
19 regard to the intercompany transfers, you know, there
20 are going to be a lot of documents out there.
21     You showed an email from the bank
22 obviously that showed an intercompany transfer.
23 Obviously when you have affiliated companies that are
24 performing different services for each other, there



Page 286

1    Q    And that attachment is reflected in the
2    second page of the exhibit?
3    A    It is.
4    Q    I should say the second and the third
5    page.
6        And Mr. Harris writes, As a follow-up
7    to a meeting, I have put together the attached outline
8    separating services, responsibilities, and revenue
9    sources by companies.
10       Did I read that correctly?
11   A    Yes.
12   Q    And he's referring to separating up
13   services, responsibilities, and revenue sources among
14   VAP, Bluestone Capital Markets, Blue Stone Financial
15   Services and also Health Care Finance?
16   A    Uh-huh.
17   THE REPORTER:  Is that yes?
18   THE WITNESS:  Yes.
19   MR. VOSHELL:  Q  And he says this a rough first
20   draft.  Do you see that?
21   A    Yes.
22   Q    Is this the first time that anybody either
23   at VAP or another other entity attempted to separate
24   out services, responsibilities, and revenue services

Page 287

1    by company?
2    A    So, you know, again I'd have to kind of
3    check to see if I have any email records.  Obviously I
4    had -- because Gene would not have had the ability --
5    identified all of the services, all of the activities
6    being performed across all of the trusts.
7        So I think separately I had my own
8    notes, and I don't know what documents I may have
9    created in Word, but certainly my own notes.
10       Also I would point out that I was at
11   the meeting with him in San Juan, and he and I spent
12   quite a bit of time there and quite a bit of time
13   talking about this.
14   Q    Who is Edgar that you met with?
15   A    That's our attorney at PMA.
16   Q    In Puerto Rico?
17   A    In Puerto Rico.
18   Q    And Mr. Harris then writes, as a next
19   step, I will start to work through the economics
20   (profitability by entity) to see what sort of results
21   this gives us; right?
22   A    Sure, yes.
23   Q    So Mr. Harris here is focusing on the
24   profitability of each entity; correct?

Page 288

1    A    Yes.
2    Q    And he's focused on the results of
3    separating out these various alleged services;
4    correct?
5    A    Right.
6    Q    And seeing what profit results various
7    permutations of that separation would develop; right?
8    A    So results here actually refers to the
9    absolute and principal purpose of creating Blue Stone
10   Finance, tax impact.
11   Q    And that's your understanding as to why
12   you believe it was created correct?
13   A    No.  That's why it was created.
14   Q    Are you aware that it was created just
15   weeks after a dispute with respect to the member
16   purchase agreement arose?
17   A    No.
18   Q    And you don't speak for Mr. Harris, do
19   you, Mr. Reape?
20   A    I don't.
21   Q    And do you don't know what his motives
22   were, do you?
23   A    No.
24   Q    And you're aware that SFR in this case is

Page 289

1    taking the position that any money assigned or
2    allocated to Blue Stone Finance should not be included
3    in the provision of the member purchase agreement?
4    A    I am aware of that via this litigation.
5    Q    At this time, August 5th, 2017, was there
6    an office for Blue Stone Finance in Puerto Rico?
7    A    We were in the process of leasing space.
8    Q    So no?
9    A    No.
10       Let me, if I could, step back from
11   that.  Brian Hynes's principal residence in Puerto
12   Rico was our listed office address.
13   Q    But you said he moved in there in 2014?
14   A    Correct.
15   Q    And Blue Stone Finance wasn't created
16   until March of 2017?
17   A    Right.
18   Q    So there was no new office for Blue Stone?
19   A    No.  At the time Blue Stone Finance was
20   created, our principal office was Brian's house or
21   Brian's condo.
22   Q    Were there any employees of Blue Stone
23   Finance as of August 5th, 2017?
24   A    No.

MAGNA
LEGAL SERVICES

Page 302

1  Markets to serve as the risk retention entity -- we
2  were transferring VAP-held certificates to Bluestone
3  Capital Markets.  At the time that we created the
4  Barclays revolving facility, VAP had been the
5  certificate holder.
6         One of the things -- So there were a
7  series of reasons why we decided we were going to
8  transfer the VAP-held certificates to Bluestone
9  Capital Markets.  One was that we already had the IRT
10  funding trust that was holding those certificates.  We
11  were kind of viewing Bluestone Capital as our equity
12  entity; so for an organizational standpoint, it made
13  sense to hold all of those.
14         With regards to the Barclays revolving
15  facility, we had been extremely successful; and we
16  were at capacity.  I had some discussions with
17  Barclays about upping the commitment which they had
18  from an on balance sheet perspective an issue with.
19  But they said we could actually create notes series
20  under the trust that was holding the revolving
21  commitment.
22         So anticipating like we have with all
23  of the note series that we would need a risk retention
24  entity, I thought it made sense on the Barclays

Page 303

1  revolving note or the Barclays revolving trust to
2  transfer that certificate.
3         Citi certificate and the RRT
4  certificate, again it was just part of the
5  restructuring to put all of those kind of activities
6  in there.
7         So the reason we were communicating
8  with Josh Wrightsman who is our principal contact at
9  Bridgeview Bank was we wanted to get his consent
10  because the loan was directly with VAP.  We didn't
11  want to make it look like we were taking collateral
12  out of that loan.  So that's why we did those
13  certificate transfers.
14         So Board consents, there is a whole set
15  of procedures that have to happen for a certificate to
16  be transferred and reissued with U.S. Bank.
17         So this was to get -- this email refers
18  to the consent we had to obtain from Bridgeview under
19  our loan agreement with them.
20      Q    And the loan agreement you're referring
21  to, is that the one that was obtained from Bridgeview
22  to pay down the member debts?
23      A    And for working capital purposes.
24      Q    But that is the $5 million one?

