# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WARREN HILL, LLC,<br><br>                            Plaintiff,<br><br>v.<br><br>SFR EQUITIES, LLC,<br><br>                            Defendant. | No. 2:18-01228-HB |

## PLAINTIFF WARREN HILL, LLC'S REPLY BRIEF IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

**ELLIOTT GREENLEAF, P.C.**

Gregory S. Voshell
Thomas B. Helbig, Jr.
925 Harvest Drive, Suite 300
Blue Bell, PA 19422
(215) 977-1000 (p) / (215) 977-1099 (f)
gsv@elliottgreenleaf.com
tbh@elliottgreenleaf.com

*Counsel for Plaintiff Warren Hill, LLC*

Dated: May 16, 2019

**TABLE OF CONTENTS**

ARGUMENT IN REPLY ............................................................................................... 1

    I.    SECTION 1.2(E), BY ITS PLAIN TERMS, EMBRACES THE TRUST CERTIFICATE INCOME ........................................................... 2

        A.    Warren Hill Offers the Only Reasonable Interpretation of Section 1.2(e)(iii) ................................................................................ 2

        B.    SFR Concedes that the Transfer of the Trust Certificates Is Not Relevant to Calculating the Section 1.2(e)(iii) Earnout Payment ............................................................................................ 5

        C.    SFR's Remaining Arguments Are Irrelevant and Should Be Rejected .............................................................................................. 6

    II.    THIS COURT ALREADY HELD THAT THE BLUESTONE ENTITIES DO NOT "EARN" THE MANAGEMENT FEES BECAUSE IT IS UNDISPUTED THAT THEY ARE NOT AND CANNOT BE MANAGERS OF ANY TRUST. ................................................ 10

    III.    SFR CONCEDES THAT BCBS WAS INVESTIGATED AND TRANSACTED WITH PRIOR TO THE MIPA BEING SIGNED. .................... 12

CONCLUSION ............................................................................................................ 15

# **TABLE OF AUTHORITIES**

**Cases**

*Ameritrust Co. Nat'l Ass'n v. Strozier*,
    1987 U.S. Dist. LEXIS 9011 (N.D. Ill. Sept. 25, 1987) .......................................................... 11

*BA Jacobs Flight Servs., L.L.C. v. RutAir Ltd.*,
    2015 U.S. Dist. LEXIS 9222 (N.D. Ill. Jan. 27, 2015) .......................................................... 11

*Banc One Fin. Servs. v. Advanta Mortg. Corp. USA*,
    2002 U.S. Dist. LEXIS 960 (N.D. Ill. Jan. 22, 2002) ........................................................... 11

*Blagrave v. Nutrition Mgmt. Servs. Co.*,
    2008 WL 2682690 (E.D. Pa. July 8, 2008) ............................................................................ 8

*Chi. Dist. Council of Carpenters Pension Fund v. Simpson Constr. Co.*,
    2006 U.S. Dist. LEXIS 92163 (N.D. Ill. Dec. 18, 2006) ...................................................... 11

*Czapski v. Maher*,
    954 N.E.2d 237 (Ill. App. Ct. 2011) ....................................................................................... 4

*Diaz v. Westgate Lincoln Mercury*,
    1994 U.S. Dist. LEXIS 16300 (N.D. Ill. Nov. 7, 1994) ........................................................ 11

*Fleet Bus. Credit, L.L.C. v. Enterasys Networks, Inc.*,
    816 N.E.2d 619 (Ill. App. Ct. 2004) ....................................................................................... 4

*Gerow v. Rohm & Haas Co.*,
    308 F.3d 721 (7th Cir. 2002) .................................................................................................. 4

*Harmon v. Gordon*,
    712 F.3d 1044 (7th Cir. 2013) ........................................................................................ 8, 11

*Kopplin v. Wis. Cent. Ltd.*,
    914 F.3d 1099 (7th Cir. 2019) ................................................................................................ 8

*Krok v. Burns & Wilcox, Ltd.*,
    2000 U.S. Dist. LEXIS 1451 (N.D. Ill. Feb. 7, 2000) .......................................................... 11

*Museum Pointe Condo. Ass'n v. Tower Residences Condo. Ass'n*,
    2017 IL App (1st) 152929-U ................................................................................................. 4

*Right Field Rooftops, L.L.C. v. Chi. Cubs Baseball Club, L.L.C.*,
    870 F.3d 682 (7th Cir. 2017) .................................................................................................. 3

*Robertson P'ship v. Erie Ins. Exch.*,
    2016 IL App (2d) 150517-U (Ill. App. Ct. 2016) ................................................................. 11

*Sodowski v. Nat'l Flood Ins. Program of Fed. Emerg. Mgmt. Agency*,
    834 F.2d 653 (7th Cir. 1987) ................................................................................................ 11

*Thompson v. Gordon*,
    948 N.E.2d 39 (Ill. 2011) ............................................................................................... 2, 4

Plaintiff Warren Hill, LLC ("Warren Hill"), through its undersigned counsel, submits this Reply Brief in further support of its Motion for Summary Judgment. Warren Hill respectfully requests that the Court grant its motion.

