IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WARREN HILL, LLC | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| SFR EQUITIES, LLC | : | NO. 18-1228 |

MEMORANDUM

Bartle, J.                                                                                July 23, 2019

        Plaintiff Warren Hill, LLC ("Warren Hill") has brought this diversity action under Illinois law for breach of contract against defendant SFR Equities, LLC ("SFR"). It also seeks an accounting. Specifically, Warren Hill claims that SFR has breached the "Membership Interest Purchase Agreement" ("MIPA") governing the sale to SFR of Warren Hill's stake in a company called Vendor Assistance Program, LLC ("VAP"). The amended complaint alleges that SFR has failed to pay the full amount due to Warren Hill and has improperly deducted certain expenses.[1]

        Before the court are cross motions for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Warren Hill has moved for summary judgment as to the interpretation of several key provisions of the MIPA related to the purchase price for its ownership interest in VAP. SFR

---

1. SFR had also counterclaimed to recover purported MIPA over-payments to Warren Hill but both parties have now agreed that the counterclaim is moot.

likewise seeks summary judgment with respect to certain provisions of the MIPA concerning the purchase price.

I

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The material facts underlying the issues now before the court are not in dispute. The focus is on the interpretation of §§ 1.2(d) and 1.2(e) of the MIPA.

II

We begin the recitation of the undisputed evidence with the stark fact that the State of Illinois does not pay its bills on time. As a result, Illinois established the Vendor Payment Program ("VPP") in order to ensure that vendors who provide the State with goods and services are promptly compensated despite the State's cash flow deficit. Under the VPP, Illinois approves certain entities as "Qualified Purchasers," which may purchase outstanding accounts receivable from the State's vendors. The Qualified Purchasers pay the vendors 90% of the face value of the accounts receivable and do so much more quickly than if the vendors had to wait for the State to send a check. Illinois now owes the Qualified

Purchasers, and not the vendors, the value of the accounts receivable. Qualified Purchasers may not subsequently assign accounts receivable to another entity without first providing written notice to the State that the entity is also an approved Qualified Purchaser.

VAP became a Qualified Purchaser under the VPP in 2011 and since that time has been involved in initiating the purchase of hundred of millions of dollars of accounts receivable from vendors of the State of Illinois. In order to purchase such a sizeable amount of accounts receivable under the VPP, VAP facilitates the creation of Delaware statutory trusts, such as the VAP Funding Master Trust II which has the U.S. National Bank as the trustee.[2] Illinois has approved each trust as a Qualified Purchaser in the VPP in reliance on representations made by VAP that VAP is the manager of the trust and that the trust was formed solely for the purpose of purchasing qualified accounts receivable.

---

2. The trusts are established under Delaware law which requires that every statutory trust file with the Secretary of State a certificate of trust that contains certain identifying information including the trust name, the name and address of at least one Delaware trustee, the future effective date of the certificate if any time other than upon filing, and any other information the trustees determine to include. Del. Code Ann. tit. 12, § 3810.

For VPP to be viable, the Qualified Purchasers such as VAP must of course have money to pay the vendors promptly. In order to obtain the necessary funds, the trust, as a Qualified Purchaser, borrows money from a lending bank, such as Barclays Capital. VAP locates the lending banks and arranges the financing for the trusts it has established to purchase the receivables. David Reape, CEO of VAP, testified in his deposition that VAP's board of managers consents to and approves through resolutions every such lending transaction. Each trust issues trust certificates to the entity or entities which hold the beneficial ownership in the trust.[3] The record contains trust agreements in which signatories are the trustee, the lending bank, VAP as the indemnitor, and the certificate holder. There are also management agreements naming VAP as the manager of the trusts.

When Illinois finally pays what is due, it pays the trust, as the Qualified Purchaser, and includes a substantial interest penalty. The vendor receives the remaining 10% of what is owed, the loans to the trust from the lending bank are then repaid with interest, and the various fees and expenses related to the management of the trust are satisfied. What is left

---

3. These trust certificates are not to be confused with the certificate of trust which each Delaware statutory trust must file with the Delaware Secretary of State.

constitutes the profit which is paid to the trust certificate holder, that is, the entity which holds a beneficial interest in the trust. A profit is possible because the interest penalty paid by Illinois to the trust exceeds the trust's various fees and expenses and the interest the trust pays to the lending banks.

