IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WARREN HILL, LLC | : | CIVIL ACTION |
| v. | : | |
| SFR EQUITIES, LLC | : | NO. 18-1228 |

MEMORANDUM

Bartle, J.                                                December 3, 2019

Plaintiff Warren Hill, LLC ("Warren Hill") brings this diversity action under Illinois law for breach of contract, declaratory relief and an accounting against defendant SFR Equities, LLC ("SFR"). Warren Hill sold to SFR its membership interest in an Illinois limited liability company named Vendor Assistance Program, LLC ("VAP"). Warren Hill claims SFR breached the contract that governed the sale. Specifically, Warren Hill claims SFR underpaid it under the provisions of their Membership Interest Purchase Agreement ("MIPA"). The court has determined liability in favor of Warren Hill. Before the court presently is the motion of Warren Hill for summary judgment on damages and interest under Rule 56 of the Federal Rules of Civil Procedure.

I

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there

is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A dispute is genuine if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986). We view the facts and draw all inferences in favor of the nonmoving party. See In re Flat Glass Antitrust Litig., 385 F.3d 350, 357 (3d Cir. 2004).

Summary judgment is granted where there is insufficient record evidence for a reasonable factfinder to find for the nonmovant. See Anderson, 477 U.S. at 252. "The mere existence of a scintilla of evidence in support of the [nonmoving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." Id. In addition, Rule 56(e)(2) provides "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for the purposes of the motion." Fed. R. Civ. P. 56(e)(2).

II

We begin with a summary of the circumstances that resulted in this litigation. The state of Illinois does not pay its debts on time. As a way of ensuring that Illinois vendors

can be paid for the services rendered or goods supplied to Illinois, the state established the Vendor Payment Program ("VPP") in 2011. Under the VPP, Illinois permits third parties to purchase accounts receivable from its vendors at 90% of their face value. In order to participate in the VPP, the third-party purchasers must demonstrate a financial ability to fund the purchase of receivables and commit a minimum purchase amount based on the needs of the VPP. If the third parties meet these and other requirements under Illinois law, they are designated "Qualified Purchasers" and may participate in the VPP.

VAP is a "Qualified Purchaser" under the VPP. In this capacity, VAP purchases accounts receivable from vendors through previously established trusts. VAP holds the accounts receivable in accordance with management agreements with the trusts. To finance the purchase of vendor receivables, the trusts borrow funds from a lending bank. VAP indemnifies the loans to the trusts and is ultimately responsible for ensuring the lending banks are repaid.

When Illinois finally pays the accounts receivable, it pays the trusts. The trusts repay the loans used to purchase the receivables with interest, and Illinois's vendors receive their remaining 10%.

A profit to VAP is possible because when Illinois finally satisfies the accounts receivable, it does so with

substantial interest penalties. These penalties are greater than the interest the trusts pays to the lending banks.

From this profit, the trusts pay "Trust Fee Income" and "Trust Certificate Income." The trusts pay VAP "Trust Fee Income" pursuant to the trust agreements for tasks performed in its capacity as manager. For example, VAP organizes the financing of the trusts with the lending banks and locates receivables to purchase.

The trusts pay "Trust Certificate Income" to the holders of the trust certificates.[1] Trust certificates represent the beneficial interest in the trusts. "Trust Certificate Income" is the spread which remains after all related fees and expenses are paid and the bank loans with interest are discharged.

Before 2016, Warren Hill owned 33.246% of the membership interest in VAP. Warren Hill sold its membership interest to SFR in accordance with the terms of a Membership Interest Purchase Agreement ("MIPA") which became effective January 1, 2016. Germane to this motion, in addition to a lump sum at closing, SFR agreed to pay Warren Hill a portion of VAP's income for 2016, 2017, and 2018.