Page 304

1      A    Yes.  It is.
2      Q    When you talk about certificates, you're
3  referring to I think the residual value of those some
4  of these trusts?
5      A    So every trust at the bottom has a
6  certificate; and depending on the economics of the
7  trust, that certificate could never have any value; or
8  depending on how the deal was structured, for example,
9  the RRT trust, the only value any of the companies
10  would ever derive would be from that certificate.  No
11  senior or junior fees were paid.
12         So depending on the trust, it kind of
13  defines how that certificate works.  But basically
14  under most trusts, when money actually hits that
15  certificate, it just gets kicked out of that to
16  whoever holds the certificate.
17      Q    At the top of this email chain on Page 1,
18  Mr. Wrightsman writes back and says the likely need to
19  amend the loan docs.  Do you see that?
20      A    Right.
21      Q    Is he referring to the $5 million loan
22  there?
23      A    Yes.
24      Q    Is he referring to the $5 million loan

Page 305

1  there?
2      A    Yes.  I don't believe they were amended.
3  I believe the consent was sufficient.
4      Q    So even though Mr. Wrightsman raises the
5  concept of an amendment --
6      A    Penned and signed a consent.
7      Q    -- you don't think that happened?
8         All right.  Was that consistent with
9  the loan documents to the best of your recollection?
10      A    The consent was consistent, yeah.
11      Q    Were there any guarantees exchanged in
12  connection with this transfer?
13      A    So the initial -- So I believe.  I have to
14  look at the consent, but I believe Bluestone Capital
15  Markets probably gave a guarantee as part of this
16  consent.
17      Q    Not VAP?
18      A    Well, VAP was already on the loan.
19         (W.H. Deposition Exhibit No. 47
20         was marked for identification.)
21      Q    Mr. Reape, I've handed you a two-page
22  exhibit marked Number 47.  It's another email chain.
23  When you have had a chance to review it, please let me
24  know?



Page 310

```
1           (W.H. Deposition Exhibit No. 48
2           was marked for identification.)
3      Q    Mr. Reape, we have handed you a document
4   marked Warren Hill 48.  It's a single email or two
5   single emails on a single page.  Please let me know
6   when you've had a chance to review.
7      A    Yes.
8      Q    The first email is dated September 16,
9   2017 at 11:14 a.m.; correct?
10     A    Yes.
11     Q    It's from Alan Wilson to you, Mr. Reape;
12  right?
13     A    Yes.
14     Q    And he's using his AHG-group.com email
15  domain?
16     A    Yes.  He is.
17     Q    At this time was Mr. Wilson is an employee
18  of Blue Stone Finance?
19     A    I'd have to check records as to when we
20  started paying him.  At this point he was certainly
21  performing services for Bluestone.
22     Q    Was Mr. Wilson compensated for any
23  services he performed for Bluestone prior to the
24  employment agreement?
```

Page 311

```
1      A    Again, I'd have to check our accounting
2   records.  We've had a lot of activities here.
3      Q    He writes to you:  David, here are my
4   notes after our discussion yesterday.  Gene filled me
5   in that we might be having issues getting BSF into the
6   new deals.
7      A    Yes.
8      Q    Did I read that correctly?
9      A    Uh-huh.
10     Q    And do you know what Mr. Wilson's
11  referring to here?
12     A    Sure.  Obviously if BSF was taking on
13  certain servicing responsibilities, it would be nice
14  to have had all of the deals we did amended to reflect
15  that.
16          Unfortunately, the way these trusts
17  were set up, they're very hard wired.  So they're hard
18  wired into roles which is why even if VAP was doing
19  none of the performed services, if the management fee
20  is directed to VAP in the agreement, that's how it
21  goes.
22     Q    So none of those deals were, in fact,
23  amended; correct?
24     A    Too much work, too much brain damage to
```

Page 312

```
1   actually do, as I've explained here.
2      Q    That's where I'm going next.
3          You responded on the same day at
4   2:42 p.m.; correct?
5      A    Yes.
6      Q    And you wrote:  Yes, that's where we're at
7   so far.  I've put everyone on notice we are adding a
8   servicer and have provided KYC info.
9          Did I read that portion correctly?
10     A    Yes.
11     Q    When you say you put everyone on notice,
12  first, who was everyone?
13     A    That would be our lenders and U.S. Bank as
14  trustee.
15     Q    And when you say you put everyone, the
16  lenders and U.S. Bank on notice, what does that mean?
17     A    I would have called and had a discussion
18  with them, let them know that we had a new servicing
19  entity in Puerto Rico.
20     Q    Go ahead.
21     A    For future transactions if we were to
22  bring BSF in, the trustees and lenders obviously have
23  very detailed KYC processes.  Obviously I didn't want
24  to start a transaction that BSF was going to be a
```