## **ARGUMENT IN REPLY**

SFR Equities LLC's ("SFR") response brief is another example of SFR's ongoing attempt to obfuscate and deflect, and it does not advance SFR's substantive position. Indeed, SFR's response brief is largely inflated with irrelevant arguments and curious attempts to defend what are, at best, suspicious business decisions that have no bearing on the outcome of the issues raised in Warren Hill's motion. The Court should reject SFR's irrelevant arguments and instead focus its inquiry on the narrow and undisputed matters that remain under the express terms of the Membership Interest Purchase Agreement ("MIPA"). In particular:

- *First*, Warren Hill is entitled to judgment under Section 1.2(e)(iii), because trust certificates are financial instruments held pursuant to financing arrangements among VAP and its lenders. SFR agrees that the trust certificates are "financial instruments," but argues that Section 1.2(e)(iii) is inapplicable because it applies only where VAP is loaned money directly from a bank. SFR's proffered interpretation is nonsensical, would eviscerate the plain language of the MIPA, and would wholly undermine the parties' intent.

- *Second*, this Court has twice rejected SFR's interpretation of Section 1.2(d), which governs management fees earned by Vendor Assistance Program, LLC ("VAP"). Now that Warren Hill has moved for judgment, SFR is back to criticizing the Court's application of the summary judgment standard. SFR's position has no merit now, just like it had no merit previously.

- *Finally*, SFR improperly deducted bonuses paid to Brian Hynes when it calculated "Net Income" under Section 1.2(d). SFR concedes that the vendor at issue (Blue Cross) was "investigated" and "transacted with" long before the MIPA was signed, so the bonus payments were not deductible. SFR nevertheless claims Mr. Hynes earned the bonus, and while dubious, that assertion is irrelevant. The question for the Court is not whether the bonus was deserved or approved by VAP's board. The question is simply whether SFR can deduct the bonus under Section 1.2(d)(ii)(D). SFR cannot.

Accordingly, Warren Hill respectfully requests that the Court grant judgment in its favor.

I.     SECTION 1.2(E), BY ITS PLAIN TERMS, EMBRACES THE TRUST CERTIFICATE INCOME

   A.   Warren Hill Offers the Only Reasonable Interpretation of Section 1.2(e)(iii)

SFR must include trust certificate income in the Section 1.2(e)(iii) earnout because the trust certificates are "financial instruments" held "pursuant to the terms of any financing arrangement among VAP and any of its lender(s)." (*See* Ex. 1, MIPA § 1.2(e)(iii).)  SFR agrees that trust certificates are financial instruments. (*E.g.*, SFR Resp., Ex. 2, Decl. D. Reape ¶ 11.) SFR disputes only the "financing arrangement" condition of Section 1.2(e), arguing that the phrase "financing arrangement among VAP and any of its lender(s)" applies only to situations where VAP receives a direct loan from a bank.  SFR's position is meritless.[1]

*First*, SFR asks this Court to re-write the parties' contract. *Thompson*, 948 N.E.2d at 51. Section 1.2(e)(iii) does not use the word "loan," much less limit its application to situations where VAP is a direct debtor.  Significantly, other provisions of the MIPA do speak to situations where VAP is a direct debtor, and the parties elected to use materially different language there than they did in Section 1.2(e)(iii).  Section 1.2(c) uses the phrase "loan to VAP" when referring to VAP as a direct borrower.  Section 1.2(d) similarly uses the phrase "debt for which VAP is the debtor."  In contrast, Section 1.2(e) uses a materially different and broader phrase, confirming that the parties did not intend to limit the section to embrace only a "loan to VAP" where "VAP is the direct debtor." *Id.* at 47.  The use of the word "among" further reinforces the parties' intent, because it indicates "collective relationships involving more than two parties," such as the financing arrangements that are the core of VAP's business. *See* Chicago Manual of Style, § 5.220.  The use of "by and between"—which the parties used to refer to a direct loan to VAP in

---

[1] SFR made the same "direct lender" argument in its motion for partial summary judgment, to which Warren Hill responded.  (D.E. 78.)  Warren Hill summarizes its arguments on this point herein, but directs the Court to Warren Hill's response to SFR's motion for a full recitation of Warren Hill's position, with all corresponding case law and analysis.