The trust pays "Trust Fee Income" and "Trust Certificate Income." Pursuant to the trust agreements, VAP is paid "Trust Fee Income" for tasks performed in its capacity as manager, such as organizing the financing of the trusts with the lending banks and locating the receivables to purchase.

The "Trust Certificate Income," by contrast, is paid to the trust certificate holder. As noted above, each of the trusts has one or more holders of the trust certificates, which represent the beneficial interests in the trust. Under the trust agreements at issue, the entity that holds the trust certificates is entitled to "Trust Certificate Income," that is the spread which remains after all related fees and expenses are paid and the bank loan with interest is discharged.

Warren Hill sold its interest in VAP to SFR pursuant to the MIPA, effective January 1, 2016. Before 2017, VAP received both "Trust Fee Income" as manager of the trusts and "Trust Certificate Income" as certificate holder of the trusts. The VAP Funding Master Trust II in SFR's Exhibit L is an example

-5-

of such an agreement.  It names the U.S. Bank Trust National Association as the "Trustee" and VAP as the "Manager" and "Certificateholder."  The agreement provides that the Trustee shall distribute funds from a particular account in order of priority, with the "Certificateholder" receiving any remaining amounts.

In 2017, after the sale of Warren Hill's stake in VAP to SFR, the management of VAP created Bluestone Capital Markets ("BCM") and transferred to BCM the trust certificates that VAP previously held.[4]  BCM and VAP share an identical CEO and board of managers as well as nearly identical beneficial owners and ownership percentages.  SFR controls one of the six seats on VAP's and BCM's board of managers and owns the largest percent interest in BCM at over 40%.  BCM, unlike VAP and the trusts, is not recognized by the State of Illinois as a Qualified Purchaser in the VPP.

---

4. The parties discuss at length in their briefs the reason for this decision.  SFR states that the board of VAP created BCM and transferred to it the existing trust certificates in order to comply with new risk retention regulations promulgated following the Dodd Frank Act.  Warren Hill questions the legitimacy of this explanation and, while noting that VAP transferred the trust certificates without receiving consideration in return, suggests that SFR played a role in the creation of BCM in order to artificially deflate VAP's profitability under the MIPA.  Whatever the explanation for the transfer of the trust certificates may be, the parties now agree the reasons are not relevant for present purposes.

Since 2017, BCM, rather than VAP, has also been named as the certificate holder of newly created trusts. For example, the Series 2017-4 and Series 2017-4B Series Trust Agreements in SFR's Exhibit K list BCM as the "Certificateholder Representative," VAP as the primary "Indemnitor," Barclays Capital as the "Depositor" (the lender), and U.S Bank Trust National Association as the "Trustee" and "Collateral Agent." As in the VAP Master Trust II, these trusts provide that the Trustee shall distribute funds in order of priority, with the "Certificateholder Representative" receiving remaining funds after all fees and expenses are paid. BCM now receives trust certificate income directly from the trusts instead of VAP, which no longer holds any trust certificates.

As noted previously, SFR purchased Warren Hill's interest in VAP pursuant to the MIPA which was effective January 1, 2016. SFR agreed to pay Warren Hill an initial purchase price as well as sums to be calculated based on subsequent events, including an amount equal to 50% of VAP's "Net Income" for the years 2016, 2017, and 2018 under § 1.2(d) of the MIPA and an amount equal to 16.623% of the "Included Reserve Amounts" for the years 2016, 2017, and 2018 under § 1.2(e). As described in § 1.2(d), "Net Income" includes:

> (i) the sum of (A) any and all fees earned by VAP in its capacity as a manager or administrator of (1) the Vendor Assistance Trust and/or (2) any

> other trust or account maintained in the course of VAP's business, . . . and (D) any and all revenues received by VAP other than the Reserve Amounts (as defined [in § 1.2(e)]) <u>less</u> (ii) . . . (D) any consulting fees paid to any member of VAP or any third party in exchange for introducing any new business opportunity to VAP, <u>provided</u> that such new business opportunities exclude any business involving any vendor, payee, program or party which VAP had previously investigated, transacted with or paid any consultant with respect to. (Emphasis added).