---

1. These trust certificates are not to be confused with certificates of trust.

At the time of the sale, VAP held the trust certificates. VAP received therefore both "Trust Fee Income" as manager of the trusts and "Trust Certificate Income" as holder of the trust certificates. In 2017, the management of VAP created Bluestone Capital Markets ("BCM") which shares a CEO and board of managers with VAP. VAP transferred the trust certificates to BCM for no consideration.[2]

In March 2018, Warren Hill brought this action, claiming breach of contract and seeking an accounting under the terms of the MIPA. The parties took discovery and filed several motions for summary judgment on the issue of liability, in which they disputed the meaning of the MIPA. The court held oral argument, ultimately determining liability in favor of Warren Hill. The court decided the summary judgment motions, issued two memorandum opinions in which it provided the reasoning for its decisions, and denied SFR's motion for reconsideration. It will not now revisit the meaning of the MIPA. The focus at this stage is on the calculation of damages and interest in light of the court's previous decisions.

---

2. Warren Hill suggests that SFR played a role in the creation of BCM in order to artificially deflate VAP's profitability under the MIPA. SFR controls one of the six seats on VAP's and BCM's board of managers and owns the largest percent interest in BCM at over 40%.

III

We turn to the terms of the MIPA relevant to our calculation of damages. SFR agreed to pay Warren Hill a lump sum of $4,000,000 at closing for its 33.246% membership interest in VAP. Sections 1.2(a)-(c) of the MIPA govern payment of the $4,000,000 at closing. It is undisputed that SFR met its obligations under Sections 1.2(a)-(c).

SFR agreed also to pay Warren Hill a portion of "Reserve Accounts" for 2016, 2017, and 2018. These accounts are required to be held as security until their release by VAP lenders. Section 1.2(e) governs the portion of the "Reserve Accounts" due to Warren Hill for 2016, 2017 and 2018. For purposes of this motion, SFR does not dispute Warren Hill's calculation of damages under Section 1.2(e).[3]

SFR further contracted to pay Warren Hill a portion of VAP's "Net Income" for 2016, 2017, and 2018. Section 1.2(d) governs "Net Income" payments due to Warren Hill in these years. SFR disputes Warren Hill's calculation of "Net Income" for 2017

---

3. Because VAP transferred the trust certificates to BCM, the trust certificate income was diverted from VAP to BCM. This resulted in a dispute as to whether the payments due to Warren Hill under Section 1.2(e) should include the trust certificate income paid to BCM. The parties filed cross motions for summary judgment on this issue. The court decided that the unambiguous language of Section 1.2(e) entitled Warren Hill to its portion of the trust certificate income.

and 2018.[4]  SFR disputes therefore Warren Hill's calculation of damages under Section 1.2(d).

"Net Income" payments due to Warren Hill are calculated as a percentage of "Net Income."  "Net Income" is the difference between "Revenue" and "Expenses," as calculated under Sections 1.2(d)(i) and 1.2(d)(ii) of the MIPA.  Under Section 1.2(d)(i), "Revenue" is:

> (i) the sum of <u>(A) any and all fees earned by VAP in its capacity as a manager or an administrator of (1) the Vendor Assistance Trust and/or (2) any other trust or account maintained in the course of VAP's business</u>, (B) any and all interest income, (C) any and all fees earned from providing services to affiliates or third parties, and (D) any and all other revenues received by VAP other than the Reserve Amounts (as defined below). . . . (emphasis added).

Under Section 1.2(d)(ii), "Expenses" are:

> (ii) the sum of (A) $50,000 per month for each month in which VAP's average outstanding receivables are greater than or equal to $50,000,000, (B) $25,000 per month for each month in which VAP's average outstanding receivables are less than $50,000,000, (C) interest paid by VAP on debt for which VAP is the debtor and any member of VAP is the lender solely to the extent that (1) such debt was outstanding as of the Closing Date, (2) the original principal of such debt, in the aggregate, does not exceed $4,000,000, and (3) the interest rate to which such debt is subject does not exceed 12% per annum, and <u>(D) any consulting fees paid to any member of VAP or any third party in exchange for introducing any new business opportunity to VAP, provided that such new business opportunities exclude any business involving any vendor, payee,</u>

---

4.  Warren Hill does not seek damages for 2016.

> program or party which VAP had previously investigated, transacted with or paid any consultant with respect to. (emphasis added).

SFR is obligated to pay Warren Hill half of the "Net Income" attributable to the VAP membership interest it purchased from Warren Hill, that is, 50% of 33.246%, or 16.623%, of VAP's "Net Income."