Page 313

```
1   servicer on or have some other function and not have
2   them KYC'd first, and that process could take three
3   weeks.
4      Q    And, again, KYC is Know Your Customer?
5      A    Yes.
6      Q    You said you told U.S. Bank you were
7   adding a servicer; is that right?
8      A    I let them know we had a new entity that
9   would be doing the servicing.  They have a process, so
10  I just wanted them to send me the forms just so that
11  in the event a transaction happened that they would
12  have that work done.
13     Q    And what type of a transaction are you
14  referring to?
15     A    Any future financing.  So have been a
16  number of other entities on the Health Care Finance
17  side which is not party to this that we set up and
18  that we had to have KYC'd with the lender and the
19  trustee.
20     Q    Is that independent of the Vendor Payment
21  Program?
22     A    Yes.
23     Q    So when you're reaching out to put the
24  banks and the lenders and U.S. Bank on notice, is that
```

**MAGNA** ◗
LEGAL SERVICES

David Reape

DAVID REAPE - CONFIDENTIAL

Page 375

1 were able to purchase those receivables with some
2 accrual and the trust got the benefit of the
3 accrual.
4        Q.      So by facilitating the deal the
5 trust and the manager of the trust benefit?
6        A.      Correct.
7        Q.      And VAP was the manager of all the
8 trusts at issue with those transactions; right?
9        A.      That's correct.
10       Q.      So by extending the financing to
11 help close the deal, VAP was, in a sense, helping
12 itself?
13       A.      Yes.
14       Q.      Who was VAP's lender on those
15 limited transactions, Mr. Reape?
16       A.      The first set of transactions in
17 '16 would've been, at that time, Citibank.  And
18 then in 2017 it would have been Barclays.
19       Q.      Mr. Reape, you can put the
20 confirmation requests aside.  If you could keep
21 out Exhibits 21 and 117, I would appreciate it.
22             I'm going to hand you three
23 documents, Mr. Reape.  One has previously been
24 marked as Warren Hill 56, and then two additional

Page 376

1 documents marked Warren Hill 118 and 119.  If you
2 could take a few moments to review those and then
3 let me know when you've completed that review.
4        A.      (Reviewing documents.)
5        Q.      Mr. Reape, have you had a chance to
6 review, at least preliminarily, the three exhibits
7 we've placed in front of you?
8        A.      I have.
9        Q.      Let's begin with Exhibit 56.  Are
10 you familiar with the document that's been marked
11 previously as Exhibit 56?
12       A.      It's a tax return.
13       Q.      A tax return for which entity, Mr.
14 Reape?
15       A.      Blue Stone Finance.
16       Q.      It's a Puerto Rican tax return;
17 correct?
18       A.      Correct.
19       Q.      About two-thirds of the way down,
20 is that your signature, Mr. Reape?
21       A.      It is.
22       Q.      That's dated July 23, 2018;
23 correct?
24       A.      Correct.

Page 377

1        Q.      And then below your name is Mr.
2 Wilson; correct?
3        A.      Correct.
4        Q.      If you're familiar with it, is that
5 his signature?
6        A.      It is.
7        Q.      Moving to Exhibit 118, are you
8 familiar with this document?
9        A.      Yes.
10       Q.      Can you describe, for the record,
11 what it is?
12       A.      It's a tax return.
13       Q.      A tax return for which entity, Mr.
14 Reape?
15       A.      Bluestone Capital.
16       Q.      This is a U.S. Form 1065 return;
17 correct?
18       A.      Yes.
19       Q.      You'll note, about two-thirds of
20 the way down the page, there is a line for a
21 signature; right?
22       A.      Yes.
23       Q.      There's no signature on this
24 document; right, Mr. Reape?

Page 378

1        A.      That's correct.
2        Q.      Do you recall signing Bluestone
3 Capital Markets' Form 1065 return?
4        A.      I don't.
5        Q.      Is this the type of document you
6 would sign as the CEO of Bluestone Capital
7 Markets?
8        A.      It might, but somebody else could
9 have signed it.
10       Q.      Someone would have had to have
11 signed it before it was submitted; right, Mr.
12 Reape?
13       A.      I think that's IRS rule.
14       Q.      So somewhere in Bluestone Capital
15 Markets' or VAP's records there would be a signed
16 version of this return?
17       A.      I would assume, yes.
18       Q.      Put that aside for a moment, Mr.
19 Reape.
20             If you could turn to Exhibit 119,
21 can you please describe for the record what this
22 document is, if you're familiar with it?
23       A.      It's a tax return.
24       Q.      For which entity, Mr. Reape?