2

Section 1.2(c)—refers to a deal involving only two entities. *Id.*; *see Right Field Rooftops, LLC v. Chi. Cubs Baseball Club, LLC,* 870 F.3d 682, 690 (7th Cir. 2017).

***Second***, under SFR's interpretation, Warren Hill would be entitled to nothing at all under Section 1.2(e)(iii) when the funds in the trust certificates are released. Thus, SFR would get 100% of its proportionate share of the trust certificate income and Warren Hill would get 0%. SFR argues that Warren Hill already received its share of a "Citi Reserve Account," under Section 1.2(e)(i). (SFR Resp. at 10.) Warren Hill agrees that it received its share of the money that was the subject of ***Section 1.2(e)(i)***. This dispute, however, is about ***Section 1.2(e)(iii)***. SFR's compliance with Section 1.2(e)(i) does not excuse or cure SFR's breach of a separate, independent provision. SFR wants to keep 100% of its share of the Section 1.2(e)(iii) amounts, while leaving Warren Hill with nothing. This would be an absurd result.

SFR also mischaracterizes Warren Hill's position, by claiming Warren Hill contends that it was "somehow not getting paid at all" under the terms of the MIPA. (*Id.*) Not so. The MIPA has numerous payment provisions, some that required up-front payments to Warren Hill, *see* Ex. 1, MIPA at § 1.2(a), (b), and some that required SFR to make earnout payments over a period of time post-closing, *see id.* §§ 1.2(d), (e). SFR cannot avoid its obligations under Section 1.2(e)(iii) by pointing to the fact that it paid Warren Hill other amounts owed under different provisions. SFR's argument does not make its proffered interpretation any less absurd.[2]

---

[2] The absurdity of SFR's position is perhaps best understood when considering the practical outcome that SFR is seeking. Section 1.2(e) is an earnout provision. The parties expected that VAP would receive certain income post-closing, *i.e.*, the release of the Section 1.2(e)(i) reserve amount, as well as amounts under Section 1.2(e)(iii). The parties agreed to split SFR's share of that revenue when it came in. (*See* Ex. 1, MIPA at §1.2(e) (requiring payment within 5 days of release).) Yet, SFR appears now to be asking the Court to construe Section 1.2(e)(iii) as applying to a debt—a loan that would obligate VAP to pay a third party money—rather than an asset, as described in Sections 1.2(e)(i), (ii), and, indeed, (iii). It simply makes no sense in the context of an earnout provision for the parties to have agreed to split non-existent revenue associated with a debt that VAP might owe to a third party.

3

***Third***, SFR's interpretation ignores the commercial context of the MIPA. *Fleet Bus. Credit, LLC v. Enterasys Networks, Inc*., 816 N.E.2d 619, 629 (2004); *Gerow v. Rohm & Haas Co*., 308 F.3d 721, 725 (7th Cir. 2002).  The trusts are financial intermediaries VAP uses to facilitate the financing, through banks, of VAP's purchase of receivables.[3]  Interpreting Section 1.2(e) to not apply to the banks that finance VAP's purchase of receivables because "the trusts' lenders are not VAP's lenders," divorces the language of the MIPA from the relevant commercial context—the parties knew that the trusts had certificates that captured the residual value of VAP's business operations, the parties intended Warren Hill to get half of SFR's share of the certificate income as it was released, and the parties knew that VAP entered into financial arrangements with its lenders involving intermediary trusts, which is why Section 1.2(e) exists.

***Fourth***, SFR contends that VAP does not borrow money directly from any lenders. (Doc. 60, ¶ 36 ("SFR denies that VAP borrows money from lenders.").)  Yet, SFR is asking the Court to interpret Section 1.2(e) to apply only where VAP borrows money directly.  SFR's asserted interpretation that Section 1.2(e) is implicated only where VAP is directly borrowing money therefore renders the phrase "financing arrangement among VAP and any of its lenders" meaningless and superfluous.  This is unreasonable as a matter of law. *Czapski v. Maher*, 954 N.E.2d 237, 244 (Ill. App. Ct. 2011) ("[a]n interpretation that renders a provision meaningless is not reasonable."); *Museum Pointe Condo. Ass'n v. Tower Residences Condo. Ass'n*, 2017 IL App (1st) 152929-U, ¶ 35 (articulating same).

***Fifth***, it is well-established that "[a] court will not interpret a contract . . . in a way that is contrary to the plain and obvious meaning of the language used." *Thompson*, 948 N.E.2d at 47.