Items (A) through (D) of clause (i) are defined in § 1.2(d) as "**Revenue**" and items (A) through (D) of clause (ii) are defined as "**Expenses**."

> Section 1.2(e) provides in relevant part:
>
> (e) For purposes of this Agreement, "**Reserve Amounts**" are defined to mean any and all amounts (i) deposited in VAP's series 2012-1 Reserve Account, (ii) deposited in any other reserve account held by, on behalf of, or for the benefit of, VAP, and/or (iii) held in the form of any financing instrument, in each case as may be required pursuant to the terms of any financing arrangement among VAP and any of its lender(s).

Section 1.2(e) defines as "**Reserve Accounts**" the accounts and financing instruments described in clauses (i), (ii), and (iii). The balance of the 2012-1 Reserve Account is defined as the "**Excluded Reserve Amount**," and all other Reserve Amounts that are or become Reserve Amounts during the three year period following the closing date of the MIPA are defined as the "**Included Reserve Amounts**." Under § 1.2(e), "within five days of the release of any Included Reserve Amount from any Reserve

-8-

Account" SFR must pay to Warren Hill "an amount equal to 16.623% of such released Included Reserve Amount (each such amount, a "**Seller Included Reserve Amount**")."  The fact that the financing instruments are now owned by BCM or other entities is irrelevant under § 1.2(e) since the "Included Reserve Amounts" payments do not depend on what entity actually receives the trust income, only that the income is released.

III

In 2017 and 2018, SFR deducted from VAP's Net Income earnout calculation a total of nearly three million dollars in bonus payments made to Brian Hynes, a member of the board of managers for VAP, for obtaining the accounts receivable of Blue Cross Blue Shield ("BCBS").  Warren Hill claims those bonus payments are consulting fees which must be included in the calculation under § 1.2(d)(ii)(D) because those payments were for "business involving any vendor . . . or party which VAP had <u>previously</u> investigated, transacted with, or paid any consultant with respect to," that is, before the MIPA became effective on January 1, 2016. (Emphasis added).[5]  Warren Hill seeks summary judgment on this issue.

---

5.  Warren Hill also raised previous communications with United Health and Bank of America in its motion for summary judgment. At oral argument, both parties agreed that these contacts were de minimus and that the bonus, for all intents and purposes, related to BCBS.

SFR counters that the payments to Hynes related to Hynes' investigation and transaction with BCBS after January 1, 2016 and thus may be deducted.  We must therefore look at the record and the timetable of Hynes' efforts.

The undisputed record reflects significant instances of contact between VAP and BCBS prior to January 1, 2016.  David Reape, CEO of VAP, testified that VAP personnel Hynes and Drew Delaney were involved in investigating BCBS as a vendor who might sell to VAP its accounts receivable with the State of Illinois.  Hynes had been in communication with BCBS "probably since 2012," years before the MIPA was signed.  The record depicts ongoing email correspondence regarding BCBS dating back to 2012 as well as telephone calls with BCBS from 2013 to 2015.  There was also a "meeting with senior management" of BCBS in 2014.  A successfully closed deal between BCBS and VAP for the purchase of BCBS's accounts receivable culminated at the end of 2015, before the MIPA's effective date of January 1, 2016.  Excerpts from the December 2015 Financing Arrangement Closing Binder list VAP as the manager of the trust.

SFR characterizes VAP's interaction with BCBS prior to 2016 as "relatively trivial."  No reasonable person can accept this description.  There can be no doubt that the bonus, that is, consulting fees, paid to Hynes as a reward for his successful effort with BCBS, related to a business involving a

vendor that VAP had "investigated" or "transacted with" prior to January 1, 2016. Thus, SFR improperly deducted nearly three million dollars in payments to Hynes from VAP's Net Income as an Expense under § 1.2(d)(ii)(D) of the MIPA. Warren Hill is entitled to summary judgment on this issue so that the amount due to it reflects these dollars.