First, for each of 2017 and 2018, Warren Hill calculates a top-line amount for VAP's "Revenue" as defined by Sections 1.2(d)(i)(A)-(D). Second, Warren Hill deducts "Expenses" from this top-line amount, namely, the fixed monthly expense permitted under Sections 1.2(d)(ii)(A)-(B) and the interest expense permitted under Section 1.2(d)(ii)(C). Warren Hill does not deduct any expense for consulting fees described under Section 1.2(d)(ii)(D). Finally, Warren Hill multiplies the resulting "Net Income" by 16.623%. Warren Hill's calculations of damages are as follows:

|  | **2017** | **2018** |
|---|---:|---:|
| Revenue |  |  |
| § 1.2(d)(i) Revenue and § 1.2(e)(iii) trust certificate income | 14,280,000.00 | 31,384,295.00 |
| Expenses |  |  |
| § 1.2(d)(ii)(A) Expense deduction | (600,000.00) | (600,000.00) |
| § 1.2(d)(ii)(C) Interest deduction | (403,414.00) | (119,013.00) |
| Net Income | 13,276,586.00 | 30,665,282.00 |
| 16.623% of Net Income | 2,206,966.89 | 5,097,489.83 |
| Amount already paid under § 1.2(d) | (633,473.00) | (1,135,337.00) |
| Damages | $1,573,493.89 | $3,962,152.83 |

SFR disputes the amount Warren Hill uses for "Revenue" in 2018. SFR disputes also Warren Hill's calculation of "Expenses" for 2017 and 2018.

IV

We first address SFR's dispute over 2018 "Revenue." SFR asserts that "Revenue" for 2018 should be decreased by $2,950,147 in fees because the VAP Funding Master Trust paid the fees directly to BCM, not VAP.

Section 1.2(d) requires "any and all fees earned by VAP in its capacity as a manager" of any "trust or account maintained in the course of VAP's business" be included in the calculation of "Revenue." SFR moved for summary judgment to determine whether revenue VAP is entitled to, but has not yet been paid, is included in "Revenue." The court granted SFR's motion, holding that, in this context, the MIPA unambiguously provides that management fees are only "Revenue" if received by VAP. "Net Income" for purposes of determining what is due to Warren Hill under Section 1.2(d) does not include revenue accrued but not yet paid to VAP.

Misconstruing this holding, SFR argues that because the $2,950,147 in fees were never received by VAP, they were never earned by VAP and are excluded therefore from the calculation of "Revenue." This reasoning is incorrect. The key fact is that the money in question has been paid by the State of

-9-

Illinois to the VAP Funding Master Note Trust.  This court did not hold that fees are not "earned by VAP in its capacity as manager" of the trusts simply because they do not touch down in a VAP account.  To the contrary, regardless of whether VAP receives the fees or directs them to be paid elsewere, they are "earned by VAP in its capacity as manager" of the trusts when paid by the state.  Only VAP is a Qualified Purchaser under Illinois law, and, as a matter of law, only VAP may earn fees as manager of the trusts.

SFR appears to suggest that VAP may avoid its obligations to Warren Hill under the MIPA by diverting fees away from VAP to BCM.  This result is contrary to reasoning repeatedly articulated by this court.  We will therefore include the $2,950,147 in the top-line amount for "Revenue" in 2018.

V

We turn to SFR's dispute over "Expenses" in 2017 and 2018.  SFR asserts first that $48,000 and $4,000 in consulting fees VAP paid to BFH Investments, LLC ("BFH")[5] in 2017 and 2018 should be deducted as "Expenses."  SFR states VAP paid these fees to BFH for business development activities that resulted in VAP's purchase of receivables from Illinois vendor CVS/Caremark.

---

5. SFR asserts BFH is controlled by Brian Hynes.

Section 1.2(d) includes in "Expenses" any "consulting fees paid to any member of VAP or any third party in exchange for introducing any new business opportunity to VAP. . . ." However, consulting fees may not be included in "Expenses" where the "new business involve[es] any vendor, payee, program or party which VAP ha[s] previously <u>investigated, transacted with</u> or paid any consultant with respect to." (emphasis added).