12 (Pages 375 - 378)

David Reape
DAVID REAPE - CONFIDENTIAL

Page 391

1    A.    I would guess this is probably a
2 document that Mr. Wilson distributed to members.
3    Q.    If you look at the bottom left-hand
4 corner, it's dated January 29th, 2019; right?
5    A.    Correct.
6    Q.    And so your testimony is that you
7 believe Mr. Wilson distributed this to members,
8 including SFR, on or around that date?
9    A.    I can't say when he distributed it,
10 but it looks like that would have been the
11 preparation date.  So I would assume on or after
12 that date.
13    Q.    And to the best of your knowledge,
14 it would be inaccurate to characterize this
15 document as coming from the company's QuickBooks?
16    A.    I think you need to clarify that
17 question.
18    Q.    To the best of your knowledge, it
19 would be inaccurate for someone to characterize
20 this document as coming from the company's
21 QuickBooks?
22    A.    This certainly is not a
23 QuickBooks-produced report.  Is that your
24 question?

Page 392

1    Q.    That's right.
2        And if someone had represented to
3 Warren Hill that this was indeed from QuickBooks,
4 that would be an inaccurate representation?
5    A.    I think so.  Again, based on my
6 knowledge of QuickBooks.
7    Q.    This is dated December 31st, 2018;
8 correct?
9    A.    Correct.
10    Q.    So these are year-end numbers; is
11 that right?
12    A.    I would assume, yes.
13    Q.    Well, do you know or are you
14 assuming, Mr. Reape?
15    A.    Based on the dating, it would have
16 to be; yeah.
17    Q.    There's a heading called "Assets."
18 Right?
19    A.    Yes.
20    Q.    And the first line under that reads
21 "cash and due from banks."  Correct?
22    A.    Yes.
23    Q.    What does that line or row
24 represent?

Page 393

1    A.    That's cash.
2    Q.    That is cash that's actually in the
3 accounts or cash that was received for the month,
4 Mr. Reape?
5    A.    It's a balance sheet.  It's cash in
6 the accounts.
7    Q.    And then it also says "due from
8 banks."  Do you see that?
9    A.    Yes.
10    Q.    What does that relate to?
11    A.    I don't think that has any meaning.
12    Q.    Could it be like a money market
13 account or something like that?
14    A.    No.
15    Q.    So the total cash on hand for the
16 three entities at the end of December 31st, at
17 least according to this sheet, is approximately
18 12.3 million; correct?
19    A.    Correct.
20    Q.    The next row has the notation that
21 reads "trust certificate income receivable."  Do
22 you see that?
23    A.    Yes.
24    Q.    What does that represent?

Page 394

1    A.    That's the value of our trust
2 certificates.  That's an internally calculated
3 value.
4    Q.    Let's pause there.  What do you
5 mean, internally calculated?
6    A.    The various companies hold trust
7 certificates and you can calculate -- at any
8 point, based on a loan outstanding, senior fees
9 receivable, trustee expenses, whatever, to the
10 extent that a company was holding the certificate,
11 you can calculate a value for that certificate.
12 So it's a way of listing an asset calculation that
13 wouldn't appear anywhere else, any reports,
14 anything like that.
15    Q.    So is this the company's estimation
16 of the value of those certificates --
17    A.    It's an estimation.
18    Q.    -- as of December 31st, 2018?
19    A.    Yes.
20    Q.    When you say trust certificate
21 income receivable, does that also include any
22 reserve amounts?
23    A.    You would include that in the trust
24 certificate because it's a liquidating value of

16 (Pages 391 - 394)

David Reape
DAVID REAPE - CONFIDENTIAL

Page 395

1 reserves.
2      Q.      So those concepts, trust
3 certificate and reserve amounts, are synonymous to
4 you, Mr. Reape?
5      A.      No.
6      Q.      What's the distinguishing feature,
7 if any?
8      A.      So a reserve is a specific account
9 within a trust that is there to hold an expense or
10 over collateralization amount of money.  Some of
11 our trusts don't have reserves.  So to the extent
12 money flows down to the level of the trust
13 certificate it just goes out to whoever holds the
14 certificate.
15      Q.      We'll talk more about this later.
16 But with the money that flows down to the
17 certificate, when is that money released to the
18 certificate holder?
19      A.      So when it flows to the
20 certificate, it flows out.
21      Q.      Is that essentially when the
22 receivables have been paid off?
23      A.      It would have to be a very large
24 paydown of receivables.

Page 396

1      Q.      And with reserve amounts that are
2 released, are those released at a similar time
3 when there's been largely a payoff of the
4 underlying receivables?
5      A.      It depends on the mechanics of the
6 trust.  There really aren't reserves, per se, that
7 are of any significance for any of our trusts.
8      Q.      As of today; right?
9      A.      As of today.
10      Q.      There were reserves that were of
11 significance to the trust previously; correct?
12      A.      At one time under the Citi trust
13 only.
14      Q.      Was that the five-million-dollar
15 reserve that came in this year?
16      A.      There was a reserve requirement
17 under the Citi trust which had been amended.
18      Q.      What do you mean, it's been
19 amended?
20      A.      It was originally five million
21 dollars.  The note's paid off, so there was no
22 reason to have the trust have a five million --
23 there's no noteholders to benefit from that.
24      Q.      And that's when the five million