---

[3] (*See* SFR Smt of Facts, ¶ 7 ("Prior to 2017, VAP facilitated the creation of trusts for the purchase of State of Illinois receivables from numerous vendors through the State of Illinois Vendor Payment Program."); The Court recognized this during oral argument, when asking SFR's counsel "in other words, this is a vehicle for financing the payment; is that it?"  SFR's counsel responded "Yes." (Ex. 4, Tr. at 11:5-7.)

Here, Section 1.2(e) expressly states it applies with respect to "*any* financing arrangement among VAP and *any* of its lenders." However, under SFR's interpretation, this phrase would apply to only *one* type of "financing arrangement"—a loan—and only *one* type of "lender"—a direct creditor. Accordingly, it would distort the plain language of Section 1.2(e) to interpret this phrase to apply only in the scenario where a bank is lending money directly to VAP.

*Finally*, SFR's interpretation distorts the plain and obvious structure of Section 1.2(e) by parsing the clause "in each case as may be required pursuant to the terms of any financing arrangement among VAP and any of its lender(s)" to only apply to clause (iii), rather than clauses (i), (ii), *and* (iii). In fact, SFR glosses over and eliminates, via ellipses, the critical phrase in Section 1.2(e) that undermines its position—"in each case." (*See* SFR Resp. at 8.) The reason SFR distorts and omits the express language is obvious. SFR admits that it made a payment under Section 1.2(e)(i). The 2012-1 Reserve Account was required pursuant to VAP's financing arrangement with Citi (Warren Hill Resp. to SFR Sum. J. at Ex. 16 at §§ 3.02, 4.05(c)), consistent with the plain language of Section 1.2(e). Because the phrase "in each case as may be required pursuant to the terms of any financing arrangement among VAP and any of its lender(s)" applies to Section 1.2(e)(i), the unreasonable interpretation SFR now advances is inconsistent with its prior Section 1.2(e)(i) payment. Yet, SFR now argues that these banks "are not VAP's lenders," and thus no payment would have been required. (SFR Br. at 15.) Nevertheless, these banks are VAP's lenders, which is why SFR made payment consistent with the plain, unambiguous language of Section 1.2(e)(i).

    **B.**    **SFR Concedes that the Transfer of the Trust Certificates Is Not Relevant to Calculating the Section 1.2(e)(iii) Earnout Payment.**

Warren Hill explained in its moving papers that Section 1.2(e)(iii) does not require VAP to be the nominal holder of the trust certificates or to directly receive the trust certificate income

in order for that income to be included in the Section 1.2(e) earnout calculation.  SFR agrees, stating that "the transfer of the trust certificates is not relevant for purposes of the MIPA 1.2(e)(iii) analysis."  (SFR Br. at 8.)  Given this, and SFR's agreement that the trust certificates are financial instruments (*e.g.*, Reape Decl. ¶ 11), the parties' dispute under Section 1.2(e)(iii) is limited to whether the clause applies to the financing arrangements that are the core of VAP's business or, as SFR posits, only to situations where VAP takes out a direct loan from a bank.

        C.        **SFR's Remaining Arguments Are Irrelevant and Should Be Rejected.**

SFR next makes several irrelevant arguments that have no bearing on the scope or construction of Section 1.2(e)(iii).  The Court can disregard these arguments for purposes of deciding Warren Hill's motion.  In particular:

- SFR claims that the "value of the trust certificates was unknown" at the time the parties executed the MIPA.  (SFR Resp. at 10.)  While true, SFR's statement is misleading and, in fact, bolsters Warren Hill's interpretation.  As financial instruments that hold residual value that is to be released at future dates, the ultimate value of the trust certificates may not be "known" in advance with complete certainty; however, SFR ignores that (1) the expected value of the trusts certificates is calculable (Ex. 3, Reape Dep. at 393-94, 396-97, 419-20, 429), (2) such expected value is calculated in VAP's audited financial statements (Ex. 5, Consol. Fin., at 7), and (3) it is precisely because the ultimate value of the trust certificates may diverge from the expected value that the parties agreed that Section 1.2(e) payments would not be made until the trusts released the trust certificate income.  By structuring the timing of payment in this respect, the parties purposefully accounted for the nature of the trust certificate income.