IV

Warren Hill also seeks summary judgment in its favor so as to require SFR, under § 1.2(d)(i)(A)(1) of the MIPA, to include fees paid by VAP to BCM and Bluestone Finance ("the Bluestone entities") in its calculation of the earnout payments due to Warren Hill.

We had previously explained in our Memorandum dated February 8, 2019 (Doc. # 62) that the plain language of § 1.2(d)(i)(A)(1) requires SFR to include such fees in the calculation because the definition of Revenue includes "any and all fees earned by VAP in its capacity as a manager . . . of (1) the Vendor Assistance Trust and/or (2) any other trust . . . maintained in the course of VAP's business." See Warren Hill, LLC v. SFR Equities, LLC, No. CV 18-1228, 2019 WL 528915 (E.D. Pa. Feb. 8, 2019). The monies SFR excluded in its earnout payments were management fees received by VAP and only thereafter allocated to the Bluestone entities. We wrote that "[w]hat VAP does with a portion of these fees after it receives

them does not alter the MIPA designation of such fees as Revenue." Id. at *3. Accordingly, we denied SFR's motion for partial summary judgment seeking the contrary result.

SFR, reiterating its argument that we rejected in its motion for reconsideration, contends that the court considered extrinsic evidence when it previously interpreted this MIPA provision. SFR asserts that this is an issue of fact that should be reserved for trial. SFR yet again mischaracterizes the court's analysis in interpreting the MIPA. We did not inappropriately rely on extrinsic evidence. Rather, we determined the meaning of the unambiguous language in the MIPA and applied this interpretation to the undisputed facts before the court.

We did not previously enter judgment in favor of Warren Hill on this issue because it was SFR and not Warren Hill which had moved for summary judgment. The record is undisputed that SFR has excluded in its earnout payments money allocated to the Bluestone entities in violation of the plain language of § 1.2(d)(i)(A)(1). We will now grant summary judgment in favor of Warren Hill on this issue so that the earnout payments include in the calculation the payments VAP makes to the Bluestone entities.

V

The parties have filed cross motions for summary judgment on the question whether the percentage of Included Reserve Amounts payable to Warren Hill under § 1.2(e) of the MIPA encompasses the trust certificate income payable to the certificate holders of the trusts.[6] SFR is required to pay Warren Hill an amount equal to 16.623% of the Included Reserve Amounts, which include "any and all amounts . . . (iii) held in the form of any financing instrument, in each case as may be required pursuant to the terms of any financing arrangement among VAP and any of its lender(s)." The facts are not in dispute but the parties disagree over the meaning of the words "any financing arrangement among VAP and any of its lenders."

Under Illinois law, which governs the interpretation of the MIPA, "the meaning of a written contract is ordinarily a question of law and not one of fact." Hufford v. Balk, 497 N.E.2d 742, 744 (Ill. 1986), quoting Chicago Daily News v. Kohler, 196 N.E. 445, 451 (Ill. 1935). A determination of whether a contract is ambiguous is also a question of law.

---

6. SFR also discusses in its motion for partial summary judgment that the trust certificate payments should be excluded from VAP's Net Income under § 1.2(d). Warren Hill does not suggest that it should be included under this provision and instead relies upon § 1.2(e).

Berryman Transfer & Storage Co. v. New Prime, Inc., 802 N.E.2d 1285, 1287 (Ill. App. Ct. 2004).

When interpreting a contract, the court's primary objective is to give effect to the intent of the contracting parties. United Airlines, Inc. v. City of Chicago, 507 N.E.2d 858, 861 (Ill. 1987). The language of the contract is typically the best evidence of this intent. Id. The court must construe the contract language as a whole, interpreting each provision so that it is consistent with other provisions and giving effect to each contract clause and word. Thompson v. Gordon, 948 N.E.2d 39, 47 (Ill. 2011); Hufford, 497 N.E.2d at 744; In re Halas, 470 N.E.2d 960, 964 (Ill. 1984). In interpreting the contract's language, the court should generally give words their ordinary meaning. Thompson, 948 N.E.2d at 47.