The court addressed the issue of consulting fees on the motion for summary judgment of Warren Hill. <u>See</u> <u>Warren Hill, LLC v. SFR Equities, LLC</u>, Civil Action No. 18-1228, 2019 WL 3304693 (E.D. Pa. July 23, 2019). In 2017 and 2018, SFR included in "Expenses" nearly three million dollars paid to Brian Hynes for obtaining the accounts receivable of Illinois vender Blue Cross Blue Shield ("BCBS"). Warren Hill claimed the three million dollars should be excluded from the calculation of "Expenses" because VAP had investigated the transaction with BCBS before the effective date of the MIPA. SFR countered that the three million dollars related to Hynes's "investigation" and "transaction with" BCBS after the effective date of the MIPA. The court found, after reviewing the summary judgment record, that no reasonable juror could find that VAP had not "investigated" or "transacted with" BCBS prior to the effective date of the MIPA and granted judgment in favor of Warren Hill.

At oral argument on Warren Hill's motion, the court asked SFR whether the three million dollars it paid Hynes was only for business transacted with BCBS, or whether some portion of it was for business with other Illinois vendors. SFR stated that the entirety of the three million dollars related to business with BCBS. SFR appears now to reverse its course and argue that a portion of the consulting fees were for the purchase of receivables from CVS/Caremark.

SFR had ample opportunity to produce evidence on this issue in opposition to Warren Hill's motion for summary judgment. Discovery has been closed for some time. The court considered the summary judgment record, granted Warren Hill's motion, and issued a memorandum providing the reasoning for its decision. It will not now revisit this decision to consider new facts SFR failed to call to the court's attention at the appropriate stage of this litigation, especially after the court made a specific inquiry on this subject at oral argument. The $48,000 and $4,000 in consulting fees paid by VAP to BCM will be excluded in the calculation of "Expenses" for 2017 and 2018.

VI

SFR asserts also that $154,000 and $887,000 in consulting fees paid by BCM to BFH in 2017 and 2018 should be included in "Expenses" if the court determines the $2,950,147 from above is included in "Revenue." Specifically, SFR argues

-12-

that it "seems both apparent and fundamentally fair" that "BFH's bonus for [the] CVS/Caremark and United Health Group business []  be deducted as an expense" if the revenue generated from these activities is included in "Net Income."

By this statement, SFR appears to assert that the $2,950,147 in management fees paid directly to BCM and the $154,000 and $887,000 in consulting fees paid by BCM to BFH both relate to new business, not before investigated, with CVS/Caremark.  The court rejects this assertion for the same reasons articulated in Section V above.  Despite ample opportunity, SFR has failed to put into the record in a timely manner any such evidence.

Even accepting SFR's assertion as true, SFR's argument raises a new question of interpretation.  Namely, whether consulting fees paid by BCM, an entity that did not exist on the effective date of the MIPA, are "paid by VAP" as required for inclusion in "Expenses" under the MIPA.  As noted, we do not now revisit the meaning of the MIPA.  Our focus is on the calculation of damages in light of our previous decisions.  The time for this inquiry has passed.  Consequently, we will exclude the $154,000 and $887,000 in consulting fees paid by BCM to BFH in the calculation of "Expenses" for 2017 and 2018.

VII

For the reasons stated above, we adopt Warren Hill's calculation of damages. Under Section 1.2(d) of the MIPA, Warren Hill is entitled to $1,573,493.89 in damages for 2017, and $3,962,152.83 in damages for 2018. Under Section 1.2(e), it is undisputed that Warren Hill is entitled also to $363,580.42 in damages which represents 16.623% of all "Included Reserve Amounts,"[6] including trust certificate income, released from the "Reserve Accounts" in 2019. In addition, prejudgment interest in the amount of $327,461.05 is due.[7]

Finally, Warren Hill seeks, and SFR does not dispute, entry of a declaratory judgment that SFR pay to Warren Hill 16.623% of all "Included Reserve Amounts," including trust certificate income, not yet released by the trusts.

Judgment will be entered accordingly.

---

6. Amounts required to be held by VAP lenders under VAP's financing arrangements with those lenders are "Reserve Amounts." "Included Reserve Amounts" are all those "Reserve Amounts" which were either held as of closing or became "Reserve Amounts" in the three-year period following closing, as defined by Section 1.2(e) of the MIPA.

7. SFR does not dispute Warren Hill's calculation of prejudgment interest.