Page 397

1 dollars was released to VAP?
2      A.      I actually had to go back with the
3 trustee and have the reserve reduced from five
4 million to 100,000.  Now it's purely an expense
5 reserve since there are no noteholders.
6      Q.      Are there trust certificates
7 related to the Barclays trust that are contained
8 in this 12.5 million dollar estimate?
9      A.      Yes.
10      Q.      What about trust certificates
11 related to the Citi deals in that 12.5?
12           MR. ONUFRAK:  Citi deals?
13           MR. VOSHELL:  Yes.
14           THE WITNESS:  Citibank, yes.
15 BY MR. VOSHELL:
16      Q.      Any other lenders who have trust
17 certificates associated with that 12.5 million
18 dollars that's listed here under trust certificate
19 income receivable?
20      A.      Just Barclays and Citi, although
21 there are two different Barclays trusts.  So
22 they're two different certificates.
23      Q.      If you can, Mr. Reape,
24 approximately what portion of the 12.5 million

Page 398

1 dollar estimate here is associated with the two
2 Barclays trusts?
3      A.      As of 12-31, at least 10 million;
4 maybe substantially more.
5      Q.      Is it fair to say that the
6 overwhelming majority of that 12.5 million dollar
7 estimate is associated with the Barclays trust
8 certificates?
9      A.      Yes.
10      Q.      Mr. Reape, I know we touched on it
11 earlier.  But do you know whether any amounts
12 associated with the Citi deal were paid in January
13 of 2019?
14      A.      I believe some were, yes.
15      Q.      Would any of those amounts be
16 related to a trust certificate for the Citi deal?
17      A.      That's all it could be.  That's all
18 that's left with the Citi deal is a trust
19 certificate.
20      Q.      Did the entire certificate pay out
21 in January of 2019 for the Citi deal?
22      A.      No.
23      Q.      There's still some amount of the
24 Citi deal trust certificate outstanding?

17 (Pages 395 - 398)

David Reape

DAVID REAPE - CONFIDENTIAL

Page 419

1    marked, for identification purposes, as
2    Warren Hill Exhibit 121.)
3 BY MR. VOSHELL:
4    Q.    Mr. Reape, we're back on the
5 record.  You remain under oath.
6        I've placed in front of you a
7 document that's been marked Warren Hill Exhibit
8 121.  Just take a moment to look at it.  I have a
9 few questions.
10   A.    (Reviewing document.)
11       Okay.
12   Q.    This is another document labeled
13 Balance Sheet dated February 28, 2018; right?
14   A.    Correct.
15   Q.    This looks similar to the document
16 we just reviewed as Exhibit 120; right?
17   A.    It looks similar, yes.
18   Q.    Do you believe this document was
19 also prepared by Mr. Wilson?
20   A.    I do.
21   Q.    Again, it has the trust certificate
22 income receivable row under Assets.  Do you see
23 that?
24   A.    Yes.

Page 420

1    Q.    The value of that receivable, as of
2 at least February 28th, 2018, was 21.7 million
3 dollars; right?
4    A.    Yes.
5    Q.    That's eight or nine million
6 dollars higher than what we looked at in the
7 December 2018 exhibit; correct?
8    A.    Correct.
9    Q.    Can you explain why there is that
10 difference in the two receivable values?
11   A.    Sure.  It's most likely a cash
12 paydown.
13   Q.    Do you recall when that cash
14 paydown occurred?
15   A.    Over the course of the year, there
16 were a number of significant state paydowns as
17 well as state payments of prompt payment penalty.
18   Q.    So there are payments made by the
19 state that, I guess, flowed through to the
20 certificates in 2018?
21   A.    Yes.
22   Q.    Do you recall which bank
23 certificates those paydowns impacted?
24   A.    Well, absolutely impacted the Citi

Page 421

1 certificate.  And there was -- because the paydown
2 in 2018 was so significant, there was some outflow
3 from the Barclay certificate, also.
4    Q.    If you turn to the third page, Mr.
5 Reape, under the heading Liabilities and Member's
6 Equity, there are the NAI loan and the SFR
7 Equities loan referenced; right?
8    A.    Correct.
9    Q.    For the NAI loan it shows an
10 outstanding value of $275,000; right?
11   A.    Yes.
12   Q.    And for the SFR loan it shows an
13 outstanding value of 1.725 million dollars;
14 correct?
15   A.    Correct.
16   Q.    You testified earlier that the NAI
17 loan was a total of 1 million dollars, correct,
18 Mr. Reape?
19   A.    Yes.
20   Q.    When, if you know, was that paid
21 down to $275,000?
22   A.    I believe over the course of 2017,
23 possibly into 2018.
24   Q.    Well, this is February 28th of '18;

Page 422

1 correct?
2    A.    Correct.
3    Q.    So if it leaked into 2018, would
4 that be reflected in the January sheet?
5    A.    I have to see the January sheet for
6 comparison to see what number is listed there.
7    Q.    I, too, would like to see the
8 January sheet.  It has not been produced.
9        The SFR Equities loan here, this
10 is down from 3 million dollars to 1.725; correct?
11   A.    Actually, there are other SFR
12 loans.  So at one point their balance was much
13 higher than 3 million.  I can't tell whether this
14 is a balance from the loans they assumed or
15 whether this is a balance from other loans they
16 made to the company.
17   Q.    What documents would you need to
18 look at to know whether this is a balance from the
19 loan that SFR assumed from Warren Hill?
20   A.    Just the timing of payments would
21 probably tell me which was paid down.
22   Q.    What documents would you look at,
23 Mr. Reape, to ascertain the timing of the
24 payments?