- SFR also asserts that Warren Hill was "certainly aware of the possibility that it could receive nothing under [Section] 1.2(e)[.]"  (*Id.* at 11.)  This, too, is somewhat true, but it is

irrelevant. The earnout provisions (Section 1.2(d)-(e)) were tied to the financial performance of VAP in the years following the closing. If VAP underperformed, then the earnout provisions would have reduced value. But, VAP did not underperform. As a result, the earnout provisions have considerable value. SFR seems to conflate the risk that the business might perform poorly (which risk would be borne by both SFR and Warren Hill) with SFR's absurd interpretation that SFR could retain its entire share of the trust certificate income while paying none of it to Warren Hill under 1.2(e). In agreeing to the terms of the MIPA, the parties created a structure through which SFR and Warren Hill would share the risk of VAP's post-closing performance. The parties agreed to language in Section 1.2(d) and (e) that captured the entire "spread," and now Warren Hill is entitled to be paid what it is owed. The possibility that VAP might have performed poorly (in which case SFR would have received a lower return on its investment and Warren Hill would have received correspondingly lower earnout payments) does not permit SFR to breach Section 1.2(e).

- SFR represents that "none of the current trust depositors [*i.e.*, lenders] have had a lending relationship with VAP." (SFR Resp. at 6.) This is false and based on a misleading citation to Paragraph 7 of a new declaration from David Reape. Mr. Reape attests that the relevant lenders—Citi, Barclays, and Bank of America—are not direct "lenders *to VAP*" in the context of the purchase of receivables. (SFR Resp. Ex. 2 at ¶ 7 (emphasis added).) Warren Hill does not dispute that the loans are made to the trusts that VAP establishes as financing intermediaries; Warren Hill contends that this does not matter when interpreting the scope of Section 1.2(e). In any event, Mr. Reape did not attest that there is no "lending relationship" between VAP and these three lenders. In actuality, Mr. Reape repeatedly testified under oath that the identified banks are VAP's lenders (*see* Ex. 10), and thus he could not author a

7

declaration to the contrary without it being a complete sham.[4] SFR's misleading statement about VAP's lending "relationship[s]" is not supported by the record or Mr. Reape's new declaration.

- SFR contends that the transfer of the trust certificates from VAP to BCM was "supported by consideration," because "BCM accepted the risk of loss on the certificates[.]" (SFR Resp. at 12.) As an initial matter, whether the trust certificates were transferred for actual consideration has no bearing on whether trust certificate income must be included within the Section 1.2(e)(iii) earnout payments. SFR admitted this, by agreeing that the transfer of the certificates is "not relevant" to ascertaining the scope of Section 1.2(e)(iii). (SFR Br. at 8.) In any event, there was no consideration paid by BCM for the certificates. The value of the certificates cannot fall below zero, so BCM, which did not pay any consideration to purchase the certificates, bore no risk of losing anything (other than the value gifted to it by VAP). That is, even if the certificates were to decrease in value, BCM would have simply had a smaller gain, rather than an actual loss, because BCM never paid for the certificates in the first place. This situation is similar to receiving stock as a gift; the recipient is not undertaking a "risk of loss" simply because the share price of the gifted stock might decline.

- SFR also contends that VAP earns and receives management fees for its role as the manager of the trusts. SFR suggests that this is good enough for VAP (and, by extension, Warren Hill). This argument makes no sense and, with respect to new trusts, is false and

---

[4] *See, e.g.*, *Kopplin v. Wisconsin Cent. Ltd.*, 914 F.3d 1099, 1102–03 (7th Cir. 2019) ("a party may not create an issue of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony."); *Harmon v. Gordon*, 712 F.3d 1044, 1051–52 (7th Cir. 2013) ("Harmon's representation directly contradicts his earlier deposition testimony, which clearly indicated the parties' intent to negotiate a new contract following Gordon's three or four seasons with the Bulls, and the law of this circuit does not permit a party to create an issue of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony."); *Blagrave v. Nutrition Mgmt. Servs. Co.*, 2008 WL 2682690, at *4 (E.D. Pa. July 8, 2008) (Bartle, J.) ("As articulated by our Court of Appeals, the sham affidavit doctrine directs district courts to disregard a subsequent affidavit from a witness who has given prior testimony when the affidavit comes in later to explain away or patch up [earlier testimony] in an attempt to create a genuine issue of material fact.")

misleading. First, the parties agreed to split SFR's share of the business's spread, and they created Section 1.2(d) and Section 1.2(e) to account for their deal. The fact that VAP earns management fees, which are akin to an advance on the spread and which are included within Section 1.2(d), has nothing to do with whether the parties agreed to include the remainder of the spread (*e.g.*, trust certificate income) in a separate provision, Section 1.2(e). The Court already held that Warren Hill is entitled to its portion of the Section 1.2(d) fees, and now Warren Hill seeks the remainder of the spread that SFR owes under Section 1.2(e). Second, in more recent deals, the management fees have been set to zero, so that the entire value of the deals flow through the trust certificates. (Ex. 3, Reape Dep. at 304; SFR Mot. Summ. J. at Ex. K (SFR17026, 17765, 17790 (defining manager fee and manager incentive fee to be zero).) This coincides—not coincidentally—with SFR's litigation position that the trust certificate income is not included within Section 1.2(e). SFR's attempt to paint the management fees as capturing the full value of VAP's transactions, while failing to inform the Court of the newer, zero-fee deals, is outrageous.