Nonetheless, the court must also be sure to construe the contract so that no provision is rendered meaningless. Premier Title Co. v. Donahue, 765 N.E.2d 513, 518 (Ill. App. Ct. 2002). The court is not "confined to a strict and literal construction of the language used" if doing so would frustrate the intent of the contracting parties. United Airlines, 507 N.E.2d at 861. "A court may therefore properly disregard even unambiguous language when it is clear the parties meant something different than what was said." Id. We must always keep in mind the commercial context of the agreement. Fleet

Bus. Credit, LLC v. Enterasys Networks, Inc., 816 N.E.2d 619, 629 (Ill. App. Ct. 2004). As Judge Easterbrook of the Court of Appeals for the Seventh Circuit has recognized when interpreting contracts under Illinois law, "when there is a choice among plausible interpretations, it is best to choose a reading that makes commercial sense, rather than a reading that makes the deal one-sided. . . . In the case of a commercial contract, one must have a general acquaintance with commercial practices." Baldwin Piano, Inc. v. Deutsche Wurlitzer GmbH, 392 F.3d 881, 883 (7th Cir. 2004) (internal quotation marks and citation omitted). The court must generally assume that a "contract's significance must, to a certain extent, be attributed to the parties' intent to bargain for 'something sensible.' . . . It is therefore incumbent upon a reviewing court to understand the practical context of the operative contractual language." Prestwick Capital Mgmt., Ltd. v. Peregrine Fin. Grp., Inc., 727 F.3d 646, 656 (7th Cir. 2013) (internal citation omitted).

Similarly, when a contract is susceptible to two interpretations, one of which is "fair, customary, and such as prudent persons would naturally execute, while the other makes it inequitable, unusual, or such as reasonable persons would not be likely to enter into," the court must construe the contract reasonably to avoid absurd results and adopt the rational and

probable interpretation. Foxfield Realty, Inc. v. Kubala, 678 N.E.2d 1060, 1063 (Ill. App. Ct. 1997).

Keeping these contact principles in mind, we must determine the meaning of § 1.2(e)(iii), the provision of the MIPA which entitled Warren Hill to "any and all amounts . . . held in the form of any financing instrument, in each case as may be required pursuant to the terms of any financing arrangement among VAP and any of its lender(s)." (Emphasis added). The parties agree that trust certificates issued by the trusts are financing instruments and that trust certificate income is "held in the form of a financing instrument" as required by the terms of the trusts. As noted above, where Warren Hill and SFR disagree is over the meaning of the phrase "any financing arrangement among VAP and any of its lenders." SFR asserts that this language refers only to an arrangement where there is a direct loan to VAP itself. Since there are no direct loans to VAP from lending banks, SFR contends that nothing is due to Warren Hill under this provision of the MIPA. Warren Hill counters that the financing instruments referenced under § 1.2(e)(iii) include the trust certificates present here because VAP initiates, arranges, facilitates, and approves the loans to the trusts and is a signatory to the trust or management agreements which involve, among other things, the

money from the lending banks to pay for the accounts receivable. VAP is also the indemnitor under the trust agreements.

We must frame our interpretation of § 1.2(e)(iii) in light of the commercial context of the MIPA governing the sale of Warren Hill's interest in VAP. Baldwin Piano, Inc., 392 F.3d at 883. It is undisputed that VAP, as explained previously, derives profits in the form of management fees for work performed in its capacity of manager of Delaware statutory trusts.[7] Throughout VAP's history and certainly before Warren Hill and SFR entered into the MIPA, VAP has used trusts as the intermediary to borrow hundreds of millions of dollars to purchase accounts receivable from vendors of the State of Illinois.[8] VAP arranges the financing for the trusts by locating banks who loan money to the trusts, which the trusts in turn use to purchase the accounts receivable identified by VAP. VAP's board of managers, which includes Gene Harris, the lead Manager of SFR responsible for SFR's day-to-day operations, approves the financing arrangements for the purchase of accounts receivable