23 (Pages 419 - 422)

David Reape
DAVID REAPE - CONFIDENTIAL

Page 427

1 would there be the more detailed itemization for
2 June of 2018?
3     A.     I'd have to kind of compare
4 document by document, but I would -- absolutely,
5 yeah.
6     Q.     You can put that aside.
7           MR. VOSHELL:  Mark this as 125.
8           (Whereupon, the document was
9     marked, for identification purposes, as
10     Warren Hill Exhibit 125.)
11 BY MR. VOSHELL:
12     Q.     Mr. Reape, we've placed in front of
13 you what's been marked as Warren Hill 125.
14     A.     Okay.
15     Q.     Again, this is the next in a series
16 of spreadsheets similar to the ones we just looked
17 at, this one ending July 31st, 2018; correct?
18     A.     Correct.
19     Q.     This particular exhibit does have
20 the itemization following the first two pages;
21 correct?
22     A.     It does.
23     Q.     There is a line item for the NAI
24 loan and the SFR Equities loan; correct?

Page 428

1     A.     Correct.
2     Q.     But here there's no value
3 associated with those loans; right?
4     A.     Correct.
5     Q.     Is that because the loans were paid
6 off as of the end of July, 2018?
7     A.     Yes.
8     Q.     Now, we looked two exhibits ago at
9 the end of May of '18 and the loans were still in
10 existence; correct?
11     A.     Correct.
12     Q.     There was not the itemization in
13 the June balance sheet; right?
14     A.     Not in your printout.  I certainly
15 would have guessed that it would've been there.
16 But, again, that could be an issue with just what
17 was printed.
18     Q.     Sure.  But it's fair to say that
19 sometime between the end of May 2018 and the end
20 of July 2018 the NAI loan and the SFR Equities
21 loan were paid off?
22     A.     As well as another short-term loan,
23 it appears.
24     Q.     But yes as to --

Page 429

1     A.     Yes.  Um-hum.  Absolutely.
2     Q.     You can put that aside.
3           MR. VOSHELL:  Mark this as 126.
4           (Whereupon, the document was
5     marked, for identification purposes, as
6     Warren Hill Exhibit 126.)
7 BY MR. VOSHELL:
8     Q.     Mr. Reape, in front of you is
9 Exhibit Warren Hill 126.  This is the September
10 30th, 2018 balance sheet; right?
11     A.     Yes.
12     Q.     Again going to the trust
13 certificate income receivable row, there is a drop
14 in the outstanding receivable from 27.4 million at
15 the end of August of '18 to 19 million at the end
16 of September of '18; correct?
17     A.     Correct.
18     Q.     And you believe that this drop is
19 the result of payments made by the state?
20     A.     I'm certain of this.
21     Q.     You said earlier that the
22 certificate income receivable was an estimate by
23 VAP; correct?
24     A.     Correct.

Page 430

1     Q.     Just so the record is clear, the
2 drop here relates to payments made by the state,
3 not to a downward deviation in VAP's estimate?
4     A.     Yes.
5     Q.     You can put that aside.
6           MR. VOSHELL:  Mark this as 127.
7           (Whereupon, the document was
8     marked, for identification purposes, as
9     Warren Hill Exhibit 127.)
10 BY MR. VOSHELL:
11     Q.     Mr. Reape, in front of you is
12 Exhibit 127.  This is the October 31st, 2018
13 balance sheet; right, Mr. Reape?
14     A.     Correct.
15     Q.     Again, the trust certificate income
16 receivable line lists, as of the end of October of
17 2018, a total of 14.1 million; correct?
18     A.     Correct.
19     Q.     And that is a drop of approximately
20 5 million from the close of September of 2018;
21 right?
22     A.     It is.
23     Q.     Is your testimony, again, that that
24 drop relates solely to payments made by the state

25 (Pages 427 - 430)

DAVID REAPE - CONFIDENTIAL

1  of Illinois?
2      A.    Yes.
3      Q.    You can put that aside.
4           MR. VOSHELL:  Mark that as 128.
5           (Whereupon, the document was
6      marked, for identification purposes, as
7      Warren Hill Exhibit 128.)
8           MR. ONUFRAK:  Is this the new one?
9           MR. VOSHELL:  It is.
10 BY MR. VOSHELL:
11     Q.    Mr. Reape, I've placed in front of
12 you a document that's been marked as Exhibit 128.
13 Take a moment to review it and let me know when
14 you've completed that review.
15     A.    (Reviewing document.)
16         Okay.
17     Q.    Before we get into the document, I
18 believe your testimony is that Bluestone Capital
19 Markets and Blue Stone Finance do not have the
20 same owners; correct?
21     A.    Correct.
22     Q.    That's because those two Elliott
23 groups own part of Bluestone Capital Markets, but
24 not part of Blue Stone Finance; correct?