- SFR also accuses Warren Hill of creating a "strawman" by arguing that SFR suggested SFR was required by the new risk regulations to create BCM. (SFR Resp. at 13.) SFR further represents that "SFR has argued no such thing." (*Id.*) This is disingenuous. SFR's own expert report asserts the inadmissible legal conclusion that a "new requirement" in risk retention rules forced VAP to create BCM. (*See* SFR Resp., Ex. 3 at 2.) This is consistent with prior representations SFR made during this case, including those identified in Warren Hill's moving papers. (D.E. 74 at 15.) Regardless, because SFR admits that the transfer of the certificates is not relevant to the interpretation of Section 1.2(e), the parties' dispute over the applicability of the risk retention regulations is not at issue in resolving the instant motion.

- SFR contends that the MIPA does not mention the phrase "trust certificate." (SFR Resp. to Facts at 2.) This is correct but, again, misleading because the parties agreed to use a broader term—"financial instruments"—which encompasses, as SFR concedes, trust certificates. David Reape expressly states in his declaration that "trust certificates are functionally subordinated *financial instruments*." (Reape Decl., ¶ 11 (emphasis added).) Indeed, SFR does not argue that trust certificate income falls outside of Section 1.2(e) because *trust certificates* are outside the plain language of 1.2(e); rather SFR only argues that the trust certificate income is outside 1.2(e) because the banks that finance the purchase of receivables are purportedly not VAP's lenders. The parties' use of the broader term "financial instruments" rather than "trust certificates" embraced the possibility that VAP's business might be structured flexibly in the post-closing earnout period. The fact that the MIPA does not use the phrase "trust certificates" does not support SFR's interpretation, as SFR concedes that trust certificates are "financial instruments." (Reape Decl., ¶ 11.)

- Finally, SFR asserts that Warren Hill is attempting to "squeeze as much money out of the MIPA as possible" by interpreting Section 1.2(e) to include the trust certificate income. To be clear: Warren Hill is seeking to recover in this litigation everything it is entitled to under the MIPA. Warren Hill's assertion of its rights under the MIPA does not make SFR's absurd interpretation reasonable, nor does it render Warren Hill's interpretation—the only reasonable interpretation of the contract language—unreasonable.

## II. THIS COURT ALREADY HELD THAT THE BLUESTONE ENTITIES DO NOT "EARN" THE MANAGEMENT FEES BECAUSE IT IS UNDISPUTED THAT THEY ARE NOT AND CANNOT BE MANAGERS OF ANY TRUST.

SFR's argument that the Court should deny summary judgment in favor of Warren Hill on the issue of whether SFR may exclude management fees VAP diverted to the Bluestone

entities is beyond frivolous. (SFR Br. at 15-16.)  SFR argues that "[b]ecause the Court relied on this extrinsic evidence to define 'Revenue' under the MIPA, the Court must have concluded that ambiguity existed in the contract." (*Id.*)  Therefore, SFR contends, the Court must deny summary judgment "on the issue of revenue earned by the Bluestone Entities under MIPA Section 1.2(d)" because "ambiguity in a contract is an issue for trial." (*Id.*)  This Court has rejected SFR's argument *twice*, but SFR now seeks a *third* bite at the apple, arguing that the Court does not understand the summary judgment standard.  (Docs. 62 & 68.)

This Court did not rely on extrinsic evidence and did not conclude that ambiguity existed in the contract.  Rather, relying on *Sodowski v. National Flood Insurance Program*, 834 F.2d 653 (7th Cir. 1987), the Court held that it "looked at the unambiguous language in the MIPA and applied this interpretation to the undisputed facts in the record."[5] (Doc. 68, at 3.)  Indeed, the Court held that "[t]o the extent that defendant argues that the Bluestone entities, rather than VAP, 'earned' the management fees at issues, *this argument is without merit*," because "*it is undisputed* that the Bluestone entities are not and cannot be managers of any trust." (Doc. 62, at 10; emphasis added).[6]