---

7. Prior to the creation of BCM in 2017, VAP also received trust certificate income from the trusts.

8. As counsel for SFR explained in oral argument on its previous motion for partial summary judgment, VAP uses trusts as the vehicle for assignment of the accounts receivable, rather than soliciting banks to provide VAP itself with financing, because the volume of money at issue is in the hundreds of millions of dollars. (Doc. # 61).

and the establishment or use of a trust to make the purchase viable. We acknowledge that VAP does not directly receive the funds from the lending banks used in its business. Indeed, as far as the record reveals, it has never received any such loans. However, VAP's board of managers routinely characterize banks which lend their money to the trusts as "VAP's" lenders, "our lenders," and "our banks."[9] VAP, as the indemnitor of the trusts pursuant to the trust agreements, is ultimately responsible for ensuring the lending banks are repaid. Significantly, SFR was well aware of these arrangements and the way VAP did business before it entered into the MIPA. Gene Harris represented in his declaration dated November 20, 2018 that he, as lead manager of SFR, "became aware of VAP's business and knew some of its principals prior to 2016" as a result of SFR's conversion of a loan owed to SFR by a company that owned an equity interest in VAP.[10]

---

9. The record contains numerous examples of this practice. Gene Harris, Drew Delaney, and Bryan Hynes have referred to "our . . . lenders" and "our banks" in emails to other VAP board members. Reape repeatedly used the phrase "our lenders" during his deposition testimony. Moreover, when asked by counsel for Warren Hill, "Who was VAP's lender on those limited transactions," "What institutional lender . . . was VAP's first," and "About what time period if you recall did VAP first obtain financing from these lenders," Reape responded without questioning the designation as "VAP's lender" or clarifying that the lenders belonged to the trusts, rather than VAP.

10. In 2015, SFR had also made a loan to a VAP affiliate and learned that Warren Hill wished to sell its interest in VAP.

If SFR is correct that § 1.2(e)(iii) refers only to financing instruments involving direct loans to VAP, this provision would be a nullity because VAP does not obtain and never has obtained loans directly from banks in connection with the purchase of accounts receivable. In essence, Warren Hill would not be entitled to be paid a penny as a result of any profits paid by the trusts under this provision of the MIPA. It is unreasonable to conclude that a sophisticated party such as Warren Hill would acquiesce in such a meaningless and absurd provision, especially when considering the commercial realities of VAP's business as understood by both parties. See Premier Title Co., 765 N.E.2d at 518; Foxfield Realty, 678 N.E.2d at 1063.

Notably, SFR has not identified any meaning that would breathe life into § 1.2(e)(iii). There is nothing in the record to suggest that banks would ever lend hundred of millions of dollars directly to VAP to purchase accounts receivable or would make such sizeable loans without the protections of a vehicle such as a Delaware statutory trust and the accompanying complex agreements involved in each transaction. Indeed, SFR in its

---

Harris reported that the negotiations "started in 2015 and dragged on for many months." until the MIPA was signed February 17, 2016, effective January 1, 2016.

-19-

briefs suggests the banks would not do so. If we accept SFR's literal interpretation, § 1.2(e)(iii) would be meaningless.

In sum, the words "its lenders" in the phrase "held in the form of any financing instrument, in each case as may be required pursuant to the terms of any financing arrangement among VAP and any of its lender(s)" in § 1.2(e)(iii) can only reasonably be interpreted in light of the underlying commercial context to mean lenders to the trusts which VAP arranges for, organizes, facilitates, and approves and which VAP manages and indemnifies pursuant to various trust agreements to which it and the lenders are parties. Thus, Warren Hill is entitled under the MIPA to an amount equal to 16.623% of the trust certificate income, that is, the income from these financing instruments for 2016, 2017, and 2018.

We will grant the motion of Warren Hill for summary judgment so as to require SFR to include an amount equal to 16.623% of that income in calculating what it owes and will deny SFR's contrary motion for summary judgment.