1      A.    They haven't been admitted yet.
2  We've had discussions with them, but they're not
3  members yet.
4      Q.    Can you please describe for the
5  record what this document is, Mr. Reape?
6      A.    This is a risk retention agreement
7  that was in connection with a Medicaid loan
8  financing transaction.
9      Q.    And that Medicaid loan transaction
10 occurred in 2018; correct?
11     A.    Correct.
12     Q.    This lists Blue Stone Finance, LLC
13 as the manager of the trust; correct?
14     A.    Correct.
15     Q.    And then Blue Stone Finance, LLC is
16 defined as the "VAP Sponsor."  Right?
17     A.    Correct.
18     Q.    Just to be clear, the Medicaid deal
19 occurred outside of the Vendor Payment Program and
20 Vendor Support Initiative; right?
21     A.    Yeah.  It's not an assignment.
22 It's a loan transaction.  Correct.
23     Q.    It's part of, I think, a timely pay
24 program?

1      A.    No.
2      Q.    Is it part of any program?
3      A.    The receivables do accrue prompt
4  payment penalty, but they're not assignable.  So
5  it's a -- this transaction was structured as a
6  loan.
7      Q.    If you turn to page four of this
8  risk retention agreement -- actually, let's start
9  on page three.  Do you see Section 2 lists
10 "Representations and Warranties"?
11     A.    Yes.
12     Q.    Now if you turn to page four,
13 subsection (b), it reads:  "The VAP sponsor" --
14 and that's Blue Stone Finance; right?
15     A.    Yes.
16     Q.    -- "represents and warrants that
17 Bluestone Capital Markets, LLC is owned by the
18 same persons who have the same proportionate
19 interests therein as the VAP sponsor."  Right?
20     A.    Yes.
21     Q.    That is not the case, though,
22 right, Mr. Reape, because Blue Stone Finance is
23 not owned by the same individuals or entities that
24 own Bluestone Capital Markets?

1      A.    Well, they have substantially
2  identical ownership.  This is a legal document, so
3  I don't -- I would have to kinda defer to our
4  attorneys who prepared it.
5      Q.    Sure.  But it says "owned by the
6  same persons," right, not owned by substantially
7  the same persons?
8      A.    It says that, yes.
9      Q.    And so the VAP sponsor, which is
10 Blue Stone Finance, is in violation of this
11 representation; correct, Mr. Reape?
12         MR. RUBIN:  Objection.  Calls for
13     a legal conclusion.
14 BY MR. VOSHELL:
15     Q.    You can answer.
16     A.    I don't know.  I'm not a lawyer.
17     Q.    You can put that aside.
18         MR. VOSHELL:  129.
19         (Whereupon, the document was
20     marked, for identification purposes, as
21     Warren Hill Exhibit 129.)
22 BY MR. VOSHELL:
23     Q.    Mr. Reape, I've placed in front of
24 you what's been marked as Warren Hill 129.  When

26 (Pages 431 - 434)

David Reape

DAVID REAPE - CONFIDENTIAL

Page 507

1     A.    Yes.
2     Q.    Now, we've talked a number of times
3  about the waterfall when a state makes a payment.
4          Could you, I guess, as
5  simplistically as possible, just kind of walk
6  through what happens when the state of Illinois
7  makes a payment that relates to the Barclays line?
8     A.    Sure.  And the priority of payments
9  is specifically outlined in this document.  But to
10 follow that waterfall specifically, when payments
11 come in there's frequently a portion that goes
12 back to the vendor.  So at the highest priority
13 level, the portion being returned to the vendor is
14 kind of immediately segregated from the rest of
15 the flow of funds.
16    Q.    Let me pause you right there.
17          When you say "immediately
18 segregated," is there a certain account that that
19 money flows into?
20    A.    So the trust has multiple accounts
21 for multiple different reasons.  But in the
22 initial allocation, which is when money that's
23 come in is applied, which happens once a week, the
24 first segregation is these are none-trust monies

Page 508

1  that go back to vendors.
2     Q.    So you have the segregation of
3  funds that go back to the vendors.
4     A.    Right.
5     Q.    What happens next?
6     A.    So then the money coming over to
7  the trust moves through the trust waterfall, which
8  in order of priority of payments is trustees'
9  expenses -- I may miss a minor priority or two
10 here, but I'm going to put the main ones out.
11 Lender interest, lender-accrued interest, senior
12 fees up to VAP.
13          To the extent there's unpaid
14 principal -- which would be principal that had
15 been applied to somewhere else in the waterfall
16 prior, so that there's what they call an accrued
17 unpaid principal, that then money would go to
18 that.  And then once that was paid everything goes
19 through a couple of more minor priorities for
20 potentially unpaid trust expenses.
21          There is a reserve under this
22 trust, which is one and a half percent of the
23 drawn amount.  So the reserve requirement changes
24 as the drawn amount changes.