---

[5] *See also Banc. One Fin. Servs. v. Advanta Mortg. Corp.*, 2002 U.S. Dist. LEXIS 960, at *16 (N.D. Ill. Jan. 22, 2002); *Robertson P'ship v. Erie Ins. Exch.*, 2016 IL App (2d) 150517-U, ¶ 24 (Ill. App. 2016); *Diaz v. Westgate Lincoln Mercury*, 1994 U.S. Dist. LEXIS 16300, at *23 (N.D. Ill. Nov. 7, 1994); *Chi. Dist. Council of Carpenters Pension Fund v. Simpson Constr. Co.*, 2006 U.S. Dist. LEXIS 92163, at *23 (N.D. Ill. Dec. 18, 2006); *Krok v. Burns & Wilcox, Ltd.*, 2000 U.S. Dist. LEXIS 1451, at *10  (N.D. Ill. Feb. 7, 2000); *BA Jacobs Flight Servs. v. RutAir Ltd.*, 2015 U.S. Dist. LEXIS 9222 (N.D. Ill. Jan. 27, 2015); *Ameritrust Co. Nat'l Asso. V. Strozier*, 1987 U.S. Dist. LEXIS 9011, at *4 (N.D. Ill. Sept. 25, 1987).  Moreover, even assuming that the language was ambiguous, which it is not, SFR's assertion that "ambiguity in a contract is an issue for trial" is also wrong as a matter of law where, as here, the record evidence is undisputed.  *See Harmon v. Gordon*, 712 F.3d 1044, 1051 (7th Cir. 2013).

[6] SFR's reliance upon its expert's report is misguided.  The expert reports addressed Warren Hill's *alternative argument* that even if the Bluestone entities "earned" the fees in question, which this Court already held they did not, then the fees are still nonetheless "earned" by VAP because VAP and the Bluestone entities are merely alter egos of one another. (Warren Hill's Resp. to SJ, at 17-19)  But, in light of this Court's holding that VAP, and only VAP, earned the fees at issue, the alter ego theory (and SFR's expert report) are immaterial to this issue.  (*See* Doc. 62, at 10.)

11

SFR's concession that its counterclaim is moot "[i]n light of this Court's prior ruling" is also inconsistent with, and further highlights the frivolity of, SFR's position. (SFR Br. at 4.) On the one hand, SFR concedes that its counterclaim—which was based upon its contention that SFR included management fees in the earnout that were allegedly "earned" by the Bluestone entities, not VAP—is foreclosed by the Court's prior opinion. And, on the other hand, SFR argues that the issue of whether VAP or Bluestone earned the fees is an issue that should be "reserve[d] ... for trial." (SFR Br. at 16.) If, as SFR concedes, the Court's prior ruling is dispositive of its counterclaim, then it must be dispositive of whether SFR may exclude management fees VAP paid to the Bluestone entities.

Accordingly, this Court should enter judgment in favor of Warren Hill.

### III. SFR CONCEDES THAT BCBS WAS INVESTIGATED AND TRANSACTED WITH PRIOR TO THE MIPA BEING SIGNED.

SFR cannot deduct amounts associated with bonus payments to Brian Hynes from the Section 1.2(d) "Net Income" calculation. Section 1.2(d)(ii)(D) permits SFR to deduct consulting fees that are paid in exchange for bringing VAP *new* business opportunities, "provided that such new business opportunities exclude any vendor, payee, program or party which VAP had previously investigated, transacted with, or paid any consultant with respect to." SFR took nearly $3 million in deductions in 2017 and 2018 for bonuses paid to Brian Hynes for his alleged role in investigating and securing BCBS as a vendor that would participate in the Program through VAP.[7] These are ineligible deductions under Section 1.2(d)(ii)(D).

---

[7] Warren Hill moved for judgment as to any bonus paid in connection with BCBS and United. SFR does not mention United in its response, meaning that it either agrees that United was indeed investigated/transacted with prior to the MIPA being signed or that VAP did not base its bonus to Mr. Hynes on anything relating to United. In any event, SFR does not cite any dealings with United in defense of its decision to deduct Mr. Hynes' bonus from "Net Income."

The undisputed record shows that VAP investigated BCBS beginning in 2013, and that its investigation of BCBS continued throughout 2014 and 2015. (Ex. 3, Reape Dep., at 245:1-8, 254:22-255:5; (Ex.15 (Deposition Exhibit 38) at 5-7; (Ex. 17 (BCBS CRM showing contacts back to 2013).) The record also confirms that VAP "transacted with" BCBS prior to the MIPA being signed. Specifically, VAP and BCBS entered into a financing arrangement (using Bank of America) in December 2015. (*See* Ex. 3, Reape Dep., at 258:22-259:1; *id.* at 263:17-22; Ex. 10-11.) Moreover, the record confirms that Mr. Hynes was paid a consulting fee associated with respect to his investigation of/work with BCBS prior to the closing of the MIPA. (Ex. 3, Reape Dep., at 267:7-24.) There is no dispute as to these facts.