Page 509

1     Q.    When you say drawn amount, just so
2  the record's clear, it's essentially how much is
3  outstanding on the line?
4     A.    The outstanding loan balance.  And
5  then below that level, to the extent that that
6  reserve is full, money flows out to the trust
7  certificate.
8     Q.    So the senior fees, you say that
9  they went to VAP; right?
10    A.    Yes.
11    Q.    In the Barclays deal has the senior
12 fee been set to a value of zero?
13    A.    No.
14    Q.    What is the senior fee value under
15 the terms of the Barclays deal?
16    A.    It's one percent -- it accrues one
17 percent of the outstanding receivable balance.
18 I'm sorry.  One percent of the outstanding loan
19 balance.  Not receivable balance, loan balance.
20 Oh, I missed -- one of the priorities is that
21 there's a $75,000 expense account that gets
22 replenished.
23    Q.    Let's just take a $100 payment from
24 the state.  That comes in, and say only 20 of it

Page 510

1  is segregated out to the vendor.  So you have $80
2  coming in.
3          What account does that $80 hit
4  first?  Think actual trust account.
5     A.    So there's actually a trust --
6  without looking at the list because there are,
7  again, I think, about seven or eight accounts.  So
8  I'm not sure of the precise name.  For want of a
9  better -- that would be a trust disbursement
10 account.
11    Q.    And then a certain portion of that
12 money is deposited into the Barclays reserve
13 account?
14    A.    No.  So it goes through the
15 waterfall.  A better example would be -- there
16 probably would be no example where $20 would be
17 segregated and 80 would stay in.  It's more likely
18 that 5 gets segregated for vendors and 95 is going
19 in.  So that 95 would come in, pay trust expenses.
20 To the extent that the trust reserve was under
21 $75,000 --
22    Q.    You mean the trust expense account?
23 You said trust reserve.
24    A.    Oh, trust expense account.  Yeah.

45 (Pages 507 - 510)

David Reape

DAVID REAPE - CONFIDENTIAL

1  I'm sorry.  Wrong word.  Trust expense account.
2  And then it would flow to lender interest until
3  all lender interest was paid in full.  Then it
4  would flow to senior management fees until all of
5  that was paid in full.  Then it would go to what's
6  termed accrued principal -- accrued unpaid
7  principal, which would be principal payments that
8  have come in, but have been paid to something else
9  above it in the waterfall.
10        And then to the extent all of the
11 accrued unpaid principal is paid, then it goes
12 down to the certificate.
13     Q.    You didn't mention the reserve.
14     A.    Oh, I'm sorry.  Yes.
15     Q.    So after the unpaid principal -- if
16 that's paid off and the reserve is not at the
17 appropriate level, money would be deposited into
18 the reserve account?
19     A.    Yes.  And, again, that reserve --
20 the amount that has to be in that reserve changes.
21     Q.    One and a half percent of whatever
22 is outstanding; right?
23     A.    Yes.
24     Q.    Whose name is the reserve account

1  in?
2      A.    The reserve account is a trust
3  account.
4      Q.    VAP is the manager of the Barclays
5  trust; right?
6      A.    Of this specific trust, yes.
7      Q.    The manager of all the trusts, with
8  the exception of, I guess, the Medicaid ones we
9  looked at earlier?
10     A.    That's correct.
11     Q.    If you could, Mr. Reape, flip to
12 Section 5.06 of the trust agreement.  I believe
13 it's titled "Reserve Account."  Do you see that?
14     A.    Okay.
15     Q.    Is that the reserve account you
16 were referring to as second-to-last in the
17 waterfall?
18     A.    Yes.
19     Q.    This also refers to an eligible
20 deposit account.  Do you know what that is?
21     A.    All of the trust --
22     Q.    Strike that.  That's fine.  You can
23 put the trust agreement aside.
24        You're aware of recent news

1  articles relating to donations made by
2  VAP-affiliated entities either to the campaign of
3  Susana Mendoza directly or to Danny Solis' Ward;
4  right?
5      A.    I don't think the donations were
6  made to Danny Solis' Ward.  But, yes, I am aware
7  of the news articles.
8      Q.    You're aware of donations that were
9  made directly by VAP-affiliated entities to Susana
10 Mendoza's campaign; correct?
11     A.    Yes.
12     Q.    Was it your idea to make those
13 donations, Mr. Reape?
14     A.    No.
15     Q.    Who came up with the idea?
16     A.    In discussions with Brian and
17 Malcolm and the board, decisions were -- like all
18 organizations, we make political donations.
19 There's nothing unusual about that.
20     Q.    Well, we'll get to that.
21        But who brought the idea of making
22 donations directly to Susana Mendoza's campaign to
23 your attention?
24     A.    It was probably Brian that made the

1  suggestion.
2      Q.    You referred earlier to Malcolm.
3  That's a reference to Malcolm Weems; correct?
4      A.    It is.
5      Q.    Do you recall when Brian Hynes made
6  the suggestion?
7      A.    I don't have a specific date
8  recollection as to when he may have suggested it
9  or -- obviously, if I saw the checks I would know
10 when we sent the checks.
11     Q.    Was it in 2018 that Mr. Hynes
12 brought this to your attention?
13     A.    I think we've made political
14 contributions throughout the life of that.  So
15 there could have been other contributions.
16 Specific to the Mendoza campaign, that's 2018.
17     Q.    Are you sure, Mr. Reape, that VAP
18 has made contributions to political campaigns
19 throughout its existence?
20     A.    I think so, yes.  To clarify,
21 members of VAP maybe made contributions.  Maybe
22 they weren't specific to VAP.  I would have to
23 check to see what we did early on, you know, 2012,
24 '13.

46 (Pages 511 - 514)