SFR offers three arguments in response, none of which alter the outcome of this issue. First, SFR admits that VAP identified and investigated BCBS as a potential business opportunity prior to the MIPA closing, but it attempts to downplay the success of VAP's investigation. (*See* SFR Resp. Ex. 2, Reape Decl. at ¶¶ 18-23.) SFR contends that initial efforts to do business with BCBS were not consummated, so in 2015, Mr. Hynes became the primary point of contact between BCBS and VAP. (*Id.*)[8] SFR represents that in 2015, Mr. Hynes took over the efforts to secure BCBS business and that his contacts led to critical meetings with BCBS decision-makers. These 2015 meetings culminated with a transaction among BCBS and VAP in December 2015. (Exs. 10-11.) All of these activities—the investigation by Mr. Hynes and others and the transaction itself—occurred before the MIPA was signed by the parties. Moreover, Mr. Hynes was being paid a consulting fee in connection with this pre-MIPA work with BCBS. (Ex. 3, Reape Dep., at 267:7-24.) Therefore, even accepting SFR's version of events, the undisputed

---

[8] Warren Hill disagrees with SFR's attempt to minimize the work done by VAP to secure BCBS business in 2013 and 2014, but that dispute is not material to the outcome. For example, Mr. Reape attests that there were not meetings of consequence with BCBS prior to Mr. Hynes involvement, but the CRM materials attached as Exhibit 17 show numerous meetings.

13

record demonstrates that SFR cannot take the deduction because BCBS was a vendor that was investigated, transacted with, and with respect to which a consultant was paid prior to the MIPA being signed.

Second, SFR spends a great deal of effort defending the decision to pay Mr. Hynes a bonus. Whether Mr. Hynes deserved a bonus is not relevant. The question is not whether he earned a bonus or whether VAP made a good business decision in paying him one. Rather, the question for the Court is simply whether SFR can *deduct* those bonus payments under Section 1.2(d)(ii)(D). For the reasons set forth above, SFR cannot. Moreover, SFR's attempt to conflate the decision to pay Mr. Hynes a bonus with SFR's ability to deduct those payments under the MIPA eviscerates SFR's claim that Warren Hill's position will disincentive employees from seeking new business opportunities for VAP. (*See* SFR Resp. at 17.) VAP can elect to incentivize its employees/consultants with lawful bonuses where it deems appropriate. SFR, however, cannot deduct the bonuses from its payments to Warren Hill if the bonuses do not represent new business as defined by the parties in Section 1.2(d)(ii)(D).

Finally, SFR claims that Warren Hill's position would prevent SFR from deducting "any" bonus that was paid to any employee if a vendor had previously been "cold-called." (SFR Resp. at 17.) This irrelevant hypothetical is a distraction from the issue before the Court. SFR's "cold-call" hypothetical could potentially lead to a triable issue, depending on the actual facts. However, that hypothetical is not before the Court. The only deductions at issue relate solely to bonuses paid to Brian Hynes in 2017 and 2018, for which there is a detailed record of investigation, transaction, and consultant payment. SFR did not attempt to deduct any other bonus. The record shows that BCBS was a significant target for VAP in 2013, 2014, and 2015; the record shows dozens of contacts between VAP and BCBS prior to the MIPA being signed;

14

and even the evidence submitted by SFR shows that, at a minimum, Mr. Hynes was involved in investigating BCBS as early as 2015 (and SFR applauds him for allegedly securing a transaction with BCBS that closed in December 2015, prior to the MIPA being signed).

Accordingly, SFR cannot deduct the bonuses paid to Mr. Hynes from Net Income, as defined in Section 1.2(d).  Warren Hill is entitled to summary judgment on this issue.

## **CONCLUSION**

For all the foregoing reasons, Plaintiff Warren Hill, LLC respectfully requests that this Court grant its motion and enter judgment in favor of Warren Hill.

Respectfully submitted,

*/s/ Gregory S. Voshell*
Gregory S. Voshell
Thomas B. Helbig, Jr.
ELLIOTT GREENLEAF, P.C.
925 Harvest Drive, Suite 300
Blue Bell, PA 19422
(215) 977-1000

Dated: May 16, 2019                                  *Counsel for Plaintiff Warren Hill, LLC*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on this date, I have caused a true and correct copy of the forgoing to be served upon each attorney of record via the Court's ECF system.

>   */s/ Gregory S. Voshell*
>   GREGORY S. VOSHELL

Dated: May 16, 2019